IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 3:10-CR-73 |
| | ) | VARLAN/GUYTON |
| DARREN WESLEY HUFF | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION TO DISMISS INDICTMENT
AND MEMORANDUM OF LAW IN SUPPORT**

**Oral Argument Requested**

The Defendant, Darren Wesley Huff, by and through counsel, moves this Honorable Court, pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, for the entry of an Order dismissing the indictment against him which charges him with a violation of transporting in commerce a firearm with the intent that such firearm would be used unlawfully in furtherance of a civil disorder in violation of 18 U.S.C. §231(a)(2), and possession of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c). For cause, Mr. Huff would show that there exist no disputed facts in this case and that, as a matter of law, the Government is incapable of proving Mr. Huff's violation of the statute under which he is charged. The Defendant submits the following memorandum of law in support of his motion to dismiss:

**Relevant Facts**

During a visit to the Chase Bank in Hiram, Georgia, on April 15, 2010, Mr. Huff

conversed with the bank branch manager, Robert Longmire, whom he had known for several years. (Longmire FBI Interview, Apr. 19, 2010, **Exhibit 1)**[1]. As a result of this conversation, Longmire had contact with the FBI on April 19th. During an interview with the FBI, Longmire related that Mr. Huff had discussed the arrest of Walter Fitzpatrick in Madisonville, Tennessee, with him, and had told Longmire of his intent to return to Madisonville on April 20th to attend a court hearing for Fitzpatrick. (Longmire FBI Interview, Apr. 19, 2010). Longmire stated that Huff had said that he and others would be traveling to Madisonville and that he would be armed. (Longmire FBI Interview, Apr. 19, 2010). While Longmire believed that Huff stated that he "intended to take over the city of Madisonville" he later clarified that Mr. Huff never indicated that violence would be used during his trip to Madisonville, nor had he ever suggested violence as a tool to Longmire at any other time. (Longmire FBI Interview, May 4, 2010, **Exhibit 2**).

The day before Mr. Huff was to travel to Madisonville he was interviewed at his home in Dallas, Georgia, by an FBI agent and two local officers. He informed the FBI at that time that "he did not anticipate any violence associated with [his] travels to Madisonville, Tennessee." (Huff FBI Interview, Apr. 19, 2010, at 1, **Exhibit 3**). He did not know how many people would be at the gathering in Madisonville and even stated that the group was not well organized. (Huff FBI Interview, Apr. 19, 2010, at 1). Mr. Huff further informed the FBI agent that visited his home that he would be carrying his

---

[1] The exhibits referenced in the Motion to Dismiss consist solely of documents, video tapes and audio tapes provided by the government as discovery in this case. Because the written documents, video and audio exhibits are lengthy, the relevant portions are being transferred to a single compact disc and will be submitted to the Court and the government under seal at the earliest possible time.

2

Colt .45 handgun, that he possessed a license to do so, and that he would have his AK-47 rifle in truck. (Huff FBI Interview, Apr. 19, 2010, at 2; BlogTalkRadio.com Audio Recording at 4:30-6:35). Mr. Huff provided the agent with his telephone number in case he needed to contact him with any additional questions. (Huff FBI Interview, Apr. 19, 2010, at 2).

On April 20, 2010, Mr. Huff drove from Georgia to Tennessee to support Fitzpatrick at the hearing scheduled in Monroe County. (Huff FBI Interview, Apr. 30, 2010, at 3-4, **Exhibit 4**). When Mr. Huff reached the exit off I-75 at Sweetwater, Tennessee, shortly before 8:00 a.m., he was stopped by officers on Highway 68 for an alleged failure to fully stop at the stop sign on the exit ramp and following too closely behind the vehicle in front of his on the ramp. (Williams FBI Interview, Apr. 21, 2010, at 1, **Exhibit 5**). As Mr. Huff pulled his vehicle to the side of the highway, he observed several more law enforcement vehicles already in place at that location. (Tennessee Highway Patrol video, April 20, 2010, **Exhibit 6**) (hereinafter referred to as "THP video"). He and his passenger put their hands out the windows on either side of the truck as the officer approached and before Mr. Huff was instructed to exit the vehicle. (THP video). When Mr. Huff stepped out as requested, Lieutenant Donald Williams ("Lt. Williams") of the Tennessee Tenth Judicial District Drug Task Force ("DTF") observed Mr. Huff wearing his Colt .45 pistol on his hip; at the officer's request, he removed the weapon and gave it to the officer for safety purposes. (Williams FBI Interview, Apr. 21, 2010, at 1; THP video). Despite Mr. Huff's statements from the

previous night, no one witnessed Mr. Huff in possession of an AK-47 at any point during the stop or at any other time on April 20, 2010. (THP video).

