UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:10-CR-73 |
| ) | (VARLAN/GUYTON) |
| DARREN WESLEY HUFF, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is now before the Court on the Defendant's Motion to Suppress Evidence [Doc. 22], filed on July 26, 2010. The parties appeared before the undersigned for a hearing on the Defendant's Motion on September 22, 2010. Assistant United States Attorney William Mackie was present on behalf of the Government. Attorneys Jonathan Moffatt, Paula Voss, and Ann Passino were present on behalf of the Defendant, who was also present. Following the hearing, counsel requested and was granted, leave to file post-hearing briefs on or before October 20, 2010 [Doc. 47]. The Government filed its brief [Doc. 58] on October 20, 2010. The Defendant requested [Doc. 59] and was granted [Doc. 61] additional time in which to file his brief. The Defendant filed his post-hearing brief [Doc. 60] on October 26, 2010, and the Court took the matter under advisement at that time.

# I. FACTS

Based on the testimony and evidence presented at the suppression hearing on September 22, 2010, the Court makes the following findings of fact. On April 20, 2010, Trooper Michael Wilson ("Trooper Wilson") of the Tennessee Highway Patrol (THP) was on patrol in Monroe County, Tennessee. [Tr. 8]. Trooper Wilson has thirteen years of experience with the Tennessee Highway Patrol, and he had made thousands of traffic stops based on violations of traffic laws prior to the day in question. [Tr. 7-8]. On that day, Trooper Wilson was on "special assignment" from the Homeland Security Lieutenant for the THP to patrol and provide safety to the public relative to a potential for threats to public safety which might occur in connection with a court proceeding for Walter Fitzpatrick at the Monroe County Courthouse in Madisonville. [Tr. 9, 50]. Trooper Wilson was told at a briefing that morning that persons coming from surrounding counties and "from the state of Georgia" had threatened to make "citizens arrests" of Monroe County public officials. [Tr. 10]. Other than Fitzpatrick and a mention of "the militia," Trooper Wilson was not given the names of any person or specific group that was of interest on that day. [Tr. 53-54].

While on patrol on I-75 north between 6:50 a.m. and 7:00 a.m., Trooper Wilson spotted a black pickup truck with "suspicious indicators" on it: the words "OATH KEEPERS" in large writing on the back window, the words "Not on our watch!" on the bumper, and a pro-militia bumper sticker. [Tr. 14-16 & Exh. 2]. The truck also had a personalized Georgia license plate which read "IM LIT." [Tr. 16-17].

Trooper Wilson followed the truck as it took the exit 60 ramp toward Madisonville. He testified that he observed the truck commit two traffic violations, following too closely and running a stop sign, and he initiated a traffic stop. [Tr. 20]. Trooper Wilson testified that he saw the

Defendant's truck "traveling too close in an unsafe position behind a gray Honda passenger car." Trooper Wilson further testified that he then saw the Defendant's truck proceed past a stop line and make a "very brief rolling stop" at the intersection of the exit ramp and Highway 68. [Tr. 20]. Before initiating the traffic stop, Trooper Wilson did not know who was in the truck, nor could he discern the number of occupants in the truck, due to the tinted windows. [Tr. 60-61]. He also did not "run the tags" prior to the stop. [Tr. 21].

The in-cruiser video showing the events upon which Trooper Wilson based his decision to effect a traffic stop, and also showing the stop, was marked as Exhibit 3 and played in Court. The video begins at 7:08 a.m. [Tr. 28]. Trooper Wilson testified that at the 7:09 a.m. mark in the video, the Defendant's truck is following too closely, "within a car length." [Tr. 29]. Trooper Wilson described this as "unsafe." [Tr. 30]. Then, the video shows the Defendant's vehicle traveling through the intersection, where there is a stop line and a stop sign. [Tr. 30].

Trooper Wilson decided to stop the Defendant's truck based on these traffic violations. [Tr. 49]. After pulling over the Defendant's truck, Trooper Wilson attempted to radio dispatch but had trouble getting through. He then used his cellular telephone to call in the stop. [Tr. 32]. Meanwhile, the Defendant stuck his hands out the driver's window, and then the Defendant got out of the vehicle with his hands up. [Tr. 32].

