IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:10-CR-73 |
| Plaintiff, | ) | JUDGE VARLAN |
| v. | ) | |
| | ) | |
| DARREN WESLEY HUFF, | ) | |
| Defendant. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## SECOND MOTION TO DISMISS
## FOR INEFFECTIVE ASSISTANCE OF COUNSEL

COMES the Defendant in the above-entitled action, Darren Wesley Huff, and would show this Court the following.

1. Defendant Darren Wesley Huff ("Huff") has repeatedly requested his assigned counsel to file his pretrial motions. Those motions are on file with this Court.

2. The history of those refusals is as follows:

a. Upon the termination of the relationship between Federal Defender Services of Knoxville ("FDS") and Huff, Huff was introduced to attorney Scott Green ("Green"). The court took a brief recess to allow Huff the opportunity to meet with Green to determine if he would be suitable replacement counsel.

b. During the brief meeting, Huff explained to Green the reasons he terminated FDS, including their refusal to file two specific motions for dismissal: namely, the illegal actions by the federal prosecutor who violated the Fifth Amendment in regards to an illegally obtained indictment, and the fact that

1

Congress was never granted the authority to infringe on the Second Amendment by enacting unconstitutional statutes through the commerce clause.

c. During the same meeting, Huff expressed to Green his utmost willingness to resolve these issues and that he had exercised extreme patience with previous counsel and had tried desperately to work with them for an entire 15 months. Huff told Green that his patience was running low and that he had no intentions of waiting for another 15 months to fire an attorney who would fail to properly represent him.

d. From the outset of the case, Huff has repeatedly asked the question, "How does this Court have jurisdiction in this matter?" No one from FDS was willing to address that issue.

e. Huff felt that Green would be able to assist him in understanding the charges because of his extensive experience. At the hearing Huff stated that he was more confused at that time than he was at the beginning.

f. Around mid-August, 2011, Huff met Green and his investigator, Mr. Cohan, at an eatery in Tennessee to discuss the specifics surrounding the case and to give Green a file that contained purported criminal activity within the Monroe County government that Huff wished to be filed with the court for his defense.

g. After pleasantries were exchanged, Huff began to inquire about the previously stated concern, as well as other topics. Huff asked Green a series of questions to allow Huff to better understand Green's qualifications. Huff asked Green how long he had been an attorney. Green responded that he had been an

attorney for approximately 25 years. Huff then asked Green how long he had been a defense attorney. Green replied that it had been around eight and a half years. Huff asked how many times Green had been to trial in those eight and a half years. Green said about ten times. Huff asked Green how many of those ten times he had won. Green seemed to stumble for an answer and Mr. Cohan interjected and stated that it depended on Huff's definition of "win."

      h.     Huff is not an attorney and is not familiar with legal terms and jargon, so he responded that his definition of "win" was "not guilty." Green and Mr. Cohan then seemed defensive and stated that "not guilty" was not the only way to win a case. They simultaneously began to tell Huff about a case in which a gentleman was up for the death penalty, but they were able to reduce it to 20 years, and that would be considered a win.

      i.     At that moment, Huff's heart sank due to what he perceived was a worthless attorney. Huff assumed that in eight and a half years Green had represented thousands of defendants, had only been to trial approximately ten times, and out of those ten times the best "win" that he could muster was that someone was sentenced to 20 years. Huff is not sure that the particular defendant in that case would consider 20 years of imprisonment as a win but Huff would not. As the meeting wrapped up, Green informed Huff that he was still reviewing the two previously mentioned motions.

      j.     On, or about Thursday, August 25, 2011, Huff discovered through an online resource that a motion for an extension had been filed, without his knowledge or consent. The following email was sent immediately to Green.

3

-----Original Message-----
From: nightceo <nightceo@aol.com>
To: gsglaw <gsglaw@bellsouth.net>
Sent: Thu, Aug 25, 2011 12:51 pm
Subject: Darren Huff

Good afternoon, Scott. I'm not sure where to begin, other than to say that I apologize for not being clearer in our previous meeting regarding being kept in the loop on my own case. I remember saying that I do not want to get the latest details from a website, and would rather hear them from you; but your motion to extend fell through the cracks, and to say that I am disappointed would be an understatement, as I read about your motion from a website who follows this case, and not directly from you. I have even called and left a voice mail with no response as of yet. My concern is two-fold: first, I want to hear from you prior to any action taken on my behalf, so that I may be included in any decision regarding my case. Secondly, this extension will likely lead to another postponement, and another, and another, which will obviously have an impact on my trial date, which I am not willing to blindly postpone any further. I understand that you, as all attorneys, are inundated with case files. You, I, the court, and the world knows full well that this is a sensitive and important case; and I refuse to be treated without due respect as it pertains to the goings on of this case. I am not a statistic, and refuse to be treated like one. If we cannot properly communicate, then you cannot properly represent me. If you cannot properly represent me, then we will end this relationship immediately.

