IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT AT KNOXVILLE TENNESSEE

FILED

2012 APR 18 P 2: 34

U.S. DISTRICT COURT
EASTERN DIST. TENN.

_____ DEPT. CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | MEMORANDUM OF LAW |
| | ) | IN SUPPORT OF |
| Plaintiff, | ) | MOTION TO TAKE |
| | ) | JUDICIAL NOTICE |
| v. | ) | Fed. R. Evid. 201 |
| | ) | and MOTION IN ALLOCUTION |
| DARREN WESLEY HUFF, | ) | |
| | ) | DOCKET NO: 3:10-CR-73 |
| Defendant. | ) | |

COMES the Defendant in the above-entitled action, Darren W. Huff, and would show this Court the following:

During trial, prosecutor, Jeffrey Theodore made a blanket statement that all of my witnesses were friends, and thereby had a reason to lie, clearly giving the implication that they did, in fact, lie. However, he was unable to direct the court, or the jury, to a single example. The Government's witnesses are a different story altogether.

Shayne Longmire, bank manager, admitted under oath that he engaged in unethical activity by divulging my private banking information, including balances, deposits, and purchases without any authorization from my wife or myself, and without any warrant or other authorization from any law enforcement agency. Shayne also swore to tell "the whole truth", yet failed to state for the court or the jury, that, not only did I not mention anything about violence regarding the non-event of April 20, 2010, but also that at no other time have I ever mentioned anything about violence – all of which were in his statement.

Jessica Dupree, bank teller, testified at trial that she had never seen the camouflage utility truck until it showed up at the bank with "Georgia Militia" painted on

the side. However, when the prosecution played a recorded phone call between her and the Madisonville Police chief, she clearly stated that she had seen it before, and identified it by stating that it used to be white, and that I drove it all the time.

Lt. Don Williams of the 10th Judicial Task Force, testified that I agreed to store my .45 in the toolbox of my truck at the traffic stop – which contradicts his statements both before and after trial, in which he stated that I agreed to put it away when I got to Madisonville. Lt. Williams was forced to change his testimony because the story as presented by the government demanded it; yet it leaves a contradiction.

Lt. Williams also testified that, regardless of the story, that I did store the .45 at the traffic stop, which was supported by the Dash Cam video. Lt. Williams then testified that it appeared that I rearmed myself once in Madisonville, by me entering my toolbox while parked on the side of Donna's Restaurant. Lt. Williams testified that he could not see what I retrieved, because I was on the opposite side of the truck from his position: which would have placed me on the passenger side of my truck. The .45 was placed into the driver's side, as demonstrated by the dash cam, and therefore impossible to be retrieved.

I believe that Lt. Williams used specific language at the traffic stop by asking me to put my .45 away "When I got to Madisonville," knowing full well, by the briefing that was held that morning, that snipers would be present on the rooftop. Had I have listened to Lt. Williams that day, I would have driven into town armed, and, with every right intention, would have removed that weapon from it's holster for the purpose of storing it, only to be gunned down on the sidewalk in Madisonville.

2

Also present at the traffic stop was trooper Michael Wilson, who presented testimony as well. Wilson's testimony presented me as a deranged psychopath, who seemed obsessed on "taking over the courthouse." The emotion displayed by Wilson was certainly compelling, as he hammered home to this court and jury that I repeatedly said, to show my determination, that I was going to take over that courthouse.

Wilson's testimony contradicted the facts in two ways. First, the deranged lunacy that he portrayed in me periodically put multiple jurors to sleep. They were forced to endure 90 minutes of pure monotony. Secondly, Wilson was the one who was miced for the traffic stop, and who's mic recorded the entire episode. Because of that, anything and everything that I stated in his presence, with one brief exception, was captured on the audio portion of the traffic stop. For the entirety of the video, not a single time was the courthouse even mentioned, let alone any implication of taking it over. The audio portion began prior to any verbal engagement between Wilson and myself, and continued until I left the scene.

Wilson also testified that no specifics were given, to his knowledge, at the early morning briefing, stating that he was forced to remain outside of the meeting room, due to the volume of officers present.

The question is then: if Wilson did not hear about any "takeover" plot at the briefing, and the courthouse takeover plot is missing from the entire audio from the traffic stop – where did Trooper Michael Wilson, of the Tennessee Highway Patrol, come up with the testimony that included such an intent, unless the government, in an attempt to secure a conviction, persuaded Wilson to commit perjury.

4

In an attempt to further portray me as a threat, the majority of the government's witnesses within the law enforcement community, stated in various ways and degrees, that they failed to act that day for fear of a violent reaction. It was reported, by Government witnesses, that there were approximately 75 officers from different agencies present in Madisonville that day, including multiple snipers and helicopters. It is absurd to believe that such a large number of professionally trained officers, with far superior firepower, could cower under the weight of such insignificant "opposition."

These same witnesses, along with others, testified that they have lived in fear for their lives because of me. Please.

The government also implied the outright absurdity that I, a man of common intelligence, sought out complete strangers within the law enforcement community, to recruit them to activity which was knowingly illegal. There exists no officer, or witness who testified or could testify, that I was withdrawn in my conversations, or deceitful in anyway. The facts and testimony reveal the opposite in that most witnesses testified that I, in fact, do not possess an "off" switch, and will talk, as demonstrated in the dash cam footage, without reservation. Is that consistent with criminal intent at any level?

