# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE, TENNESSEE

| | | |
|---|---|---|
| United States of America, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Case No. 3:10-cr-73 |
| | : | |
| Darren Wesley Huff, | : | **Trial Testimony** |
| | : | |
| Defendant. | : | |

Transcript of proceedings before the Honorable Thomas A. Varlan,

U. S. District Judge, on October 18th, 2011.

Appearances:

On behalf of the Plaintiff:

A. William Mackie, Esq.
Jeffrey E. Theodore, Esq.
U. S. Attorney's Office
Knoxville, Tennessee

On behalf of the Defendant:

G. Scott Green, Esq.
Knoxville, Tennessee

Court Reporter:

Donnetta Kocuba, RMR
800 Market Street, Suite 132
Knoxville, Tennessee 37902
(865) 524-4590

# I N D E X

| Plaintiff's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Gary D. Pettway | 3 | 25 | 32 | 33 |
| William Bivens | 34 | 45 | 50 | 53 |
| Shane Longmire | 54 | 64 | 71 | – |

| Plaintiff's Exhibits: | Identified | Received |
|---|---|---|
| 1- Video- attempted arrest of Pettway | 18 | 19 |
| 2- Citizens' Arrest Warrant | 15 | 15 |
| 4- Photo of Fitzpatrick/Captain Bivens | 38 | 38 |
| 5- Photo of Fitzpatrick/Sheriff Bivens | 43 | 43 |
| 23- Photo-Defendant Huff's truck-4/30/10 | 61 | 61 |
| 25- Photo-rear of Huff truck-4/30/10 | 61 | 61 |

| Defendant's Exhibits: | Identified | Received |
|---|---|---|
| 1- Photo- Defendant Huff/group of people | 27 | – |

| Recesses: | 54, 74 |
|---|---|

1    (Whereupon, Tuesday, October 18th, 2011, Court convened at

2    9:00 a.m.; discussion between Court and parties re: jury selection

3    procedure; a jury duly empaneled and sworn; preliminary jury

4    charge and opening statements presented to the jury. Following is

5    the trial testimony:)

6        THE COURT:  All right.  Thank you, Mr. Green.  Thank

7    you, both counsel, for your opening statements.  Is the Government

8    ready to proceed with its first witness?

9        MR. THEODORE:    Yes, your Honor.

10       MR. MACKIE:    Yes, your Honor.  The United States

11   would call Gary Pettway.

12       COURTROOM DEPUTY:    Raise your right hand.  Do

13   you solemnly swear your testimony will be the truth, the whole

14   truth, and nothing but the truth, so help you God?

15       MR. PETTWAY:  I do.

16       COURTROOM DEPUTY:    Would you please state and

17   spell your name for the record?

18       THE WITNESS:  My name's Gary Pettway, G-a-r-y, P-

19   e-t-t-w-a-y.

20       MR. MACKIE:    May I proceed, your Honor?

21       THE COURT:  Yes.

22                    **DIRECT EXAMINATION**

23   by Mr. Mackie:

24   Q.    Good afternoon, sir.  You've stated your name.  Can you tell

25   the jury where you live and what you're currently employed as?

1    A.    I live in Sweetwater, Tennessee, 1107 Broad Street, and I'm

2    retired from TVA .

3    Q.    At some point– and let's look back to April of 2010, or let's

4    go back to 2009. 2009, were you retired then or were you working

5    for TVA?

6    A.    I was retired.

7    Q.    Were you involved in any kind of public service job?

8    A.    Yes. I served as a grand jury foreman for Monroe County.

9    Q.    And how long had you been appointed as a grand jury foreman

10   for Monroe County?

11   A.    At that time, approximately 28 years.

12   Q.    Now, is that a continuous term or are those successive terms?

13   A.    Those were successive terms.

14   Q.    Of about how much?

15   A.    Two years each.

16   Q.    From your understanding from either your own research or

17   what anyone has told you, was that ever a problem, serving for

18   more than a two-year term?

19   A.    No.

20   Q.    How do you know that?

21   A.    It was given to me by the judges in the Tenth Judicial District

22   and–

23              MR. GREEN:  Your Honor, that's clearly hearsay.  I

24   object.

25              MR. MACKIE:   Your Honor, it's a question being

1  whether he believed what he was doing was illegal.

2        THE COURT:   So you're offering it not for the truth of

3  the matter asserted?

4        MR. MACKIE:    No.  Just whether he thought his

5  continuing service was legal or illegal.

6        MR. GREEN:   We don't have an objection to him

7  asking if he believed what he was doing was legal, but as far as any

8  source of research or who told him what. If he believed it was

9  legal, that's fine.

10        THE COURT:   That would seem like that would suffice,

11  then, Mr. Mackie.

12        MR. MACKIE:    I can proceed, then?

13        THE COURT:   Allow the inquiry.

14  Q.    Allow me to inquire, did you read anything to determine that?

15  A.    Yes. I read a section or a case that was presented to the

16  Tennessee Supreme Court, I think.

17  Q.    All right.  In the time that you were the grand jury foreman,

18  can you describe what was the process if a citizen wanted to come

19  and present something to the grand jury?  Did that exist?

20  A.    Yes, it did.

21  Q.    And how did that work?

22  A.    Any citizen living within the boundaries of Monroe County

23  was afforded the opportunity to bring charges against anyone that

24  committed a crime in Monroe County by coming before a panel of

25  three people of the grand jury that was seated.

1       Once they came before that panel, they were allowed to

2   present their evidence.  Once that evidence presented, that panel

3   voted as to whether or not the full grand jury was allowed to hear

4   their testimony.

5   Q.    And had that process that you just described been in existence

6   for the time that you were the grand jury foreman?

7   A.    It was the process given to me at the time that I was installed

8   as grand jury foreman.

9   Q.    Was there a point that a person by the name of Walter

10  Fitzpatrick approached you about presenting some sort of evidence

11  to the grand jury?

12  A.    Yes.

13  Q.    Were you aware of who Mr. Fitzpatrick was?  Did you know

14  him prior to that time?

15  A.    Prior to that, no, I did not know him.

16  Q.    So when he came to you, in your capacity– well did he come

17  to you in your capacity as a grand jury foreman?

18  A.    Yes. He called me, asking to meet with me.

19  Q.    What time frame was this?

20  A.    This was some time in 2009.

21  Q.    Was this what season or what–

22  A.    It was probably late summer.

23  Q.    Okay. And he called you and what did he ask to do?

24  A.    He asked me to meet with him, he needed at least four hours of

25  my time, because he wanted to bring some information before the

1    Monroe County Grand Jury. And I informed him that he needed to

2    tell me what his issue was and that I did not need to know

3    information, I just needed to know what the issue was and that he

4    would be able to be put on the docket to come before a committee

5    of the grand jury.

6    Q.    Did you afford to him the same rights that any other citizen

7    had?

8    A.    During my time, I afforded every citizen that came forward

9    with that same right.

10   Q.    Did Mr. Fitzpatrick ever come to present something to this

11   three-person panel?

12   A.    Yes.

13   Q.    And time frame again? Was this in–

14   A.    This was after we had contact. I let him know what date he

15   could come to present his issue.

16   Q.    This was in what, summer or fall?

17   A.    This was like August or September, somewhere in the fall.

18   Q.    Just sometime in that time period?

19   A.    Right.

20   Q.    And so did Mr. Fitzpatrick appear before some panel?

21   A.    Yes, he did.

22   Q.    And can you describe what this was about?

23   A.    Mr. Fitzpatrick came in and I explained the process again that

24   I had explained to him, and then I had to tell him that he had to fill

25   out certain information before he could go before the panel. He

1   also had to waive his rights because any information that he would

2   give can be used in a court of law against him by the grand jury.

3        He said he understood it, he did not want to sign our

4   documents that are used in the Monroe County court system. And I

5   informed him that he had to sign those documents, and they were

6   signed in the clerk's office there in Monroe County. And, at that

7   time, he was told when he would be allowed to come in before the

8   three-man panel.

9   Q.    All right. So with that, this, I guess, this whole issue about

10  which form to use and all, was there a point then in that fall time

11  period, the first time that we're talking about, right, that he came

12  and presented some sort of evidence or something to the grand

13  jury, I guess, three-person panel?

14  A.    Yes.

15  Q.    And can you describe to the grand jury what was the nature of

16  the allegations or the charges he wanted to bring?

17  A.    The charges he wanted to bring were treason against the

18  President of the United States, fraud against the President of the

19  United States, based on his– what he considered a false birth

20  certificate; and charges against the people who court-martialed him

21  in his military court martial.

22  Q.    So from what he presented, he had been in the Navy and had

23  been court-martialed?

24  A.    Yes.

25  Q.    And that was on the list of– the nature of the charge was?

1   What was that again?

2   A.    Treason against the president.

3   Q.    And what about the Navy people?

4   A.    He said the Navy people was– it was a conspiracy and that

5   they had falsely prosecuted him or court-martialed him.

6   Q.    How much time did you afford Mr. Fitzpatrick on his

7   allegations of treason and all with this panel?

8   A.    Mr. Fitzpatrick was brought in about 1:30 that afternoon, and

9   it was probably about 5:30 when we finally had to conclude.

10  Q.    Did you or the panel reach any kind of resolution that day?

11  A.    The panel reached a resolution.

12  Q.    And what was that?

13  A.    And the resolution was not to recommend that it be brought to

14  the full grand jury, based on what he was requesting was outside

15  the scope of the Monroe County Grand Jury.

16  Q.    Did you inform Mr. Fitzpatrick of that?

17  A.    Yes, I did.

18  Q.    And without going into any great discussion or anything,

19  from your impression, what was his reaction to that?

20  A.    He was very argumentative and disappointed that the three-

21  panel persons were not attentive to what he was giving them, and

22  there was a level of frustration. Once he was notified that the panel

23  did not recommend him going forward to the full grand jury, he

24  asked to be seen again.

25  Q.    So this is time number one.  Did he come back for time

1   number two?

2   A.    Yes, he did.

3   Q.    And when was that, roughly speaking?

4   A.    That was sometime October, November, I think, somewhere in

5   that time range.

6   Q.    Just so the jurors can understand, in Monroe County, is the

7   grand jury panel or– excuse me– the grand jury itself, when it sits,

8   is that like in secrecy or is it publicly available?

9   A.    It's in secrecy.  No one is known on the grand jury other than

10  myself.

11  Q.    All right.  So everybody there, it's in secret.  Now, how about

12  when the grand jury sits, just the day that it sits? Do people know

13  that?

14  A.    Yes. It's notified in the newspaper and posted at the

15  courthouse, the day that the grand jury will be in session.

16  Q.    So let's turn to time number two.  Does Mr. Fitzpatrick

17  approach you about re-presenting something to the grand jury?

18  A.    Yes. Mr. Fitzpatrick came to the courthouse and requested to

19  present again to the panel, the process that we go through, and–

20  Q.    Let me ask you, did he want to go to the grand jury or the

21  panel?

