# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE, TENNESSEE

United States of America,           :
                                    :
                    Plaintiff,      :
                                    :
vs.                                 :            Case No. 3:10-cr-73
                                    :
Darren Wesley Huff,                 :        **Trial Testimony/Motions**
                                    :
                    Defendant.      :

Transcript of proceedings before the Honorable Thomas A. Varlan,

U. S. District Judge, on October 19th, 2011.

Appearances:

On behalf of the Plaintiff:

A. William Mackie, Esq.
Jeffrey E. Theodore, Esq.
U. S. Attorney's Office
Knoxville, Tennessee

On behalf of the Defendant:

G. Scott Green, Esq.
Knoxville, Tennessee

Court Reporter:

Donnetta Kocuba, RMR
800 Market Street, Suite 132
Knoxville, Tennessee 37902
(865) 524-4590

# I N D E X

| Plaintiff's Witness: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Erica Dupree | 5 | 13 | 21 | 22 |
| Michael Wilson | 23 | 46 | 72 | 75 |
| Donald Williams | 80 | 113 | 131 | 133 |
| Michael Hall | 134 | 149 | 158 | – |
| Thomas Walker | 161 | 188 | 196 | 197 |
| Charles Reed | 198 | 209 | 221 | 222 |
| Stipulations Read to Jury | 225 | | | |

**Defenant's Rule 29 Motion for Acquittal:**                     **231**
**Defendant's Renewal of all Previous Defense Motions:**      **232**

| Plaintiff's Exhibits: | Identified | Received |
|---|---|---|
| 3 - Affidavit of Criminal Complaint | 42 | 43 |
| 6 - AK-47 weapon | 201 | 202 |
| 6a- Photo of Exhibit 6 | 203 | 203 |
| 7a-d- AK-47 ammunition clips | 203 | 204 |
| 7 - Photo of Exhibit 7a-d | 204 | 204 |
| 8 - AK-47 ammunition | 204 | 204 |
| 8a/b- Photos of ammunition box closed/open | 206 | 206 |
| 9 - Video of traffic stop of 4/20/10 | 43 | 45 |
| 10,11- Photos of truck at traffic stop | 30 | 31 |
| 12,13- Photos of handgun/ammunition-Colt 45 | 33 | 33 |
| 14 - Colt 45 handgun | 34 | 34 |
| 14a- Photo of Exhibit 14 | 35 | 35 |
| 15 - Colt 45 ammunition clip | 35 | 35 |
| 15a- Photo of Exhibit 15 | 36 | 36 |
| 19 - Citizens' arrest warrant from traffic stop | 41 | 41 |
| 20 - Affidavit of criminal complaint from tr. stop | 41 | 41 |
| 21 - Photo of Defendant Huff's driver's license | 36 | 36 |
| 22 - Stipulation re: Text Messages | 225 | 225 |
| 22a-Text messages of 4/7/10 | 226 | 226 |

INDEX (continued)                                    Identified  Received

    25 - Photo-Colt 45 handgun, ammo clip/holster    166    166
    26 - Photo-AK-47 ammunition clips                167    167
    27a-h - AK-47 clips                              172    172
    27 - Photo of Exhibit 27a-h                      175    175
    28 - Photo - AK-47 ammunition box                175    175
    29 - AK-47 ammunition box                        175    185
    29a- Photo of Exhibit 29                         176    176
    30 - Photo of Defendant's cell phone             169    169
    31 - Photo of Kel-Tec firearm                    177    177
    32 - Kel-Tec Assault Rifle                       178    178
    32a- Photo of Exhibit 32                         181    181
    33a-d- Kel-Tec ammunition clips                  179    180
    33 - Photo of Exhibit 33a-d                      181    181
    34 - Photo of Kel-Tec assault rifle/ammo clips   182    182
    35 - Photo of Citizens' Arrest Warrants          168    168
    36 - Stipulation re: traveling interstate commerce  227    227
    37 - Aerial Photo of City of Madisonville        100    100
    39 - Video Clip 1 of 4/20/10 traffic stop         95     96
    40 - Video Clip 2 of 4/20/10 traffic stop         95     96
    42 - Video Clip 4 of 4/20/10 traffic stop         95     96
    43 - Audio C.D.-Donna's Restaurant
      re: AK-47 statements                       148    148
    44 - Photo-Arrest Inventory-4/30/10 traffic stop  182    182
    45 - Stipulation re: firearm                     227    227
    52 - C.D. of video clips from traffic stop       111    111


Defendant's Exhibits:                                Identified  Received


    2 - Stipulation re: valid firearm permit         229    229


Recesses:          78, 103, 187

1    (Whereupon, Wednesday, October 19ᵗʰ, 2011, Court convened

2    in the following matter without jury at 9:08 a.m.)

3         THE COURT:   Good morning, everyone. I think we

4    have our next witness ready; good morning to you. I might have

5    Ms. Norwood mention to the jury I have to attend to some other

6    matters during lunch time and take a little bit longer lunch. So I'm

7    thinking of just like going until 11:30 and then breaking until one,

8    as opposed to taking a break. I think we'll do that, so she's going to

9    mention that to the jurors.

10        MR. GREEN:   Your Honor, could we ask one of the

11   court officers, if someone attempts to come into the courtroom

12   while the trial is in progress this morning, to check and make sure

13   that they're not a witness; if they're a witness, to tell them to

14   leave?

15   Because we've got a couple of people coming this morning

16   that I don't think will come in, but the last thing– I can't keep

17   looking over my shoulder, worrying about somebody coming in

18   and breaching the rule of sequestration, then I can't use them.

19        THE COURT:   Well, we'll try to do that. I mean, really,

20   the burden's on you. I'll ask our marshal, if you see somebody

21   come in, ask if they're a witness–

22        MR. GREEN:   I would appreciate that. Thank you.

23        THE COURT:   –appreciate it.

24   (Jury convened in courtroom at 9:12 a.m.)

25        THE COURT:   All right. Thank you. Good morning,

1   everyone. Everyone may be seated. Good morning to our jury on

2   this rainy Wednesday morning. Mr. Mackie, you can announce the

3   next witness for the Government?

4              MR. MACKIE:  Yes, your Honor. The United States

5   will call Erica Dupree.

6              THE COURT:  Have the courtroom deputy swear in our

7   witness.

8              COURTROOM DEPUTY:  Ma'am, if you could stand

9   and raise your right hand. Do you solemnly swear your testimony

10  will be the truth, the whole truth, and nothing but the truth, so help

11  you God?

12             MS. DUPREE:  Yes.

13             COURTROOM DEPUTY:  Would you please state and

14  spell your name for the record?

15             THE WITNESS:  Erica Dupree, E-r-i-c-a, D-u-p-r-e-e.

16             MR. MACKIE:   May I proceed, your Honor?

17             THE COURT:  Yes.

18                        **DIRECT EXAMINATION**

19  by Mr. Mackie:

20  Q.   Ms. Dupree, good morning. I thank you for coming in. Have

21  you been here for a couple days now?

22  A.   Yes, I have.

23  Q.   Are you from this area?

24  A.   No, sir.

25  Q.   Where do you live currently, in general?

1    A.    In Georgia.

2    Q.    And in Georgia are you currently employed?

3    A.    Yes, I am.

4    Q.    Were you living in Georgia as well in April of 2010?

5    A.    Yes.

6    Q.    And speak up. And in April, 2010, where were you living in

7    Georgia?

8    A.    I was living in Hiram, Georgia.

9    Q.    And is Hiram near the town of Dallas?

10   A.    Yes, it is.

11   Q.    And where were you working in Hiram, Georgia, in April,

12   2010?

13   A.    At Chase Bank.

14   Q.    Is that a branch there in Hiram?

15   A.    Yes, there is.

16   Q.    And what was your position at Chase Bank?

17   A.    I was currently filling in as a teller.

18   Q.    How long have you been at Chase Bank there in Hiram?

19   A.    For three years.

20   Q.    Did you know the Defendant, Darren Huff?

21   A.    Yes.

22   Q.    How long had you known him?

23   A.    Since I started, for three years.

24   Q.    Was he a bank customer over that time period?

25   A.    Yes. He was a regular customer that came in quite often.

1  Q.    And in your recollection, do you remember him over those

2  three years?

3  A.    Yes, I do. We had a friendly relationship, and, you know, I

4  helped him quite often.

5  Q.    So not only was he a regular of the bank, but he was a regular

6  as far as dealing with you–

7  A.    Right.

8  Q.    – as to his banking business?

9  A.    Yes. He would come up and let me help him. You know, if

10  there were other people that he didn't know, he would come to me.

11  Q.    Do you believe that he was comfortable talking with you?

12  A.    Yes, I do.

13  Q.    Let's focus on April of 2010. Was there a time when he came

14  into the bank and talked with you that really sticks out in your

15  mind?

16  A.    He came in on April 15th, and it was right around close,

17  probably five or six o'clock, and I was the only teller up on the line

18  at that point. And he came up to me and just started talking about a

19  trial that was going on in Madisonville, Tennessee, the Fitzpatrick

20  case, and–

21  Q.    Excuse me. Is this something you had heard him before?

22  A.    No.

23  Q.    Go ahead.

24  A.    He was telling me about the Fitzpatrick case and how him and

25  the Georgia Militia were going to be coming to Tennessee with

1    guns, AK-47s, things like that, to take over the city at nine o'clock

2    of April 20th.

3    Q.    So this was very specific as to date and time?

4    A.    Right. It was at nine o'clock.

5    Q.    And as to the particular person in the case, he mentioned that

6    to you?

7    A.    Yes.

8    Q.    Fitzpatrick?

9    A.    Right.

10   Q.    In the course– well, first, at this time, did this cause you any

11   concern?

12   A.    Yes, very much so.

13   Q.    In terms of his demeanor versus what you'd seen him over the

14   past three years, did he appear the same or different?

15   A.    Definitely different.  He always came in, we would joke

16   around, things like that, and this was totally serious.  I mean, this

17   was totally different.

18   Q.    Did he, in the course of talking with you there, make any

19   remark about how you might learn about this in some manner?

20   A.    He just said that it had been on YouTube, and then he also

21   said that he hoped to make the 12:00 o'clock news and hoped it

22   would go international.

23   Q.    And this would be something that you might hear about; is

24   that what–

25   A.    Right.

1    Q.    Was it clear to you from what he was saying whether he

2    intended to take weapons?

3    A.    Yes. He did say he would be taking AK-47s and mount some

4    kind of gun on the back of his truck.

5    Q.    Had you ever seen him drive up in a truck before?

6    A.    Yeah. I saw his, you know, regular, everyday truck. But this

7    time it was a different truck.

8    Q.    All right. I'm going to show you Government's Exhibit 23

9    and ask you if you recognize that. As we're pulling it, let me ask,

10   on that day, after he was talking with you, did you go out to try to

11   look at or look out the window or some way to see the truck he was

12   talking about?

13   A.    Yes, I did. After he had left, I just kind of peeked around the

14   corner to see what he was driving.

15   Q.    And what did it look like?

16   A.    It was very similar to this, except the driver's side door did

17   have "Georgia Militia" stenciled on it.

18   Q.    But in terms of the shape of the truck and the panels and that

19   sort of thing, did it look similar?

20   A.    Right.

21   Q.    Let's look at Government Exhibit 24.  Those that said

22   "Georgia Militia," was there anything similar to that or maybe a

23   different size or different format?

24   A.    I didn't see the back of the truck because it was backed in the

25   parking lot, so I just saw the driver's side door.

1    Q.    But you distinguished–

2    A.    But it– yeah, it was very similar to this, the type of truck.

3    Q.    Now, I think you were saying that he was talking about this

4    Fitzpatrick case and what was going to happen at nine o'clock on

5    the 20th.  Did he in any way talk about what this was all about?

6    A.    Just correction in the city, that they were doing false arrests,

7    and he didn't agree with that.

8    Q.    And so this Fitzpatrick case had something to do with that?

9    A.    Right.

10   Q.    And did he indicate, from talking with you, that he was

11   somehow caught up in or involved in some way, connected to the

12   Fitzpatrick case?

13   A.    He just said that he was part of the Georgia Militia and they

14   didn't really agree with the things that were going on in

15   Madisonville with that case.

16   Q.    Did he make any remark about going to the courthouse or

17   anything like that?

18   A.    Yes. They were going to go, him and them, the Georgia

19   Militia, were going to take over the city.

20   Q.    And when this discussion was going on, at some point did

21   anyone else from the bank come around and join into it?

22   A.    Yes. My manager actually came up when he heard the

23   conversation. Then Mr. Huff was kind of talking between both of

24   us, and then we were both right there, that he was then talking to

25   me and Shane.

1    Q.    So did Shane Longmire, from what you could tell, he was, you

2    know, taking part in it, but listening to this conversation?

3    A.    Right, right.

4    Q.    Towards the end, or somewhere along the line, I guess, Mr.

5    Huff left?

6    A.    Right. He just said, it was nice knowing you and if I never see

7    you again, so–

8    Q.    How did that make you feel?

9    A.    I was very scared.

10   Q.    And being left with that feeling, did you take any action after

11   he left?

12   A.    I did. I called someone that I knew that worked for the

13   government in our area and told this person about it. And they

14   immediately pulled up the Madisonville Police Department and

15   called them to let them know. And then the chief of police actually

16   gave them my number– or gave their number to this person to give

17   to me so that I could call and let them know everything that

18   happened.

19   Q.    And did you have a chance to talk with the chief of police?

20   A.    Yes, I did. I immediately called him.

21   Q.    And did you understand it to be the chief of police of

22   Madisonville?

23   A.    Yes.

24   Q.    And what did you tell him, essentially?

25   A.    I told him exactly what I've said here.

1    Q.    In reference to everything that you just said?

2    A.    Right.

3    Q.    And did he ask you whether– or let me rephrase that.  Did you

4    tell him whether you thought that Mr. Huff was serious about

5    taking over the city or taking over the courthouse?

6    A.    I did.  I took it– I mean, I told him I took it very seriously.

7    Q.    Looking back on April 20th, and based upon your three years'

8    experience with knowing Mr. Huff, on his demeanor, his

9    expression, the way he was talking, do you believe he was just kind

10   of bragging or do you believe he was serious?

11   A.    I believed he was serious.

12   Q.    And is this something that is easy for you to testify about?

13   A.    No.

14   Q.    Why?

15   A.    Not at all.  It's just not an easy thing.  I mean, I've known Mr.

16   Huff, like I said, for three years.  You know, we've always had this

17   friendly relationship, and then, that day, it was like everything was

18   different, so–

19   Q.    Has it caused you concern then and afterwards?

20   A.    Yes.

21   Q.    How so?

22   A.    Just knowing and just it scares me.

23   Q.    Are you still scared?

24   A.    Yes.

25          MR. MACKIE:    No further questions, your Honor.

1    THE COURT:   Thank you. Cross- examination?

2    MR. GREEN:   Thank you, your Honor.

3                           **CROSS-EXAMINATION**

4   by Mr. Green:

5   Q.    Good morning, Ms. Dupree.

6   A.    Good morning.

7   Q.    My name's Scott Green. I represent Mr. Huff. And I've got a

8   few questions for you, and if there's something that I ask you that

9   you don't understand, you make sure that you understand it before

10  you answer the question; okay?

11  A.    Okay.

12  Q.    Fair enough? All right. I want to speak first about, because

13  you were talking– the last thing you talked to Mr. Mackie about

14  was the conversation that you had with the chief of police in

15  Madisonville, and that would have been, I'm assuming, just within

16  a day or so, few hours, probably?

17  A.     A few hours.

18  Q.    Right. And so it was still very fresh in your mind–

19  A.    Right.

20  A.    –is that correct? Were you aware that that conversation was

21  being tape recorded?

22  A.    No, I wasn't.

23  Q.    Okay. Do you recall, at the end of the conversation, telling

24  the chief from Madisonville, I believe you said, your words were,

25  "I hope he was all talk"? Do you remember saying that?

1    A.    No.

2    Q.    Okay.  But if it's on the tape–

3    A.    If it's on the tape, then yeah.

4    Q.    I mean, you're not denying that you said that; you just don't

5    remember saying it, right?

6    A.    Right.

7    Q.    Okay.  And when we get right down to it, what happened on

8    the 15th with Mr. Huff, whether you believed he was serious or

9    didn't believe he was serious, at that point it was just all talk,

10   wasn't it?

11   A.    No. I believed he was serious.

12   Q.    Okay.  But it was all talk at that point, correct? He did nothing

13   more at that point than tell you what he was going to do?

14   A.    He told me what he was going to do, but I did take him

15   serious.

16   Q.    Okay.  And I appreciate that and I appreciate the fact that you

17   called law enforcement, and I'm not trying to belabor the obvious.

18   But at that point he had done nothing more than just say this is

19   what I plan to do?

20   A.    I mean, that's– he told me what he was going to do, so I took it

21   seriously.

22   Q.    Okay.  And that was on the 15th of April, correct?

23   A.    Right.

24   Q.    Now, you said you dealt with Mr. Huff for about three years;

25   is that correct?

1   A.    Right.

2   Q.    Did you find him, in your previous dealings with him, to be an

3   articulate person?

4   A.    What do you mean by that?

5   Q.    I mean, he could converse easily and freely with you?

6   A.    Right. Uh-huh.

7   Q.    Seemed to have a mastery of the English language?

8   A.    Uh-huh.

9   Q.    Seemed to be a bright and intelligent guy, didn't he?

10  A.    Yes. Very smart guy.

11  Q.    Very smart guy. And let me ask you. You strike me as a

12  person who would never ever do anything wrong. If the FBI

13  showed up on your doorstep, would that be something that would

14  cause you concern?

15  A.    Yes.

16  Q.    Okay. And if they were asking you some questions about

17  some travel plans that you had, would that be something that would

18  cause you concern?

19  A.    Not if I had done nothing wrong.

20  Q.    Okay. If the FBI, knowing Mr. Huff as you know him, if the

21  FBI showed up on his doorstep on April the 19th–

22          MR. MACKIE:   Your Honor, if I may, I think he's

23  calling for speculation as to hypotheticals.

24          MR. GREEN:   I'm asking based on the information she

25  has and the knowledge she has of Mr. Huff.

1      THE COURT:   Well, let me hear the question, keeping

2    the potential objection in mind perhaps.

3    Q.    Is it reasonable, based on what you know about Mr. Huff, to

4    assume that he would recognize the significance of the FBI

5    showing up on his doorstep?  He's a smart guy, isn't he?

6          MR. MACKIE:   Your Honor, I object. It's calling for

7    speculation on what Mr. Huff might think.

8          THE COURT:   I'll sustain the objection. Ask what she

9    knows about Mr. Huff. But that question, I believe, is

10   objectionable.

11   Q.    Well, let me ask it this way.  The conversations that you had

12   with Mr. Huff occurred on April the 15th, correct?

13   A.    Right.

14   Q.    And he told you about these plans that he had, which were to

15   occur on April the 20th, correct?

16   A.    Right.

17   Q.    And it is obvious, but let's just ask it, anyway.  April the 19th

18   comes before April the 20th, doesn't it?

19   A.    Right.

20   Q.    Okay.  Now, he told you about–

21          MR. GREEN:   Could I see the Exhibit 23 again?

22          MR. MACKIE:    I'll pull it up.

23          THE COURT:   Want to put it up on the screen?

24   Q.    You saw this truck, and this was the truck that he had talked

25   to you about "I'm going to mount this big gun in the back of,"

1    correct?

2    A.    He just said that he was going to mount a gun on the back of

3    his truck. He didn't specify which one.

4    Q.    Okay. But Shane was with him, and do you recall Shane and

5    he going out and looking at the vehicle he was driving?

6    A.    We just kind of went around the corner to look out the

7    window. We never went outside.

8    Q.    And that's the truck he was talking about, right?

9    A.    It was very similar.

10              MR. GREEN:   Have a picture of the "Oath Keepers"

11   truck, please?

12              MR. MACKIE:   Of which one?

13              MR. GREEN:   "Oath Keepers" truck, the black truck?

14              MR. MACKIE:   Yes. Just a moment. Which one is– it's

15   ten.

16   Q.    I'm showing you what's been marked as–

17              MR. MACKIE:   We've got it on there, except we've got

18   to switch the system.

19              MR. GREEN:   Oh, okay. Great.

20   Q.    It certainly wasn't that truck that he was– that day, was it?

21   A.    No, no.

22   Q.    And his stated plan to you about what he was going to do on

23   the 20th with this big gun was about the camo-truck you've just

24   seen that was there in the parking lot with him that day, right?

25   A.    He just– I mean, he didn't specify which truck. He just said

1   that he was going to mount a gun on his truck.

2   Q.    All right. Now, but the camo-truck is the one that said

3   "Georgia Militia," right?

4   A.    Right. On the driver's side.

5   Q.    On the driver's side door, stenciled in. Okay. Mr. Huff told

6   you, I believe you told us a few minutes ago, that his reason for

7   going to Madisonville was that he believed there was some

8   corruption going on, correct?

9   A.    Right.

10  Q.    And did he seem to honestly believe, passionately believe,

11  that that was occurring?

12  A.    Yes.

13  Q.    So, I mean, he didn't tell you, hey, I can make some money by

14  driving up there and flashing some guns around, did he?

15  A.    No.

16  Q.    In your mind, from what you could see from his serious

17  demeanor you told us about, he was going up there because he

18  honestly believed in what he was doing; is that a fair statement?

19  A.    Yes.

20  Q.    And he told you as well that this would go international.  Is

21  that the words that he used, he hoped it would go international?

22  A.    He said that he hoped it would go international.

23  Q.    All right.  And obviously if some public officials were

24  arrested, that's some big news, isn't it?

25  A.    Yes.

1    Q.    Okay. With or without guns, correct?

2    A.    Right.

3    Q.    Do you recall testifying before the grand jury in this case?

4    A.    Yes.

5    Q.    Do you remember the first question that the grand juror– not

6    Mr. Mackie, but one of the grand jurors made a statement to you

7    right after you got through testifying? Do you recall that? I know

8    it's been a while.

9    A.    I recall that there were some questions asked, but I don't

10   recall.

11   Q.    Do you recall the grand juror thanking you?

12   A.    Yes.

13   Q.    And why did he thank you?

14   A.    For actually doing something about the situation and not just

15   blowing it off.

16   Q.    Right. For getting off your backside and taking action, right?

17   A.    Right.

18   Q.    For not being apathetic, right?

19   A.    (No response.)

20   Q.    Have you talked with Shane at all about the case?

21   A.    Not recently.

22   Q.    Okay. But you and he have talked about the case, correct?

23   A.    Right.

24   Q.    I want to make sure I understand the sequence of events now.

25   Mr. Huff begins talking with you first?

1    A.    Right.

2    Q.    And then Shane walks up, correct?

3    A.    Right.

4    Q.    Were you with Mr. Huff and Mr. Longmire the entirety of the

5    time that Mr. Longmire and Mr. Huff were talking?

6    A.    Yes, I was.

7    Q.    So there was not a period of time where it would have been

8    just Mr. Longmire and Mr. Huff, correct?

9    A.    Right.

10   Q.    And have you related to us everything that you recall about

11   the conversation that day that you overheard Darren Huff say?

12   A.    Yes, I have.

13   Q.    You seem like a very, very nice person that never had a bad

14   thought in your life, but I'm going to ask it anyway. Have you ever

15   thought about maybe doing something that you shouldn't and then

16   later on decided maybe that's not the right thing to do and didn't go

17   through with it?

18   A.    No.

19   Q.    Okay. Well, I have. But that's not an uncommon human

20   emotion, is it?

21   A.    No.

22   Q.    And you're certain that these conversations occurred on the

23   15th, prior to the 19th, correct?

24   A.    Right.

25          MR. GREEN:   Thank you.

1          THE COURT: Thank you. Any redirect?

2          MR. MACKIE: Yes, your Honor, just briefly.

3                  **REDIRECT EXAMINATION**

4  by Mr. Mackie:

5  Q.    During the time that you were there and Mr. Longmire was

6  there, I think was the question that you were just asked, was there

7  any portion in which Mr. Longmire or Mr. Huff may have made

8  some remark while you were, say, doing the transaction that you

9  may not have heard?

10  A.    There could have been, I mean, because I was doing his

11  transaction, and Mr. Huff was kind of standing in the middle of

12  both of us, so there could have been.

13  Q.    But most of it, but you heard–

14  A.    I heard most of it, yeah.

15  Q.    –what was going on there, right? And in that conversation,

16  that, I believe the question was, that he was focused on a hearing at

17  the courthouse?

18  A.    Right, right. The Fitzpatrick case.

19  Q.    And that was in connection with whose case? What case was

20  he going to go?

21  A.    The Fitzpatrick.

22  Q.    Fitzpatrick?

23  A.    Uh-huh.

24  Q.    And did he make any remark as to what he was going to do at

25  the courthouse?

1    A.    Take over the city.

2    Q.    And with?

3    A.    With guns.

4         MR. MACKIE:    No further questions.

5         THE COURT:   Thank you. Any recross?

6         MR. GREEN:  Briefly.

7                   **RECROSS-EXAMINATION**

8    by Mr. Green:

9    Q.    This was a conversation that obviously alarmed you enough,

10   that you took seriously enough, that you called law enforcement

11   later, correct?

12   A.    Right.

13   Q.    So it's a fair statement that's a conversation, because you had

14   those emotions ramped up, you were listening to him pretty

15   carefully, weren't you?

16   A.    Right.

17        MR. GREEN:   Thank you.

18        THE COURT:   All right.  Thank you, Ms. Dupree. The

19   Court appreciates your being here this morning to testify. You may

20   be excused.

21        (Witness excused.)

22        THE COURT:   The Government may call its next

23   witness.

24        MR. THEODORE:    The Government will call Trooper

25   Michael Wilson to the stand.

1    COURTROOM DEPUTY:    Raise your right hand.  Do

2  you solemnly swear your testimony will be the truth, the whole

3  truth, and nothing but the truth, so help you God?

4    MR. WILSON:  Yes, ma'am.

5    COURTROOM DEPUTY:  Please state and spell your

6  name for the record.

7    THE WITNESS:  Trooper Michael Wilson, the

8  Tennessee Highway Patrol. Michael, M-i-c-h-a-e-l; last name

9  Wilson, W-i-l-s-o-n.

10               **DIRECT EXAMINATION**

11  by Mr. Theodore:

12  Q.    Good morning, Trooper Wilson.

13  A.    Good morning, sir.

14  Q.    You're a trooper with the Tennessee Highway Patrol?

15  A.    Yes, sir.

16  Q.    Can you describe specifically what your position is with the

17  Tennessee Highway Patrol?

18  A.    I'm a Tennessee State Trooper, and my position is, I work for

19  an interdiction-plus program which I do assist cities and counties

20  and federal officers in that part of my assignment.

21  Q.    So what type of cases do you typically work on in that role?

22  A.    Actually, my assignment, I still work vehicle crashes, I still

23  do traffic enforcement. I do work criminal enforcement and assist

24  in any other type of investigation that's required by any other

25  organizations like for us to come in and assist them.

1    Q.    And you said you work with other counties; is that right?

2    A.    Yes, sir.

3    Q.    About how many counties do you work with?

4    A.    I actually have 11 counties that I'm assigned to, but I have

5    traveled into Fall Branch, into their district, and into Nashville,

6    working in their district. Cookeville, I've had to work in their

7    district. So I actually work several different locations in the State

8    of Tennessee.

9    Q.    What about Monroe County? Do you ever work with that

10   county?

11   A.    Yes, sir. That is one of the counties that I'm assigned to.

12   Q.    Okay. And how long have you been a trooper with the

13   Tennessee Highway Patrol?

14   A.    Fourteen and a half years.

15   Q.    How long have you worked in law enforcement all together?

16   A.    I started my career in law enforcement in 1992, which I went

17   to the basic law enforcement academy. I worked with the City of

18   Caryville as a patrol officer.

19   Q.    How long did you work there?

20   A.    City of Caryville? Approximately four, four and a half years.

21   Q.    Okay. Were you ever promoted during that time?

22   A.    I was promoted to a sergeant.

23   Q.    So you joined the Tennessee Highway Patrol about– what year

24   was that?

25   A.    1997.

1    Q.    Now, were you employed, as you've just described, as a

2    trooper with the Tennessee Highway patrol and an interdiction-

3    plus team leader back on April 20th of 2010?

4    A.    Yes, sir.

5    Q.    And you were on duty that day?

6    A.    Yes, sir.

7    Q.    Were you working the morning hours of that day?

8    A.    Yes, sir.

9    Q.    All right.  And part of that day started– was there anything a

10   little different about that day as opposed to maybe some other

11   days?

12   A.    Yes, sir.  This was a special assignment that they had placed

13   me on, this morning of April the 20th.  At approximately 5:00, 5:30,

14   I was to report to Madisonville in Monroe County.  I think it was at

15   the city or county building.

16   Q.    Five, 5:30 a.m.?

17   A.    A.m., yes, sir.

18   Q.    And so you went to Monroe County that morning?

19   A.    Yes, sir.

20   Q.    What was the purpose for that?

21   A.    This is to patrol the areas, to be there, to provide safety for

22   any state, local, federal, citizens of Monroe County.  My

23   assignment was to be accessible in Monroe County in the

24   Madisonville area that day.

25   Q.    Okay.  Was there a meeting or something that morning?

1   A.   There were a briefing that morning.

2   Q.   Who was involved in that briefing?

3   A.   The briefing, the best that I could recollect, there were

4   multiple agencies. I know the FBI were there; the drug task force,

5   they were there; Monroe County, Madisonville, Tenth Judicial

6   Task Force, I believe they were there. There was multiple agencies

7   at that briefing.

8   Q.   And what was the purpose for that briefing?

9   A.   This briefing was, there were going to be a trial that took

10  place, Fitzpatrick trial, and there were numbers of people that were

11  coming from the surrounding counties, and maybe even from the

12  State of Georgia, that would come in that might actually make

13  some type of– some type of an arrest on maybe some judges or

14  some government officials.

15  Q.   So you actually heard there might be people coming from out

16  of state?

17  A.   Yes, sir.

18  Q.   So what were your directions specifically then, after that

19  meeting? What were you to do?

20  A.   After the meeting, my job assignment was just to patrol in the

21  area and be accessible to answer any calls or any assistance that

22  may be– that may rise up in the area.

23  Q.   Okay. Were you to be on the lookout for somebody in

24  particular, anything like that?

25  A.   No, sir.

1  Q.    Were you looking for any particular vehicle when you were

2  out on patrol later that morning, after the briefing?

3  A.    No, sir.

4  Q.    What area were you patrolling primarily then, after that

5  meeting?

6  A.    Highway 68 to the interstate, and that would be Exit 60.

7  Q.    So was that by Interstate I-75 and 68?

8  A.    Yes, sir.

9  Q.    Or was 68.  That's the area you were pretty much patrolling?

10 A.    That was the area that I was patrolling, yes, sir.

11 Q.    Okay.  All right. And when you were patrolling that area, did

12 anything– did you see anything unusual, anything that caught your

13 interest?

14 A.    I did make a traffic stop that morning.

15 Q.    Why don't you just describe what happened, what led to that

16 and what happened?

17 A.    Okay. As I was traveling on I-75, I was traveling northbound,

18 and as I was exiting the exit ramp on– at the Exit 60 off I-75 and I

19 was proceeding down the ramp, I did see a vehicle traveling in

20 front of me, a vehicle that actually had some– large amount of

21 writing on the window.

22        As I proceeded on down the ramp, I did see some traffic

23 violations.  I did make a traffic violation stop at Highway– it's

24 Highway 68, at the intersection of I-75, Exit 60. Upon making that

25 traffic stop, that's where I came in contact with Mr. Huff.

1   Q.   Okay. And that's in Monroe County, at that time; is it not?

2   A.   Yes, sir.

3   Q.   Was there anything else that you noticed about this vehicle?

4   You said you saw some writing. Anything else about it that caught

5   your interest?

6   A.   I seen several suspicious indicators on the vehicle.

7   Q.   Okay. What was your reason for stopping the vehicle?

8   A.   The reason I stopped the vehicle was, following too close and

9   traffic control device. That would be a stop sign, stop light.

10  Q.   So you observed this vehicle commit a traffic violation?

11  A.   Yes, sir.

12  Q.   What time was that, approximately?

13  A.   Traffic stop occurred the morning of the 20th, at

14  approximately 7:09, 7:10.

15  Q.   At the time you made the stop, did you have any idea who you

16  were stopping at that time? You said you learned it was Mr. Huff.

17  But when you actually pulled the vehicle over, did you know who

18  you were stopping?

19  A.   No, sir.

20  Q.   You didn't call it in before you, as you were pulling it over,

21  run the tags or anything like that?

22  A.   No, sir.

23  Q.   And so what happened then? Describe what happened once

24  you met– well, let me ask you this first. Did you have a camera

25  going at that time with a audio?

1   A.    Yes, sir, I did.

2   Q.    And was that activated as part of your stop?

3   A.    It was, yes, sir.

4   Q.    Why don't you describe what happened after you made the

5   stop?

6   A.    After I made the traffic stop, Mr. Huff had, at the time, the

7   driver, he had his hand sticking out the window, out the driver's

8   window. As I was trying to call in this traffic stop, I was having a

9   difficult time trying to get a hold of the command post.

10          The highway patrol, actually, this date, had set up a command

11  post that we was going to try to relate to each other, because they

12  were probably 25 or so troopers working that assignment that day,

13  on different assignments, different traffic posts, just being visible

14  in the area, trying to perform their duties.

15          But as I was trying to get through, I couldn't get through on

16  the radio, and I was trying to phone, a phone call. And that's when

17  I looked out the window and they were a gentleman standing on

18  each side, actually on both sides of my patrol car.

19          And I had my door open. I asked him, I said, I'm trying to

20  radio out to my help, and he said, I'm your help today, or

21  something to that effect, which later was found out to be the

22  Judicial Tenth Task Force.

23  Q.    So you received some backup almost immediately after you

24  stopped the vehicle; is that right?

25  A.    Yes. They had pulled up, they had seen me make the traffic

1  stop, and apparently they pulled right in behind me to help me in

2  the traffic stop.

3  Q.    Okay. So did you learn of the person, the identity of the

4  person, driving?

5  A.    At that time, I did not. But just shortly after that, he exited

6  the vehicle, and as he started– we had him to back up to me,

7  because when he stepped out of the vehicle, had his hands up, and I

8  noticed he had a firearm on his side, so then– a pistol. So I had him

9  to back up to the patrol car, which I took the pistol, I made it safe,

10  and had him– to escort him back out of the edge of the roadway, at

11  the back of the trunk section of my patrol car.

12  Q.    Did you learn of that person's identity?

13  A.    At that time, I did.

14  Q.    And who was that?

15  A.    That was Mr. Huff.

16  Q.    Okay. Do you see him in this courtroom right now?

17  A.    Yes, sir, I do.

18        MR. GREEN:  Stipulate his identity, your Honor.

19        MR. THEODORE:  Your Honor, may the record reflect

20  that the witness identified the Defendant?

21        THE COURT:  Yes, it will.

22        MR. THEODORE:  Thank you, your Honor.

23  Q.    I want to show you what has been marked as Government's

24  proposed Exhibit Number Ten, proposed Exhibit Number Ten.

25        THE COURT:  No objection to this document, I assume?

1      MR. GREEN:   No objection, your Honor.

2      MR. THEODORE:   I would move to admit.

3      THE COURT:   Government's Exhibit Ten.

4      (Government's Exhibit No. 10 received into evidence.)

5   Q.   Do you recognize what is depicted in that photograph?

6   A.   Yes, sir.

7   Q.   And what is that?

8   A.   This is Mr. Huff's pickup truck.

9   Q.   Okay. That's the vehicle you stopped on that day around 7:00

10  a.m. on April 20th, 2010?