Mr. Huff engaged in conversation with the officers at the traffic stop for over an hour. (THP video). For the duration of the stop, Mr. Huff remained polite, calm and cooperative. (THP video; Tennessee Tenth Judicial District Drug Task Force Dash Cam video, April 20, 2010, **Exhibit 7**) (hereinafter referred to as "Dash Cam video"). One of the officers at the stop requested Mr. Huff's consent to search his vehicle; he denied that request, stating that he was in an "awkward position" because there was already an officer looking into his vehicle while its doors were open and "there's nothing in there." (THP video at 7:14-7:16). In the course of that discussion, Mr. Huff stated that since the officers were aware of the substance of the discussion which Mr. Huff had with the FBI on April 19, 2010, they were abreast of the motivations for his trip to Madisonville and that "we have no violent intentions of any sort…none whatsoever." (THP video at 7:15:28). When asked, Mr. Huff verified that there were no explosives in his vehicle, and he suggested that the officers bring a police dog to sniff for explosives to confirm his word. (THP video at 7:16-7:18). The video shows, in fact, that dogs were run around the vehicle by law enforcement officers. Mr. Huff produced his Georgia gun carry permit for the officer and stated that he had already checked to ensure that his Georgia permit would be recognized as valid by Tennessee law enforcement. (THP video at 7:16; 8:18:01-8:19). He additionally allowed an officer to search the inside of his cigarette container when he smoked a cigarette. (THP video at 7:57).

Mr. Huff informed the officers that very few members of the Oath Keepers

4

organization would be heading to Madisonville that day and that they would more or less be "a bunch of protestors." (Dash Cam video at Chapter 1, Title 7, 8:00-9:00). He further stated that he only knew of one man who was definitely meeting him there and that, while the man would be carrying a weapon, Mr. Huff would "let him know about the situation." (THP video at 7:56:47). The officers were aware that Mr. Huff was going to Madisonville in an effort "to support his friend at the courthouse." (THP video at 7:32:09).

 Mr. Huff stated repeatedly that he did not intend to invoke violence to accomplish the goals of the trip. (THP video at 7:15:28; 8:18:01; Dash Cam video at Chapter 1, Title 7, 8:00-9:00; Chapter 1, Title 8, 3:20). While confirming that they would "absolutely" affect their intended citizen's arrests "peaceably," Mr. Huff explained why he would go to such an event with his gun. (THP vide at 8:18-8:19). He compared the situation to the police "com[ing] in fully armed, prepared" for their job which they try to do "peaceably" and stated that even if they had "200 to 500 armed men, there's not going to be a shot fired." (THP vide at 8:18-8:19). When an officer asked Mr. Huff the question directly: "so, no violence today?" Mr. Huff responded with, "No." (Dash Cam video at Chapter 1, Title 7, 8:00-9:00). He further explained that everyone was peaceful when he went to observe and film Fitzpatrick's citizen's arrest of the grand jury foreman on April 1, 2010, stating that he "even had [his] .45 on [him] during that time" and "it never got pulled out." (Dash Cam video at Chapter 1, Title 7). An officer at the stop requested that Mr. Huff lock his gun up and the toolbox on the back of his truck for the duration of the day, and he agreed to do so. (THP video at 7:47-7:48; 7:56:47-

5

7:57).

Mr. Huff told the officers on the scene that he and the others supporting their cause hoped that police officers would cooperate with them and assist them in assuring that those arrested under Fitzpatrick's citizen's arrest warrant were given a fair trial. (THP video at 8:14-8:15; Dash Video at Chapter 1, Title 7, 8:00-10:00; Title 8, 2:00-3:00). Mr. Huff stated that he was only participating in the Oath Keepers' activities in Madisonville "to make sure these guys are properly placed in custody and hand them over to some people like" the officers at the stop. (THP video at 8:19-8:20).