When he exited the truck, the Defendant was wearing a pistol on a holster belt, so Trooper Wilson disarmed the Defendant. Trooper Wilson then brought the Defendant to the back of the patrol car. The Defendant produced a Georgia driver's license and a Georgia handgun carry permit ("HCP"), but he did not have any proof of registration for the vehicle. [Tr. 33-34; 37]. A photo of the HCP was marked as Exhibit 4. Trooper Wilson was suspicious of the authenticity of the HCP,

because it "looked unprofessional," having a different appearance than the carry permits of "most states." [Tr. 35]. Within minutes, three other law enforcement vehicles arrived to assist Trooper Wilson: A SUV that was stationed nearby on the side of the road, his partner Trooper Kelly Smith, and a lieutenant from the Tenth Judicial Task force. [Tr. 59] During the course of the stop, two trained police dogs[1]–a drug dog and a bomb-sniffing dog–were led around the Defendant's truck, but neither alerted.

Later, Trooper Wilson determined that the Defendant's driver's license was valid. However, despite trying for "about an hour" to call various authorities in Georgia, he was not able to verify the HCP. Trooper Wilson then returned the pistol to the Defendant, gave the Defendant three "warning citations" for following too closely, a stop sign violation, and a violation of the registration law [Exhibit 5], and released him. When Trooper Wilson gave the warning citations, he told the Defendant that they would not "cost" him or go on his record. Trooper Wilson and the Defendant then shook hands, and Trooper Wilson said, "I appreciate you" and "be careful." [Tr. 41]. The Defendant, despite having been released to leave, stayed at the scene and engaged Trooper Wilson in more conversation. [Tr. 41].

On cross-examination, Trooper Wilson testified that he had never heard of the Oath Keepers prior to stopping the Defendant on April 20, 2010. [Tr. 55]. He stated that the video shows that a tractor trailer truck was on the exit ramp in front of the Honda, which was in front of the Defendant's truck. [Tr. 69]. He stated that he was directly behind the Defendant and that the Defendant slowed down as he approached the end of the exit ramp. [Tr. 69-70]. Trooper Wilson testified that at 7:09:04 on the video, the tractor trailer was stopped at the intersection at the end of

---

[1]Trooper Wilson is a K-9 officer and had his narcotics detection dog with him on that day, but it was not one of the two dogs that sniffed the Defendant's truck. [Tr. 66-67, 92, 97].

the exit ramp. [Tr. 72-73]. Trooper Wilson stated that at this point, the Defendant applied his brakes and nearly hit the Honda in front of him. [Tr. 72-73]. Trooper Wilson did not believe there was a car-length of space between the Honda and the Defendant. [Tr.73-74]. Trooper Wilson stated that following too closely involved following at an unsafe distance that could result in a crash. [Tr. 74]. He said that the Tennessee statute does not speak in terms of the number of seconds or feet that must be between vehicles. [Tr. 74-75]. Trooper Wilson testified that generally, he looks at whether a third vehicle would be able to get between the two vehicles that are following each other. [Tr. 74]. He denied that he used his own "personal safety standards" when enforcing the traffic laws. [Tr. 75].

With regard to the Tennessee law on stop signs, Trooper Wilson said that the vehicle had to come to a "true stop" behind the "reference line" before turning once it is safe to do so. [Tr. 75-76]. He stated that the "stop line" is a line painted on the pavement perpendicular to the intersecting roadway and that the stop line does not go all the way across the intersection. [Tr. 98]. He identified a photograph [Exh. 7] of the stop line at issue in this case, agreeing that in the photograph, taken five months after the stop, the line was covered with debris or a shadow. [Tr. 100-01].

Trooper Wilson testified that at 7:09:09 on the video, the tractor trailer was turning right at the intersection. [Tr. 76]. He stated that the Honda stopped behind the tractor trailer, and that the Defendant stopped abruptly behind the Honda, nearly hitting it. [Tr. 76-78]. He agreed that the Honda did not stop at 7:09:07 on the video. Trooper Wilson stated that once the Honda was through the intersection, the Defendant approached the intersection and made a rolling stop, lasting "less than one second." [Tr.78-79]. Although he acknowledged that the Defendant's brake lights were on at 7:09:16, he opined that this maneuver was not a "controlled stop" or a "legal stop." Trooper Wilson stated that the person must come to a "safe stop" that allows full control of the vehicle and

-5-

the opportunity to view the traffic in front of him or her, in order to comply with the law. [Tr. 80].