Sincerely,
Darren W. Huff

k. No response was given.

l. On, or about, Wednesday, August 31, 2011, Green, Cohan, and Huff met again at an eatery to discuss the progress of the case. The meeting was recorded via a hand held device. During the meeting Huff asked again for Green to identify and outline how a federal court has jurisdiction over him or this case. To Huff's surprise Green stated that he himself did not fully understand jurisdiction and how it is obtained. Huff told Green that jurisdiction should be

4

Case 3:10-cr-00073 Document 127 Filed 10/03/11 Page 4 of 15 PageID #: 907

one of the first things established before the government could take action and informed him that Huff had accepted the jurisdiction of the court by fraud, deceit, and coercion from his previous counsel. At Huff's initial appearance when Huff stated before the court that he, in fact, did not understand the charges, his previous counsel simply took Huff to a corner and repeatedly told him that he was about to "piss off the judge" and that, if he wanted to be released, he better just say yes, and that they would "figure it out later."

    m.    Green and Cohan then proceeded to ask Huff what they "were supposed to do." Huff told them that the two motions that he had given them at the beginning would be a good start. Green stated that he would not file the motion due to his disagreement with its contents. Huff asked which motion he disagreed with. Green stated that he only the motion regarding the Fifth Amendment motion to dismiss. Huff told Green that there were two motions "on the table." Green stated that he did not have the other motion.

    n.    Huff told Green that he would expedite a copy to him and then asked about the motion regarding the Fifth Amendment. Green stated that there was "no basis in law" for it, that he disagreed with its position and would not file it. Huff asked Green how he could state such things since he has never won a case. Green then said that he had won several, contradicting his former statement about his record.

    o.    Huff told Green that he was certain that there was a way for him to adopt and file the two motions even if he did not agree with its contents. Green paused momentarily and requested a few days to think about it. Huff stated that

5

he knew a deadline was fast approaching. Green assuredly told Huff not to worry about the deadline.

    p.    During this meeting, Green informed Huff that he intended to file two motions by September 2nd: one for the return of Huff's property that Huff believed was illegally seized and held by the FBI and another to remove Huff's conditions for release, as he has proven that he was not, nor ever was, a threat to anyone. Green stated that he wanted Huff's conditions removed so that they could meet at a moment's notice without waiting for approval by Huff's pretrial supervisor. Huff informed Green of Magistrate Judge Guyton's own words from his memorandum and order following a hearing in which the government maliciously attacked Huff's character and tried to deprive him of his liberty.

> The Government argues that Huff is a danger to the community. There is no evidence, however, that Huff is any more of a danger to the community, or for that matter a flight risk, today than he was in May, 2010, when he was placed on pretrial release by Magistrate Judge Shirley.

Memorandum and Order, Docket Entry No. 70 (January 6, 2011).

    q.    On September 2, 2011, the following emails were sent to Green:

> -----Original Message-----
> From: Darren Huff <nightceo@aol.com>
> To: gsglaw <gsglaw@bellsouth.net>
> Sent: Fri, Sep 2, 2011 2:50 pm
> Subject: Darren Huff - The 2nd Amendment Motion To Be Filed
>
> Attached is the other motion that needs to be adopted and filed. I assume that they need to be filed by Wednesday, and I assume that you've had time to reconsider the 5th amendment motion. I'll hope to hear from you by the deadline, as I do not wish to ignore the court's date of the 7th to make a decision. Have a great weekend.
>
> Darren

-----Original Message-----
From: Darren Huff <nightceo@aol.com>
To: gsglaw <gsglaw@bellsouth.net>
Sent: Fri, Sep 2, 2011 5:44 pm
Subject: Darren Huff Motions

Sorry for not including this in my last email; but I would like it if you could send me all motions previously filed in a PDF format, and the ones in the future at the time of filing. As I've stated, I hate finding out about my case from a website instead of my attorney. I simply would like the opportunity to see them for myself at the time they are filed - if not beforehand.