What both sides failed to reveal, and in fact withheld from this court, is where the "courthouse takeover" statement did come from. William Bryan of North Carolina is active on several political websites under the username "PJ Foggy." Several investigations by reporters have been conducted on him, and have revealed his admissions, through captured screenshots that he is the one who claims responsibility solely for the massive police presence in Madisonville. His remarks demonstrate his

5

mockery of the American system of law, and he touts an "untouchability," due to the implications that he is connected to the White House.

When I refused to take an offered deal, I was threatened that I would face more severe charges, which the government fulfilled. They then began a campaign of libel and slander against me, using the media, including TIME Magazine, to assassinate my character – making a fair trial impossible.

## Argument

### I

First and foremost, am I to be sentenced for what the jury convicted me of or am I to be sentenced to the maximum punishment allowed by law because I exercised my Constitutional right to a jury trial?

The case law does indicate that a 60-month sentence, the maximum allowed by law – would be for exercising my right to a jury trial:

A criminal defendant cannot be punished merely because he or she chose to exercise his or her constitutional rights. See *United States v. Jackson*, 390 U.S. 570, 581, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968) (right to jury trial).

> It is well settled that an accused may not be subjected to more severe punishment simply because he exercised his right to stand trial. *United States v. Capriola*, 537 F.2d 319, 321 (9th Cir. 1976); *United States v. Stockwell*, 472 F.2d 1186, 1187 (9th Cir.), cert. denied, 411 U.S. 948, 36 L. Ed. 2d 409, 93 S. Ct. 1924 (1973). The "courts must not use the sentencing power as a carrot and stick to clear congested calendars, and they must not create an appearance of such a practice." *United States v. Stockwell*, 472 F.2d at 1187. Although we do not doubt the good faith of the district judge, we find that the above quoted statements clearly give rise to the inference that Medina-Cervantes was punished more severely because of his assertion of the right to trial by jury. Nothing in the record before us serves to dispel this inference. Accordingly, in order to avoid the "chilling effect" upon the exercise of the right to trial presented by even

> the appearance of such a practice, we conclude that the sentence imposed on Medina-Cervantes must be vacated.

*United States v. Medina-Cervantes*, 690 F.2d 715 (9th Cir. 1982)

> The first portion of the district judge's remarks are susceptible to the interpretation that they were directed toward Medina-Cervantes' attorney rather than toward Medina-Cervantes himself. Even if all of the judge's remarks were so interpreted, it would not alter our conclusion. Medina-Cervantes was represented by an attorney associated with Federal Defenders of San Diego, Inc. Attorneys with Federal Defenders are consistently representing criminal defendants in the federal courts. Any indication from trial judges that persons will be punished more severely if they exercise their right to jury trial will necessarily cause these attorneys to be reluctant to advise their client to go to trial. This reluctance will result in the "chilling" of an individual's right to trial as surely as if the individual himself were advised by the judge that additional punishment will be meted out if he demands a jury trial.
>
> Regardless of to whom the remarks were directed, they were clearly improper. The plain fact of the matter is that, under our Constitution, a defendant should never have "anything to lose" if he exercises his right to a jury trial.

*Id.* Footnote Omitted.

## II

A conviction obtained by the knowing use of perjured testimony must be set aside if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (internal quotation marks omitted); see also *United States v. Agurs*, 427 U.S. 97, 103 (1976).

## III

> Pursuant to Fed. R. Evid. 201, we have held that it is appropriate to take judicial notice of "adjudicative facts" such as agency and judicial decisions, even where those decisions contain disputed statements of fact, as long as we take judicial decisions, even where those decisions contain

7

disputed statements of fact, as long as we take judicial notice for some purpose other than to take a position on the disputed fact issue. See, e.g., *United States v. Garland*, 991 F.2d 328, 332 (6th Cir. 1993).

*Don Lee Distributor Inc. v. N.L.R.B.*, 145 F.3d 834, 158 L.R.R.M. (BNA) 247 (6th Cir. 1998).

Defendant is merely asking this Court in this context, to note that the video on the webcam and the testimony at trial are not the same. The same problem exists with witness Jessica Dupree.

Which poses the question, have the federal courts devolved to the level of the English courts of the 17th century?

> [King James I] being mightily disappointed in not getting any gold, Sir Walter Raleigh was tried as unfairly, and with as many lies and evasions as the judges and law officers and every other authority in Church and State habitually practiced under such a King.

Dickens, <u>A Child's History of England</u>, p. 390 (Collier & Son 1900).

WHEREFORE, Defendant moves this Court to take judicial notice as requested.

Respectfully Submitted,

_____
Darren W. Huff

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT AT KNOXVILLE TENNESSEE

| UNITED STATES OF AMERICA, | ) | DOCKET NO: 3:10-CR-73 |
|---|---|---|
| | ) | |
| Plaintiff, | ) | MOTION TO TAKE |
| | ) | JUDICIAL NOTICE |
| v. | ) | Fed. R. Evid. 201 |
| | ) | and MOTION IN ALLOCUTION |
| DARREN WESLEY HUFF, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

This is to certify that I have on this 16TH day of April, 2012 placed a true and

exact copy of the foregoing:

## MOTION TO TAKE JUDICIAL NOTICE FED. R. Evid. 201 AND MOTION IN ALLOCUTION WITH MEMORANDUM OF LAW

In the U.S. Mail, postage prepaid, addressed to:

A William Mackie
U.S. Department of Justice (Knox USAO)
Office of the U.S. Attorney
800 Market St.
Knoxville Tennessee 37902

865-545-4167

_Darren W. Huff_ (signature)

Darren W. Huff

Darren W. Huff
BCADC
920 E. Lamar Alexander Pkwy
Maryville, TN 37804

Clerk of Court
800 Market Street
Suite 320
Knoxville, TN 37902