22  A.    He wanted to go to the grand jury.

23  Q.    And what did you tell him?

24  A.    And I told him he had to be– go through the panel process, and

25  if they recommended going to the grand jury, then he would be

1    allowed.

2    Q.    So was there a second time that the three-person panel heard

3    from Mr. Fitzpatrick?

4    A.    Yes. There was a separate group of people and a separate

5    panel.  We have two panels, so he went before the second panel

6    members.

7    Q.    And what this time was the major allegations, charges, that he

8    wanted to be brought?

9    A.    He had the same charges with the addition that some Monroe

10   County officials were barring him from moving forward with the

11   charges.

12   Q.    So describe again, was there something written about this?

13   A.    He wrote out the charges that he wanted to bring.

14   Q.    So describe again. He's added now, expanded to Monroe

15   County officials.  And what was the nature, as best you could tell,

16   at that time?

17   A.    As best I could tell, he felt like that Monroe County–

18                 THE COURT:  Mr. Green?

19                 MR. GREEN:   Your Honor, I hate to impose an

20   objection.  I've tried to allow a lot of latitude.  But unless there's

21   some connection with Mr. Huff to these two proceedings, it's rank

22   hearsay, for them to be relating what Mr. Fitzpatrick told.

23                 THE COURT:  Mr. Mackie?

24                 MR. MACKIE:    Your Honor, these are the very same,

25   almost word-for-word, the very same charges, that he's going to

1    testify as to the arrest warrant and affidavit, of which Mr. Huff

2    then joined in on that. This is the background for what happened

3    on April 1st.

4              MR. GREEN:   And I don't dispute the fact that he can

5    put before this jury the fact that Mr. Fitzpatrick appeared before a

6    Monroe County Grand Jury three-person panel, but as far as what

7    was said, his reactions, I think that's hearsay.

8              THE COURT:   All right. I understand. I'll overrule the

9    objection for the time being. But I think it's a valid point, to not

10   delve too much into the conversations. Just put the basic facts,

11   background information.

12             MR. MACKIE:    Yes, your Honor.

13   Q.    Simply put, was Mr. Fitzpatrick heard by the three-panel for

14   that second time?

15   A.    Yes, he was.

16   Q.    And I think you described the nature of those charges, right?

17   A.    That's correct.

18   Q.    And what did the three-panel group do?

19   A.    They recommended it not be brought before the full grand

20   jury.

21   Q.    Did you tell Mr. Fitzpatrick that? Did you tell Mr. Fitzpatrick

22   that, that they turned it down?

23   A.    Yes.

24   Q.    All right. Did Mr. Fitzpatrick come back another time?

25   A.    Yes, he did.

1    Q.    And was this in 2009 still?

2    A.    Yes, it was.

3    Q.    And what was the point of the third time?

4    A.    He again wanted to be presented before the grand jury, and we

5    told him that if he didn't have any charges any different than the

6    other charges that it would be a waste of the grand jury's time.

7    Q.    That's what you told him?

8    A.    Yes.

9    Q.    And was there, on the third time, another panel presentation

10   or not?

11   A.    Yes, there was.

12   Q.    About how long?

13   A.    I think it was around the first of January, 2010.

14   Q.    And how long did Mr. Fitzpatrick present his evidence?

15   A.    Because the charges at this time was of all the Monroe County

16   criminal court system people, I was removed from this panel when

17   this panel met.

18   Q.    You were added to that?

19   A.    Yes, I had been added to the list.

20   Q.    And what happened the third time?

21   A.    The panel recommended again not to have charges move

22   forward.

23   Q.    At this point, did Mr. Huff come back once again relating to

24   these issues, including the charges of the Monroe County officials,

25   including yourself?

1    THE COURT:   Do you mean Mr. Huff or Mr.

2    Fitzpatrick?

3    MR. MACKIE:    Excuse me.

4    Q.    Mr. Fitzpatrick.

5    A.    Yes, he did, and he was asked to leave.

6    Q.    Who did?  Did you tell him?

7    A.    Yes. I was called out of session and informed him that he

8    would need to leave.

9    Q.    And did he leave?

10   A.    He was eventually removed by the Madisonville Police

11   Department.

12   Q.    After that point, did you see Mr. Fitzpatrick another time?

13   A.    No.

14   Q.    All right.  So this would have been– and we're talking about

15   2010, spring, 2010, time period?

16   A.    Yes.

17   Q.    All right.  So let's focus on after that.  Do you recall anything

18   that happened before the grand jury on April 1st, 2010?

19   A.    Yes. We were in session, and the clerk came in and asked me

20   to see someone outside, who happened to be the court officer,

21   Benny Byrum, and I told her that I would come out as soon as we

22   had a break.

23   Q.    Did you have any idea what this was about?

24   A.    No, I didn't.

25   Q.    So did you go out and meet Mr. Byrum?

1    A.    Subsequently, we had a break, and I went out and Mr. Byrum

2    was there, and then he asked me what to do– put a form in front of

3    me and said, what about this.  And I said, well, after seeing it, it

4    had no merit.

5    Q.    All right.  Look in front of you at what's been marked for

6    identification as Government Exhibit One. Do you recognize that?

7    A.    This is two?

8    Q.    Oh, two, excuse me, government exhibit?

9    A.    Yes, I do.

10    Q.    And is that what was presented to you that day?

11    A.    Yes, it was.

12    Q.    And looking at Government Exhibit Two, does it look to be

13    substantially the same, if not the same, of what you were handed

14    that day, on April 1st?

15    A.    Yes, it does.

16            MR. MACKIE:    Your Honor, at this time, the United

17    States would offer in evidence Government Exhibit Two.

18            MR. GREEN:  I don't know what it is.  I'm assuming

19    it's a citizen's complaint.

20            THE COURT:  Monday, March 29, 2010.

21            MR. GREEN:  Your Honor, we'll stipulate that. No

22    objection.

23            THE COURT:  So admitted.

24        (Government's Exhibit No. 2 received in evidence.)

25            MR. MACKIE:    Your Honor, at this time, can I display

1    that?

2    Q.    All right.  Do you see that on the screen?

3    A.    Yes, I do.

4    Q.    All right.  And that is a citizens' arrest warrant. Is that was

5    handed you that day?

6    A.    Yes, that's the document that Officer Byrum had.

7    Q.    And had you seen that before?

8    A.    No, I hadn't.

9    Q.    In looking at the people that are listed as the declared

10   domestic enemies, do you see your name in there?

11   A.    Yes, I do.

12   Q.    Do you recognize– or let me ask you, did it appear in any

13   fashion to be similar to some of the charges that Mr. Fitzpatrick

14   was trying to bring to the grand jury earlier?

15   A.    Yes, it was.

16   Q.    What did you do at this point when you saw this purported– I

17   mean, this citizens' arrest warrant?

18   A.    Well, I informed Officer Byrum that this had no merit because

19   it wasn't issued through the court clerk's office and not to worry

20   about it.  And he was in civilian dress, so I assumed he was off

21   duty, to go on home. And we went back and convened the session.

22   Q.    So for the 20 years that you have been a grand jury foreman, I

23   take it that you have been involved in indictments brought by the

24   grand jury in Monroe County, correct?

25   A.    I have.

1   Q.    And you are familiar with what arrest warrants look like?

2   A.    Yes.

3   Q.    And the process that they are?

4   A.    Yes.

5   Q.    And so, in your opinion, was this a legitimate arrest warrant?

6   A.    No.

7   Q.    Did you hand it back to Mr. Byrum– Officer Byrum?

8   A.    I actually never took it from him. I just looked at it in his

9   hands.

10  Q.    All right. So what did you do at this point?

11  A.    I went back and reconvened the panel and continued with the

12  grand jury.

13  Q.    All right. And this is on the day the grand jury is sitting

14  normally, correct?

15  A.    Yes.

16  Q.    Now, after that, did you have an encounter with Mr.

17  Fitzpatrick?

18  A.    Sometime approximately 30 minutes or so afterwards, Mr.

19  Fitzpatrick came into the courtroom where we were convened and

20  proceeded to come in. And I confronted him, that he could not

21  come in.

22  Q.    Can you describe the setting where you were, where the grand

23  jury was and where Mr. Fitzpatrick came in?

24  A.    I was sitting in the courtroom, at that table over there, on that

25  side. The doors would have been on that side of the room, the

1    double door. The grand jury would have been sitting about where

2    you're standing, the witness about where the lady here is sitting.

3    The D.A.'s office was at the stand to the right, and then the doors

4    burst open with Mr. Fitzpatrick and others coming in.

5    Q.    Sir, can you describe when Mr. Fitzpatrick entered, I mean,

6    just how did it happen? Did he knock, did he wait, or what

7    happened?

8    A.    No. The door was just jerked open and he just came bolting

9    through. I rose from my seat and rushed to stop anyone from

10   coming in, because it is a secret group, and telling them that they

11   cannot come into this room.

12   Q.    Was he there by himself or was there anyone else?

13   A.    No. There were other people there coming in the door with

14   him.

15   Q.    And did you see the Defendant, Mr. Huff, there?

16   A.    Yes, I did.

17   Q.    And where was he?

18   A.    He was behind Mr. Fitzpatrick.

19   Q.    Now, I have before you– and this time we'll get it right–

20   Exhibit One. Is that something that you recognize of you having

21   reviewed before?

22   A.    Yes.

23   Q.    And does it have your initials on it?

24   A.    Yes, it does.

25   Q.    And, from your recognition, is that a short video presentation

1    or video depiction of what happened when Mr. Fitzpatrick came in?

2    A.    Yes. It is part of what happened.

3    Q.    And from when you watched that, is that in basically the

4    same, an unaltered version as to what happened that day?

5    A.    Yes.

6              MR. MACKIE:    Your Honor, at this time, the

7    Government would offer in evidence Exhibit One.

8              MR. GREEN:   No objection.

9              THE COURT:   So admitted.

10        (Government's Exhibit No. 1 received in evidence.)

11             MR. MACKIE:    Your Honor, if I could publish this?

12             THE COURT:   Yes.

13   Q.    Mr. Pettway, I'm going to ask you to look at it so that you can

14   describe the events that happened, what's happening that moment.

15             MR. MACKIE:    Your Honor, may I approach?

16             THE COURT:   Yes.

17             MR. MACKIE:    I'm sorry. I need to get the disc out.

18        (Government's Exhibit No. 1, a videotape, played without

19   audio to the jury.)

20   Q.    Let's pause that just for a moment.  And just so we have the

21   setting, where are you standing, where is this right now?

22   A.    This is in the courtroom, at the Monroe County courthouse,

23   and I'm– I have already approached Mr. Fitzpatrick and retreating

24   as to the group, and he comes in to arrest me.

25   Q.    So you had been further back at some point, where you were

1  sitting further back?