11  A.   Yes, sir.  This is the vehicle that I stopped on Highway 68,

12  intersection of I-75.

13  Q.   And that's exactly how it was marked at that time, with that

14  plate and the stickers?

15  A.   Yes, sir.

16  Q.   I want to show you what's been marked as Government's

17  Exhibit Number 11.

18      THE COURT:   I assume no objection?

19      MR. GREEN:   No objection.

20      THE COURT:   So admitted.

21      (Government's Exhibit No. 11 received into evidence.)

22  Q.   And do you recognize what's shown in that photograph?

23  A.   Yes, sir, I do.

24  Q.   And what is that?

25  A.   This is Mr. Huff's vehicle.  This is my patrol car with my

1    video camera, and that is Mr. Huff with his hands up and his pistol

2    on his right side.

3    Q.    Okay. You can actually see that in that photograph; is that

4    right?

5    A.    Yes, sir.

6    Q.    So what happened? When you saw him with that firearm, did

7    you testify that you disarmed him at that time?

8    A.    I did disarm him and made the gun safe.

9    Q.    And why did you do that at that time?

10   A.    For protection of myself and for the other officers that were

11   on the scene.

12   Q.    Okay. And what did you do with it after you took it? Where

13   did you actually take that firearm?

14   A.    At that time, I asked him– I was still dealing hands with him,

15   so I actually made it safe and put it in my beltline. And then after

16   we secured and put him in a safe place so he didn't get ran over or

17   we didn't get ran over out of the edge of the roadway, I did put it in

18   the front seat of my patrol car.

19   Q.    Okay.

20              MR. THEODORE:    Any objection?

21              MR. GREEN:  (Shook head.)

22              MR. THEODORE:    Your Honor, I want to offer

23   Government's Exhibit Number 12. I believe there's no objection

24   to that.

25              MR. GREEN:  No objection.

1    THE COURT:  So admitted.

2    (Government's Exhibit No. 12 received into evidence.)

3  Q.    Looking at Government's Exhibit Number 12, Trooper

4  Wilson, do you recognize what is shown there?

5  A.    Yes, sir.

6  Q.    What is that?

7  A.    This is a Colt .45 semiautomatic pistol with a magazine in a

8  side holster. It's laying in my front seat, on my camera Pelican

9  case.

10  Q.    So that's after you actually secured it for safety and had it in

11  your vehicle?

12  A.    Yes, sir.

13  Q.    Was that firearm loaded at the time that you seized it?

14  A.    The firearm was not loaded, but it did have a magazine with

15  eight rounds in the gun itself.

16  Q.    Okay.  But you don't believe there was one in the chamber,

17  right?

18  A.    It was not chambered.

19  Q.    But there was ammunition in the clip in the gun?

20  A.    Yes. The magazine was loaded, fully loaded, and it was

21  inserted in the gun.

22  Q.    Showing you what has been marked as Government's Exhibit

23  Number 13.

24    MR. THEODORE:  I don't believe there's any

25  objection.

1           MR. GREEN:  No objection.

2           THE COURT:  So admitted.

3           (Government's Exhibit No. 13 received into evidence.)

4   Q.    Do you recognize what's shown in that photograph?

5   A.    Yes, sir.

6   Q.    What is that?

7   A.    This is eight rounds of the .45-caliber ammunition with one

8   magazine.  This was what was actually taken out of the gun when I

9   made it safe at the initial traffic stop.

10  Q.    And that reflects the rounds that were in that clip?

11  A.    It does, yes, sir.

12          MR. THEODORE:  All right.  Exhibit 14.

13          MR. GREEN:  Your Honor, we'll stipulate he had a

14  loaded .45 on his hip; that's the gun.

15          MR. THEODORE:  Your Honor, I want to just go ahead

16  and admit the exhibit. If I may approach the witness.

17          THE COURT:  Yes. This is Exhibit 14?

18          MR. THEODORE:  Yes, it is.

19          THE COURT:  No objection; so admitted.

20          MR. THEODORE:   And it's been rendered safe.

21  Q.    Do you recognize that, Trooper Wilson, Exhibit 14?

22  A.    Yes, sir.

23  Q.    Does that appear to be the same Colt .45 that you seized from

24  Mr. Huff on the morning of April 20th, 2010, when you made the

25  vehicle stop?

1    A.    Yes, sir.

2    Q.    Could you just kind of, just hold it up in a safe manner, so the

3    jury can see what we're looking at?

4          (Witness complied with request.)

5    Q.    Okay.  Thank you.

6          MR. THEODORE:  Your Honor, at this time, I would

7    move to withdraw that and substitute Government's Exhibit 14A in

8    its place.

9          THE COURT:   We'll allow that.  Thank you.

10         (Government's Exhibit No. 14A received into evidence.)

11   Q.    I'd like to show you what's been marked as Government's

12   Exhibit Number 15, and do you recognize that–

13         MR. THEODORE:    Is there any objection to that?

14         MR. GREEN:  No objection.

15         THE COURT:  So admitted.

16         (Government's Exhibit No. 15 received into evidence.)

17   A.    Yes, sir.

18   Q.    And what does that appear to be?

19   A.    This is the magazine for a Colt .45 pistol.

20   Q.    And does that appear to be the one that went with the .45 that

21   you actually seized from Mr. Huff?

22   A.    Yes, sir.

23   Q.    Now, you didn't actually permanently seize it from him at that

24   time, did you?

25   A.    No, sir.

1          MR. THEODORE:   Okay.  Your Honor, at this time, I'd

2     like to ask to withdraw Government's Exhibit Number 15 and

3     substitute 15A for that.

4          MR. GREEN:   No objection.

5          THE COURT:   That's allowable. Thank you.

6          (Government's Exhibit No. 15A received into evidence.)

7     Q.    Did you ask for any type of documentation from Mr. Huff,

8     identification and whatnot?

9     A.    He actually, at the truck stop, as he was backing up to me, he

10    was telling me that he had a gun carry permit.

11    Q.    Okay.  What about things just like license and registration,

12    things like that?

13    A.    I did ask for a driver's license, and he was able to give me a

14    driver's license.  I asked for vehicle registration, and he didn't

15    have that with him.

16    Q.    But he provided a driver's license to you?

17    A.    Yes, sir.

18    Q.    Did you photograph that license?

19    A.    I did, yes, sir.

20         MR. GREEN:   No objection.

21         MR. THEODORE:   Your Honor, I don't believe there's

22    any objection to Government's Exhibit Number 21.

23         THE COURT:   So admitted.

24         (Government's Exhibit No. 21 received into evidence.)

25    Q.    And do you recognize that exhibit?

1   A.   Yes, sir.

2   Q.   And what is that?

3   A.   This is a driver's license from the State of Georgia belonging

4   to Darren Wesley Huff.

5   Q.   And that's what you photographed at that time?

6   A.   Yes, sir.

7   Q.   Okay. And that indicates a residence on that license of

8   Dallas, Georgia; is that right?

9   A.   Yes, sir.

10  Q.   And did he indicate to you that that was a valid license?

11  A.   He just gave me– he said, here's the driver's license, his

12  driver's license.

13  Q.   As far as you could tell, that was a valid license?

14  A.   Yes, sir.

15  Q.   You said he also mentioned something about having a permit

16  for the firearm?

17  A.   He did.

18  Q.   And what transpired with that? Did he show you a permit?

19  A.   He did give me his gun carry permit.

20  Q.   Okay. And what happened after that?

21  A.   When he handed me the gun carry permit, it looked very

22  unprofessional, and I'm sure the Court will be able to show us this

23  permit here in just a moment. And then that's when I started doing

24  my investigation, to see if this was a valid gun carry permit or not.

25  Q.   And you did that because what you saw did not look typical to

1    you?  Is that why?

2    A.    That's correct.

3    Q.    So what did you do after that?  What did you do to try to

4    verify that?

5    A.    I had called the Tennessee Fusion Center.  It's a database

6    that's set for law enforcement.  They had took the information, the

7    V.I.N. number, the make and the model, and run it; and also see if

8    the gun was stolen. They made phone calls also for me, trying to

9    verify this firearms permit paper was valid or not.

10   Q.    Did that whole process take a little bit longer than you

11   expected at that time?

12   A.    Yes, sir, it did.

13   Q.    Approximately, about how long did it take?

14   A.    It took over an hour.

15   Q.    At that time, were you ever able to verify whether it was a

16   valid permit?

17   A.    I was unable to ever verify this was a permit, that it was a

18   legal permit or not, if it was a valid permit.

19   Q.    Did you issue Mr. Huff any citations for anything?

20   A.    A warning citation. I issued Mr. Huff three warning citations.

21   Q.    So you did not actually give him a ticket then?

22   A.    No, sir.

23   Q.    Now, how many other or how much backup did you end up

24   getting after you made the stop?  You mentioned that somebody

25   came up right away and said that they are your help, right?

1    A.    Yes, sir.

2    Q.    Who was that; do you know? Do you know who came to assist

3    you all together?

4    A.    There were two– the initial vehicle that pulled up, there were

5    two DTF officers. I cannot recall their names. I never met them

6    before that date. I had never– if I'd seen them, I may have just

7    passed them on the road or something.  I'm not even sure if I've

8    ever actually seen the two.  They were a lieutenant for the drug task

9    force, Tenth Judicial Task Force; he did back me up. I didn't know

10   him prior to that date, but he was–

11   Q.    Have you learned his identity since?

12   A.    Sir?

13   Q.    Have you learned of his identity since then, before– who was

14   that, the lieutenant?

15   A.    Yes. Lieutenant Williams from the drug task force.

16   Q.    All right. And who else?

17   A.    Actually, my backup, the one that I work on criminal

18   enforcement team with, approximately five minutes later he was

19   able to get to me to assist me. That was my true backup.  This is

20   who I worked together with, and his name, again, was Trooper

21   Kelly Smith, Tennessee Highway Patrol.

22   Q.    After you issued Mr. Huff the warning– so, again, he wasn't

23   given a ticket; is that right?

24   A.    That's correct. He was not given a ticket; just a warning.

25   Q.    Citation. So about what time was that, the best you can

1  remember?

2  A.  The citation was finally issued to him, hand-delivered to him,

3  at approximately 8:13.

4  Q.  And what happened after– well, did you release him at that

5  point?  Was he free to go at that point, after you gave him the

6  warnings?

7  A.  As I gave him the warning citations, we handed it to him, I

8  explained to him there wasn't going to be any cost to it.  Just

9  shortly, directly after that– and I'm sure we'll see the video and

10  you'll see exactly when I had released him, shook his hand and

11  began walking off.

12  Q.  And then what happened?

13  A.  Mr. Huff had called me.  I made approximately three or four

14  steps from him, after I shook his hand. I said, be careful, be safe, I

15  appreciate you, were the three or four words that I spoke to him.  I

16  begin walking off, and he said– he brought up his voice and his

17  hands, and I caught him out of the corner of my eye, and he said,

18  "Let me pre-warn you," and he gave me a very strong statement.

19      And I stopped and I turned around and I wanted to hear what

20  he had to say.  He wanted to talk to me and I wanted to listen.

21  Q.  What did he say?  What did he tell you?

22  A.  He said, if– first of all, he said, "Let me pre-warn you," and

23  he looked right at the lieutenant, pointed right at his chest, and

24  said, "and you too." He said, "If enough of us show up today," he

25  said, "we are going to proceed forward in this citizen's arrest."

1    And he said, "that's why that I have my .45. Ain't no government

2    official going peacefully." And that's what he had quoted to me.

3    Q.    Did you actually see the arrest warrant that he was talking

4    about at that time?

5    A.    At that time, I had not.

6    Q.    Okay. At some point later did you?

7    A.    Yes, sir.

8    Q.    Okay. Where was that, that you saw it?

9    A.    Mr. Huff had given this paperwork to Trooper Kelly Smith, be

10   my partner.

11   Q.    So did he give him more than one document? Did he give him

12   an arrest warrant and anything else?

13   A.    He actually had gave me a card. He gave Trooper Kelly Smith

14   a few documents and also Lt. Williams from Drug Task Force a few

15   of his promotional documents.

16   Q.    Okay. Was there an affidavit of complaint along with that

17   warrant, too?

18   A.    Yes, sir, they were.

19              MR. GREEN:   No objection.

20              MR. THEODORE:   Your Honor, I don't believe there's

21   any objection to Government's Exhibits Number 19 and

22   Government's Exhibit 20.

23              THE COURT:   So admitted.

24         (Government's Exhibit Nos. 19 and 20 received in evidence.)

25   Q.    You said at some point you actually saw that citizen's arrest

1    warrant?

2    A.    Yes, sir.

3    Q.    And does that appear to be what you saw of what he had given

4    you that day or given your partner, Kelly Smith?

5    A.    Yes, sir.

6    Q.    Where it indicates certain declared domestic enemies and

7    whanot?

8    A.    Yes, sir.

9    Q.    Is that what he was referencing when he was talking about

10   citizens' arrests?  Was he talking about these warrants he had?

11   A.    Yes, sir.

12   Q.    I want to show you what's been admitted as Government's

13   Exhibit 20. That's an affidavit of criminal complaint, it states at

14   the top. Is that also what you saw afterward, when you had received

15   copies of what he had given you?

16   A.    Yes, sir.

17   Q.    And it indicates there at the top that the below people have

18   committed treason; is that right?

19   A.    Yes, sir.

20   Q.    Did he actually talk about that at the time? Was he talking

21   about people having committed treason?

22   A.    Not to me, sir.

23         MR. THEODORE:   Your Honor, we're going to move

24   for the admission– I don't believe there's any objection– of

25   Government's Two and Three.  One of them may have been

1    admitted already.

2              MR. MACKIE:    Two was received.

3              MR. THEODORE:    Two, okay.

4              THE COURT:  All right. We'll admit them, admit Three.

5         (Government's Exhibit No. 3 received into evidence.)

6    Q.    I just want to quickly show you, Trooper Wilson,

7    Government's Exhibit Number Two. Does that appear to be pretty

8    much, except for maybe some additional markings, like here, does

9    that appear to be the same thing that you saw at the traffic stop?

10   A.    Yes, sir, it does appear to be the same citizen's arrest warrant.

11   Q.    Okay. At least as far as the substance of what is in here, that's

12   the same thing– is it not– as the other one, best you can tell?

13   A.    Yes, sir.

14   Q.    And let me show you Government's Exhibit Number Three,

15   which has been admitted, the affidavit of criminal complaint. Is

16   that pretty much, as far as what's typed out there, the same thing as

17   what you had seen in the previous exhibits that you saw after the–

18   or after the stop?

19   A.    Yes, sir.

20   Q.    Trooper Wilson, I want to show you what has been marked as

21   Government's Exhibit Number Nine.

22              MR. THEODORE:   May I approach the witness, your

23   Honor?

24   Q.    And do you recognize that, Trooper Wilson?

25   A.    Yes, sir.

1  Q.    What do you recognize that to be?

2  A.    Exhibit Number Nine has my initials, and I dated it 10-14-

3  2011.

4  Q.    And have you actually reviewed that C.D.?

5  A.    Yes, sir.

6  Q.    Okay.  Is there a video and audio portion?

7  A.    Yes, sir.

8  Q.    Have you listened to it as well?

9  A.    Yes, sir.

10  Q.    Okay.  And is that a fair and accurate C.D., both the video and

11  the audio, of the statement, at least part of the statement, that Mr.

12  Huff made during that traffic stop?

13  A.    Yes, sir.

14  Q.    That's a fair and accurate recording?

15  A.    Yes, sir.

16  Q.    Okay. Now, have you actually watched that being played on a

17  laptop computer, that C.D. there? Did you watch it?

18  A.    This one, yes, sir.

19  Q.    Okay.  Was there a transcript that scrolled underneath that

20  video when you watched that?

21  A.    Yes, sir.

22  Q.    Okay.  And was that a fair and accurate transcript?

23  A.    Yes.

24  Q.    That was going along with this?

25  A.    Yes, sir.

1      MR. THEODORE:   Your Honor, I'd move the

2  admission of Government's Exhibit Number Nine.

3      MR. GREEN:   No objection.

4      THE COURT:   So admitted.

5      (Government's Exhibit No. 9 received into evidence.)

6      MR. THEODORE:   Your Honor, if we could play that

7  video.

8      (Government's Exhibit No. 9 played to jury and concluded.)

9  Q.    Is that what you heard Mr. Huff say at that time?

10 A.    Yes, sir.

11 Q.    And that's fair and accurate?

12 A.    Yes, sir.

13 Q.    What did you think when he said that?  What effect did that

14 have on you?

15 A.    He was serious about what he was doing.

16 Q.    You took him seriously?

17 A.    I took him serious.

18     MR. THEODORE:    Nothing further, your Honor.

19     THE COURT:   Thank you. Cross-examination?

20     MR. GREEN:   Thank you, your Honor.  Has the video of

21 the entire traffic stop been prepared yet? Do we have that here?

22     MR. THEODORE:    Well, you have the–

23     MR. GREEN:   Well, the segregated part of it, is that

24 prepared yet?

25     MR. THEODORE:  Not yet.

1      MR. GREEN:  Okay.  Your Honor, I don't want to have

2  to make Trooper Wilson come back, and maybe we can just

3  stipulate.  But we intend to play the entirety of the video, from the

4  time that Trooper Wilson first turned his camera on with the truck

5  coming off of the exit ramp, just so that we know.  And Mr.

6  Theodore and Mr. Mackie and I will work that out between us.

7      THE COURT:  Thank you.

8                    **CROSS-EXAMINATION**

9  by Mr. Green:

10  Q.    Trooper Wilson, how are you today?

11  A.    Fine, sir.

12  Q.    I believe you and I know each other, but just for the record's

13  sake, I'm Scott Green. Now, I want to follow up on something that

14  you just said a moment ago. This statement that Mr. Huff had made

15  about 200 to 500 armed men, that's after he had been talking to

16  everybody there for about an hour and a half, trying to get all the

17  cops, the THP, the TBI, the FBI, all the cops from the surrounding

18  area, to join in this quest, correct?

19  A.    It wasn't over an hour and a half, no, sir.

20  Q.    Well, the time that he had been there, he had been talking to

21  all of you, trying to educate you, saying, hey, you guys need to join

22  in with us? He had been doing that, hadn't he?

23  A.    There were only myself, Trooper Kelly Smith, and I think he

24  spoke with, at length, with Lieutenant Williams.

25  Q.    And the task force officers, correct?

1   A.    Just those three are the ones I actually seen him actually

2   talking to.

3   Q.    Okay.  Well, then maybe I'm misstating it, but while he was

4   there and talking to those three individuals and yourself, he was,

5   the entire time, almost nonstop, talking about the problems in

6   Madisonville and trying to get help from law enforcement; was he

7   not?

8   A.    He was talking to three of us, me, Kelly Smith, and Lt. Mike

9   Williams, and he did speak with us very lengthy about his cause.

10  Q.    Okay. There's problems in Madisonville, we want you guys to

11  help us, right?

12  A.    I assume that's what he was thinking. I have never known a

13  problem in Madisonville, but he thought they were.

14  Q.    Okay. I understand that.  But he was wanting to try to get law

15  enforcement to help him, wasn't he?

16  A.    I feel he was trying to recruit us.

17  Q.    Okay.  That's my question. Now, you told Mr. Theodore just a

18  moment ago that you took what he said very, very seriously?

19  A.    Yes, sir.

20  Q.    Okay.  So when did he say this, right within a minute or so

21  when he climbed in his truck and left or half an hour or so before he

22  left?

23  A.    And the question was?

24  Q.    The statement that we just heard play, when, in the context of

25  this traffic stop at the side of Highway 68, when was that statement

1   made?

2   A.      Approximately 7:18, 7:17. I mean– correction– 8:18.

3   Q.      Okay. And the initial traffic stop occurred when?

4   A.      At 7:09 a.m.

5   Q.      Okay. So we're over an hour into the traffic stop when he

6   made that statement, correct?

7   A.      Yes, sir.

8   Q.      And even then he didn't immediately leave right after that,

9   did he?

10  A.      Correct.

11  Q.      He stayed there and talked some more to you guys that were

12  there on the scene, didn't he?

13  A.      Yes, sir.

14  Q.      Even though he was free to go, didn't he?

15  A.      Yes, sir.

16  Q.      And talked and talked and talked and talked, didn't he?

17  A.      Yes, sir.

18  Q.      Still trying to recruit you, wasn't he?

19  A.      Yes, sir. Educate us and recruit us.

20  Q.      All right. Now, you said, and you've showed us the .45 that

21  you saw on his hip. We saw the pictures of the .45, we've seen

22  pictures of the clip and the rounds that were in the .45. Now, if

23  he's got a carry permit, that's perfectly legal, for him to have that

24  on his hip; is it not?

25  A.      If it's a valid permit, it would be legal.

1    Q.    Okay. And if he's got a valid carry permit, it's perfectly legal

2    for him to possess an AK-47; is it not, if you know?

3    A.    I don't know that answer.

4    Q.    Okay. And you never saw the AK-47, did you?

5    A.    No, sir.

6    Q.    But he told you there was one in there, didn't he?

7    A.    He didn't tell me they were one in there.

8    Q.    Well, you've learned since he told the drug task force officers

9    there was one in there?

10    A.    He told national media.

11    Q.    Told anybody that would listen, didn't he?

12    A.    Yes, sir.

13    Q.    And so we know that he's got a loaded .45, and you said that

14    you couldn't obtain verification that morning that the .45– that the

15    permit carry was valid. Do I understand that correct?

16    A.    That's correct, sir.

17    Q.    All right. And you took him very seriously about this

18    statement. You said he was wagging his finger, talking about if

19    we've got enough people we're going to go do this, right?

20    A.    Yes, sir.

21    Q.    So we've got an armed man that we're taking seriously

22    because of these statements that he's making, but you let him drive

23    down the road to Madisonville?

24    A.    Unarmed.

25    Q.    And he was unarmed because initially you asked him or the

1    task force officer asked him, in your presence, would you let me

2    keep that .45 while you're in Madisonville?  Remember that

3    conversation occurred?

4    A.    That's correct.

5    Q.    And Mr. Huff said, no, sir, I can't do that, I've got a Second

6    Amendment right and a valid carry permit to have that weapon.

7    Remember that conversation?

8    A.    Yes, sir.

9    Q.    But what Mr. Huff did agree to do was, out of respect for you

10   guys, meaning you guys, law enforcement, I'll put that weapon in

11   the toolbox of that truck?

12   A.    Yes, sir.

13   Q.    Correct?  And you watched him do that, didn't you?

14   A.    Yes, sir.

15   Q.    And he locked that toolbox, correct?

16   A.    No. He unlocked it. I don't know if he ever locked it back.

17   Q.    Well, but the gun was put in the toolbox, correct?

18   A.    Yes, sir.

19   Q.    And do you have one scintilla of evidence that that gun ever

20   came out of that toolbox the rest of the day that he was in

21   Madisonville?

22   A.    No. No, sir.

23   Q.    Okay.  And when he was talking to you about effecting those

24   citizens' arrests, was that before or after that gun got put up?

25   A.    That was before.

1  Q.    And what were you going to do if he said no, I'm not going to

2  put that gun up?

3  A.    The last statement that I made– I can't recall if he put his gun

4  in there. Can you please just ask that question again, let me see if I

5  can get it?

6  Q.    What were you going to do if he said no, I'm not going to give

7  you that gun, and when the discussion occurred about putting it up

8  while you were in Madisonville, said nope, I've got a right to carry

9  it on my hip, what were you going to do?

10 A.    Don't know. I wasn't faced with that.

11 Q.    Okay. Well, the truth of the matter is, he had a valid and legal

12 right to have that gun, correct, and there's nothing that you could

13 have done if he wanted to keep it on his hip, correct?

14 A.    Couldn't have took it away from him unless I could have

15 verified it was a invalid permit, yes, sir. That's correct.

16 Q.    Okay. Well, the United States and Mr. Huff have stipulated

17 for purposes of this trial that that's a valid carry permit that he had

18 with him, so there's no issue about that. So my question is,

19 because he's got a valid carry permit, if he had wanted to keep that

20 gun on his hip and go sauntering into Madisonville with it on his

21 hip, there's not a thing you could have done about it, is there?

22 A.    At that location, it was out of my hands.

23 Q.    Okay. Maybe I'm not asking the question correctly. If he's

24 got a valid carry permit, he's got every right to wear that gun on his

25 hip into Madisonville that day; doesn't he?

1   A.   Yes, sir.

2   Q.   But he agreed with the law enforcement officers at the scene

3   on Highway 68 to put it in the toolbox, didn't he, sir?

4   A.   Yes, sir.

5   Q.   All right. And you said that, in your presence, Mr. Huff never

6   said anything about anybody committing treason; is that correct?

7   A.   That I can recall.

8   Q.   But he was talking about it was his belief that there was some

9   corruption going on in Madisonville?

10  A.   Yes.

11  Q.   Did he seem to honestly believe that?

12  A.   Yes.

13  Q.   Seemed to passionately believe that?

14  A.   Yes, sir.

15  Q.   Now, tell me about this debriefing that occurred first thing

16  that morning between you and the other law enforcement agencies.

17  A.   Okay. I was going to report to the– it's either the city hall or

18  the county building that's in Madisonville, at approximately 5:00,

19  5:30. Upon responding to the city hall building, we were there for

20  a little time, which they had a room inside the building designated

21  for this meeting.

22  Q.   What time do you think you showed up?

23  A.   Five-thirty, five, 5:30, when I was supposed to report there,

24  best I can recollect.

25  Q.   Were you the first one there?

1    A.    No, sir.

2    Q.    Bunch of cops there, weren't there?

3    A.    Bunch, yes, sir.

4    Q.    But did you hear it from start to finish?

5    A.    No, sir.

6    Q.    The briefing? How long were you there being debriefed?

7    A.    I was in the building, but not in the room. I couldn't get in the

8    room. I tried one time for just a matter of a few steps in, and it was

9    wall to wall, a smaller room. With all the law enforcement there, I

10   couldn't get in. I walked out, stayed about 30 feet outside the

11   room.

12           MR. GREEN:    Could we see the "Oathkeeper" truck

13   exhibit again, please?

14           MR. THEODORE:    Exhibit Ten?

15           MR. GREEN:    Ten, please.

16   Q.    If you could, Trooper Wilson, look at the picture. That truck

17   appears to be a black GMC Sierra pickup, correct?

18   A.    Yes, sir.

19   Q.    And a black GMC Sierra pickup, we're going to see those all

20   over the highway, aren't we?

21   A.    Yes, sir.

22   Q.    All right. But this one tends to stand out just a little bit,

23   doesn't it?

24   A.    Yes, sir.

25   Q.    Is it a fair statement that the person driving that vehicle

1    perhaps wants to be noticed?

2    A.    Yes, sir.

3    Q.    All right. And you do interdiction; you said that's your

4    training. That's what you do with the highway patrol?

5    A.    Yes, sir.

6    Q.    And that's, if I understand interdiction correctly, that's trying

7    to identify drug dealers coming up and down I-75, correct?

8    A.    Part of the assignment.

9    Q.    But, obviously, you're interdicting other crimes if you can,

10   but you're looking for drug dealers and for anybody that's

11   violating the law, correct?

12   A.    We're actually categorized as Interdiction-Plus. That's any

13   crimes, any times.

14   Q.    Well, is it your training, sir that– let's talk about a drug

15   dealer. A drug dealer's not going to drive down the road with a big

16   sign on the side of his truck that says, "I'm a drug dealer," is he?

17   A.    No, sir.

18   Q.    Somebody that's doing money laundering, he's not going to

19   go drive down the side of the road with a big dollar sign on the side

20   of the truck saying, "I launder money," are they?

21   A.    No, sir.

22   Q.    In fact, is it your experience and training that most criminals

23   try to hide what they're doing?

24   A.    They usually try to hide it behind specific indicators and

25   disclaimers.

1    Q.    Exactly. But they're not putting it out in the front, like, pull

2    me over, please, are they?

3    A.    Disclaimers and specific indicators, yes, sir, they do.

4    Q.    Well, but the specific disclaimers and indicators are what you

5    learned about in your training, not what the person that's pulled

6    over knows, correct?

7    A.    You're talking about the one that might be committing the

8    offense?

9    Q.    Right.

10   A.    Yes, sir, I'm sure they know. That's the reason they're doing

11   what they're doing, the reason we're trained to do what we do.

12   Q.    I'm not making myself clear, and I apologize.

13   A.    That's all right.

14   Q.    Give me an example of a suspicious indicator. If you're

15   looking, you see a car, you think that's a little bit suspicious for

16   drug activity, give me an example of a suspicious indicator that

17   would jump out at you.

18   A.    I would rather just show you the suspicious indicators I'd

19   seen this day.

20   Q.    Well, right there, it's pretty obvious what the suspicious

21   indicators are, that big "Oath Keepers," right?

22   A.    Well, like as the two men with guns, I see "Oathkeeper," I see

23   "Not on our watch." When you connect that with two guns, "Not

24   on our watch." I do see another bumper sticker, "Oath Keepers,"

25   and then a "Support our local militia." And through my training,

1   my favorite one of this– and it will stand until I go to my grave– is

2   a clean vehicle, and that's consistent with any type of crime they

3   do, why they do– why they do it.

4   Q.      Would there be any danger if you told me?

5   A.      Contamination. They wash the contamination off the vehicle.

6   Q.      Mine's getting the only wash it's getting; it's raining today.

7   This vehicle, though, anybody that looks at it can see that this

8   person's got all sorts of indicators all over it, correct, including the

9   driver. The driver knows that people are going to look at "Oath

10  Keepers," right?

11  A.      I'm sure he wants people to look at it.

12  Q.      Right. Exactly. That's my point. And a drug dealer driving

13  down the road, he's not going to know that because I've got a clean

14  car the cops may pull me over; is that a fair statement?

15  A.      I don't think he cares. I think his concern is washing the

16  contamination off that vehicle, because they're not afraid of us as

17  much as they are of the drug dogs and the bomb dogs.

18  Q.      Of the dogs?

19  A.      They're terrified of that.  So I'm sure they know that's a thing

20  that they have to go through.

21  Q.      Okay. While we're talking about dogs, both a drug dog and a

22  bomb dog were run around that truck, weren't they?

23  A.      Yes, sir.

24  Q.      Neither one of them hit, did they?

25  A.      No, sir.

1    Q.    And, in fact, you're a K-9 officer, aren't you?

2    A.    I am.

3    Q.    All right.  Was it your dog or another dog?

4    A.    No, sir, it wasn't mine.  I was trying to validate the

5    information and the drug task force– actually, THP had the drug-

6    sniffing– or the bomb-sniffing dog or explosives-sniffing dog.

7    The DTF was able to use theirs while I was conducting my

8    investigations, to help. And the only reason they were there,

9    because he didn't give us consent to search.  He refused us to

10   search his vehicle.  He didn't want to cooperate with that.

11   Q.    All right.  In your mind, Trooper Wilson, is it consistent for

12   someone who is getting ready to go do an armed takeover of a

13   courthouse to put his weapons away?

14   A.    If it would allow him to leave that scene, to meet his goal at

15   the other end, I'd say, yes.

16   Q.    Then why did you let him go?

17   A.    What could I do?

18   Q.    Well, if I'm understanding your testimony here correctly and

19   I understand the Government's position, he's already violated 18

20   U.S.C. 231 and 18 U.S.C. 924(c).  That's why we're here today.

21   Why did you let him go?

22   A.    Well, those, I'm sure, those are federal charges. We fall under

23   state guidelines.

24   Q.    All right.  Well, were there not federal agents in that

25   debriefing?

1    A.    There was no federal agents on the traffic stop.

2    Q.    Were there federal agents in the debriefing?

3    A.    I'm sure they were, yes. I'm sure they was FBI. I wasn't

4    introduced to only two–

5    Q.    Were there federal agents within radio contact?

6    A.    Not myself, but probably through the DTF. I think they had

7    connections to the command post, to talk with them. But I did not

8    have radio connection. I was unable to talk to them.

9    Q.    Okay. Well, there was federal agents in Madisonville that

10   day; you know that, don't you?

11   A.    I'm sure they were.

12   Q.    There was FBI and FBI S.W.A.T. team?

13   A.    Yes.

14   Q.    Apparently, they had, understand what the Government's

15   saying, they had some sort of big tank over in Sweetwater, ready to

16   roll if need be. Did you know that?

17   A.    No, sir, I didn't.

18   Q.    Now, you said you'd been in law enforcement for 18 and a

19   half years; is that correct?

20   A.    Yes, sir. That would be a fair– 18, 19 years.

21   Q.    All right. How many times have you pulled somebody over,

22   just– I'm not asking for an exact count, but ballpark, how many

23   times have you pulled somebody over for a stop sign violation?

24   A.    Numerous times.

25   Q.    Okay. And in all those numerous times in your 18 years of

1    law enforcement, that you pulled someone over for a stop sign

2    violation, have you ever seen five police vehicles involved in that

3    stop?

4    A.    For traffic violations, I have. I can't really recall right now

5    just on specific– like a single stop sign. But I have seen several

6    patrol cars and actual on the scene, too, at a crime– or at a traffic

7    stop.

8    Q.    Okay. Did you see or have you ever seen shotguns and

9    submachine guns pulled out by the cops, for running a stop sign?

10    A.    For traffic violations, I have.

11    Q.    For just running a stop sign, you get a submachine gun pulled

12    on you?

13    A.    Not for just that particular– something that extends from the

14    initial stop and what corresponds after the stop, and sometime may

15    even be during the stop. It depends on if the guy has a gun, if he's

16    showing a gun, or they were something that might lead up to that.

17    Q.    All right. Well, let's talk about this stop. Mr. Huff wasn't

18    showing a gun when he was pulled over, was he?

19    A.    No, sir.

20    Q.    You didn't even know who he was when you pulled him over,

21    did you?

22    A.    That's correct, I did not know.

23    Q.    And all you knew was this was a funny-looking black truck

24    with a bunch of writing on it, correct?

25    A.    Yes, sir.

1    Q.    Had Georgia plates on it, correct?

2    A.    Yes, sir.

3    Q.    And, by the way, that plate says, "I'm lit," correct?

4    A.    Yes.

5    Q.    And if you owned a lighting business, that would be kind of a

6    cool thing to have on your license plate, wouldn't it?

7    A.    Yes, sir, I'm sure it would be.

8    Q.    Okay. All you knew when you pulled him over was that there

9    was a Georgia truck with funny writing on it, and there's this guy

10    sitting up here and his passenger sitting over here, right? Right?

11    A.    I couldn't see inside the vehicle. His windows were tinted.

12    Q.    That's my point. You didn't know anything more about it than

13    what you could see on the outside of that truck, correct?

14    A.    Yes, sir, you're correct.

15    Q.    But before you even got him out of the vehicle or the

16    passenger out of the vehicle, there were other law enforcement

17    vehicles around you, correct?

18    A.    Yes, sir.

19    Q.    Before you got either one of them out of the vehicle, before

20    anybody ever saw that gun, there were shotguns and other guns

21    drawn down on that vehicle, correct?

22    A.    I never once drawed my gun down.

23    Q.    I'm not asking if you did. I'm asking if other people there, in

24    your presence, did.

25    A.    There were an officer– he was a DTF officer, to my left of my

1   patrol car and to my right of my patrol car, behind the driver's

2   door. When I did exit the vehicle, I did know that he had either a

3   shotgun or assault rifle in his arms. Was it drawed down? I didn't

4   see it point downrange. It may have been, but I wasn't looking

5   backwards; I was looking forward. But I did see him–

6   Q.    Saw the gun out, though, didn't you?

7   A.    Yes, sir, I did.

8   Q.    Okay. For running a stop sign at this point, correct?

9   A.    At that point, he had followed too close and did run a stop

10  sign.