As a further measure of his cooperation, Mr. Huff gave the officers his cell phone number in case they found a problem with his gun carry permit. (THP video at 8:14-8:15). He additionally told the officers that they could look him up on the Oath Keepers website, but that it was not his website and that he was not very active on it. (*Id.*) Yet again, when asked if there would be violence of any kind, he said that there would not be; he offered to talk further with the officers during the course of the day, noting that, "you have my information, so I'm going to leave it in your hands to call me. I'll keep you guys abreast one on one." (Dash Cam video at Chapter 1, Title 7, 8:00-9:00). As Mr. Huff left the location of the traffic stop and parted ways with the officers, he told them that his "hat is way off to [them]" and that he "appreciate[s] what [they] are doing." (Dash Cam video at Chapter 1, Title 9). He again tells them to call him "if anything comes up" and tells them that he will "absolutely" let the officers know if there will be a large number of men with guns coming to town. (Id.)

6

After leaving the scene of the traffic stop, Mr. Huff proceeded to Donna's Restaurant, located across the street from the Monroe County courthouse. Once in the restaurant, Mr. Huff gave a religious speech with Bible scripture quotations to those inside. (Donna's Restaurant Sound Recording, April 20, 2010, **Exhibit 8)**; (10th Judicial District Drug Task Force Supplemental Report, Mike Hall, April 20, 2010, **Exhibit 9**) (hereinafter referred to as "Supplemental Report"). In his speech, Mr. Huff emphasized that his and the others' fight is a spiritual one and "is not against flesh and blood." (Donna's Restaurant Sound Recording). While at Donna's, Mr. Huff also told the group there about his traffic stop earlier in the morning. (Huff Soundbyte #1, **Exhibit 10**). When discussing the officers' desire to search his truck for explosives and ensure that no violence ensued in Madisonville, he stated that he had told the officers that they were "talking to the wrong people, because we are intending on peaceful resolution of the issues at hand." (*Id.*) He likewise stated that "the bottom line" is that he and the other supporters of Fitzpatrick "are not the ones intending violence." (*Id.*). Mike Hall, Director of the 10th Judicial District Drug Task Force, worked undercover in the restaurant during throughout the day. (Supplemental Report). While Mr. Hall observed that others in the restaurant may have been armed, he did not observe any weapons on Mr. Huff. (*See* Supplemental Report at 2). At once point during the day, Huff took sausage biscuits and coffee to the officers near the courthouse "to ease the tension just a tad." (BlogTalkRadio.com Audio Recording at 25:20-25:25, **Exhibit 11**).

Later in the evening on April 20, Mr. Huff took part in a radio program to discuss the events of the day. (BlogTalkRadio.com Audio Recording). While on that radio

7

Case 3:10-cr-00073-TAV-HBG    Document 31    Filed 08/13/10    Page 7 of 17    PageID #: 107

broadcast, Mr. Huff explained the situation surrounding the traffic stop, including the fact that he had fully stopped at the stop sign and that he felt he was "profiled" by the officers. (BlogTalkRadio.com Audio Recording). He also related that he had told the officers that he respected what they were doing, but that "we're trying to maintain the peace" and "we mean nobody harm." (*Id.* at 10:40-10:50). Mr. Huff stated that, as he left the scene of the traffic stop, he felt like at least two of the officers were his friends. (*Id.* at 16:15-16:25). During the radio broadcast, Carl Swensson, another participant, referred to the time spent in Madisonville, stating that the officers "knew we were not there for anything other than peaceful means." (*Id.* at 25:25-26:00).

While Mr. Huff jokingly referred to an exchange with the officers about an AK-47 being located in his tool box, (Huff Soundbyte #1), this exchange does not appear on any video evidence of the traffic stop and he did not mention having had this gun during his radio appearance later that night. (*See* Dash Cam Video; THP video; BlogTalkRadio.com Audio Recording). Additionally, Mr. Huff informed FBI agents in a post-arrest interview on April 30th "that he didn't actually have the AK-47 with him, and that he told the officers that [at the traffic stop] out of, 'sheer stupidity.'" (Huff FBI Interview, Apr. 30, 2010, at 3).