Trooper Wilson further testified on cross-examination that when he turned on his emergency lights at 7:09:24, the Defendant immediately pulled over and stopped. [Tr. 81]. He agreed that an SUV, containing law enforcement officers armed with rifles, backed him up within two seconds of his stopping the Defendant. [Tr. 81]. Although those officers got out of their SUV, they waited beside Trooper Wilson's patrol car and did not approach the Defendant's truck until much later in the stop. [Tr. 81-82]. Trooper Wilson testified that at 7:09:26 on the video, the driver of the pickup truck, whom he later learned was the Defendant, stuck both hands out of his window. [Tr. 82]. The Defendant got out of his truck, and at that point, Trooper Wilson learned that he was armed. [Tr. 83]. At 7:12:33, the passenger, Mr. Desilva, got out of the truck and was directed to walk backward toward Trooper Wilson's police car. [Tr. 84].

Trooper Wilson testified that once the Defendant got out of his truck, following the traffic stop, the Defendant approached him and gave Trooper Wilson his driver's license. [Tr. 83]. The Defendant told Trooper Wilson that he had a HCP. [Tr. 85]. At 7:14:39, Trooper Wilson asked the Defendant if there were more guns in his truck. [Tr. 85]. Around 7:15:07, Trooper Wilson asked the Defendant if he could search the truck. Then, the Defendant stated that he did not have any violent intentions. [Tr. 86]. Trooper Wilson stated that the Defendant gave him his Georgia HCP. [Tr. 87]. Although he had never seen a Geogia HCP before, Trooper Wilson believed this one was suspicious because it looked "unprofessional." [Tr. 87-89]. Trooper Wilson agreed that the HCP had a raised circular imprint and an expiration date of January 15, 2015. [Tr. 89]. He attempted to verify the HCP through law enforcement but was told that the Georgia HCP's were issued by the

-6-

local probate judge in each county. [Tr. 89-90]. Despite the early hour, Trooper Wilson attempted to contact the clerk's office in Paulding County, Georgia, without success. He agreed that the traffic stop lasted over one hour due to his attempt to verify the HCP and that most courthouses would not be open between 7:08 and 8:10 a.m. [Tr. 90]. He said that because the Defendant stated that the FBI had been to his house, his suspicions were heightened, and he felt that he had to verify the HCP before allowing the Defendant to proceed with the gun. [Tr. 91].

Around 7:18 a.m., Trooper Wilson asked the Defendant for his vehicle registration, but the Defendant did not have it. [TR. 92]. Beginning at 7:19:35, a THP bomb detection dog was led around the Defendant's truck. [Tr. 96]. Three minutes later, the Tenth Judicial Task Force's drug dog[2] was also led around the truck. [Tr. 96]. Neither dog alerted. [Tr. 97]. At 7:30:29 on the video, Trooper Wilson told a Task Force officer that his probable cause for stopping the Defendant was "a traffic control device" [Tr. 97] and that the Defendant had rolled through a stop sign.

Trooper Wilson stated that around 8:14 a.m., he gave the Defendant's gun back to him and explained that the Defendant would not be permitted to take it into a courthouse. [Tr. 92]. He then handed the Defendant his warning citations, shook the Defendant's hand, and told him to be careful. [Tr. 103, 106]. At this time, the Defendant was free to leave. [Tr. 103]. He agreed that he had the discretion to decide whether to write a citation or a warning citation for the Defendant. [Tr. 67]. Trooper Wilson turned and took a couple of steps toward his patrol car, when the Defendant made a strong statement in a raised voice that caught Wilson's attention. [Tr. 104-06]. Trooper Wilson listened to what the Defendant had to say and also eventually talked to the Defendant and requested

---

[2]Trooper Wilson stated that he did not have time to deploy his own drug detection dog because he was busy with the investigation. [Tr. 97].

some of his brochures. [Tr. 105-06]. The Defendant left about thirty minutes after being released. [Tr. 107].