Thanks,
Darren

-----Original Message-----
From: Darren Huff <nightceo@aol.com>
To: gsglaw <gsglaw@bellsouth.net>
Sent: Fri, Sep 2, 2011 6:45 pm
Subject: Darren Huff

I just came across this:
09/01/2011 113 ORDER as to Darren Wesley Huff re 107 MOTION FOR CLARIFICATION filed by Darren Wesley Huff, 102[RECAP] MOTION to Dismiss filed by Darren Wesley Huff, 112[RECAP] MOTION for Return of Property/PreTrial filed by Darren Wesley Huff: The Court ORDERS that the Governments deadline for responding to the Motion for Return of Property is September 12, 2011. The deadline for responding to any additional motions filed by September 7 and to **the Defendants original pro se motions, should Attorney Green file a notice that the Defendant seeks to pursue these motions**, is September 21, 2011. Signed by Magistrate Judge H Bruce Guyton on 9/01/2011. (KMK) (Entered: 09/01/2011)

r.   The defendant seeks to pursue these motions. The door is open....

After an extended period of no response from Green, the following email was sent on Wednesday, September 14, 2011.

-----Original Message-----
From: Darren Huff <nightceo@aol.com>
To: gsglaw <gsglaw@bellsouth.net>

7

Sent: Wed, Sep 14, 2011 1:32 pm
Subject: Darren Huff

Good afternoon. I am writing to find out what is going on with my case. I sent you three emails on September 2: 1) the 2nd amendment motion that you say that you did not have, 2) a request of the motions that you have filed to date in PDF format, and 3) a copied and pasted item from judge Guyton addressing the pro se motions that I have filed. I have not herd a single word from you regarding any of these. I know that a cutoff date was set for 9- 9, which you stated in our meeting would not be an issue.

Well, it is. I am not an attorney, and I respect the dates given for motions to be completed. To date, I have made multiple requests for you to act on my behalf, including a motion to remove the conditions for release. You have left me completely in the dark, and from all appearances, you have not filed anything beyond a motion for the release of my property that was stolen by the government. Scott, I know that I am not the most eloquent of speakers, but I am clear in my language. I openly and clearly asked you to file these motions, and you stated that you were going to file the motion concerning my conditions for release within a day or two from our last conversation. You also said to give you a few days to review the two pro se motions: it's been 2 weeks, and the deadline has past. I refuse to be bulldozed by the government, due to your inaction and lack of communication. If you do not have the courage or kahunas necessary to represent me or communicate with me, then please let me know. I told you in our initial meeting, at my last hearing, that it would not take me 15 months to fire you. You will either represent me, or you will not. I would have hoped that the uniqueness of this case would have caused you to take an interest beyond the norm; but your delay tactics and lack of communication have shown that you, so far, intend to treat this as any other. All future communications, whether by phone, or otherwise, will be recorded.

Darren

s. The following response came on Friday, September 16, 2011:

-----Original Message-----
From: G. Scott Green <gsglaw@bellsouth.net>
To: Darren Huff <nightceo@aol.com>
Sent: Fri, Sep 16, 2011 3:42 pm
Subject: Re: Darren Huff

8

> Darren....Mike Cohan and I just finished meeting about your case and have set aside Wednesday (9/21) to accomplish a number of tasks, which include meeting with Carl Swenson and Mike Desilva. I intend to finish your trial notebook, and draft a response to the Bill of Particulars (after I review Judge Guyton's Order) this weekend. If I have not kept you well enough informed I apologize. But rest assured any perceived shortcoming on my part is not because I lack the "courage or kahunas" to properly represent you. I believe in your case and will bust my *** to defend you to the best of my ability, but that does not mean I will always agree with what you perceive the law to be. I will not question your character should we disagree, and would hope I could expect the same in return. If you feel as though you would be better served with someone else as your attorney, please let me know and I will advise the Court. But until I am told I am not your attorney I intend to do everything within my power toward the goal of hearing the jury foreman uttering two words, rather than one, when your verdict is read.................Scott

t. After Green ignored most of the concerns contained in Huff's original correspondence, Huff tried to understand why. Later that day, Huff saw, from an online source, that his two motions to dismiss had been "denied as moot."