2  A.    Yes. At the desk that you can see, where the– it's probably

3  where a white book or something is there. That's where I would

4  have been sitting.

5  Q.    So this interaction right here, what's happening at this point?

6  A.    I'm trying to stop Mr. Fitzpatrick and get him to go back out

7  of the room, as well as all the other people, and he keeps coming in,

8  spouting and ranting about arresting me, and I'm trying to get him

9  to stop and just, I guess–

10  Q.    All right.  Let's play the rest of the video.

11        (Government's Exhibit No. 1 playing to the jury without

12  audio.)

13  A.    And you see my hands up, asking him to remove himself from

14  the room and tell him. Then I ask Mr. Freiberg(phonetic) to please

15  go get the officers, too.  I have fear of the group, fear of Mr.

16  Fitzpatrick causing problems, as well as my grand jury panel,

17  which you can't see in this video. But where Ms. Oswald(phonetic)

18  is standing, the panel is directly in front of her, and by now they

19  have become very concerned with these people coming into the

20  room also.

21        (Video stopped.)

22  Q.    So after this point, then, and I think we just– this is a clip

23  we're looking at right here. I take it that this goes on for a little

24  while?

25  A.    Yes. I couldn't tell you the time frame because it was

1  happening at such a rapid pace.

2  Q.   And does Mr. Fitzpatrick stay in– well, let me back up.  This

3  picture is coming, as you can tell, from where in the courtroom or

4  where is this happening?

5  A.   This picture's coming from the people, Mr. Fitzpatrick.

6        (Government's Exhibit No. 1 playing to the jury now with the

7  audio, and paused.)

8   Q.   And that was, I guess, that was the audio of what you were

9  just describing?

10  A.   Yes.

11  Q.   Now, at this point, is the grand jury panel in there, at this

12  point?

13  A.   Yes, they are.

14  Q.   Now, I was going to ask you, from the perspective, what you

15  can tell, you were looking over towards where the camera was.

16  Who was filming this?

17  A.   Mr. Huff.

18  Q.   And was this in– where in connection with the courtroom?

19  A.   He's, he's still coming up behind Mr. Fitzpatrick as all of this

20  is going on, and the camera is going, and other people are also

21  coming in behind him.

22  Q.   So there was more than Mr. Fitzpatrick and Mr. Huff?

23  A.   Yes. That's correct.

24  Q.   What occurred after this as far as this group of Mr. Fitzpatrick

25  and Mr. Huff and the others?

1   A.    Well, as you saw at the end of the video, he informed the

2   officers that Mr. Pettway was under arrest. And the officers were

3   coming through, and the lead officer was Mr. Bivens. And at that

4   point they began to retreat back out of the courtroom.

5   Q.    Now, let me ask you, at this point, that they have been

6   removed from the courtroom, what do you do?

7   A.    Once they removed from the courtroom, I locked the door, and

8   then I go back to the panel. And since we had a witness on the

9   stand, I shut down that part of the grand jury, because they were so

10  agitated and people were so upset, we decided that they probably

11  were not ready to hear the case addressed today, so we closed down

12  the grand jury.

13  Q.    In terms of your sense of what was going on, how were you

14  feeling after that just happened?

15  A.    Well, my concern was both for my welfare as well as those 14

16  people who I had empaneled there. Obviously, some of them were

17  very upset, because they– actually, some were almost ready to cry

18  because this was something unusual.  We never had anyone come in

19  and disrupt a session.

20  Q.    You, I think, testified that you had seen Mr. Fitzpatrick– that

21  this was the fourth or the fifth time on this?

22  A.    Yes.

23  Q.    And at this time you said there was Mr. Huff and several

24  others, correct?

25  A.    That's correct.

1  Q.    Can you describe your level of concern for yourself as far as

2  this arrest?

3  A.    Well, because that so much had been going on, and there had

4  been allegations that people were coming to my house to cause

5  harm to me whatever way, I was certainly concerned, because now I

6  have more people coming other than Mr. Fitzpatrick.

7  Q.    What had you seen before that caused concern?

8  A.    Pardon?

9  Q.    What else– were you saying that you saw other persons that

10  gave you concern?

11          MR. GREEN:   Your Honor, unless there is a nexus

12  between what he saw and the concerns he had of Mr. Huff, it is not

13  relevant, and we object.

14          MR. MACKIE:    Your Honor, I think it's very relevant

15  as to whether this citizens' arrest warrant and, at this time, Mr.

16  Huff's involvement, was something that caused Mr. Pettway to be

17  concerned for his personal safety, which leads up, of course, to the

18  issues on the 20th as to whether this was the Defendant and the

19  others taking actions to arrest county officials.

20          THE COURT:   Overrule the objection.

21  A.    That was a lot of concern, because some of the people on the

22  panel were obviously upset and in tears.

23  Q.    But as far as you, did you believe that you were under threat

24  of some sort of personal harm?

25  A.    Yes.

1   Q.    And why was that?

2   A.    Because Mr. Fitzpatrick had clearly given signs that he was

3   not happy with me and I had already been charged– tried to be

4   charged twice before this, and from information given from the

5   officers, that he was putting out information about me that was

6   erroneous.

7   Q.    Apart from the courtroom, did you have any sense for your–

8   apart from the courtroom, did you have some concern for your

9   personal safety; and if so, what reasons?

10  A.    Yes, I did, and so much so that, having been trained to carry a

11  gun, that I did carry my gun full time.

12  Q.    And why were you concerned? What was giving you concern?

13  A.    Because I felt that Mr. Fitzpatrick and his issues and his

14  concerns and those people that were supporting him were people

15  that could cross the line and that my life would be in jeopardy.

16  Q.    And had you seen other people around–

17  A.    Yes.

18  Q.    –that gave you some sense of threat?

19  A.    Yes. At one of the prior sessions, he had another of group

20  people with him who confronted me and told me that, you know, I

21  shouldn't be in position, that I was wrong.  I mean, they actually

22  got in my face and they put cameras in my face, really very

23  demeaning.

24  Q.    Did you think they knew where you lived?

25  A.    Yes.

1    Q.    Why so?

2    A.    Many times my neighbors would point out to me that there

3    were vehicles and people in the community would–

4              MR. GREEN:    Your Honor, please, this is double

5    hearsay. What his neighbors are telling him? I object.

6              THE COURT:    That's a valid objection, so I'll sustain

7    that objection.

8              MR. MACKIE:    No further questions, your Honor.

9              THE COURT:    Thank you. Cross- examination?

10              MR. GREEN:    Thank you, your Honor.

11                      **CROSS-EXAMINATION**

12    by Mr. Green:

13    Q.    Good afternoon, Mr. Pettway.

14    A.    Good evening.

15    Q.    My name's Scott Green. I represent Mr. Huff. If I ask you

16    some questions that– sometimes lawyers don't make sense when

17    they're asking stuff– just tell me, and we'll try to get it cleared up;

18    okay? You mentioned a moment ago that you obtained a firearm; is

19    that correct?

20    A.    Obtained?

21    Q.    Did you get a–

22    A.    I went through training with the officers to have training and

23    a permit to carry a firearm.

24    Q.    Okay. So you have a carry permit now; is that correct?

25    A.    Yes, I do.

1    Q.    And you carry your firearm with you when you deem it

2    necessary; is that correct?

3    A.    Yes, I do.

4    Q.    And if you deem it necessary to carry that firearm when you

5    travel to Knoxville, you carry it with you, correct?

6    A.    Yes.

7    Q.    If you deem it necessary to carry that firearm with you to

8    Chattanooga, you carry it, correct?

9    A.    Yes.

10   Q.    And you have an absolute and lawful right to carry that gun,

11   don't you?

12   A.    I do.

13   Q.    Okay.  I want to direct your attention back to the first few

14   events that you told Mr. Mackie and this jury about concerning Mr.

15   Fitzpatrick. Mr. Huff was never there on any of those occasions

16   when Mr. Fitzpatrick appeared before the three-person panel, was

17   he?

18   A.    Not to my knowledge .

19   Q.    Okay.  In fact, the first time you ever saw Darren Huff was on

20   April the 1st, correct?

21   A.    No.

22   Q.    When did you see him before?

23   A.    I can't say the exact date, but at one point he was in town and

24   an officer pointed out to me that that's who he was.

25   Q.    Okay.

1    A.    But I can't really tell you what date that was, but it was prior

2    to April 1st.

3    Q.    Now, it was before April 1st?

4    A.    Yes.

5    Q.    Okay. Now, on April the 1st there were several people that

6    had video cameras that day, weren't there?

7    A.    I know there was a video camera, and I think there was a still

8    camera. I can't say. I know one had a light that was directly behind

9    Mr. Fitzpatrick.

10   Q.    Okay. And I'm going to show you what we can mark and file

11   as the next exhibit for identification purposes. Does that

12   accurately depict the people that you recall seeing that day, on

13   April the 1st that were with Mr. Fitzpatrick?

14   A.    I was not in that area, so I don't know.

15   Q.    Let me ask it this way. You said you saw Mr. Huff that day?

16           MR. MACKIE:  Your Honor, just objecting. If he

17   doesn't identify this scene or this picture, then he has no

18   knowledge of this.

19           MR. GREEN:  Well, let me ask it a different way, then,

20   please, your Honor.

21           THE COURT:  I understand the objection, but the

22   picture has not yet been asked to be admitted into evidence.

23           MR. GREEN:  Right.

24           THE COURT:  So we'll hold back on the objection. Go

25   ahead.

1    Q.    Does this picture accurately depict the way that Mr. Huff was

2    dressed that day?

3    A.    I can't, I can't say.

4    Q.    Okay.  Well, how long did you get a chance to look at him

5    when you said he was in the grand jury room?

6    A.    It was just a moment that they came in. And as you can see in

7    the previous video, that I was really tied up with Mr. Fitzpatrick

8    coming at me and trying to get him stopped and get him to change

9    direction.

10   Q.    Okay.  Well, let's talk for just a second about Mr. Fitzpatrick.

11   First and foremost, we don't see him over here today, do we?

12   A.    No.

13   Q.    Okay.  Do we see any of these other people you just saw in

14   that picture over here today?

15   A.    No.

16   Q.    All right.  And Mr. Fitzpatrick, when he appeared on April the

17   1st, you didn't see a firearm on his person, did you?

18   A.    No.

19   Q.    Did you see a firearm on any other person's body?

20   A.    I didn't have time to look around to see if anybody had

21   anything. I was being confronted.

22   Q.    Okay.  Well, let's look at this picture again.  Do you

23   recognize any of the people that were in this picture?

24   A.    It appears that Mr. Huff is in the back.

25   Q.    In the back?  Would you describe which one he is, please?

1    A.    Well–

2    Q.    Is there anybody in front of him, in between the–

3    A.    No. Probably the person to the left.

4    Q.    Okay.  With the black shirt on?

5    A.    Yes.

6    Q.    And the white-looking pants?

7    A.    Yes.

8    Q.    Does it appear he's got a firearm on him anyplace?

9    A.    In this picture, no.

10   Q.    Okay.  Now, when Mr. Fitzpatrick came into the grand jury

11   room, he said to you, Mr. Pettway, you're under arrest, I believe we

12   saw in the video, for official oppression, or something like that,

13   right?