11  Q.    Okay. Now, we're going to watch the whole video later. Are

12  you telling us that that truck did not stop coming off the exit ramp?

13  A.    He slowed down to a rolling stop for approximately–

14          MR. THEODORE:  Your Honor, I'm going to object.

15  This is not relevant. It's been the subject of another matter,

16  another hearing. I don't think it's relevant for this proceeding.

17          MR. GREEN:   It's relevant if his credibility is at issue,

18  your Honor. If the truck– they're going to watch a video, and I'm

19  asking– he's testified that that truck came to a stop, and these

20  jurors can judge for themselves whether or not it's–

21          MR. THEODORE:  It's already been ruled upon by the

22  Court, though–

23          MR. GREEN:   That's not the issue before the Court,

24  your Honor.

25          THE COURT:  Okay. Let Mr. Theodore finish.

1    MR. GREEN:  I'm sorry.

2    THE COURT:  Go ahead.

3    MR. THEODORE:  Your Honor, that issue has been

4    decided by the Court, and I don't think that that's relevant for

5    purpose of this hearing.

6    MR. GREEN:  That issue has been decided by the Court

7    in the context of another issue that was brought up to the Court.

8    This witness is testifying before this jury. That is a relevant matter

9    that is part of what this jury is going to see as part of the entirety of

10   this stop.

11   And the question that I'm asking is, simply, is he saying that

12   what they're going to see on that video was, in fact, a stop by that

13   vehicle.

14   THE COURT:  I'll overrule the objection to that limited

15   extent.  There's no issue in this case about the stop itself or the

16   ability or lawfulness of the stop.  But in terms of the testimony and

17   what the jury's going to see on the videotape, I'll allow the

18   questions for that limited purpose.

19   MR. GREEN:  Thank you, your Honor. That's the only

20   reason we're asking it.

21   THE COURT:  Go ahead.

22   Q.    Are you telling us, under oath, that that truck did not stop

23   when it came off the exit ramp?

24   A.    My statement was that he pulled up to the stop line, proceeded

25   past it, came to approximately one-second stop, a rolling stop, and

1    then turned right onto Highway 68.

2    Q.    Okay. So just for all of us, for future reference, when we're

3    out driving, so a one-second stop's not good enough, right?

4    A.    There's a stop line that you have to stop behind. And when

5    you pull up to an intersection, you stop and you look to the right,

6    look to your left, and then you decide to pull over, can you do that

7    in one second? I say you cannot do it safely.

8    Q.    All right. But you weren't given any information to be

9    looking for that truck, were you?

10   A.    That's correct, I was not.

11   Q.    Nobody told you in this debriefing that you were part of, hey,

12   you need to be looking for a black truck that's got "Oath Keepers"

13   on it that's going to be coming up from Georgia? You didn't hear

14   that, did you?

15   A.    No, sir.

16   Q.    And you didn't hear anything in this debriefing about you

17   need to be looking for an older model paneled truck, Ford, that's

18   painted in camo-style, and has "Georgia Militia" on the side of it.

19   You didn't hear that, either, did you?

20   A.    No, sir.

21   Q.    And you didn't hear the name "Darren Huff" before it passed

22   his lips after you got him out of the truck, after you got him out of

23   the truck, did you?

24   A.    That's right, I had not, sir.

25   Q.    Now, it's a fair statement– is it not– that you certainly hadn't

1    broadcast over the radio and called Georgia and said, I'm going to

2    pull Mr. Huff over and I'm going to keep him for an hour? That just

3    happened, right?

4    A.    I don't fully understand your question.

5    Q.    Well, I don't, either, because I didn't ask it very well.  When

6    you pulled the truck over, that would have been what, about seven

7    o'clock or was a little shortly after 7:00 a.m. that morning?

8    A.    7:09, 7:10 a.m.

9    Q.    Okay.  And the truck stayed there until you told him he's free

10   to go.  What time was it that you told him he was free to go?

11   A.    7:17– or sorry to the Court– eight, about 8:18, 8:19, 8:17 a.m.

12   that morning, real close to that time.

13   Q.    Okay.  And that would have been over the course then– he was

14   at the side of the road with you and the other officers for a little bit

15   over an hour, correct?

16   A.    Yes, sir.

17   Q.    And it's a fair statement that that certainly wouldn't have

18   been something he probably anticipated when he came up the road,

19   was it?

20   A.    No, sir.

21   Q.    All right.  And all of us, if we have a schedule to keep, we

22   want to try to keep that schedule to do what we're planning to do,

23   correct?

24   A.    Yes, sir.

25   Q.    And so he's been detained for over an hour that he wasn't

1   expecting, correct?

2   A.    Yes, sir.

3   Q.    But he decides he's going to stay there for an additional half

4   hour and talk to you guys?

5   A.    Yes, sir.

6   Q.    That's what happened, right?

7   A.    Yes, sir.

8   Q.    Keep trying to recruit, right?

9   A.    Educate us and recruit.

10  Q.    He wasn't on a big hurry to get on into Madisonville because

11  he was behind schedule and he had to meet somebody, was he?

12  A.    I assume that's a correct statement.

13  Q.    Okay. Thank you. And, of course, Mr. Huff– and we're going

14  to hear it on video– he told you that, we have no intention of

15  violence? He made that statement, didn't he?

16  A.    May have been part of his statement. I'm sure it comes with a

17  justifiable yes, without reviewing the rest of the tape and see what

18  the full statement was, just a very small clip of it.

19  Q.    Okay. And he also said, we're all on the same side, didn't he?

20  A.    He thought we was on the same side.

21  Q.    I mean, he made that statement– did he not– we're all on the

22  same side?

23  A.    Something probably very close. I'd have to review the tape

24  and listen to it, but–

25  Q.    Fair enough, fair enough. Now, let's talk about the young

1   man that was with Mr. Huff. Do you recall his name?

2   A.   Michael William– last name starts with–

3   Q.   DeSilva something?

4   A.   –Silva, DeSilva.

5   Q.   How old would you guess him to be?

6   A.   Thirties.

7   Q.   Young man, correct?

8   A.   Yes.

9   Q.   Younger than you and I are, right?

10  A.   Yes, sir.

11  Q.   All right. And this young man, was he searched when he was

12  taken out of the vehicle?

13  A.   I can't recall. I did not search him.

14  Q.   Oh, he's not sitting over here today, obviously, correct?

15  A.   I don't see him in the courthouse today.

16  Q.   You don't see him seated over here at this table?

17  A.   Oh, no, sir.

18  Q.   And the only weapon that you saw connected with that traffic

19  stop was the one that Mr. Huff had on his hip, correct?

20  A.   Yes, sir.

21  Q.   Mr. DeSilva didn't have one, did he?

22  A.   He didn't have one on his person. We will never know if he

23  had one in the vehicle because we wasn't allowed to search it.

24  Q.   Okay.  Well, did anybody ever question Mr. DeSilva about

25  what was going on, why you all were coming up the road?

1   A.   I did not.

2   Q.   Okay.  Well, wouldn't it have been kind of important to know

3   what the man who was with this dangerous criminal, who was

4   going to take over Madisonville, what his intentions were?

5   A.   I'm sure to someone it was. My effort then was to validate the

6   gun carrying permit, to see if the Defendant is guilty of that or not,

7   to see if I can let him go continue forward or not.  So my, my effort,

8   my work, was with the Defendant, Mr. Huff.

9   Q.   Well, there were several officers there; were there not?

10  A.   No. There were two drug dogs.  I don't know how long they

11  stayed.  Myself, Trooper Kelly Smith, Lieutenant Williams from

12  the DTF, and he had also two officers. And one of those DTF

13  officers did spend some time with Michael.

14  Q.   Okay.  Do you dip snuff?

15  A.   No, sir.

16  Q.   Is that Trooper Smith that does that?

17  A.   Yes, sir.

18  Q.   Okay.

19  A.   I actually have a can, but it's like a year old, and occasionally

20  I think, I'm a man, then I realize I'm not and just keep it, but–

21  Q.   You got rid of it?

22  A.   I actually still have the can, and they laugh because it's

23  Hawken's.

24  Q.   Well, we're going to see in that videotape that things were so

25  stressful there that somebody, one of the officers, put a dip of snuff

1   in his mouth, didn't he?

2   A.    I don't know. I'm sure, if it's on videotape, it will show it,

3   and that's one thing I do like about videotape.

4   Q.    Well, the truth of the matter is, that everybody was just kind

5   of yucking it up and talking back and forth while you're trying to

6   figure out whether or not his carry permit is valid, correct?

7   A.    You'll have to ask them that question. I know what my job

8   was and my assignment was, and I can tell you it's lucky I didn't

9   smoke or lucky I didn't chew, because I would probably be. I was

10  stressed out.  I'll be honest with you, I was stressed out.

11  Q.    Okay.  Well, while you were stressed out, do you recall going

12  over and talking to Mr. DeSilva when he was back over toward the

13  passenger's side of that pickup truck?

14  A.    One time I did approach him, after we had released Mr. Huff,

15  and I did– I talked to him just a few minutes, and I actually told

16  him, I said, there's a better way than this. I said you– I actually

17  tried to get him to turn a different way.  I said, there's a better way

18  than this, or something similar to that.  I don't know exactly what

19  my statements were to him. But a young man, I wished he would go

20  a different route. There's a better way than what they had

21  intentions to do, and I hope and pray that he goes down a different

22  road.

23  Q.    Well, a better way than what?  What was he there to do?  What

24  was Mr. DeSilva there to do?

25  A.    To go arrest some judges and some officials and use a .45 and

1   weapons to conduct that arrest. If they could do it and get it done,

2   they would have, and if it wasn't going to happen that day, it was

3   going to happen soon.

4   Q.    Did he tell you he was going to do that?

5   A.    Yes, sir, he did.

6   Q.    Did Mr. DeSilva tell you he was going to do that?

7   A.    Oh, no, sir, no. No, he did not. It was Mr. Huff's statement.

8   Q.    And, in fact, there's no evidence that Mr. DeSilva had any

9   intent to do anything, was there?

10  A.    I have no– as far as my interview, my speaking with him, I had

11  nothing. You'll have to ask the other officers what their

12  conversations were with him.

13  Q.    You seem like a very reasonable and intelligent man. Can you

14  think of a single logical reason for him to have brought Mr.

15  DeSilva with him if Mr. DeSilva was not part of the plan?

16          MR. THEODORE:  Objection, your Honor. Calls for

17  speculation.

18          MR. GREEN:  All right. Withdrawn. We'll argue that

19  later.

20          THE COURT:  Thank you.

21  Q.    Because, in fact, Mr. DeSilva was just there, wasn't he?

22  There's no evidence he had any intent to do anything wrong, was

23  there?

24          MR. THEODORE:  Objection. Calls for speculation,

25  your Honor.

1          MR. GREEN:  Based on what he knows.

2          MR. THEODORE:  Say as far as what he said.  He

3    doesn't know what Mr. DeSilva was thinking.

4          THE COURT:  Well, the question was, is there any

5    evidence as to his intent or what Mr. DeSilva's activities or actions

6    were.  So within the realm of your personal knowledge, was the

7    question, how I'll interpret the question.

8          MR. GREEN:  And I'm sorry if I wasn't clear. That was

9    the question. I need to let his Honor start doing my questions for

10   me.

11   A.    He may have quoted something to these other officers, but to

12   myself, he did not quote anything to me.

13   Q.    Okay.  In fact, the only thing you and he really talked about

14   was credibility, wasn't it?  Do you remember having a conversation

15   with him about credibility?

16   A.    What we just spoke about?  Yes, sir.

17   Q.    And, of course, once again, that's going to be on the tape,

18   what was said, right?

19   A.    Yes.

20   Q.    Now, as a law enforcement officer, it's your duty to resolve

21   everything that you can to assure that a situation is going to be safe

22   and without trying to hurt a suspect, in this case, Mr. Huff, or hurt

23   the citizens in any way to conduct your job.  That's your role as a

24   law enforcement officer, isn't it?

25   A.    Yes, sir.

1  Q.    In fact, you've testified to that very statement right there in

2  the past, haven't you?

3  A.    Yes, sir.

4  Q.    So with that being your role, and after hearing what this jury

5  heard on that video, and after knowing that Mr. Huff had weapons

6  in his truck, you considered it safe for him to go on, didn't you?

7  A.    No, sir, I didn't.

8  Q.    Then did you breach your duty as a law enforcement officer?

9  A.    I tell you what. When I left that day, I felt sick of my stomach,

10  not knowing what's going to take place over there. He was

11  released that day.

12  Q.    Well, you couldn't have felt too sick at your stomach later

13  that day, because nothing happened over there, did it?

14  A.    I think something did happen, but I wasn't– I was part of, at a

15  later time they asked me– they actually pulled everybody and all

16  the troopers and was getting ready to pull the strike team. And, of

17  course, I'm the patrol dog, so I was going to be part of that

18  deployment. And I don't know exactly what time, maybe noon or

19  so, but they were a time there that they did pull us from all of our

20  assignments to get ready, prepare. Something apparently was going

21  to happen at the courthouse.

22  Q.    Did anything happen at the courthouse, Trooper Wilson?

23        MR. THEODORE:   And I object, your Honor. He said

24  that he wasn't there, he wasn't in Madisonville, so he doesn't have

25  personal knowledge of what transpired.

1              MR. GREEN:  All right.

2      Q.    Have you heard about anything happening at the courthouse

3      that day?

4              MR. THEODORE:  Objection, hearsay, your Honor.

5      This is not the witness–

6              THE COURT:  I'll sustain the objection.

7              MR. GREEN:  Well, they don't have a witness that can

8      prove that. That's my whole point.

9              THE COURT:  Well, we'll leave that to argument, as

10     necessary.

11             MR. GREEN:  That's all.

12             THE COURT:  Thank you. Redirect?

13             MR. THEODORE:   Yes, your Honor.

14                    **REDIRECT EXAMINATION**

15     by Mr. Theodore:

16     Q.    And then, just for clarification, Trooper Wilson, you did not

17     go to Madisonville after making that stop of Mr. Huff; is that

18     right?

19     A.    I did not go to the courthouse or in the courthouse, that's

20     correct.

21     Q.    But went immediately after to be part of whatever law

22     enforcement presence was going to be in Madisonville?

23     A.    Around 12:00 o'clock they had called us into the city hall for

24     a briefing to establish the strike team just in case they had to go out

25     with part of that.  But we never did actually leave the city hall to go

1    into Madisonville.

2    Q.    How far is Madisonville, the town of Madisonville, from

3    where you made that traffic stop?

4    A.    Five, six– approximately five or six, seven miles, six miles.

5    Six, seven minutes away.

6    Q.    Okay.  Now, you're a state law enforcement officer; is that

7    right?

8    A.    Yes, sir.

9    Q.    Not a federal agent or federal law enforcement officer?

10   A.    Yes, sir, that's correct.

11   Q.    Okay.  Are you well-versed then in all the aspects of different

12   federal criminal laws?

13   A.    No, sir.

14   Q.    At the time of the stop, were you in a position to decide

15   whether or not, and based upon your limited knowledge then and

16   the type of experience you had, were you in a position to decide

17   whether or not Mr. Huff had committed a federal violation? Were

18   you in a position to decide that or not?

19   A.    No, sir.

20   Q.    So you weren't in a position to decide whether he should be

21   arrested for any federal offense at that time?

22   A.    That's correct.

23   Q.    Since you didn't go to Madisonville afterwards, you don't

24   know what Mr. Huff might have done with that firearm once he got

25   to Madisonville, do you?

1    A.     That's correct, I would not known.

2    Q.     You know there was a lot being made out of the indicators on

3    this vehicle in Government's Exhibit Number Ten, you know, oh,

4    well, you know, basically, you know, you wouldn't flaunt this stuff

5    if you were really doing something wrong.  Have you known drug

6    dealers– that was given as an example– have you known drug

7    dealers to sometimes flaunt what they're doing, make it obvious

8    sometimes with the cars they drive and–

9    A.     Yes, sir.

10   Q.     And what about some other types of groups?  Let's not just

11   look at drug dealers, but anything, whether it's White Supremist

12   groups or anti-war protestors or Neo-Nazi groups. Do sometimes

13   they like to actually show what they're doing?

14   A.     Yes. They're proud of it.

15   Q.     How many officers would you say were part of that briefing in

16   the morning?

17   A.     The room was so congested that I could barely step in and

18   couldn't– stepped back out the door. I'm assuming 50 to 75 people

19   that I– that's close.  I couldn't tell you that's a true number, but

20   there were a lot of officers on the scene.

21   Q.     And that was in preparation for something happening in

22   Madisonville?

23   A.     Yes, sir.

24   Q.     Something bad happening in Madisonville perhaps?

25   A.     Yes, sir.

1   Q.    You know, there was some testimony on cross-examination by

2   Mr. Green regarding officers at the stop maybe joking around a

3   little bit, yucking it up, or whatever, so-to-speak. What was your

4   purpose at the stop? What were you trying to accomplish?

5   A.    My stop was to validate this gun-carrying permit or not.

6   Q.    So you were trying to gather information? Were you trying to

7   get, gather information at that time about things?

8   A.    No, sir.

9   Q.    Okay. Well, at least about the stop and about the permit; is

10  that right?

11  A.    Yes. I was trying to validate the gun-carrying permit.

12  Q.    Did you have any desire to get confrontational with Mr. Huff

13  at that time?

14  A.    No, sir.

15  Q.    Do you think any of the other officers wanted to get

16  confrontational–

17          MR. GREEN:   Objection. That calls for the same

18  speculation that he objected to, your Honor.

19          THE COURT:   I'll sustain the objection.

20          MR. THEODORE:  Nothing further.

21          THE COURT:   Thank you. Any recross?

22          MR. GREEN:  Yes, your Honor.

23                    **RECROSS-EXAMINATION**

24  by Mr. Green:

25  Q.    Mr. Theodore asked you if you are well-versed in federal law,

1    and you told him that you weren't.  But it's part of your job to have

2    a basic grasp of Tennessee law, isn't it?

3    A.    Yes, sir.

4    Q.    And you're aware that, in Tennessee, one can be arrested for

5    attempting to commit an offense, correct?

6    A.    Unless it happened in my presence, no, sir, I don't– can you

7    please ask the question again for me?  I'm sorry.

8    Q.    Well, have you ever charged anybody with reckless

9    endangerment?

10   A.    Through vehicles, yes, sir.

11   Q.    Okay.  And reckless endangerment is, in this state, reckless

12   conduct coupled with what?

13   A.    In a vehicle, that would be if they drove in such a reckless

14   manner that they hurt someone.

15   Q.    Right. That's reckless driving, and, of course, it could be

16   reckless endangerment by the use of a vehicle. But is reckless

17   endangerment not placing– or placing another person in imminent

18   danger of death or serious bodily injury by reckless conduct?

19   A.    I think it would be placing them in. I think it's committing the

20   crime of hurting somebody.

21   Q.    Okay.  In this state, it's also a crime– is it not, sir– if you

22   attempt to commit a crime?

23   A.    I've never charged anybody with it, but that's a very good

24   possibility.

25   Q.    Okay.  So if he's telling you and if you guys truly believed

1 he's this danger, he's telling you here's what I'm going to do, he's

2 got the means to do it, why didn't you charge him?

3 A.    That hasn't been committed.  He hasn't actually done that yet.

4 Q.    He's taken a substantial step toward it if, in fact, he's doing

5 something wrong, hasn't he?

6 A.    Yes, sir.

7 Q.    Okay.  Is that not the definition of an attempt in this state?

8 A.    I'd have to see the definition.

9 Q.    Well, you've also– have you not, sir– charged persons with

10 carrying a weapon with the intent to go armed? You've charged

11 people in the past with that; have you not?

12 A.    Yes, sir.

13 Q.    And that merely requires the unlawful possession of a weapon

14 with the intent to go armed, nothing more, correct?

15 A.    It could be more.  It could actually be– you may actually lose

16 your rights to carry that pistol for DUI offenses or drinking

17 offenses.

18 Q.    Exactly. But you can establish the offense of carrying a

19 weapon with the intent to go armed merely by having, that person,

20 having a weapon on their person that they don't have a carry permit

21 to have, correct?

22 A.    And I charge them with carrying arms–

23 Q.    Yes.

24 A.    –if they have a weapon and attempt to commit a crime?

25 Q.    No. Can you charge them for unlawful possession of a weapon

1    in this state if they don't have a valid right to carry it?

2    A.    Yes, sir.

3    Q.    But you didn't here, did you?

4    A.    I did not. At this time, I hadn't validated it one way or the

5    other to know if it was true, good or bad.

6    Q.    Because you guys weren't scared of him, were you?

7    A.    Was I not scared of him? Actually, right now, I would tell

8    you, just like the last witness probably told you when she was

9    scared to death in that room, I still worry about my family and my

10   house.

11   Q.    He's been out– this has been over a year and a half ago. He's

12   been out. Have you ever seen him in your neighborhood?

13   A.    No.

14   Q.    Have you ever gotten a threatening phone call from him?

15   A.    No, sir.

16   Q.    You carry a gun on your hip every day as part of your job,

17   don't you ?

18   A.    Yes, sir.

19            MR. GREEN:   That's all.

20            THE COURT:   All right.  Thank you, Trooper Wilson.

21   You may be excused.

22            MR. GREEN:  Your Honor, I think what we're going to

23   do–

24        (Discussion between counsel off the record.)

25            THE COURT:   You can step on down.

1  THE WITNESS: Thank you, your Honor.

2  MR. GREEN: Your Honor, we've agreed, so that

3  Trooper Wilson doesn't have to come back, we're going to play the

4  entirety of the traffic stop. I don't think we're going to do it this

5  morning. We're probably going to do it in our proof. But–

6  THE COURT: That's fine.

7  MR. GREEN: –we'll just stipulate the introduction of

8  the tape so he doesn't have to come back.

9  THE COURT: Thank you. You can go ahead. Thank

10  you, sir.

11  (Witness excused.)

12  THE COURT: The Government can call it's next

13  witness.

14  MR. THEODORE: Your Honor, the Government calls

15  Lieutenant Don Williams.

16  (Discussion at bench between Court/courtroom deputy off the

17  record.)

18  THE COURT: We're going to take a short break.

19  (Recess had 10:50 a.m.; reconvened without jury 11:00 a.m.)

20  THE COURT: While we're waiting for our jury, have

21  our next witness on the stand. Good morning.

22  THE WITNESS: Good morning, sir.

23  MR. GREEN: Could I ask the Government how long

24  they anticipate Lieutenant Williams' testimony on direct will be?

25  MR. THEODORE: I'm guessing about a half hour. We

1    have some tapes to play, though, some clips, which are pretty short,

2    because they're just short clips.

3                    THE COURT:   Sounds like we won't get to cross this

4    morning.

5                    MR. GREEN:   I'm going to ask, and I know what the

6    Court's response is going to be, because we all want to get through

7    this, but I'm kind of nitpicky.  I'd like, if I could ask the Court's

8    indulgence, to just do the entirety of a witness before we break, but

9    I understand what the Court's problem is.

10                   THE COURT:   I can try to work that at the end of the

11   day, but I don't see any issues with starting the direct. If we get to

12   when we need to break for lunch, then we can come back wherever

13   we are, whether it's to finish direct or go on to cross.

14                   MR. GREEN:   Thought I'd ask.

15                   THE COURT:   Thank you.

16              (Jury reconvened in courtroom at 11:05 a.m.)

17                   THE COURT:   Thank you. Everyone may be seated.

18   We'll ask our witness to remain standing to be sworn in.

19                   COURTROOM DEPUTY:   Raise your right hand.  Do

20   you solemnly swear your testimony will be the truth, the whole

21   truth, and nothing but the truth, so help you God?

22                   MR. WILLIAMS:   Yes, ma'am, I do.

23                   COURTROOM DEPUTY:   Please state and spell your

24   name for the record.

25                   THE WITNESS:   Thank you. My name is Donald

1    Williams, W-i-l-l-i-a-m-s.

2                       **DIRECT EXAMINATION**

3    by Mr. Theodore:

4    Q.    And what is your occupation?

5    A.    I'm a lieutenant with the State of Tennessee Tenth Judicial

6    District Drug and Violent Crime Task Force in the Bradley County

7    area of Tennessee.

8    Q.    And so what area does that cover?

9    A.    It covers four counties, Bradley County, Monroe County,

10   Polk County and McMinn County, in Tennessee.

11   Q.    What type of things are you involved with? I mean, some of it

12   seems obvious. But can you just describe what your position is a

13   little bit more?

14   A.    I'm a supervisor over the field units who do undercover

15   operations. I'm also supervisor over the interdiction units, which

16   are in a uniform and drive marked police cars–

17        (Court reporter requested defendant to repeat.)

18             THE WITNESS:   Yes, ma'am.

19   A.    Over the field operations, which is an undercover unit that do

20   buys and do search warrants. I'm also a supervisor over the

21   interdiction unit, which are the officers wear uniforms, are up on

22   the interstate and do drug interdiction on the interstate.

23   Q.    And how long have you worked in that capacity?

24   A.    Five years.

25   Q.    And how long have you worked in law enforcement all

1    together?

2    A.    It's been 33 years.

3    Q.    And do you have any educational background in law

4    enforcement?

5    A.    Yes, sir, I do.

6    Q.    Could you just briefly describe?

7    A.    Yes, sir.  My degree was in law enforcement, where I went to

8    state college in Florida, where I was raised and born.  I started

9    there when I was 18 years old with the City of West Palm Beach

10   Police Department as a police cadet, where I continued my

11   education in college, got my degrees.

12         And as a continuing education, our states in Florida and

13   Tennessee also require a minimum of 40 hours per year of training.

14   I've been doing that for the last 33 years.  So it's the continuing

15   career development classes we take.

16   Q.    Okay.  Now, were you working as a lieutenant for the Tenth

17   Judicial Task Force on April 20th of 2010?

18   A.    Yes, sir, I was.

19   Q.    And did you have any special assignments that day?

20   A.    Yes, sir, I did.

21   Q.    Can you just describe that, please?

22   A.    I was assigned as the tactical team leader to gain surveillance

23   and set up what we call an outer perimeter around the courthouse

24   and around the routes into the courthouse off of the interstate.

25   Q.    And what was the reason for that?

1    A.    We had received information and had been to a briefing that a

2    group was going to try and take over the courthouse.

3    Q.    Okay.  And you said there was a briefing on that?

4    A.    Yes, sir.

5    Q.    And was that in the early morning?

6    A.    Yes, sir, that's correct.

7    Q.    About how many law enforcement officers or agents were part

8    of that?

9    A.    Guessing, 40 to 50.

10   Q.    At that meeting?

11   A.    Yes, sir.

12   Q.    Okay.  So after that meeting, then, what did you actually do in

13   response to your assignment?

14   A.    Oh, I prepared a field operational plan of action where I

15   assigned agents to the routes leading into the Madisonville and the

16   Sweetwater area, and we set up the, what I call, the outer perimeter.

17   My position where I took up was on Exit 68 of the Sweetwater area

18   in Monroe County, Tennessee.

19   Q.    So you went on the road yourself?

20   A.    Yes, sir, that's correct.

21   Q.    So what was your vantage point?  I mean, what were you

22   trying to observe at your location when you were at that location?

23   A.    I was to gain intelligence information on militant groups that

24   were coming in, and one of them was called out as the Oath

25   Keepers. We were to watch out for any vehicles that had decals or

1    any indication they were with the Oath Keepers to–

2    Q.    Now, I want to direct– oh, I'm sorry.

3    A.    I was supposed to transmit that information back to our

4    command post, which was near the courthouse in Monroe County.

5    Q.    If I could direct your attention to sometime around 7:00 a.m.

6    that morning, did you observe anything, any type of a stop being

7    made?

8    A.    Yes, sir, I did.

9    Q.    Okay. Can you tell me where you were and what you saw?

10   A.    Well, to the best of my knowledge, it was after 7:00 o'clock a

11   trooper called in to the command post that one of these vehicles

12   was seen or possibly two vehicles seen coming up the interstate

13   toward Exit 68 in Sweetwater, Tennessee.

14          Shortly after that, I visually saw a trooper in a marked State of

15   Tennessee trooper vehicle pull a truck over coming off of Exit 68

16   in Sweetwater, Tennessee.

17   Q.    And what did you do in response to that?

18   A.    I was about maybe a block away. I drove my unmarked car

19   down. I've got a silver 2007– it's an SUV; it's a Trailblazer. I

20   drove that down to back him up as an officer safety.

21   Q.    And what happened when you got there then? Did you get to

22   the location of the stop?

23   A.    Yes, sir. I pulled up behind the trooper. He had his blue

24   lights going. And I got out of my vehicle as what we call a

25   secondary officer, a cover unit. I was there to protect him.

1    Q.    Were there any other vehicles that showed up?

2    A.    Yes, sir.

3    Q.    Who else showed up?

4    A.    Agent Fredricks(phonetic) from the drug task force. He was

5    stationed actually on the interstate. He was in a blacked-out SUV,

6    a Tahoe, Chevy Tahoe. He also pulled up. And Sergeant Matt

7    Bales(phonetic), who was in a drug task force uniform and in his

8    police vehicle, he pulled up also.

9    Q.    So what happened after you arrived at that stop, that traffic

10   stop? Just describe what happened, what you observed.

11   A.    There was a black-colored GMC vehicle that was pulled over

12   by the trooper. It had markings on it that said "Oathkeeper," and

13   there were symbols I remember seeing of like a militia man

14   carrying a rifle, and there was other paraphernalia from militias on

15   the bumper and, I believe, the sides of the vehicle.

16   Q.    Okay. And then after you made that observation, did you

17   actually see the driver of that vehicle?

18   A.    Yes, sir, I did.

19   Q.    Did you see him exit the vehicle?

20   A.    Yes, sir, I did.

21   Q.    Okay. Do you see that person in this courtroom right now?

22   A.    Yes, sir, I do.

23        MR. GREEN:   Stipulate identity, your Honor.

24        MR. THEODORE:   Okay. Your Honor, I'd ask that the

25   record reflect that the witness identified the Defendant.

1        THE COURT:  So reflect.

2   Q.    What did you see when you saw the Defendant?  Did you later

3   learn of his identity as being Darren Huff?

4   A.    Yes, sir.  That's correct.

5   Q.    What did you see Mr. Huff do immediately when you got to

6   the scene?

7   A.    Well, the trooper was what we call the primary officer who

8   actually made the stop of the vehicle.  I was there as what we call

9   the secondary officer, as a backup officer for his protection.  The

10  driver was ordered out of the truck.

11        When he came out of the vehicle, he put his hands in the air

12  like this, which made his black button-up shirt raise up, and I saw a

13  gun on his right hip, and I called that information out to the other

14  officers as an officer safety issue, that there was a gun on his right

15  hip.

16  Q.    Okay.  Let me show you what has been marked as

17  Government's Exhibit Number 11. Did you see anything like that

18  when you got to the scene?

19  A.    Yes, sir.  That fairly depicts what I saw at the scene as a

20  backup officer.

21  Q.    Okay.  So you actually observed a firearm on Mr. Huff's hip

22  at that time?

23  A.    Yes, sir.

24  Q.    Okay.  And what happened to that firearm after that?

25  A.    There again, the primary officer was the trooper, since he

1    made the traffic stop. I was backup.  We both approached him and

2    took the weapon away from Mr. Huff.

3    Q.    Okay.  So you actually observed the weapon yourself?

4    A.    Yes, I did.

5    Q.    And was that weapon loaded?

6    A.    Yes, sir, it was.

7    Q.    What type of weapon was it?

8    A.    It was a, to the best of my knowledge, a Colt .45, and there

9    were ammunition in the magazine of this particular weapon that

10   was actually in the base of the gun.

11   Q.    I want to show you Government's Exhibit 14A.  Does that

12   appear to be the firearm that you saw at that time?

13   A.    Yes, sir, it does.

14   Q.    Okay.  Now, did you learn the reason for the stop made by the

15   trooper in that case?

16   A.    Yes.

17   Q.    And that was Trooper Wilson; is that right?

18   A.    Yes, sir. Trooper Wilson from the Tennessee Highway Patrol.

19   Q.    Did you learn of his reason for making the stop?

20   A.    Yes, sir.

21   Q.    And what was that?

22   A.    He observed traffic violations that had been made by Mr. Huff

23   while driving up the interstate, coming off the interstate, onto Exit

24   68 in Sweetwater, Tennessee.

25   Q.    Okay.  And did Trooper Wilson try to do anything with

1    respect to those violations once Mr. Huff was stopped in that

2    vehicle? Did he try to verify anything?

3    A.    Yes, sir, he did.

4    Q.    What did he do?

5    A.    He tried to verify a carry concealed weapon permit out of the

6    State of Georgia.  Mr. Huff told us that he had a carry concealed

7    weapon permit and produced this, which is a small, to the best of

8    my knowledge, a small white card, and had plastic over top of the

9    actual card.

10   Q.    Is that a little bit different than the permits that you typically

11   see in Tennessee?

12   A.    Yes, sir, it is.

13   Q.    So Trooper Wilson was trying to verify that?

14   A.    Yes, sir.

15   Q.    Were there any citations or warnings or anything issued

16   during that stop?

17   A.    Yes, sir.  I saw him write out a Tennessee warning ticket for

18   Mr. Huff.

19   Q.    And he gave that to Mr. Huff?

20   A.    Yes, sir, that is correct, he did.

21   Q.    All right. And then what happened after that? Was Mr. Huff

22   allowed to leave after that?

23   A.    Yes, sir.

24   Q.    And did Mr. Huff just decide to leave right after that?

25   A.    No, sir.

1    Q.    Okay.  What happened?

2    A.    Well, it was raining, and I was glad that the traffic stop was

3    over.  I wanted to get back to my vehicle, get out of the rain.  And

4    Mr. Huff gestured to us and said he wanted to talk to us, he wanted

5    to forewarn us about an incident.

6    Q.    What did he want to forewarn you about?

7    A.    That he was there with other militia and Oath Keepers and

8    there were intentions of taking over the courthouse, Monroe

9    County courthouse, and effect citizens' arrests based on warrants

10   that he had copies of.

11   Q.    Okay.  Did you actually see those warrants?

12   A.    Yes, sir.  I asked if I could see it, and I saw the document; a

13   piece of paper is what I saw.

14   Q.    And when he said arrest, did he talk about physically

15   arresting?

16   A.    Yes, sir.

17   Q.    All right.  And did he explain why?

18   A.    Yes, sir.

19   Q.    What did he say? What did he give as his reasons?

20   A.    That there were up to 24 names on this piece of paper that he

21   had.  I don't want to call it an arrest document because it really

22   wasn't when I looked at it. You know, for 33 years I've done arrest

23   paperwork, and I know that a– either a clerk has to sign a criminal

24   summons or a magistrate or judge has to sign an actual arrest

25   warrant based on probable cause.

1          When I looked over this document, there was no signature on

2    it from the magistrate or a judge authorizing this arrest. That kind

3    of surprised me, and I asked him what authority do they have to

4    make this arrest.

5    Q.    Let me show you Government's Exhibit Number 19. Does

6    this appear to be a fair copy of what he was showing you at that

7    time?

8    A.    Yes, sir. There was actually two documents, sir, that he

9    showed me.

10   Q.    Okay. And was the other one an affidavit of a complaint?

11   A.    Yes, sir. That's correct.

12   Q.    What did he say he wanted to do with the people that were

13   arrested?

14   A.    After the physical arrest had taken place, he was going to turn

15   them over to the state police to be interned in a state jail or county

16   jail.

17   Q.    Did he say that other people had this same arrest warrant that

18   he had?

19   A.    Yes, sir.

20   Q.    That others had it?

21   A.    Yes, sir, he did.

22   Q.    Did he indicate whether or not he was going to be working

23   with other people on this?