The second FBI interview of Mr. Huff took place on April 30, 2010, following his arrest on the criminal complaint in this case. The FBI notes of this interview determined that Mr. Huff is forty years old and served in the United States Navy for several years. (Huff FBI Interview, Apr. 30, 2010, at 1). He is a Georgia resident and previously owned and operated an outdoor lighting business in that state. (Huff FBI Interview ,

8

Apr. 30, 2010, at 1). Mr. Huff is a religious man and hosts many Bible study classes. (Huff FBI Interview, Apr. 30, 2010, at 2). Mr. Huff became involved in both the Georgia Militia and the Oath Keepers organization around the later part of 2009, and he served as the chaplain of the former. (Huff FBI Interview, Apr. 30, 2010, at 2).

Mr. Huff first became acquainted with Walter Fitzpatrick on April 1, 2010 when, Tennessee Oath Keepers leader, Rand Cardwell, told him to travel to Madisonville, Tennessee to film the attempted citizen's arrest of the Monroe County Grand Jury Foreman, Gary Petway by Walter Fitzpatrick. (Huff FBI Interview, Apr. 30, 2010, at 3). Fitzpatrick was later arrested for his conduct on that date, and Mr. Huff conversed with him once or twice in the month of April to discuss how best to show his support for his cause of effecting citizen's arrests and helping with his legal troubles. (Huff FBI Interview, Apr. 30, 2010, at 3).

Mr. Huff was indicted by the federal grand jury on May 25, 2010, and charged in Count I with a violation of 18 U.S.C. § 231(a)(2), which in relevant part states:

> Whoever transports or manufactures for transportation in commerce any firearm, or explosive or incendiary device, knowing or having reason to know or intending that the same will be used unlawfully in furtherance of a civil disorder…[s]hall be fined under this title or imprisoned not more than five years, or both.

On July 9, 2010, the grand jury issues a superseding indictment, charging Mr. Huff with a violation of 18 U.S.C. § 924(c)(1)(A) as Count 2.

## II.  Authorities and Argument

The indictment against Mr. Huff should be dismissed because the facts in this case are virtually undisputed and, based on those undisputed facts, the Government

9

cannot as a matter of law prove that Mr. Huff violated 18 U.S.C. § 231(a)(2) on April 20, 2010, by driving from Georgia to Tennessee in legal possession of a firearm, with the intent to use that firearm in furtherance of a civil disorder. Rule 12 of the Federal Rules of Criminal Procedure was written to encourage district courts to "entertain and dispose of pretrial criminal motions before trial if they are capable of determination without trial of the general issues." *United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992) (holding that the district judge properly entertained and granted the defendants' 12(b)motion to dismiss the indictment after making preliminary findings of fact and considering undisputed evidence). Rule 12(b)(2) states that: "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. Rule 12 (2002). In deciding questions of law set forth in pretrial motions, district courts are permitted to make preliminary findings of fact as long as the province of the jury is not invaded. *Id.* "Generally, motions are capable of determination before trial is they raise questions of law rather than fact." *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976) (citing *United States v. Miller*, 491 F.2d 638, 647 (5th Cir. 1974)).

In *Jones*, the Sixth Circuit held that "a defense is '"capable of determination" if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.'" 542 F. 2d at 665 (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)). In that particular case, the court found that "the facts were virtually undisputed and trial of the substantive charges would not substantially assist the Court in deciding the legal issue" which was raised. *Id.* Since

10

Rule 12 gives courts the authority "to determine issues of fact in such manner as the court deems appropriate," the Sixth Circuit in *Jones* determined that "[t]he District Court was not limited to the face of the indictment in ruling on the motion to dismiss." *Id.*; *see also Levin*, 973 F.2d 467. Furthermore, the Sixth Circuit determined that it was proper for the district court to order "the Government to submit a bill of particulars to supplement the allegations in the indictment so that it could determine whether there was a factual basis for ruling on the motion to dismiss the indictment." *Id.* at 666. Here, as in *Jones*, the vast amount of undisputed facts which are before the Court show that a trial of the substantive charges would not substantially assist the Court in determining whether the indictment against Mr. Huff should be dismissed as a matter of law. *See Id.* at 665.