On redirect examination, Trooper Wilson read Tennessee Code Annotated 55-8-124(a) [Exh. 8] and opined that on the morning of April 20, 2010, the Defendant followed another vehicle too closely. [Tr. 108-09]. He also read Tennessee Code Annotated section 55-8-149(c) [Exh. 8], relating to stop signs, and stated that the Defendant did not comply with this statute during the short time that he observed the Defendant on April 20, 2010. [Tr. 109]. He agreed that at the time he stopped the Defendant, he was thinking about the "safety standards" to which he had testified earlier. [Tr. 110].

William Michael Norris Desilva testified after Trooper Wilson. Mr. Desilva lives in Dallas, Georgia, attends church with the Defendant, and accompanied the Defendant to Monroe County on April 20, 2010, due to his interest in citizen's arrests and criminal justice. [Tr. 111-12]. Mr. Desilva, who had not slept that night, met the Defendant at 5:00 a.m. and rode as a passenger in the Defendant's truck. [Tr. 113]. When the Defendant exited Interstate 75 toward Monroe County, Mr. Desilva looked in the side mirror of the truck and saw a state trooper behind them. [Tr. 114]. Mr. Desilva pointed out the trooper to the Defendant. [Tr. 114-15].

Mr. Desilva stated that the Defendant's speed decreased as they traveled the uphill slope of the exit ramp. [Tr. 115]. He said that the Defendant came "to a complete stop before he took off into traffic." [Tr. 116]. He remembered the Defendant stopping because Desilva does not like traveling on the interstate and his senses were heightened after noticing the trooper behind them. [Tr. 116]. Mr. Desilva testified that he recalled "staring at the dash and as the vehicle was coming to a stop my body's inertia pressing against the seat belt and being thankful for . . . the fact we stopped." [Tr. 116]. Although Mr. Desilva recalled that there was another vehicle in front of them, he testified that

the Defendant did not slam on his brakes or almost collide with it at any point on the exit ramp. [Tr. 115, 117]. Mr. Desilva explained that the Defendant's license plate "IM LIT" referred to the Defendant's former outdoor lighting business. [Tr. 118].

On cross-examination, Mr. Desilva said he saw the Defendant carrying a Colt .45 on April 20, 2010, and that it is not unusual for the Defendant to carry his firearm. [Tr. 121, 124]. He stated that although the Defendant did not stop "suddenly" and the stop was not "violent" or "aggressive," he remembered "pressing into the seatbelt," a sensation he "pretty much feel[s] . . . every time" he stops. [Tr. 122-23]. Although he saw the vehicle traveling in front of them and he saw the stop sign out of "the corner of his eye," he did not remember where the Defendant stopped in relation to these. [Tr. 122]. He also was not looking at the stop line at the time the Defendant stopped. [Tr. 123]. On redirect examination, Mr. Desilva testified that the Defendant stopped before "he was in traffic." [Tr. 123].

## II. POSITIONS OF THE PARTIES

In his Motion [Docs. 22 and 60], the Defendant contends that Trooper Wilson violated the Fourth Amendment by making a traffic stop without probable cause to believe that a traffic offense had occurred. As a result, the Defendant asserts that all evidence obtained after the stop, including evidence that the Defendant possessed a gun, his statements made to officers at the scene, and any statements made by his passenger who would not have been identified absent the stop, must be suppressed.

In response, the Government contends that the traffic stop was lawful because it was supported by probable cause. [Doc. 38.]. The Government argues that Trooper Wilson had probable

cause to believe that a traffic violation had occurred, because he saw the Defendant's vehicle following too closely and failing to stop for a stop sign, both violations of Tennessee law.[3]

### III. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. The Defendant argues that his rights under the Fourth Amendment were violated because the officer lacked probable cause to stop his truck on April 20, 2010. He contends that any evidence, including his statements to the officers, gained as a result of the illegal stop must be suppressed as the ill-gotten "fruit of the poisonous tree." The Government maintains that the stop was proper because the officer had probable cause to believe the Defendant had committed two traffic violations.