> **09/14/2011 116 ORDER granting Government's 103[RECAP] Motion to Strike Pro Se Filing is GRANTED and the Defendants pro se motions 102[RECAP] and 107 are DENIED as moot.Signed by Magistrate Judge H Bruce Guyton on 9/14/11. (MGM) (Entered: 09/14/2011)**

u. On, or about, Monday, September 19, 2011, the following email was sent to Green in regards to the discovery of Judge Guyton's denial of motions that were never presented.

> -----Original Message-----
> From: Darren Huff <nightceo@aol.com>
> To: gsglaw <gsglaw@bellsouth.net>
> Sent: Mon, Sep 19, 2011 10:37 am
> Subject: Re: Darren Huff
>
> Thank you for the response. I will be as clear as I can be, although this may be lengthy. You may consider revisiting this message

9

when you have time to properly respond since, to date, I have not received a thorough response to my questions and concerns by **anyone**. Frankly, I am furious at seeing Guyton's order denying my motions as moot, because of your failure to adopt and file them. You stated at our meeting, which was well before a cutoff, that you only needed a few days to "think about it." Well, your inactions have shown a disregard for my wishes. I **do** respect our differences, and have given you the liberty to proceed with actions that you deem appropriate, even though I believe them to be pointless; but on the other hand, you ignore and stand idle regarding that which I deem appropriate, and by your inaction and failure to so much as address my concerns, you demonstrate that **you** do not respect our differences. Those two motions **will** be addressed Scott. There is **plenty** of case law supporting each of them, and your refusal to adopt them simply because you disagree demonstrates that you are representing yourself, or the court, and **not** me. I have repeatedly requested that you, or someone show me how this court has jurisdiction over me, or in this case at all, as it is my right to know the nature and cause of any accusation against me. It cannot be stated that I understand the charges, until I understand that I am subject to them. You stated yourself that you do not fully understand jurisdiction, which was recorded: yet you are willing to proceed on a silent judicial notice of presumption, adding to the government's overreaching, unconstitutional "authority" over those it claims to serve by assisting them in setting yet another precedent. You stated that you would file a motion to remove my conditions for release, yet I have seen nothing in regards to that. Scott, from where I sit, it looks as though you are simply attempting to give the appearance of representation.

Here is the bottom line - address the above questions and concerns thoroughly and clearly; and then tell me: Are you representing and defending me, or are you representing and defending the court? I would appreciate your candid response, and please don't double-talk me.

Darren

3. This is *not* how "assistance of counsel" is supposed to work.

## ARGUMENT

The relationship between a lawyer and client is one of agent and principal. *In re Artha Management, Inc.*, 91 F.3d 326, 328 (2d Cir. 1996). The decision to settle a case rests with client. *Id.* at 329.

> The relationship of principal and agent depends . . . upon the principal having "the right to control the conduct of the agent with respect to matters entrusted to [the agent]." Restatement (second) of Agency 14 (1958).
>
> *Transamerica Leasing v. La Republica De Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000).

An attorney cannot represent in contravention of the client, explicit instructions to contrary. *Trulis v. Barton*, 107 F.3d 685, 693 (9th Cir. 1995). An attorney . . . must follow the client's specific instructions. *Id.* at 694.

The client is master of his own defense. *U.S. v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1992) (same) *U.S. v. Moody*, 977 F.2d 1425, 1430 (11th Cir. 1992).

He must be zealous and active. *Powell v. Alabama*, 287 U.S. 45, 58. 53 S. Ct. 55, 60 (1932).

An attorney's mistakes are imputed to the client. *United States v. Commodity, Account No. 549 54930*, 219 F.3d 595, 598 (7th Cir. 2000).

Counsel only interested in discussing potential plea bargains is ineffective. *Sanchez v. Mundragon*, 858 F.2d 1462, 1466 (10th Cir. 1988).

There should be protection of the public from incompetent, unethical, or irresponsible representation. *The Florida Bar v. Moses*, 380 So.2d 412, 417 (Fla. 1980).

Though the following appears to be from the dissenting opinions in a death penalty case, some of the principles bear repeating:

> The issue before us implicates the most fundamental and important of all rights—to be represented by effective counsel. All other rights will turn to ashes in the hands of a person who is without effective, professional, and zealous representation when accused of a crime. In my view, counsel here failed in all three areas.

*Rompilla v. Horn*, 359 F.3d 310 (3d Cir. 2004).