14   A.    Yes.

15   Q.    All right.  And did you just immediately comply and say,

16   okay, I'm going with you, Mr. Fitzpatrick?

17   A.    No.

18   Q.    In fact, you told him to "Get out of here, sir"?

19   A.    Well, I asked him to leave.

20   Q.    Right.

21   A.    And tried to keep him from coming any further.

22   Q.    And repeatedly, as we saw on the video, said, "Mr.

23   Fitzpatrick, you need to leave, please, sir," correct?

24   A.    Yes.

25   Q.    So is it a fair statement that you certainly weren't going to

1    willingly go at that point with him for his citizen's arrest? Is that a

2    fair statement?

3    A.    Yes.

4    Q.    And once that became apparent, did Mr. Fitzpatrick attempt to

5    tackle you?

6    A.    No. He just continued coming at me.

7    Q.    Did he attempt to handcuff you?

8    A.    No.

9    Q.    Did he attempt to pull any sort of weapon at all on you?

10   A.    No.

11   Q.    Did he exhibit or lay the first hand on you that day?

12   A.    No.

13   Q.    Did anyone who was with him lay a hand on you that day?

14   A.    No.

15   Q.    Was there the first act of violence that was exhibited that day

16   towards you?

17   A.    In his facial expressions.

18   Q.    His facial expression?

19   A.    Right. They were.

20   Q.    And how does one have a violent facial expression?

21   A.    He looked pretty angry.

22   Q.    Okay. Did he exhibit and turn that facial expression into any

23   sort of physical action towards you?

24   A.    No.

25   Q.    Now, on April the 1st, how is it that you typically come into

1   the courthouse when you're going to show up and have a grand jury

2   session that day?

3   A.     I'm usually the first one there early in the morning, and I go

4   into the front doors of the courthouse.

5   Q.     Okay.  And is that on the Donna's Restaurant side of the

6   courthouse?

7   A.     Yes.

8   Q.     And I believe you told us a forward minutes ago, in response

9   to Mr. Mackie's questions, that you didn't have any idea, this was a

10  complete surprise, when Mr. Fitzpatrick came bursting into the

11  grand jury room; is that correct?

12  A.     That's correct.

13  Q.     All right. So there hadn't been any heads up call from the FBI

14  or anybody else, had there?

15  A.     No.

16  Q.     And, in fact, when you came in, you didn't see SWAT teams

17  on the lawn or snipers up in the trees or anything, did you, that

18  day?

19  A.     No.

20  Q.     So if somebody had the plan to effect a gun-toting, violent

21  arrest, been a lot easier that day than April the 20th, wouldn't it?

22  A.     I guess so.

23                MR. GREEN:  That's all.

24                THE COURT:  Thank you. Any redirect?

25                MR. MACKIE:   Two issues.

1  **REDIRECT EXAMINATION**

2  by Mr. Mackie:

3  Q.    Mr. Green was asking you to look at the picture as far as what

4  Mr. Huff looked like and all.  Do you remember that picture, that

5  he had a shirt on, a black shirt, and white pants? Remember that?

6  A.    Uh-huh.

7  Q.    Could you see what was under the shirt?

8  A.    No.

9  Q.    Could he have been carrying a firearm?

10  A.    He could have.

11  Q.    On that point, do you see Mr. Huff in this courtroom today?

12  A.    Yes, I do.

13  Q.    And where is he?

14  A.    He's sitting to the right.

15  Q.    Next to Mr. Green?

16        (Defendant stood up.)

17  Q.    And, lastly, in terms of the questions about whether Mr.

18  Fitzpatrick tackled you, or whatever, in the courtroom, were there

19  law enforcement people in and around the courtroom right that

20  date?

21  A.    There was the law enforcement people there to present their

22  cases, and they were on the opposite side, in the jurors' room.

23  Q.    So whether he tackled you or not, I mean, there were cops

24  sitting right nearby?

25  A.    And you had one sitting on the stand.

1   Q.    And during the time this was happening, were you asking

2   somebody to go get people to come in?

3   A.    Yes. I asked Mr. Freiberg(phonetic) to go and get the officers.

4   And as you see at the end of the video, I asked the officers to arrest

5   Mr. Fitzpatrick and remove him from the room.

6            MR. MACKIE:   I have nothing further, your Honor.

7            THE COURT:  Thank you. Anything further, Mr. Green?

8                    **RECROSS-EXAMINATION**

9   by Mr. Green:

10  Q.    Did you learn, Mr. Pettway, that Mr. Fitzpatrick and the five

11  or six people that came with him, did you learn that before they

12  came over to try to arrest you, that they called the Madisonville

13  Police Department, asked them to be there?

14  A.    No, sir.

15           MR. GREEN:  That's all.

16           THE COURT:  All right.  Thank you, Mr. Pettway.  You

17  may be excused.

18       (Witness excused.)

19           MR. THEODORE:    Your Honor, we call Sheriff

20  Bivens as our next witness. Your Honor, may we retrieve the

21  exhibits that are left at the–

22           THE COURT:  Ms. Norris, she'll bring them back to

23  you after she swears in the witness.

24           COURTROOM DEPUTY:    Raise your right hand.  Do

25  you solemnly swear your testimony will be the truth, the whole

1    truth, and nothing but the truth, so help you God?

2            MR. BIVENS: I do.

3            COURTROOM DEPUTY: Please state and spell your

4    name for the record?

5            THE WITNESS: Sheriff Bill Bivens, B-i-l-l, B-i-v-e-n-s.

6            THE COURT: Thank you. You may be seated.

7                      **DIRECT EXAMINATION**

8    by Mr. Theodore:

9    Q.    Can you tell us your name and occupation, please?

10   A.    I'm Bill Bivens, the Monroe County sheriff.

11   Q.    Okay. And, Sheriff Bivens, could you kind of pull that

12   microphone up a little closer so we can all hear you well?

13   A.    Yes, sir.

14   Q.    Now, you said you're the Monroe County, Tennessee, sheriff?

15   A.    Yes, sir.

16   Q.    And how long have you been the sheriff of Monroe County?

17   A.    Six years.

18   Q.    And were you elected to that position?

19   A.    Yes, sir. 2006.

20   Q.    Okay. And prior to being a Monroe County sheriff– why

21   don't you just briefly describe what your role is as the Monroe

22   County sheriff?

23   A.    Okay. I'm chief law enforcement agent or head of the whole

24   county; and, of course, we've got five law enforcement agencies.

25   We have Tellico Plains, Madisonville City, Sweetwater and

1    Vonore, and then the Monroe County Sheriff's Department.

2    Q.    And how many deputy sheriffs do you have on the– in the

3    Monroe County Sheriff's Department?

4    A.    Okay. I've got 23, I think is right.

5    Q.    Before you became elected sheriff, did you ever work in law

6    enforcement before that?

7    A.    Yes. I was a chief of police in Tellico Plains.

8    Q.    Okay. And how long did you have that position?

9    A.    It was around two, two and a half years. Started in as patrol,

10   moved up to sergeant, and from there I was promoted to the chief.

11   Q.    Do you have, just in your background, do you have any other

12   public service that you did?

13   A.    I'm a former Monroe County commissioner, from 1994

14   through 1998.

15   Q.    Okay. And have you ever done anything just entrepreneurial

16   in your career?

17   A.    Business owner of a small business or had a small business.

18   Q.    Okay. I'd like to direct your attention to the morning of April

19   1st, 2010. Were you working that day?

20   A.    Yes, sir.

21   Q.    Do you remember that morning?

22   A.    I do.

23   Q.    Okay. And do you recall that morning going over to the

24   Monroe County courthouse?

25   A.    Yes, sir. I was told that there was an alarm at the courthouse

1    of a disruption of the grand jury. I knew very little about it at the

2    very beginning other than there was a disruption in the courthouse.

3    Q.    And did that cause you to go over there then?

4    A.    It did.

5    Q.    Was there anything unusual occurring when you got there?

6    A.    When I got there a Madisonville City detective was speaking

7    to a Walter Fitzpatrick.  Also there was a captain of the detectives,

8    Captain Bivens, same last name, was also there too, present.  And I

9    had–

10   Q.    Now– I'm sorry.

11   A.    I had two of my officers were with me also.

12   Q.    And where was that? You went to the courthouse. Was this

13   inside the courthouse or outside the courthouse?

14   A.    No. No, sir. That was outside, at the top of the steps of the

15   courthouse, the top steps, just as you go in the first floor– or the

16   second, I guess. They've got a basement.

17   Q.    Was it your understanding– you said you heard there was

18   some type of disruption there?

19   A.    Yes.

20   Q.    Now, was it your understanding something had already

21   occurred by the time you got there?

22   A.    Yes. I knew very little, just that there was a disruption in the

23   courthouse at the time.

24   Q.    Okay.  And can you explain to the jury, explain just what

25   happened once you got there and you made those observations?

1    What happened after that?

2    A.    Okay.  Once I got there, again, I see Detective Harrill

3    (phonetic)of the Madisonville Police Department, and he was

4    speaking to Walter Fitzpatrick.  Again, I was trying to just

5    understand what had happened. Darron Bivens, which is the

6    captain of the Madisonville City, he was also there, and he came

7    over and kind of briefed me up on the fact that the grand jury had

8    been disrupted.  We were– during that time, we discussed back and

9    forth, and I think the district attorney had been called and

10   questioned of what, you know, what kind of crime may have

11   occurred, and we got information back from that also.

12   Q.    Now, did you say there was a person out there– you mentioned

13   a person named Bivens?

14   A.    Yes, Captain Bivens.

15   Q.    Is he any relation to you?

16   A.    Very distant, probably a cousin, but it's way off–

17   Q.    But he's part of the sheriff's department?

18   A.    No, sir.  He is a Madisonville City detective.  He is the captain

19   of the detectives.

20   Q.    Okay.  And did you learn of a person named Walter

21   Fitzpatrick being there at that time?

22   A.    Yes, I did.

23   Q.    And did you actually see him at that time?

24   A.    I did.  At one point he advised me that I was under arrest.

25   Q.    Okay.  So this is after you got there, you're outside, on the

1    steps of the courthouse, and Mr. Fitzpatrick told you you were

2    under arrest?

3    A.    Yes, sir.

4    Q.    And how close was he to you when–

5    A.    He was probably as close to me as this stenographer here.

6    Q.    Okay. So just a few feet; is that–

7    A.    Yes.

8    Q.    What was he saying? Did he actually say, "I'm placing you

9    under arrest"?

10   A.    Yes, he did. He said he was placing me under arrest. I don't

11   know what all the charges. I can't really recall. I know treason

12   was one of them that he mentioned.