24   A.    Yes, sir, he did.

25   Q.    Who did he say? Did he indicate who?

1   A.    It was other militia groups and also he mentioned the Oath

2   Keepers.

3   Q.    Okay.

4   A.    And that these people had other copies of the same document

5   that he showed me, this piece of paper that he showed me.

6   Q.    Did he indicate whether or not he had any other firearms in his

7   possession or in the truck, other than his Colt .45?

8   A.    Yes, sir, he did.

9   Q.    What did he indicate to you?

10  A.    He told me that he had an AK-47 and two to 300 rounds in the

11  toolbox of his vehicle and he had the right to take this out to

12  protect himself and effect these arrests.

13  Q.    Okay. Were you able to actually– did you have a lawful basis,

14  at least as far as you were aware, to go ahead and search the vehicle

15  at that time?

16  A.    No, sir. At that time, we did not.

17  Q.    You said that an AK-47 was in the toolbox in his truck?

18  A.    Yes, sir.

19  Q.    I'm going to go back to Government's Exhibit Number Ten. Is

20  that a fair and accurate picture of the truck, his truck, that was

21  stopped at that time?

22  A.    Yes, sir.

23  Q.    Do you see a toolbox in back of that truck?

24  A.    Yes, sir, it's a Diamondplate toolbox, you can see right here

25  that I've underscored. It's right underneath the words

1    "Oathkeeper," and it's silver in color.

2    Q.    Okay. So right there, that whole thing?

3    A.    Yes, sir.

4    Q.    Just quickly go back. You mentioned that there was, in

5    addition to that citizen's arrest warrant, there was actually an

6    affidavit of criminal complaint; is that right?

7    A.    Well, it wasn't a real arrest warrant. You keep calling it that,

8    sir. Just a piece of paper that I saw. It didn't have the

9    documentation that I'm used to seeing for the last 33 years of an

10   actual magistrate's signature.

11   Q.    Okay. So I guess I'm referring to how it was titled, how they

12   had titled it. But based on your experience in law enforcement,

13   that did not appear to be a valid arrest warrant to you?

14   A.    No, sir, it did not. There was no magistrate or judge's

15   signature on it indicating that they had reviewed it and there was

16   sufficient probable cause to effect these arrests.

17   Q.    Okay. Thank you. You mentioned that you thought he had an

18   AK-47 with him and he had it in the toolbox of his truck. Did he

19   ever indicate whether he was planning on using that AK-47?

20   A.    Yes, sir, he did.

21   Q.    What did he say to you?

22   A.    That he had the right, under the Second Amendment, to take it

23   out to protect himself when he effected or tried to effect these

24   arrests at the courthouse.

25   Q.    Is there anything besides that, anything else he said, that just

1  really alarmed you during that process when you were talking to

2  him?

3  A.     There were several things. We discussed this piece of paper

4  that he had, and I told him I didn't see a judge's signature on it to

5  show that there was sufficient probable cause and the judge had

6  authorized this arrest. I said, for 33 years I've got to go either to a

7  magistrate for a criminal summons or an actual warrant, I've got to

8  have the judge sign or go to a grand jury to get a criminal

9  indictment.

10          And that's when he said, well, they had their own grand jury

11  and own judge. I didn't see a signature on it from anybody other

12  than the person that had filled it out.

13  Q.     Okay. Anything else he said that just really caused you

14  concern, that really just kind of shook you?

15  A.     Yes, sir. There were several things that he said, that they had

16  enough armed people there that particular day, April the 20th, 2010,

17  that they had intentions of taking over the courthouse and effecting

18  these arrests.

19  Q.     Any other–

20  A.     The other statements that he made, can I continue with that?

21  Q.     Yes, please.

22  A.     One thing that really– the hair on the back of my neck went

23  up. He said I could be his friend and help him effect these arrests or

24  I could be his enemy and he was ready to die for his cause. That,

25  that caused alarm bells to go off in my head, that worried me.

Q.    Did Mr. Huff say anything about him having a position with the Georgia Militia?

A.    Yes, sir.

Q.    Okay. What did he say it is?

A.    He told me that he was the chaplain of the Georgia Militia.

Q.    And did he indicate whether he was meeting, I think you said, with other groups?

A.    Yes, sir.

Q.    And did that include the Georgia Militia?

A.    Yes, sir. And I believe he mentioned some folks out of North Carolina too, several other states.

Q.    Did he indicate to you anything about what would happen if he didn't have enough people to help him or if somehow, for some reason, they weren't able to effectuate the arrests or take over the courthouse?

A.    He told me they were going to come back in two to three weeks.

Q.    If they couldn't do it that day?

A.    Yes, sir. That's correct.

Q.    Now, at some point— did your vehicle have a camcorder or a recording device on it?

A.    No, sir. Mine is an undercover vehicle. It's just a standard, silver in color, SUV, a Trailblazer.

Q.    At some point you learned that this was being recorded— is that right— the stop?

1    A.    Yes, sir.

2    Q.    Did you ever ask to borrow one of the other officers'

3    recording devices?

4    A.    At the end, just prior to Mr. Huff leaving, I did.

5    Q.    Did you engage in some conversation with Mr. Huff?

6    A.    Yes, sir.

7    Q.    And what was the purpose for that?

8    A.    To try and gain intelligence information of what their

9    intentions were at the courthouse.

10   Q.    And were you able to record some of that conversation?

11   A.    Yes, sir.  The recordings were made by the Tennessee

12   Highway Patrol.  They had their recorder going and video and

13   audio going, and also the Tenth Judicial District, where I work,

14   Sergeant Matt Bales had his video camera going, and audio and

15   video was recorded.

16   Q.    So you actually recorded some conversation with Mr. Huff?

17   A.    Yes, sir.

18   Q.    I want to show you Government's Exhibits 39, 40, and 42.

19             MR. GREEN:   No objection.

20             MR. THEODORE:    Your Honor, I don't believe

21   there's any objection.

22             THE COURT:   What were the numbers again?  What

23   were the numbers again?

24             MR. THEODORE:  Exhibit 39, Exhibit 40 and Exhibit

25   42.

1    THE COURT:   So admitted.

2    (Government's Exhibit Nos. 39, 40, 42 received in evidence.)

3    Q.    Have you had a chance– just going to kind of put it up here– to

4    actually review that tape there?

5    A.    Yes, sir.  You see my initials, "DW," at the top right and the

6    date of 10-14-2011.

7    Q.    Okay.  So you reviewed that?

8    A.    Yes, sir.

9    Q.    Was it fair and accurate?

10   A.    Yes, sir.

11   Q.    Same thing with Government's Exhibit 40, have you reviewed

12   that?

13   A.    Yes, sir.  You see my initials there again, "DW," 10-14-2011.

14   Q.    Okay.  And was that fair and accurate?

15   A.    Yes, sir.

16   Q.    And looking at Government's Exhibit 42, same thing, same

17   question.

18   A.    Yes, sir.  My initials appear and the date that I reviewed it.

19   Q.    Now, this is not the entire stop, is it?  This is just certain

20   portions?

21   A.    That's correct.

22   Q.    Okay.  And again, you were not, it's my understanding, you

23   weren't recording Mr. Huff the entire time, you, yourself?

24   A.    No, sir.

25   MR. THEODORE:   Your Honor, I'd like to publish

1    Government's Exhibit Number 39.

2         THE COURT:   They're all admitted.  You may do so.

3         (Exhibit 39, a video recording clip, was played to the jury.)

4    Q.    Do you recall that conversation?

5    A.    Yes, sir, I do.

6    Q.    And those statements are by Mr. Huff?

7    A.    Yes, sir.

8         MR. THEODORE:   Your Honor, I'd like to play

9    Government's Exhibit Number 40.

10   Q.    Can I ask you, when he made the reference to war in there, did

11   that cause you any concern?

12   A.    Yes, sir, it did.

13   Q.    What were you thinking? What were your thoughts?

14   A.    That he was going to use these weapons against our

15   government to effect these arrests, he would use the weapons. That

16   concerned me for the safety of not only myself and the police

17   officers I was with, but the citizens there in Monroe County and the

18   citizens around the courthouse and inside the courthouse.

19        (Ex. No. 40, a video recording clip, was played to the jury.)

20   Q.    Do you recall that statement?

21   A.    Yes, sir, I do.

22        MR. THEODORE:   Your Honor, I want to now play

23   Government's Exhibit 42.

24   Q.    When he said, "I don't have a choice," what did you think

25   about that?

1 A.    It bothered me.  But you do have a choice, and I tried to

2 explain to him. I have the choice, if I don't like a politician, I can

3 use my vote to go down and vote him out of office.  I'm not going

4 to take arms and bear arms against our government to try and throw

5 someone out or go to war with the police.

6        (Exhibit 42, a video recording clip, played to the jury.)

7 Q.    Did he say, "You're ultimately protecting criminals"? Is that

8 what–

9 A.     Play it again. I–

10 Q.     Play that again.

11        (Exhibit 42, a video recording clip, played to the jury.)

12 A.    Yes, sir.

13 Q.    Just explain all together– I know you've kind of, you've made

14 some statements already, but what was your overall impression

15 after Mr. Huff was allowed to leave?

16 A.    Well, we discussed a lot of things. And I told him I didn't

17 agree with some of the things that took place, but I would vote

18 people out of office if I didn't agree with a politician; I wouldn't

19 bear arms against our government.  And when he discussed about

20 going against the police, that bothered me.  I had a concern about

21 that.

22 Q.    Did you think he was serious?

23 A.    Yes, sir.  He looked me right in the eye, and I felt that he was

24 going to– his intent was to take over the courthouse, based on what

25 he told me, and his actions, coming out of Georgia with these

1    weapons.

2    Q.    Was he given, at some point, was he given his Colt .45 back

3    and allowed to leave?

4    A.    Yes, sir.  He and I had a conversation. I asked him, please, to

5    put it into the locked toolbox to try and avoid any problems there.

6    And he agreed with me at that point, that he would put it into the

7    toolbox, and he did place it in the toolbox when he left the actual

8    traffic stop on Highway 68 in Sweetwater, and he continued toward

9    the area of the courthouse.

10   Q.    Now, did you then go to Madisonville that morning?

11   A.    Yes, sir.

12   Q.    And what happened? What was your role when you got to

13   Madisonville?

14   A.    After the traffic stop been made, I was assigned what we call

15   the inner perimeter, around the courthouse, to try and protect the

16   people inside the courthouse.  And I set up about maybe a half a

17   block away from Donna's Restaurant, which is right across the

18   street from the Monroe County courthouse.

19   Q.    How many other law enforcement officers– I know you don't

20   have an exact count, but approximately, that were in Madisonville

21   also offering protection that day?

22   A.    I believe a fair guess would be between 50 and 75, based on

23   my knowledge of what I saw.

24   Q.    Was that just all one agency or was that various agencies?

25   A.    No, sir.  It was various agencies. We had, I believe, nine to ten

1    agents from the Tenth Judicial District Drug Task Force, those

2    agents from the sheriff's department, from the police department,

3    from the FBI, and the state troopers.

4    Q.    I want to show you what has been admitted as Government's

5    Exhibit Number 37.

6              MR. THEODORE:    Not admitted? What I'd like to

7    offer at this time as Government's Exhibit Number 37.

8              MR. GREEN:  Is that the aerial?

9              THE COURT:  I believe that's the aerial photo.

10             MR. GREEN:  No objection.

11             THE COURT:   To the extent it's not been admitted,

12   we'll admit it.

13        (Government's Exhibit No. 37 received into evidence.)

14             MR. THEODORE:  It is now admitted, right?

15             MR. GREEN:  No objection.

16             MR. THEODORE:    Okay.

17   Q.    Lieutenant Williams, do you recognize what's shown in that

18   photograph?

19   A.    It appears to be an aerial depiction of downtown, where the

20   courthouse is located in Monroe County, Tennessee?

21   A.    Okay. And from that, from that vantage point there in that

22   picture, are you able to see various buildings and whatnot in there?

23   A.    Yes, sir.

24   Q.    Do you see the actual courthouse? Can you make out where

25   the courthouse is from that?

1    A.    This picture's a little bit blurry. Could you point out on

2    your– where you're referring to?

3    Q.    Do you recognize this building here?

4              MR. GREEN:  Your Honor, I'm familiar with downtown

5    Madisonville. I'll stipulate that's the courthouse.

6    A.    That appears to be the courthouse, yes, sir.

7    Q.    From that, then, with that as a landmark, do you know where

8    Donna's Restaurant is there?

9    A.    Yes, sir. It's across the street. I've indicated with a circle.

10             (Courtroom Deputy handed exhibits notebook to witness.)

11             THE WITNESS:  Thank you very much. That helps out.

12   Q.    Okay. Were you able to actually see Donna's Restaurant and

13   the courthouse from where you were located when you were in

14   Madisonville?

15   A.    Yes, sir.

16   Q.    Can you show us where you were located?

17   A.    Right. About there, where the "X" is, it's about, I'm guessing,

18   a half a block down from Donna's, where I could visually see

19   Donna's Restaurant, vehicles parked there, and I could see the road

20   in front of the actual courthouse.

21   Q.    I want you to describe to the jury just the overall situation

22   there in Madisonville that morning, when you were there, just your

23   overall sense of things.

24   A.    We had undercover agents out on foot who were gaining

25   intelligence and passed on this information over the police radio

1    that I could hear from my agents. And then the command post was

2    also giving out intelligence information, what the other agents

3    were seeing taking place downtown. My personal observations

4    myself, I saw groups anywhere between 15 to 20 people around

5    Donna's. Several of these people were armed. I also saw what– it

6    looked like people doing reconnaissance around the courthouse.

7    Q.    Now, are these law enforcement officers?

8    A.    No, sir.

9         MR. GREEN:   Your Honor, I object to "people doing

10   reconnaissance." He can say what he saw they were doing. But,

11   one, that calls for a conclusion; and, secondly, unless there's some

12   connection, if he saw Mr. Huff doing it, that's one thing. But if

13   there's no connection to Mr. Huff, it's not relevant.

14        MR. THEODORE:   Well, your Honor, I think we can

15   tie it in to Mr. Huff with some further questions. But I also think

16   that this having 30-plus years in law enforcement, he can actually–

17   it's within his experience to testify about what appeared to be

18   reconnaissance or counter-surveillance efforts.

19        THE COURT:   All right. Well, we'll allow you a little

20   leeway. Probably need to perhaps lay a better evidentiary

21   foundation. But why don't we do this? Let's take a break. The

22   Court indicated it needed to take an earlier lunch break, so we'll let

23   you get a chance to think through your questions on this subject.

24        So we're going to take a break. As I indicated earlier, or my

25   courtroom deputy indicated, the Court has some other matters to

1    handle. So we'll break until one o'clock, give you plenty of time to

2    lunch today. And we'll come back here and resume with this

3    witness at one o'clock. Thank you.

4         (Recess had 11:33 a.m.; reconvened without jury at 1:18 p.m.)

5              THE COURT:   All right.  Thank you. Are we ready to

6    continue?

7              MR. THEODORE:   Yes, your Honor.

8              THE COURT:   Bring our jury in.

9         (Jury reconvened in courtroom at 1:20 p.m.)

10             THE COURT:   All right.  Thank you. Everyone may be

11   seated, and, Mr. Theodore, I think we're ready to continue with

12   direct examination.

13             MR. THEODORE:   Thank you, your Honor.

14   Q.    Good afternoon, Lieutenant Williams.

15   A.    Good afternoon, sir.

16   Q.    I want to go back. We kind of left off, you had indicated you

17   went to Madisonville, Tennessee, shortly after the traffic stop of

18   Mr. Huff and you positioned yourself along the street there where

19   you had a view of the courthouse and, I think you said, Donna's

20   Restaurant or café?

21   A.    Yes, sir. That's correct.

22   Q.    Was it your testimony you were about a half block from them,

23   sir?

24   A.    Yes, sir.  Approximately half a block.

25   Q.    Describe, just overall, just in general, describe the situation

1    from your perspective of being a law enforcement officer who was

2    taking part in the responsibilities that day.

3    A.    I saw a group of men that had weapons on their sides, and they

4    were talking to Mr. Huff.

5    Q.    And where did you see that occurring?

6    A.    This was in front of Donna's Restaurant, directly across the

7    street from the courthouse.

8    Q.    Okay.  And I think you already described on that exhibit,

9    Government's Exhibit 37, where that was; is that right?

10   A.    Yes, sir.  That's correct.

11   Q.    About how many other individuals were there with Mr. Huff

12   at that point?

13   A.    Between 15 to 20.

14   Q.    And how did Mr. Huff– could you see any expressions from

15   him?  How did he appear to you from that point, from that vantage

16   point?

17   A.    He was using his arms a lot, I guess describing.  They were

18   looking back across the street toward the courthouse while he was

19   talking to this group.  Obviously– I was a half a block away– I

20   couldn't hear what they were saying. But he was animated with his

21   hands.

22   Q.    It appeared that he was talking to the group as a group?

23   A.    Yes, sir.

24   Q.    Now, I think you've indicated you've been in law

25   enforcement for over 30 years?

1    A.    Yes, sir.

2    Q.    Are you aware of certain reconnaissance or counter-

3    surveillance techniques that are used by people?

4    A.    Yes, sir. I've done the classes, the tactical surveillance

5    classes, counter-surveillance classes, what to look for, the action

6    that's taken by individuals, that would heighten my understanding

7    what they were doing.

8              MR. GREEN:   Your Honor, I don't still believe he's

9    laid a proper foundation, and if we could approach, please.

10              THE COURT:   All right.  Thank you. Excuse us.

11         (Discussion at bench had off the record.)

12    Q.    Lieutenant Williams, without characterizing the actions, if

13    you could just describe what you saw certain people– I think

14    you've described the group that Mr. Huff was talking to?

15    A.    Yes, sir.

16    Q.    Could you describe any unusual actions by people that looked

17    like they were part of that group or associated with that group that

18    Mr. Huff was talking to?

19    A.    People would leave that group in two-person units or team,

20    whatever word you want to use, and they would go around the

21    courthouse. They would be pointing to the courthouse. One

22    actually was taking pictures of the courthouse.  They would go

23    completely around the courthouse and come back.

24         And another group took two people, but go out and do the

25    same thing, basically, go around the courthouse, be pointing, and

1    then come back.

2    Q.    Were they pointing to any other areas other than the

3    courthouse?

4    A.    Not that I could see, sir. They only pointed at the courthouse

5    when I observed them.

6    Q.    Did you see that more than once, that action?

7    A.    Yes, sir.

8    Q.    Did you notice anything unusual about the vehicle traffic in

9    the town that day as far as like tags of vehicles, of where they were

10   parked and whatnot?

11   A.    Yes, sir. I saw numerous cars with out-of-state tags from

12   Georgia and North Carolina and Alabama. There were also a

13   motorcycle group that had come in with out-of-state tags also, and

14   these men had weapons on them.

15          MR. GREEN:    I object to a motorcycle group unless

16   they can tie it to Mr. Huff, which they can't. I object to that.

17          MR. THEODORE:    Your Honor, maybe we can–

18          THE COURT:    All right. Well, right now he's just

19   saying what he observed, and some observations may be related to

20   the Defendant, some may not. But that will be necessarily

21   dependent on further questioning by the Government or cross-

22   examination by the Defendant. So go ahead.

23   Q.    Did you see what appeared to be any collaboration between

24   some of these various groups of people from out of state?

25   A.    They would be parking around the courthouse and walking up

1    to Donna's Restaurant.

2    Q.    Was that at about the same time Mr. Huff was there?

3    A.    Yes, sir.

4    Q.    Were you concerned at that time?

5    A.    Yes, I was.

6    Q.    And why were you concerned?

7    A.    Well, Mr. Huff was very straightforward in what his

8    intentions were and what he told me on the side of the road. I was

9    concerned about them trying to take over the courthouse, either

10   harm policemen and/or victims inside and around the courthouse.

11   Q.    I'm sorry. What was your last statement?

12   A.    Based on what Mr. Huff told me what his intentions were, to

13   take over the courthouse, I was concerned for the law enforcement

14   officers, I was also concerned for the individuals inside of the

15   courthouse.

16   Q.    Were you expecting anything to happen?

17   A.    Based on what Mr. Huff told me, yes, sir, I was.

18   Q.    What were you worried about or concerned about happening?

19   A.    Well, as I indicated to you earlier, Mr. Huff said he was going

20   to utilize his AK-47, he had the right to take that out and protect

21   himself and effect these arrests inside the courthouse. I was

22   concerned about that, sir.

23   Q.    From where you were positioned, were you worried at all that

24   you would have to engage?

25   A.    Yes, sir.

1  Q.    Who did you think you might have to engage with?

2  A.    Mr. Huff. He came out of Donna's Restaurant on at least

3  three occasions and went to a toolbox on his vehicle where he said

4  that the weapon was located.

5  Q.    So you could see his vehicle from where you were positioned

6  as well?

7  A.    Yes, sir.

8  Q.    And did he actually open up the toolbox?

9  A.    He did.

10 Q.    Did he appear to do anything unusual when he went to the

11 toolbox?

12 A.    When he went to the toolbox, I did not see a bulge on his side.

13 When he left the toolbox, he was on the opposite side of the truck.

14 I actually couldn't physically see through the truck he was

15 standing over there. When he walked back away from the truck, I

16 saw what appeared to be a bulge on his right hip.

17 Q.    Did you see any hand movements at all when he went into the

18 toolbox?

19 A.    His hands went into the box. As I indicated to you, I couldn't

20 see; below his chest level. He was on the opposite side of the truck.

21 Q.    Did he just go to his truck one time that you could see or did

22 he do it more than once?

23 A.    More than once.

24 Q.    What was your overall sense of the situation there, I mean, in

25 the town that day, with the groups that were there and what you

1    saw?

2    A.    I was concerned that they were going to follow up with the

3    intent that he told me they were going to do and actually take over

4    the courthouse.

5    Q.    Was the situation calm?

6    A.    No, sir, it was not. It was very tense.

7    Q.    Now, Mr. Huff was not arrested at that time, was he?

8    A.    No, sir, he was not.

9    Q.    And if you do– I don't know if you have it. Do you have any

10   knowledge of why he was not arrested at that time?

11   A.    You're referring to on the traffic stop?

12   Q.    No. I'm referring to in the town of Madisonville, later on.

13   A.    Well, he had his carry a concealed weapon permit, which gave

14   him the right to carry his .45 on his hip.

15   Q.    Right. Did you and law enforcement want to engage with him

16   or confront him at that time?

17   A.    No, sir, I didn't want to engage him. I didn't want anything to

18   escalate at that point, sir.

19   Q.    Was it your impression that things were– the situation was

20   such that things could have escalated?

21   A.    Very easily.

22   Q.    During one of the tapes that was played, Mr. Huff made, that

23   he wanted to go in there, I think he said, "with our force." Did that

24   have any effect on you, when he said that, as far as whether or not

25   he was going to do anything offensively or defensively or–

1   A.    Well, it corroborated what he told me about taking out his

2   AK-47, he would utilize that to protect himself.  He thought he had

3   the right to take that out and effect this arrest, and that concerned

4   me, yes, sir.

5   Q.    I just want to just for a moment go back to the traffic stop

6   itself, just for– again, just a question.  When you were there with

7   Mr. Huff's vehicle during that stop, was there anybody else that

8   seemed that they were with Mr. Huff in another vehicle?

9   A.    To the best of my recollection, there was a smaller gray

10  vehicle that I believe was in front of his vehicle that circled around

11  behind us and went up to the Burger King, which is a higher

12  elevation, above us, where we were on the traffic stop.  I was

13  concerned about that.

14  Q.    Well, did they appear to be doing anything, anybody, from

15  that vehicle?

16  A.    It appeared that he had a video camera in his hands and was

17  looking down where we were on the traffic stop and filming that.

18  Q.    You described the situation as being tense there.  Were you

19  concerned that any type– that something could have triggered

20  something?

21  A.    Yes, sir.

22  Q.    What was your concern at that time?

23  A.    I was concerned we had armed men there and that he had told

24  me his intentions was to take over the courthouse and effect these

25  arrests.  I was concerned, if I tried to approach him in front of these

1   men, it could have escalated from there.  I was also concerned

2   about him taking out the AK-47, which is a very powerful weapon,

3   capable of going through the bullet-resistant vests that we wear.

4              MR. THEODORE:  Any objection?

5              MR. GREEN:  No.

6              MR. THEODORE:  Your Honor, I have Government's

7   Exhibit Number 52, collective, with several clips within that C.D.

8              THE COURT:  All right.  So admitted.

9          (Government's Exhibit No. 52 received into evidence.)

10  Q.   Let me just show you, Lieutenant Williams, on the overhead

11  here.  Do you see that disc, that C.D.?

12  A.   Yes, sir.

13  Q.   That's Government's Exhibit 52, collective.  Are your initials

14  on that?

15  A.   Yes, sir, they are, and the date that I reviewed it.

16  Q.   Okay.  Was that a fair and accurate composition of different

17  clips there?

18  A.   Yes, sir, it was.

19  Q.   I want to go back into the traffic stop and have you– show you

20  a few more clips from that stop.

21  A.   Yes, sir.

22          (Video clip one played.)

23  Q.   Okay.  And I'd ask if we could play that again. Listen

24  carefully, see if you can hear that.  Could you hear that?

25  A.   Yes, sir.

1    Q.    And what was Mr. Huff saying there?

2    A.    "Kind of like the higher end of this enforcement."

3    Q.    And what was Mr. Huff talking about there; do you recall?

4    Was he talking about his position?

5    A.    Yes, sir.

6    Q.    And position in what?

7    A.    The Oath Keepers.

8    Q.    All right. Go to the next.

9          (Video clip two played.)

10   Q.    Now, do you recall that statement being made?

11   A.    Yes, sir, I did.

12   Q.    And, again, that, he's referring to Barack Obama there.

13   President Obama is one of the individuals listed in the citizens'

14   arrest warrant; is that correct?

15   A.    On the piece of paper that they had, yes, sir.

16   Q.    Yes. What they titled "Citizens' Arrest Warrant"?

17   A.    Yes, sir.

18         (Video clip three played.)

19   Q.    And then that, among other things, I think Mr. Huff was

20   indicating that 9/11 was an inside job–

21   A.    Yes, sir.

22   Q.    –by the Government? Was that consistent with some of his

23   other anti-government statements?

24   A.    Yes, sir.

25   Q.    Now, I'm going to show you what's been admitted already as

1    Government's Exhibit Number Nine, and this is back at the traffic

2    stop again. I want you to– I believe you indicated that you had– did

3    you watch a–

4              MR. THEODORE:    Stipulate that you reviewed this?

5              MR. GREEN:   I do not– if you tell me I did.  It's already

6    admitted, but if you tell me I did, that's fine.

7    Q.    This is already admitted into evidence, but do you recognize

8    that?

9    A.    Yes, sir.  I see my initials and the date, 10-14-2011.

10   Q.    And you reviewed that exhibit?

11   A.    Yes, sir.

12   Q.    Okay.  Was that fair and accurate?

13   A.    Yes, sir.

14   Q.    Again, referring to the traffic stop, the statements Mr. Huff

15   made, I want to show you this clip.

16         (Video clip from Exhibit 9 played.)

17   Q.    Do you recall that statement?

18   A.    Yes, I do.

19             MR. THEODORE:    Nothing further, your Honor.

20             THE COURT:   Thank you. Cross- examination?

21                    **CROSS-EXAMINATION**

22   by Mr. Green:

23   Q.    Good afternoon, Lieutenant.

24   A.    Good afternoon, Mr. Green.

25   Q.    Would you prefer that someone was honest with you about

1  their intentions in what they thought they might plan to do or

2  would you prefer that, when you tried to talk with someone, they

3  basically flipped you the proverbial middle finger and said, figure

4  it out, I'm not telling you anything?

5  A.    I think all of us would prefer someone being honest with us,

6  sir.

7  Q.    Open and honest, right?

8  A.    Yes, sir.

9  Q.    And if nothing else, Mr. Huff was certainly open on the 20th;

10  was he not?

11  A.    Yes, he was. He explained his intent to take over the

12  courthouse. Yes, he was very honest and straightforward, what his

13  intent was.

14  Q.    Okay. And this intent that you say he's expressed, to take

15  over the courthouse, he expressed that intent to you on the roadside

16  on Highway 68?

17  A.    To myself and the troopers that were there, yes, sir.

18  Q.    Okay. We're going to take it over, I'm going to use my guns,

19  don't mean to, but it might get violent, might get bad, right?

20  A.    He said I could be his friend or his enemy. I took that very

21  seriously. And he said he was ready to die for what he believed in.

22  Q.    Okay. You took it so seriously that you let him get back in his

23  vehicle, with an AK that you had been told about in a toolbox and a

24  .45 that you knew was in the toolbox, and drive to Madisonville,

25  correct?

1    A.    That is correct. After I talked to him about it, he agreed to

2    place the .45 in the toolbox. I had no probable cause to effect an

3    arrest at that time.

4    Q.    Because he hadn't done anything at that time, had he?

5    A.    That's not correct sir. He came across state lines with these

6    weapons and told me his intent was to take over the courthouse, so

7    he did do an overt act.

8    Q.    Did you arrest him then?

9    A.    No, sir.

10   Q.    You let him go to the courthouse with his guns?

11   A.    I'm a state police officer, sir. That would be a federal crime.

12   I was basing my intentions on what I had ability to do as a state

13   police officer.

14   Q.    Well, there was a lot of federal officers in Madisonville that

15   day; were there not?

16   A.    I remember seeing a few FBI agents there, yes, sir.

17   Q.    And you were in radio contact with every– I take it it's your

18   duty as a law enforcement officer to relate to other officers what

19   you've heard?

20   A.    We're on different radio frequencies. I was relaying my

21   information to Director Hall, who was at the command post. I use

22   an 800-band radio. I can't communicate with the troopers or the

23   FBI agents. They're on a different radio frequency.

24   Q.    You've got a cell phone. You can call the FBI, can't you?

25   A.    Yes, sir, I could have. But I was calling the command post,

1   which I was instructed to do, passing all my information,

2   intelligence gathered, to the command post.

3   Q.   And this command post had FBI and federal agents in it; did it

4   not?

5   A.   When I was there for the briefing that morning, I do remember

6   seeing FBI agents. I don't know what happened the hours after

7   that, sir, if there were agents there or not.

8   Q.   Did you get there at the start of that debriefing?

9   A.   Yes, I did.

10  Q.   And was the name Darren Huff used?

11  A.   Yes, it was.

12  Q.   Was there a description of the vehicle he was going to be

13  driving?

14  A.   To the best of my knowledge, yes, sir.

15  Q.   What was that?

16  A.   It was a large black vehicle, GMC, had the markings on it.

17  Q.   Okay. There wasn't any description about there's going to be

18  a camo-truck with possibly an anti-aircraft gun on it?

19  A.   That was intelligence that we had received earlier also, that

20  may be a vehicle to watch for. They also told us to watch for any

21  vehicles with any militia insignias, any type vehicles, motorcycles,

22  trucks and cars, and to pass all that information to the command

23  post.

24  Q.   Okay. And, of course, I take it you got the information about

25  the black truck was the one you were going to see because you've

1    now learned that the FBI was watching his house and watched him

2    leave, right?

3    A.    No, sir, I didn't have that knowledge at the time.

4    Q.    So you don't know that?

5    A.    No, sir.

6    Q.    All right. Well, anyway, back to where we were on the 20th. So

7    you didn't have probable cause to arrest him at the roadside after

8    he's made all of these statements that we've just heard on tape.

9    You, as a law enforcement officer, said, I've got to let him go, I

10   can't say that he's done anything wrong at this point, correct?

11   A.    As far as the state laws, yes, sir. I was passing on the

12   information to the command post. We were instructed to let him go

13   from there. He had a carry concealed weapon permit that he did

14   show, which gave him the right to carry his weapon.

15   Q.    Because, of course, under state law, you're not aware of any

16   state law that makes thinking a crime, are you, sir?

17   A.    As far as what, sir?

18   Q.    Stating you're going to do something is not a crime under

19   state law, is it?

20   A.    I'm not a legislator, sir. I'm not a lawyer, like you. I'm just a

21   police officer. I'd have to look at the TCA.

22   Q.    You said you had to let him go because he said he hadn't

23   violated state law, correct?

24   A.    Based on the information I got back from the command post,

25   we were told to let him go.

1    Q.    Having a big mouth and bragging about what you're going to

2    do is not a violation under the law in the State of Tennessee, is it?

3    A.    He told me what he intended to do, and if he did take his AK-

4    47 out, which is a very dangerous weapon, then he would be

5    breaking the law, sir, to try and take over the courthouse.

6    Q.    But he didn't, did he?

7    A.    There was attempts to, yes, sir.

8    Q.    When?

9    A.    As I–

10   Q.    When did you tell these folks that he tried to get that AK-

11   47 out? When was that, Lieutenant Williams?

12   A.    While I was watching Donna's Restaurant, he went out to the

13   vehicle several times and opened up the toolbox.

14   Q.    Okay.  And, of course, you knew, you're sitting there,

15   watching, there's this powder keg, this tinderbox getting ready to

16   go off. You're sitting there, watching this man that you confronted

17   out next to the interstate, who you know has got a .45 because

18   you've seen it, and who has told you he's got an AK with two to

19   300 rounds in that toolbox, the toolbox you saw him go to, and you

20   just let him go?

21   A.    Based on information we got back from the command post,

22   yes, sir.

23   Q.    And you knew that this man who was doing all this was

24   supposed to be taking over a courthouse which was right across the

25   street.  That's what I understand you're saying; is that correct?

1   A.     That is correct. That's what he told me his intentions was and

2   this group's intentions.

3   Q.     And if I understand you correctly, you were watching him

4   interact with other armed subjects, to use your terms, waving his

5   arms around, and you saw him go to that same toolbox and get out

6   the .45 or get out something that created a bulge under.  Why didn't

7   you arrest him then?

8   A.     I didn't have probable cause to arrest him.  He had his carry

9   concealed weapon permit from Georgia, which we reciprocate in

10  the State of Tennessee.  He is allowed to wear a weapon concealed

11  in the State of Tennessee with a Georgia license.

12  Q.     Because he hadn't done anything wrong at that point, had he,

13  sir?

14  A.     Mr. Green, you're trying to put words in my mouth.  I tried to

15  explain to you what my intentions was, what I thought on that day.

16  He had–

17  Q.     Had there not been a posting that anybody– and I'm talking

18  about the law enforcement– that anybody seen armed within the

19  City of Madisonville that day was going to jail, no questions

20  asked?

21  A.     Was I said at the briefing? Is that what you're trying to say?

22  Q.     Had you been informed of that fact, that if you see someone

23  armed, they are to go to jail, no questions asked?

24  A.     No, sir.  Unless they enter the courthouse, where it's a

25  violation to carry a weapon into a courthouse.

1    Q.    Of course, Mr. Huff didn't enter the courthouse, did he?

2    A.    No, sir, he did not. I believe the intent was still there, based

3    on what he told me and what other officers told me that they

4    overheard him saying at Donna's.

5    Q.    In fact, the only time Mr. Huff went to the courthouse was

6    when he carried a bag of biscuits over to Deputy Byrum, correct?

7    A.    I don't know who the officer was. I did see him cross over

8    with a sack.

9    Q.    A sack full of biscuits, right?

10   A.    I'm not going to say right, sir. I couldn't see what was in the

11   sack. It could have been coffee, it could have been anything. But

12   he did take a sack over across the street.

13   Q.    Okay. So the closest we got to, that day, to effecting a

14   citizen's arrest was taking biscuits, or whatever was in that sack, to

15   an officer. Is that what you're telling us?