Mr. Huff is charged with a violation of 18 U.S.C. §231(a)(2), which requires that he knew or had reason to know or intended that the .45 caliber handgun with which he crossed state lines would be used in furtherance of a civil disorder. A "civil disorder" is statutorily defined in 18 U.S.C. § 232(1) as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." Mr. Huff's statements prior to, during, and after his trip to Madisonville show his lack of knowledge or intent to use his gun in furtherance of any violence which would constitute a civil disorder. (*See* Dash Cam Video; THP video; BlogTalkRadio.com Audio Recording). He repeatedly stated to officers and other individuals that he and the others headed to Madisonville wished to show support for their cause through peaceful

11

means. *Id.* Specifically, when interviewed at his residence on the evening prior to his April 20 trip to Madisonville, Mr. Huff informed the FBI agent that he did not anticipate violence of any kind on his trip. (Huff FBI Interview, Apr. 19, 2010, at 1). Further, his lack of knowledge of the number of people who would be present, combined with his general belief that the group going to support Fitzpatrick was disorganized, show the low level of planning involved and no intent to assemble a large group of people there. *See, Id.*

During the traffic stop in Sweetwater, Mr. Huff's comments and actions further exhibited his cooperation and peaceful intent. (*See* Dash Cam Video; THP video). Throughout the duration of the stop, Mr. Huff engaged in conversation with the officers and remained calm and collected; he specifically informed the officers that he had "no violent intentions of any sort…." (*See, Id.*; THP video at 7:15:28). When discussing the possibility that citizen's arrests might be attempted, Mr. Huff agreed with officers that they needed to be done so "peaceably." (THP video at 8:18-8:19). Mr. Huff's lack of violent intent was additionally exhibited by his agreement with the officers to keep his .45 in his toolbox throughout the day, an agreement which he upheld. (*See* THP video at 7:47-7:48; 7:56:47-7:57). The fact that no one observed Mr. Huff with a weapon in Donna's Restaurant in Madisonville goes to further prove that point. (*See* Supplemental Report at 2). Lastly, Mr. Huff's continued cooperation in providing officers at every stage of the process with his personal cell phone number and instructing them that he would be happy to discuss happenings with them if any violence erupted shows his lack of intent or knowledge that any violence or other

12

disturbance would occur.  (*See* Huff FBI Interview, Apr. 19, 2010, at 2; Dash Cam video at Chapter 1, Title 7, Title 9).

In *Levin*, the Sixth Circuit distinguished between motions challenging the sufficiency of an indictment for failing to state the elements of a criminal offense and challenges to the sufficiency of the evidence before the grand jury from the issues in that case.  973 F.2d at 469.  In *Levin*, as in this case, the issue was whether the government could "as a matter of law establish criminal intent beyond a reasonable doubt" and the district court determined that it could not.  *Id.*  In that case, the district court reviewed "undisputed extrinsic evidence including a series of official letters issued by the government," and the Sixth Circuit held that the motion to dismiss the indictment was proper, in that the government was incapable of proving beyond a reasonable doubt "the requisite intent required to convict" the defendants.  *Id.*  As intent was "an integral element" of the statutory violation charged, the government's inability to prove it allowed the court to dispose of a legal issue by granting the defendants' pretrial motion to dismiss.  *Id.* at 470.

*Levin* has been acknowledged and upheld most recently in *United States v. Ali*, 557 F.3d 715 (6th Cir. 2009), where the Court reiterated the applicability of Rule 12(b)(2) to dispose of an indictment "if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense."  The Sixth Circuit again cited the U.S. Supreme Court's holding in *Covington*, *supra,* ("where the defendant is arguing that as a matter of law the undisputed facts do

13

not constitute the offense charged in the indictment, the Court is reviewing a question of law, not fact.").