#### A. Traffic Stop

If an "officer has probable cause to believe that a traffic violation has occurred or was

---

[3]In its initial response [Doc. 38], the Government also contends that all statements made by the Defendant after he was told that he was free to leave the scene were volunteered by the Defendant and were not taken in violation of the Defendant's Fifth Amendment rights. This appears to be in the nature of an alternative argument, made to preserve the statements made at the conclusion of the stop in the event that the Court finds that the officer lacked probable cause to stop the Defendant. During the suppression hearing, AUSA Mackie objected to the relevance of Mr. Moffatt questioning Trooper Wilson at length about the events that occurred after the Defendant was stopped. [Tr. 93]. Mr. Moffatt responded that the events of the stop were relevant to the Government's response that the Defendant was not detained beyond the scope of the traffic stop and that his statements following the completion of the stop were volunteered. [Tr. 93, 95]. AUSA Mackie responded that the issue before the Court is "was there probable cause to stop, plain and simple[,]" and that anything more in the Government's filing was "surplusage" and "not relevant" to the issue before the Court. Accordingly, the Court finds that the only issue before it is the propriety of the stop.

occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 513 U.S. 828 (1994). Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. Id. at 388; see Whren v. United States, 517 U.S. 806, 810 (1996) (holding that "[a]s a general matter, the decision to stop an automobile is reasonable [within the meaning of the Fourth Amendment] where the police have probable cause to believe that a traffic violation has occurred"); United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2002) (holding that "[a] police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct"). Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion," United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. Ferguson, 8 F.3d at 392 (citing Illinois v. Gates, 462 U.S. 213, 244 n.13 (1983)).

The Court finds that Trooper Wilson lawfully stopped the truck driven by the Defendant. Based upon his personal observations, Trooper Wilson had probable cause to believe that the driver of the pickup truck had committed two traffic violations: (1) following too closely, see Tenn. Code Ann. § 55-8-124, and (2) the failure to stop at a stop sign, see Tenn. Code Ann. § 55-8-149(c). With regard to the traffic offense of following too closely, Tennessee law provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." Tenn. Code Ann. § 55-8-124(a). The statute offers the following guidance as to what constitutes

following too closely, at least with regard to vehicles traveling in a caravan:

> Motor vehicles being driven upon any roadway outside of a business or residence district in a caravan or motorcade, whether or not towing other vehicles, shall be so operated as to allow sufficient space between each vehicle or combination of vehicles so as to enable any other vehicle to enter and occupy the space without danger. This subsection (c) does not apply to funeral possessions.

Tenn. Code Ann. § 55-8-124(c).

In the present case, Trooper Wilson testified that he observed the Defendant's truck traveling on the exit ramp so closely behind a gray Honda that he deemed the distance to be unsafe. He stated that as the Defendant followed the Honda on the exit ramp, there was not a car-length of space between the Honda and the Defendant's truck. He stated that as the Honda was slowing down as it approached the tractor trailer stopped at the end of the exit ramp, Trooper Wilson saw the Defendant apply his brakes and nearly hit the Honda. This testimony reveals that Trooper Wilson had probable cause to believe that the Defendant was following the Honda too closely in violation of section 55-8-124(a).

Trooper Wilson also had probable cause to believe that the Defendant violated the law regarding observation of traffic control devices, i.e.,

the stop sign at the intersection of the exit ramp and Highway 68. Tennessee law provides that

> [e]very driver of a vehicle and every operator of a streetcar approaching a stop sign shall stop before entering the crosswalk on the near side of the intersection, or in the event there is no crosswalk, shall stop at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver or operator has a view of approaching traffic on the intersecting roadway before entering the intersection, except when directed to proceed by a police officer or traffic control signal.

Tenn. Code Ann. § 55-8-149(c). The definition of "stop" in this context is provided by Tennessee

Code Annotated section 55-8-101(61): "'Stop,' when required, means complete cessation from movement."

In the present case, Trooper Wilson testified that the Defendant's truck made "a very brief rolling stop" after it was beyond the stop line at the intersection of the exit ramp and Highway 68, where there is a stop sign. Although Trooper Wilson acknowledged that the Defendant did apply his brake lights and may have paused for "less than one second" before proceeding into the intersection, he said that the Defendant did not make a "true," "controlled," "legal," or "safe" stop, that is a stop that would have allowed him to be in full control of his vehicle and the opportunity to view the traffic in the intersection. Based upon this testimony, the Court finds that Trooper Wilson had probable cause to believe that the Defendant had violated section 55-8-149(c), which required the Defendant to come to a complete cessation of movement before crossing the stop line and/or entering the intersection.