> Too often appointed trial counsel lack the experience, training or financial resources necessary to adequately represent those defendants on trial for their life who face the powerful forces of the government. *See, e.g.*, Stephen B. Bright, *Counsel for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer*, 103 YALE L. J. 1835, 1862 (1994). In my view, any level of inadequate representation not only undermines the reliability that must be the foundation of our adversarial process, but also heightens the risk that defendants will be convicted and sentenced to death despite their actual or incremental innocence.

*Id.* (footnote omitted).

> Ideally, the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984), should act as a safety net to correct injustices caused by ineffective counsel. I view the results as less than ideal. I begin with the Supreme Court instruction to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. I submit, however, that where the sanction, once executed, is irreversible, the presumption must be defined narrowly—not widely. Unfortunately, in the twenty years since the standard was set out in *Strickland*, it has degraded. The range of what is deemed "effective" has widened to, in my view, an astonishing spectrum of shabby lawyering. Counsel has been deemed "effective" despite, for example, sleeping through a portion of the case. *See McFarland v. Texas*, 928 S.W.2d 482, 505 (Tex. Crim. App. 1996) (recognizing that defense counsel slept through parts of defendant's capital trial, but deeming him "effective."). Other shocking examples include cases where counsel was intoxicated during the capital trial, *see Haney v. Alabama*, 603 So.2d 368, 377-78 (Ala. Crim. App. 1991); and cases where counsel presented no evidence whatsoever during the sentencing phase, *see Mitchell v. Kemp*, 762 F.2d 886, 888 (11th Cir. 1985). In my view, the majority opinion in this case infuses our jurisprudence with this degraded standard.

*Id.* (footnote omitted).

Defendant, at this point, suspects there are other forces at work here than to insure

12

that his constitutional rights are protected and that he has a fair trial.

The legal business is a profitable one, at least for those administering the system. Fourteen years ago the cost of operating a federal case was $17,500 *a day. See United States v. Rostoff*, 966 F.Supp. 1275 n. 16 (D. Mass 1997). With the exception of the appointment of counsel (if—and only if—the counsel is actually working on behalf of the client) *none* of that money benefits the defendant and the taxpayers pay for *all* of it.

Were this Court to strike down the federal statutes that violate the Second Amendment, the taxpayers would be spared expenses in the *billions*. The problem, at least in the present case, appears to be that no public defender wants to lose the income that he desires from his present situation. That is, once an unconstitutional statute is so declared, the public defender must then find another section of the criminal code to "defend" those appointed to him against.

Defendant is well aware of the judicially created doctrines of hybrid representation and—if a defendant refuses to be mislead by several liars and losers appointed to him by the Court that he has then "waived" his right to counsel and must proceed pro se. *See e.g., United States v. Mosley*, 810 F.2d 93, 97-98 (6th Cir. 1987). The district court may, in its discretion, allow the defendant to participate in his own defense *with counsel. Id.*

Before this Court appoints another incompetent and/or lazy lawyer more interested in collecting a paycheck to "defend" against unconstitutional statutes, this Court should consider the following questions:

1. Wouldn't it simply be easier to ask an attorney—before he is appointed—if he will adopt a defendant's pro se motions? Yes or no?

13

2. Is an attorney who has never—or rarely—won an acquittal effective? Yes or no?

3. Is an attorney who lies to his client effective? Yes or no?

4. Is the client the master of his own defense? Yes or no?

5. Did this Court take a solemn oath pursuant to 28 U.S.C. § 453, to defend the Constitution of the Untied States? Yes or no?

6. Is the Second Amendment part of the Constitution? Yes or no?

WHEREFORE, Defendant Darren Wesley Huff moves this Court to dismiss the indictment against him, *with prejudice*.

.
Respectfully submitted,

Dated: September 29 , 2011

Darren Wesley Huff
617 Shoals Trail
Dallas, GA 30132

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:10-CR-73 |
| Plaintiff, | ) | JUDGE VARLAN |
| v. | ) | |
| | ) | |
| DARREN WESLEY HUFF, | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

This certifies that I have on this **29** day of September, 2011, placed a true and exact copy of the

**SECOND MOTION TO DISMISS
FOR INEFFECTIVE ASSISTANCE OF COUNSEL
with MEMORANDUM IN SUPPORT**

in the U. S. Mail, first class postage prepaid, addressed to:

A William Mackie
U.S. Department of Justice (Knox USAO)
Office of the U.S. Attorney
800 Market Street, Suite 211
Knoxville, TN 37902

865-545-4167

_____
Darren Wesley Huff