13   Q.    Okay. I'm going to show you what has been marked– well, let

14   me go with this. I'm going to show you what's been marked

15   Government's proposed Exhibit Number Four.

16            THE COURT:   Is there any objection to this exhibit?

17            MR. GREEN:   No, your Honor.

18            THE COURT:   All right. We'll go ahead and admit it.

19       (Government's Exhibit No. 4 received into evidence.)

20   Q.    Do you recognize what's depicted in that Government's

21   Exhibit Number Four which has been admitted?

22   A.    You mean the persons and the place?

23   Q.    Yes.

24   A.    Yes, sir. That is the floor that I– the step, the top step, of the

25   Monroe County Courthouse. That's also Captain Darron Bivens to

1    the left with the law enforcement shirt on, Walter Fitzpatrick

2    facing him with the ball cap, and Mr. Darren Huff in the

3    background with a camera.

4    Q.    Okay. You've identified Mr. Huff in the background, you

5    said?

6    A.    Yes, sir.

7    Q.    And that's right behind the shoulder of Mr. Fitzpatrick there?

8    A.    Yes, sir.

9    Q.    So you actually saw who you identified as Mr. Huff, you saw

10   them in there at that time?

11   A.    I did.

12   Q.    And do you see him here in this courtroom right now?

13   A.    I do.

14          MR. GREEN:   We will stipulate his identity.

15          MR. THEODORE:   Your Honor, may the record reflect

16   the witness has identified the Defendant?

17          THE COURT:   Yes. You may proceed.

18          MR. THEODORE:   Thank you.

19   Q.    What was transpiring in your mind right here when you saw

20   this and what did you– what was occurring?

21   A.    Well, from what I can recall there, it looks as if Darron

22   Bivens– which is the captain, and I'll speak of him sometimes as

23   Darron. I apologize for that, because I know his first name. But

24   Captain Bivens was speaking to him, and I guess at that time we

25   were awaiting some information of what Mr. Fitzpatrick had done,

1    had he committed a criminal act. And we were waiting on the

2    Attorney General's answer.

3    Q.    About him going to the grand jury that day?

4    A.    Yes, yes, disrupting the grand jury.

5    Q.    Okay. So it's in the course of your discussing that that Mr.

6    Fitzpatrick then tries to place you under arrest; is that right?

7    A.    Yes, sir. I think it was after this.

8    Q.    Okay.

9    A.    I know it was after this, yes, it was.

10   Q.    Let me show you what has been marked as Government's

11   Exhibit Number Five. Well, let me hold on a second before I get to

12   that. So after Mr. Fitzpatrick told you that you were under arrest,

13   he's placing you under arrest for, among other things, treason,

14   what was your response?

15   A.    Well, at that time, I think before this, we had spoken with Mr.

16   Harrill (phonetic), Detective Harrill, and he had some documents

17   supposedly that were supposed to be an arrest warrant, which we

18   seen not to be an arrest warrant, not a legal document as an arrest

19   warrant, anyway.

20   Q.    What was that title to that arrest warrant?

21   A.    Titled?

22   Q.    Was that a citizen's arrest warrant?

23   A.    Yes. Yes, it was.

24   Q.    And you actually saw that document?

25   A.    I did see that document just briefly, not enough to, you know,

1    actually read it fully, but I did see it, yes.

2    Q.    I'm going to show you what's been admitted into evidence as

3    Government's Exhibit Number Two. Is that the document that you

4    saw?

5    A.    It is.

6    Q.    On that day?

7    A.    It is.

8    Q.    And you're listed on there; are you not?

9    A.    I am.

10   Q.    Listed as a domestic enemy; is that right?

11   A.    Yes.

12   Q.    Where is your name on there?

13   A.    It's over to the right, in the first paragraph, below

14   "domestic," about the third line from the bottom or fourth from the

15   top.

16   Q.    Okay. Why don't you go ahead and circle? You can touch the

17   screen and circle.

18   A.    Where I'm at?

19   Q.    Yes.

20   A.    It's above that one.

21   Q.    Okay. Bill Bivens right there; that it?

22   A.    Yes. Yes, it is.

23   Q.    Okay. When did you see that, this citizen's arrest warrant?

24   A.    It was during the time that either Darron– again, I'm sorry–

25   Captain Bivens or Detective Harrill had it in his hand. He was

1  looking at it and explaining that it wasn't a legal– an actual arrest

2  warrant.

3  Q.    You ever committed treason?

4  A.    No, sir.

5  Q.    Is there any validity whatsoever to this document?

6  A.    None whatsoever.

7  Q.    What happened after Mr. Fitzpatrick tried to place you under

8  arrest? Did you comply, did you submit to him?

9  A.    No, sir.  During that time, he continued to talk in a manner of

10  me being arrested and Captain Bivens with the Madisonville City

11  directed him to– initially, warned him; and then, after he

12  continued, told him he was under arrest.

13          At that point, we went down the stairs of the– out into the

14  front lawn, toward the road or the street, sidewalk, and continued

15  to talk with Mr. Fitzpatrick.  And at that point he was under arrest

16  and started to place him under arrest with– I started actually to put

17  handcuffs on Mr. Fitzpatrick. During that time, he struggled and

18  resisted, and he was taken into custody at the bottom of the steps,

19  near our vehicle.

20  Q.    So after Mr. Fitzpatrick tried to place you under arrest, he

21  ultimately was arrested?

22  A.    Yes, he was.

23  Q.    And what was he arrested for?

24  A.    It was for disruption of a meeting, which was the grand jury.

25  Also it was for disorderly conduct, resisting and inciting a riot.

1    Q.    I want to show you what has been marked as Government's

2    proposed Exhibit Number Five.

3              MR. GREEN:   No objection.

4              MR. THEODORE:    Your Honor, I don't believe there

5    is an objection.  I'd move the admission of Government's Exhibit

6    Number Five.

7              MR. GREEN:   No objection.

8              THE COURT:   So admitted.

9         (Government's Exhibit No. 5 received into evidence.)

10   Q.    Do you recognize what's shown in that photograph, Mr.

11   Bivens?

12   A.    Yes, I do.

13   Q.    And are you actually in that photograph?

14   A.    I'm pretty much middle ways of the photograph, yes, sir.

15   Q.    Is this you right there?

16   A.    Yes, it is.

17   Q.    And do you see Mr. Huff in that?

18   A.    I do, just behind me, on my left shoulder, behind me.

19   Q.    Does he have a video camera?

20   A.    Yes, sir.

21   Q.    Is this Mr. Huff?

22   A.    Yes, sir.

23   Q.    Now, what's going on right there? What's transpiring there?

24   A.    He has been told that he was under arrest and–

25   Q.    That's Mr. Fitzpatrick, you're talking?

1    A.    Yes, sir.

2    Q.    Okay.

3    A.    And that's Captain Morgan next to Captain Bivens. He is

4    removing the video recorder– not video recorder, but a audio

5    recorder from Mr. Fitzpatrick, and he gave it to someone that was

6    with Mr. Fitzpatrick.

7    Q.    Okay. What happened after this scene right here?

8    A.    Just after that, I think that's when I attempted to put the

9    handcuff just prior– I mean, just after this, just a little while after

10   that. And then he resisted and then we got him into custody, and he

11   was walked for a short distance and then refused to walk, and he

12   had to be picked up and carried to the patrol car.

13   Q.    In addition to the citizen's arrest warrant, did Mr. Fitzpatrick

14   or anybody else there have any other documents there that were

15   associated with the citizen's arrest warrant?

16   A.    Don't recall.

17   Q.    Did they have anything like an affidavit of criminal

18   complaint, anything like that as well?

19   A.    Don't recall anything else.

20   Q.    Okay. All right. At that time, when Mr. Fitzpatrick was

21   trying to place you under arrest, told you you were under arrest, did

22   that cause you concern?

23   A.    Well, I knew I hadn't done anything, so I really wasn't that

24   concerned. But it's something, you know, personally, somebody

25   says you're under arrest, you wonder, you know, what's the

1  validity of what they're doing? It did feel a little bit

2  uncomfortable, yes.

3           MR. THEODORE:    I have nothing further.

4           THE COURT:   Okay. Thank you. Cross-examination?

5           MR. GREEN:   Thank you, your Honor.

6                    **CROSS-EXAMINATION**

7  by Mr. Green:

8  Q.   Good afternoon, Sheriff.

9  A.   Good afternoon.

10  Q.   My name's Scott Green. I represent Mr. Huff. I want to touch

11  upon what you just said a moment ago about, when somebody tells

12  you that you're under arrest, regardless of whether or not that

13  arrest is valid, it kind of ramps your blood pressure up?

14  A.   Why, sure. I think it's normal reaction–

15  Q.   Normal reaction, to make you uptight and maybe think and

16  say and do things that you wouldn't ordinarily normally do?

17  A.   Well, I don't know as far as doing unordinary things, but just

18  in general you're wondering, you know, what's the validity of what

19  they're saying.

20  Q.   Okay.

21  A.   Of course, trying to understand.

22  Q.   That, I take it, even though you're a law enforcement officer,

23  I think that would be a fair statement, that a private citizen might

24  have those same concerns?

25  A.   Why, sure.

1    Q.    All right. Now, you all charged Mr. Fitzpatrick with inciting a

2    riot. Where was the riot?

3    A.    Actually, those were the charges that Captain Bivens imposed

4    on Mr. Fitzpatrick. I didn't actually do the charging.

5    Q.    Did you see a riot occur?

6    A.    That's what I– I did not, other than a large number of people

7    being there and the fact that he was in the grand jury room. So I

8    knew very little of what all had transpired. When I came up there,

9    it was all new to me.

10   Q.    And, of course, all the chattering, by the time you got there,

11   all the chatter going back and forth was between Mr. Fitzpatrick

12   and various law enforcement officers; is that correct?

13   A.    When I once got there, yes, sir.

14   Q.    While you were there and before Mr. Fitzpatrick was placed

15   under arrest, did you ever hear Mr. Huff utter one word?

16   A.    Not, not at that time. After he was arrested I did hear in the

17   background him speaking as we walked Mr. Fitzpatrick to the

18   patrol car.

19   Q.    Okay. And when you got Mr. Fitzpatrick down to the jail,

20   before he's admitted into the jail, he would have been searched; is

21   that correct?

22   A.    That's normal, yes.

23   Q.    And no weapon was found on him, was there?

24   A.    No.

25   Q.    When Mr. Fitzpatrick told you you were under arrest, you said

1  kind of made you feel funny, of course, but did you go with him?

2  A.    No, sir. I knew I hadn't done anything, and knowing the

3  document that he had at hand wasn't an actual arrest warrant, I had

4  no reason to go with him.

5  Q.    Okay. Did he attempt to lay hands on you and force you to go

6  with him?

7  A.    No, he didn't.

8  Q.    The document, now, you said that's not a valid document, but

9  there is such thing as citizens' arrests, isn't there?