16   A.    No, sir, I'm not telling you that, Mr. Green.

17   Q.    Okay. Were you relaying, when you saw Mr. Huff, as I've

18   heard you testify, go to the truck, were you relaying that to other

19   officers?

20   A.    Back to the command post, as I was instructed to do.

21   Q.    Okay. So you took that to be a rather significant fact, that

22   you're seeing this man go back and forth to this pickup truck

23   towards this toolbox, where you knew a weapon was?

24   A.    Yes, sir.

25   Q.    Okay. Do you remember when the FBI interviewed you?

1    A.    It was the following day. They called me and then I went on

2    the 22nd, actually sat down and talked to them.

3    Q.    And you didn't mention word one about any of that to the FBI,

4    did you?

5    A.    Yes, I did.

6    Q.    Is there any reason that you can think of why they wouldn't

7    put it in their report? Pretty important facts, aren't they?

8    A.    I believe they are important facts, yes, sir.

9    Q.    All right. Now, when you were at the roadside and Mr. Huff

10   was talking about what they may have to do later, you asked him to

11   do you a favor, didn't you?

12   A.    Yes, I did.

13   Q.    You said, would you please call me if you're going to come

14   back, didn't you?

15   A.    Yes, I did.

16   Q.    And he gave you his word that he would do so, didn't he?

17   A.    Yes, he did.

18   Q.    And, in fact, that day, after everybody had left Madisonville,

19   you got a phone call on your cell phone from Mr. Huff, didn't you,

20   sir?

21   A.    Yes, I did.

22   Q.    And he thanked you for your professionalism that day, didn't

23   he?

24   A.    Yes, he did.

25   Q.    Now, the Government's made an issue of these statements that

1    Mr. Huff made. Let's start first with 9/11. You're not suggesting

2    to this jury that we should lock up a citizen for believing that 9/11

3    was an inside job, should we?

4    A.    I don't believe it was an inside job, based on what I've heard

5    and the knowledge that I had. I'm not making that suggestion, sir.

6    You're putting words in my mouth. That's not a suggestion. I'm

7    not–

8    Q.    I'm not trying to put words in your mouth. I'm asking you

9    that question. I mean, he has the right to believe that it was an

10   inside job; does he not?

11   A.    Yes, he does.

12   Q.    And he's certainly not the only one that believes that, is he?

13   A.    Probably not.

14   Q.    In fact, there have been books written on the subject; haven't

15   there been?

16   A.    Yes, sir.

17   Q.    There's been books written about the fact that those buildings

18   collapsed completely upon themselves, which is almost impossible

19   to have done had they been caused by planes crashing into them.

20   Are you aware of that?

21   A.    I'm aware books have been made. I don't believe that, sir. I

22   watched it on television. I know what I saw, what hit the building

23   and what caused it to collapse.

24   Q.    We all saw planes hit. But I'm just telling you, there are

25   plenty of people that believe that. Is that not true?

1    A.    There are a few people that believe that, yes, sir.

2    Q.    You took an oath when you became a police officer. Do you

3    recall what that oath was?

4    A.    Yes, sir.

5    Q.    Could you relate that to the members of this jury?

6    A.    It was a long time ago when I took it, but basically is to

7    protect life and property.

8    Q.    And you also swore to protect and defend the United States

9    Constitution; did you not, sir?

10   A.    Yes, sir.

11   Q.    Against all enemies, foreign and domestic, correct, sir?

12   A.    Yes, sir.

13   Q.    And is there any doubt in your mind that Mr. Huff

14   passionately believed in what he was doing?

15   A.    He was very passionate when he told me what his intentions

16   were, to take over the courthouse and effect these arrests and use

17   his weapon if he had to.

18   Q.    All right.  Can you tell us what the names were of the other

19   people that you saw armed there in Madisonville?

20   A.    No, sir, I cannot.

21   Q.    Well, who was it that went up and talked to them?

22   A.    We had an undercover agent inside Donna's who was trying to

23   gain information, and I believe he's here to testify, sir.  I'll let him

24   explain that to you.

25   Q.    Okay.  I guess my question is, did anyone confront any of

1  these other armed subjects and say what are you doing here with a

2  gun, show me your permit?

3  A.  I can only tell you that I did not.  I was set up on a position to

4  watch Donna's. I did not approach them.  I can't tell you what any

5  of the other agents did, sir.

6  Q.  Well, who was the, for lack– a better way of putting it, who

7  was the head cheese, who was in charge of the command post?

8  A.  Director Mike Hall was my immediate supervisor. He's over

9  the Tenth Judicial District. General Steve Bebb was there, who was

10  the district attorney for the Tenth Judicial District, which covers

11  the Madisonville area. There was other FBI agents. I don't have

12  their names. I believe there was a gentleman there from Homeland

13  Security also.

14  Q.  Okay.  So Steve Bebb, who is the current District Attorney

15  General for your judicial district and who also had been a judge in

16  that judicial district for 23-plus years was there, correct?

17  A.  I don't know how many years he was a judge, but, yes, sir, he

18  was there.

19  Q.  He was a judge, he was a criminal court judge?

20  A.  Yes, sir.

21  Q.  He was there, correct?

22  A.  Yes, sir.

23  Q.  And, of course, he would be the person who made the ultimate

24  decision whether someone had or had not violated state law,

25  correct?

1   A.    I wasn't in the command post, sir. I couldn't tell you that.

2   You need to talk to the agents that were there to get direct

3   testimony on that.

4   Q.    I guess my question is, there was no directive from the

5   command post to arrest anybody for any violation of state law that

6   day, was there?

7   A.    Information was passed on from numerous agents, including

8   myself, what we saw, what we observed.

9   Q.    Well, what were you all going to do, just let this armed group

10  that you've told us about start moving on the courthouse before

11  you started shooting people? I mean, what was the plan?

12  A.    My intention wasn't to shoot anyone unless I was fired upon,

13  sir.

14  Q.    Well, if you stopped Mr. Huff and if we're telling this jury

15  that it was a violation for him to come to Tennessee with a firearm

16  on his person with the intent to do something in that courthouse,

17  and we see other people around the courthouse, armed, are you

18  telling us that you're not aware whether or not anybody's ever

19  talked to those people?

20  A.    I can only tell you what I did on that day, Mr. Green. I didn't

21  approach him and talk to him other than discussing what Mr.

22  Huff's intention was, to take over the courthouse.

23  Q.    Okay. Do you recall which way Mr. Huff's vehicle was parked

24  when it was there next to Donna's? Was it facing towards the

25  courthouse or away from the courthouse?

1    A.    I don't recall the exact position it was in, sir.

2    Q.    Okay.  And you would agree with me that, when he placed the

3    weapon back at the scene, back at Highway 68, next to the

4    interstate, he put that in the driver's side of that toolbox, correct?

5    A.    To the best of my knowledge, thinking back a year and a half

6    ago, I believe he was on the driver's side when he placed it into the

7    toolbox when I asked him to and he complied.

8    Q.    Now, you told us that there was nothing that you or any other

9    officer could do when you believed that he had obtained this

10   weapon then, because he had a valid carry permit to have it,

11   correct?

12   A.    He showed us a permit.  I couldn't say if it was valid or not at

13   that time. They are different from the State of Tennessee. We go

14   through the Tennessee Highway Patrol to get ours.  It looks just

15   like a driver's license. In the State of Georgia, from what I

16   understand later, they go to a particular county that they are in.

17   This did not look like an official document. However, they weren't

18   open yet to verify, and the trooper was handling that portion of it.

19   It was his traffic stop. I was just there to back him up.

20   Q.    All right.  So now we're back to being in Madisonville and

21   he's put this gun– if I'm understanding your testimony correctly,

22   there's a bulge that's reappeared under his shirt.  If you had told

23   him back out at the interstate, if he had said, I don't want to put

24   that gun on my– I'm going to drive out here with it on my hip, what

25   would you have done?

1    A.    Based on the carry concealed weapon permit that he had, I

2    couldn't have done anything unless I had determined that it was an

3    invalid or a non-carry concealed permit in the State of Georgia.

4    Q.    Exactly, exactly. Because it's not against the law for him to

5    merely possess that weapon, is it?

6    A.    To merely possess it, no. To come across state lines to try and

7    take over a courthouse with violence and use that weapon, it is a

8    crime.

9    Q.    Okay. It's not against the law for him to merely possess an

10   AK-47, is it?

11   A.    There again, if he's going to use it to try and take over the

12   courthouse and use it against policemen or government officials,

13   then it would be a crime, sir.

14   Q.    I understand you're trying to make your point, but please

15   answer my question, Lieutenant Williams. To merely possess the

16   AK-47, even if he took it across state lines, is not a crime in and of

17   itself, is it?

18   A.    To possess an AK-47, no, but with the intent to come across

19   state lines, try to take over the courthouse, yes.

20   Q.    You've made your point; okay? Now, do you recall the agent

21   that you spoke with, the FBI agent, that next day?

22   A.    I don't recall his name, no, sir. I was very tired. We had been

23   up for a long period of time.

24   Q.    Did you write up a statement of your own, handwritten

25   statement, about the events that you saw that day?

1    A.    No, sir. Our Director Hall wrote up a police report covering

2    what I did. I was a witness, and that's where I went to the federal

3    building and talked to the FBI agent. He took my statement as a

4    witness.

5    Q.    All right. The document that Mr. Theodore showed you, what

6    Mr. Huff was referring to as the citizens' arrest warrants, you've

7    told us that, obviously, that was not a valid document because it

8    was not signed by a magistrate, correct?

9    A.    Yes, sir.

10   Q.    And you've also told us about you're not familiar with federal

11   law; you're familiar with state law, correct?

12   A.    Yes, sir.

13   Q.    And you're aware, of course, that a citizen has the right in this

14   state to effect a citizens' arrest if they see a crime committed in

15   their presence, correct, sir?

16   A.    As far as I understand it, the state TCA, which is the

17   Tennessee Code, the laws that are provided by the State of

18   Tennessee, there is elements and guidelines I've got to follow as a

19   policeman and there are guidelines that a individual making an

20   arrest has to follow. And one of those is having probable cause and

21   fill out an affidavit, and it has to be signed by a magistrate. I have

22   to go to a judge to have this signed by a magistrate, which is a

23   judge.

24   Q.    Okay. I guess just a couple more questions.

25   A.    Yes, sir.

1    Q.    Back to, again, we're at Madisonville. If Mr. Huff had the

2    intent, as you've told this jury over and over that you believe he

3    had, to try to take over the courthouse or to go effect a citizen's

4    arrest warrant that day, you weren't moving on him, no other law

5    enforcement officer was moving on him.  Why didn't he?

6    A.    Would you repeat that again, Mr. Green?  I'm having a hard

7    time hearing you, sir.

8    Q.    You told us that you saw Mr. Huff conversing with these other

9    guys and the scary-looking dudes that have got the guns?

10   A.    Mr. Green, I didn't say they were scary-looking dudes. Please

11   don't put words in my mouth.

12   Q.    Well, if they have guns on their hips and somebody is trying

13   to take over the courthouse, you didn't consider them scary?

14   A.    Not scary, no, sir.

15   Q.    Okay. But Mr. Huff's scary?

16   A.    I didn't say that, either.

17   Q.    So we've got this group of people who were armed, and Mr.

18   Huff's talking to them. And then you see Mr. Huff, if I understand

19   your testimony, go into a truck, and all of a sudden there's a bulge

20   that appears on his side. And you're telling this jury that you

21   believe his intent that day– because we're here for what his intent

22   was on April the 20th, that day– was to take over the courthouse.

23   You didn't attempt to stop him, did you? Did you?

24   A.    No, sir.

25   Q.    Did you see any other law enforcement officer attempt to stop

1  him?

2  A.    No, sir.

3  Q.    Why didn't you do it?

4  A.    You're asking my personal opinion?

5  Q.    Uh-huh.

6  A.    Because there was too many policemen there for him to take

7  over the courthouse at that time.

8  Q.    And, quite frankly, it would have been impossible that day to

9  do it, wouldn't it?

10  A.    No, sir, I don't think it would have been impossible. An AK-

11  47 is a very dangerous weapon, it's a military weapon. As I

12  indicated to you all earlier, it could go through my police vest and

13  the vests of other police officers. One person with an AK-47, it

14  would be very easy to take over that courthouse and harm people.

15  Q.    Okay. So it would have been easy for him to do. So if his

16  intent was to do it, why didn't he do it?

17  A.    You're asking me to think about his mind, decisions that he

18  made? I think there was too many policemen there. That's why he

19  didn't do it. I think the intent was there. There was people went

20  around the courthouse to look at it, just like I would do if I was

21  going out, do a surveillance on a target location. I think the intent

22  was fully there, but there was just too many policemen to take over

23  at that time.

24  Q.    I'll ask you what I asked you again a moment ago. So he

25  couldn't have done it; is that what you're telling us?

1  A.    I'm not saying he couldn't have done it, sir.

2  Q.    So he could have done it, but he just didn't because there was

3  too many policemen there. Is that what you're telling us? He had

4  every opportunity to, but he didn't, because of all the cops around?

5  A.    That's what I believe personally why he didn't do it, because

6  there were too many policemen there to take over.  I do believe the

7  intent was there to take over, based on what Mr. Huff told me, sir.

8  Q.    And also because that's the only possible theory that can

9  make their argument fly, under these facts, isn't it?

10  A.    Mr. Green, I'm here to tell the truth, sir. I'm not here to back

11  up anybody's theory. You asked me questions; I honestly answered

12  them, based on what Mr. Huff told me his intent was.

13            MR. GREEN:   Thank you.

14            THE COURT:   Thank you. Redirect?

15            MR. THEODORE:    Yes, your Honor.

16                    **REDIRECT EXAMINATION**

17  by Mr. Theodore:

18  Q.    Lieutenant Williams, Mr. Green asked repeatedly, well, why

19  wasn't he arrested.  I want to go back to something you said in your

20  direct testimony. Was there concern in Madisonville that if an

21  arrest would have tried to been accomplished against Mr. Huff that

22  something could have erupted, with the situation being as it was?

23  A.    Very easily. If we would have confronted him, I think it could

24  have instigated and started a gunfight, which is not what we

25  wanted. We were there to try and protect the citizens of

1    Madisonville. If we had to effect an arrest later, we could do it.

2    Basically, we were there to keep the peace, make sure no one got

3    hurt at the courthouse.

4    Q.    Was that concern by people in the– as part of the law

5    enforcement team that day?

6    A.    Yes, sir. Every officer felt the same way.

7    Q.    How many law enforcement officers were there in

8    Madisonville, approximately?

9    A.    There again, I'm guessing, at 50 to 75.

10   Q.    And that's certainly not a normal amount for Madisonville?

11   A.    No, it is not.

12   Q.    That was because of this incident?

13   A.    Yes, sir. That's correct.

14   Q.    If there had not been that type of a law enforcement presence

15   there, by you and others in law enforcement, what do you think

16   could have happened?

17   A.    I know what would have happened, based on Mr. Huff told me

18   his intent was. They were going to take over the courthouse, effect

19   these arrests, and use weapons against our government officials.

20   Q.    You're not ultimately a person who makes a decision on

21   whether he should be arrested or not, are you?

22   A.    No, sir, I was not.

23              MR. THEODORE:    Nothing further.

24              THE COURT:  Any recross?

25              MR. GREEN:  Very briefly.

1    **RECROSS-EXAMINATION**

2    by Mr. Green:

3    Q.    Lieutenant Williams, so if you're telling us that it's your

4    belief that, because of all of the cops all over Madisonville that

5    day, that he wasn't going to undertake an attempt to effect a

6    citizen's arrest, to take over the courthouse, his taking a weapon,

7    as you have suggested that he did out of that truck, would have

8    nothing to do with that intent, would it? Wouldn't have anything

9    to do with any sort of nefarious intent, would it?

10    A.    Mr. Green, I think you listened to the same thing I listened to

11    on these excerpts, where he said he would use his weapon if the

12    officials wouldn't go along peaceably. I think his intent was to use

13    that weapon, sir.

14    Q.    Okay. So his intent, when he gets the gun out of the toolbox,

15    if I understand you correctly, is to use the weapon and take over the

16    courthouse, but he just doesn't because he can't, right? Is that

17    what you're saying?

18    A.    I've explained to you what my feelings were, sir.

19            THE COURT:   All right. Thank you, Lt. Williams. You

20    may be excused.

21            THE WITNESS:    Yes, sir. Thank you, Judge.

22        (Witness excused.)

23            THE COURT:   The Government may call its next

24    witness.

25            MR. THEODORE:    Yes, your Honor. The Government

1    would call Mike hall to the stand.

2              COURTROOM DEPUTY:    Raise your right hand.  Do

3    you solemnly swear your testimony will be the truth, the whole

4    truth, and nothing but the truth, so help you God?

5              MR. HALL:   I do.

6              COURTROOM DEPUTY:   Please state and spell your

7    name for the record.

8              THE WITNESS:   My name is Mike Hall. Last name

9    spelling, H-a-l-l.

10                          **DIRECT EXAMINATION**

11   by Mr. Theodore:

12   Q.    Are you Mike, who's known as "Mike-too-tall-Hall"?

13   A.    Mike-too-tall-Hall, to all of my fans, both of them.

14   Q.    Could you please state your current position right now?

15   A.    Currently, I am a contracted advisor, as the advisor to the

16   Commander of the Afghan National Police in Kabul, Afghanistan.

17   Q.    And how long have you had that position?

18   A.    Been there since around– I think I left in June or July, first of

19   July.

20   Q.    Okay.  Of this year?

21   A.    Of this year, correct.

22   Q.    And you're back here for this trial?

23   A.    That's correct.

24   Q.    Come a long way to come back to testify here?

25   A.    Yes, sir.

1   Q.    I want to direct your attention to back in April, April 20th of

2   2010.  What position did you hold back then?

3   A.    I was the Director of the Tenth Judicial District Drug Task

4   Force.

5   Q.    So what did that position entail?

6   A.    It was– actually, we changed the name when I was there,

7   Tenth Judicial Drug and Violent Crime Task Force.  We had four

8   counties; Bradley, McMinn , Polk, and Monroe County. We

9   predominately did drugs and violent crimes, investigated narcotics

10  crimes and helped and assisted in other violent crimes with local

11  and state departments.

12  Q.    Okay.  And you were the director of that, you said?

13  A.    Yes, sir.

14  Q.    Okay.  And how long did you have that position?

15  A.    I was a director a little over four years and I was an agent with

16  them, roughly– I was on loan to them in 1998, so I've been

17  affiliated with the drug task force since roughly around 1998.

18  Q.    And how long have you worked in law enforcement all

19  together?

20  A.    I started as a correctional officer roughly around 1992, '93.

21  Q.    Okay.  Let me direct your attention again to April 20th of

22  2010. Were you working on that day?

23  A.    I was.

24  Q.    Was there anything different or unusual about that day, how it

25  started and whatnot?

1    A.    We were asked by the District Attorney's Office and the

2    Madisonville Police Department and the Monroe County Sheriff's

3    Office to help on a detail, to help provide protection for the

4    Madisonville courthouse.

5    Q.    And what was the purpose for providing protection,

6    additional protection, on that day?

7    A.    There was a dispute of an arrest made with Mr. Walter

8    Fitzpatrick, I believe his name was, and there were individuals

9    there that went to come to demonstrate against his arrest.

10    Q.    Now, were you aware that Mr. Fitzpatrick had been

11    previously arrested?

12    A.    Yes.

13    Q.    And then was that on April 1st, 2010?

14    A.    Yes. That was– he came in, I think, during a grand jury time

15    and was arrested for like a disorderly conduct at that time.

16    Q.    And was he eventually bonded out?

17    A.    He was. Not long after that, maybe April– I don't remember

18    the date. It was probably April the 6th or something like that.

19    Q.    And then this is April 20th, and just to talk, refer to Mr.

20    Fitzpatrick for a second, are you aware of when his next court

21    hearing was scheduled after April 20th, 2010?

22    A.    I was there as well, and it was in May something. I can't

23    remember the exact date. I believe it was in May.

24    Q.    Okay. Was that early May?

25    A.    I can't– I couldn't recall. I'm sorry.

1    Q.    Anyway, so there was special preparations being made on

2    April 20th, 2010, because of the Fitzpatrick court hearing?

3    A.    Correct.

4    Q.    And what were you concerned about?  What was the concern?

5    A.    Well, we were concerned that there might be a hostile

6    takeover of the courthouse.  We had information.  I was in a brief–

7    I was privileged to be in the first brief of the operation.  We were

8    concerned that there would be armed demonstrators that had made

9    threats to take over the Madisonville courthouse.

10   Q.    Was there any information where you believed this was

11   coming from?

12   A.    The information we had, the majority of it was going to come

13   from Atlanta, Georgia, namely, Mr. Huff.

14   Q.    Okay.  Is that Darren Huff?

15   A.    Darren Huff, correct.

16   Q.    Did you ever have occasion to actually see Mr. Huff after

17   that?

18   A.    I did.

19   Q.    Okay.  Do you see him in this court right now?

20   A.    Sitting there.

21          MR. GREEN:   We'll stipulate his I.D.

22   Q.    So what happened after the briefing then?  What transpired

23   after that?

24   A.    Oh, we set up. My end of it was to help gather intelligence and

25   to, I guess, to identify any armed persons and trying to bring a

1    peaceful resolve.

2    Q.    And approximately, if you can, if you recall, about how many

3    law enforcement officers were involved that day in Madisonville?

4    A.    There was probably, for the whole operation, in the whole

5    county, there was probably 70 or so.

6    Q.    Okay. And were you working in uniform or were you

7    undercover?

8    A.    On the 20th I was– I worked undercover. I was in plainclothes.

9    Q.    Okay. Did you position yourself at any locations?

10   A.    Yeah. In the morning I went to Donna's Restaurant. We had

11   information that they were– that they actually had reserved part of

12   Donna's to have a rally before Mr. Fitzpatrick's court case.

13   Q.    Okay. Was it your information that there were any particular

14   groups coming in?

15   A.    Just what I heard was the Oath Keepers and maybe the

16   Georgia Militia.

17   Q.    Why don't you just describe the situation there in

18   Madisonville at the time? Describe the mood and everything.

19   A.    Well, we got there about three o'clock in the morning, to start

20   with, and we all briefed. Didn't know what to expect fully. The

21   tensions were pretty high. Going into the morning there was more

22   activity, of course, inside the City of Madisonville. There were a

23   lot of, you know, out– there were plates from out of town, namely,

24   Georgia, some North Carolina, that were unfamiliar. And so as the

25   morning progressed, I guess tensions were raised a little bit.

1   Awareness was definitely raised a lot.

2   Q.     And you said you positioned yourself at Donna's?

3   A.     Yeah, Donna's Restaurant. It's directly across from the

4   courthouse steps.

5   Q.     And when you were inside Donna's, what did you observe?

6   A.     Inside Donna's there was a crowd, a crowd gathering. I was

7   there for about 30 minutes. After I was there for 30 minutes, I

8   observed– I looked out the window, observed a Cruiser, PT

9   Cruiser– a man came out– from Georgia; he had a revolver on his

10  hip. He came inside the store, which got my attention. I had a

11  police radio. At times I would go back to the restroom, to go back

12  to command post and try to identify certain people that we thought

13  were armed. That way, we could have those people kind of just

14  looked upon.

15        And then Mr. Huff came in about maybe 35, 40 minutes or so

16  after I had been into the restaurant.

17  Q.     Did you see any other armed people? You mentioned the one.

18  Were there other armed people there?

19  A.     I saw another person that was in a pickup truck that had a– he

20  had like a Glock pistol. He had it on and he put a coat over top of

21  it.

22  Q.     So are you always able to tell whether or not somebody's

23  carrying a weapon on them?

24  A.     Oh, not always, no, no.

25  Q.     Who else were you communicating with? You mentioned the

1    command post. Any other particular officers?

2    A.    I was communicating with Lieutenant Don Williams. Lt.

3    Williams worked for me. I had communicated back and forth. I

4    knew that he was out on the traffic stop with Mr. Huff, and so I

5    assumed during that traffic stop– that's when I actually went over

6    to the command post, sometime after the traffic stop, because I

7    wanted to get there before they had their meeting. According to our

8    intelligence that we had, there was going to be a meeting there.

9    Q.    Were you communicating with Lt. Williams when he was in

10   Madisonville?

11   A.    Yeah. Lt. Williams had talked to me back and forth on the

12   phone, just give me updates of where our people were positioned,

13   where he was positioned, and just checking on my safety as well.

14   Q.    Did Lt. Williams describe things that he was observing at that

15   time?

16   A.    On the traffic stop or in Madisonville?

17   Q.    In Madisonville.

18   A.    Lt. Williams did say that he saw some people looking around

19   he thought were doing counter-surveillance of the courthouse. He

20   had made mention of others from out of town he thought may be

21   armed. So I kept those things, you know, with me.

22   Q.    Without getting into what's said right now, did he make any

23   statements to you at that time while perceiving them, while

24   observing them, about anything that Mr. Huff was doing in

25   Madisonville?

1    A.    Oh, Mr. Williams had made mention that– and I would have to

2    reference it to what he– information he gave me from the traffic

3    stop to validate what he told me in Madisonville. Because he said

4    that he had taken a .45-caliber pistol off the traffic stop and that he

5    had put it in a toolbox in his truck.

6          Mr. Williams had told me that Mr. Huff had been to that

7    toolbox on a couple of occasions, back and forth.

8    Q.    He, Lt. Williams, told you that when he was in Madisonville?

9    A.    Correct.

10   Q.    That he observed Mr. Huff going to his toolbox?

11   A.    Correct.

12   Q.    Did he indicate that Mr. Huff had retrieved the .45–

13         MR. GREEN:    Your Honor, I'd object to the leading.

14         THE COURT:    I'll sustain the objection.

15   Q.    While he's perceiving these events, did he convey to you what

16   he thought Mr. Huff was doing in the toolbox?

17   A.    Mr. Williams said just be careful, and he told me about the

18   gun that was in the toolbox and that Mr. Huff had been in the

19   toolbox, just be careful, that he may be armed.

20   Q.    Did you observe Mr. Huff?

21   A.    I did.

22   Q.    Okay.  Did you ever see him talking to other individuals

23   outside there, in Madisonville?

24   A.    Mr. Huff came into the hotel– I mean, to Donna's Restaurant,

25   and I was sitting in the parlor area with several other people from

1  out of town that I didn't recognize– and began, I guess, to give a

2  little, I call a motivational speech to the folks that were there.

3  Q.    Now, do you know what stage in the process this was? I mean,

4  this was kind of a fluid situation going on in Madisonville; was it

5  not?

6  A.    Correct.

7  Q.    So things were developing and then things eventually, at some

8  point, somewhat, subsided; is that right?

9  A.    Oh, yeah. We were anticipating maybe a bigger crowd, for

10  one. The reports that we had, there was up to four to 600 people.

11  When we got there in Donna's, it was roughly 20 or so individuals

12  that we had observed. There were a lot of out-of-state tags for that

13  time of the year.

14        I mean, Madisonville is a– I'd say it's a little bigger than this

15  courthouse, but not much more. It's a small, everybody knows

16  everybody, town, you know. So you don't get a lot of Georgia plate

17  and a lot of North Carolina plate cars that really come through

18  there on a daily basis. So it was more traffic for that time of the

19  morning for Madisonville as well, you know.

20        So we had expected a little bit more due to some of the

21  reports, and to be honest with you, as soon as we heard it, we were

22  all looking up on the internet to try to figure out who are we

23  dealing with. And so we all "Googled" and "YouTubed" the Oath

24  Keepers and the Georgia Militia, and there was rhetoric about

25  trying to show support, to come to Madisonville. So we were

1   expecting a great push.

2   Q.    Even with about 20 people, you said, in that group, was that a

3   concern to you?

4   A.    It was a concern to me.  One person with a gun is a concern to

5   me, to be honest with you.

6   Q.    Okay.  Is that all you had?

7   A.    No, no. I think that we identified, with all the collaboration,

8   that we– at least six, in my count, I believe, or more.

9   Q.    Did Mr. Huff state what his intentions were being in

10  Madisonville?

11  A.    Mr. Huff gave a motivational speech.  I believe he even

12  quoted some scripture and tried to rally some of the people that

13  were there.  He made mention that he did have an AK-47 with three

14  or 400 rounds.  He went outside and–

15  Q.    He indicated he had that where?

16  A.    In his car, in his truck.

17  Q.    Three hundred to 400 rounds?

18  A.    Of AK-47 ammunition.

19  Q.    Okay.  What else did he say?

20  A.    Oh, after that, listening to what he had to say, he went outside

21  and talked with the gentleman from the PT Cruiser that I observed

22  earlier that had the pistol.  And I was at a vantage point to hear, but

23  I didn't want to– you know, I didn't want to be all up on them to

24  give away who I was.

25        And he had made a mention to the fact of, "I wish we had more

1  people that were here," and, "If it was raining, you know, today

2  would be a really good day to take over the courthouse."

3  Q.    Did he say that it would be good to take it over because it was

4  raining?

5  A.    Because we wouldn't expect it. It was raining, he says– when

6  I was listening, it was, "Today would be a good day to do it because

7  it was raining, but, you know, we needed more people. I wish we

8  had more people. They wouldn't expect us to do anything like

9  this."

10        And then him and the gentleman, they kind of glanced and

11  looked at me, and then they walked off away from me, and then I

12  just– I figured I was done then. They realized that I was probably

13  not with their group.

14  Q.    What else did Mr. Huff say about his intentions about what he

15  planned on doing that day?

16  A.    When he was giving his speech, you know, he talked a lot

17  about standing up for, you know, what's right. One thing that stuck

18  out, I believe it was Isaiah 59, "When the enemy comes in like a

19  flood, the Lord will raise up a standard against it." And so I had the

20  feeling that, you know, he was the standard that was going to be

21  raised up against us, and I felt like we were the enemy, and that was

22  something–

23  Q.    And that was you?

24  A.    Yeah. And that was my understanding, because Lt. Williams

25  had contacted me, and Lt. Williams said something that rang

1  through me when he called me. He says, be careful, he says if

2  we're not with him, then we're his enemy.

3  Q.    Did he mention anything about doing citizens' arrests while

4  he was there?

5  A.    I did not hear him ask to make a citizen's arrest inside

6  Donna's or outside. That wasn't something that I heard.

7  Q.    Okay. So what was he talking about when he said, "This

8  would be a good day to do it, they're not expecting it, but I wish we

9  had more people"? What was he referring to there?

10  A.    He was referring to, I guess, come to the aid of Mr.

11  Fitzpatrick.

12  Q.    Okay. Was that in reference to taking over the courthouse?

13  A.    That was my understanding, to take over the– the control over

14  the Madisonville courthouse.

15  Q.    Why was that your understanding, that that's what he was

16  talking about?

17  A.    Because he said it would be a good day to take it over. And so

18  even in the pre-planning stages we had feared that there would be a

19  movement to take over the Madisonville courthouse from the

20  authorities.

21  Q.    Just for help, in your view, do you think that there was a

22  sufficient amount or do you feel that there was a strong law

23  enforcement presence there at that time?

24  A.    There was a strong law enforcement presence there, which

25  was good. I think, without it, there would have been– there was

1    two issues there for me. One, there was a good law enforcement

2    presence and there was good control over law enforcement's

3    presence, if that makes sense. There was a sense of who's going to

4    fight first, if that makes sense, who's going to make the first

5    punch, who's going to push the first person and–

6    Q.    Did you feel it was that type of situation?

7    A.    Oh, yeah.

8    Q.    It was that tense?

9    A.    It was very tense, yeah, yeah.

10   Q.    So go on. What–

11   A.    So, I mean, our feeling was, you know, how do you peacefully

12   go about– if they're going to have a demonstration, that's fine. We

13   made measures to make sure that there were not guns to be close to

14   the courthouse. They were supposed to meet at a park. We put

15   guns– signs up there that says no guns at the park, even though

16   nobody showed up at the park that was across from the courthouse.

17         But we were trying to make peaceful measures so that we

18   could accommodate what they wanted to do. At the same time, we

19   didn't want to– we were afraid if we would have pushed-pushed,

20   then they would have felt like we slapped them first, so then they

21   have the right to retaliate, and that was something that we were

22   trying to avoid. More than just have a police presence, I think

23   police restraint was more important than anything.

24   Q.    Because you think something could have escalated?

25   A.    Oh, yeah. Yeah, no doubt.

1    Q.    Do you think that if Mr. Huff had been arrested at that time,

2    what would be your impression of what could happen?

3            MR. GREEN:   Your Honor, that calls for pure

4    speculation. I object.

5            MR. THEODORE:   I think it's a fair opinion, under the

6    circumstances.

7            THE COURT:   I'll sustain the objection.

8    Q.    Were you the person that was in charge, ultimately, to make

9    the decision on whether or not Mr. Huff should be arrested or not?

10   A.    No, I was not.

11   Q.    Is it fair to say that that decision would have been– was being

12   made at maybe a higher level than yourself as far as rank within the

13   law enforcement community there?

14   A.    Yeah. I mean, we– at the time, I believe, the FBI and the Feds

15   at the time were the ones that were helping us out the most, and so

16   we were going to follow orders. You've got to have like a chain of

17   command or it breaks down. So we were taking ours, our advice

18   and our command, from the federal government at that time.

19   Q.    Okay. Have you ever dealt with a situation quite like what

20   you had there in Madisonville that day? Of course, you're in

21   Afghanistan.

22   A.    Well, I have, but not in this country. I haven't, up to this

23   point here.

24           MR. THEODORE:   I have nothing further– well, your

25   Honor, I'm sorry. I did want– we did want to play a exhibit here.

1    One moment, if I could. Your Honor, I don't believe there's any

2    objection to Government's Exhibit Number 43.

3            THE COURT:   What's the number again?

4            MR. THEODORE:    Forty-three.

5            THE COURT:   All right. So admitted.

6        (Government's Exhibit No. 43 received into evidence.)

7    Q.    Mr. Hall, or Advisor Hall, I guess, do you recognize that

8    exhibit, Exhibit 43?

9    A.    Yes, I do. It's my signature, dated October the 14th.

10   Q.    Did you review that exhibit?

11   A.    I did.

12   Q.    Did you listen to it?

13   A.    Yes.

14   Q.    And the clip on there, is it fair and accurate?

15   A.    It is.

16       (Exhibit 43, a video recording clip, played to the jury re: AK-

17   47 statements.)

18   Q.    Is that the statement you heard Mr. Huff make, among other

19   statements, there?

20   A.    Yes, sir.

21           MR. THEODORE:   Your Honor, may we approach?

22           THE COURT:   Yes.

23       (Discussion at bench had off the record.)

24           THE COURT:   Anything further on direct?

25           MR. THEODORE:    No further questions.

1    THE COURT:  Cross- examination?

2    MR. GREEN:  Thank you, your Honor.

3    **CROSS-EXAMINATION**

4    by Mr. Green:

5    Q.    Too-tall-Hall?

6    A.    Too-tall-Hall.

7    Q.    You didn't play any football, did you?

8    A.    Football? No. I tell people I played miniature golf, but I came

9    to Tennessee to play basketball at Lee University. That's what

10   moved me to Tennessee from south Florida.

11   Q.    Down in Cleveland, right?

12   A.    Down in Cleveland, yes, sir.

13   Q.    Okay.  You wind up playing?

14   A.    Yeah, I played at Lee and then ended up staying here.  That

15   was 20-plus years ago.

16   Q.    Why did they decide to put you undercover? You look like

17   you might stick out just a little bit.

18   A.    I've got that friendly face, I guess. I don't know. People like

19   me.

20   Q.    And, of course, some of us have friendly-looking faces and

21   some of us have scarier-looking faces, but that doesn't make the

22   scarier-looking person a criminal, does it?

23   A.    It does not.

24   Q.    Now, I want to back up to the last thing Mr. Theodore did in

25   your direct examination, was he played a snippet of a clip of Mr.