Additionally, in both *Levin* and *Kentucky v. Long*, 837 F.2d 727 (6th Cir. 1988), the trial courts held an evidentiary hearing on the defendants' 12(b) motions to dismiss their indictments in order to make preliminary findings of fact upon which to base their conclusions. *Id.*; 837 F.2d at 739-40. In *Long*, the defendant argued that his actions were within the necessary and proper scope of his employment as an FBI agent. 837 F.2d at 730. During the evidentiary hearing on the motion to dismiss, the prosecution produced a bill of particulars, the defense called several witness, and the prosecution called no witnesses. *Id.* at 731. The district court preliminarily determined that a Rule 12 pretrial motion was not the proper vehicle for deciding the issue presented if "the underlying facts are substantially in dispute." *Id.* at 739-40. But in granting the motion to dismiss the indictment, the court noted that an indictment itself is not evidence from which the court can infer a dispute and that while the prosecution alleged factual dispute in its brief in opposition of the motion, it presented no evidence at the hearing to dispute the defendant's statement and the defense witnesses' testimony at the hearing. *Id.* at 740. Despite minor contradictions in the proof before it, the district court concluded that no genuine issue of fact existed and dismissed the indictment. *Id.* at 740-41. The Sixth Circuit affirmed the dismissal and further found that the imposition of a burden on the prosecution to rebut the defendant's assertion in that case was consistent with the purpose of Rule 12(b). *Id.* at 750.

14

As in the above referenced cases, the material facts in Mr. Huff's case are not in dispute. As set forth above, the undisputed facts in this case show that the Government cannot as a matter of law prove beyond a reasonable doubt that Mr. Huff had the requisite intent for a violation of 18 U.S.C. § 231(a)(2). Conversely, Mr. Huff's words and actions prior to, during, and after his trip to Madisonville on April 20 show that he traveled there without the intent to cause a public disturbance and without the intent to use his firearm for any violent purposes. As in *Levin* and *Long*, an evidentiary hearing may be appropriate in this case to assist the Court in making the necessary preliminary factual determinations to make a proper ruling on this motion. *See, e.g.,* 973 F.2d at 469; 837 F.2d at 739-40.

Since the Government is incapable as a matter of law of proving beyond a reasonable doubt that Mr. Huff violated 18 U.S.C. § 231(a)(2) as charged in Count I, the Government also cannot as a matter of law prove beyond a reasonable doubt that Mr. Huff violated Count 2 of the superseding indictment.

### III.   Conclusion

For the foregoing reasons, the defendant moves this Honorable Court for the entry of an Order dismissing the superceding indictment returned against him. He requests the opportunity to reply to any response filed by the Government and requests oral argument or, in the alternative, an evidentiary hearing.

Respectfully submitted this 13th day of August, 2010.

                        FEDERAL DEFENDER SERVICES OF
                        EASTERN TENNESSEE, INC.

By:      s/ Jonathan A. Moffatt
        Jonathan A. Moffatt   BOPR No. 18137
        Paula R. Voss BOPR No. 7148
        Asst. Federal Community Defenders
        800 S. Gay Street, Suite 2400
        Knoxville, TN 37929
        (865) 637-7979


        s/ Anne E. Passino
        Anne E. Passino [BPR No. 027456]
        Ritchie, Dillard & Davies, P.C.
        606 W. Main St., Suite 300
        Knoxville, TN 37901-1126
        (865) 637-0661

        **COUNSEL FOR THE DEFENDANT**


## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2010, a copy of the foregoing Motion was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

                                      s/ Jonathan A. Moffatt
                                      Jonathan A. Moffatt

## List of Exhibits

Exhibit 1 - FBI Form 302 - interview of Robert Shane Longmire, April 19, 2010

Exhibit 2 - FBI Form 302 - interview of Robert Shane Longmire, May 4, 2010

Exhibit 3 - FBI Form 302 - interview of Darren Huff, April 19, 2010

Exhibit 4- FBI Form 302 - interview of Darren Huff, April 30, 2010

Exhibit 5 - FBI Form 302 - interview of Lt. Donald Williams, April 21 - 22, 2010

Exhibit 6 - Tennessee Highway Patrol video of vehicle stop, April 20, 2010

Exhibit 7 - Tennessee 10th Judicial District Drug Task Force Dash Cam video of vehicle stop, April 20, 2010

Exhibit 8 - Donna's Restaurant Sound Recording, April 20, 2010

Exhibit 9 - 10th Judicial District Drug Task Force Supplemental Report, Mike Hall, April 20, 2010

Exhibit 10 - Huff Sound Byte #1

Exhibit 11 - BlogTalkRadio.com Audio Recording, April 20, 2010