The Defendant contends that the video of the events in question, buttressed by the testimony of his passenger Michael Desilva, establishes that he was not following too closely and that he did come to a brief stop at the stop sign. The Court disagrees. The Court has viewed the video recording of the Defendant's driving immediately before he was stopped by Trooper Wilson and finds that it fully corroborates Trooper Wilson's testimony with regard to the Defendant following the Honda too closely. At the start of the video recording (7:08:53), the Honda and the Defendant's truck appear to be at approximately the midway point on the exit ramp. At this point, the Defendant appears to be less than a car length from the Honda. Moreover, as the Honda and the Defendant's truck enter the last quarter of the exit ramp and the tractor trailer comes to the top of the ramp, the Defendant's truck already appears to be within a few feet of the Honda. Given the road conditions

at the time, which the video reveals were the low visibility of dawn and a light rain, the Court finds that Trooper Wilson had probable cause to believe that the Defendant's truck was following the Honda "more closely than [was] reasonable and prudent[.]" Tenn. Code Ann. § 55-8-124(a).

With regard to the video's depiction of whether the Defendant stopped completely and before the stop line, the Defendant contends that the stop line was not clearly marked and that, in any event, he stopped before reaching it. The Defendant contends that his truck did stop at the 7:09:19 mark on the video. He asserts that the statute does not require that the stop be for any certain length of time, only that he come to a complete cessation of movement. The Court finds that the video shows that the Defendant applied his brakes and paused briefly at 7:09:17 but was moving into the intersection by 7:09:18. The Court is not able to discern the stop line on the video or on the Defendant's pictures [Exh. 7] of the intersection, which were taken on a sunny day some five months after the stop on April 20, 2010, and which depict a dry roadway, dappled with shadows cast by the signs at the intersection. Nevertheless, the Court observes that the statute states that if there is no stop line, a vehicle must stop before entering the intersection. Tenn.Code Ann. § 55-8-149(c). In the Defendant's pictures of the exit ramp and intersection, the Court sees what appears to be a large white spot (perhaps from a paint spill) at the top of the exit ramp just before it intersects with the traffic lane of Highway 68. The Court has viewed the video, watching for whether the Defendant's front wheels were past this white spot and, thus, actually in the intersection at the time the Defendant paused for less than one second at the 7:09:17 mark on the video. Based upon the vantage point and angle of the camera, it is impossible for the Court to tell from the video whether the Defendant's truck was in the intersection at 7:09:17, although it appears that it could have been. In any event, the video does not clearly contradict Trooper Wilson's testimony.

Moreover, Trooper Wilson was in a much better position to determine where the Defendant was in relation to the intersection and the stop sign when he made the "rolling stop." Accordingly, the Court credits Trooper Wilson's testimony in this regard. See United States v. Fisher, 27 F. App'x 558, 560 (6th Cir. 2001) (holding that where there are two permissible views of the testimony at issue, the court is entitled to choose between them, so long as the choice is not "clearly erroneous"). In so finding, the Court notes that the probable cause standard does not require that Trooper Wilson witnessed the traffic violation beyond a reasonable doubt, or even by clear and convincing evidence. Instead, an officer has probable cause to believe that a traffic violation has occurred when he has "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion[.]" Bennett, 905 F.2d at 934. Given the road conditions, Trooper Wilson's clear view of the Defendant's driving as he traveled behind him, and the fact that the Defendant paused for less than one second before traveling further into the intersection, the Court finds that Trooper Wilson had more than a mere suspicion that the Defendant had violated the traffic laws regarding stop signs and, indeed, had reasonable grounds to believe there was a substantial chance that the Defendant had failed to make a proper stop.