10  A.    Yes, sir. I don't disagree with that. There is a citizen's arrest.

11  Q.    And, in fact, if one of your officers, if he goes outside of his

12  jurisdiction, if he wants to make an arrest, he's doing so as a

13  private citizen, isn't he?

14  A.    A private citizen's arrest is legal, yes.

15  Q.    In the State of Tennessee, correct?

16  A.    Yes. The particular, if I may, the particular document that I

17  seen did not have the magistrate or the clerk's signature on it, and

18  it did not appear to be, in no way, think it was an arrest warrant. So

19  that's the reason I didn't comply with Mr. Fitzpatrick.

20  Q.    Okay. And that's fair. But in Tennessee you don't have to

21  have a document to effect a citizen's arrest if you see a public

22  offense committed in your presence?

23  A.    I agree. Yes, sir, you're correct.

24  Q.    Okay. You can arrest without a warrant, can't you?

25  A.    Yes, yes.

1    Q.    Thank you. Now, you're named in this domestic citizen's

2    complaint signed by Mr. Fitzpatrick, correct?

3    A.    Yes, sir.

4    Q.    And we've already established you weren't arrested on April

5    the 1st. Were you arrested on April the 20th?

6    A.    No.

7    Q.    Did a group, a posse, of armed individuals, try to take you

8    into custody that day?

9    A.    No, sir.

10   Q.    Okay. To your knowledge, was anyone, was there any attempt

11   to place anybody under arrest on April the 20th?

12   A.    No attempts. There was information that we had received

13   through phone calls to Madisonville Police Department, as well as

14   through the internet, that there was something bad going to happen.

15   It appeared from different information had come to us.

16   Q.    Okay. And you've got a deputy named Benny Byrum, don't

17   you?

18   A.    Yes. He is the captain of the court.

19   Q.    Okay. He's over the courthouse security; is that correct?

20   A.    He's the court officer, yes.

21   Q.    All right. He's named on that document that we have been

22   looking at as well, isn't he?

23   A.    I think so. I'm not positive. I'd have to look at it again. I just

24   mainly looked at mine. I know there are some judges on it as well.

25   Q.    And you told us that, if I'm not mistaken, when you arrived on

1    April the 1st, when you arrived at the scene to the courthouse, that

2    there was Detective Harrill from the Madisonville Police

3    Department there?

4    A.    Yes, sir.

5    Q.    And there was also Captain Bivens from the Madisonville

6    Police Department; is that correct?

7    A.    Yes.

8    Q.    And so is it a fair statement that Madisonville Police

9    Department officers arrived at that scene prior to you getting there

10    as the sheriff, right?

11    A.    Prior to me, yes. It is inside the city limits, of course, the

12    courthouse is, and they respond a lot of times with us.

13    Q.    Have you gone back over, in anticipation and preparation for

14    your testimony today, have you been asked to review any of the

15    radio logs or the phone logs for that morning to see if anybody

16    called in, said, hey, they're getting ready to do a citizen's arrest

17    over at the courthouse?

18    A.    You're talking about on?

19    Q.    April the 1st.

20    A.    April 1st. No, not on April the 1st, no.

21            MR. GREEN:   Okay. Thank you.

22            THE COURT:   Thank you. Redirect?

23            MR. THEODORE:    Just a couple follow-up questions,

24    your Honor.

25                    **REDIRECT EXAMINATION**

1    by Mr. Theodore:

2    Q.    Sheriff Bivens, Mr. Green was asking you about April 20th.

3    Now, what was going on on April 20th, 2010?

4    A.    Okay.  After the April 1st incident, we received information

5    from Madisonville Police Department that several calls had come

6    through to them, and the chief there let me know that he had gotten

7    calls. And we were in a very big concern with something happening

8    at the courthouse, maybe some type of a threat was going to occur.

9          Also, via the internet, there was, to our knowledge, there was

10   things put on there.  I never read them directly; just information

11   that I received.  And I had great concern for the courthouse and, of

12   course, the county, as far as that goes.  We, in preparation prior to

13   the 20th or during the 20th, we prepared early.  We alerted each

14   other, municipality, the sheriff's department, the other four police

15   departments and the THP– well, I spoke with the district attorney

16   in concern, and we had members from the Tennessee Highway

17   Patrol and other agencies that assisted.  And there were some 75

18   that were brought or came to that on that date, came to the

19   courthouse.

20   Q.    You're saying about 75 law enforcement officers?

21   A.    Yes.

22   Q.    Came to Madisonville?

23   A.    There was just great concern, with the information that had

24   been given us.  And we actually took– we've got a bomb dog, that

25   we ran our dog around the premises of the courthouse in different–

1    you know, in an effort to make sure everything was safe and

2    nothing was going to happen.

3    Q.    And what were you preparing for?

4    A.    We had heard that there was going to be some problems, big

5    problems. And, of course, some of the folks, during the time that–

6    during the arrest, there was, you know, you could tell that there

7    was some heightened, you know, things that were said that sounded

8    like that they were very unhappy with what had happened with Mr.

9    Fitzpatrick and maybe some retaliation may come as a result.

10   Q.    So be more specific, though, you were preparing for

11   something bad to happen.  What were you anticipating happening?

12   A.    Well, we had information that there was a truck with some

13   type of a missile launcher maybe in the back of it and just different

14   things like that, that there was going to be some violence, you

15   know, because of Mr. Fitzpatrick's arrest.

16   Q.    Okay.  Were you aware of people coming in from out of town

17   for that?

18   A.    Yes. We had understood they were coming from Georgia.

19   Q.    Who did you think was coming?

20   A.    Well, my understanding, Mr. Huff, his name was mentioned.

21   Q.    And was he part of any group that you were aware of?

22   A.    There was a couple of different vehicles that were in town

23   during that time named Oath Keepers, I believe–

24          MR. GREEN:   Your Honor, this is way beyond the

25   scope of where we went on cross-examination–

1          MR. THEODORE:   Your Honor, I don't think it is. I

2     didn't–

3          MR. GREEN:   –and I object.

4          THE COURT:   Hard to hear both sides. Don't interrupt

5     each other. Go ahead.

6          MR. THEODORE:   Your Honor, I didn't bring up the

7     April 20th thing with Sheriff Bivens, but Mr. Green got into that,

8     and I think this relates to exactly what Mr. Green was eliciting

9     from Sheriff Bivens about the 20th–

10          MR. GREEN:   We don't dispute there was a lot of law

11     enforcement there on April the 20th, but as to what information,

12     who told him what, one, it's hearsay, and two, it's not relevant.

13     It's beyond the scope of where we went on cross.

14          THE COURT:   I believe this part is beyond the scope,

15     so I'll sustain the objection.

16          MR. THEODORE:   Your Honor, may I– just want to

17     ask him if he's aware of whether or not people did, in fact, come in

18     that day from other places.

19          THE COURT:   You can ask that.

20          MR. GREEN:   If he has personal knowledge.

21          THE COURT:   Go ahead and ask that.

22          MR. THEODORE:   All right.

23     Q.    Sheriff Bivens, are you aware of whether or not people did, in

24     fact, come in from other places on that day when law enforcement

25     was braced for them in Madisonville?

1    A.    Yes. There was people on the streets there, yes.

2          MR. THEODORE:  Okay. Thank you. Nothing further.

3          THE COURT:  Thank you.

4                    **RECROSS-EXAMINATION**

5    by Mr. Green:

6    Q.    And in follow-up to that, Sheriff Bivens, you all got this

7    information, but, now, can you tell me where in the Tennessee

8    Code it says that it's a crime to talk big?

9    A.    Well, we're not going to take– you know, I can't tell you that.

10   But I would, any kind of threat we're, of course, going to take

11   immediate action to try to protect the citizens of Monroe County

12   and their courthouse.

13   Q.    As you should have done, as you should have done.

14   A.    Yes, sir.

15   Q.    But just because a whole bunch of law enforcement officers,

16   bunch of police officers had to come out that morning, that doesn't

17   mean that somebody's got to go to jail, does it?

18   A.    No. Somebody has to commit a crime.

19         MR. GREEN:    Thank you, sir.

20         THE COURT:   All right.  Thank you, Sheriff Bivens.

21   You may be excused as a witness.

22        (Witness excused.)

23         THE COURT:   Does the jury want a short break?  Why

24   don't we go ahead and take a break?  We'll go a little bit longer,

25   but let's take– let's break until 4:20, make it a little bit shorter

1    afternoon break, since we're kind of near the end of the day,

2    anyway. Thank you.

3            (Recess had 4:08 p.m.; reconvened without jury at 4:23 p.m.)

4            THE COURT:   I think you all have been told that one of

5    our jurors does have to leave by five o'clock today, so we'll need

6    to break about then. So why don't you go ahead and– we'll bring

7    our jury in, and, Mr. Mackie, you can go ahead and get your next

8    witness and–

9            MR. MACKIE:    Just bring them in?

10           THE COURT:   –bring them up to the witness stand, yes.

11           (Jury reconvened in courtroom at 4:24 p.m.)

12           THE COURT:   Thank you. Everyone may be seated.

13   Mr. Mackie, do you want to announce the next witness?

14           MR. MACKIE:   Yes, your Honor. The United States

15   would call Shane Longmire, Robert Shane Longmire.

16           COURTROOM DEPUTY:    Raise your right hand.  Do

17   you solemnly swear your testimony will be the truth, the whole

18   truth, and nothing but the truth, so help you God?

19           MR. LONGMIRE:   Yes.

20           COURTROOM DEPUTY:    Have a seat and please tell

21   your name and spell it.

22           THE WITNESS:   Shane Longmire, S-h-a-n-e, L-o-n-g-

23   m-i-r-e.

24           MR. MACKIE:    May I proceed, your Honor?

25           THE COURT:   Yes.

1    **DIRECT EXAMINATION**

2    by Mr. Mackie:

3    Q.    Mr. Longmire, can you tell us in general where you reside?

4    A.    Dallas, Georgia.

5    Q.    How are you employed?  What's your job?

6    A.    I work for a bank in the Atlanta area.

7    Q.    Back in 2010, in April of 2010, where were you working?

8    A.    J.P. Morgan-Chase.

9    Q.    And where was that location?

10   A.    Hiram, Georgia.

11   Q.    Is that anywhere near Dallas, Georgia?

12   A.    Yes.

13   Q.    Did you know the Defendant, Darren Huff, in April, 2010?

14   A.    Yes.

15   Q.    Roughly speaking– and if you could speak into the

16   microphone too– roughly speaking, how long had you known him

17   from the April, 2010, time period?

18   A.    About nine years.

19   Q.    Now, during the period– well, okay.  So you've known him

20   for nine years, and how long as a bank customer?

21   A.    Since 2005.

22   Q.    Did you see him on a regular basis during the time as a bank

23   customer?