1   Huff's voice talking about the AK-47 inside of Donna's, correct?

2   A.   Uh-huh.

3   Q.   You were in there for the entirety of the time that Mr. Huff

4   was there; were you not?

5   A.   Uh-huh.

6   Q.   It's a fair statement that Mr. Huff pretty much didn't shut up

7   the whole time he was in there?

8   A.   Yeah.  He talked quite a bit.

9   Q.   He's a talker, isn't he?

10  A.   Uh-huh.

11  Q.   And have you listened to the entirety of the recording from

12  Donna's?

13  A.   I have not.  I kept going back and forth to the bathroom as

14  well to check in every now and then, so I would miss parts of it.

15  But I haven't heard the whole thing from Donna's.

16  Q.   But you're aware that there is a recording of the entirety of

17  the conversation–

18  A.   I'm sure there is.

19  Q.   –when he was inside of Donna's, correct?

20  A.   Sure.

21  Q.   And that's but just a fraction of that entire recording, correct?

22  A.   Correct.

23  Q.   But even in that little snippet we can hear people laughing,

24  can't we?

25  A.   Sure.

1    Q.    And that was the mood inside there, everybody was laughing

2    and yucking it up, weren't they?

3    A.    Not everybody.

4    Q.    Well, okay, you weren't, but everybody sitting around,

5    listening to the ringmaster talk, they were all having a big time,

6    weren't they?

7    A.    Sure.

8    Q.    And he was more than happy to talk and put on a show for

9    them, wasn't he?

10   A.    That's correct.

11   Q.    And I believe you told us a little while anything that what he

12   was giving a motivational speech, right?

13   A.    Correct.

14   Q.    He was trying to talk people up and talk up his cause, correct?

15   A.    Correct.

16   Q.    And, of course, the First Amendment's still alive and well in

17   Monroe County, isn't it?

18   A.    Yes, sir.

19   Q.    Nothing illegal at all for him to do that, is there?

20   A.    No, sir.

21   Q.    The Second Amendment's alive and well in Monroe County,

22   as well, isn't it?

23   A.    Yes, sir.

24   Q.    Provided he's got a valid carry permit, which he does, he

25   could lawfully possess a firearm, couldn't he?

1    A.    Correct.

2    Q.    Could lawfully possess a .45, couldn't he?

3    A.    That's correct.

4    Q.    Could lawfully possess an AK-47, couldn't he?

5    A.    That's correct.

6    Q.    In fact, from your– just with your two eyes, did you observe

7    him violate one single state statute when you were watching and

8    observing him?

9    A.    No.

10    Q.    Did you observe anyone he was with violate a single state

11    statute?

12    A.    No.

13    Q.    Now, the people that he was talking to, a good number of them

14    were older, middle-aged to older, gentlemen, weren't they?

15    A.    Correct.

16    Q.    How old would you guess them to be?

17    A.    I'd say a range from about 35 to 55, 60.

18    Q.    Of course, I like to believe, since I'm almost 50, that that's

19    young now, but we're not talking about a bunch of 19- or 20-year-

20    old skin-heads running around, are we?

21    A.    No.

22    Q.    You said that you had observed a number of out-of-state tags?

23    A.    Correct.

24    Q.    Did you run those tags?

25    A.    They did.

1    Q.    All right. And you said, if I understand your testimony

2    correctly, that you all observed six different people you identified

3    with firearms; is that correct?

4    A.    To my knowledge, yeah. There might have been more, but I

5    remember six specifically around the courthouse.

6    Q.    Okay. Do you have a list of their names and where they're

7    from when you all did field interviews of them?

8    A.    All that stuff was given to the Fusion Center, the command

9    center, and they were making a list of those things, of people that

10   we had identified.

11   Q.    Okay. Who identified these people?

12   A.    Nobody walked up to them.

13   Q.    So you've got a tinderbox situation where there's supposed

14   to be this armed takeover of the courthouse, you see people

15   walking around with guns?

16   A.    Correct.

17   Q.    And nobody approaches them to say, who are you, what are

18   you doing here?

19   A.    I didn't want to be the one to do it.

20   Q.    Why?

21   A.    That's a dangerous situation, in my opinion. You're talking

22   about, you know, people that want to take over. Are they waiting

23   for me to give them the reason to take over? Am I going to be the

24   one to get shot that day? We're not cowards, but at the same time,

25   restraint is some of the law enforcement's greatest tool.

1    At the time, they didn't give us a reason to push it hard.  We

2  could have went and interviewed and went to those people, but, to

3  me, I would have felt like I was pushing them to do something to

4  escalate the situation that was already tense.

5  Q.    Well, I guess you said what I was leading to, and I appreciate

6  that.  But they never gave you any reason to approach them, did

7  they?

8  A.    No.

9  Q.    They never rushed the courthouse, did they?

10  A.    They didn't rush the courthouse, no.

11  Q.    They never got together and started marching toward the

12  courthouse, did they?

13  A.    No.

14  Q.    There was never any indication that they were going to do

15  anything toward the courthouse that you observed with your eyes,

16  was there?

17  A.    I think being there was an indication enough for me.

18  Q.    Well, did you see Mr. Huff approach the courthouse?

19  A.    I saw him at the– go to the courthouse and walk around maybe

20  the front, front section of the courthouse by the steps, but not go

21  inside the courthouse, no.

22  Q.    And, in fact, you saw him carry a sack over to Detective

23  Byrum with the sheriff's department, didn't you?

24  A.    I did not. I did not see that.

25  Q.    And you said that Mr. Huff made the statement at one point

1    that– and correct me if I'm wrong here– that, I wish we had more

2    people, this would be a good day to do it, words to that effect,

3    something about because it was raining?

4    A.    They wouldn't expect it.

5    Q.    If he's saying, I wish we had more people, this would be a

6    good day to do it, is that not indicating from you that he doesn't

7    intend to do it that day?

8    A.    There was enough people there for him to do it.

9    Q.    Okay. But there weren't enough people for him to do it?

10   A.    That's right.

11   Q.    Isn't that what he said?

12   A.    Uh-huh.

13   Q.    So doesn't that indicate an intent that he wasn't going to do it

14   that day?

15   A.    His intent to do it was, he was there, in my opinion.

16   Q.    So him just showing up was enough?

17   A.    I don't know what his business was at the courthouse in

18   Madisonville, Tennessee.

19   Q.    Well, you just told me that the First and Second Amendments

20   still apply in Madisonville. He's got every right to show up there if

21   he wants to, just watch Mr. Fitzpatrick walk in and out of the

22   courthouse, doesn't he?

23   A.    True.

24   Q.    All right. You've used, and we've heard this word throughout

25   this trial, what could have happened. This was bad, this was tense,

1    what could have happened.  We haven't heard anything yet about

2    what did happen, but what could have happened.

3          Have you ever– I'm not talking about in Afghanistan. I'm

4    talking about in the United States of America. Have you ever put

5    anybody in jail before for what could have happened?

6    A.    No. That's the unfortunate thing.

7    Q.    But that's the law, though, isn't it?

8    A.    Well, we can't arrest anybody until something does happen,

9    so the "could have's" are not necessarily bad.  I think that day

10   averted a tragedy, in my opinion.

11   Q.    Well, of course, the tragedy was averted because the man

12   sitting behind me has got a big mouth and told everybody what the

13   worst thing possible that he could have done, right? I mean, you all

14   got your information because he ran his mouth, right?

15   A.    Correct.

16   Q.    You got your information there at the roadside because he

17   told you why he was there, right?

18   A.    Correct.

19   Q.    And this jury's going to hear the entirety of the tape from

20   Donna's, but while you were in there, do you recall hearing Mr.

21   Huff when he's doing his motivational speech telling the people

22   there that we're looking for a peaceful resolution? Ever hear him

23   saying that?

24   A.    I don't remember, don't recall.

25   Q.    He talked about the roadside stop that had just occurred.  Do

1  you remember him talking about that?

2  A.    Uh-huh.

3  Q.    And do you remember him relating to the crowd in Donna's

4  that he had told the officers at the roadside stop, that if you guys

5  will be there to keep the peace, we welcome it? Do you remember

6  him saying that?

7  A.    Uh-huh.

8  Q.    Do you remember him saying, we don't intend violence?

9  A.    I remember.

10  Q.    Do you remember him saying, once again, talking about

11  talking to the cops out at the roadside, we want you to be there?

12  A.    Correct.

13  Q.    Okay. If we didn't do anything in Madisonville and we

14  wanted the cops to be there when we did do something, what have

15  we done wrong?

16  A.    Just go back to the statement he made, "If you're not with me,

17  you're my enemy."

18  Q.    So if I tell you right now you're not with me, you're my

19  enemy, I should go to a federal penitentiary?

20  A.    No, not unless you've got a gun and have an intention to do

21  something.

22  Q.    Okay. Well, you've been a cop for a while and you strike me

23  as a pretty good one. When you are attempting to investigate a

24  case, you look at not only what's been spoken, but you also look at

25  what a person has done or not done, correct?

1    A.    My motto is– and it's kept me alive this far– I trust God and

2    everybody else is a suspect, and that motto's been good for me.

3    What people say and what people do ain't always the same. Mr.

4    Huff talks a lot. Some things he says, hey, I might even agree with;

5    some things he says, I'm totally against.

6         But what part do I take true? Do I take the part true he's got

7    300 and 400 rounds of AK– I don't have 300, 400 rounds of AK-47,

8    and I drive around Afghanistan. So, you know, those are pretty

9    serious things for me. Those aren't things that a normal person, in

10   my opinion, would do. So I take it serious.

11   Q.    Never said he was normal, but being abnormal doesn't mean

12   that you should go to jail; agreed?

13   A.    I agree.

14   Q.    And I want to touch upon– I love what you just said, because

15   that is a motto you should live by as a law enforcement officer. I

16   believe you just told us that just because somebody says something

17   doesn't mean they're going to do it, right?

18   A.    You never know.

19            MR. GREEN:  That's all.

20            THE COURT:  Thank you. Redirect?

21            MR. THEODORE:    Briefly, your Honor.

22                    **REDIRECT EXAMINATION**

23   by Mr. Theodore:

24   Q.    I think Mr. Green just asked you about, well, if something just

25   could have happened, that can't be a crime. You're involved in

1    drug investigations, correct?

2    A.    That's correct.

3    Q.    Or you have been doing that in the past?

4    A.    Sure.

5    Q.    And conspiracy charges, you've been involved in conspiracy

6    investigations, correct?

7    A.    Correct.

8    Q.    Isn't that oftentimes just what that is, is what could happen?

9    A.    It's an overt act.

10   Q.    Doesn't necessarily happen; it's what could happen, right, or

11   could be any conspiracy to commit any crime?

12              MR. GREEN:   I have to object. I don't believe that's an

13   accurate statement of the law of conspiracy.

14              THE COURT:   Well, I'll allow the question,

15   understanding– subject to the objection, allow recross. But go

16   ahead.

17   Q.    Sometimes there are crimes that aren't completed. I think, in

18   the law they use a fancy word, inchoate crimes, crimes like

19   attempts and conspiracy, things like that, where the crime doesn't–

20   the act, the worst act, doesn't occur, but there is either an attempt

21   or a conspiracy to commit it?

22   A.    Sure.

23              THE COURT:   And actually, not to interrupt, just, in

24   light of the objection, just remind the jury again, as I have, that

25   questions by the lawyers are not evidence, whether they are

1  questions by counsel for the Government, questions by counsel for

2  the Defendant. To the extent the jury is to consider the law

3  applicable to this case, that will be given by the Court in the

4  Court's closing instructions.

5      Go ahead.

6          MR. THEODORE:   I'll move on, your Honor.

7  Q.    Let me, just one last question. In your opinion, why do you

8  believe that something did not happen? I think you touched on

9  this, but why do you think that there wasn't a takeover of the

10  courthouse or an attempt to takeover?

11          MR. GREEN:   Your Honor, I have to respectfully

12  object. I believe this has been asked and answered and covered.

13  And, once again, while we allowed it before, I'm not sure his belief

14  is entirely material and competent evidence.

15          MR. THEODORE:   Your Honor, I would agree, it is

16  somewhat speculative. I think it was kind of touched on in cross-

17  examination.

18          THE COURT:  I think, to the extent it needs to be

19  covered, it was covered.

20          MR. THEODORE:   Thank you.

21          THE COURT:  Thank you. Any recross?

22          MR. GREEN:  No, your Honor.

23          THE COURT:   All right. Thank you, Mr. Hall. You may

24  be excused.

25          THE WITNESS:   Thank you, sir.

1    (Witness excused.)

2         THE COURT:   Swear in our next witness, please.

3         COURTROOM DEPUTY:   Raise your right hand.  Do

4    you solemnly swear your testimony will be the truth, the whole

5    truth, and nothing but the truth, so help you God?

6         MR. WALKER:   I do.

7         COURTROOM DEPUTY:   Please state and spell your

8    name.

9         THE WITNESS:  Thomas Walker, T-h-o-m-a-s, W-a-l-

10   k-e-r.

11        MR. MACKIE:   May I proceed, your Honor?

12        THE COURT:   Yes. Go ahead.

13                  **DIRECT EXAMINATION**

14   by Mr. Mackie:

15   Q.   Good afternoon. Can you tell the jury what your position is

16   and who you're employed by?

17   A.   I'm a detective with the Knox County Sheriff's Office, and

18   I'm assigned to the FBI's Joint Terrorism Task Force.

19   Q.   And how long have you been a detective with the Knox

20   County Sheriff's Office?

21   A.   About four years.

22   Q.   And what, generally, are your duties?

23   A.   I'm the supervisor over the gang unit, and I'm assigned to the

24   FBI's Joint Terrorism Task Force, so I split my time between the

25   sheriff's office and then the task force.

1    Q.    And how many years have you been in law enforcement?

2    A.    Eighteen years.

3    Q.    Can you tell the jury, in April, 2010, did you participate in the

4    arrest of the Defendant, Darren Huff?

5    A.    Yes, I did.

6    Q.    And what was that based upon?

7    A.    There was a federal arrest warrant that was outstanding for

8    him, and he was coming through Knox County, and I was assigned

9    as a deputy to the sheriff's office, assigned through the JTTF to

10   make a traffic stop.

11   Q.    So this was when, on what date, the date that it happened?

12   A.    It was April 10th, I believe.

13   Q.    When the arrest was?

14   A.    The same date.

15   Q.    Was the arrest on April 30th?

16   A.    Yes.

17   Q.    And that was in connection, you say, with an arrest warrant?

18   A.    Yes. There was an outstanding warrant for his arrest.

19   Q.    Do you understand whether that was in connection with an

20   indictment?

21   A.    Yes. I believe it was with the federal system, yes.

22   Q.    Well, in that time period, up to April 30th, an indictment had

23   been returned, correct?

24   A.    Correct. Yes.

25   Q.    And you were instructed to arrest him based upon the warrant

1  relating to that indictment?

2  A.    Correct.

3  Q.    Now, can you describe just briefly the situation where you

4  arrested him? What was the location?

5  A.    I was pre-stationed in my county car, county marked cruiser,

6  with the video camera running, at I-640 at 40 on the west end of

7  town. He was being followed or shadowed by two Tennessee

8  Highway Patrolmen, and they were in radio communication with

9  me, telling me that he was coming, getting closer.

10      When he passed me in his truck, then I pulled out, initiated

11  the stop, and he pulled over in between I-640 and Papermill on I-

12  40, westbound.

13  Q.    And at the time that you pulled him over, can you describe the

14  nature of the truck that he was driving?

15  A.    He was driving a camouflaged Ford pickup truck with a utility

16  bed on the back with a "Support your local militia" sticker on the

17  back and American flag stickers that were in the upside down

18  position.

19  Q.    All right. I'm going to show you what's been already

20  admitted into evidence as Government's Exhibit 23. Do you

21  recognize that?

22  A.    Yes, sir. That was the vehicle he was driving.

23  Q.    And while we're here, can you describe– this is on the

24  driver's side– what are the things that you see back behind the

25  driver's door, and describe what those things are.

1    A.    Those are three compartment doors that actually open up into

2    storage compartments that are built into the bed of the truck, and

3    there's three of them.  One's an upright, one's kind of a horizontal

4    that goes over the wheel well, and then the back one is another

5    upright storage locker.

6    Q.    And we're going to return to that in just a moment.

7    A.    Yes.

8    Q.    Let's take a look at Government's Exhibit 24 that's also in

9    evidence. Can you describe what that is?

10   A.    That is the back of the– Mr. Huff's truck with the "Support

11   your local militia" sticker and then the upside down American

12   flags.

13   Q.    Now, when you were there and Mr. Huff was placed under

14   arrest, did you transport Mr. Huff or did somebody else?

15   A.    No. The FBI transported him.

16   Q.    After that happened, were you involved in any type of

17   examination or search of the vehicle that we're looking at? Let's

18   go back to 23.

19   A.    Yes. When I initiated the stop, Mr. Huff was asked to step out

20   of the truck. He did, and we took him into custody at that point. We

21   or I went up and I checked the inside of the truck to make sure there

22   was nobody else inside.

23        As you can see, looking from the back, you can't see the

24   inside of the passenger compartment. There was nobody inside it, it

25   was deemed to be towed because he was being arrested.  So we

1    were going to tow it to our impound lot, which then requires, by

2    our standard operating procedure, is an inventory search be done. I

3    have to fill out a log of what I find inside the vehicle, to make it

4    stays inside the vehicle once it's been towed.

5    Q.    Did you look in the side panels that were in the truck there?

6    A.    Yes, I did.

7    Q.    Before we go into there, when Mr. Huff was arrested, you

8    were on the scene, obviously, correct?

9    A.    Yes.

10   Q.    And was Mr. Huff carrying a firearm?

11   A.    He was.

12   Q.    And what did you do, if anything, with regard to that firearm?

13   A.    When we were calling him out, we were doing what is

14   commonly known as a felony stop where we call him back on a

15   public address system on our cruiser. He stepped back from the

16   truck, we could see that he had a Government Model .45 on his

17   right hand side, in a holster.

18         We made him step backwards, walk backwards towards us,

19   made him go down onto his knees, and then he was arrested. And

20   the state trooper that was actually physically arresting him took the

21   holster off of his side and placed it on the top of my cruiser, which

22   was the lead car in line, so it's on the hood of my cruiser.

23   Q.    At this time, I'd like to show you what's been marked for

24   identification as Government's Exhibit 25.

25              MR. MACKIE:    Is there an objection?

1      MR. GREEN: We have no objection.

2      MR. MACKIE: Your Honor, at this time, I would

3   move in evidence Government Exhibit 25.

4      THE COURT: So admitted.

5      MR. MACKIE: And may I publish it to the jury?

6   (Government's Exhibit No. 25 received into evidence.)

7   Q.    Can you describe to the jury what that is?

8   A.    That is the weapon in the holster that Mr. Huff was wearing at

9   the time of his arrest.

10  A.    And what kind of weapon is that?

11  A.    It's a Government Model .45.

12  Q.    And what did you do with that afterwards?

13  A.    Once Mr. Huff was in custody, I went back to my cruiser, took

14  the weapon out of the holster, ejected the magazine, which is the

15  part that goes into the butt of the weapon that holds the rounds for

16  the ammunition. And I locked the slide to the back to make sure

17  there was no round inside the chamber and then laid it out on the

18  seat to take a picture of it, and then it was confiscated by the FBI.

19  Q.    And so you turned it over to who?

20  A.    The FBI.

21  Q.    And, to your knowledge, that's been in their custody since?

22  A.    Yes.

23  Q.    All right. Let's go back to– just taking a glance back to 23.

24  I'm going to go back here again. This is a picture of the side panel

25  truck, right?

1    A.    Correct.

2    Q.    Now, can you give us, give the jury, an idea of which panels

3    did you open up and search, all of them or–

4    A.    Yeah, all of them.  You start with the passenger's– or the

5    driver's side front door and you work your way around the truck

6    clockwise so you can keep an inventory of what you find, as you

7    find it.

8    Q.    At this time, I'm going to ask you to take a look at what's

9    been marked for identification as Government Exhibit 26, which I

10   understand has–

11                  MR. MACKIE:    Does the Defendant have an objection?

12                  MR. GREEN:  No.

13                  THE COURT:  So admitted.

14                  MR. MACKIE:    At this time, I would move in evidence

15   Government Exhibit 26.

16                  THE COURT:  Thank you. So admitted.

17            (Government's Exhibit No. 26 received into evidence.)

18   Q.    And can you tell the jury what this is?

19   A.    That is a picture of the compartment that is over the wheel

20   well, so it would be the second compartment of the utility bed.  The

21   door folds down to make it like a little table, as you see. On the left

22   hand side you'll see a green military ammunition box.  The green

23   bag, cloth bag, that's laying out there is a magazine carrier. And

24   then the magazine for the rifles with the rounds that were inside the

25   magazines are laid out, and then the green bag is another magazine

1   carrier.

2   Q.    What's on the far right?

3   A.    A magazine carrier. It's where more magazines were inside.

4   Q.    So the green bag on the left and the green bag on the right

5   both carried magazines?

6   A.    Correct.

7   Q.    When you opened up the truck, where were the magazines?

8   I'm talking about these ammo magazines.

9   A.    They were inside the green bags inside the compartment there.

10  Q.    And did these magazines contain ammunition?

11  A.    Yes, they did.

12  Q.    Did you, at that time, based on your training and experience,

13  did you have an idea what kind of magazines these were?

14  A.    They're commonly referred to as AK-47 magazines or MAK-

15  90 would be this model if it were to fire semiautomatic.

16  Q.    And I think you said the green box in the upper left hand

17  corner?

18  A.    Yes.

19  Q.    What was that?

20  A.    That is a standard issue military ammunition can.

21  Q.    We're going to discuss these items more specifically, but

22  before we do, I want to ask you, did you look into the front

23  compartment of this truck?

24  A.    Yes, I did.

25  Q.    And did you find some things there?

1   A.      Yes. There was a bunch of electronic items. There was a

2   Garmin Blackberry cell phone, a video camera, a laptop computer,

3   some business cards with Mr. Huff's name on it stating that he was

4   a lieutenant with the militia.

5   Q.      I'd like to show you what's been marked for identification

6   Government 30 and 35.

7           MR. GREEN:   No objection.

8           MR. MACKIE:     No objection from the Defendant. I

9   would move in evidence Government's Exhibits 30 and 35.

10          THE COURT:   So admitted.

11          (Government's Exhibit Nos. 30, 35 received into evidence.)

12  Q.      Taking a look at Government Exhibit 30, can you describe

13  what that is?

14  A.      That is the Blackberry that was found in the console in the

15  center of the passenger compartment.

16  Q.      Did you seize that Blackberry?

17  A.      It was taken into evidence by the FBI, yes.

18  Q.      Can you read what is that card that's next to it there? Did you

19  see that, did you take that into evidence as well?

20  A.      I believe the card was taken into evidence by the FBI, and it

21  says, "Chaplain, 2nd Lieutenant, Georgia Militia, Darren Huff."

22  Q.      All right. Let's turn our attention to Government's Exhibit

23  35. Can you tell us what that where that was and what did you find

24  there?

25  A.      That is in the passenger's compartment, on the seat of the

1    truck, and it's a citizen's arrest warrant issued by a Walter

2    Fitzpatrick, III. It is basically how I found it in the truck just like it

3    is. There was the map, the sheriff's constitution, the camouflage

4    hat, and then it's arrest paperwork.

5    Q.    Now, let's just focus for a moment on those pieces of paper.

6    We're going to look at Government Exhibit Two. Does that look to

7    you like the affidavit– excuse me– the citizens' arrest warrant that

8    you found in there?

9    A.    Yes, sir, it is.

10   Q.    And let's look at Government's Exhibit Three that's also been

11   admitted into evidence. Is that the other document that was in

12   there?

13   A.    Yes, sir, it is.

14   Q.    And what did you do with those things?

15   A.    I left it where it was, photographed it. The FBI came and

16   confiscated it.

17   Q.    All right. Let's go back to Government Exhibit 35, if we may.

18   I notice there looks to be a map there. Was there any indications on

19   the map of anything that caught your attention?

20   A.    The map book had circles in it, you know, like he was going to

21   certain places. And then with the Garmin that was in the truck, it

22   was matching up to where he was going to, like sheriff's

23   departments in East Tennessee.

24   Q.    Right. So it looked to be like county seats or something like

25   that?

1    A.    Correct.

2    Q.    All right. Let's turn our attention back, if we would, to

3    Government Exhibit 26, please. Now, you found, I think, these

4    items right here in that panel that was, I believe you described it,

5    was on the driver's side over the wheel well, correct?

6    A.    Correct. You can see the wheel right below the picture there.

7    Q.    Just to keep us busy there, let's just look at 23 for a moment,

8    just to make sure we know exactly what we're– is that the one

9    that's the lower or the higher over the wheel well?

10   A.    It's the longer, higher one above the wheel well, above where

11   the gas refills are.

12   Q.    All right. Going back to 26. I'm going to ask you to take a

13   look at what's been marked for identification as Government

14   Exhibit 27A through 27H. You may take a look inside and tell us

15   whether that's something that you recognize and whether that's

16   something that relates to the items that you seized that day, on

17   April 30th, that is displayed in Government Exhibit 26.

18   A.    This is the magazine holder that you'll see on the left hand–

19   Q.    Well, before you go through it, just looking through there,

20   does it look to be some of those items that we're talking about?

21   A.    Yes.

22              MR. MACKIE:   Your Honor, at this time, I would move

23   into evidence Government Exhibit 26–

24              MR. GREEN:   No objection.

25              MR. MACKIE:    I mean– excuse me– 27A through H.

1          THE COURT:  So admitted.

2          (Government's Exhibit Nos. 27A-H received into evidence.)

3     Q.     All right.  Now, let's talk about it.

4     A.     This is the green magazine carrier that you will see on the left

5     hand side of the picture. Inside it was two, four– I think there was

6     five magazines in this one. And then this is the magazine pouch

7     you will see on the right hand side, and there were four in this one,

8     or three, three or four.  And then the magazines, as you see, were

9     loaded just like this, and they were inside the magazine pouches.

10    Q.     So those right there are as they were at the time? They were

11    loaded when you found them as they are now, right?

12    A.      Yeah. I should have a picture of me holding one, showing the

13    pictures of the bullets inside.

14    Q.     We're at this time identifying these particular clips.  Are

15    some containing a certain amount of ammunition and others–

16    describe for me whether they're all the same or ammunition clips?

17    A.     They are all basically the same.  They are all AK-47

18    magazines.

19    Q.     Containing how many rounds?

20    A.     It says holds 30, but usually everybody keeps like 28 in them

21    to keep the spring from going weak if you're going to store them in

22    there for a long time.

23    Q.     So those were all loaded?

24    A.     Yes.

25    Q.     An so each one of those clips then are the same size or are any

1    longer?

2    A.    They appear to be about the same size. I don't see the one

3    that– there should be another one that's 40. It's a longer one.

4    Q.    What's that?

5    A.    There was another one, I think. There was a longer one.

6    Q.    All right. So could you hold them up for the jury just so they

7    could see the size? And those are?

8    A.    These are 30-round magazines.

9    Q.    Thirty rounds?

10   A.    Yes.

11   Q.    Now, the longer ones would have held more rounds than 30?

12   A.    Forty.

13   Q.    Forty?

14   A.    They make them 40, 50, and then there are like a drum that

15   holds 100.

16   Q.    Now, are you familiar with, in a sense, the AK-47 magazine

17   clips?

18   A.    Yeah.

19   Q.    Is there a difference on the open market between obtaining a

20   30-round clip and a 40-round clip?

21   A.    The high-capacity magazines, after the Brady laws came out,

22   basically made it illegal to own a high-capacity magazine more

23   than a standard 20- or 30-round magazine. So if you get the extra

24   long ones or the extra capacity, you have to be in law enforcement

25   or military.

1  Q.   That was fast for me.

2  A.   Okay.

3  Q.   So those 30-round clips, are those you can buy on the market?

4  A.   Yes. You can buy them online.

5  Q.   But there were two that had 40-round clips, right?

6  A.   Yes.

7  Q.   Now, where can you get those?

8  A.   Those are supposed to be for sale just to military and law

9  enforcement. You know, how he got them, I don't have a clue.

10 Q.   You don't know where they came from?

11 A.   No.

12 Q.   But there is a difference between the 30-round and 40-round

13 clips as far as the–

14 A.   Yes. Availability and legality of having them, yes.

15 Q.   And, you said, because the 40-round clips are restricted under

16 the law?

17 A.   Correct.

18 Q.   To military?

19 A.   Military and law enforcement.

20 Q.   Okay. You can put them back in the box there. I'm going to

21 show you Government Exhibit 27.

22       MR. MACKIE:   Your Honor, the United States would

23 move into evidence Government Exhibit 27 as a substitute for the

24 actual magazine rounds.

25       MR. GREEN:   Your Honor, I don't have an objection to

1    that, but I would ask that the actual exhibit be left up there,

2    because I want to ask Detective Walker a couple questions about

3    them.

4              THE COURT:   Place them in the box there.

5    Q.    So just, once again, for purposes of the record, that

6    Government's Exhibit 27 depicts what you were just discussing,

7    27A through H, as far as the magazine rounds; is that correct?

8    A.    Correct.

9    Q.    All right.  Take us back to 26. Let's discuss the ammo box.

10   I'm going to show you what's been marked for identification

11   Government Exhibit 29. Based upon your observation of the tags,

12   do you recognize that?

13   A.    Yes. This was the box was in the truck when we found it.

14   Q.    And was it empty or did it contain stuff?

15   A.    It contained ammunition.

16   Q.    All right.  Let's take a look at Government Exhibit 28, which

17   I'll show you has been marked for identification. Do you recognize

18   that?

19   A.    That was what was inside the box when I popped the lid open,

20   and that's my hand holding it, taking the picture.

21             MR. MACKIE:   Your Honor, at this time, I would move

22   in evidence Government Exhibit 28.

23             MR. GREEN:   No objection.

24             THE COURT:   So admitted.

25        (Government's Exhibit No. 28 received into evidence.)

1    Q.    Now, at this moment, at this time, can you tell us whether

2    there were rounds in the ammo box?

3    A.    Yes.

4    Q.    Does it look similar to what this picture shows?

5    A.    Yes, it does.

6    Q.    After the fact, maybe not at that time that you were taking the

7    pictures, but subject to the inventory, can you tell the jury, do you

8    have an idea how many ammunition rounds were contained

9    between the box and ammo clips?

10   A.    There was probably about 400 in here and between 750, 800 in

11   the truck all together.

12              MR. MACKIE:    Your Honor, at this time, the

13   Government would move into evidence Government Exhibit 29A as

14   a substitute for the actual ammunition and ammunition box.

15              MR. GREEN:    Once again, no objection, with the same

16   qualification.

17              THE COURT:    That's fine.

18         (Government's Exhibit No. 29A received into evidence.)

19   Q.    Moving back to, just for point of reference, then, to

20   Government Exhibit 23, did you find– let's see. Did you find

21   something in the lower side panel over the wheel well?

22   A.    The one to the left of the side panel, the first one right behind

23   the driver's side door, was a bunch of survival equipment.

24   Q.    And was there any other– another weapon in that?

25   A.    There was a Kel-Tec survival rifle, folding rifle.

1    Q.    So that's the one immediately past the driver's door?

2    A.    Correct.

3    Q.    So let's turn to Government Exhibit 31, been marked for

4    identification, but at this time– well, do you recognize that as what

5    was in that panel box?

6    A.    Yes. That's the picture I took with the rifle in between the

7    ground sleeping mat and the tent.

8              MR. MACKIE:    Your Honor, at this time, the

9    Government would move into evidence Exhibit 31.

10             THE COURT:   So admitted.

11      (Government's Exhibit No. 31 received into evidence.)

12   Q.    Can you describe in that picture what you found in this box

13   that was behind, that panel box that was right behind the driver's

14   door?

15   A.    Starting, it was divided into two shelves, so it had three

16   compartments inside this door area. The very bottom part is what

17   you're seeing right now, has a tent with a Kel-Tec rifle that folds in

18   half laying on top of the tent.  And then the green round thing on

19   top is a military foam sleeping mat that rolls out and you sleep on

20   it, keeps you off the ground.

21             Next one up at the top left you will see a little camouflage bag

22   that had a Ghillie suit in it.  A Ghillie suit is something that

23   marines or snipers use to camouflage themselves if they're going to

24   go out into the woods. The orange thing right next to it was a

25   blanket.  The next shelf up had a pair of combat boots, tan in color;

1    canteen, military-style plastic canteens, with chrome canteen cups;

2    dry good foods, bottled water, stuff like that.

3    Q.    At this point, I'm going to ask you to take a look at

4    Government Exhibit 32 and ask if you recognize that?

5    A.    Yes. This is the Kel-Tec rifle that was folded up underneath.

6    Q.    Just one moment. Now, I just wanted to make sure we're in the

7    right succession here. So we were now talking about– remind me.

8    What is that, this 20–

9    A.    Thirty-one.

10           MR. MACKIE:    Thirty-two, correct?

11           THE COURT:    Yes, the present weapon is 32, is what

12    you said.

13           MR. MACKIE:    Thirty-two, your Honor, we'd move it

14    into evidence at this time.

15           MR. GREEN:    Same, no objection, but subject to the

16    qualification.

17           THE COURT:    So admitted.

18       (Government's Exhibit No. 32 received into evidence.)

19    Q.    Now, can you discuss– and we're going to see a picture of it,

20    but what is that? Is it folded up, is that how it looks?

21    A.    Yes.

22    Q.    Or what is that?

23    A.    This is how it kind of like folds up to be stored. In order to

24    release it and bring it out, you push down the little release pin, then

25    it folds out, and it's being prevented to lock all the way because of

1    the stripper clips. But when it folds all the way out, it will make a

2    rifle that you can use.

3    Q.    All right. And you were saying in a moment when I was

4    conferring with counsel, what is the nature of that weapon? What's

5    it called, what model is it?

6    A.    It's a survival rifle, something you would take like put in the

7    car or something if you had to be out in the woods to survive. It's a

8    small, smaller rifle.

9    Q.    And what's the model number, I mean, not the serial number.

10   You called it, said a Kel-Tec?

11   A.    Yeah, Kel-Tec, K-e-l, Tec, T-e-c.

12   Q.    And was it .40-caliber?

13   A.    I believe this one was, yes.

14   Q.    Now, what type of ammunition does that use?

15   A.    Basically, the same type we carry at the sheriff's department.

16   It's a pistol cartridge, .40-caliber, and it uses the– actually exactly

17   the exact same magazines that we use. We can take them out of our

18   pistols and actually put them into the this rifle and it will function.

19   Q.    Okay. Now, did you find in this truck any ammunition clips

20   that fit the Kel-Tec 40?

21   A.    Yes. There were two 30-round extended pistol magazines for

22   this and then two 15-round magazines for it.

23   Q.    All right. At this point, I'm going to ask you to take a look at

24   Government Exhibit 33A through D.

25              THE COURT:   What were the number on these again,

1    what number is this?

2            MR. MACKIE:    This is Government Exhibit 33A, B, C,

3    and D.

4            THE COURT:    All right.  Without objection, so

5    admitted.

6            MR. GREEN:    No objection.

7        (Government's Exhibit No. 33A through B received.)

8    Q.    Detective Walker, Can you tell us what those are?

9    A.    This is a 30-round clip or a magazine for the weapon, and

10   basically it would feed into the handle/stock area, just slide up

11   inside, and then function. These are the– these hold 28 rounds, but

12   with the extended butt stock on there it could hold 30.  So it would

13   have 30 in each one of these. And then these are your standard

14   pistol magazines. They will also function the same way.  You slide

15   them up inside there and it will fire the ammunition.