Moreover, the testimony of Mr. Desilva, even if fully credited, does not foreclose Trooper Wilson's determination that the Defendant was following the Honda too closely and failed to come to a complete stop before entering the intersection. Mr. Desilva testified that the Defendant never slammed on his brakes or nearly collided with the car in front of him while on the exit ramp, but he did not testify with regard to how closely the Defendant was following the Honda as they proceeded on the exit ramp before the Defendant stopped behind it. Moreover, while Mr. Desilva testified that the Defendant came to a complete stop, he did not recall where the Defendant stopped in relation

to the car in front of him, the stop sign, or the stop line. In fact, he testified that he was looking at the dash when he felt the truck stop and that he only knew that the Defendant stopped before "he was in traffic." The Court finds that this testimony by Mr. Desilva does not diminish the credibility of Trooper Wilson's conclusions that the Defendant had committed two traffic violations, following too closely and the failure to stop at the stop sign as required by law.

In his supplemental brief, the Defendant asks the Court to scrutinize Trooper Wilson's true reasons for stopping him, which he claims are revealed by Trooper Wilson's finding the lettering and bumper stickers on his truck to be "suspicious indicators." The Defendant acknowledges that an officer's subjective reasons for making a traffic stop do not matter as long as he witnesses an actual traffic violation. See Whren, 517 U.S. at 813; Ferguson, 8 F.3d at 391. Arguing that no actual traffic infractions occurred, the Defendant maintains that Trooper Wilson applied his own interpretation of safety standards to make a pretextual stop, thereby holding the Defendant to a driving standard not required under Tennessee law.

Based on the analysis above, the Court disagrees with the Defendant's assertion that Trooper Wilson stopped him to engage in a "fishing expedition" when no traffic infraction had actually occurred. As discussed above, the Court has found that Trooper Wilson's probable cause for stopping the Defendant for traffic offenses was objectively grounded in both fact and law. Thus, Trooper Wilson's decision to stop the Defendant was not an abuse of his authority. See United States v. Freeman, 209 F.3d 464, 470-71 (6th Cir. 2000) (Clay, J., concurring) (observing that the courts, in permitting officers broad latitude to stop for any infraction even though the officer's real purpose is to find evidence of another crime, have a duty to insure that an officer is not abusing his or her authority). Unlike the officer in Freeman, who erroneously stopped the defendant for failing

to keep his motor home within a single lane "as nearly as practicable" based upon the motor home crossing into the emergency lane for a few feet on a single occasion, id. at 466, the Court finds that Trooper Wilson observed actual traffic violations.

Accordingly, because Trooper Wilson had probable cause to stop the Defendant for the traffic violations that he observed occur, the Court finds that the Defendant was properly seized under the Fourth Amendment. The stop itself provides no basis for the suppression of evidence.[4]

---

[4]In his summary of the facts in both his initial motion [Doc. 22] and his supplemental brief [Doc. 60], the Defendant implies that Trooper Wilson detained him for an unreasonable length of time and beyond the purpose of the traffic stop, while allegedly attempting to verify his Georgia handgun carry permit. Despite alluding to this issue, he does not raise it in his argument in either brief. In response to the Government's objection at the suppression hearing to the relevance of questions relating to events occurring after the Defendant was stopped, Mr. Moffatt informed the Court that "the length of time for the detention of Mr. Huff is certainly an issue." [Tr. 94]. The Court asked defense counsel to point out where the Defendant had raised that issue in his brief. [Tr. 94]. Mr. Moffatt responded that the Government had raised the issue by responding that the Defendant was not detained beyond the scope of the detention. [Tr. 94]. As noted above, AUSA Mackie essentially withdrew this issue, if the Government had in fact ever advanced it, by stating that the only issue before the Court was the propriety of the stop itself. [Tr. 95]. Importantly, despite this conversation at the hearing, the Defendant did not make any argument regarding the length of the stop in his post-hearing brief. Thus, the Court has likewise not analyzed it. In any event, the Court notes that Trooper Wilson learned that the Defendant had a handgun as soon as the Defendant got out of his vehicle. Thus, the fact that the Defendant was carrying a handgun would not be subject to suppression based upon an argument that the detention exceeded the scope of the traffic stop.

## IV. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Defendant's Motion to Suppress Evidence **[Doc. 22]** be **DENIED**.[5]

Respectfully submitted,

s/ H. Bruce Guyton
United States Magistrate Judge

---

[5] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (affirming the Court of Appeals for the Sixth Circuit rule "conditioning appeal, when taken from a district court judgment that adopts a magistrate's recommendation, upon the filing of objections"). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Fed'n of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).