24   A.    Yes.

25   Q.    From the, let's say, the 2009 time period, mid to late 2009 and

1    2010, did Mr. Huff, in the bank, in interaction with you, express

2    any sentiments or expressions relating to the federal government?

3    A.    Yes.

4    Q.    And can you describe that?

5    A.    That the government was a conspiracy and he was anti-

6    government, just stuff along that line.

7    Q.    Was that something different than earlier times, prior to

8    2009?

9    A.    Yes.

10   Q.    In what way?

11   A.    That never came up earlier.

12   Q.    So it started to come up around when, just in general?

13   A.    A little bit after the election, presidential election.

14   Q.    Into the 2010 time period, can you describe whether he was

15   the same, increased, decreased, in those expressions?

16   A.    It was more often.

17   Q.    Going into when?

18   A.    Going into, you know, 2010.

19   Q.    Now, in 2010, then, I guess, you were working at Chase Bank

20   and Mr. Huff was a customer there, correct?

21   A.    Yes.

22   Q.    Do you recall a time in April of 2010, in which you had

23   interaction with Mr. Huff that caused you some concern?

24   A.    Yes, I did.

25   Q.    And can you give us, as best you can, a point in time when

1    that happened?

2    A.    It was late on a Thursday evening, around the 15th of April,

3    Mr. Huff came into the bank.

4    Q.    All right.  And so when he came into the bank, where were

5    you and what caused your attention– what caught your attention?

6    A.    I was close to the back of the branch, and he was at the teller

7    line, talking to– or coming to make a deposit with one of the

8    tellers, and that was when I went over.

9    Q.    What prompted you to go over there?

10   A.    A couple of the tellers had, you know, stated that they were

11   kind of uncomfortable with some of the stuff that he was saying.

12   Q.    Political related?

13   A.    Yeah. Yes, sir.

14   Q.    So when you approached Mr. Huff, who else was around

15   there?

16   A.    Erica Dupree.

17   Q.    Erica Dupree?

18   A.    Dupree, yes.

19   Q.    And at the time that you went over there, can you describe any

20   discussions or statements that Mr. Huff said to you at that time?

21   A.    He said that he was getting ready to head to Madisonville,

22   Tennessee.

23   Q.    I'm sorry. What's that?

24   A.    He was getting ready to head to Madisonville, Tennessee.

25   Q.    And did he say why?

1    A.    To take back over the city.

2    Q.    What was it in connection with?

3    A.    Somebody was wrongly accused or wrongly arrested, a

4    gentleman by the name of Fitzpatrick.

5    Q.    Now, when you came up, was he already in discussion when

6    you came up to him?

7    A.    Not, not too much into it.

8    Q.    All right. So did you ask him, I mean, just trying to say, how

9    did you bring this up? What prompted this discussion?

10   A.    He was talking about some of the previous times that he had

11   went.

12   Q.    I'm sorry. The previous time that what?

13   A.    That he had went to Madisonville.

14   Q.    And from your understanding from what he said, that he had

15   been there sometime before, and why was he there before?

16   A.    To– I mean, you know, kind of like a protest against this

17   town.

18   Q.    Did you have a name or anything or just it was somebody

19   that–

20   A.    Just it was someone, the first time. The second time was when

21   he told me it was Fitzpatrick.

22   Q.    Okay. So he's talking to you, and does he indicate when he's

23   going and what he's going to do?

24   A.    Yes.

25   Q.    Can you describe that as carefully and as best as you can?

1    A.    He said that he was going up with a couple other groups to

2    take over the city.

3    Q.    And did he say what type of groups?

4    A.    Militia groups.

5    Q.    And did he indicate whether he was taking anything with him?

6    A.    I had asked the question, if he was going to videotape it this

7    time. He said no, that he was going to be taking an AK-47.

8    Q.    And why did you ask about the videotape?

9    A.    Because he had said previously that he had videotaped it.

10   Q.    So when you asked him about the videotape, can you describe

11   his words?

12   A.    "Be kind of hard. I'm going to have– be on the front line with

13   two AK-47s."

14            MR. GREEN:   I'm sorry. I didn't hear the last part.

15            THE COURT:   Could you repeat that testimony?

16   A.    That he was going to be on the front, where it would be kind

17   of hard to videotape because he was going to have his hands full,

18   he was going to have two AK-47s on the front line.

19   Q.    Did he indicate at all whether you might learn about it in some

20   manner?

21   A.    I'm sorry?

22   Q.    Did he indicate how you might learn about this?

23   A.    Going pull it up on YouTube.

24   Q.    Did he say you were going to hear about it somehow or–

25   A.    Yeah. He said you can catch it on the 12:00 o'clock news.

1  Q.    You've seen Mr. Huff for a number of years?

2  A.    Yes, sir.

3  Q.    And you've testified as to some expressions he was having.

4  On that day, on April 15th, when he was talking like that, how did

5  that strike you?

6  A.    Kind of odd.

7  Q.    Humm?

8  A.    Kind of odd.

9  Q.    Did you think he was joking or serious? How would you–

10  A.    No. I thought he was serious.

11  Q.    So much so that were you concerned about it?

12  A.    Yes, I was.

13  Q.    And why were you concerned?

14  A.    Because, you know, you never know. I don't want anybody

15  innocent being harmed, put in harm's way, because of it.

16  Q.    And did you at that time– when you talked with him about this

17  stuff going on, did he leave by himself? Did you walk out with

18  him? What happened at that point?

19  A.    I walked to the front door.

20  Q.    And did he tell you, besides about the AK-47s, did he tell you

21  whether he was planning or thinking about taking some other type

22  of weapon or something to Madisonville?

23  A.    Yeah. He showed me the vehicle he was taking, and he said

24  that there was going to be a bracket put on the back of the truck for

25  an anti-aircraft gun.

1   Q.   And did you take a look at that kind of truck?

2   A.   Yes, I did.

3   Q.   I'm going to show you what's been marked for identification

4   as Government Exhibit 23 and 24.

5            MR. MACKIE:  Can I approach the witness? This is 23.

6            THE COURT:   Any objection to these documents?

7            MR. GREEN:  No, your Honor.

8            THE COURT:   All right.  We'll admit 23 and 24.  Go

9   ahead and show them to the jury.

10       (Government's Exhibit Nos. 23, 24 received into evidence.)

11  Q.   Now, can you tell the jury whether you recognize this?

12  A.   This was the truck.

13  Q.   And had you seen him driving something different at any

14  other time?

15  A.   Yes, sir.

16  Q.   Can you describe that, please?

17  A.   It was a black truck, it was a work truck, and it was his

18  company's truck.

19  Q.   So which had you seen him normally driving?

20  A.   Not this one; the other truck.

21  Q.   So was this the first time you saw this?

22  A.   Yes, sir.

23  Q.   I'm going to show you Government Exhibit 24.  Do you

24  recognize anything on that?

25  A.   Yes, sir.

1  Q.   Were there, again, were there stickers that you saw on there,

2  on that truck?

3  A.   I don't recall seeing those stickers, but, you know, I got a

4  look at, but I didn't see those exact ones.

5  Q.   Was there something about him driving this truck versus the

6  black truck you saw that gave you any concern?

7  A.   I saw some writing on the side of it, said, "Georgia Militia"

8  on the door.

9  Q.   And what made you concerned about that?

10  A.   It was something out of the ordinary.  You know, you don't

11  see a lot of trucks with "Georgia Militia," utility trucks.

12  Q.   After what you just described happened in interaction with

13  him, did you take any action or did you just let it go?

14  A.   I went home and spoke to my wife, and she was the one that

15  stated I need to call someone.  So I talked to an acquaintance of

16  mine, which is a Paulding County sheriff .

17  Q.   And why did you feel that was necessary?

18  A.   I didn't want anything to happen to anybody that shouldn't

19  been– shouldn't have happened.

20  Q.   Did you talk with anyone?

21  A.   I talked to the– my acquaintance that I talked to, yes.

22  Q.   And then what?  I'm sorry. Go ahead.

23  A.   Then I got a phone call from a Captain Morgan from

24  Tennessee, and that was– I told him exactly what, you know, I've

25  said here today.

1    Q.    And did you explain to him what your concerns were?

2    A.    Yes, sir.

3    Q.    Did you tell him what Mr. Huff was saying?

4    A.    Yes, sir.

5    Q.    And I take it do you recognize Mr. Huff in this room?

6    A.    Yes, sir.

7    Q.    Does he–

8            MR. GREEN:   Stipulate the I.D., your Honor.

9            MR. MACKIE:    Okay. So we don't need to.

10   Q.    So you talked to this captain in Tennessee, right, and

11   described what he told you?

12   A.    Yes, sir.

13   Q.    All right. looking back, then, on that April 20th, time period

14   and the fact that you testified that you'd known Mr. Huff for a

15   number of years, can you describe to the jury whether this was

16   something you took seriously and was concerned about?

17   A.    It was something I took very seriously. That's why I'm

18   sitting here today. It was something out of the ordinary. Like I

19   said, I've known Mr. Huff for quite a few years, and this was

20   something that just didn't seem right.

21   Q.    And the Mr. Huff that you knew in the early years, did he ever

22   talk like that?

23   A.    No, sir.

24   Q.    Did he ever say anything close to what happened on the 20th?

25   A.    No, sir.

1    MR. MACKIE:    Just a moment, your Honor.

2    Q.    Just to make sure that I covered that, did Mr. Huff say to you,

3    on the 15th, when he was going to Madisonville?

4    A.    The Tuesday, next Tuesday, the 20th.

5    Q.    The 20th?

6    A.    Right.

7    Q.    I think you said something there was going to be a court

8    hearing or something like that. Did he express any intent on taking

9    actions relating to the court or the city?

10   A.    Take back over the city from the corruption.

11            MR. MACKIE:    That's all I have, your Honor.

12            THE COURT:  All right. Thank you. Cross-examination?

13                      **CROSS-EXAMINATION**

14   by Mr. Green:

15   Q.    Mr. Longmire, my name's Scott Green.  I represent Mr. Huff.

16   How are you?

17   A.    I'm good, thank you.  How are you?

18   Q.    Fine. I've got some questions. If you don't understand

19   something I ask you, and you tell me, we'll make sure we're both

20   singing off the same sheet; okay?

21   A.    Yes, sir.

22   Q.    You mentioned a moment ago that you've known Mr. Huff for

23   a while.  How long ago was that?

24   A.    At about 2001.

25   Q.    Okay. So right at ten years?

1    A.    Yes.

2    Q.    And you said that the comments that he was making on April

3    the 15th were out of the ordinary for him.  Is that a fair

4    representation of what you just said?

5    A.    Yes, sir.

6    Q.    Okay. So you never heard him express anything like that

7    before?

8    A.    Before October 15th– April 15th, yes, sir, I have.

9    Q.    Okay.  And you said that he had some frustrations and

10   expressed some anti-government sentiments back kind of

11   beginning around 2009, after the election; is that correct?