16   Q.    And when you found them that day, were they loaded as they

17   are here now?

18   A.    Yes, they are.

19           MR. MACKIE:    Your Honor, I'm going to bring up

20   Government Exhibit 32A.

21   Q.    Can you tell us, Detective Walker, does that look to be the

22   actual weapon that you are looking at, which is Government

23   Exhibit 32, the Kel-Tec 40?

24   A.    That is what it looks like when it's fully– it's not locked.

25           MR. MACKIE:    Your Honor, we would submit that

1    into evidence at this time as a substitute for the actual weapon.

2              THE COURT:   So allowed.

3         (Government's Exhibit No. 32A received into evidence.)

4    Q.    And at this time also, if we would look at Government

5    Exhibit– if you would look at Government Exhibit 33.  Detective

6    Walker, do you recognize that?

7    A.    Yes. That's a picture of these magazines.

8              MR. MACKIE:    And, your Honor, we would offer this

9    in evidence as a substitute for the actual magazines and ammo.

10             THE COURT:   So allowed.

11        (Government's Exhibit No. 33 received into evidence.)

12   Q.    Now, pulling it together, if we look at Government's Exhibit

13   34, do you recognize those as– tell me what they are.

14   A.    These are the same magazines, same rifle, and that would be a

15   demonstration on how that magazine would fit into the rifle to be

16   able to function.

17             MR. MACKIE:    Your Honor, at this time, we would

18   offer in evidence Government Exhibit 34.

19             MR. GREEN:   No objection.

20             THE COURT:   So admitted.

21        (Government's Exhibit No. 34 received into evidence.)

22   Q.    I'd like you to take a look at what's been marked for

23   identification as Government's Exhibit 30– excuse me– 44.

24             THE COURT:   Is this 44?

25             MR. MACKIE:    Forty-four.

1         MR. GREEN:  No objection.

2         THE COURT:  So admitted.

3     (Government's Exhibit No. 44 received into evidence.)

4    Q.    Can you describe, Detective Walker, what is the– this is a

5    composition, I guess a picture that has a number of items in here.

6    Can you describe what this is and where you found it in the truck?

7    A.    All these items were taken out of the truck or the bed of the

8    truck.  The backpack that you see on the far left, that was in the last

9    compartment on the driver's side of the pickup truck. That would

10   have been the third door on the bed of the truck on the driver's

11   side.

12        The tan combat boots, those were in the first compartment, on

13   the top shelf.  The green roll that you see, that is that military

14   sleeping mat that you see, that was on the bottom shelf of the first

15   door behind the driver's compartment.  That was what the Kel-Tec

16   rifle was underneath.  The camouflage bag, that is that Guillie suit

17   I was telling about that is the sniper uniform to hide you in the

18   woods.  Of course, then all the paperwork you see on the floor there

19   is what we found in the cab of the truck, to include some of the

20   recruiting posters.

21        Now, that was in a cardboard box on the passenger side, one

22   of the compartments right behind the passenger's side door. Had

23   also "Support your local militia" stickers inside the same

24   cardboard box. The pamphlet there, the multi-colored pamphlet

25   there towards the middle bottom, I believe that's the one that says

1    the "American Sheriffs." It's basically a sovereign citizen

2    movement believes that the sheriff's department is the only legal

3    law enforcement in the country because it's under the constitution.

4        If you go right above that, you will see a green military web

5    belt with a magazine pouch that held two clips for the .45

6    automatic that he was wearing on his side. That was in the long

7    compartment, above the wheel well, where all the rest of the

8    magazines and the ammo, ammunition, were found.

9        The little gray, round thing right above the belt, it actually

10   should be almost right in the center of your page, that is a military

11   mess kit. Basically, you flip it open and it's got like a little frying

12   pan, you can make it into a frying pan, and it's got a plate and then

13   a little pot, stuff like that. It's common issue for the military.

14       The gas mask right next to it is the gray thing with the

15   goggles on it, that is a gas mask with a gas mask filter or cartridge

16   that actually spins into the side, and it's made to defeat any kind of

17   chemical agent that might be sprayed or put out in your area.

18       The two green things with the silver cups that are right next to

19   the gas mask, those are military canteens. The little cups that are

20   sitting are the canteen cups, and that's actually carried inside a

21   carrier with a canteen. That's standard issue. Then, of course,

22   you've got your bags that all this stuff was being carried in.

23       In the center of the page, it's actually on the hanger, is the

24   black vest-like thing, is a tactical vest that you can put your

25   magazines in so you can carry into the woods, kind of like an

1   assault vest. And then there are– the big green thing in the back, is

2   a jacket.

3   Q.   If you made mention, I want to– this thing here is a gas mask?

4   A.   Yes, it is.

5   Q.   Was it independent or did it have– was it operable?

6   A.   It was operable. Yeah, you just put the cartridge in, you spin

7   it in, you just screw it in, and you take the white tab out of the end

8   so the air will flow and it's operational.

9   Q.   So you don't have like another bag?

10  A.   No. It just fits on and you breathe through the cartridge.

11  Q.   And what's that behind that?

12  A.   I can't make that out.

13  Q.   If you can tell, behind the canteens.

14  A.   I'd be guessing.

15  Q.   You can't tell?

16  A.   Yeah, I can't tell. I'm sorry.

17  Q.   And just the last thing and maybe I didn't hear. What's that

18  right there next to that?

19  A.   That is the Ghillie suit.

20  Q.   That's the Ghillie suit. Now, lastly, I think we, I think– I

21  want to make sure I cover this. Do you remember the ammo box up

22  there?

23  A.   Yes.

24  Q.   It contained ammunition for what type of weapon?

25  A.   An AK-47.

1    Q.    And between the clips– and just want to make sure, the clips

2    and the ammo box, you estimate the total amount of rounds for the

3    AK-47 was about how much?

4    A.    There was a little over 400 rounds in here. Most of it was AK-

5    47 ammunition. And then the total in the truck, there was three

6    different calibers; there was .45, .40-cal, and 7.62 by 39, which is

7    the AK rounds, was between 750 and 800 rounds.

8                 MR. MACKIE:    Just one moment.

9    Q.    Just check and make sure, I want to make sure, is Exhibit 29

10   the ammo box itself?

11   A.    Yes, it is.

12                MR. MACKIE:    Your Honor, I just want to check. Did

13   I move that in evidence; if not, I do at this time.

14                THE COURT:  What was the number again?

15                THE WITNESS:   Twenty-nine.

16                MR. MACKIE:   Twenty-nine.

17                THE COURT:  I don't have it, so we'll move 29, and

18   admit 29 into evidence.

19        (Government's Exhibit No. 29 received into evidence.)

20   Q.    If we wanted to, going back to Government's Exhibit 30– all

21   right. Government's Exhibit 30, can you tell us again where you

22   found this, what it is?

23   A.    It's the Blackberry was in the center console of the truck. The

24   center part of the seat folded down, and there was cupholders, and

25   it was sitting in there.

1    Q.    All right.  And this Blackberry was turned over to the FBI?

2    A.    Correct.

3              MR. MACKIE:    Your Honor, at this time, I would wish

4    to offer into evidence Government Exhibit 22, which is a

5    stipulation relating to the Blackberry and the Blackberry text,

6    certain text that were found in the Blackberry.

7              MR. GREEN:   Your Honor, we've stipulated that they

8    don't have to bring in the FBI tech. to say that these are the text

9    that came off of this, but I think it might be more appropriate to

10   enter the stipulation between witnesses rather than in the middle of

11   one.  But as far as putting this in, no, we've agreed.

12             THE COURT:   Now, what is 22? Is it a photo of the

13   Blackberry?

14             MR. MACKIE:    It is a stipulation of certain contents

15   of the Blackberry text.

16             MR. GREEN:  This is what was done by way of the

17   stipulation, your Honor, is it's being– the stipulation being done in

18   lieu of a witness.

19             THE COURT:   If that's accurate, do you need to ask

20   this witness about the stipulation?

21             MR. MACKIE:    No, your Honor.

22             THE COURT:   All right.  Then let's just wait until after

23   the witness to introduce the stipulation. Thank you.

24             MR. MACKIE:    In which case we can absolutely

25   introduce the stipulation afterwards and publish it at that time.

1   That is all the questions I have of the witness.

2           THE COURT:   All right.  Why don't we do this? Let's

3   go ahead, before we start cross, let's go ahead and take our

4   afternoon break, 15 minutes.

5           MR. GREEN:   We can do that. I'm not going to be very

6   long at all with him, but I don't care to take a break.  That's fine.

7           THE COURT:  We need to go ahead and take a break.

8           (Recess had at 3:21 p.m.; reconvened without jury 3:43 p.m.)

9           THE COURT:   I believe we're ready for our jury.  Do

10  you have more, Mr. Mackie?

11          MR. MACKIE:    I made a mistake on one things. I

12  wanted to clarify one thing.

13          THE COURT:   Okay.  Bring our jury in.

14          (Jury reconvened in courtroom at 3:45 p.m.)

15          THE COURT:   All right.  Thank you. Everyone may be

16  seated.  Mr. Mackie?

17          MR. MACKIE:    Yes, your Honor. Thank you.

18  Q.    Detective Wilson (sic), I believe I was asking you a question

19  relating to the magazines.

20  A.    Yes.

21  Q.    Magazines which are the AK-47 versus the Kel-Tec?

22  A.    Yes, sir.

23  Q.    Let me look at the exhibit– or can you tell me? It's easy

24  enough. What are the magazines for the AK-47, Exhibit 37?

25  A.    27E.

1    Q.    Twenty-seven. And what is the Kel-Tec?

2    A.    Thirty-three.

3    Q.    What's that?

4    A.    Thirty-three.

5    Q.    Okay. Now, I was asking you whether one of those magazines

6    were of the type that were military related versus the other, and I

7    asked you about the AK-47s. Are those of a length that have to be

8    or are restricted under the Brady law?

9    A.    No. These are military 30-round standard magazines.

10   Q.    So you could obtain those wherever?

11   A.    Yes. You can buy them at gun shows and stuff.

12   Q.    What about the extended length Kel-Tec ones?

13   A.    These are restricted to law enforcement and military.

14   Q.    So I had that backwards?

15   A.    Yes.

16   Q.    It's the Kel-Tec that was restricted?

17   A.    Correct.

18   Q.    Not the AK-47?

19   A.    Not these.

20              MR. MACKIE:    That's all I have. Thank you.

21              THE COURT:   Thank you. Cross- examination?

22                          **CROSS-EXAMINATION**

23   by Mr. Green:

24   Q.    Detective Walker, how are you, sir?

25   A.    Very good, sir.

1    Q.    Just a few questions, if we could. Everything you've got

2    stacked up there in front of you–

3            MR. GREEN:   Could we flash up Number 23, please?

4    Q.    Now, all of that came out of that truck, correct?

5    A.    Correct. Everything here came out of this truck.

6    Q.    That matched the truck he was driving on April 30th, correct?

7    A.    Correct.

8            MR. GREEN:   Flash up Number Ten, please.

9    Q.    He wasn't driving in that truck, was he?

10   A.    No, sir, he wasn't.

11   Q.    And that truck, I guess you've learned, was the one that was

12   driven on April the 20th to Tennessee, or do you know?

13   A.    I do not. I wasn't involved in that, sir.

14   Q.    You don't even know if that's his truck, do you?

15   A.    No, sir, I don't.

16   Q.    So the Kel-Tec that you found, you didn't find in that truck,

17   did you?

18   A.    No, sir. It was in the camouflage truck.

19   Q.    The Kel-Tec extended magazine and magazines that you

20   found, you didn't find in that truck, did you?

21   A.    No, sir. They were in the camouflage.

22   Q.    And the AK-47 rounds that you found– now, show those

23   again.

24   A.    All of them?

25   Q.    Just a couple of them. Those weren't found in that truck,

1    either, were they?

2    A.    No, sir.

3            MR. GREEN:   May I approach the witness, your Honor?

4            THE COURT:   Yes. Do you want to get an exhibit?

5            MR. GREEN:   Just I want to, if I could just spend one

6    moment next to him, I want to look at one thing with him.

7            THE COURT:   That's find. Go ahead.

8    Q.    Now, these AK-47– you said there wasn't an AK-47 found

9    inside of the camo-truck when you stopped it, correct?

10   A.    No, sir, there was not.

11   Q.    And these rounds won't fire from that gun, will they?

12   A.    No, sir.

13   Q.    They won't fire from that .45, either, will they?

14   A.    No.

15   Q.    So, basically, all Mr. Huff could do with those rounds that day

16   was throw them at people, right?

17   A.    Yeah.  They couldn't be fired, yes.

18   Q.    So he was about as dangerous as Ernest T. Bass with a rock

19   that day, as far as those AK-47 rounds were concerned, correct?

20   A.    As far as those, yes.

21   Q.    All right.  Thank you. Now, you said you're the supervisor, I

22   believe, of the gang squad over at the sheriff's department, Joint

23   Task Force for Terrorism?

24   A.    Yes, sir.

25   Q.    So that means that you're, I'm assuming, kind of in charge of

1   the intelligence coming in from the local street gang scene,

2   correct?

3   A.    Correct.

4   Q.    You don't have any intelligence that Mr. Huff was out trying

5   to recruit Gangster Disciples to help him, do you?

6   A.    No, sir.

7   Q.    You don't have any evidence that he was out attempting to

8   recruit Vice Lords to help him, do you?

9   A.    No, sir.

10  Q.    Or Crips or Bloods?

11  A.    No, sir.

12  Q.    In fact, what you found the day that you stopped him, I

13  believe you told us a few minutes ago, was you found a map,

14  correct?

15  A.    Yes.

16  Q.    And that map had various sheriffs' department locales

17  circled, correct?

18  A.    Correct.

19  Q.    It had Greene County circled?

20  A.    Yes.

21  Q.    Had Greeneville P.D. circled?

22  A.    That one, I don't know about the Greeneville P.D., but it was

23  in the same county, yes, sir. I don't know exactly where every place

24  is.

25  Q.    Had Sevier County circled?

1   A.    Yes, sir.

2   Q.    And it had Loudon County circled, didn't it?

3   A.    Yes.

4   Q.    And did you say you looked at his TomTom as well?

5   A.    Yeah, the Garmin. It was in there and it got confiscated, and I

6   heard that it matched everything on there.

7   Q.    Okay. So the Garmin, as well, confirmed and matched the fact

8   that the only locations that he found or had programmed in, either

9   on a map or his Garmin, were to go to sheriffs' departments in East

10  Tennessee?

11  A.    As far as I know, yes, sir.

12  Q.    All right. Now, everything that you found in there, the camo–

13  what was the exhibit number, please, that had all the stuff stacked

14  up? Was it 34? If you could draw that up, please, look at that,

15  please.

16  A.    Yes, sir.

17  Q.    Now, the camo stuff, a person would put that on, they would

18  blend in better in the woods, wouldn't they?

19  A.    Yes, sir.

20  Q.    Can you think of any way that's going to help you blend in if

21  you're trying to take over a courthouse?

22  A.    Not unless it's in a wooded area.

23  Q.    What about the gas mask? Now, that was also found in that

24  camo-truck, correct?

25  A.    Yes, sir, it was.

1  Q.     And on the Blackberry that you seized and turned over to the

2  FBI, there was also some pictures, weren't there?

3  A.     I don't know, sir. I didn't look at it. I just found it, I turned it

4  over to the FBI. I did not look in it.  I can't tell you what's in it.

5  Q.     So you don't know that, in fact, there were pictures on there

6  that, on that Blackberry, that showed field training exercises with

7  the Georgia Militia?

8  A.     No, sir, I did not.

9  Q.     And everything that you found here would be consistent with

10  somebody who wanted to go out in the woods and shoot guns and

11  do field training exercises, correct?

12  A.     Sure.

13  Q.     The AK rounds that you found, perfectly legal for somebody

14  with a carry permit to have, aren't they?

15  A.     Anybody can buy it.

16  Q.     Anybody can?

17  A.     Yes, sir.

18  Q.     The Kel-Tec that you found, perfectly legal for someone with

19  a carry permit to have that, isn't it?

20  A.     Yes, sir.

21  Q.     The .45 that you found, perfectly legal for somebody with a

22  carry permit to have that even on their side, isn't it?

23  A.     If they have a carry permit when they're supposed to be

24  concealed, yes, sir.

25  Q.     But the big issue is having the carry permit, right?

1    A.    Yes.

2    Q.    Did you happen to–

3              MR. GREEN:   Could we flash back up 23, please?

4    Q.    What can you tell us about how thoroughly you inspected that

5    truck? I mean, you looked around it, kind of inside and outside of

6    it, right?

7    A.    Yes, sir.

8    Q.    Can you explain to the jury how the bed of that truck had been

9    modified?

10   A.    It's– as far as I know, it hasn't been modified. It's a standard

11   utility bed.

12   Q.    Just a standard utility bed, right?

13   A.    Correct.

14   Q.    And you didn't see any bracket on there to put an anti-aircraft

15   gun on?

16   A.    No.

17   Q.    Thank you. Now, you all did a felony stop on Mr. Huff,

18   correct?

19   A.    Correct.

20   Q.    And that's because you had a warrant for his arrest from

21   federal court for a felony offense, correct?

22   A.    Correct.

23   Q.    You've been a cop for?

24   A.    Eighteen years.

25   Q.    Eighteen years?

1    A.    Yes, sir.

2    Q.    Knox County Sheriff's Department?

3    A.    City.

4    Q.    Knoxville City Police Department, correct?

5    A.    Correct.

6    Q.    And you were a parole officer for a long time, weren't you?

7    A.    Ten years, yes.

8    Q.    Can you think of a time in your law enforcement career where

9    you did a felony stop for somebody running a stop sign and only

10   for running a stop sign?

11              MR. MACKIE:    Objection, your Honor.  This is not

12   relevant to anything related to what he testified to.

13              THE COURT:   I'll sustain the objection.

14   Q.    The truck, when you pulled Mr. Huff over, was heading south

15   on 75, correct?

16   A.    Yeah, westbound on I-40, yes, sir, south.

17   Q.    Okay.  He was headed back towards Georgia, correct?

18   A.    Correct. Yes.

19   Q.    Okay.  About what time of the day would this have been?

20   A.    I don't remember an exact time, sir.  It was probably around

21   noon-ish, in the evening sometime.

22   Q.    Daytime, noon-ish?

23   A.    Yeah, yeah.

24   Q.    And from Knoxville, Tennessee, where was it that you pulled

25   him over? Did you say that was around Papermill?

1   A.   Yes, sir.  Right in between Papermill and 640, I-40.

2   Q.   From Papermill, are you familiar where Cartersville, Georgia,

3   is?

4   A.   No, sir, I'm not.

5   Q.   Do you know how far it takes to get from Knoxville,

6   Papermill, to Atlanta?

7   A.   Three and a half, four hours, depending how you drive.

8   Q.   And everything that you found that you've got stacked up

9   there in front of you came out of that truck, not the black one,

10  right?

11  A.   Correct.

12          MR. GREEN:   That's all.

13          THE COURT:   Thank you. Any redirect?

14          MR. MACKIE:    Couple things.

15                    **REDIRECT EXAMINATION**

16  by Mr. Mackie:

17  Q.   You were asked about whether the AK-47 magazines and the

18  rounds were legal, and I believe you said they were what?

19  A.   They are legal for people to possess.

20  Q.   Look at Exhibit 33A and B. That's the Kel-Tec magazines, the

21  long ones?

22  A.   Yes.

23  Q.   Is that those, right?

24  A.   Yes, sir.

25  Q.   Can you tell me, are those restricted?

1   A.      Yes. These are restricted to law enforcement and military

2   personnel.

3   Q.      So a non-law-enforcement person owning that would not be

4   legal?

5   A.      No, sir, it would not.

6   Q.      And let me ask you one thing. He was talking about how– I

7   believe the question was, were the AK-47s, the rounds just by

8   themselves can't hurt anybody. Do you believe, from your training

9   and experience, that if you put that 40-round Kel-Tec magazine

10  into the Kel-Tec gun, could you shoot somebody?

11  A.      Yeah. They're 30-rounds, but yes.

12  Q.      Thirty rounds?

13  A.      But it basically makes it into the a small assault rifle.

14  Q.      So in your training and experience is that small assault rifle

15  good for shooting squirrels or shooting people?

16  A.      This is designed to shoot people.

17          MR. MACKIE:    I have no further questions.

18          THE COURT:   Any recross?

19                    **RECROSS-EXAMINATION**

20  by Mr. Green:

21  A.      And it takes the act of another person holding the gun, pulling

22  the trigger, to make it shoot somebody, doesn't it?

23  A.      Correct. It doesn't go off by itself.

24  Q.      Can't go off by itself. And this was on April the 30th, wasn't

25  it, that you stopped Mr. Huff?

1   A.   Correct, sir.

2   Q.   Okay. Are you aware of any evidence that he had that Kel-Tec

3   with him on April the 20th?

4   A.   No, sir. I had no contact.

5   Q.   Don't have the first clue about that, do you?

6   A.   No, sir.

7   Q.   Could you help me out, because I'm a little bit dense here.

8   What does whether or not he had an extended magazine on the 30th

9   have to do with his intent on the 20th? Can you help me out there?

10  A.   All I know is, he had these on the 30th inside the camouflage

11  truck. I don't know anything about the 20th.

12  Q.   And is that a different truck than he was in on the 20th, right?

13  A.   Correct.

14          MR. GREEN:   That's all.

15          THE COURT:   Thank you. Officer, you may be excused.

16          (Witness excused.)

17          MR. THEODORE:   Your Honor, the Government calls

18  Special Agent Charles Reed.

19          COURTROOM DEPUTY:   Raise your right hand. Do

20  you solemnly swear your testimony will be the truth, the whole

21  truth, and nothing but the truth, so help you God?

22          MR. REED:   I do.

23          COURTROOM DEPUTY:   Please state and spell your

24  name for the record.

25          THE WITNESS:   My name is Charles Reed. First

1    name's spelled C-h-a-r-l-e-s; last name's spelled R-e-e-d.

2                          **DIRECT EXAMINATION**

3    by Mr. Theodore:

4    Q.    And again, just for the record, can you state your name and

5    occupation, please?

6    A.    My name is Charles Reed.  I am a supervisor, special agent,

7    with the FBI.

8    Q.    And where do you work, which division or branch?

9    A.    Washington D.C., at our headquarters, in the counter-

10   terrorism division.

11   Q.    How long have you worked in that capacity?

12   A.    Fourteen months.

13   Q.    And how long have you been a special agent with the FBI?

14   A.    Seven and a half years.

15   Q.    Where were you employed during April of 2010?

16   A.    I was assigned as a special agent in the Atlanta division of the

17   FBI in the Rome resident agency in Rome, Georgia.

18   Q.    And what were your responsibilities at that location?

19   A.    We handled investigations, federal crimes, of all federal

20   crimes.  Didn't specialize in any one in that office.  We handled, all

21   that covered nine counties, we handled in northwest Georgia.

22   Q.    Let me direct your attention to April 30th of 2010. Were you

23   working at that time?

24   A.    Yes.

25   Q.    And were you working on that day, were you on duty that day?

1   A.   I was.

2   Q.   And do you recall going to the location of 617 Shoals Path,

3   Dallas, Georgia?

4   A.   I did.

5   Q.   And what was the purpose for going there?

6   A.   To execute a federal search warrant at that location.

7   Q.   Okay.  And whose residence was that?

8   A.   It was Darren Huff's.

9   Q.   And you said you had a search warrant?

10  A.   I did.

11  Q.   And what was the primary purpose for the search warrant?

12  A.   To locate an AK-47 rifle and any ammunition that went with

13  that rifle.

14  Q.   Did you meet anybody at the residence when you went there?

15  A.   Mr. Huff's wife was at the residence?

16  A.   Did you see Mr. Huff there?

17  A.   No, sir. He was not there.

18  Q.   And did you indicate the purpose for being there at that time?

19  A.   I did.

20  Q.   What time was it when you went there?

21  A.   It was probably– I don't recall exactly, but about five o'clock

22  in the afternoon.

23  Q.   And it was during the daytime?

24  A.   Yes, sir.

25  Q.   When you went over there, how did you approach the

1   residence? What did you do? How did you execute the search

2   warrant?

3   A.    We– Ms. Huff met us at the residence. I believe she, if I recall

4   correctly, she knew we were going to be there. I believe Darren had

5   spoke with her and advised that we were going to be there to

6   execute search warrants and get the weapon and the ammunition.

7   So we just met her at the house. I don't recall exactly if we

8   knocked on the front door, but she was there, and advised who we

9   were and what our purpose was.

10  Q.    You didn't go there and kick down the door, anything like

11  that?

12  A.    No, sir.

13  Q.    You met her there?

14  A.    Yes, sir.

15  Q.    Was she cooperative with you at that time?

16  A.    Yes, sir, she was.

17  Q.    And what happened once you got there? Were you actually

18  able to obtain any weapons?

19  A.    Yes, we were. We located the AK-47 rifle that was named in

20  the search warrant.

21  Q.    Where did you locate that?

22  A.    I believe it was in the garage of the residence.

23         MR. THEODORE:   Your Honor, may I have the witness

24  look at Exhibit Number Six? It has been secured as well, your

25  Honor, isn't loaded.

1          THE COURT:   Exhibit Six, did you say?

2          MR. THEODORE:   Yes.

3          THE COURT:   All right.  Any objection to it?

4          MR. GREEN:   No objection.

5          THE COURT:   All right. We'll admit Government's Six.

6     (Government's Exhibit No. 6 received into evidence.)

7   Q.    Is that the, Agent Reed, is that the AK– well, describe what

8   that is, what you have in your hands.

9   A.    This is an AK-47 rifle.  This is the one that I got that day.

10  Based upon the serial number on the side, it was the same one that

11  we were looking for.

12  Q.    That's the one you seized on April 30th, 2010, from Mr.

13  Huff's residence?

14  A.    Yes, sir.

15  Q.    Could you just hold that up in a safe manner so the jury can

16  see that, the jury and the Court can see that? And, of course, that

17  doesn't have a clip in it or anything, an ammunition clip?

18  A.    No, sir, it doesn't right now.

19  Q.    And that's in the same or substantially the same condition as

20  when you obtained it?

21  A.    Yes, sir, it is.

22          MR. THEODORE:   Your Honor, at this time, I would

23  also move to withdraw that and offer 6A, Government's Exhibit

24  6A, as a substitute for that.

25          MR. GREEN:   No objection.

1          THE COURT:   That will be fine.

2          (Government's Exhibit No. 6A received into evidence.)

3    Q.     And I would you like to show you now, Agent Reed,

4    Government's Exhibits 7A through 7D.

5          MR.  THEODORE:    Your Honor, Mr. Green indicates

6    that he has no objection. I would move for the admission of those

7    exhibits, four exhibits, 7A through 7D.

8          THE COURT:   So admitted.

9          (Government's Exhibit Nos. 7A-D received into evidence.)

10   Q.     And do you recognize those, Agent Reed?

11   A.     Yeah.  They're the magazines that were in the gun case with

12   this weapon when it was seized.

13   Q.     So those exhibits there, those– why don't you hold those up

14   so the jury can see? Now, those are– what are those?

15   A.     They're magazines for this AK-47 rifle. I believe that's 7.62

16   ammunition.

17   Q.     And were those loaded?  Are those full magazines?

18   A.     They are.  They are loaded, fully loaded, with 29 to 30 rounds.

19   Q.     And each one has 29 to 30 rounds?

20   A.     Yes, sir.

21   Q.     And where were those, where were those seized?

22   A.     There's four pouches on the side of the black firearm carrying

23   bag, and they were in those four pouches.

24   Q.     So those were in the same area as the AK-47 itself?

25   A.     That's correct.

1    Q.    And those were seized from Mr. Huff's residence?

2    A.    That's correct.

3    Q.    Was each one of those magazine clips full?

4    A.    Yes, sir.

5              MR. THEODORE:    I'd like to, your Honor, at this

6    time, offer Government's Exhibit Number Seven as a substitute for

7    7A through 7D.

8              MR. GREEN:   No objection.

9              THE COURT:   So admitted.

10        (Government's Exhibit No. 7 received into evidence.)

11   Q.    At this time, I'd like to show you Government's Exhibit

12   Number Eight.

13             MR. THEODORE:    Any objection?

14             MR. GREEN:   No objection.

15             THE COURT:   No objection, Exhibit Eight will be

16   admitted.

17        (Government's Exhibit No. 8 received into evidence.)

18   Q.    Do you recognize that, Special Agent Reed?

19   A.    I do.

20   Q.    And what is that?

21   A.    That's a brown ammunition can that was taken from the

22   residence pursuant to the search warrant on April 30th, 2010.

23   Q.    So you seized that as well?

24   A.    That's correct.

25   Q.    Okay. Could you open that up? What does that contain?

1    A.    It's got boxes of 7.62 millimeter ammunition.

2    Q.    Could you just hold up one of the boxes there? Okay.  And

3    could you kind of open, just tilt the canister and kind of show the

4    Court and the jury what's contained in there? What type of

5    ammunition is in that box?

6    A.    7.62 millimeter ammunition to be used in an AK-47.

7    Q.    So that works for an AK-47?

8    A.    Yes.

9    Q.    How many rounds? Do you know how many rounds are there

10   in the box?

11   A.    There's 27 boxes, with 15 rounds in each box.  It appears that

12   some of them, apparently, have come open, you know, during past

13   year or so this has been in evidence. Approximately 405 rounds.

14   Q.    Is that just in the box itself?

15   A.    Yes, sir.

16   Q.    Okay.  So that's not even including the ammunition, magazine

17   clips?

18   A.    No, sir.  That's independent of the box.

19   Q.    And just so we're clear, when you say 400 and– how many

20   rounds?

21   A.    Approximately 405.

22   Q.    Approximately 405 rounds.  Just so it's clear, that's 400,

23   potentially, 405 shots from the AK-47; is that right?

24   A.    That's correct, sir.

25              MR. THEODORE:    Your Honor, at this time, I would

1    move for the admission– withdraw Government Exhibit Number

2    Eight and move for the admission of Government Exhibit 8A and

3    8B as substitutes for that, and that shows that exhibit in both the

4    closed box and the open box.

5                    THE COURT:   So admitted.

6              (Government's Exhibit Nos. 8A-B received into evidence.)

7    Q.    Was your primary focus, when you went to execute the search

8    warrant, the AK-47?

9    A.    Yes. The AK-47 and the ammunition that went with it.

10   Q.    I want to back up a little bit further then with you, Special

11   Agent Reed, and go to April 19th of 2010. Do you recall that day?

12   A.    Yes, sir.

13   Q.    Were you working at that time?

14   A.    I was.

15   Q.    And do you recall going to Mr. Huff's residence at that time?

16   A.    I do.

17   Q.    And what was the purpose for going there at that time?

18   A.    The purpose was to speak with Mr. Huff regarding a

19   complaint that our office had received about some statements that

20   were made at a bank, I believe, in Hiram, Georgia, which is in our

21   area of responsibility.

22   Q.    Was there concern on your part of something that might

23   happen elsewhere at that time?

24   A.    There was.  There was concern on the FBI's part about these

25   statements Mr. Huff had made regarding travel to Madisonville,

1    Tennessee, to support another individual who was having a hearing

2    at that location.

3    Q.    When you went there on April 19th, 2010, did you meet with

4    Mr. Huff at his residence?

5    A.    I did.

6    Q.    Did you just approach and knock on the door?

7    A.    I did.  I had two uniformed sheriff's deputies that were there

8    with me.

9    Q.    As far as you knew, was he expecting you that day?

10   A.    No, sir, not that I recall.

11   Q.    You didn't call him ahead of time, tell him that you were

12   coming over, anything like that?

13   A.    No, sir.

14   Q.    And how was Mr. Huff at that time when you met with him?

15   A.    He was willing to talk to us. He stepped out on his front step

16   on the front porch, and we spoke for ten to 15 minutes.

17   Q.    Did you let him know that it was a voluntary situation with

18   him when you were talking to him?

19   A.    Yes, sir.

20   Q.    You didn't take him into custody or anything like that?

21   A.    No, sir.

22   Q.    Did you talk about the– your concerns about what might

23   happen in Madisonville, Tennessee, or anything like that?

24   A.    We did.  We asked about the situation and his involvement

25   with the situation and statements that were made at the bank.

1    Q.    And did Mr. Huff make some statements to you then?

2    A.    He did.

3    Q.    Anything that was of interest to you?

4    A.    There was. Mr. Huff said that he was planning to travel the

5    following day to Madisonville to support this other individual,

6    show support for him, that he would be armed with his Colt .45

7    handgun and he would have his AK-47 with him.

8    Q.    Did he say why he wanted to take his AK-47 with him?

9    A.    I don't recall anything explicit. Mr. Huff did make comments

10   about the entire situation, that they could go there to try to take

11   back Madisonville and possibly they could take back Monroe

12   County, then possibly the State of Tennessee and the United States.

13   Mr. Huff also said that this was a situation where it's us against

14   them and that they would do what they had to do in this situation.

15   Q.    When he said us against them, how did you interpret that?

16   A.    My interpretation was law enforcement and the government

17   itself in Madisonville, Tennessee.

18   Q.    That they were the "them"?

19   A.    That's correct. It was Mr. Huff and his associates were the

20   "us," and the "them" were the law enforcement and government in

21   Madisonville, Tennessee.

22   Q.    Now, you said you didn't believe Mr. Huff was expecting

23   you?

24   A.    No, sir.

25   Q.    Did you ask him anything about whether or not he was going

1    to be peaceful in his approach?

2    A.    We did discuss that. Mr. Huff said that they would not resort

3    to violence unless they were provoked. That was pretty much the

4    extent of that conversation.

5    Q.    Was there something in particular that he felt very strongly

6    about regarding Madisonville, what was going on there, that he

7    expressed to you? Was there a particular event going on there?

8    A.    There was the hearing the following day. I believe Mr.

9    Fitzpatrick had a court hearing that day and there would be a group

10   of them going there to support Mr. Fitzpatrick at that court hearing.

11   Q.    Did Mr. Huff indicate anybody else who might be going with

12   him to Madisonville on the 20th?

13   A.    At that time, I don't– I don't believe he did.

14   Q.    Did he mention to you that he was part of a group?

15   A.    He did. He did mention that he was a member of the Georgia

16   Militia, that he believed he was a chaplain in the Georgia Militia,

17   and another group I believe called Oath Keepers.

18        MR. THEODORE:    Your Honor, I have nothing

19   further of this witness.

20        THE COURT:   Thank you. Cross- examination?

21                    **CROSS-EXAMINATION**

22   by Mr. Green:

23   Q.    Agent Reed, good afternoon.

24   A.    Good afternoon, sir.

25   Q.    My name's Scott Green. I represent Mr. Huff. I have a few

1    questions for you.

2    A.    Okay.

3    Q.    On April the 30th, you placed a phone call to Mr. Huff on his

4    cellular telephone; is that correct?

5    A.    I don't recall. But I do know I believe we talked that day.

6    Q.    Do you remember calling Mr. Huff and informing him that

7    there was a meeting that was going to take place at the Cartersville

8    Police Department at two o'clock that afternoon?

9    A.    That's correct, that's correct. I did know to call him to meet

10   him at the Cartersville Police Department that afternoon.

11   Q.    Okay.  And you told Mr. Huff that– he told you at some point

12   that he was not in Georgia, he was in Tennessee that day, didn't he?

13   A.    That's correct.

14   Q.    And he made the statement to you, will you promise me you'll

15   look at what I've got if I show up for this meeting, didn't he?

16   A.    I don't remember I made any promises about what I would

17   look at, but I advised him to meet me at the Cartersville Police

18   Department, that's correct.

19   Q.    And he turned– and you know now, that he was headed back to

20   the Cartersville Police Department to meet with you when he was

21   arrested, correct?