12   A.    Towards the end of 2009.

13   Q.    Kind of bashing the president and everything going on up in

14   Washington?

15   A.    Yes, sir.

16   Q.    Of course, that's the same stuff we're going to hear if we tune

17   in to Rush Limbaugh, isn't it?

18   A.    Yes, sir.

19   Q.    Same stuff we hear if we tuned in to Fox News and Sean

20   Hannity, isn't it?

21   A.    Yes, sir.

22   Q.    And before Obama was elected, while Bush was in office,

23   same stuff we would have heard if we tuned in to MSNBC, right?

24   A.    Yes, sir.

25   Q.    Okay. Now, the vehicle that he showed you, this truck that's

1  got the upside down flags on it, I believe that's Government

2  Exhibit 24 that I'm referring to, and you're aware of what the

3  significance of an upside down American flag is, aren't you?

4  A.    No, sir.

5  Q.    You're not aware that that means country in distress?

6  A.    No, sir.

7  Q.    Okay. Were you ever in the service?

8  A.    No, sir.

9  Q.    Did you ever take an oath of any kind to defend and protect

10  the constitution?

11  A.    No, sir.

12  Q.    Okay. You said he normally drives the black truck; is that

13  correct?

14  A.    Yes, sir.

15  Q.    And it was this camo-painted truck, was the one that he told

16  you on the 15th that I'm going to Tennessee and with my anti-

17  aircraft gun, correct?

18  A.    Yes, sir.

19  Q.    Okay. So if, in fact, he didn't drive this camo-truck on the

20  20th, would that not indicate to you, sir, that perhaps his plans had

21  changed?

22  A.    Could have.

23  Q.    All right. Now, the statement that he said, "I'm going to take

24  over the city," did I understand that correctly, take back over the

25  city?

1   A.   Take back the city, yes, sir.

2   Q.   Take back the city. Okay. Did Ms. Dupree hear him say that?

3   Was she within earshot?

4   A.   Yes, sir.  We were both standing there.

5   Q.   Okay. Now, the phrase "take back" anything can be construed

6   any number of different ways, couldn't it?

7   A.   Yes, sir.

8   Q.   Are you a college football fan?

9   A.   Yes, sir.

10  Q.   Who do you like, Georgia?

11  A.   Florida State.

12  Q.   And if the Seminoles are going to be playing Tennessee in

13  Neyland Stadium and you all were bringing 60,000 folks up here, it

14  wouldn't be uncommon to say we're taking over Neyland Stadium,

15  would it?

16  A.   No, sir, wouldn't.

17  Q.   Doesn't mean you're necessarily going to have guns and have

18  any violent interaction with the folks over here on the banks of the

19  Tennessee River, right?

20  A.   No, sir.

21  Q.   All right.  Now, you've known Darren and Cindy Huff, both,

22  for, you and your wife both, for a number of years; is that correct?

23  A.   Yes, sir.

24  Q.   And, of course, you were trying to do the right thing, you

25  said, by telling law enforcement about what Mr. Huff had said; did

1   I understand correctly?

2   A.    Yes, sir.

3   Q.    And it was on April the 15th that these statements were made

4   to you by Mr. Huff, correct?

5   A.    Yes, sir.

6   Q.    And just as an aside, it's probably not that uncommon for

7   people to express frustration with the United States Government on

8   April 15th, is it?

9   A.    That's the first time I've heard that in a bank, though.

10  Q.    Okay. And you've seen Mr. Huff with that firearm, that .45 on

11  his side, before, haven't you?

12  A.    One time.

13  Q.    In fact, he came into your bank one time, and you had to ask

14  him to leave with it?

15  A.    Yes, sir.

16  Q.    Right. So, I mean, he's carried the .45 with him before on

17  other occasions?

18  A.    Yes, sir.

19  Q.    Correct?

20  A.    Yes, sir.

21  Q.    Did Mr. Huff or Cindy Huff give you permission to disclose

22  any of their financial records?

23  A.    No, sir.

24  Q.    And you were the bank manager of Chase Bank, correct?

25  A.    Yes, sir.

1    Q.    Were you served with a subpoena by a federal agency to

2    obtain their private financial information?

3    A.    No, sir.

4    Q.    And, in fact, any information in your bank, as a federally

5    insured bank, is, in fact, protected by federal law, correct?

6    A.    Yes, sir.

7    Q.    Were you served with a certificate signed by the FBI director

8    that he was investigating international terrorism?

9    A.    No, sir.

10   Q.    But yet you disclosed private financial information about the

11   Huffs to the FBI, didn't you?

12   A.    Yes, sir.

13   Q.    You told them about deposits that Mr. Huff had made?

14   A.    Yes, sir.

15   Q.    Correct?

16   A.    Yes, sir.

17   Q.    Told them about, as well, a purchase that Mr. Huff had made

18   at an army/navy surplus store?

19   A.    Yes, sir.

20   Q.    Told him that Mrs. Huff's name, Cindy's name, was on that

21   account, correct?

22   A.    Yes, sir.

23   Q.    All right. And you didn't have any permission or right to do

24   that, did you?

25   A.    No, sir.

1  Q.    It's a fair statement, and I believe you told us, that Mr. Huff

2  said that there was going to be some other groups going up there

3  with him; is that correct?

4  A.    Yes, sir.

5  Q.    And it's a fair statement in your mind, I take it, what he

6  described was going to happen on the 20th certainly would have

7  taken more than one person, correct?

8  A.    Yes, sir.

9  Q.    Would take a small army, wouldn't it?

10  A.    Yes, sir.

11  Q.    Okay.  How many times a year do you think you've interacted

12  with Mr. Huff over the last ten years?

13  A.    Since 2005, probably about twice a month.

14  Q.    Okay. And it's a fair statements, would it be a fair

15  characterization of Mr. Huff, that he can be something of a

16  loudmouth?

17  A.    Yes, sir.

18  Q.    Is it a fair characterization of Mr. Huff that he can sometimes

19  be a little bit on the obnoxious side?

20  A.    Yes, sir.

21  Q.    But it's also a fair characterization of Mr. Huff that he's no

22  dummy either, is he?

23  A.    Yes, sir.

24  Q.    He's a pretty bright guy, isn't he?

25  A.    Yes, sir.

1    Q.    And based on your interaction and knowledge with him– the

2    statements were made to you that you just told us about on April

3    the 15ᵗʰ, correct?

4    A.    Yes, sir.

5    Q.    Mr. Huff, in your judgment, is bright enough to realize the

6    significance of the FBI showing up on his doorstep on April the

7    19ᵗʰ, isn't he?

8    A.    Yes, sir.

9    Q.    Which is the day before the 20ᵗʰ, isn't it?

10   A.    Yes, sir.

11            MR. GREEN:   That's all.

12            THE COURT:   Thank you. Redirect?

13            MR. MACKIE:    Yes, your Honor.

14                    **REDIRECT EXAMINATION**

15   by Mr. Mackie:

16   Q.    Mr. Green was saying that you heard stuff from Sean Hannity

17   and Rush Limbaugh. I want you to think now, did you ever hear

18   any one of those people say anything about taking a AK-47 to take

19   back a city?

20   A.    No, sir.

21   Q.    So I want you to respond to my question here about when

22   discussion about is he a blow-heart or saying– puffing or talk. Was

23   there something on the 20ᵗʰ, when you look in the context of what

24   you've known him over those years, that struck you as different?

25            MR. GREEN:   I'm sorry. Are you asking about the 20ᵗʰ

1   or the 15th?

2              MR. MACKIE:    About statements on the 20th.

3              THE COURT:  Probably meant the 15th. Are you asking–

4              MR. MACKIE:    Excuse me. I am so sorry.

5   Q.    On the 15th.

6   A.    On the 15th it was just the– I've heard Darren talk a few times

7   about, you know, anti-government. But as far as going– going as

8   far as taking guns to take back over a city because someone was

9   wrongly arrested, you know, a bunch of innocent lives could be at

10  stake there. You know, it's not my case to say was he going to use

11  them.

12  Q.    Did he say anything about what he was going to do as far as

13  Mr. Fitzpatrick?

14  A.    Break him out of jail.

15             MR. MACKIE:    Just one moment.

16  Q.    There was a question relating to bank records and all. Do you

17  recall whether you received a grand jury subpoena for bank

18  records?

19  A.    I don't recall.

20             MR. MACKIE:  Okay. That's all right. No further

21  questions.

22             THE COURT:  All right. Any recross?

23             MR. GREEN:  No, your Honor.

24             THE COURT:  All right, sir. Thank you, Mr. Longmire.

25  You may be excused.

1      (Witness excused.)

2            THE COURT:   Got a little over ten minutes left for

3    today.  Do you want to call your next witness?

4            MR. GREEN:  Well, your Honor, I would, if we're going

5    to start a witness, I'd like to be able to finish, and I understand

6    there is a conflict at five o'clock.  So I would respectfully ask that

7    we wait until the morning before the next witness.

8            THE COURT:  Mr. Mackie, what–

9            MR. MACKIE:  Well, if it's ten minutes, I think it might

10   be–

11           THE COURT:  How long is your direct, a little bit

12   longer than–

13           MR. MACKIE:   I would think it would be about, about

14   this length.

15           THE COURT:   All right. Well, let's just go ahead and

16   break now, then, and bring the witness in the morning. Is that all

17   right with everyone?

18           MR. GREEN:  That's fine.

19           MR. MACKIE:   I mean, I understand if we have to leave

20   at five.

21           THE COURT:  I think today we have to leave at five; is

22   that correct? Okay.  All right.  Let's do that.  We'll come back at–

23           MR. MACKIE:    That's fine.

24           THE COURT:   –nine o'clock tomorrow morning, which

25   will be Wednesday, October 19th. So just remind the jury again, as I

1    stated just a few hours ago, not to talk about the case during the

2    overnight recesses or otherwise and to just put the case aside for

3    the evening, and follow the other instructions I gave you earlier.

4    We'll just see everybody here and get started right at nine a.m.

5    tomorrow. Thank you.

6            (Jury recessed at 4:49 p.m.)

7                    THE COURT:   Do we have anything else to take up?

8                    MR. GREEN:   No, your Honor.

9                    MR. THEODORE:   No, your Honor.

10                   THE COURT:   I assume your next witness might be Ms.

11   Dupree, I'm assuming, correct?

12                   MR. THEODORE:   Yes, your Honor.

13                   THE COURT:   I understand– we just had a juror

14   conflict, had to leave at five o'clock. So we'll just start tomorrow

15   morning. All right.  See everyone tomorrow.

16           (Whereupon, the Court adjourned at 4:50 p.m.)

## C E R T I F I C A T I O N

I certify that the foregoing is an accurate transcript of the record of

proceedings in the titled matter.

_____/s/*Donnetta Kocuba*_____                          __8/25/12__

Donnetta Kocuba, RPR-RMR
Official Court Reporter
U.S. District Court
Knoxville, Tennessee