22   A.    I don't know if he was coming at that point.

23   Q.    He was heading southbound, wasn't he?

24   A.    Okay.  I don't know.  I wasn't at the arrest scene.

25   Q.    Okay.  And, of course, you had no intentions of meeting with

1  him at the Cartersville Police Department at two o'clock that day

2  once you found out he was in Tennessee, did you?

3  A.    At that point, yes. I did not know anything at that point that

4  was going on in Tennessee.

5  Q.    But he agreed to come back and meet with you, didn't he?

6  A.    That's correct.

7  Q.    All right. Because he said he wanted to show you some stuff

8  and get somebody to look at this stuff, correct?

9  A.    I do not recall.

10  Q.    He could have said that; you just don't remember?

11  A.    Right.

12  Q.    All right. Now, I want to direct your attention back to the

13  19th.

14  A.    Okay.

15  Q.    You were given information, based on some statements that

16  Mr. Huff had made to some bank employees. And who was your

17  supervisor at the FBI at that time?

18  A.    My supervisor was Gary Will (phonetic).

19  Q.    And you were out at the Rome satellite office?

20  A.    Yes, sir. The Rome resident agency.

21  Q.    And I'm assuming that when this information came in he said,

22  Agent Reed, I need you to go out here and talk to Mr. Huff and find

23  out what's going on?

24  A.    That's correct.

25  Q.    And, of course, the 19th is the day before the 20th; we can all

1    agree on that, right?

2    A.    That's correct.

3    Q.    He hadn't made it to Tennessee yet, had he?

4    A.    No, sir.

5    Q.    And when you showed up at his residence, you said that you

6    knocked on the door and he agreed to talk to you outside, correct?

7    A.    That's correct.

8    Q.    And I imagine that's so he could smoke a cigarette while you

9    all were talking?

10   A.    I believe he did smoke.

11   Q.    But, of course, if he said, I've got nothing to say to you, there

12   wouldn't have been anything you could have done about it except

13   turn around, get in your car and leave, correct?

14   A.    That's correct.

15   Q.    And he had with him– or you had with you two deputies with

16   the Paulding County Sheriff's Department, correct?

17   A.    That's correct.

18   Q.    Billy Johnson and Buford Young (phonetic)–

19   A.    That's correct.

20   Q.    –were the names?

21   A.    I believe so.

22   Q.    And they would have been present and heard everything that

23   transpired in the conversation between you and Mr. Huff, correct?

24   A.    That's correct.

25   Q.    And it was basically just you and Mr. Huff talking, correct?

1    A.    Yes, sir.

2    Q.    Do you recall towards the latter part of the conversation his

3    wife, Cindy, came out and joined you all outside?

4    A.    Yes, sir, she was there.

5    Q.    And she would have heard the latter part of the conversation,

6    correct?

7    A.    Yes, sir.

8    Q.    Now, you've told us already that you, of course, identified

9    yourself as an FBI agent, correct?

10   A.    Yes, sir.

11   Q.    And I'm assuming you flashed one of those big hubcaps you

12   all carry around–

13   A.    Yes.

14   Q.    –that shows you're an FBI agent, right?

15   A.    That's right.

16   Q.    And there's not much mistaking, once you do that, who you

17   are, is there?

18   A.    That's correct.

19   Q.    So it's reasonable to assume that Mr. Huff knew he was

20   talking to the FBI at that point?

21   A.    That's correct.

22   Q.    And it's also reasonable to assume, because I anticipate that

23   you're the one that broached the subject, probably started

24   something along the lines of, hey, man, tell me about Madisonville,

25   what's going on?

1    A.    That's correct. We would have talked about Madisonville.

2    Q.    Okay.  And Mr. Huff proceeded to tell you about

3    Madisonville, correct?

4    A.    That's correct.

5    Q.    He told you that, I'm going to go up there tomorrow, correct?

6    A.    That's correct.

7    Q.    And at the point in time that you're talking to him, you're

8    standing in the State of Georgia, correct?

9    A.    That's correct.

10   Q.    And you knew that Madisonville is in the State of Tennessee,

11   correct?

12   A.    Correct.

13   Q.    And you knew he would have had to cross the state line to get

14   to Madisonville, correct?

15   A.    That's correct.

16   Q.    And he told you that, I'm going to go up there and I'm going

17   to have my .45 with me, correct?

18   A.    Correct.

19   Q.    And he told you that, I'm going to have my AK-47 with me,

20   correct?

21   A.    That's correct.

22   Q.    And he told you that they intended, if they could, to effect

23   some citizens' arrests up there, correct?

24   A.    That's correct.

25   Q.    Okay.  And you didn't arrest him at that point, did you?

1  A.    No, sir.

2  Q.    Now, how were you able to contact– I'm jumping back a little

3  bit, going back to the 30th. How were you able to contact Mr. Huff

4  on April the 30th?

5  A.    He had given me his telephone number on the 19th.

6  Q.    In fact, he'd given you his business card that had his cellular

7  telephone number on it, correct?

8  A.    I don't recall if he gave me the card or if he just gave me his

9  telephone number.  But, either way, I had the telephone number.

10  Q.    And when he gave you that card, that was at the end of the

11  conversation, correct?

12  A.    That's correct.

13  Q.    And he said, call me if there is a problem, correct?

14  A.    That's correct.

15  Q.    Did you call him and say, hey, there's a problem with you

16  going to Tennessee tomorrow?

17  A.    I believe we talked about it right then, while we were there,

18  essentially, that, you know, I think– I don't know if we ever got to

19  the point of saying there's a problem with doing that.  We did talk

20  about the whole Madisonville incident and why going up there.

21  Q.    Okay. And he told you why they were going up there?

22  A.    That's correct.

23  Q.     I'm going to carry my guns and we're going to attempt to

24  effect some citizens' arrests if we can, correct?

25  A.    That's right.

1   Q.    Now, it's a fair assumption– is it not, sir– that if the FBI

2   shows up on your doorstep talking to you about what your plans are

3   tomorrow, that maybe somebody's going to be watching what you

4   do? That's a fair assumption, isn't it?

5   A.    There are a lot of different situations. I couldn't say if that's

6   a fair assumption.

7   Q.    All right. Well, you're an FBI agent, so maybe you're not a

8   good example. But if Ms. Norwood had the FBI show up on her

9   doorstep and asked her what she was doing tomorrow, would it not

10  be reasonable to assume–

11          MR. THEODORE:   Objection, objection, your Honor.

12  It's speculative.

13          THE COURT:   I think, as asked, it probably is. So I'll

14  sustain the objection.

15  Q.    Let me ask it a different way. When you show up and you

16  flash your hubcap and say, I'm the FBI, I'm here to talk to you,

17  people's eyes usually get just a wee bit wider?

18  A.    It usually draws some attention to them, yes.

19  Q.    Okay. Now, in the course of discussing with you on the 19th,

20  Mr. Huff also told you that he was unsure about how many people

21  were going to be up there in Madisonville, didn't he?

22  A.    That's correct. I believe I recall that.

23  Q.    And I believe his statement to you, as well, was, look, we're

24  jut not real organized–

25          MR. THEODORE:    Objection. Hearsay. It's not an

1  admission of a party-opponent.

2          MR. GREEN:  May we approach, your Honor?

3          THE COURT:  Yes. Excuse us.

4      (Discussion at bench had off the record.)

5          THE COURT:  Go ahead, Mr. Green.

6  Q.  Did Mr. Huff relate to you, Agent Reed, that this was a rather

7  disorganized or unorganized, whichever word he used, group at

8  this point?

9  A.  Yes, I believe he did talk about they weren't as organized as

10  they had hoped to be, I think is what he told me.

11          MR. GREEN:  Is your Honor going to give the limiting

12  instruction now or later?

13          THE COURT:  Yes. There was an objection made, and

14  we considered, to that question, and the Court considered at side

15  bar, and I'm allowing that question to be asked and answered by

16  this witness.  The objection was basically a hearsay objection,

17  which you may have heard during the course of this trial.

18      So, essentially, I have allowed the question and answer to be

19  given, not to prove the truth of the matter asserted, but under a

20  hearsay exception which would allow a statement of the declarant's

21  then existing state of mind to prove such thing as intent, plan,

22  motive or design.  So the question is– the answer is being allowed

23  by the Court for that purpose, not for the purpose of showing the

24  truth of the matter asserted.

25      Go ahead, Mr. Green.

1    Q.    And to follow up with what his Honor said, whether it was

2    true or not, Mr. Huff said that, at that point, in his mind, this was

3    an unorganized bunch, correct?

4    A.    Right. They were not as organized as they hoped to be.

5    Q.    Now, the statement, if we can take back Madisonville, then

6    perhaps we can take back the county; if we take back the county,

7    perhaps we can take back Tennessee; if we can take back

8    Tennessee, perhaps we can take back the country, that Mr. Huff

9    told you that, correct?

10   A.    That's correct.

11   Q.    Or words to that effect?

12   A.    That's correct.

13   Q.    And, of course, that's not too much different than any

14   political rhetoric that you're going to hear in a campaign, is it?

15   A.    I couldn't answer that.

16   Q.    Do you recall, when President Bush was running for office,

17   that he was going to take back the Whitehouse on principles of

18   integrity and morality?

19   A.    I don't recall that.

20   Q.    Been a while back, hasn't it?

21   A.    It has been.

22   Q.    Or when President Obama was running for office, his promise

23   to the American people was to effect change by taking back the

24   country for the people instead of special interests?

25   A.    I don't recall, you know, what was said.

1  Q.    Mr. Huff did tell you that he did not anticipate any violence

2  unless they were provoked, correct?

3  A.    Correct. That's correct.

4  Q.    And Mr. Huff also told you that he was happy that the FBI

5  showed up to talk to him, correct?

6  A.    That's correct.

7  Q.    And that he hoped you guys would be in Madisonville the next

8  day; told you that as well, didn't he?

9  A.    That's correct.

10  Q.    And, of course, his possession, in and of itself, of the .45 was

11  not illegal, is it?

12  A.    Just the mere possession itself, without knowing the status of

13  a permit or something like that, then no, or his criminal history.

14  Q.    And, of course, if he had a carry permit, he could legally carry

15  that .45, couldn't he?

16  A.    That's correct.

17  Q.    And his possession of the AK-47 in and of itself was not

18  illegal, is it?

19  A.    As long as he had the permits for it.

20  Q.    So if he had a valid carry permit, he could legally possess that

21  AK-47 as well, couldn't he?

22  A.    That's right.

23  Q.    Now, you told me about, at some point, Mr. Huff gave you his

24  business card and you were able to or you got his phone number

25  and you were able to call him.  Where were you when you called

1    Mr. Huff on April the 30th? And I realize I'm jumping ahead a bit.

2    A.    I was in my office in Rome, Georgia.

3    Q.    And you are familiar with where Cartersville, Georgia, is; is

4    that correct?

5    A.    I am.

6    Q.    And is it a fair statement that from Cartersville, Georgia, to

7    Knoxville, Tennessee, is approximately three hours?

8    A.    That would be, well, approximately three hours, correct.

9    Q.    And that's probably about the best you could do if you were

10   driving an old Ford truck that probably didn't get over 50 or 55

11   miles an hour?

12   A.    I would say so.

13   Q.    Now, Mr. Huff indicated that from wherever he was, he was

14   willing to come and talk to you so that you could look at what he

15   had, right?

16   A.    He was willing to meet with me, that's correct, I do recall

17   that.

18   Q.    All right.  Do you recall, after Mr. Huff's wife, Cindy, came

19   out, that there was a point in time where you looked at Mr. Huff

20   and told him that you were going to have to check with your

21   supervisor on something that– on a question that he had asked you?

22   Do you recall that?

23   A.    I don't recall that. I couldn't say it did or didn't happen. I

24   don't recall.

25   Q.    Do you recall immediately prior to that, in the presence of Mr.

1   Huff's wife, Cindy, that he made, Mr. Huff, made the statement to

2   you, "If there's a problem, don't come kicking my door down at

3   four o'clock; just call me, I won't go up there." Remember him

4   saying that to you?

5   A.    I don't recall exactly what was said. I do know that he said,

6   "If there's a problem, call me."

7   Q.    "And I won't go"?

8   A.    Yeah, I don't recall if that was added on.

9   Q.    But you wouldn't deny that that could have been said?

10  A.    I couldn't, yeah, I couldn't deny that was said.

11        MR. GREEN:   Thank you, sir.

12        THE COURT:   Thank you. Redirect?

13        MR. THEODORE: Just a couple questions, your Honor.

14                **REDIRECT EXAMINATION**

15  by Mr. Theodore:

16  Q.    Were you guys in a position, do you feel, to make an arrest

17  that evening, on April 19th?

18  A.    No, sir, I was not.

19  Q.    And why not?

20  A.    There was no federal crime had been committed at that point.

21  Q.    But he indicated he was going– he had the intent, he was

22  going to take an AK-47 to Madisonville, Tennessee; is that right?

23  A.    That's correct. He did say that.

24  Q.    So was there any problem as far as from your perspective?

25  A.    At that point, there was no federal crime that had been

1    committed.

2    Q.    What would have been required after that?

3    A.    Mr. Huff would actually had to have crossed a state line to

4    satisfy that element of the crime.

5    Q.    How far is Dallas, Georgia, from the Tennessee state line?

6    A.    Approximately 100 miles.

7    Q.    How long of a drive would you say?

8    A.    Probably about two hours, just based on his location in

9    proximity to the nearest interstate.

10   Q.    And that's if you go and take I-75 to Tennessee?

11   A.    That's correct.

12   Q.    Well, what time was it when you talked to Mr. Huff that day?

13   A.    It was, it was probably about 5:00 or 6:00 p.m.

14         MR. THEODORE:    Nothing further.

15         THE COURT:   Thank you. Recross?

16         MR. GREEN:   Thank you, your Honor.

17                    **RECROSS-EXAMINATION**

18   by Mr. Green:

19   Q.    Agent Reed, you're aware, though, that the federal

20   authorities, specifically, the FBI, did surveillance of Mr. Huff on

21   Mr. Huff that night, didn't they?

22   A.    That's correct. There was a surveillance that evening.

23   Q.    Watched so you knew when he was going to leave, didn't you?

24   A.    The surveillance team, that was the purpose of the

25   surveillance, to see when he did leave, if he did, in fact, leave.

1    Q.    There was surveillance on him from the time that he left,

2    correct?

3    A.    I believe so.  I was not part of that surveillance team.

4    Q.    And, of course, if there's surveillance, if we're waiting on

5    him to cross the state line, the second he rolled into Tennessee, just

6    south of Chattanooga, there was a federal crime that was committed

7    if we understand these words to mean he had the intent to incite a

8    civil disorder?

9    A.    That's correct.  When he would have crossed the state line,

10   that would have satisfied the other element of that crime, that's

11   correct.

12   Q.    And nobody stopped and arrested him, did they?

13   A.    Not that I'm aware of, no.

14   Q.    All right.  Do you recall, when you went and got the search

15   warrant affidavit, that you, when you filled that out, you said, told

16   the magistrate-judge in Georgia, that you believed you had

17   probable cause to believe that Mr. Huff had violated 18 U.S.C.

18   Section 231?

19   A.    Yes, sir.

20   Q.    And do you recall that you also told the magistrate-judge that

21   you believed that you had probable cause to believe that he

22   violated 18 U.S.C. Section 2101; is that correct, inciting a riot?

23   A.    That's correct.

24   Q.    And, of course, that charge is not here before this jury today,

25   is it?

1   A.    I'm not sure about that. Not that I'm aware of.

2   Q.    That charge requires an overt act–

3               MR. THEODORE:    Objection. Relevance, your

4   Honor.

5               MR. GREEN:   He swore to it, your Honor. It's not here.

6               MR. THEODORE:   It's a legal conclusion, his asking a

7   witness this.

8               THE COURT:   I'm going to sustain the objection.  That

9   charge is not, as you state, that charge is not before this jury or this

10  court. I'll sustain the objection.

11              MR. GREEN:   Thank you.

12  Q.    When Mr. Huff said, "Call me if there's a problem," nobody

13  called, did they?

14  A.    I did not call him, no.

15              MR. GREEN:   Thank you.

16              THE COURT:   All right.  Thank you, Agent Reed.  You

17  may be excused.

18              THE WITNESS:    Thank you, sir.

19              (Witness excused.)

20              THE COURT:   Do you want to retrieve the exhibits?

21              MR. THEODORE:    Your Honor, did we check the

22  exhibit list? Just can I check and see if Exhibit Eight, I believe it

23  was admitted and then withdrawn? That's the box of ammo.  It was

24  admitted?

25              THE COURT:   Yes. And 8A and B were substituted in

1    its place.

2              MR. THEODORE:    Yes. Thank you. Your Honor, I

3    have a few stipulations I wanted to present to the Court and enter

4    into evidence.  The first would be Government's Exhibit 22. It's

5    been stipulated to, a stipulation by the Defense. Any objection, Mr.

6    Green?

7              MR. GREEN:  No. We've stipulated.

8              MR. THEODORE:    Your Honor, if I may move that

9    into evidence and then present that to the jury.

10             THE COURT:  Yes. We'll admit Exhibit 22.

11        (Government's Exhibit No. 22 received into evidence.)

12             MR. THEODORE:    And, your Honor, if I may read

13   that stipulation.  It reads:

14         "The Defendant, through counsel, hereby agrees and

15   stipulates that Government Exhibit 22-A accurately reflects the

16   Defendant's cellular telephone text messages sent and received on

17   April 7, 2010, that were contained on the Defendant's cellular

18   telephone and of which messages were retrieved from this

19   telephone. The Defendant agrees that no further authentication or

20   identification is necessary for Government Exhibit 22-A to be

21   admitted into evidence."

22        Your Honor, I'd offer Government Exhibit 22-A. Any

23   objection?

24             MR. GREEN:  No. We've stipulated to it.

25             THE COURT:  So admitted.

1          (Government's Exhibit No. 22A received into evidence.)

2          MR. THEODORE:    And, your Honor, just looking at

3    that particular exhibit, and, again, these are text messages from Mr.

4    Huff's Blackberry cellular phone. It shows messages that are

5    incoming and outgoing to and from that phone, and there is one for

6    "Mike." It starts with– again, this is on April 7th, 2010, and it goes

7    by– it actually goes by the day, the month, and then the year.

8          MR. GREEN:   And we agree with that, your Honor. It's

9    a little bit different, but that's the correct date.

10          THE COURT:   Thank you.

11          MR. THEODORE:    And then I'll just read them in

12    order there as they go down, the conversation that's going on on

13    that Blackberry, the text messages, starting with right alongside

14    here from a Mike Fulmer: "How did today go? Are you still a free

15    man?" "LOL," I think most people understand as "laughing out

16    loud," "It went well, and now we're moving to Phase 2," and that's,

17    again, that's from Mr. Huff's cell phone, so that's what he sent.

18          The next message coming in: "What happened? Did ya do a

19    citizen arrest?" Also coming in to his phone the message, "Did ya

20    pull out the mussell(sic)," a spelling mistake there, but– and,

21    again, that's coming in to his phone.

22          The message that Mr. Huff sends from his phone is: "Not

23    today. They released him night before last, so now we're adjusting

24    days." Message coming to his phone then from Mr. Fulmer: "So a

25    wasted trip?" Mr. Huff's message back: "Not at all. We met with

1    the arrested to coordinate with all groups involved."

2         And that's, again, that's Exhibit 22A, your Honor.  Your

3    Honor, we also have Government Exhibit 45, stipulation by the

4    Defense.  Like to offer that.  It's a stipulation offered into

5    evidence.

6              THE COURT:   What is that number again?

7              MR. THEODORE:    Forty-five.

8              THE COURT:  So admitted.

9         (Government's Exhibit No. 45 received into evidence.)

10             MR. THEODORE:   That stipulation reads: "The

11   Defendant, through counsel, hereby agrees and stipulates that

12   Government Exhibit Six, the AK-47 rifle, and Government Exhibit

13   14, the Colt .45 handgun, are firearms which are designed to or

14   may readily be converted to expel any projectile by the action of an

15   explosive, or the frame or the receiver of any such weapon; and,

16   thus, constitute firearms under federal law."

17             MR. GREEN:   There is no issue about that, your Honor.

18             MR. THEODORE:   And then I'd offer Government's

19   Exhibit Number 36, stipulation by the Defense.

20             THE COURT:  So admitted.

21        (Government's Exhibit No. 36 received into evidence.)

22             MR. THEODORE:    And that has been somewhat

23   modified by the Defense, the last sentence there, but reads: "The

24   Defendant, through counsel, hereby agrees and stipulates to the

25   following: On the morning of April 20th, 2010, Defendant was

1  observed by FBI agents leaving his residence in Dallas, Georgia,

2  and driving his GMC Sierra pickup truck, Georgia license plate

3  number IM-LIT, across the Georgia-Tennessee state line. At that

4  time, the Defendant was en route to Madisonville, Tennessee, and

5  possessed firearms within the automobile he drove."

6       And that's, again, edited by the Defendant, Mr. Green there,

7  that last sentence.

8       Your Honor, at this time, I would also ask the Court at this

9  time if it could take judicial notice of the fact that this court has

10 previously ruled on the legality of the traffic stop made by Trooper

11 Michael Wilson on April 20th, 2010, which was– which he testified

12 about this morning and today.

13      MR. GREEN:   Your Honor, I think that's a matter that I

14 don't believe it's a proper subject for judicial notice and certainly

15 something we should be taking up outside the presence of the jury.

16      THE COURT:   Why don't we take that up– I mean, the

17 Court has already noted to the jury, in response to questions and

18 objections, that the legality of the traffic stop is not at issue in this

19 trial. I don't think there's any dispute in that regard, but to the

20 extent you're asking me take judicial notice of some matter, let's

21 take that up at the break.

22      MR. THEODORE:   Very well.

23      MR. GREEN:   We're not attempting to dispute the

24 legality of the traffic stop.

25      THE COURT:   Excuse me?

1      MR. GREEN:  We're not attempting to dispute the

2    legality of the traffic stop. There's one other stipulation. Could we

3    go ahead and read that into the record?

4      MR. THEODORE:  Did you not to mark it as your

5    exhibit?

6      MR. GREEN:  Mark it as the next exhibit, next exhibit,

7    whatever number that is.

8      MR. THEODORE:  Okay.  Well, do you want to make it

9    yours?

10     THE COURT:  Let's go ahead and read it. If you want to

11   make it a Defendant's Exhibit, we can do it tomorrow.

12     MR. GREEN:  We'll introduce it as our first exhibit.

13     THE COURT:  We won't give it a number yet.

14     MR. THEODORE:   Oh, okay.

15     THE COURT:  What is the next Defendant's number,

16   Ms. Norwood? Has there been a Defendant's One, I believe?

17     COURTROOM DEPUTY:   Yes, sir.

18     THE COURT:  All right.  We'll mark this Defendant's

19   Exhibit Two and admit it into evidence as Defendant's Exhibit two.

20       (Defendant's Exhibit No. 2 received into evidence.)

21     MR. THEODORE:   Which reads: "The parties agree

22   and stipulate that on and about April 20th, 2010, that Mr. Huff

23   possessed a valid permit to carry firearms, which was issued by the

24   State of Georgia.  The parties further agree and stipulate that the

25   State of Tennessee recognizes and honors the validity of such a

1    Georgia carry permit."

2              THE COURT:   Thank you.

3              MR. THEODORE:   Your Honor, may we approach?

4              THE COURT:   Yes.

5         (Discussion at bench had off the record.)

6              THE COURT:   Mr. Theodore?

7              MR. THEODORE:    Yes, your Honor. Subject to just

8    double-checking certain exhibits, making sure they are admitted

9    into evidence, we do rest.

10             THE COURT:   Thank you. The Government rests at this

11   time, and the Court's going to allow them the opportunity to make

12   sure the exhibits that they want introduced into the record that have

13   been discussed have actually been introduced, and they can do that

14   overnight.

15        I'll go ahead and let the jury go for the day when we switch

16   over cases. Instead of starting this late with the Defendant's proof,

17   I believe it would be better to wait until tomorrow. And I have

18   some things I need to discuss with counsel, anyway, so we'll let the

19   jury go.

20        Before you get up and leave, just, again, want to thank you all

21   again for your service today and tomorrow. We will reconvene

22   tomorrow, which is October 20th, I believe Thursday, at 9:00 a.m.

23   Just to remind you, as I reminded you earlier, or yesterday,

24   continue not talking about the case among yourselves or with

25   anyone else. Don't communicate with anyone about the case.

1   Continue to keep an open mind until you hear all the evidence.

2        You've just heard the Government's evidence that it has

3   presented so far, and beginning tomorrow you'll hear evidence

4   presented by the Defendant, and at some point after that then we'll

5   have closing arguments and my instructions. So until all that

6   happens, continue to keep an open mind until you start your

7   deliberations.

8        Don't attempt to do any type of investigation, as I've talked

9   about. Either don't listen to or read anything about this case, don't

10  do any type of internet research or any other technological research

11  either to learn about the case or to communicate about the case.

12  Just simply, basically, I recommend you just put the case aside

13  until you come back tomorrow morning, with those instructions in

14  mind.

15        So, again, thank you for your service today, and we'll see

16  everyone tomorrow morning, Thursday, at 9:00 a.m., and the jury's

17  excused at this time.

18        (Jury recessed for the day at 4:47 p.m.)

19             THE COURT:   Thank you. Mr. Green?

20             MR. GREEN:   The Court please, pursuant to Rule 29,

21  we would respectfully move for the Court to enter judgment of

22  acquittal on both of the counts alleged. We don't believe that there

23  is sufficient evidence in the record that would warrant a reasonable

24  and prudent jury in their ability to convict Mr. Huff of either

25  offense.

1      And, specifically, we would renew all of those motions and

2  objections that we have filed heretofore, both by myself and by the

3  Federal Defender's Office, regarding the validity, for instance, of

4  having both the 231 charge and the 924(c) charge, as well as we

5  renew our objection that the Government has not proven a crime of

6  violence as it relates to Count One.

7      We respectfully move the Court to enter judgment of acquittal

8  as to both counts.

9           THE COURT:   All right.  Thank you. Does the

10  Government wish to respond, briefly?

11          MR.  THEODORE:    Yes, your Honor. Your Honor, we

12  believe that, viewing this evidence in a light most favorable to the

13  Government, that this court must, in such a motion, that a rational

14  fact-finder could find all of the elements of the offenses, and that

15  beyond a reasonable doubt.

16      We had witness testimony here from several witnesses that

17  testified about Mr. Huff's expressed intent, his intent to come

18  down from Georgia, from Dallas, Georgia, to come down to

19  Madisonville, Tennessee, with a militia group or some other

20  groups with– armed with an AK-47 and other firearms, to come to

21  Madisonville and do a few different things.

22      One, for starters, to take over the courthouse and free Walter

23  Fitzpatrick.  He had indicated his intent to do that.  He had

24  indicated his intent to execute citizens' arrest warrants, and those

25  warrants were, of course, were offered into evidence before this

1  court.

2        He was actually stopped the morning of the offense, and in his

3  truck he had indicated he had an AK-47. He was observed and was

4  seen by officers that he had a Colt .45 handgun with him at the

5  time. Again, he expressed his intent to fully execute citizens'

6  arrest warrants.

7        Your Honor, I think, certainly, as far as whether civil

8  disorder, whether he intended to commit civil disorder, I think

9  that's the real key here; when he crossed the state line, did he have

10 the intent to commit a civil disorder. It matters not whether the

11 civil disorder actually occurred; it's whether, when he crossed the

12 state line with firearms, whether he had the intent to commit a civil

13 disorder.

14       We would submit there's ample evidence that he did.

15 Certainly, executing citizens' arrest warrants implies physical

16 force by that, and that by Mr. Huff and by various associates of his,

17 other people that were going to help him, would imply that there

18 would be a group or assemblage of three or more people and that

19 there would be an act of violence.

20       Also, your Honor, with that, certainly we think that the

21 evidence is clear that Mr. Huff had a firearm on his side at the time,

22 had a handgun, also evidence he had an AK-47. Certainly, those are

23 used and carried during and in relation to the crime of violence

24 which, we submit, would be Count One, which was proven

25 sufficiently, taken in a light most favorable to the Government.

1      THE COURT:   All right.  Thank you. Anything further?

2      MR. GREEN:   May I briefly respond, your Honor?

3      THE COURT:   Yes.

4      MR. GREEN:   I'm just going to focus on Count One,

5  because if Count One fails, Count Two, by necessity, does as well.

6  The issue that I'm asking the Court to take a little bit closer look

7  at– I mean, I could stand here and argue until I'm blue in the face

8  that they haven't proven beyond a reasonable doubt, to a moral

9  certainty, that he had the requisite intent.

10      I certainly think there's ample evidence in the record

11  suggesting by not only the words that were spoken, but by his

12  actions as well, and by the actions and inactions of law

13  enforcement, that he did not have the requisite intent.

14      But they've got– the Government has to prove that he

15  intended to commit each of the elements which comprise 18 U.S.C.

16  Section 231(a)(2), and that statute contains the requisite element

17  that the firearm had to be used in furtherance of a civil disorder.

18      And, further, a civil disorder is defined in Section 18 U.S.C.

19  Section 232 as– I don't have the language in front of me, but the

20  point I'm trying to drive home at this juncture is that they haven't

21  proven who, who is this assemblage of three or more persons that

22  Mr. Huff was planning to use this firearm in conjunction with?

23      We've got just scattered all over the place– well, he runs into

24  some people at Donna's.  There's no evidence that he knew or had

25  planned to meet them there. He's got one other, a young man in his

1    truck with him, who there's no evidence was participating in this,

2    no evidence that he was armed, evidence that he's not charged.

3        Who is the assemblage of three or more persons that he was

4    going to use this firearm with? And that's the focus, at this point, I

5    would ask the Court to take very careful look at. Because we

6    believe that– I have to make the motion. I'm not going to concede

7    it is a factual question, but, obviously, his intent is going to be up

8    to the jury perhaps to determine, but only if the Government has

9    proven all the elements that they had to prove.

10       They haven't proven that he knowingly intended to join an

11   assemblage of three or more people and, by violence, use the

12   firearm in furtherance of that civil disorder. That's the definition,

13   and they have to prove that he knowingly intended the elements

14   that comprise that definition.

15       THE COURT:   All right. If you want to respond

16   specifically to that, Mr. Theodore, I'll give you the chance. Mr.

17   Green, I guess, honed in his argument on–

18       MR. THEODORE:   Your Honor, I think some of those

19   issues were kind of litigated. But I think the key is whether he

20   intended to do acts. I mean, we don't have to identify particular

21   individuals that he was going to meet up with. There's no

22   requirement of that. I think there's evidence presented at trial that

23   Mr. Huff intended to coordinate and to act with other groups, and

24   there was evidence that he, in fact, did meet with various people in

25   Madisonville.

1    And, your Honor, we would submit that if his intent was to

2    execute citizens' arrest warrants, that that would be an act of– it

3    would be a civil disorder.  Exercising unlawful citizens' arrest

4    warrants, not even looking at intending to take over the

5    courthouse, which, by its very terms, implies using force and

6    violence, clearly, that would constitute a civil disorder, your

7    Honor.

8    THE COURT:   All right.  Thank you. The Court

9    appreciates the arguments of both sides. Before the Court is the

10   Defendant's Rule 29 motion for judgment of acquittal.  Rule 29(a)

11   provides that, after the Government closes its evidence, the Court,

12   on the Defendant's motion, may enter a judgment of acquittal on

13   any offense for which the evidence is insufficient to sustain a

14   conviction.

15   In assessing a Rule 29 motion, it's important to note that the

16   Court must consider all the evidence presented to date in a light

17   most favorable to the Government and that the Government must be

18   given the benefit of all inferences which can reasonably be drawn

19   from the evidence, even if the evidence is circumstantial.

20   With this standard in mind, and mindful of the arguments

21   made by the parties, and considering all of the evidence that's been

22   presented over the course of today and yesterday by the

23   Government, the Court believes it appropriate to deny Defendant's

24   motion for judgment of acquittal under Rule 29.

25   The Court also, to the extent, the Court would add, to the

1    extent the Defendant, through counsel, is asking the Court to

2    reconsider its denial of previous Defendant motions and/or to

3    reconsider the Court's upholding of magistrate-judge's orders in

4    this case unfavorable to the Defendant, the Court would similarly

5    deny that request as well.

6         Anything else we need to take up this afternoon? A couple

7    things. We'll start tomorrow with the Defendant's case. While I'm

8    thinking about it– well, let me ask you, Mr. Green. I'm not going to

9    hold you to it, but, generally speaking, what do you think in terms

10   of time factoring and cross-examination for Defendant's case?

11        MR. GREEN:   We can be done tomorrow.

12        THE COURT:   With the proof?

13        MR. GREEN:   We've got several witnesses, but we can

14   get done with the proof tomorrow.

15        THE COURT:   Why don't we do this, then? We

16   probably won't get the case to the jury until Friday. Why don't you

17   all– can you all look over the jury charge tonight and meet with Ms.

18   McCook in the morning so we can at least get a feel for what

19   objections, if any, you have to the Court's draft?

20        Let's do that. Let's meet at 8:30, have attorneys, at least one–

21   doesn't have to be both, but both if you would like. But have the

22   attorneys only meet with my law clerk here in the courtroom in

23   what I'd call the informal charge conference. That would be just

24   the attorneys meeting on side conference and have a prelude to the

25   formal charge conference we'll have on the record regarding the

1    jury charges.

2                    MR. THEODORE:    Thank you.

3                    MR. GREEN:   Thank you, your Honor.

4                    MR. THEODORE:   Your Honor, I just want, just so you

5    know, too, as far as factoring a timeline, depending upon the exact

6    nature of the testimony, we anticipate that there may be at least one

7    rebuttal witness for the Government. That would probably be a

8    relatively short witness, though.

9                    THE COURT:   And I'm not going to ask the Defendant

10   about whether he's going to testify or not at this point. I assume

11   that's something under consideration.  But let me do mention to

12   you, Mr. Huff, while I'm thinking about it.

13          You've probably had some discussions with your counsel

14   about whether to testify or not testify, and you certainly have the

15   absolute right, as the Defendant in this criminal trial, to testify or

16   not testify.  Certainly, the Court would encourage you to listen to

17   your counsel and seek the guidance of your counsel on that issue.

18          But I want to make sure that you understand that the right to

19   testify or not to testify in this criminal proceeding is yours and

20   ultimately yours alone as a defendant in this case. Do you

21   understand that?

22                   MR. HUFF:  Yes.

23                   THE COURT:  Okay.  Thank you. Anything further by

24   either side?

25                   MR. THEODORE:    No, your Honor.

1          MR. GREEN:   No, your Honor. So we need to be here–

2          THE COURT:   So counsel will be here at 8:30 to meet

3    with Ms. McCook, and then we'll see. If you can't get everything

4    done by 9:00, you can perhaps meet a little bit during the lunch

5    hour, end of day as well. Then we'll probably anticipate finishing

6    the Defendant's case tomorrow, maybe rebuttal as well; or, if not,

7    Friday morning. And, hopefully, we'll talk tomorrow about time

8    deadlines for closing arguments and when to have our formal

9    charge conference on the record.

10          All right.  Everyone have a pleasant evening.

11          (Whereupon, October 19th, 2011, Court adjourned at 5:00

12    p.m.)

# C E R T I F I C A T I O N

I certify that the foregoing is an accurate transcript of the record of

proceedings in the titled matter.


___/s/_*Donnetta Kocuba*_____                    ___9/17/12___
Donnetta Kocuba, RPR-RMR
Official Court Reporter
U.S. District Court
Knoxville, Tennessee