## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE, TENNESSEE

United States of America,      :
                                    :

              Plaintiff,      :

                                    :

vs.                             :         Case No. 3:10-cr-73

                                    :

Darren Wesley Huff,        :        **Trial Testimony/Motions**

                                    :

              Defendant.     :

Transcript of proceedings before the Honorable Thomas A. Varlan,

U. S. District Judge, on October 20th, 2011.

Appearances:

                            On behalf of the Plaintiff:

                            A. William Mackie, Esq.
                            Jeffrey E. Theodore, Esq.
                            U.  S. Attorney's Office
                            Knoxville, Tennessee

                            On behalf of the Defendant:

                            G. Scott Green, Esq.
                            Knoxville, Tennessee

Court Reporter:

                            Donnetta Kocuba, RMR
                            800 Market Street, Suite 132
                            Knoxville, Tennessee 37902
                            (865) 524-4590

I N D E X

<u>Defense presents and plays videotape of traffic stop to the jury</u>:        4


<u>Defendant's Witnesses</u>:                    <u>Direct</u>    <u>Cross</u>    <u>Redirect</u>  <u>Recross</u>

    Tim Guider                                   7          11          –
    Cindy Huff                                  14          19          22          –
    John Bigham                                 24          31          –
    Carl Swensson                               44          64          88          89
    Mike Fulmer                                 90          94          –
    W. Michael Morris DeSilva                   97         115         122          –
    Darren W. Huff                             122 **(continued on 10/21/11)**


<u>Defendant's Exhibits</u>:                                         <u>Identified</u>  <u>Received</u>

    3A,B - Videotape of traffic stop                       4            4

    46 -    E-mail re: "Here's what you need"               83           84


<u>Recesses</u>:            6, 44, 97


<u>Court's Rulings on Motions in Limine</u>:            175

1    (Whereupon, Thursday, October 20th, 2011, Court convened

2    without jury at 9:10 a.m.)

3            THE COURT:   Good morning, everyone.  Mr. Green,

4    are we ready to proceed?

5            MR. GREEN:   We are, your Honor, and the first thing

6    we're going to do is to play the entirety of the THP trooper stop.

7    The Government and I have agreed that the actual DVD that we're

8    going to be playing contains some other stops of his. The jury

9    doesn't have to see that. But we are going to substitute a duplicate

10   that has been made just of the relevant traffic stops and that will go

11   back to the jury.

12           THE COURT:   So what is being shown to the jury this

13   morning is what you want submitted?

14           MR. GREEN:   Right, right.

15           THE COURT:   It doesn't have any other–

16           MR. GREEN:    But as far as going back with them to the

17   jury room, there are some other stops on the DVD itself that they

18   won't see here this morning. But we are going to substitute a

19   duplicate that's been made of just what they see.

20           THE COURT:   All right.  You may do that, or Ms.

21   Norwood informs me, with our new JERS equipment, she can

22   record what's being shown to the jury this morning.

23           MR. GREEN:   All right.  Well, we'll just do that then.

24           COURTROOM DEPUTY:   As long as you don't stop

25   and start, I'm okay.

1      MR. GREEN:   There's one segment of it that goes for

2   about an hour, and then the second segment goes for about 35 to 40

3   minutes.

4      COURTROOM DEPUTY:   Then I can name it as 3A

5   and 3B.

6      MR. GREEN:   Yeah, we can do it as two exhibits.

7      THE COURT:   All right.  We'll do that as Defendant's

8   Exhibits 3A and 3B, admit those at this time, without objection.

9      (Defendant's Exhibit Nos. 3A and 3B received.)

10     THE COURT:   All right. Are we ready to bring the jury

11  in?

12     MR. GREEN:   Is it cued up, Paul?  The problem with

13  this, when it's got those little blue bars that have to go across it.

14     (Jury convened in courtroom at 9:26 a.m.)

15     THE COURT:   All right.  Thank you. Everyone may be

16  seated.  Good morning to our members of the jury.  You will recall,

17  the Government rested with its case yesterday, and then Defendant

18  is ready to begin the presentation of his evidence.

19     Mr. Green, do you want to announce your first–

20     MR. GREEN:   Thank you very much, your Honor.  The

21  parties have agreed to stipulate that, had Trooper Wilson been

22  recalled, we would introduce what will be the entirety of the THP

23  traffic stop from the morning of April the 20th, 2010.

24     And I just want to say I apologize on the front end.  This is

25  about an hour and a half long, and there are some periods where

1    there is not much going on. But we want the jury to see the whole

2    tape, so with that, if we could play the tape, please.

3                THE COURT:   All right.  We'll proceed forward with

4    the tape.  We'll probably show the tape and then take a break.  If

5    someone needs a break before the tape's over, then just get my

6    attention or Ms. Norwood or the security officer's attention.

7    Thank you.

8          (Whereupon, Defendant's Exhibit 3A was played to the jury.)

9                MR. GREEN:   Your Honor, if we could stop that for a

10   moment to get the sound on, stop that a moment.

11         ( Defendant's Ex. 3A stopped and then played to the jury with

12   audio.)

13               MR. GREEN:   Your Honor, there's a second segment to

14   this tape that is going to be about 35 to 40 minutes long.  I didn't

15   know if this was a good time the Court wanted to inquire if

16   anybody needed a break. Will take just a second to pause the next

17   one down. It should start at 4:49.

18               THE COURT:   Does anyone need to take a break? Is

19   that all right, then? What–

20               MR. GREEN:   It will take just a couple minutes to

21   download the second segment.  Paul, it's the next one down, should

22   say 8:04:49.

23               THE COURT:   The members of the jury may want to

24   stand up while we have a little bit of a wait.

25         (Defendant's Ex. 3B, next segment, played to the jury and

1    paused at 8:32:21.)

2    THE COURT:   Is the sound muted–

3    MR. GREEN:   No. The sound is "miked" in to the

4    trooper, and there's times when he gets back in the car that it cuts

5    out. There's a period here, your Honor, when the trooper reappears,

6    I know that there's some more sound that comes up. That may be a

7    few minutes, though.

8    THE COURT:   Why don't we do this? Why don't we go

9    ahead and stop the video and go ahead and take a break?

10   MR. GREEN:   Be fine.

11   THE COURT:   You all need a break, we're going to go

12   back, and if there's anything anyone wants to look at, anyway,

13   we'll hold it right here.  Let's take a 15-minute recess.

14   (Recess had 10:54 a.m.; reconvened without jury 11:15 a.m.)

15   THE COURT:   Ready to continue?

16   MR. GREEN:   We are, your Honor.

17   THE COURT:   All right.  Bring our jury in, please.

18   MR. GREEN:   Your Honor, before the jury comes back

19   in, I just wanted to say that, if we could, I've got one brief witness.

20   In fact, I've got several brief witnesses, but one of whom has

21   driven up from Loudon County, and I'd like to get him on real

22   quick and get him back after we do this.  It's going to be kind of out

23   of order, but it will make sense.

24   THE COURT:   That's fine. How much more do we have

25   left on the tape, 15 minutes?

1          MR. GREEN:  Fifteen minutes, tops.

2          THE COURT:   How long will that witness take on

3   direct?

4          MR. GREEN:  Five minutes.

5          THE COURT:   All right.  Well, looks like you'll have

6   plenty of time for that.  We're ready.

7               (Jury reconvened in courtroom at 11:17 a.m.)

8          THE COURT:   All right.  Thank you. Everyone may be

9   seated, and let's go ahead and hear the rest of the tape.

10          MR. GREEN:  Your Honor, I think Agent Johnson's

11   been running the machine over here.  If we could– like I said, there

12   will be a few minutes.  From what I can tell, it's just silence, and

13   we're just looking.

14          (Defendant's Exhibit No. 3B videotape played to the jury

15   beginning from 8:32 and then paused.)

16          MR. GREEN:  Your Honor, with the Court's

17   permission, I don't believe there's any sound on here until we see

18   the trooper reappear on the right side of his cruiser, passenger side,

19   headed toward the passenger side of his truck.  If we could just ask

20   permission, if we could just fast-forward to that.

21          THE COURT:  That would be fine.

22          MR. GREEN:  Unless the jury just wants to sit here and

23   look at the rain coming down on the window.

24          THE COURT:  I think we can fast-forward.

25          MR. GREEN:  I want to say it's around 8:39, 8:40, Paul.

1    (Defendant's Exhibit No. 3B videotape fast-forwarded,

2  played to the jury beginning at 8:42:12 and concluded.)

3          MR. GREEN:   That's it. Thank you. If you could turn

4  that off, please.

5          THE COURT:   Thank you. Defendant may call its next

6  witness.

7          MR. GREEN:   Your Honor, this witness will be a little

8  bit out of order and will be very brief. If we could call Tim Guider,

9  please.

10          THE COURT:   Do you need someone to get him?

11          MR. GREEN:   He's right outside. Tim Guider, please.

12  Sheriff, if you would come around here.

13          COURTROOM DEPUTY:   Raise your right hand. Do

14  you solemnly swear your testimony will be the truth, the whole

15  truth, and nothing but the truth, so help you God?

16          MR. GUIDER:  I do.

17          COURTROOM DEPUTY:   Please state and spell your

18  name for the record.

19          THE WITNESS: Tim W. Guider, T-i-m, W, G-u-i-d-e-r.

20                    **DIRECT EXAMINATION**

21  by Mr. Green:

22  Q.   Good morning, Sheriff. How are you?

23  A.   Just fine. Thank you.

24  Q.   If you could, sir– you've already told this jury what your

25  name is. How is it that you're employed?

1    A.    I'm the duly elected sheriff of Loudon County.

2    Q.    And you've been the duly elected sheriff of Loudon County, I

3    believe, for several terms now; is that correct?

4    A.    Yes, sir. I'm in my sixth term.

5    Q.    Prior to that you were in law enforcement, I believe, for a

6    while before that as well, weren't you?

7    A.    Yes, sir.

8    Q.    Well, your family, in fact, was related in the marshal's service

9    here in the U.S. Courthouse; is that correct?

10   A.    Yes, sir. I had an uncle who was a deputy marshal.

11   Q.    I want to direct your attention, Sheriff Guider, to the latter

12   part of April, last year, 2010. Do you recall a period of time when

13   you and Sheriff Butch Burgess from Cumberland County were

14   working together on some sort of joint investigation?

15   A.    I do.

16   Q.    And during the course of that investigation, was there a day

17   where Sheriff Burgess was there at the Loudon County Justice

18   Center?

19   A.    Yes, sir. Yes, sir.

20   Q.    Describe just to the members of the jury who may not be

21   familiar with the justice center. If you parked in the parking lot,

22   how would you get to your office in the justice center?

23   A.    If you're parked in the front parking lot of the Loudon County

24   Justice Center, there is a sidewalk, a ramp, if you will, on the left

25   side of the building, at the flag pole, and you walk up that ramp to

1    my office.

2    Q.    Do you recall at some point, sometime during the period April

3    28th through the 30th of last year, seeing this gentleman, Mr. Huff,

4    walk up and talk to you?

5    A.    Yes, sir. I don't know if he had the goatee or not then. I'm

6    not sure. I can't– I don't remember it.

7    Q.    Okay. Perhaps a shorter version of it?

8    A.    Maybe, yes, sir.

9    Q.    If you would, tell the members of the jury what you recall

10   about the conversation between you and Mr. Huff.

11   A.    It was mid-morning, I guess. I had gotten out of my car and

12   was walking toward the office, and there about the flag pole area I

13   heard a voice. I think he said, "Sheriff," or "Are you the sheriff?"

14   I stopped and we talked.

15        He asked me– and just forgive me, because– and I think I told

16   you, sir, that it's very vague to me and it was very brief. He asked

17   me if I– what my morals were, I think, possibly, and would I be

18   willing to arrest a colleague, a fellow sheriff, if it warranted, and if

19   that person was corrupt, would I be willing to arrest that person.

20   Q.    And what was your response when he asked you that?

21   A.    Well, I was kind of shocked. I mean, I just didn't know how–

22   I think I may have said something like, well, I'd have to know more

23   about it than this, I mean, just based on hearsay, maybe. I may

24   have said I might do it, yes.

25   Q.    How long do you think the conversation between you and Mr.

1 Huff lasted?

2 A.   Well, again, I was kind of in a hurry and we were having–

3 going to be culminating investigation, including several agencies,

4 multi-jurisdictional investigation.  And Sheriff Burgess and I– I

5 think I said, yes, I'm going to be meeting a fellow sheriff, we're

6 going to be working on a case very soon, and I need to go. Maybe

7 five, ten minutes at the most.

8 Q.   Was there any discuss perhaps getting together later with Mr.

9 Huff?

10 A.   If there was, I don't remember.

11 Q.   Okay.  Was it your impression that Mr. Huff was seeking to

12 ask for your help in doing something to assist him?

13 A.   I suppose.

14         MR. GREEN:   You may cross-examine.

15         THE COURT:   Thank you. Cross-examination

16         MR. THEODORE:    Just briefly, your Honor.

17                 **CROSS-EXAMINATION**

18 by Mr. Theodore:

19 Q.   Had you ever met Mr. Huff before that day?

20 A.   No, sir.

21 Q.   Who did you think– I mean, did you think he was just some

22 citizen from your county coming up to you?  What did you think?

23 A.   I don't think I would have thought he was a citizen from my

24 county.  I don't– again, it's very vague, and I don't know if he even

25 mentioned where he was from or anything.  But I was almost

1    certain he wasn't from my county.

2    Q.    Did he indicate that he wanted to arrest certain public

3    officials?

4    A.    He wanted me to– he wanted to know if I would, if I would

5    arrest corrupt officials, if I would, in my position as a sheriff, from

6    say, from say a neighboring county. I believe that's the way he

7    said it.

8    Q.    And did he say specifically who? Did he give a name?

9    A.    I can't recall.

10   Q.    I want to show you what's been admitted as Government's

11   Exhibit Number Two. Was he talking about executing some

12   warrants against somebody who might have been a colleague of

13   yours, something like that?

14   A.    I've not seen, I've not seen this document nor, I don't believe,

15   he asked me to execute a document at that time. The conversation

16   was, again, very short, and he just kind of wanted to know if I

17   would be– if I would arrest someone who I thought would be

18   corrupt.

19   Q.    You're the chief law enforcement officer of the county, of

20   Loudon County, then, correct?

21   A.    Yes, sir.

22   Q.    When you look at this document, Sheriff, what's titled a

23   "Citizens' Arrest Warrant," that, as a law enforcement officer,

24   does that appear to have any legitimacy to you at all?

25   A.    No, it doesn't. It's not similar to any warrants that I'm

1    familiar with.

2    Q.    Did you notice the vehicle that Mr. Huff arrived in when you

3    saw him?

4    A.    I couldn't say for sure.

5    Q.    If you can see this, this is Government's Exhibit 23.  This is a

6    utility truck with camouflage paint on it.  Does that look familiar;

7    do you recall?

8    A.    No, sir.

9    Q.    Going back to Government's Exhibit Number Two, do you see

10   where it says, "Declared Domestic Enemies"?

11   A.    Yes.

12           MR. GREEN:   Your Honor, I'd object.  He's already

13   said he was not shown this document, is not familiar with the

14   document.  It's already in evidence.  I object to this line of

15   questioning.  It's beyond the scope of direct, anyway.

16           MR. THEODORE:    Well, your Honor, it's been

17   admitted, and he can give his opinion, I think, about it as the chief

18   law enforcement officer, and part of the direct testimony was

19   concerning making possible arrests.

20           MR. GREEN:   He's already said that it did not appear to

21   be a valid warrant.  We'll stipulate that no clerk issued it.

22           THE COURT:   I understand. You don't need further

23   questions on this opinion on the validity of the warrant.  Is that a

24   specific question about an individual on the warrant? Otherwise, if

25   not, I'll sustain the objection.

1      MR. THEODORE:   Yes.

2   Q.   The question is just, Sheriff, would you, based on this

3   document, would you arrest anybody listed there that's on that

4   based upon this document?

5   A.   I would not.

6         THE COURT:   And I believe that's already been

7   addressed, so let's go ahead.

8         MR. THEODORE:   All right. Nothing further, your

9   Honor.

10        THE COURT:   Any redirect?

11        MR. GREEN:   No, your Honor.

12        THE COURT:   All right. Thank you, Sheriff Guider.

13   You may be excused.

14        THE WITNESS:   Thank you, sir.

15      (Witness excused.)

16        MR. GREEN:   Your Honor, I call Cindy Huff.

17        COURTROOM DEPUTY:   Raise your right hand. Do

18   you solemnly swear your testimony will be the truth, the whole

19   truth, and nothing but the truth, so help you God?

20        MS. HUFF:   Yes.

21        COURTROOM DEPUTY:   Would you please state and

22   spell your name for the record?

23        THE WITNESS:   Cindy Huff, C-i-n-d-y, H-u-f-f.

24                    **DIRECT EXAMINATION**

25   by Mr. Green:

1   Q.   Good morning, Ms. Huff. If you would, if you have trouble

2   hearing me, let me know, but if you would just answer my

3   questions and speak up so these folks can hear. Okay. You

4   introduced yourself as Cindy Huff and how are you related to

5   Darren Huff?

6   A.   I'm his wife.

7   Q.   And how long have you all been married?

8   A.   Ten years.

9   Q.   All right. Just some very brief questions, get straight to the

10  point. Do you recall on April the 19th, 2010, were you at home when

11  there was a knock on the door and Agent Reed with the FBI showed

12  up?

13  A.   Yes, sir.

14  Q.   Who all was present at your house when the FBI showed up?

15  A.   Darren and myself.

16  Q.   Was there anyone with the FBI agent that you recall?

17  A.   Yes, sir.

18  Q.   And who was that?

19  A.   Two deputies from the sheriff's department, Paulding County.

20  Q.   Where did Darren and these individuals go to talk?

21  A.   They stayed out on the front porch.

22  Q.   Were you out there with them the entirety of the time?

23  A.   I was in and out, not the entirety.

24  Q.   Okay. When you were outside, who was doing all of the

25  talking?

1    A.    Pretty much Darren.

2    Q.    And that's not uncommon, for Darren to talk a lot, is it?

3    A.    No, sir.

4    Q.    Was Agent Reed, from what you could hear, the one who was

5    speaking among the three law enforcement officers that were

6    there?

7    A.    Yes, sir.

8    Q.    Do you recall a point in time where agent Reed said that he

9    was going to have to call his supervisor?

10   A.    Yes, sir.

11   Q.    And immediately prior to him making that statement, do you

12   recall Darren saying something to Agent Reed?

13   A.    Yes.

14   Q.    And what was that?

15   A.    He said that, in reference to going down to Monroe County, he

16   said that if he would talk to his supervisor, if he thought it was a

17   bad idea, that he needed to– he asked him to give him a call and he

18   would call the whole thing off.

19   Q.    And Darren said that, correct?

20   A.    Yes.

21   Q.    To the FBI agent, correct?

22   A.    Yes.

23   Q.    And that's when the FBI agent said he needed to call his

24   supervisor?

25   A.    Yes.

1   Q.    Were you present outside and did you hear, prior to that, your

2   husband tell the FBI agent that they planned to go up there with his

3   .45 and his AK?

4   A.    I don't recall.

5   Q.    Didn't hear that part?

6   A.    No.

7   Q.    Describe the terrain around where you live, where your house

8   sets.

9   A.    It's very rural. We have 100 acres of logging land behind our

10  house. It's a subdivision that's not completely finished out.

11  Q.    And as far as where your house sits, is there one way in and

12  one way out?

13  A.    Yes, sir.

14  Q.    Are there woods around either side of the road on the road

15  coming up to where your house is?

16  A.    Yes, sir.

17           MR. GREEN:   If you could put Exhibit 23 back up,

18  please.

19  Q.    Are you familiar with that truck that's in that picture?

20  A.    Yes, sir.

21  Q.    And whose is that?

22  A.    That's Darren's.

23  Q.    Do you recall back in April of last year, was there ever a time

24  when there was an anti-aircraft gun mounted in it?

25  A.    No, sir.

1    Q.    As recently as just a couple of days ago, have you looked at

2    the bed of that truck?

3    A.    Yes, sir.

4    Q.    Has it been modified in any way?

5    A.    No, sir.

6            MR. GREEN:  If you could flash up Number Ten, please.

7    Q.    Is that, likewise, your husband's truck that you see in front of

8    you?

9    A.    Yes.

10   Q.    Now, it doesn't look exactly like that today, does it?

11   A.    No, sir.

12   Q.    Read the license plate, if you would, that you see in front of

13   you.

14   A.    It says "IM-LIT."

15   Q.    What type of business did your husband used to have?

16   A.    He had an outdoor lighting business.

17   Q.    And was that same plate on there when he had the outdoor

18   lighting business?

19   A.    Yes, sir.  He got it for that.

20   Q.    Before there was the "Oath Keepers" writing on this truck,

21   what did it say?

22   A.    On this?  It said, "Artistic Nights Outdoor Lighting."

23   Q.    It's fair to say your husband likes to talk a lot, doesn't he?

24   A.    Yes.

25           MR. GREEN:   You may cross-examine.

1    THE COURT:   Thank you. Cross-examination.

2                      **CROSS-EXAMINATION**

3    by Mr. Theodore:

4    Q.    Good morning.

5    A.    Good morning.

6    Q.    You mentioned you were with your husband when an FBI

7    agent came over on April 19th, 2010?

8    A.    Correct.

9    Q.    And was that Special Agent Reed?

10   A.    That was correct.

11   Q.    And do you recall your husband telling Agent Reed at that

12   time that he planned to go to Madisonville that next day to execute

13   citizens' arrest warrants?

14   A.    I don't recall the whole– I was in and out between some of the

15   conversation?

16   A.    Did you hear those statements by your husband?

17   A.    No. I don't recall.

18   Q.    Do you recall him telling Agent Reed that they wanted– that if

19   they could take back Madisonville, they could take back Monroe

20   County? Do you recall your husband saying that?

21   A.    I don't recall.

22   Q.    Do you recall him saying that it was a situation right then

23   where it was "Us against them"? Do you recall him telling that to

24   Agent Reed?

25   A.    Like I said, I was in and out. I don't– I don't recall.

1    Q.    You know that your husband, though, just from conversations

2    with him, was planning on going to Madisonville to execute

3    citizens' arrest warrants that next day, don't you?

4    A.    Correct.

5    Q.    In fact, he was very passionate about that; was he not?

6    A.    Yes.

7    Q.    And, in fact, probably say he was pretty almost obsessed with

8    it at that time?

9    A.    Passionate, yes.

10   Q.    He was going to Madisonville, Tennessee, from his residence,

11   he was going there quite frequently, wasn't he?

12   A.    Yes.

13   Q.    And he doesn't have any other connection to Madisonville,

14   Tennessee, other than this incident, right?

15   A.    No.

16   Q.    You don't have any relatives there, he doesn't have any

17   relatives there?

18   A.    No.

19   Q.    Your husband also told you that, in addition to wanting to

20   execute citizens' arrest warrants, they wanted to take over the

21   courthouse in Madisonville, Tennessee, didn't he?

22   A.    No.

23   Q.    Never said that?

24   A.    No.

25   Q.    But he talked about executing citizens' arrest warrants?

1  A.   Yes.

2  Q.   Did you see him on the early morning hours of April 20th,

3  2010?

4  A.   Yes, when he left the house.

5  Q.   And you saw that he had a firearm on his person at that time,

6  right?

7  A.   Yes, as I recall.

8  Q.   He had his Colt .45?

9  A.   Yes.

10  Q.   And he took an AK-47 with him as well; did he not?

11  A.   I don't know. I don't know what was in the truck.

12  Q.   Did he commonly keep it in the truck?

13  A.   I don't know. I don't– I don't recall.

14  Q.   Okay. Well, even if you don't recall that day, do you know if

15  he normally keeps it in a truck?

16  A.   I don't think he would, no.

17  Q.   Were you aware of the fact that your husband, in addition to

18  having this AK-47, kept several hundred rounds of ammunition in

19  his possession at the residence or other places?

20  A.   Yes.

21  Q.   In fact, the search warrant was executed at your house, you

22  were there at that time; is that right?

23  A.   Yes.

24  Q.   And there were over 400 rounds of AK-47 bullets or

25  ammunition found in your house, right?

1   A.   Yes.

2   Q.   Do you know if your husband had rounds of ammunition in

3   the truck when he left for Madisonville, Tennessee, on April 20?

4   A.   No.

5           MR. THEODORE:   Nothing further your Honor.

6           THE COURT:   Thank you. Redirect?

7           MR. GREEN:   Your Honor, just briefly, since we

8   touched upon the morning of the 20th on cross.

9                    **REDIRECT EXAMINATION**

10   by Mr. Green:

11   Q.   Ms. Huff, you said you saw Darren, your husband, leave on

12   the morning of the 20th?

13   A.   Yes, sir.

14   Q.   Who was with him?

15   A.   He was by himself when he left my house.

16   Q.   Okay.  The morning that he left to go to Madisonville, who

17   rode up there with him?

18   A.   Michael was supposed to go.

19   Q.   Michael did?

20   A.   Uh-huh.

21   Q.   And who's Michael?

22   A.   Michael is one of our Bible study kids that we've known for a

23   while.

24   Q.   All right.  And how would you characterize your relationship

25   and your husband's relationship with Michael?

1    A.    They're friends.

2    Q.    Close friends?

3    A.    Yeah.

4              MR. GREEN:  That's all.

5              THE COURT:  Thank you. Any recross?

6              MR. THEODORE:    No, your Honor.

7              THE COURT:  All right.  Thank you, Ms. Huff. You

8    may be excused.

9              THE WITNESS:    Thank you.

10         (Witness excused.)

11             MR. GREEN:  Your Honor, the next number of

12   witnesses that I've got may be– we can try it if you want, but it's

13   quarter 'til.  It may be–

14             THE COURT:  Well, we just took a break.  Why don't

15   we go ahead and start with one of them?

16             MR. GREEN:  Okay.

17             THE COURT:  We'll just go maybe for about 30

18   minutes or so, little longer.

19             MR. GREEN:  I call John Bigham.

20             COURTROOM DEPUTY:    Raise your right hand.  Do

21   you solemnly swear your testimony will be the truth, the whole

22   truth, and nothing but the truth, so help you God?

23             MR. BIGHAM:  I do.

24             COURTROOM DEPUTY:  Would you please state and

25   spell your name for the record?

1          THE WITNESS:  John, J-o-h-n; B-i-g-h-a-m, Bigham.

2                    **DIRECT EXAMINATION**

3     by Mr. Green:

4     Q.    If you could, sir, tell this court and jury where you live.

5     A.    I live in McDonough, Georgia.

6     Q.    And do you know Mr. Huff?

7     A.    I do, sir.

8     Q.    How long have you known him?

9     A.    I've known Darren probably about three, three years, three

10    and a half years, somewhere in that neighborhood.

11    Q.    And how was it that you met him?

12    A.    I met him actually– I had a Georgia Militia meeting that I like

13    to refer to as the overgrown Boy Scout club.

14    Q.    Did you guys– did you know him before that?

15    A.    I did not.

16    Q.    Now, you were a member of the Georgia Militia at the time; is

17    that correct?

18    A.    Yes, sir. That's correct.

19    Q.    You characterize it as an overgrown Boy Scouts club.  Just

20    describe–

21              MR. MACKIE:    Objection, your Honor, leading.

22              MR. GREEN:  I'm just trying to get to the crux, your

23    Honor.

24              THE COURT:  Go ahead.

25              MR. GREEN:  Apologize if I was leading.

1    Q.    Describe to the members of this jury your experience with the

2    Georgia Militia.  What did it entail?

3    A.    Well, the Georgia Militia, really, I call it the overgrown Boy

4    Scout club. It was a bunch of guys who were– used to call them

5    survivalists, and now they call them "preppers," I think, and kind

6    of prepare themselves for emergencies.

7         We go out and do cold-weather camping, much colder than it

8    was today, as a matter of fact. We would do land navigation, radio

9    communications, and we'd go out and shoot from time to time.

10   Actually, pretty rare when we shot, but we did– I don't think

11   anybody's ever done any Appleseed training. It's like a

12   marksmanship training class. That was the bulk of it.

13   Q.    And how often would you and the other militia members get

14   together each month?

15   A.    We'd usually get together about once a month.  We'd try to.

16   Every now and then, we'd skip a month, but about once a month

17   we'd get together on a weekend and do something, whatever. It was

18   just a, you know, meeting to chitchat and go over maybe some

19   academics, like book work.  And then, you know, every now and

20   then we'd go on what we called like a field training exercise, where

21   we did the cold weather camping.

22   Q.    Where would these meetings take place?

23   A.    Most of them were at Darren's house.  As a matter of fact, I

24   can't think of one that wasn't at Darren's house.

25   Q.    Where would the field training exercises take place?

1    A.    You know, there was a couple places we did that.  One was

2    just private residence where the guy had plenty land where we did

3    the Appleseed Marksmanship training.  And then the other one

4    was– I think they leased out some land and had like power lines

5    going over it, and we'd go over there and do some camping.  I think

6    we did that once or twice.

7    Q.    Now, on April the 20ᵗʰ, 2010, you did not come to Tennessee,

8    did you?

9    A.    No, sir, did not.

10   Q.    Was there a prior engagement that you had before that that

11   encompassed part of the couple days before that?

12   A.    Yes, sir.  There was actually what we call a "Restore the

13   Constitution" rally. There was a Second Amendment rally actually

14   going on downtown Washington D.C.  Of course, you know, the

15   law forbids you to take a weapon to Washington D.C., and we

16   wanted to actually demonstrate with our weapons, and so we

17   actually posted up across the Potomac River in Virginia, where

18   you're legally allowed to carry weapons, and that's where we had

19   our demonstration, right along with, you know, police liaisons.

20         You know, we– how do I say this?  Nobody likes surprises,

21   especially law enforcement, when there's guns.  So we made sure

22   that they knew what we're doing, how many were coming, you

23   know, what kind of weapons we were carrying and things like that,

24   so there weren't any surprises. You know, it was a very peaceful

25   rally, but we just happened to have our, you know, sidearms or

1   firearms and arms– and sidearms with us.

2   Q.    And how many people do you think were at this rally?

3   A.    I've seen varying figures, but somewhere between 45, 50

4   people. You know, the one law enforcement liaison was there, and

5   there was probably– I think we were probably out-numbered by the

6   media, to be honest with you. There was at least 50 or 60 of the

7   news media there.

8   Q.    What types of weapons were there?

9   A.    Well, they were varying from, you know, AK-47s, AR-15s to,

10  you know, M-4 carbines, which is like a variation of an AR-15;

11  sidearms, varying calibers, you know, nine-millimeter, .40

12  millimeter or 45– or caliber, excuse me, caliber. So but just, you

13  know, various weapons that were there.

14  Q.    What type of weapons did you have?

15  A.    I had a nine-millimeter side arm and an M-4 carbine, which is

16  a rifle, like a– almost like an M-16, for the guys that know what an

17  M-16 is. It's very similar to an M-16.

18  Q.    Okay. Did you drive from Georgia to this area with these

19  weapons you just described?

20  A.    Yes, sir.

21  Q.    Across state lines?

22  A.    Yes, sir. We're very cautious to, you know, what the laws

23  were from state to state. As a matter of fact, every state that we

24  went through, except for South Carolina, has what they call a

25  reciprocity agreement; whereas, if you have a carry permit within

1    your residing state and you have another state that recognizes that,

2    that permit, then you can legally carry your weapon, as long as you

3    abide by their state laws.

4         And South Carolina does not recognize Georgia carry permits,

5    so made sure, you know, weapons were stowed when we went

6    through South Carolina, and we got them back out, you know, when

7    we got through South Carolina.

8    Q.    And when you got to D.C., the actual demonstration was on

9    the 19th, in Virginia?

10   A.    It was a Monday. I'd have to look at the calendar if that was,

11   you know, the 19th. I think it was the 19th; the 19th or 20th, whatever

12   that Monday was.

13   Q.    And the day before, what happened?

14   A.    Oh, that was– I'd say it was funny, but I'm sure the law

15   enforcement didn't think it was real funny. We got there a day

16   before to go through what we call like a dry run, just to kind of go

17   through the motions. We met at one park and then we caravan'd

18   over to a place called Gravelly Point, which is right– you know,

19   you can see the Capitol Building from this park; it's right at the

20   end of the runway of Reagan International Air Port as well.

21        Most of us just had sidearms, but one person happened to be

22   carrying his rifle slung over his shoulder. You know, that was one

23   of the safety things; if you're going to carry a rifle, we want it

24   slung over your shoulder, barrel down, so you wouldn't

25   accidentally discharge and shoot at, you know, a plane overhead or

1 whatever.

2 But, anyway, we gathered around, and there were, you know,

3 families there, you know, doing soccer and playing, you know,

4 riding bikes, and things like that. All of a sudden somebody said

5 there's a bunch of police officers just came in the parking lot. I

6 turned, and there was probably about, you know, four or five of

7 them or so, and they're coming out, getting their body armor on.

8 We had a sergeant, police liaison, there with us, and she says,

9 "Darn. I should have called and let them know we're coming to do

10 this," because, evidently, somebody in the park saw that rifle and

11 got, you know, nervous, which is hard to blame them for that. They

12 got nervous and called the police.

13 So she, you know, went over there, and there was probably

14 another four or five of them coming in by the time she went over

15 there to tell them what was happening, and, you know, just

16 explained what was happening, and they packed up and left.

17 Q.    So if I'm understanding correctly, there was three or more

18 people there, correct?

19 A.    I'm sorry?

20 Q.    Three or more people at the park that day?

21 A.    Three? I mean–

22 Q.    Three or more people at the park–

23 A.    Oh, yeah, oh yeah. Yeah, at that time, we didn't have a full,

24 you know, contingency there, but I would say there was probably at

25 least 20. And then the next day is when we had about 45 or 50.

1    Q.    Cops show up because there was a bunch of guns there, right?

2    A.    Yes, sir.

3    Q.    At least, for a moment, on the 18th, somewhat unsettling,

4    correct?

5    A.    I'm sure it was for some of those families, yeah.

6    Q.    And you transported guns across state lines, correct?

7    A.    A few of them, actually, yeah.

8    Q.    Are you under indictment for violating 18 U.S.C. 231?

9    A.    I have no clue what that is, so I'm not under indictment for

10   anything, so I'm going to say no to that.

11   Q.    Backing up to some of the militia meetings, do you recall a

12   meeting where Mr. Huff was speaking to you and other militia

13   members about going to Tennessee?

14   A.    Yes, sir.

15   Q.    And you declined to go; is that correct?

16   A.    Declined to go to Tennessee, yes. I was at that meeting,

17   though, yeah.

18   Q.    Okay. Was Mr. Huff talking about going to effect citizens'

19   arrests?

20   A.    Yes, sir. It was a citizen's arrest and also to show support for

21   Lieutenant Commander Fitzpatrick, otherwise known as Walt to

22   some of us. But he was intent going, effecting a citizen's arrest up

23   there, and Darren wanted to, you know, solicit some help not as a

24   militia member, but just as a person. He actually kind of said that

25   disclaimer before he started asking us to go up there.

1    Really, he wanted us to come more like witnesses. You know,

2    I was concerned about– how do I say this? Every experience I've

3    had with law enforcement has been very good. Okay. But he was

4    concerned about some of the law enforcement within Madison

5    County and Madisonville, and his feeling was, there were plenty of

6    people to watch what was going on. Then there wouldn't be any

7    adverse reactions by law enforcement. He was a little concerned he

8    was, honestly, going to get roughed up a little bit.

9    Q.    And did he specifically say what his feelings are about

10   whether or not there should be any violence?

11          MR. MACKIE:    Objection. If he's asking what Mr.

12   Huff says. I object as to hearsay.

13          MR. GREEN:   That's fine. Your witness.

14          THE COURT:  All right. Thank you. Cross-examination.

15          MR. MACKIE:   Yes, sir.

16                        **CROSS-EXAMINATION**

17   by Mr. Mackie:

18   Q.    Good morning. Almost afternoon. I'll try to be brief on this.

19   I'm Mr. Mackie, I'm with the U.S. Attorney's Office. I want to ask

20   you a few questions as to this. You understand that today you're

21   testifying as to certain facts, correct?

22   A.    Yes, sir.

23   Q.    All right. And I believe that it's, shall I say, appropriate for

24   me and would you agree to ask questions of you to determine so the

25   jury can assess whether you have any sort of bias or any sort of

1    inclination to favor Mr. Huff?

2    A.    Okay.

3    Q.    That might affect your testimony?

4    A.    Understood.

5    Q.    All right.  So that's a fair proposition, correct?

6    A.    I– sure.  Do I have a choice?

7    Q.    And you being a member of the Georgia Militia–

8    A.    Yes, sir.

9    Q.    –it would be fair to say that you want to defend, in a sense, the

10   right of you and Mr. Huff to be in this group that's called the

11   militia, correct?

12   A.    I think that we have the right to be in this group, we have the

13   right to bear arms as well.  You know, it's constitutional, so, you

14   know, I guess define the word "defend."  I'm not quite sure what

15   you mean by that.

16   Q.    Defend, as you're saying, that it was something akin to the

17   Boy Scouts as opposed to an armed group?

18   A.    Yeah, it was.  As I said, it was more of a overgrown Boy Scout

19   troop, to be honest with you.

20   Q.    If we could–

21   A.    Can I add to that?  Because, actually, it was something I

22   considered when I joined.  Because, you know, I think, typically,

23   when people think militia, they think of a bunch of guys with guns

24   going out in the woods and, you know, trying to plot to take over,

25   you know, places, and some of them do, to be honest with you.  I'm

1  with you on that. I was really kind of concerned about that when I

2  first joined with these guys, but not all of them are like that. I

3  mean, this group was not even close to that.

4  Q.     Let me ask you, do you possess assault rifles?

5  A.     I possess an M-4 carbine.

6  Q.     Which, if I'm not mistaken, is a single-action shotgun– I

7  mean, a single gun that shoots one time. It looks like an M-16;

8  only it shoots one bullet at a time?

9  A.     It does not shoot more– well, it shoots one bullet at a time.

10  It's semiautomatic, so it has to cycle through, and you have to pull

11  the trigger again to shoot again. Very similar like a Ruger, you

12  know, 10/22, for those of you who are familiar with that,

13  semiautomatic.

14  Q.     I'm going to show you what is Government Exhibit 64; it's in

15  evidence. It's a Kel-Tec 40. Do you have anything like this, which

16  is an assault–

17              THE COURT:   Just for the record, what's the number

18  again? I believe–

19              MR. MACKIE:    Thirty-four, excuse me, 34.

20              THE COURT:   Thirty-four. Thank you.

21  A.     No, I do not.

22  Q.     Would you agree that that weapon is used to shoot people and

23  not, say, squirrels?

24  A.     I would say you're talking to a Second Amendment supporter

25  here, and it's not the gun that shoots the people; it's the person

1  behind the gun that shoots the person. That gun is for sport, for

2  shooting, whatever, you know, the person behind it decides wants

3  to shoot.

4  Q.    Right. So if that person wants to shoot someone, that is the

5  type of weapon– that's an assault weapon that would be used to

6  shoot people?

7  A.    Again, I don't like the term "assault weapon." I think that's

8  way overblown. In fact, I was quite disappointed when I bought

9  mine because it was, blown up to be this really major, dangerous

10 weapon, and it's really nothing but a glorified .22 caliber rifle. So,

11 I mean, you know, it's kind of melodramatic, if you will, to call it

12 an assault rifle.

13 Q.    Have you ever been involved in the Boy Scouts?

14 A.    I have, in the Cub Scouts. I actually, you know, left after Cub

15 Scouts.

16 Q.    Did you ever take an assault weapon to the Cub Scouts and

17 test-fire it?

18 A.    I was under age then. I was underage then, to be able to carry

19 a weapon, so–

20 Q.    But if you were a scout master, would you bring this to a Boy

21 Scouts or Cub Scouts campout?

22 A.    I don't have one, so–

23 Q.    Now, do you recognize, as a member of the Georgia Militia,

24 do you recognize the federal jurisdiction of this court?

25 A.    First, I'm no longer a member. But–

1   Q.    Do you, as a person, recognize the jurisdiction of the federal

2   court?

3   A.    I recognize the jurisdiction just about every court that's out

4   there, law-abiding citizen.

5   Q.    So you don't challenge the jurisdiction of this court?

6   A.    No. No, I wouldn't challenge the jurisdiction of the court,

7   but, you know, you challenge that through lobbying your

8   legislature and changing the law, if you want to challenge

9   anything, so–

10  Q.    Do you share some of the views, when you were with the

11  Georgia Militia, at the time that you were with Mr. Huff, of the

12  Georgia Militia, coming off of their website, that the government

13  at federal, state and local levels, trample on the people and the

14  constitution?

15  A.    To an extent, I think that's a fair statement. That's not just

16  isolated to the militia, by the way. I think there is a pretty good

17  movement these days where people feel like the Government is

18  trampling on our rights.

19  Q.    And as a way to, in your belief–

20         MR. GREEN:   Your Honor, I want to interpose an

21  objection. Now, there's two Georgia Militias. I just want to make

22  sure we're talking about the one that Mr. Huff was a member of.

23         MR. MACKIE:    Well, that would be a good question.

24  Q.    There are at least, I think, three Georgia Militias. Which one

25  are you talking about?

1    A.    Honestly, I don't even remember reading that on that website,

2    to be honest with you. I think there's more than three or two.

3    Well, there's different like regions, you know, and people have

4    their own little meetings and stuff. But I couldn't tell you how

5    many Georgia Militias there are

6    Q.    Do you know what this symbol means?

7         (Attorney Mackie holding up three fingers.)

8    A.    Three.

9    Q.    But does that mean anything as far as the next revolution, to

10   your knowledge?

11   A.    Well, if you're referring to what they call the three

12   percenters? Is that kind of what you're driving at? I've heard of

13   that before. I've never seen anybody do that, though, except for

14   you.

15   Q.    Well, what does the three percenters mean?

16   A.    Well, there is a, mostly from a historic perspective, people

17   have said during the Revolutionary War back in the 1700s, that

18   there was three per cent of the population that actively participated

19   in that battle to win the freedom of the colonies and–

20   Q.    So it's essentially saying that there's three per cent of the

21   population that basically are legitimate because they are

22   descendants of the ones that fought the revolution?

23   A.    I'll take your word for that. Haven't heard that before.

24   Q.    Do you subscribe to the view that politicians and the media

25   will pay a lot more attention to you and your message if you show

1    up with weapons?

2    A.    I used to, but that doesn't seem to happen anymore.  We've

3    actually had numerous armed rallies starting with the one at

4    Gravelly Point, where, in that situation, you know, we were

5    outnumbered by the news media.  We've since held probably six or

6    seven in Atlanta and in my home town, McDonough; and, to my

7    knowledge, we have not had any news media show up in– well,

8    there was one, the one we held in McDonough, in my home town,

9    on the town square there, there was one media, a news media guy

10   that showed up, and he actually gave us pretty favorable coverage.

11   Q.    Now, you discussed traveling up to D.C. for some gathering

12   on, I guess it was, the 19th?

13   A.    I didn't say D.C., but it was Virginia.  I mean, it was–

14   Q.    Where was it?

15   A.    In Virginia, Gravelly Point, Virginia.  We couldn't go into

16   D.C. because we had guns, so we stayed away from there.

17   Q.    When you were going up there, did you travel, I think the

18   question was, you traveled with weapons up there, correct?

19   A.    Correct.

20   Q.    Were you going up there with the intent to take possession,

21   take over, to take command of that field or a courthouse or

22   anything like that?

23   A.    Well, the intent of the rally was to call attention to the

24   potential for our Second Amendment rights being taken away from

25   us. That was why we were there.

1    Q.    I believe you said the law enforcement showed up because

2    somebody was called in or something like that?

3    A.    Well, we had a liaison that was actually with us every moment

4    we were there– well, every moment we were in the parks.  I mean,

5    you know, when we dispersed for the day, they didn't go with us.

6    We had one liaison that I believe was the park police that was with

7    us whenever we were in the park.

8    Q.    Okay.  So you took an action trying to call ahead to the

9    authorities to let them know you were going to be there with

10   weapons?

11   A.    Yes, we– I did not personally on that one, although I have

12   with some of the rallies in Atlanta.  We just want to make sure that

13   law enforcement knows what our intentions are, they are peaceful,

14   we're just here to demonstrate and exercise our First Amendment

15   right as well as our Second Amendment right at the same time.  We

16   just want to make sure they are aware of what we're doing.

17   Q.    Do you believe that, at that instance, or any other instance, as

18   a member of the militia, if someone in state or federal law

19   enforcement or federal government tried to take your weapons or to

20   do something, that you would have the right to forcibly resist that?

21   A.    You know, I've struggled with that in my mind, and I've not

22   honestly come up to a conclusion with that.  Just I hope it never

23   happens.  I just do not know.  I mean, it's a violation of the law.  I

24   don't know.  I mean, I'd have to wait for that moment to happen

25   and just hope it never does, to be honest with you.  I just–

1    Q.    Let's assume for the moment, of course, that you–

2    A.    I don't want to assume for a moment that that's the case.

3    Q.    Well, let's assume for a moment that you have a lawful permit

4    and that would have been an improper taking of your weapon.

5          MR. GREEN:   Your Honor, I've allowed a lot of

6    latitude, but assuming for the moment is not proper cross-

7    examination.

8          MR. MACKIE:    All right.  I will rephrase that.

9          THE COURT:   Thank you.

10   Q.    If you're there and a police officer comes and takes your

11   weapon, that you believe is unlawful, my question is, then it's up

12   to you, it's your decision whether you have a right to shoot him?

13   A.    Well, let me put it this way.  This is the best way I think I can

14   explain that, and I'll say that most of my interaction has been very

15   positive with the law enforcement. As a matter of fact, become

16   friends with some of the capital police down at the Georgia capital.

17   Q.    Could you respond to the question?

18   A.    I will.  It's–

19   Q.    It's a yes or no question.

20   A.    Well, I'm not going to honor that with a yes or no because it

21   requires more explanation.

22          THE COURT:   The question is, can you answer yes or

23   no; if not, in what way can you answer that?

24          THE WITNESS:    Okay.  I'm sorry.

25          THE COURT:   Go ahead.  If the question can be

1    answered yes or no, then try to do so; if it cannot, then you can

2    explain why it cannot.

3    A.    I can't, I can't answer that question.  There's, you know,

4    numerous circumstances that could come into play with that, and

5    like I said, I hope never to encounter that.

6    Q.    Well, then, to be fair to you, you're saying that there could be

7    instances where you think it's justified to shoot a police officer?

8    A.    I think you're putting words in my mouth. I don't know. I

9    mean, I really– you can try to corner me on this, if you want to, but

10   I can tell you that I don't know the answer to that.

11            THE COURT:   All right.  Let's go on.

12   Q.    All right. Did you talk with Mr. Huff before he went up to

13   Madisonville on the 20th of April, 2010?

14   A.    Did I talk of him or to him?

15   Q.    Talk to him.

16   A.    Before he went up, like that day or just, I mean–

17   Q.    Let's say between the week before.

18   A.    No. I'm not–

19   Q.    Let me rephrase it.  Did you talk to him the week before about

20   what he planned to do up in Madisonville?

21   A.    Well, the only conversation I can really recall having with

22   him before he went up was at that meeting, where he described

23   what the intentions were of– you know, the Georgia Militia

24   meeting, I'll be clear– where he said he was going to go up to show

25   support for Lieutenant Commander Fitzpatrick. You know, I'll say

1   that because I know where this is going, but never did he say he

2   was going up to take over that town.  That did not come out of his

3   mouth, so–

4   Q.    At that time?

5   A.    Yeah, at that time, he never said that to me. But, you know,

6   there are some things, just, you know, don't make sense to me, and

7   that line does not make sense to me at all.  That doesn't seem to be

8   Darren's character to me at all, that he would do such a thing.

9   Q.    Well, just this moment you said, well, I couldn't really say

10  whether I have a right to shoot a police officer or not.  You don't

11  know what was in his mind at that time, do you?

12  A.    I'm not a mind reader, no.  I know what he said, I know what

13  he told me his intentions were.  It defies my common sense–

14          THE COURT:   I think– I don't mean to interrupt the

15  witness or the counsel.  Let's stick to the questions and answers.

16  The question was, what did he say, and you testified what he said,

17  so, now, Mr. Mackie, go ahead and ask your next question.

18  Q.    So my simple question is, you don't really know what his

19  intent was, do you?

20  A.    I do not.

21  Q.    Huh?

22  A.    Well, I didn't know what was in his mind.

23  Q.    At that time?

24  A.    I know what he said his intent was.

25  Q.    Now, let me ask you, I guess, this.  During this time, when

1    you were in the Georgia Militia– and this was in April, into May,

2    into June of 2010?

3    A.    Perhaps.  I think it was April or– May, I think, is when I left.

4    Q.    Were you aware that Mr. Huff was kicked out of the Georgia

5    Militia for extremist views?

6    A.    I was.

7                MR. GREEN:  Your Honor, I think we need to approach.

8                THE COURT:    All right.  Excuse me.

9         (Discussion at bench had off the record.)

10               THE COURT:    Members of the jury, the Court has

11   sustained the objection to the last question.  There may have been

12   an answer before– I don't even recall– before the objection was

13   made and before the Court could have a side bar conference.  To

14   the extent there were, the Court would instruct the jury to disregard

15   the last question and answer, if an answer was given.

16         Go ahead, Mr. Mackie.

17   Q.    Yes. I'm going to show you Government Exhibit Two.  This is

18   a citizen's arrest warrant.  In the discussions that Mr. Huff had at

19   that meeting or elsewhere, I think you discussed he was talking

20   about going to effect a citizen's arrest warrant, right?

21   A.    Yes, sir.

22   Q.    Do you ascribe to the same belief that both the President of

23   the United States and various Monroe County officials are declared

24   domestic enemies, guilty of treason?

25   A.    No.

1    Q.    So you would, yourself, have not have sought to arrest these

2    people based upon this?

3    A.    I actually declined to go up. I had no interest in doing such a

4    thing.

5    Q.    So you had a different belief and a different intent regard to

6    this issue than what you understood Mr. Huff had?

7    A.    I just wasn't interested in it. I don't know if it's a different

8    belief or not. I just wasn't interested in going up. I had no desire to

9    go up there whatsoever. But, you know, even if I hadn't had that

10   prior engagement, I still would not have gone up.

11   Q.    Which means, the way you're saying, you weren't part of this

12   cause, were you?

13              MR. GREEN:   Asked and answered, your Honor.

14              THE COURT:   I'm sorry. What was the objection?

15              MR. GREEN:   The objection was, it's been asked and

16   answered about three times.

17              THE COURT: I believe it has. I'll sustain that objection.

18              MR. MACKIE:   Well, I have no further questions.

19              THE COURT:   All right. Thank you. Any redirect?

20              MR. GREEN:  No, your Honor.

21              THE COURT:   All right. Thank you, Mr. Bigham. You

22   may be excused.

23              THE WITNESS:    Thank you.

24              THE COURT:   Why don't we go ahead and take our

25   lunch break at this time?

1          THE WITNESS:  Thank you, ladies and gentlemen.

2      (Witness excused.)

3          THE COURT:   All right.  We'll go ahead and break

4   until 1:30. Thank you. Try to get started right then.

5      (Recess had at 12:16 p.m.; reconvened without jury 1:36 p.m.)

6          THE COURT:   All right.  Thank you. Good afternoon.

7   Everyone may be seated.  Looks like we're ready for our next

8   witness.

9          MR. GREEN:   We are ready, your Honor.

10          THE COURT:   Let's bring in our jury, please.

11      (Jury reconvened in courtroom at 1:38 p.m.)

12          THE COURT:   Thank you. You may be seated, and the

13   courtroom deputy will swear in our next witness, please.

14          COURTROOM DEPUTY:    Raise your right hand.  Do

15   you solemnly swear your testimony will be the truth, the whole

16   truth, and nothing but the truth, so help you God?

17          MR. SWENSSON:  I do.

18          COURTROOM DEPUTY:   Please state and spell your

19   name for the record.

20          THE WITNESS:  Carl Swensson. C-a-r-l, S-w-e-n-s-s-

21   o-n.

22                    **DIRECT EXAMINATION**

23   by Mr. Green:

24   Q.    Good afternoon, Mr. Swensson.

25   A.    Hello.

1    Q.    If you could, sir, tell the members of the jury– you've

2    informed them of your name. Could you tell them where you reside,

3    please, sir?

4    A.    I reside in Morrow, Georgia. That is approximately 12 miles

5    south of Atlanta.

6    Q.    All right. And are you a lifetime resident of the State of

7    Georgia?

8    A.    No. I'm a transplant. I moved to Georgia back in 1990 from

9    south Florida.

10   Q.    I want to direct your attention, please, sir, back to April of

11   last year, 2010, and specifically April the 1st, 2010. Prior to that

12   date, had you ever met Darren Huff?

13   A.    No.

14   Q.    Did you have occasion to meet Mr. Huff on April the 1st,

15   2010?

16   A.    Yes, I did.

17   Q.    Prior to April the 1st of 2010, did you know an individual, had

18   you spoken with an individual named Walter Fitzpatrick?

19   A.    Yes, I did.

20   Q.    All right. On April the 1st of 2010, where did you meet Mr.

21   Huff?

22   A.    Our initial meeting would have been at Donna's, which was a

23   restaurant directly across the street from the Madisonville

24   courthouse, the Monroe County Courthouse in Madisonville,

25   Georgia (sic).

1    Q.    Who was present in that meeting?

2    A.    Commander Fitzpatrick, Darren Huff, Rand Cardwell, John

3    Bowman, Tina Parsons, and myself.

4    Q.    All right.  And what was the purpose of this meeting?

5    A.    The purpose of this meeting was to find out exactly what

6    Commander Fitzpatrick was going to be doing at the courthouse on

7    that day.

8    Q.    And did he tell you what he was going to do that day?

9    A.    Absolutely.

10   Q.    And did you and others there agree to participate in some

11   form or fashion?

12   A.    Absolutely.  We agreed to witness what he was going to do.

13   Q.    I want to ask you, when you were inside of Donna's, did you

14   see a firearm on any single person within your group?

15   A.    No.

16   Q.    Did you have a gun?

17   A.    No.

18   Q.    Did you ever see a gun on Mr. Huff's person?

19   A.    No.

20   Q.    What was your role in the events of April the 1st, 2010?

21   A.    At the restaurant I was told that Commander Fitzpatrick was

22   going to be going in and filing paperwork necessary to perform a

23   citizen's arrest, which is allowed under Tennessee Code.  He was

24   going to then enter into the courtroom where the crime that he has

25   alleged was occurring and place this grand jury foreman under

1   arrest.

2   Q.    All right.  Did you witness– well, let me ask you this.  Did all

3   of you all go together over to the courthouse that day?

4   A.    Not exactly. Mr. Bowman, Cardwell and Tina Parsons went

5   and were documenting, videotaping with their phones, and Mr.

6   Huff as well, were documenting this for witness reasons.  And I

7   was instructed– excuse me. James Bowman and myself were

8   instructed to place calls to the Madisonville Police Department as

9   soon as he was walking into the courtroom.  Mr. Huff, Tina Parsons

10  and Rand Cardwell escorted Mr. Fitzpatrick across the street,

11  where–

12  Q.    Did you call the Madisonville Police Department?

13  A.    Absolutely, as did Mr. Bowman.

14  Q.    And did you tell them what was getting ready to happen at the

15  courthouse?

16  A.    Absolutely.

17  Q.    When you got to the courthouse, was there– did you see Mr.

18  Fitzpatrick go to the clerk's office?

19  A.    No. When I got there, what I was going to do was walk around

20  to the back of the courtroom, not in it, but around the back, in the

21  hallway, and just take a look and make sure that there were no

22  means of egress for Mr. Pettway. And I did that, I walked around to

23  the back, and when I saw that there was, in fact, a bailiff in the

24  doorway there, I knew that he wasn't coming that way.

25  Q.    In other words, a uniformed law officer?

1   A.   Absolutely.

2   Q.   Did you go back to the front door of the courthouse or the

3   courtroom?

4   A.   Yes, sir.

5   Q.   Who was present there?

6   A.   At that point, everybody that I had mentioned was in front of

7   the Clerk of Court's office. Commander Fitzpatrick had come out

8   of there and was then walking towards the doorway of the

9   courthouse– or the courtroom. He checked to see if it was locked; it

10  was not locked, so he proceeded to go in.

11  Q.   All right. Did you go in the courtroom?

12  A.   No.

13  Q.   Did Mr. Huff go in the courtroom?

14  A.   No.

15  Q.   Who went in the courtroom with Mr. Fitzpatrick?

16  A.   Tina Parsons followed him as far as the doorway so that she

17  could get video of the event. Mr. Bowman had been standing in the

18  doorway. I wasn't certain, and I'm still not certain, if he was

19  leaning in to have his SmartPhone capture the events that way, but

20  everything that was recorded was recorded right there at the– at the

21  doorway. So, actually, going into the room, I think the only one to

22  get their full body into the room would have been Tina Parsons.

23  Q.   Were there any firearms on any person in your group at that

24  point?

25  A.   No, no.

1    Q.    Could you hear Mr. Fitzpatrick's voice, what he was saying

2    and what Mr. Pettway was saying in return?

3    A.    Yes.

4    Q.    What was Mr. Fitzpatrick saying to Mr. Pettway?

5    A.    Mr. Fitzpatrick was putting Mr. Pettway under arrest, telling

6    him why he was under arrest, and repeating himself multiple times.

7    Mr. Pettway was, in turn, asking Mr. Fitzpatrick to leave the room,

8    asking him more than one time to leave the room.

9    Q.    Was there ever a point in time where you saw Mr. Pettway

10   come out, be escorted out, by Mr. Fitzpatrick?

11   A.    No, sir.  Mr. Fitzpatrick never laid a hand on Mr. Pettway.

12   Q.    And, in fact, was that the plan that was discussed when you

13   went over there?

14   A.    Absolutely. The police were to make the physical arrest. He

15   was to file the documentation, and then go in and use the words,

16   and allow the police officers to do their job.

17   Q.    Okay.  And I believe I asked this.  You had called the

18   Madisonville Police Department on the way over there?

19   A.    Absolutely. Yeah.

20   Q.    How long did the exchange inside the courtroom, between Mr.

21   Fitzpatrick and Mr. Pettway, how long did that go on?

22   A.    I want to say a minute, if that; maybe, maybe as many as two

23   minutes.  It was not long.

24   Q.    What happened then?

25   A.    After he had attempted several times to get the attention of

1    officers, an officer of the law finally did show up. I do not

2    remember that officer's name, but that officer escorted Mr.

3    Fitzpatrick out of the courtroom.

4    Q.    What happened then?

5    A.    The officer really didn't know what to do, so Commander

6    Fitzpatrick explained to him what was happening and what the law

7    is as per Tennessee Code, and he was trying to explain 22– TCA

8    22-2-314, along with several other codes that Mr. Pettway was in

9    violation of.

10         And the officer really wasn't familiar with this and really

11   didn't have any interest in making the arrest, and after an exchange

12   of words between Commander Fitzpatrick and the officer, he was

13   requested to go down to a landing, which was one flight of stairs

14   down, where more officers would come and discuss this with him.

15   Q.    All right. I want to talk about the exchange between the

16   officer and Mr. Fitzpatrick that you just described to us. Was there

17   ever a point in time where Mr. Fitzpatrick raised his hand to this

18   officer?

19   A.    Never, never.

20   Q.    Was there ever a point in time where anyone in your group

21   tried to lay a hand on this officer?

22   A.    Absolutely not.

23   Q.    What happened down at the landing?

24   A.    At the landing, no one initially showed up. The entire group

25   of individuals that I previously spoke of was just there talking with

1   Commander Fitzpatrick, where he was showing some more

2   paperwork that he had just filed and recognizing that he had gotten

3   receipt from the Clerk of Court, stamped the documents.

4          And after a few minutes of waiting, then one of the sheriff's

5   deputies came down and began talking to Commander Fitzpatrick,

6   at which point I believe it was the sheriff that was also cited on the

7   arrest form that Commander Fitzpatrick had filed. So he followed

8   this officer back upstairs towards the clerk's office and then tried

9   to put him under arrest as well.

10  Q.    Same fashion, just telling him you're under arrest?

11  A.    Absolutely. Yeah, yeah.

12  Q.    Did he try to lay a hand on the sheriff?

13  A.    Never, never.

14  Q.    Was there a point in time when Mr. Fitzpatrick was arrested?

15  A.    Yes. After the exchange on the landing, it was requested that

16  Commander Fitzpatrick and the people with him go out onto– and

17  leave the courthouse. And so everybody did and went to the

18  courthouse steps, at which point they were joined by many officers,

19  some of the Madisonville Police Department, some from the

20  sheriff's department.

21         It was out there where the codes in question were cited, where

22  the request was made for Mr. Pettway to be put under arrest and

23  taken into custody. And at that point the officers told Commander

24  Fitzpatrick, where are we to take Mr. Pettway? And I remember

25  Commander Fitzpatrick saying, where would you take anybody that

1  you just arrest, and he responded by saying the jail in back of the

2  courthouse.

3  Q.    What happened then?

4  A.    So Commander Fitzpatrick said, well, that's what I would

5  wish you'd do, is put him under arrest, take him there, and then

6  let's sort this out.  They refused to do that.  And shortly after that–

7  now, the exchange and talking with the various officers, that

8  probably lasted as long as ten minutes, and the whole time people

9  were recording this for posterity, for being witnesses.  Everything

10 was being recorded.

11 Q.    Was there ever any violence that happened?

12 A.    Not on the part of Commander Fitzpatrick or any of the group

13 that I was there with, no.

14 Q.    Did Commander Fitzpatrick or you or Mr. Huff or anyone else

15 attempt to strike any officer?

16 A.    Never, no.

17 Q.    After he was placed under arrest, where was he taken, I mean,

18 Mr. Fitzpatrick?

19 A.    He was taken to the very jail that he had requested Mr.

20 Pettway to be taken.

21 Q.    All right.  Now, you have a website; is that correct, Mr.

22 Swensson?

23 A.    That is correct.

24 Q.    And what's the name of that website?

25 A.    Rise up for America dot com.

1    Q.    Was a video that was shot on April the 1st posted on your

2    website?

3    A.    Absolutely.

4    Q.    And did you narrate the events of April the 1st?

5    A.    Yes, I did.

6    Q.    And what were you requesting those who viewed your website

7    to do?

8    A.    Come to Madisonville and help bring justice, to support, to

9    support this war hero in his efforts to bring justice to an out of

10   control judiciary in Monroe County.

11   Q.    Was there ever any call for violence on your website?

12   A.    No.

13   Q.    Was there ever a call for guns or weapons to be brought?

14   A.    Definitely not.

15   Q.    After April the 1st, did you take it upon yourself to try to

16   marshal support, to raise support for Mr. Fitzpatrick?

17   A.    I tried to get the message out to as many places on the internet

18   and the "blogosphere" as possible so that people would be aware of

19   what was going on with Commander Fitzpatrick and with the

20   Madisonville courthouse situation that we've just discussed.

21   Q.    Is it a fair statement that you were the one calling out the

22   folks, not Mr. Huff?

23   A.    Oh, absolutely.

24   Q.    On April the 20th, did you come to Tennessee from Georgia?

25   A.    Yes, I did.

1    Q.    What were you driving?

2    A.    I was driving, on that day, a Honday Civic Hybrid.

3              MR. MACKIE:   Excuse me. I just wanted– did you

4    specify the date this was?

5              MR. GREEN:   The 20th.

6    A.    I was driving a Honda Civic Hybrid, and I believe it's a 2009.

7    Q.    Is that one of those gas-electric combo things?

8    A.    Yes, sir.

9    Q.    Was there anyone in the vehicle with you?

10   A.    No. I was by myself.

11   Q.    Did you have a weapon with you?

12   A.    No, I did not.

13   Q.    Was there any plan or discussion about where you and your

14   friends and acquaintances were going to meet?

15   A.    Yes. We were going to meet at Donna's, the restaurant across

16   the street from the courthouse.

17   Q.    And what was the plan and discussion about why you were

18   going to Donna's?

19   A.    To show support for Commander Fitzpatrick in the

20   arraignment hearing that he was about to go through.

21   Q.    Do you recall, as you were approaching the Highway 68 exit–

22   I believe the exit number is actually Exit 60 off of I-75. Just

23   explain to the members of this jury what happened about when you

24   got off the interstate there.

25   A.     As I was approaching the exit, and I thought that was Exit 62.

1    It's the Sweetwater exit that takes us to Madisonville. As I was

2    approaching the exit, maybe a half a mile from that, I noticed an

3    Oath Keeper truck in front of me, and I was happy to see that the

4    Oath Keepers were going to be there.

5        So, at that point, I was– I passed this truck, I waved to let

6    them know that I'm part of the entourage that's going to be there,

7    and proceeded to– I hate to say it– almost cut him off, because we

8    were really getting close to the exit. Anyway, I pulled in front of

9    him and we got off on the exit.

10   Q.    All right. Now, at that point in time, did you know that was

11   Mr. Huff in the Oath Keepers truck?

12   A.    I knew that it was somebody that– yes, I did know it was

13   Darren Huff because this was on the 20th. This was after, after I'd

14   already met him on the 1st. Of course, I knew it was him.

15   Q.    Well, I mean, did you know– did you all caravan up the

16   interstate together or did you just happen to see him and recognize

17   him at that point?

18   A.    No. I just happened to catch up with him at that point. I had no

19   idea where he was on the road.

20   Q.    All right. What happened as you were exiting off of the

21   interstate onto Highway 68?

22   A.    As I exited off the expressway, I came to a– what is

23   classically referred to as a rolling stop and turned right onto, I

24   guess it's 62?

25   Q.    Sixty-eight.

1  A.    Sixty-eight, the highway going into–

2  Q.    Did you come to a complete stop?

3  A.    No, sir, I did not.

4  Q.    Were you able to see Mr. Huff in your rear-view mirror?

5  A.    That, I was.

6  Q.    Did he come to a complete stop?

7  A.    Yes, he did. Yes, he did.

8  Q.    Was there ever a point in time, in your judgment, that his

9  vehicle got too close to the rear of yours?

10         MR. MACKIE:    Your Honor, I would object to the

11  relevance.  This is an issue that has already been decided by the

12  Court, as a legal traffic stop.

13         MR. GREEN:   Well, then, it won't hurt him to answer

14  the question.

15         THE COURT:   Well, I'm not sure that's enough of a

16  response to– not to sustain the objection, which the Court will do.

17         MR. GREEN:   All right.  We'll move along.

18  Q.    Did you observe blue lights come on behind Mr. Huff

19  immediately thereafter?

20  A.    Yes, immediately thereafter. Once I made my turn, I looked in

21  the rearview mirror, I saw that Mr. Huff had come to a stop, and I

22  also noticed–

23         MR. MACKIE:    Your Honor, I renew my objection.

24         THE COURT:    All right.  Why don't you repeat your

25  question?

1    MR. GREEN:   I'm just asking if he saw the blue lights

2    and saw Mr. Huff's truck, what happened.

3    THE COURT:   After you saw the blue lights, what

4    happened?

5    A.    After I saw the blue lights, I tried to find a place to turn off,

6    because I wanted to see what was going on here, so–

7    Q.    When the blue lights were on initially– and just tell us, what

8    did you see from your vantage point when you were driving? Could

9    you make out how many vehicles had initially pulled Mr. Huff

10   over?

11   A.    That's really difficult to say. I knew that there was one that

12   was pulling him over.  I made a video of this, so it's hard to say

13   whether– having seen that video, it's been etched in my brain that I

14   saw these other vehicles there at the time. I can't tell you that I did

15   at that moment in time.

16   Q.    Okay. Fair enough.

17   A.    So I drove, looking for the first exit that I– or first place I

18   could turn off so that I could turn around and see what was going

19   on. I missed the very first turnoff, which was going into the Burger

20   King parking lot.  I made it to the next turn-in, which was to a gas

21   station, and it was a right-hand turn.

22   I turned into the that only to find a silver SUV, which later

23   was documented as being involved in this whatever you want to

24   call this, event for Mr. Huff, pull in front of me as if he's trying to

25   block my access there. But when he pulled in front of me, he was

1    facing exactly where Mr. Huff had been stopped, with more and

2    more blue lights following in line there.

3          So he didn't stop me. I don't even know if he was intending

4    to stop me, but, regardless, he saw that. And then I went around

5    him to go over to the Burger King parking lot, which was elevated,

6    on a hill, so that I could take out my Camcorder and record what

7    was going on.

8    Q.    And did you, in fact, do that?

9    A.    Yes, I did. Yes, I did.

10   Q.    And during the course of the time that you were there

11   observing and watching, did there come a point in time where you–

12   obviously, you can't hear what Mr. Huff and these officers are

13   saying, correct?

14   A.    Yeah. I was about, I want to say, about 75 to 100 yards away.

15   So, no, I couldn't hear anything, but I had a very good line of sight

16   and I could record all of the vehicles involved in this, in this traffic

17   stop.

18   Q.    Did the come a point in time where you saw Mr. Huff in the

19   company of some of these officers approach the toolbox of his

20   truck?

21   A.    No, I never saw Mr. Huff open any toolbox. I saw him

22   walking around the truck with the officers, I did see that. I did see

23   dogs that they had sniffing around. I saw that. I never saw a

24   toolbox opened.

25   Q.    Okay. What happened after you left the stop at Madison– on

1    Highway 68? Where did you all go from there?

2    A.    Okay.  As soon as he had been released, I packed up

3    everything and started to see if I could catch up with him, and I did,

4    at a– I guess it was a CVS pharmacy that was maybe half a mile or a

5    mile down the road.  And, at that point, he had already gotten out of

6    the truck and was talking to Michael, his friend.

7    Q.    That was the person that was with him in the truck?

8    A.    That is correct, yes.

9    Q.    Now, Michael, is that the first time that you had met Michael,

10   was at that moment?

11   A.    Yes. Yes, that is.

12   Q.    So Michael had never been to any of these meetings before?

13   A.    No, no.

14   Q.    Michael had never been a party, to your knowledge, to any

15   discussions about coming to Madisonville before?

16   A.    That was the first time I had heard or seen Michael.

17   Q.    How long were you and Michael and Darren Huff at the CVS?

18   A.    Five minutes, ten minutes, max.

19   Q.    And from there where did you go?

20   A.    To Donna's.

21   Q.    Did Mr. Huff and Michael show up shortly thereafter?

22   A.    I'm trying to think if he was in front of me or behind me on

23   that.  I really don't remember which was which, but, yeah, we met

24   back at Donna's.

25   Q.    Where did you park inside the city limits of Madisonville?

1    A.    I parked almost, well, not directly in front of Donna's, but

2    just a little, as you're looking at it from the courthouse, a little to

3    the left of it, but on Main Street. And Mr. Huff parked on the side

4    road, on the side of Donna's.

5    Q.    Okay. Do you recall the time that you and Mr. Huff and

6    Michael were inside Donna's?

7    A.    Yeah, yeah. There was a lot of discussion going on, because

8    many people– when I say many, I think there was a total of about

9    somewhere around 20 people had showed up in support of

10   Commander Fitzpatrick.

11   Q.    Now, let me stop you for a second. Did you know all of those

12   20 before that day?

13   A.    No, no. I knew a few, I knew a few through internet contact

14   and e-mails and the such, but many of them I'd never seen before.

15   Q.    All right. Who of all of the people in there was probably

16   talking the most?

17   A.    At that point in time–

18   Q.    I'm going to say over the course of the time that you all were

19   in Donna's.

20   A.    Well, I was sitting at a table with Stephanie Flader (phonetic)

21   and a gentleman by the name of Tonto, and they were out of

22   Illinois. I've known Stephanie for quite some time. I think Darren

23   was in the back room, where there was a bit of a buffet and there

24   was more people seated back there. I can't tell you all the names of

25   the people, because I honestly don't remember all of them. But he

1  was back there talking with them.

2  Q.    Well, what were they doing back there?

3  A.    Just talking.  As a matter of fact, I think at that point Mr. Huff

4  was talking about religious matters and just explaining God's way,

5  'cause that's what he is.  He's a bit of a preacher and he spends a

6  lot of time doing that.

7  Q.    And he's none too shy about talking, either, is he?

8  A.    No, sir, not at all.

9  Q.    The people that were in that back room, were they likewise

10  having breakfast?

11  A.    Eating, you know, drinking, and just basically waiting at that

12  point to get news back from what was going on with Commander

13  Fitzpatrick.  Because he was in– not the main courtroom. The main

14  courtroom had been sealed off.  And you asked if anybody had

15  guns.  Well, yeah, people had guns, but they were all the officers

16  that were surrounding the courthouse and were in these– well, I

17  couldn't see inside the blacked-out vehicles, but it's safe to assume

18  that it was there.

19      But, yeah, the guns were on these people. They had their AKs,

20  they had all of this stuff.  Apparently, there was snipers on the

21  roof, there was helicopters in the air.  That was really surprising

22  for most people, very surprising.  But he was not in that courtroom.

23  He was in a courtroom in back of that, and nobody was allowed to

24  go in and witness what was transpiring in there.

25  Q.    He, meaning Mr. Fitzpatrick?

1    A.    Mr. Fitzpatrick, that is correct.

2    Q.    All right. During the time that you were inside of Donna's,

3    did you ever see Darren Huff with a weapon in his possession?

4    A.    No, never.

5    Q.    Was there a point in time where you had to leave for a short

6    period of time, half hour, 45 minutes?

7    A.    We were there for– I think we got there right around nine

8    o'clock. Inside of the restaurant we were there for possibly 45

9    minutes to maybe an hour. At that point, Darren stepped outside

10   and I did a video interview of him of what was going on that day,

11   and he was explaining the traffic stop that had just occurred. That

12   interview took ten, 15 minutes.

13   Q.    Did you make a phone call to anyone while you were there?

14   A.    After this video was completed, at that point I made a phone

15   call to the G. Gordon Liddy Show to let them know what was going

16   on at that moment here in Madisonville, Tennessee, yes.

17   Q.    Did you actually speak with Mr. Liddy?

18   A.    Yes, I did. Yes, I did. It took a while. I was on the phone, on

19   hold. As anybody who's been on a talk show will know, you don't

20   just get right on. So I had to wait for a while, and it probably took

21   about 30 minutes. I was waiting upstairs of Donna's. There was no

22   one there. It was, I think, a banquet room that they had up there,

23   and I waited up there because it was silent.

24        And when I finally got on the phone with Mr. Liddy, at that

25   point I was able to explain what was going on. If I'm not mistaken,

1    the guest he had that day was Terry Lakin, the man who had been

2    court-martialed for exposing Barack Obama.

3    Q.    All right.  Now, while you were inside of Donna's, did you

4    ever see Mr. Huff charge the courthouse?

5    A.    No.

6    Q.    Did you ever see Mr. Huff charge the Beecher Witt Building?

7    A.    No, never.

8    Q.    Did you ever see Mr. Huff approach one of the blacked-out

9    SUVs?

10   A.    No. I heard later that–

11   Q.    Don't say what you heard; just say what you saw.

12   A.    I never saw anybody approach any vehicles there, period.

13   Q.    Did you ever see Mr. Huff with, bag in hand, go toward one of

14   the courthouse bailiffs?

15   A.    No.

16   Q.    You were gone at that point?

17   A.    I don't know if that's when– I don't know if that's when I was

18   upstairs, talking on the phone or if– well, it must have been at that

19   point, because, no, I don't remember seeing that.

20   Q.    On April the 20th, during the entirety of the time that you saw

21   Mr. Huff within the city limits of Madisonville, did you ever see a

22   firearm on his person?

23   A.    No.

24   Q.    Now, after this, you gave a statement to the FBI, didn't you,

25   when they contacted you?

1   A.    Oh, yeah, yeah.

2   Q.    And did you cooperate with them and tell them– answer their

3   questions?

4   A.    Sure. Absolutely.

5   Q.    And did they, in fact, ask you to report anything, any violent

6   activity that you heard about?

7   A.    Yes. Absolutely.

8   Q.    Was there ever a plan of violence, Mr. Swensson, of which

9   you or Mr. Huff or anyone else in your group planned to undertake

10  on April the 20th?

11  A.    Never, never.

12              MR. GREEN:   Your witness.

13              THE COURT:   Thank you. Cross- examination.

14                      **CROSS-EXAMINATION**

15  by Mr. Mackie:

16  Q.    Good afternoon, Mr. Swensson.

17  A.    Good afternoon.

18  Q.    I don't know if you remember me.  Do you remember from

19  earlier hearings on this?

20  A.    I remember you're the guy that got me arrested the last time I

21  was here, yeah.  Thanks.

22  Q.    Well, I'm Will Mackie, represent the United States today. I

23  just want to start by letting you know that I appreciate your candor

24  and your testimony today.  You understand, I'm wanting to see if

25  you understand that– you've now testified as to a certain number of

1    facts relating to April 1st and April 20th.

2          And by that, if I ask you questions about this, that what I'm

3    seeking to do is, I'm going to ask certain questions which might

4    call into question your credibility, because I believe the jury has

5    the ability to assess whether you are biased or in some way

6    prejudiced or have a view against the Government or in favor of

7    Mr. Huff. Do you understand that?

8    A.    It's your job.

9    Q.    And I'm not questioning your First Amendment right or

10   anything like that; just I want you to tell us about what happened

11   on that day and your view of what was going on that day.  First off,

12   I believe the question was raised that you do, in fact, operate a

13   website that's called "Rise up for America;" do you not?

14   A.    That is correct.

15   Q.    And that website leads off with a statement by Thomas

16   Jefferson that, "The tree of liberty must be refreshed from time to

17   time with the blood of patriots and tyrants." Do you recall that's

18   something that's right on your website?

19   A.    Absolutely. Sure.

20   Q.    And that– was it not– in reference to the American

21   Revolutionary War as to acts of war that are justified to shed

22   blood?

23   A.    That, and many other quotes, yes.

24   Q.    So that, I believe, does that reflect your view, that when you

25   believe it is politically necessary to shed blood for that you believe

1    is freedom that it's– that's warranted?

2    A.    I believe that the founders gave us the basis for this country's

3    survival, and that basis is reflected in the quotes and words that are

4    our understanding.

5    Q.    So, in your view, violence is appropriate when deemed

6    necessary by you in the defense of what you believe is liberty?

7    A.    You could say that, sure.

8    Q.    I could say that, but you would say that?

9    A.    I'm not a violent person, but I do–

10   Q.    You personally?

11   A.    I'm not violent. Personally, I'm not a violent person, and I do

12   not express the ideas that we should be violent. Everything that I

13   have done in regards to my political activities has been peaceful,

14   everything.

15   Q.    And the question was, do you believe that another, whether it

16   be Mr. Huff or someone else, would be justified in undertaking acts

17   of violence in what they believe is defense of their liberty?

18          MR. GREEN:   Your Honor, I object.  I don't know what

19   he believes about what Mr. Huff or anybody else should or could

20   do is relevant to the inquiry here.

21          MR. MACKIE:   Your Honor, I believe it all goes into

22   the issue as to what was going on on the 20th and whether there was

23   an intent, if the situation arose, to engage in acts of violence.

24          THE COURT:   Well, let's– I understand your point.

25   Let's focus at this point on this witness' beliefs.

1          MR. MACKIE:    All right. Let me go forward.

2   Q.    Do you recognize the federal jurisdiction of this court?

3   A.    The federal jurisdiction of this court?

4   Q.    Do you believe we are sitting here in a proper and federal

5   jurisdiction in this district court?

6   A.    I have questions as to the jurisdiction only insofar as I'm

7   sitting in back of flags that represent admiralty and not

8   constitutional flags. Beyond that, I'm not an expert. I do not know

9   what people say about these things called the bar. I do not

10  understand the intricacies of the legal profession.

11         What I'm reading, frankly, scares me, but I recognize that

12  when I'm in here I have a purpose, and that is to answer questions

13  honestly for the purpose of dispensing justice.

14  Q.    Let me ask you this question on this point, since we're here.

15  Do you recognize that as the American flag?

16  A.    I recognize the American flag as being fringed. That fringe

17  represents a military flag, as per Dwight Eisenhower. He has laid

18  out the specifications what this flag is supposed to be, and in no

19  cases has it ever been put into the law that that is supposed to be

20  fringed. It's supposed to be bordered. That is defacement, unless it

21  is representing military action.

22  Q.    So do you believe we are sitting here under martial law or

23  under federal law?

24  A.    I don't know. But I would ask you that question. Can you

25  answer me that question? Because I don't know.

1    Q.    Well, unfortunately, this time I'm asking you the–

2    A.    I don't know the answer to that, but I'm trying to find out.

3    Q.    So you are not sure whether we're here sitting under martial

4    law or federal law; you don't know?

5    A.    I don't know, that's correct.

6    Q.    Let me ask you. You testified that you were going to

7    Madisonville on the 20th of April in support of Walter Fitzpatrick;

8    is that correct?

9    A.    That is correct.

10   Q.    And I'm going to show you Government Exhibit Two. It will

11   take a moment. As to Mr. Fitzpatrick, do you– I think you

12   testified, have you known him for some time?

13   A.    I have known him since– it was around June of 2009.

14   Q.    And is it your understanding there, from being there on the

15   20th, that both you and from discussions with the Defendant Huff,

16   were in support of Mr. Fitzpatrick that day?

17   A.    I'm not sure I understand that question. Will you try one more

18   time?

19   A.    Well, were you– was it from your discussions with Mr. Huff,

20   did you understand that you were going on the 20th of April and

21   joining with others– I believe you said 20 or so plus– in support of

22   Mr. Fitzpatrick?

23   A.    Yes, yes.

24   Q.    And you understood that, going back to April 1st, that a

25   central part of this issue was the effort by Mr. Fitzpatrick,

1    supported by you, to arrest Mr. Pettway under a arrest warrant; is

2    that correct?

3    A.    That is correct.

4    Q.    All right. If we could look at what's been admitted in

5    evidence as Government Exhibit Two. Are you familiar with that?

6    A.    Yes. That is the arrest warrant that he submitted and filed on

7    April 1st of 2010.

8    Q.    Now, do you recognize that, in your mind, as a legitimate

9    arrest warrant?

10   A.    I cannot answer that because I am not a legal professional.

11   Q.    So it's possible it is a bogus, as in not worth anything, arrest

12   warrant?

13            MR. GREEN:   Your Honor, I object. He answered the

14   question, he doesn't know.

15            MR. MACKIE:   Well, follow-up question, your Honor,

16   is that–

17            THE COURT:   Go ahead. I'll allow the follow-up

18   question. Go ahead. The witness can answer to the extent he

19   knows.

20   Q.    So you were acting then in support of Mr. Fitzpatrick

21   regarding to an arrest warrant you didn't know whether was valid?

22   A.    The research that went into the actions of the 1st was research

23   based on the Tennessee Code Annotated and all reference there was

24   readily and is readily available on the Tennessee Government

25   website. All references to what the duration of a grand jury

1    foreman must be was there, all references to the ability of an

2    individual to do a citizen's arrest were there.  So is this, so is this

3    valid?  Maybe.

4    Q.    All right.  So the question– let me restate it.  Were you going

5    on the 1st– we're going back to the 1st– in support of Mr. Fitzpatrick

6    for him to arrest Mr. Pettway on an arrest warrant that you did not

7    know was valid?

8    A.    Okay. Here's how I have to answer that, and there's a yes or

9    no.

10   Q.    Yes.

11   A.    Yes, I was going there based on his ability to do this arrest.

12   Now, I did not know that he was submitting this arrest warrant on

13   that day when I left that morning to go up there, but I did know he

14   was going to do a citizen's arrest and I did know that the law

15   provides for that in the State of Tennessee.

16   Q.    And you are a Georgia resident, correct?

17   A.    That is correct.

18   Q.    So you, apart from Mr. Fitzpatrick, you don't have any

19   business, association with Tennessee or any personal association

20   with Tennessee; is that correct?

21   A.    That is correct.

22   Q.    So you were coming here in connection with this citizen's

23   arrest mission of Mr. Fitzpatrick, right?

24   A.    Correct.

25   Q.    All right.  And in terms of Tennessee Code, I appreciate you

1   mentioning that. Are you familiar with Tennessee Code Section

2   46-2-01, which specifies what needs to be done for a warrant

3   issued by a judge?

4   A.    No, I'm not.

5   Q.    Mr. Fitzpatrick never talked about that, did he?

6   A.    No, he did not.

7   Q.    Now, I don't know if we can expand this, but I'm going to

8   read. If you see, there's a footnote down here that it states right

9   here, Section Two, "Doctrine of nonresistance condemned. That

10  the government being instituted for the common benefit, the

11  doctrine of nonresistance against arbitrary power and oppression is

12  absurd, slavish, and destructive of the good and happiness of

13  mankind."

14        Do you hold to that, that nonresistance is what is absurd?

15  A.    Is that what's written here? Because I can't–

16  Q.    It's down at the bottom, the second–

17  A.    The preamble? Okay. I've got it now. Okay.

18        MR. GREEN:   Could we slide it over so we could see

19  the whole thing, please, on the bottom?

20  A.    If you could reduce it just a little bit, one more step down.

21  Okay. I've got it.

22  Q.    Okay. Can you read that?

23  A.    Yes, sir.

24  Q.    All right. So the question is, do you agree with that, that the

25  doctrine of nonresistance is absurd?

1  A.    I haven't had that question asked so I don't know. I don't

2  know at this point.

3  Q.    Well, then, again, I'll ask you the question.  Would violence

4  in pursuit of this warrant be– would be appropriate under

5  circumstances?

6  A.    Violence in pursuit of this, no, no.  Violence was never an

7  option on this one–

8  Q.    The question would be–

9         MR. GREEN:   Your Honor, he answered the question,

10  and he's allowed to expound.  If he could finish his answer, please.

11         THE COURT:   Well, I believe he answered the

12  question, and we'll give you the opportunity for redirect if you

13  want him to expand.

14         MR. GREEN:   I'd just ask that Mr. Mackie let him

15  finish his answer.

16         THE COURT:   I understand. But I think, to that

17  question, it was answered. But I'll certainly give the witness full

18  opportunity to explain either in response to further questions or on

19  redirect. Go ahead.

20         MR. MACKIE:    Your Honor, if I might restate that.

21  Q.    Answer yes or no and then you can explain.  Do you believe

22  that violence in pursuit of this warrant, in the execution of this

23  warrant, would be warranted under circumstances?

24  A.    In the execution of this warrant?  No.

25  Q.    Now, in your website, "Rise up for America," you discussed

1  this, Mr. Fitzpatrick and the pursuit of this warrant; did you not?

2  A.    Oh, yes, many times.

3  Q.    Many times.  And did you trust Mr. Fitzpatrick as far as

4  everything that he told you about Tennessee law and citizens'

5  arrests and all that sort of stuff?

6  A.    No.

7  Q.    Did not trust him?

8  A.    Oh, no, absolutely not.  I had to check for myself.

9  Q.    All right.  And did you check Section 46-2-01 relating to how

10  a warrant should be issued?  Did you check that?

11  A.    No, I didn't.

12        MR. GREEN:   Been asked and answered, your Honor.  I

13  object.

14        THE COURT:   Since it was asked and answered again,

15  we'll move on.

16  Q.    Were you aware that Mr. Fitzpatrick had been court-martialed

17  for misappropriation of funds, dereliction of duty?

18  A.    Yes, I was.

19  Q.    And were you aware that–

20        MR. GREEN:   I'm going to object on two bases, your

21  Honor; one, on relevance, and second, it's way beyond the scope of

22  direct examination.

23        THE COURT:   You want to respond, Mr. Mackie?

24        MR. MACKIE:    Well, it's within the scope of direct

25  examination as to discussing Mr. Fitzpatrick's mission here and

1  what his motivation was as being anti-government.

2                    THE COURT:   I'll overrule the objection.

3  Q.    Were you aware of that?

4  A.    Oh, I was aware that he had been court-martialed.

5  Q.    And were you aware that he had, including on this arrest

6  warrant, named the Secretary of the Navy because, for years, over a

7  decade, he had been fighting this issue? Are you aware of that?

8  A.    Absolutely.

9  Q.    And he considered the government to be his enemy?

10  A.    No, oh, no, not the government to be his enemy.  There were a

11  few within the Navy, within the military, that he had issues with,

12  let there be no doubt about that.

13  Q.    Well, did you believe, on the 1st, when you were going in

14  support of Mr. Fitzpatrick, that the president– let's go then to the

15  president– was an impostor?

16  A.    Yes.

17  Q.    Fair enough.  And a declared domestic enemy as far as guilty

18  of treason?

19  A.    I can agree with the second part of that.  I do not know to the

20  first part of that.

21  Q.    In fact, your beliefs, so we understand where you're coming

22  from and your testimony today, is that the Government, the Federal

23  Government in D.C., is trying to impose, from your website, a

24  Marxist new world order?

25  A.    Not exactly a Marxist new world order, but they are imposing

1  changes upon us, let there be no doubt about that.

2  Q.    And on that point of the president being an impostor, your

3  website also promotes such things as the Birther Summit and the

4  battle to expose the usurper of the office; is that correct?

5  A.    That is true.

6  Q.    Now, in going up on the 1st, on April 1st and then on the 20th,

7  was it your view that Mr. Pettway was guilty of some sort of crime

8  for sitting as grand jury foreman?

9  A.    Yes.

10  Q.    And thus, at least this arrest was justified because he was

11  guilty of some crime?

12  A.    Yes.

13  Q.    Was that crime of treason or something else?

14  A.    Oh, no.  That was the crime of being a grand jury foreman for

15  27 consecutive years when, according to the code that I read, he

16  was not able to be there but for one term and then be out of the

17  grand jury pool for a period of two years.  So, consecutive service

18  there, as I read it, was not allowed.

19  Q.    So that constitutes treason?  That's what he's being charged

20  with.

21  A.    Those are his words.  I don't know what the actual charge is.

22  He was guilty of a crime according to Tennessee Code.  However

23  you want to label it, however Walt wants to label it, that's not up to

24  me.

25  Q.    Now, it was your view as well, and I guess based upon your

1   website here, "Rise up for America," that sitting in Monroe County

2   was a corrupt judge and unlawful court. Is that your view?

3   A.   Yes.

4   Q.   With Carroll Ross and Amy Reedy being judges, that they

5   were declared domestic enemies because of that type of treason,

6   correct?

7   A.   According to this document, that is correct.

8   Q.   But was that your view?

9   A.   I think they were doing something illegal. I do not know how

10   to define it in legal terms. He chose to do it this way. I don't know

11   how I would define it. But it seemed blatantly illegal to me.

12   Q.   So the illegality of it, I take it, is because of this issue about

13   the grand jury foreman sitting for 27 years?

14   A.   Yes.

15   Q.   Now, just the last couple things on this issue about the

16   website. In your website, you posted again a number of things by

17   Mr. Fitzpatrick declaring basically the president guilty of treason;

18   that's correct?

19   A.   Uh-huh.

20   Q.   That's a view that you hold as well, right?

21   A.   I think the president, if you're asking for my opinion, and I

22   take it you are, my opinion is that he is sitting there illegally,

23   illegal by virtue of the fact that he is not an NBC, natural-born

24   citizen. As the Vattel definition goes to it and as per Minor vs.

25   Hapersett , back in 18– whatever that law case was, you have to be

1    born on the soil to parents who are citizens at the time of your

2    birth.  That is the understanding that many out there, including

3    myself, share.

4         It's also the understanding that the senate shares in

5    Resolution 511 on April– in April of 2008, when they

6    unanimously, including Barack Obama, agreed that Mr. McCain

7    was eligible to be president based on his parents being citizens at

8    the time of his birth, even though he was not born on American

9    soil.  So we have a problem in understanding the concept and

10   bringing this to the attention of America, is what I have been

11   attempting to do, from the get-go.

12   Q.   As part of your mission?

13   A.   Absolutely.

14   Q.   And the last thing I want to ask you in that regard, because

15   part of your mission was supporting Mr. Fitzpatrick along with Mr.

16   Huff, correct?

17   A.   Mr. Huff came in on April the 1st in support of Commander

18   Fitzpatrick. Prior to April 1st, I didn't know Mr. Huff, but–

19   Q.   You joined in this common goal relating to Mr. Fitzpatrick?

20   A.   Yes.

21   Q.   Absolutely?

22   A.   On that day, yes.

23   Q.   And your website also promotes– and I will show this if you

24   don't believe me. It says that, "A piece of the Communist takeover

25   puzzle is the Supreme Court decision in Brown vs. Board of

1   Education. It's a pro-Communist act upon this country." Do you

2   believe that?

3   A.    Yes, I do.

4   Q.    When you were going up to Madisonville on the 20th of April,

5   it was still your belief that Mr. Pettway and the judges and the

6   district attorney and all those associated in Monroe County were

7   still guilty of a crime?

8   A.    Yes.

9   Q.    And that related to the grand jury thing, correct?

10  A.    That is correct.

11  Q.    Now, when, I believe, when you went up to Tennessee on

12  April 20th, you testified that you were there and you filmed the

13  traffic stop; is that correct?

14  A.    That is correct.

15  Q.    Had you been to Madisonville prior to that time, on the 6th or

16  7th of April, to meet with Mr. Huff and Mr. Fitzpatrick?

17  A.    No.

18  Q.    So you hadn't been there at that time. Okay. When you got to

19  Madisonville, I take it that you went into Donna's Restaurant,

20  correct?

21  A.    Correct.

22  Q.    Now, had you talked with Mr. Huff at any time between April

23  1st, April Fool's Day, and the 20th? Did you talk with Mr. Huff?

24  A.    Yes, I did.

25  Q.    You did?

1    A.    Oh, yes.

2    Q.    All right. And did he tell you in any of that time that he had

3    been– his intention was– let me put it this way– his intention was

4    to take weapons up to Madisonville to take over the courthouse or

5    the city? Did he tell you that?

6    A.    No.

7    Q.    Did he tell you that he told other people that?

8    A.    I think there was mention of having a conversation with a

9    bank teller, that it was something that was misunderstood. I don't

10   know the particulars on that. I wasn't privy to the conversation so–

11   Q.    Did he talk to you about that?

12   A.    Pardon?

13            MR. GREEN:   Could Mr. Mackie please let the witness

14   finish with his answers, at least finish a sentence?

15            THE COURT:   Go ahead and finish your answer.

16   Q.    Go ahead and finish, Mr. Swensson. I apologize.

17   A.    It would only be hearsay on my part, but–

18   Q.    Well, did this happen before the 20th, that he mentioned it, or

19   after the 20th?

20   A.    It was just prior to, just prior to.

21   Q.    Did he ever mention to you about mounting– well, bringing

22   weapons up, including an anti-aircraft gun?

23   A.    No.

24   Q.    But you did know that he was bringing an AK-47 and several

25   hundred rounds?

1    A.     No. I know that he is a staunch Second Amendment advocate.

2    I know that he is a– legal in carrying the weapons, whatever

3    weapons he has. And all I need to know is that whatever he does

4    decide he wants to bring on his person he's legally entitled to do

5    so.

6    Q.     I might not have been clear in my question, and my question

7    was, did you know that he brought an AK-47 and 300, 400 rounds

8    that day?

9    A.     Not until that day.

10   Q.     You knew that day?

11   A.     At that point, yes.

12   Q.     Yes. So you knew when he was in Madisonville he had an AK-

13   47 and 300, 400 rounds?

14   A.     I didn't know about the rounds, but–

15   Q.     Okay. The AK-47?

16   A.     Yeah, I knew that.

17   Q.     And you also knew he had a Colt .45 or a pistol of some sort,

18   correct?

19   A.     Correct.

20   Q.     All right. Because, in fact, and just to be clear, I think your

21   testimony was you never saw him with a weapon. Didn't you tell–

22   well, let me ask you. I'm sorry. Let me ask you. You testified

23   earlier that you didn't see him with a weapon up in Madisonville,

24   correct?

25   A.     That's correct.

1  Q.    Were you at some point and do you recall being interviewed

2  by two federal law enforcement agents, an FBI agent and task force

3  agents, relating to the events on April 20th?

4  A.    Yes.

5  Q.    And that was earlier than today; that was a year ago, correct?

6  A.    Sure.

7  Q.    And do you recall telling them that you knew that Mr. Huff

8  was armed with a pistol and had something else in his vehicle?

9  A.    At the time of that interview, the answer to that is yes.

10 Q.    So when Mr. Huff was in Madisonville on the 20th, you knew

11 that he was armed?

12 A.    Yeah, but I'm a little surprised about the anti-aircraft. That's–

13 Q.    Well, besides the anti-aircraft gun. Say the pistol or the AK-

14 47; you knew he was armed when he was in Madisonville?

15 A.    Not on his person, but he was armed.

16 Q.    As in, from your understanding, it was accessible to him?

17 A.    I couldn't see it. I never did see it. I only understood that it

18 was there.

19 Q.    Just a couple, couple more topics and we're done. Can you–

20 well, let me ask you this. Isn't it a fact that you called ahead to the

21 Madisonville Police Department prior to the 20th, asking whether

22 you could obtain a permit to protest; is that correct?

23 A.    That is correct.

24 Q.    And were you not informed that there would be a place to

25 protest, but one of the requirements was that there would be no

1  weapons allowed; is that correct?

2  A.   I do not remember that part. I do remember them saying there

3  was a specific place. I don't remember them saying anything about

4  weapons, however.

5  Q.   And, in fact, you didn't ever go pick up that permit, did you?

6  A.   No.

7  Q.   Didn't feel that was necessary?

8  A.   Didn't think the people were going to come.

9  Q.   Let me ask you, Mr. Swensson, are you now, today, not on

10  April 20th, but today, are you ready and willing to admit that you,

11  Mr. Fitzpatrick, Mr. Huff, were simply flat out wrong about the

12  whole issue about the alleged grand jury foreman, Pettway,

13  violating the law for sitting 27 years? Are you ready to admit that

14  today, based upon what you know today, that that's wrong?

15  A.   No.

16  Q.   That he was not violating the law?

17  A.   No. But I will be happy to extend– entertain anything you can

18  show me that would indicate otherwise.

19  Q.   Do you recall sending an e-mail on the 28th of April, 2010, to

20  Mr. Huff in which you stated, "I have checked the cases that are

21  listed as proceedings for grand jury– excuse me– precedence for a

22  grand jury foreman to serve more than one term by appointment or

23  holdover, and that case is Nelson vs. State, 499 Southwest 2nd , 956

24  Tennessee Criminal Court of Appeals," and your words, "the

25  appellate court upheld the ruling, stating that the appellate court

1  could find no reason why a grand jury foreman could not be held

2  over or reappointed as many times as the Court wished.

3  Unfortunately, for Tennessee law, this is the precedent that

4  exonerates Mr. Pettway."

5  A.    I remember seeing that and I remember writing that,

6  absolutely.

7  Q.    So you do admit that the case law that you researched says

8  that Mr. Pettway was not in violation of anything?

9  A.    You're reading one e-mail out of many, and that particular e-

10 mail lent a little question to what I was thinking and what I was

11 reading.  But I did research a little bit further and found more

12 information out concerning that case, which would lend credence

13 to the fact that there was no way that that particular case could

14 have stayed.

15 Q.    So now you're questioning– you said you're not a lawyer, but

16 you're questioning this case?

17 A.    Well, yeah, absolutely.

18 Q.    But you are in agreement that you sent this e-mail on the 28th

19 of April?

20 A.    Seriously, I remember that one, yeah.

21         MR. MACKIE:    Your Honor, at this time, I would move

22 into evidence Government Exhibit 46.

23         MR. GREEN:  No objection.

24         THE COURT:  46?

25         MR. MACKIE:   Forty-six.

1          THE COURT:  So admitted.

2       (Government's Exhibit No. 46 received into evidence.)

3          MR. MACKIE:    It's the e-mail just discussed. Could

4    you switch over to the ELMO, and I have just one last question.

5    Q.    While we're doing that, just as a follow-up question, while

6    we're pulling this up, I think I asked a question about– back on

7    April 20th, 2010, I was asking you about your interview with the

8    FBI agent.  I'm just asking, did you not state that, "All the

9    protesters met at the restaurant across from the street, and Huff was

10   armed with a pistol"?

11   A.    Run that by me one more time?

12   Q.    You stated that, "All of the protesters met at the restaurant

13   across the street from the courthouse, and Huff was armed with a

14   pistol and with something else in his vehicle–"

15          MR. GREEN:  I'm sorry, counsel. Where are you

16   reading from?

17   A.    Yeah, you're re-reading this stuff. He was armed, but those

18   armaments were in the truck.

19   Q.    All right.  This e-mail, I just wanted to make sure that this is

20   what you recall so we can make sure we get this right. That's from

21   you, and that is actually Mr. Huff's e-mail address; is it not?

22   A.    Absolutely.

23   Q.    All right.

24          THE WITNESS:  Judge, excuse me for a second.  When

25   he's reading this stuff, does he not have to read the full context or

1    is he just–

2              THE COURT:   Well, just listen to the question.  If you

3    need to see the whole document, then, certainly, you can read it or

4    you can see it.  Depends on what the question is.

5              THE WITNESS:    Okay.

6              THE COURT:   Right now he's just asking you if this is

7    the e-mail that you sent, and if you need a physical copy of it to–

8              THE WITNESS:    No, no.

9              THE COURT:   –understand the whole thing.  But that's

10   the question.

11   Q.    I can give you the copy–

12   A.    No, no. I understand.

13             THE COURT:   The question is, is this the e-mail you

14   sent, and the answer is yes.

15             THE WITNESS:    Yes.

16             THE COURT:   So let's see what the question is, so–

17   Q.    And just to make sure that you're comfortable with what I was

18   reading there, "I have checked on the cases that are listed as the

19   precedents for the grand jury foreman to serve a term by either

20   reappointment or holdover," and that's the case that I cited, that I

21   read there, and "the appellate court upheld the ruling, stating they

22   could find no reason why a grand jury foreman could not be held

23   over or reappointed as many times as the court wished."

24         And then, further down there, that's where I read, "This is the

25   precedent that will exonerate Mr. Pettway."

1    A.    And the preface to that, the preface is, here's what a judge in

2    Tennessee did to circumvent the Tennessee law without amending

3    it.

4    Q.    Last thing, Mr. Swensson, I want to ask you about something

5    in terms of your view. You said you are not a person advocates

6    violence. Do you understand that those around you may hold

7    different views, whether it be members of that group that day, may

8    have had a different view than you, correct?

9    A.    Anything's possible.

10   Q.    And do you believe, and coming from your website, that the–

11   what you quote as the Dick Act of 1902, which I believe actually is

12   actually known as the– I believe it's the National Guard Act of

13   1902, efficiency of militia, 1902.

14          I'm reading from your website, "that since that law," citing

15   that law, "this country can now be restored only by force." Is that

16   your view?

17   A.    Not entirely, and that's the way I fight, the way I fight, is to

18   get information out to other people so that they will understand

19   that we can avoid that particular issue. The Dick Act of 1902

20   establishes a couple of things, one of which is, that every member–

21   every American between the age of 18 and 45 is automatically a

22   member of the militia. I was and I never knew it.

23          You don't look old enough to have surpassed that, so you are

24   probably still an active or inactive member of the militia, as are

25   many people in the jury pool. I didn't know that; I do now. And it

1    also said that it was incumbent upon every person that was in the

2    militia to keep and bear as many arms as possible.

3         That's a wonderful thought. I don't know how to follow

4    through on that one, but apparently that was the law and still is. I

5    don't think it's ever been repealed.

6    Q.    And your view, looking from the website, that that act, as you

7    call it, invalidates all gun control laws? Is that your view?

8    A.    That is my view, yeah.

9    Q.    So it is illegal, in your view, under your constitution, under

10   the flag without the fringe, that a person could lawfully own a .50-

11   caliber machine gun, should be able to?

12   A.    In that context, yes. Sure.

13   Q.    And an RPG; that's okay?

14   A.    You're leading me. I don't know where you want to go with

15   this. I mean–

16         MR. GREEN:   Your Honor, I have allowed a great

17   amount of latitude here without objecting. He's been cross-

18   examining him now for 45 minutes about what his beliefs are. I

19   object at this point to relevance.

20         THE COURT:   All right. Well, I'm going to sustain the

21   objection just from the standpoint I believe you elicited the

22   response you wanted to, and it's not necessary to go through

23   individual examples in support of that response.

24   Q.    So, Mr. Swensson, I leave with this question, having just

25   asked about your view on this. On the 20th of April, knowing that

1    Mr. Huff was armed, do you believe that, if there was a

2    confrontation, that violence could have been justified?

3    A.    On that day? No, no, not at all.

4    Q.    That was in your view?

5    A.    In my view, yeah.

6              MR. MACKIE:    No further questions.

7              THE COURT:   Thank you. Any redirect?

8              MR. GREEN:   Your Honor, just two questions.

9              THE COURT:   Oh, I'm sorry. I thought you were

10   standing up.

11             MR. GREEN:   Well, I'm a yo-yo sometimes.

12             THE COURT:   Go ahead.

13                      **CROSS-EXAMINATION**

14   by Mr. Green:

15   Q.    You mentioned that you were arrested when you came to court

16   one time, Mr. Swensson?

17   A.    Yeah.  That was– I've been following Darren's court

18   activities here in Knoxville, and the first such hearing that he had–

19   Q.    Well, just answer my question. Okay.  Now, you were arrested

20   when you came to one of the hearings, correct?

21   A.    Yes, sir.

22   Q.    And that was by the Monroe County authorities, correct?

23   A.    No. It was by the federal marshals here. I was turned over to

24   the–

25   Q.    That's right. The arrest originated from Monroe County,

1    correct?

2    A.    Yeah, I guess so.

3    Q.    That's where you were taken, right?

4    A.    Yes, yes.

5    Q.    And that was for events from what day?

6    A.    April 1st.

7    Q.    Okay. When you, along with Mr. Huff, had sat outside the

8    door while Mr. Fitzpatrick was inside the grand jury room?

9    A.    That's correct.

10   Q.    And ultimately what happened to those charges?

11   A.    They were dropped.

12          MR. GREEN:   Thank you, sir.

13          THE COURT:   Any recross?

14          MR. MACKIE:   Just on that question.

15                    **RECROSS-EXAMINATION**

16   by Mr. Mackie:

17   Q.    Was that a citizen's arrest warrant or a federal arrest warrant

18   that was issued by a judge?

19          MR. GREEN:   Your Honor, we'll stipulate it was a

20   valid arrest warrant from Monroe County.

21          MR. MACKIE:   Then, if it's stipulated, I have no

22   questions.

23          THE COURT:   Okay. Thank you, Mr. Swensson. You

24   may be excused as a witness. Thank you.

25          (Witness excused.)

1        THE COURT:   Defendant may call his next witness.

2        MR. GREEN:   Does the Court want to go on or–

3        THE COURT:   Go ahead and get started.

4        MR. GREEN:   Call Mike Fulmer.

5        COURTROOM DEPUTY:   Raise your right hand.  Do

6   you solemnly swear your testimony will be the truth, the whole

7   truth, and nothing but the truth, so help you God?

8        MR. FULMER:  So help me, God.

9        COURTROOM DEPUTY:   Please state and spell your

10   name for the record.

11        THE WITNESS:  Mike Fulmer, F-u-l-m-e-r.

12                    **DIRECT EXAMINATION**

13   by Mr. Green:

14   Q.    Now, Mr. Fulmer, just clearing this up on the front end,

15   you're not related to Phillip Fulmer, are you?

16   A.    That is true, sir.

17   Q.    This jury's just learned your name is Michael Fulmer.  Where

18   is it that you live, Mr. Fulmer?

19   A.    8549 Cartersville Highway, Dallas, Georgia.

20   Q.    All right.  And do you know Mr. Darren Huff?

21   A.    Yes, sir, I do.

22   Q.    How long have you known him?

23   A.    Somewhere between seven, nine years.

24   Q.    All right.  Have you and he done business together?

25   A.    Yes, sir.

1    Q.    And what do you do for a living?

2    A.    I'm a landscaper.

3    Q.    And what did Mr. Huff do in conjunction with your business?

4    A.    He does outdoor lighting.

5    Q.    How did that work out? I mean, would you send him jobs,

6    would he send you jobs? How did that work?

7    A.    Yes, sir, we would, or I would sell– when I would sell a

8    landscape job, the lighting may enhance it a little more or whatnot,

9    and then I would call him in to install that lighting.

10            MR. GREEN:   All right.  Could we pull up, please,

11   Exhibit 22A?

12   Q.    I want to direct your attention, Mr. Fulmer, to what's been

13   previously filed and stipulated to as being text messages off of Mr.

14   Huff's Blackberry, and I want you to look up here at the top.  Is

15   that your name, Mike Fulmer, there to the left?

16   A.    Yes, sir.

17   Q.    And does that look like your phone number to the far left?

18   A.    Yes, sir.

19   Q.    Is that what, a mobile phone?

20   A.    Yes, sir.

21   Q.    And directing your attention to the second line down, did you

22   send that text to Mr. Huff?

23   A.    The one that reads, "How did today go"?

24   Q.    Yes, sir.

25   A.    Yes, sir, I did.

1    Q.    All right.  Now, had Mr. Huff told you about going up to

2    Madisonville to meet with some people before?

3    A.    Yes, sir.

4    Q.    And right below that, did Mr. Huff send that message back to

5    you?

6    A.    Yes, sir, he did.

7    Q.    Below that, did you send the next message, "What happened?

8    Did you do a citizen's arrest"?

9    A.    Yes, sir.

10   Q.    And below that did you send the message, "Did you pull out

11   the mussel"?

12   A.    Yes, sir.

13   Q.    And m-u-s-s-e-l, is that your spelling for muscle?

14   A.    Evidently. I'm not the best speller in the world. I play with

15   dirt for a living, so–

16   Q.    What did you mean by muscle?

17   A.    Just I knew there was a bunch of people coming up, and I

18   didn't know if they were going in force or, you know, in numbers.

19   Q.    Did you ever mean gun?

20   A.    No. No, sir.

21   Q.    All right.  The message right below that, Mr. Huff sent you

22   back, "Not today. They released him night before last, so now

23   we're adjusting days." Do you see that one?

24   A.    Yes, sir, I see it.

25   Q.    And that was Mr. Huff sending that back to you, correct?

1    A.    Uh-huh.

2    Q.    And then below that did you send one back, "So a w-a-i-s-t-e-

3    d trip"?

4    A.    Yes, sir, I did.

5    Q.    And did that mean wasted as in useless or wasted as in–

6    A.    I just wondered if it was a beneficial trip.

7    Q.    Okay. And he responded back, "Not at all. We met with the

8    arrested to coordinate with all groups involved." Is that correct?

9    A.    Yes, sir.

10   Q.    All right. Now, we see below that, once again, some more text

11   messages with you and he about money. Did that have to do with

12   landscaping jobs?

13   A.    Yes, sir. If you'd like me to be specific about that, it has to do

14   with a job that we had done at a city park in Hiram, Georgia. We

15   had a flood there, and the park got flooded and the lighting was

16   shorted out, and I had– I was coordinating repairs inside the park.

17   And I had brought Darren in to do repairs on the stuff that was

18   underwater and had got shorted out, to run new wires, ballast, stuff

19   like that.

20   Q.    Now, what church is it you go to?

21   A.    Tabernacle Baptist Church in Cartersville.

22   Q.    Okay. And you've been going there for a long time; is that

23   correct?

24   A.    Actually, that church, I've been at just a little over a year and

25   a half. Previously, actually, the church that me and Darren had met

1  at was New Canaan Baptist Church in Dallas, Georgia. I was there

2  ten years.

3                    MR. GREEN:   Okay. Your witness.

4                    THE COURT:   Thank you. Cross- examination?

5                    **CROSS-EXAMINATION**

6  by Mr. Mackie:

7  Q.    Good afternoon, Mr. Fulmer.

8  A.    How you doin', sir?

9  Q.    Not easy to come up to the witness stand, is it?

10 A.    Sorry?

11 Q.    It's not easy to come up on the witness stand, is it?

12 A.    No, sir.  A little scary.

13 Q.    I appreciate that.  You're a business associate with Mr. Huff?

14 A.    We're not associated as far as me and other– we do not own a

15 business together.  I own a company called Outdoor Solutions, and,

16 when it was active, he owned a company called Artistic Nights.

17 And I used subcontractors to do stuff for me that I do not do, and he

18 was one of the subcontractors.

19 Q.    Yeah, I didn't mean that as a formal term. I mean, just you

20 know him from doing business?

21 A.    Yes, sir. And from we had went to church together, yes, sir.

22 Q.    And what, now?

23 A.    We had went to church together.

24 Q.    Okay.  Did you go out on any kind of like militia activities

25 with him?

1  A.    No, sir.

2  Q.    You're not involved in any of that?

3  A.    No, sir.

4  Q.    But you heard, must have heard, Mr. Huff talking about going

5  up to Tennessee on April the 7th; told you about that, didn't he?

6  A.    Yes, sir. Just kind of filled me in a little bit what was going

7  on.

8  Q.    And do you understand– well, I'm in a different mode here.

9  Did you understand that it had to do with him going to meet this

10  guy, Fitzpatrick, about this whole citizen's arrest warrant

11  business?

12  A.    I'm not familiar with the name Fitzpatrick.  All's I knew of

13  was a court in Tennessee and a citizen's arrest because of

14  something that was felt like being done wrong.

15  Q.    Did he tell you that somebody was a corrupt official or

16  something like that?

17  A.    I wouldn't say the term corrupt official was used, just more or

18  less something that wasn't legal.

19  Q.    And the text was that you were– you thought that he might

20  been getting arrested that day, right?

21  A.    I don't know that I would say I felt like he was getting

22  arrested other than I'm not a risk-taker by any means, and I didn't

23  know what was entailed here whatsoever.  I really– when you said

24  the date, I wouldn't have known it was that date other than he had

25  told me just prior to the day before, I think, that he was going.

1    Q.    Did you think there might be some kind of confrontation, I

2    guess?

3    A.    Not that I would have thought, no, sir.

4    Q.    On "mussel," were you talking like muzzle, like a gun muzzle,

5    or muscle like–

6    A.    No. I was just talking about I knew that there was several

7    people going up with him. I knew they were supposed to like meet

8    and support some guy.

9    Q.    And they were going to have weapons?

10   A.    Not that I knew of, sir.

11   Q.    And "mussel" means some type of force?

12   A.    In number, in number, yes. I would have– no better than I

13   spell, if I was going to use "muzzle," I would have said gun.

14   Q.    Yeah, not like eating mussels, what you're talking, right. Did

15   you know what the groups involved– did he ever tell you what

16   other groups were involved in this stuff?

17   A.    I had heard the word "militia" and the word "Oath Keepers."

18   Q.    So thought that–

19   A.    I just kind of thought it was like a group thing type of deal,

20   yes, sir.

21   Q.    All right. And did he ever follow up with you as to what he

22   was talking about, moving on to Phase 2?

23   A.    If he did, I can't remember.

24   Q.    Okay. Fair enough.

25          MR. MACKIE:    No questions.

1          THE COURT:   Any redirect?

2          MR. GREEN:   No, your Honor.

3          THE COURT:   All right.  Thank you, Mr. Fulmer. You

4    may be excused, sir.

5          MR. GREEN:   Your Honor, the next witness is going to

6    be rather lengthy.

7          THE COURT:   Does the jury want a break? All right.

8    Let's go ahead and take our afternoon recess at this time, 15

9    minutes.

10         (Recess had 3:05 p.m.; reconvened without jury at 3:29 p.m.)

11         THE COURT:   I see we're ready for our next witness.

12   Let's bring our jury in, please.

13         (Jury reconvened in courtroom at 3:30 p.m.)

14         THE COURT:   Thank you. Everyone may be seated, and

15   we'll ask the courtroom deputy to swear in our witness before he is

16   seated.

17         COURTROOM DEPUTY:   Raise your right hand.  Do

18   you solemnly swear your testimony will be the truth, the whole

19   truth, and nothing but the truth, so help you God?

20         MR. DeSILVA:   Yes, ma'am.

21         COURTROOM DEPUTY:   Could you please state and

22   spell your name for the record?

23         THE WITNESS:   William Michael Morris DeSilva, W-

24   i-l-l-i-a-m, M-i-c-h-a-e-l, M-o-r-r-i-s, D-e-S-i-l-v-a.

25                     **DIRECT EXAMINATION**

1    by Mr. Green:

2    Q.     Good afternoon, Mr. DeSilva.

3    A.     Afternoon.

4    Q.     Now, I know that you're softspoken, like I am, so you're

5    going to need to speak into that microphone so that these folks can

6    hear you; okay?

7    A.     Yes, sir.

8    Q.     You just told this jury your name's Michael DeSilva.  Where

9    is it that you reside, sir?

10   A.     Paulding County, Georgia.

11   Q.     And are you friends with Darren Huff?

12   A.     Yes.

13   Q.     How long have you known Mr. Huff?

14   A.     Oh, now, it might be six or seven years.

15   Q.     Okay.  And without going into any great detail, over the

16   course of the years have you become or was there a time that you

17   were close friends with him?

18   A.     Yes.

19   Q.     In April of 2010, last year, would you consider yourself a

20   close friend with him?

21   A.     Yes.

22   Q.     How did you view Mr. Huff and his wife, Cindy?

23   A.     Very down to earth individuals.  They had thrown a Bible

24   study for us, were very open and treated us very kindly, the Bible

25   study.

1    Q.    What did you consider your relationship to be with him?

2    A.    Oh, it was near family.

3    Q.    Now, what do you do for a living?

4    A.    I teach martial arts.

5    Q.    I can't pronounce what it is you do. Tell us.

6    A.    Tolsondo (phonetic).

7    Q.    Which is– is that like karate?

8    A.    It's a Korean form of martial arts. It's been more American-

9    ized. It's not a competition art; it's survival if you're attacked on

10   the street kind of thing.

11   Q.    And do they award belts kind of like they do in karate?

12   A.    Yes, sir.

13   Q.    And what degree are you?

14   A.    I'm fourth-degree black belt.

15   Q.    All right. So I take it you don't need a gun to take care of

16   yourself?

17   A.    No, sir.

18   Q.    I want to direct your attention, please, sir, to April the 19th

19   and 20th of 2010. Had you gone to any sort of higher education

20   before that time?

21   A.    I went to Chatthoochee Technical School originally for a

22   criminal justice degree, and I think I stopped short, maybe two

23   quarters, before I would have had that degree. Things came up,

24   possibility of opening up another martial arts school, so I switched

25   over to a business degree. And then, not long after that, between

1    that and the job, it was hard to keep up; and then, later, when the

2    situation were it would be a while before I could return to school,

3    and just haven't gone back since.

4    Q.    All right. How was it that in April, 2010, you viewed law

5    enforcement? What were your views towards law enforcement?

6    A.    Very good. I've grown up around it, I have family in it, and I

7    had a very strong childhood dream of following in my

8    grandfather's footsteps, putting on the uniform and badge, serving

9    the community.

10   Q.    Do you do anything else as a part-time hobby?

11   A.    I write. That doesn't pay the bills, but it's what I enjoy.

12   Q.    Have you had anything published yet?

13   A.    I've had two novels, several short stories I've published for

14   free just on the internet. Getting close to having a couple more

15   published, hopefully.

16   Q.    When was it that Mr. Huff first started speaking with you or

17   there was discussion about you coming to Madisonville with him?

18   A.    Would have been after, I believe it was, April 1st, the first

19   time we went up there, and that was when he told me that he had

20   gone up there and about Walter Fitzpatrick and that sort of thing.

21   Q.    All right. Now, let's just ask it point-blank. Was there any

22   plan between you and Mr. Huff to do some sort of armed takeover

23   of the city?

24   A.    No, sir.

25   Q.    Was there ever any discussion between you and Mr. Huff

1  about using guns or violence to do anything in Madisonville?

2  A.    No, sir.

3  Q.    Would you have gone if there had been?

4  A.    No, sir.

5  Q.    I want to direct your attention, please, sir, to the early

6  morning hours of April the 20th of 2010. Where did you go that

7  morning?

8  A.    I went to Darren's house.

9  Q.    And that's, I believe, what, 1617 Shoals Trail? Does that

10 sound right?

11 A.    Yes, on Shoals Trail.

12 Q.    What time did you meet up with Mr. Huff, ballpark?

13 A.    Between four and five. I don't have a good memory for time.

14 Q.    Had you worked the night before?

15 A.    No. I didn't work the night before, I don't believe.

16 Q.    Okay. What time did you and Mr. Huff leave?

17 A.    Maybe 15, 20 minutes after I arrived.

18 Q.    Okay. Now, did you have a firearm with you?

19 A.    No, sir.

20 Q.    Do you own a weapon?

21 A.    No, sir.

22 Q.    Did you see Mr. Huff with a firearm?

23 A.    His .45, at some point in the morning.

24 Q.    On his hip?

25 A.    Yes.

1    Q.    Now, is that the first time you had ever seen a .45 on his hip?

2    A.    No.

3    Q.    Had you been places with him on other occasions when he had

4    that .45?

5    A.    Yes, sir.

6    Q.    Like where?

7    A.    Wal-Mart.

8    Q.    When you guys left, what was your plan? What did you think

9    was going to happen in Tennessee?

10   A.    More or less, thing which would have been sticking in my

11   head was a– you hear about these tea party rallies, which were

12   pretty predominant at that point. I thought it was going to be more

13   along the lines of that and people beating on, you know, officials'

14   doors, talking to them about what's going on with the case,

15   Fitzpatrick, and that kind of thing.

16   Q.    All right.  Now, on the way up to Tennessee, approximately

17   how long a drive is it from the Cartersville, Georgia, area to

18   Madisonville, Tennessee?

19   A.    Four hours.

20   Q.    Okay.  Were you awake the whole time?

21   A.    No. It was way past my bedtime.

22   Q.    Did you sleep the whole time or were you in and out?

23   A.    In and out.  I have a thing about sleeping in cars and driving.

24   Q.    Do you recall, were you awake when you got off the

25   interstate?

1    A.    Yes.

2    Q.    Do you recall seeing a trooper behind you?

3    A.    Yes, sir.

4    Q.    Do you recall saying anything to Mr. Huff?

5    A.    Yes.

6    Q.    What did you tell him?

7    A.    I don't know what it was verbatim, but he's had a few traffic

8    tickets, so I said there's an officer behind us, because we were

9    coming up to a stop or a yield or something.

10   Q.    And what did Mr. Huff do?

11   A.    Stopped.

12   Q.    What happened then?

13   A.    We pulled out and shortly thereafter, very shortly afterwards,

14   the blue lights on the cruiser came on.

15   Q.    Did Mr. Huff respond by pulling over when the blue lights

16   came on?

17   A.    Yes.

18   Q.    What happened then?

19   A.    Pulled over and we were waiting for– Darren may have been

20   fumbling through his wallet or something. We were waiting for, I

21   guess, the trooper come up, take identification, that's what we

22   were doing, and that didn't happen.  So looked into the passenger

23   side mirror and saw a man standing there with a shotgun.

24   Q.    Was that the only gun you saw drawn out at that point?

25   A.    Yes, the guy I saw in the mirror, maybe one other behind him.

1    I can't quite remember.

2    Q.    Was that's enough at that point?

3    A.    I'm sorry?

4    Q.    Was that enough at that point?

5    A.    It was enough to set off alarms.

6    Q.    What did you do and what did Mr. Huff do?

7    A.    Told Mr. Huff that there was a man behind us with a shotgun,

8    and he made his very, I mean, mannerism, oh, very distinctive

9    sound that he does sometimes. He put his hands up, and I asked or

10   I followed him or asked him, and I put my hands up. And then he

11   stuck his out the window and I stuck mine out the window.

12   Q.    Were either of you all ordered to stick your hands out the

13   window before you did so?

14   A.    I don't know if we were ordered. I was– I didn't hear

15   anything, but he may have.

16   Q.    Okay. But you were doing what Mr. Huff told you to do,

17   correct?

18   A.    More or less following his lead.

19   Q.    All right. What happened next?

20   A.    I don't know if we were– he was commanded to step out of the

21   vehicle. The gentleman with the shotgun came around, I guess was

22   watching me. Mr. Huff stepped out of the vehicle, and at this point

23   I'm hearing voices, "Walk to the sound of my voice, walk to the

24   sound of my voice. Weapon on the right side."

25        Shortly thereafter, I'm ordered out, turn around, "Walk to the

1    sound of my voice, walk to the sound of my voice," and put on my

2    knees, searched, and then brought around to the back of the

3    trooper's car.

4    Q.    Okay. Now, at this point, you have been made to walk out

5    backwards with your hands on your head while a shotgun is drawn

6    down on you; is that correct?

7    A.    Yes.

8    Q.    All right. Had you made any statements to anyone about

9    taking over the City of Madisonville?

10   A.    No.

11   Q.    And you've already said you don't even own a weapon; is that

12   correct?

13   A.    I don't own a weapon.

14   Q.    Do you recall some discussion that you overheard between the

15   officers and Mr. Huff about searching the truck or the bomb dogs?

16   A.    I remember– I don't remember if it was a trooper, the DTF

17   leader, asking can we search your vehicle. And then Darren made a

18   statement, "As respectfully as I can, I know my rights," and then

19   they asked if they could bring out the bomb dog.

20   Q.    And what did Mr. Huff say to that?

21   A.    Yes. He affirmed one way or another.

22   Q.    Now, did you, in fact, see some dogs, a couple different dogs,

23   go around the truck?

24   A.    I only saw one.

25   Q.    As the time beside the road progressed, where were you and

1   where was Mr. Huff?

2   A.    Behind the trooper's vehicles for a little while. Eventually,

3   they said we could go free, and I went and sat back in the truck.

4   Darren had walked to the truck at some point, I think getting

5   pamphlets, Oath Keepers information, for the officers.

6   Q.    All right. In your experience with Mr. Huff, is he a shy

7   person?

8   A.    I'm sorry?

9   Q.    Is Mr. Huff a shy person?

10  A.    No. No, sir.

11  Q.    And what did he appear to be doing when he was talking to the

12  officers there?

13  A.    Talking to them about the events in Madisonville. I can't

14  recall any specific conversations like that. And then–

15  Q.    You said he had some pamphlets?

16  A.    Pamphlets, that kind of thing.

17  Q.    Okay. Where were you?

18  A.    At this point, I was on the passenger's side and Mr. Huff was

19  on the driver's side.

20  Q.    Do you recall there being a point in time when there was a

21  discussion between Mr. Huff and one or more of the officers about

22  the .45 pistol?

23  A.    They offered– they said something to the extent that you can–

24  if you're going to Madisonville, you have to put away the pistol

25  and once you get into Madisonville. And I believe Darren said,

1   well, if you guys are going down there, as well, I'll go ahead and

2   put it away.

3   Q.    And did he do that?

4   A.    Either he did or the troopers did.

5   Q.    All right. And where did they put it?

6   A.    It was in a toolbox on the driver's side.

7   Q.    On the back side, bed of the truck?

8   A.    Yes.

9   Q.    Was there some period of time that you and Mr. Huff stayed

10  there after the troopers had told you all you could go?

11  A.    At least half the time spent there, I think, was Darren talking

12  to the troopers.

13  Q.    Just wanted to keep talking, right?

14  A.    Yes.

15  Q.    In fact, did one of the troopers come up and talk to you about

16  something to the effect did he drive, talk this way all the way up

17  from Georgia?

18  A.    I'm sorry?

19  Q.    Did one of the troopers say something to you to the effect, did

20  he talk this much all the way up from Georgia or words to that

21  effect?

22  A.    I don't remember conversations that well or, I mean, this was–

23  I was very tired now that the shock has worn off, and we had been

24  sitting down or I had been sitting down for a little bit.

25  Q.    What happened after you all left the roadside?

1   A.    Went to some kind of pharmacy, a CVS or something.

2   Q.    Do you recall meeting somebody at the pharmacy?

3   A.    There was an older gentleman there, well, Carl Swensson.  I

4   didn't recognize him or I didn't know him.

5   Q.    Had you met him before?

6   A.    No.

7   Q.    And how long did you all stay at CVS?

8   A.    I can only guess, 15 or 20 minutes.

9   Q.    Where did you go from there?

10  A.    We went to a small gravel area and just off the highway there.

11  Bill Looman was also with us, and Darren wanted to put up a flag

12  there, so we could ride into the town.

13  Q.    All right.  Where was the flag going to go up?

14  A.    On the toolbox.  There were little brackets on there.

15  Q.    In the bed of the truck?

16  A.    Yes.

17  Q.    All right.  And who was the guy up in the bed of the truck?

18  A.    It was me.

19  Q.    You're a little bit wirier and springier than Darren, aren't

20  you?

21  A.    No, sir.

22  Q.    Did you get into the toolbox to get anything out?

23  A.    Yeah.  I needed a drill to fasten the bolts in, and I think the

24  flag may have even been in there.  I can't recall.

25  Q.    And what did you see when you opened up the toolbox?

1    A.    I saw the pistol. The slide was racked back, bullets scattered

2    in there. There was a case, black or navy blue, and–

3    Q.    Did it look like a gun case?

4    A.    Yes.

5    Q.    But you couldn't see what was inside of it?

6    A.    No. It was zipped or closed up.

7    Q.    Okay. Did you, in fact, put the flag up?

8    A.    Yes.

9    Q.    And where did you all go from there?

10   A.    We went to a small restaurant in town, across from the

11   courthouse.

12   Q.    Where did you park in relation to the restaurant?

13   A.    There's an intersection. The courthouse is on this side and

14   the restaurant is here. We were on the side of that restaurant.

15   Q.    Was the front of the truck facing toward the courthouse or

16   away from the courthouse when you parked?

17   A.    Toward the courthouse.

18   Q.    Okay. Which would have made the passenger side of the

19   truck closest to Donna's Restaurant, correct?

20   A.    Yes.

21   Q.    Now, I'm going to skip ahead just a little bit, then we'll come

22   back. Was there a point in time when you all were sitting there, the

23   truck was just sitting there, next to Donna's, right before you left,

24   that you had to get into the toolbox again?

25   A.    Well, much later in the day we had to hit the starter with a

1    hammer. I don't remember that came out of the toolbox or behind

2    the seats.

3    Q.    All right. Were you the one that hit the starter with the

4    hammer?

5    A.    Yes, sir.

6    Q.    Back to where we were, when the truck had parked, where did

7    you all go once you parked the truck?

8    A.    Inside the restaurant.

9    Q.    From the time that you left the roadside stop until you pulled

10   up and stopped at Donna's, were you with Mr. Huff?

11   A.    Yes.

12   Q.    Did you ever see him retrieve the pistol from that toolbox, put

13   it on his person?

14   A.    No, sir.

15   Q.    And, in fact, I believe, if I understand you correctly, right

16   before you came into town the pistol was still in the toolbox when

17   you put the flag up, correct?

18   A.    Yes, sir. It was faced up. I can distinctly remember the sight

19   of that.

20   Q.    Once you got into Donna's, where did you go and what did

21   you do?

22   A.    Went inside, ate breakfast, migrated from the inside to

23   outside a couple of times. People stepped out and smoked, that sort

24   of thing.

25   Q.    Okay. Were you in close proximity to where Mr. Huff was the

1    whole time that you were at Donna's?

2    A.    Within viewing distance at least.  He only walked away once.

3    Q.    Did you see Mr. Huff go toward– do you know what the

4    Beecher Witt Building is?

5    A.    No, sir.

6    Q.     Did you see Mr. Huff go toward the courthouse?

7    A.    Yes. They were offering a bag of biscuits and coffee they had

8    gotten from the restaurant to the officers around.

9    Q.    Did you ever see him approach the courthouse with a firearm?

10   A.    No, sir.

11   Q.    Did you ever see him attempt a takeover of the courthouse?

12   A.    No, sir.

13   Q.    When you got to Donna's, was it like everybody knew each

14   other already or was there introductions being made?

15   A.    There were introductions being made.

16   Q.    Few or many?

17   A.    It seemed like most people didn't know each other.

18   Q.    Did you know anybody there besides Darren?

19   A.    No.

20   Q.    Did Darren talk when he was inside of Donna's?

21   A.    Yes, he did talk.

22   Q.    Did he talk pretty much the whole time he was inside of

23   Donna's?

24   A.    Yes.

25   Q.    And what was it he was talking about?

1  A.    Being pulled over that morning and– well, that's about it.

2  That was kind of the spotlight was on.

3  Q.    About what time do you think it was that you all left to go

4  back to Georgia?

5  A.    Late afternoon, probably five, four or five.

6  Q.    Okay.  During the entirety of the time that you were in

7  Madisonville that day, did you ever see Mr. Huff with a firearm on

8  his person?

9  A.    No, sir.

10  Q.    During the entirety of the time that you were in Madisonville

11  that day, did you ever see Mr. Huff or anyone else, for that matter,

12  try to arrest anyone?

13  A.    No, sir.

14  Q.    During the entirety of the time that you were in Madisonville

15  that day, did you ever see Mr. Huff or anyone else or a group

16  approach the courthouse with weapons?

17  A.    No, sir.

18  Q.    Did you see anyone else there with a weapon other than the

19  cops?

20  A.    No, sir.

21  Q.    On the way back, do you recall Darren making some phone

22  calls?

23  A.    Yes.

24  Q.    Do you know who he was calling?

25  A.    I know one of the phone calls was to an officer that I believe

1  he had gotten his card from. Don Williams, I think that's the DTF

2  supervisor.

3  Q.    Obviously, you couldn't hear the other end of the

4  conversation, but what did Mr. Huff say on the end that you could

5  hear?

6              MR. MACKIE:    Your Honor, if we're going to talk

7  about what Mr. Huff said, I object as hearsay.

8              MR. GREEN:   Goes to his intent, your Honor, state of

9  mind. It's not offered for the truth. It's not being offered for the

10  truth–

11             THE COURT:   Mr. Mackie, any objection, hearing that

12  response?

13             MR. GREEN:   It's not being offered for–

14             THE COURT:   I understand that. I'm asking–

15             MR. GREEN:   Oh, I'm sorry.

16             THE COURT:   –is there is a response to your response?

17             MR. MACKIE:   If it's not offered for the truth of the

18  matter, just what he's talking about, it doesn't cause him to make

19  any actions or do anything. So it's offered essentially for what

20  he's–

21             THE COURT:   All right. Well, I'll overrule the

22  objection, but with this instruction, limiting instruction to the jury.

23  As you may recall I said yesterday, the Court will allow this

24  testimony not as hearsay, that is, not being offered for the truth of

25  the matter asserted, but will allow it as a statement of– as a present

1   state of mind or emotion or offered to prove a state of mind or

2   emotion that is in issue in this case.

3        So, for that limited purpose, the Court will allow the question

4   to be asked.

5            MR. MACKIE:    Your Honor, if I just may, I said I

6   believe this occurred, these are statements that occurred after he

7   left town, so I believe what his state of mind is as he's driving

8   home may be entirely different than when he's driving in.  So I

9   renew my objection on that.

10            MR. GREEN:   That's what these folks get to decide,

11  your Honor.

12            THE COURT:   Well, the rule does say it's offered to

13  prove subsequent conduct of the declarant in accordance with state

14  of mind, so Mr. Mackie may have a valid point there.

15            MR. GREEN:   Well, I guess the point I'm making is that

16  the Government has introduced a number of things that occurred

17  some ten days thereafter, their argument being that impacted his

18  state of mind on the 20th. And we're saying certainly that–

19            THE COURT:   But the question, is that a hearsay

20  objection to this?

21            MR. GREEN:   I don't believe it is, your Honor.  It's–

22            THE COURT:   I'm going to sustain the objection.

23            MR. GREEN:   All right.

24            THE COURT:   Since it is conduct that occurred after

25  the event at issue.

1  Q.    In any event, on the way back to Georgia, did Mr. Huff ever

2  express to you that there was any sort of plan that was thwarted?

3  A.    No.

4  Q.    Did he ever express to you that there was some violence that

5  was going to take place and it didn't?

6  A.    I'm sorry. One more time?

7  Q.    Did he ever express in anger or frustration that we were going

8  to take over the courthouse and we couldn't today?

9  A.    No, no.

10  Q.    Did he ever complain about all the cops that were in the

11  courthouse stopped this grand plan they had?

12  A.    No.

13        MR. GREEN:   You may cross-examine.

14        THE COURT:   Thank you. Cross- examination.

15        MR. MACKIE:    Yes, your Honor.

16                   **CROSS-EXAMINATION**

17  by Mr. Mackie:

18  Q.    Good afternoon, Mr. Desilva.

19  A.    Afternoon. How are you?

20  Q.    Do you recall me from a prior hearing? I'm Mr. Mackie?

21  A.    Yes, sir.

22  Q.    We met, yeah. I just want to ask you just a few questions to

23  follow up on that.  Is it my understanding correctly that you've

24  known Mr. Huff for a number of years, having attended the same

25  church and Bible study over time?

1   A.    Yes.

2   Q.    So you were friends with him from that context?

3   A.    Yes.

4   Q.    And I believe you said that you have a personal interest in

5   criminal justice; is that–

6   A.    Yes, I do.

7   Q.    Having went to school on that; is that correct?

8   A.    Yes, sir.

9   Q.    And you also are an aspiring writer, correct?

10  A.    Yes.

11  Q.    And I do believe and I think maybe you said, but let me ask

12  you, were those interests converging at that time, your interest in

13  criminal justice and maybe wanting to write a book or an article

14  about something going on in Madisonville that day?

15  A.    If there was something worth writing.

16  Q.    Something worth writing. Go ahead.

17  A.    If there was validity to what was being said, then, you know,

18  that's as you're saying.

19  Q.    It was your understanding that there was going to be some

20  activity or something relating to some kind of arrest warrant,

21  right?

22  A.    As I understood it, that arrest warrants could be effected, that

23  it would, or citizens' arrests, right.

24  Q.    So you were anticipating something to happen like that?

25  A.    If it did, it did; if it didn't, then it didn't.

1    Q.    I didn't hear you.  What?

2    A.    If it did, it did; if it didn't, then it didn't.

3    Q.    Well, it was one of your expectations for getting up early,

4    driving along, to see what was going to happen, right?

5    A.    That played into it. I was part of it, but it wasn't–

6    Q.    Well, let me ask you. Were you interested in effecting or

7    enforcing some sort of arrest on anybody?

8    A.    No, it wasn't my interest.

9    Q.    You had no dog in that fight, right?

10   A.    No. It was not my–

11   Q.    You were just coming along because he had told you that

12   something may be happening and you were interested in observing

13   it and maybe writing about it?

14   A.    Right.

15   Q.    Did you ever look at the arrest warrants or have any idea what

16   it was about?

17   A.    I believe I saw them after the fact, probably months after.

18   Q.    Okay.  But going beforehand?

19   A.    Beforehand? No, I didn't see them.

20   Q.    In fact, you didn't have an idea as to who was going to be

21   arrested and for what reason?

22   A.    The only thing that I heard about is grand jury foreman.

23   Q.    And what was your understanding about what this person had

24   done wrong?

25   A.    Served multiple consecutive terms against what, I guess, law

1  or code was allowing.

2  Q.    So were you thinking that Mr. Huff was going to participate

3  with others in arresting this grand jury foreman?

4  A.    It was possible. I don't know. The feeling was that the

5  decisions hadn't been made on that kind of thing.

6  Q.    Now, did you understand that he was also going to be

7  accompanied by another fellow by the name of, I think, Bill

8  Looman, who's a Georgia Mililtia member?

9  A.    Yes.

10  Q.    He was just running late or something or didn't show up?

11  A.    Right. He was– I remember Darren making phone calls to him

12  that morning and he was behind us.

13  Q.    But Mr. Looman of the Georgia Militia showed up later,

14  correct?

15  A.    Much later, yes.

16  Q.    And he was there with, what, 20 to 50 other people that you

17  saw around, whether Donna's or that area, that were part of this

18  group?

19  A.    No, I wouldn't say there were 20 to 50; maybe 15.

20  Q.    That was in Donna's?

21  A.    That was in Donna's?

22  Q.    Yeah. Is that what you're talking about?

23  A.    Inside Donna's, I mean, we put together two tables and–

24  Q.    Right. So you're talking about the 15 people that were in

25  there?

1    A.    Yes.

2    Q.    Did you get out and look around the town there and see what

3    was going on?

4    A.    When we were on the porch, yes.

5    Q.    Did you see a lot of law enforcement there; didn't you?

6    A.    Yes, there was a law enforcement presence.

7    Q.    And did you see other people of that group milling about or

8    standing around across from the courthouse?

9    A.    No, sir.

10   Q.    You didn't? Just saw the law enforcement people?

11   A.    There were just law enforcement.

12   Q.    Now, you observed, I think you testified– just want to be

13   sure– when Mr. Huff got in the truck he was carrying that .45,

14   correct?

15   A.    Back into the truck?

16   Q.    When he got into the truck and left, he was wearing it on his

17   hip, right?

18   A.    From Donna's?

19   Q.    I'm sorry. From Georgia.

20   A.    From Georgia, the pistol, I believe, was on him at that point.

21   Q.    Yeah, he had it?

22   A.    Yes.

23   Q.    And so when he left Georgia, and then when you– you were

24   aware also that he had, I think you said, an AK-47 in the truck, in

25   the toolbox?

1 A.   That, I had to have learned at some point because I figured

2 that's what was in that case.

3 Q.   But later you knew that there was an AK-47?

4 A.   Yes.

5 Q.   All right.  Now, when you went up there to observe, I think

6 you said you didn't bring any weapons yourself?

7 A.   No, sir.

8 Q.   Because you just wanted to observe this?

9 A.   Correct.

10 Q.   And turned out, I think, that it was kind of boring, nothing

11 much happened, right?

12 A.   Right.

13 Q.   And you were in the restaurant, and was it the case that you

14 felt you were waiting around for something and nothing ever

15 happened?

16 A.   It seemed like we were– well, I know for a portion of the day

17 we were waiting for Walter to come out of his hearing, and then he

18 was there for a while and then he left.  I mean, I was ready to go

19 home, tired at this point.

20 Q.   Have you ever– well, let me ask you this.  When you were

21 going up there with Mr. Huff and this bit about the citizens' arrest

22 warrants, did something just not seem to add up as to what

23 happened there?  I mean, it was supposed to go there, you get there,

24 nothing happens, and didn't you wonder why?

25 A.   No. Everything that– trying to figure out how to answer your

1    question in a retrospective manner.

2    Q.    That day.

3    A.    I'm sorry?

4    Q.    That day, you were anticipating something to happen, you saw

5    the law enforcement right there, and did you wonder why is

6    nothing happening?

7    A.    No, that, I didn't wonder that.

8    Q.    Because the law enforcement was there?

9    A.    No. I don't think that had anything to do with it.

10   Q.    When you went back, I guess, to Georgia, right?

11   A.    Uh-huh.

12   Q.    Was there anything that you did write about, about this

13   citizen's arrest warrant or anything that happened?

14   A.    I started a couple of small pieces, and one of the things, one of

15   the things that this was attractive– now, I've always written

16   fiction, and when you write only fiction, you're in command, you

17   get to make that world. It's a totally different beast, to switch over

18   to non-fiction and write something that's– you know, you have to

19   abide by a certain perspective or path. So it was–

20   Q.    What– go ahead. I'm sorry.

21   A.    I was having a lot of trouble getting past that point. I still do

22   today.

23   Q.    Did at any time you research or take a look at that citizen's

24   arrest warrant and determine that it was, in fact, not a legitimate

25   arrest warrant?

1    A.    I've never seen an arrest warrant before or if I have I don't

2    remember. I could have during school. But I didn't see it

3    beforehand, and afterwards, quite some time afterwards, keeping

4    up with this case, I saw it somewhere.

5    Q.    I just want to clarify that when you left Georgia that day, in

6    the morning, just that you did see Mr. Huff carrying the firearm on

7    his hip, right?

8    A.    I remember seeing it in the kitchen and then it was gone from

9    the kitchen, and at some point somewhere right before or not right

10   before, but at some point I think I've seen the pistol. I mean, this,

11   the way my whole schedule works, this is, about the time when we

12   left Georgia, I'm going to bed. So, I mean, it's been a year and a

13   half.

14            MR. MACKIE:    That's all the questions I have.

15            THE COURT:   Thank you. Any redirect?

16                     **REDIRECT EXAMINATION**

17   Q.    Follow-up on what Mr. Mackie asked you, was there anything

18   to write about that day?

19   A.    I'm sorry. Can you repeat that?

20   Q.    Was there anything to write about that day?

21   A.    No, sir.

22   Q.    Thank you.

23   A.    Tried.

24            THE COURT:   Any recross?

25            MR. MACKIE:    No, your Honor.

1       THE COURT:  All right.  Thank you, Mr. DeSilva.  You

2    may be excused.

3       THE WITNESS:    Thank you, sir.

4        (Witness excused.)

5       MR. GREEN:  May we approach, your Honor?

6       THE COURT:  Yes. Excuse us, members of the jury.

7    (Discussion at bench off the record.)

8       MR. GREEN:  Your Honor, we'd call Darren Huff.

9       THE COURT:  Thank you. Mr. Huff, if you'll please

10   make your way to the witness stand.

11       COURTROOM DEPUTY:    Raise your right hand.  Do

12   you solemnly swear your testimony will be the truth, the whole

13   truth, and nothing but the truth, so help you God?

14       MR. HUFF:  I do.

15       COURTROOM DEPUTY:   Would you please state and

16   spell your name for the record?

17       THE WITNESS:  Darren Huff, D-a-r-r-e-n, H-u-f-f.

18                    **DIRECT EXAMINATION**

19   by Mr. Green:

20   Q.    Mr. Huff, if you would, speak into the microphone so that

21   everyone can hear you.

22   A.    Okay.

23   Q.    You've told the members of this jury that your name is Darren

24   Huff, and I believe your middle name's Wesley; is that correct?

25   A.    Correct.

1    Q.    Mr. Huff, where were you born?

2    A.    Right here in Knoxville.

3    Q.    Over at Baptist or what used to be Baptist Hospital?

4    A.    Correct.

5    Q.    Did you live in Knoxville for a period of your life?

6    A.    I believe twice we lived here; obviously, when I was born and

7    also throughout my middle school years and going into high

8    school.

9    Q.    Where did you go to middle school and to high school?

10   A.    I originally– I've heard it's gone now, but Temple Baptist

11   Church over in Powell, which was also a Christian school.  Then

12   for my ninth grade year we went to Karns High School.

13   Q.    And did your family then move someplace else?

14   A.    Yes. Powder Springs, Georgia.

15   Q.    Is that where you finished high school?

16   A.    Correct.

17   Q.    Where did you go to high school down there?

18   A.    I started off at one of the best high schools at the time,

19   McEachem High School, and for my junior year I had a scholarship

20   to go to another Christian school to play football.

21   Q.    And what school was that?

22   A.    Shilo Hills Christian School. But I wound up finishing school

23   back at McEachem and graduated.

24   Q.    Did you play ball in high school?

25   A.    I did.

1    Q.    After you got out of high school, where did you go?

2    A.    I believe it was just a year after high school I went into the

3    Navy.

4    Q.    And where did the Navy send you?

5    A.    Originally, boot camp was in Great Lakes, Michigan, and, or–

6    yeah, right outside of Chicago. And then I went to trade school in

7    Philadelphia, and from Philadelphia to a place called La

8    Maddalena, Sardinia, off the coast of Italy.

9    Q.    All right. What type of ship were you on?

10   A.    A submarine tender. I did– by the time I got there, there was

11   an opening in the sheet metal shop, so I basically built lockers and

12   modified beds and other things with sheet metal, welding,

13   fabrication.

14   Q.    Now, what years would that have been that you were over in

15   the Navy?

16   A.    From '88 to '91, getting out in February of '91, just after the

17   start of Desert Storm.

18   Q.    And what year were you discharged?

19   A.    '91.

20   Q.    And how were you discharged?

21   A.    Honorable.

22   Q.    After you got out of the service, what did you do, what kind of

23   work did you do?

24   A.    I believe one of the first jobs I had was waiting tables at Olive

25   Garden, which was new at the time, and from there I sold cars

1    briefly and eventually took a position as a delivery driver for an

2    irrigation distributor. I actually kind of liked it. The pay was bad,

3    but it was actually an okay job, and I eventually worked my way up

4    to manager and wound up switching companies and became a

5    branch manager for what became John Deere Landscapes.

6    Q.    All right. Now, you're presently married; is that correct?

7    A.    Correct.

8    Q.    Your wife, Cindy, testified earlier today; is that correct?

9    A.    Correct.

10   Q.    How long have you all been married?

11   A.    About ten, maybe ten and a half years.

12   Q.    Okay. I want to direct your attention back to the calendar

13   year 2009. Have you always tried to keep up with what's going on

14   in the world and what's going on in this country?

15   A.    Honestly, no.

16   Q.    When did you start becoming more aware and paying attention

17   to what's going on in the country?

18   A.    I believe that, as one of the witnesses, Mike Fulmer had

19   testified, we had met in church, and it seemed like so many

20   Americans were not happy in church, people leave churches,

21   switch churches to try to find this happy place where we can be fed.

22   And, you know, through a series of events we wound up starting

23   this Bible study at my home just to be able to study the Bible for

24   itself.

25         And I believe through that education, you know, I guess

1    maybe the eyes were open to a little bit of the issues that we saw

2    within the church, which then, you know, in my mind, kind of

3    opened my eyes with the problems that I see in our country.  And I

4    think, you know, the bottom line for me at the time, this– you

5    know, I'm only 41 years old.  This isn't the America that I grew up

6    in 20 years ago.

7    Q.    You're how old?

8    A.    Forty-one.

9    Q.    Oh, okay.  Now, do you recall learning about a group called

10   Oath Keepers?

11   A.    I do.

12   Q.    And where was it you learned about Oath Keepers?

13   A.    I believe it was through maybe a promotional type video on

14   YouTube.

15   Q.    Okay.  Did that peak your curiosity, something you wanted to

16   get involved in?

17   A.    It did.  It was– it's an organization that reaches out to–

18   primarily the mission is to current serving law enforcement,

19   military, anyone who has taken the oath to defend the constitution.

20   Q.    And had you taken that oath in the Navy?

21   A.    I did.

22   Q.    Did you join Oath Keepers?

23   A.    I absolutely did.

24   Q.    All right.  Tell me about that process. How did that happen?

25   A.    I believe they had the website Oath Keepers dot org., and I got

1    on the site, put in an application, sent them my $35, and got back a

2    couple of little fancy bumper stickers and what they called push

3    cards to be able to find law enforcement officers and, you know,

4    keep spreading the word.

5           Through that, you know, I guess maybe looking for personal

6    fulfillment or something, I wanted to see how involved– it was a

7    brand new organization that had actually just– I believe it was

8    founded in April of 2009, up on Lexington Green, up north. In

9    fact, they used the same Minute Man from the statue at Lexington

10   Green as part of theirs just to commemorate the beginning of this

11   nation.

12          So I started making a few contacts, and one of those contacts

13   was the Tennessee State Director, whose name was Rand Cardwell.

14   At the time, Georgia had no leadership whatsoever, so I wanted to

15   contact him and see, you know, what I could possibly do to

16   contribute to the organization.

17   Q.    And based on those conversations, did you then begin to do

18   some things in Georgia towards getting Oath Keepers started?

19   A.    Absolutely. You know, every time I would see a law

20   enforcement officer, I'd pull over, give them a card, maybe a

21   brochure, tell them about the organization. The theme of Oath

22   Keepers, and I believe the inspiration for Oath Keepers, goes back

23   to Hurricane Katrina.

24          If you'll remember back to that, there were a lot of deaths and,

25   I think, if we're being frank, a lot of those deaths could be

1    contributed to the actions of the Government, where they blocked

2    off bridges, you know, ways out of the city. And people were kept

3    in whatever the arena is down there, the dome, and people had to

4    live in feces, among dead bodies, and things like that, ultimately,

5    by the people who swore to protect them.

6    Q.    So did you join Oath Keepers?

7    A.    I did.

8    Q.    Did you get a Georgia chapter started?

9    A.    Not quite. We were working on it. There were several

10   members. Again, the organization itself made so much sense that

11   there– I guess, to quote doctrine– I can't even quote them, but

12   basically there's a list of ten orders that they will not obey to

13   revolve around situations like Katrina.

14        The fact is, we grow up believing that we live in a free

15   country, and it's the responsibility of our military and our law

16   enforcement to insure that freedom. So the whole premise behind

17   Oath Keepers is to get current-serving military personnel and law

18   enforcement to understand that their oath is to the Constitution of

19   the United States.

20   Q.    The same oath you took, right?

21   A.    I'm sorry?

22   Q.    The same oath you took, right?

23   A.    Yes.

24   Q.    Did you begin to read and study the Constitution?

25   A.    I did.

1  Q.   Could you quote, if I asked you right now, the first ten

2  amendments to the Constitution that make up the Bill of Rights?

3  A.   I doubt I could quote word-for-word all ten. You know, I'm

4  admittedly not the most intelligent guy out there, but I do know the

5  basics of those.

6  Q.   Well, without quoting them word-for-word, what's the First

7  Amendment?

8  A.   Freedom of speech and religion.

9  Q.   What's the Second Amendment?

10  A.   The right of the people to keep and bear arms.

11  Q.   The Third Amendment?

12  A.   I'm sorry. The third?

13  Q.   The Third Amendment.

14  A.   I couldn't tell you that one.

15  Q.   The fourth?

16  A.   A right to be free from illegal searches and seizures.

17  Q.   And the fifth?

18  A.   A right to not incriminate myself.

19  Q.   The sixth?

20  A.   I would have to tell you, I couldn't.

21  Q.   Well, you're looking at him, the right to counsel.

22  A.   Sure. And a handsome one, at that.

23  Q.   Now, did you also become familiar with a group called the

24  Georgia Militia?

25  A.   I did.

1    Q.    Tell us about that.

2    A.    Through Oath Keepers dot org., has their own almost like a

3    social network where people log in, have user names and things

4    like that.  You can communicate much like you would through e-

5    mails or like other outfits, like Facebook, or whatever else is out

6    there.  Through communications on there, I met an individual who

7    might have been 20 or 25 miles from my home, which, considering

8    the entire State of Georgia , he's a neighbor.

9         So we started communicating and, you know, told me– you

10   know, I think a lot of people who join Oath Keepers are of the same

11   mindset.  We are veterans that have our oaths renewed in our

12   minds. And we're like, okay, now you've reminded me, that oath

13   never expires, what can I do? So people looked to get involved, and

14   that was certainly what I was doing, what can I do?

15        And this individual, you know, suggested that I check out the

16   Georgia Militia website, which I did, and it sounded, you know,

17   here's guys who train to be prepared who, some of the members, I

18   think as John Bigham had testified before, they are what's called

19   C.E.R.T. certified. It's an emergency response team that FEMA

20   actually would call, you know, ham radio operators, literally

21   anything, to avert catastrophe in an event like Katrina.

22        And literally it's hard to prepare for anything and everything,

23   so the militia, at least according to the U.S. Code, Title 10, Chapter

24   13, is a constitutional organization. You know, I was nervous about

25   it because, at the time, I'd only been a part of Oath Keepers for–

1    I'm wanting to say maybe three months.

2         I'd heard the same things that everybody else had heard about

3    militias, and I think at the time I didn't even own a piece of

4    camouflage in my life. But I was curious. I think, at the time, I

5    only had one very, very inexpensive handgun that my wife had

6    purchased me for Christmas. So, I mean, I'm like I want to do what

7    I can, but I don't have anything to offer.

8         And, you know, the one thing that I learned about the militia

9    is, you know, the typical mentality is that of the founding fathers,

10   where we pledge to each other our lives, our fortunes and our

11   sacred honor. And the one thing that I credit the guys in the

12   Georgia Militia is, they, for the most part, live up to that. If you are

13   in need and they have an abundance, here you go, so, you know,

14   vice-versa. You know, I think one of the things that it's

15   understood, that no one makes a dime off of anyone inside the

16   militia. If we have it, it's yours; if it's yours and I need it, it's

17   mine. That's just the way it worked. So it seemed like a pretty

18   good fit to me, you know.

19        So I told them, yeah, I'll check it out. And they said that they

20   needed to find a meeting place because they were meeting in some

21   storage place, so I welcomed them, you know, to come to my home.

22   Because we, as Michael had testified, we had done Bible studies

23   and actually had a 600-square-foot addition built onto the back of

24   this home.

25   Q.   All right. I want to shift your attention forward a little bit to,

1    I guess, it's going to be around January of 2010. Did you apply for

2    and obtain a Georgia weapons carry permit?

3    A.    I did.

4    Q.    Explain to the members of the jury how you went about doing

5    that.

6    A.    Well, after feeling a little bit foolish in being in a militia

7    when all these guys are– a lot of the guys that carry firearms, it's

8    just part of being in the militia and being prepared at all times, it

9    was kind of difficult to be the only guy that didn't have one. So, I

10   mean, up until that point, you know, I never really carried a

11   firearm. I had them off and on my entire life. My father, again,

12   being here from Knoxville, was a big gun guy.

13         So I was doing all this, so they said, look, go to the sheriff's

14   office, fill out your application, it will cost 60 bucks; and then, you

15   know, as long as you check out, you know, without any criminal

16   background, without any sort of anything, if you get approved,

17   then you'll wind up getting a license. So I went through the

18   procedure and if– I'm guessing, I think it might have only been

19   four days later I had the permit in the mail.

20   Q.    And that's the one we've seen pictures of flashed up on the

21   screen that was signed by the Paulding County Probate Court?

22   A.    Correct.

23   Q.    Now, I want to fast-forward a little bit to April the 1st of 2010.

24   Did you have occasion to be in Madisonville, Tennessee, that day?

25   A.    I did.

1    Q.    All right. Who had you spoken with about that told you about

2    Madisonville and what was going on there?

3    A.    It would have been the Tennessee Director of Oath Keepers,

4    Rand Cardwell. Excuse me. You know, during our conversations,

5    as I'm trying to get more and more involved, you know, we would

6    discuss, you know, things within the Government. I mean, I'm

7    not– I guess, to some people, I would be, you know, a conspiracy

8    theorist, but, you know, I'm a little more toned down, I believe,

9    anyway.

10         But, you know, when you look at, you know, again, how this

11   nation is not the same United States as it was 20 years ago or 25

12   years ago, and we're watching, with this new administration, how

13   we've– you know, all of a sudden now, the healthcare, the auto

14   industry, the housing industry, all these things are now in the

15   hands of the federal government when they were originally never

16   intended to be such.

17         And I think most people sit around, whether it was in the Bush

18   era of the 2000s or the Clinton era of the 90s or the Barack Obama

19   phase right now, people like to talk politics, and it's usually in a

20   condescending way. We just like to condemn politicians. But, for

21   me, it really came back down to the foundation of the constitution,

22   at least having read it and having a basic understanding of it, that

23   this isn't what's supposed to happen.

24         So venting my thoughts and frustrations with the Tennessee

25   director, I feel that if someone takes an oath to the Constitution, so

1    help me God, then that's who their primary focus should be. I

2    mean, again, when they take this oath, it is to support, as in lift up

3    higher than yourself and defend the Constitution of the United

4    States.

5            I don't see anything about what's going on in our government

6    today having anything to do with what's going on with the

7    Constitution. So, in my mind, I feel that they have violated their

8    oaths of office, and through talking with Rand Cardwell, what can

9    we do? You know, we're trying to vote, we're trying to vote the

10   right people in, but it doesn't matter. It's not a Republican or

11   Democrat thing. It just seems like it's, you know, we're on a

12   downhill spiral; what can we do to stop it?

13           That conversation took place around March 25th. I pull that

14   out. I know it was a few days prior. Rand's suggestion was to come

15   to Tennessee, to a little, small Madisonville, Tennessee, in the

16   middle of Chattanooga and Knoxville, and bring a video camera.

17   And I said, well, what's going on? He said, I can't tell you, I'm not

18   going to give you any details, but it might give you some insight on

19   what we can do.

20           So I said okay, you know, I mean, I'll take your word for it.

21   At that time, Rand and I had become good friends because, since

22   there was no positions in Georgia, he was serving as basically the

23   Georgia director as well, so he was my direct contact.

24   Q.    All right. And did you, in fact, go to Madisonville on April

25   the 1st of 2010?

1   A.    I did.

2   Q.    Was anyone with you when you came up here?

3   A.    Not with me, no.

4   Q.    Where did you meet the people that you were going to meet?

5   A.    I didn't know exactly where we were meeting. Rand had

6   suggested, you know, once I get in there, find the courthouse. It's

7   like a one- or two-light town, the courthouse is right in the middle,

8   I'll meet you at the courthouse at 8:30. So I parked, I believe, on

9   that day, next to the courthouse and just sat and waited for Rand to

10  arrive.

11  Q.    And who all did arrive that day?

12  A.    Rand was the first one, of course, because he's the only one

13  that I would have recognized. When he showed up, he said that,

14  you know, we were supposed to meet at Donna's. So we walked

15  across the street to Donna's, and at that point, you know, I think

16  Carl may have already been there, Carl Swensson, who had

17  testified; and a lady. I can't ever remember her name.

18          And then eventually a gentleman by the name of James

19  Bowman and then Lieutenant Commander Retired Walter

20  Fitzpatrick.

21  Q.    All right. And did Mr. Fitzpatrick talk to you and the

22  members of the group about what he planned to do that morning?

23  A.    He did. You know, at the time, I would have to be honest and

24  say that I was completely naive. Again, you know, I'm still fairly

25  new at actually reading what the Constitution says. I'm fairly new

1    in this group called Oath Keepers, and I'm fairly new in this group

2    called the Georgia Militia. So I'm showing up still not being that

3    aware of politics or anything.

4         So when Commander Fitzpatrick began speaking, he rambled

5    stuff that, if I'm being honest, just went in one ear and out the

6    other and completely over my head, about TCA this, Tennessee

7    Code this. Bottom line, you know, he said that through his work

8    that it appeared as though the grand jury foreman there was serving

9    illegally and that he had sought intervention from the TBI, the FBI,

10   other sheriffs, his own county sheriff, the Madisonville chief,

11   judges, all the way up, if I'm not mistaken, senators, as well as like

12   the assistant governor– lieutenant governor.

13        And according to his statements they all acknowledged the

14   fact that it's not exactly kosher with the Tennessee Code, but

15   they're not going to take action for one of two reasons; either they

16   had no authority to do so or they knew the guys and they weren't

17   going to do anything.

18   Q.   Well, when the plan was being formulated to go over to the

19   courthouse, did you have a weapon on your person?

20   A.   No, I did not.

21   Q.   Did anyone that you could see in the group have a weapon?

22   A.   No.

23   Q.   When you went over to the courthouse, was a phone call made

24   in your presence before going over there?

25   A.   I saw Carl with a phone. I don't recall any of the

1   conversations. I know Walt had said somebody needs to call 911

2   so that it would be treated as an emergency, that they needed a

3   police officer to respond to take Gary Pettway, who was the acting

4   grand jury foreman, into custody.

5   Q.    Did you have your video camera when you went over to the

6   courthouse?

7   A.    I did.

8   Q.    Where did you go once you got in the courthouse?

9   A.    It was, frankly, it was a confusing time, a lot of going back

10  and forth. I know I walked up the stairs and back down the stairs

11  and middle way up the stairs and hung out in front of the clerk's

12  office. I can't give you a time frame, and, frankly, most of the time

13  that we were inside the courtroom I forgot to press "record" on my

14  video camera.

15  Q.    Did you go inside the courtroom?

16  A.    Not inside the courtroom, no.

17  Q.    Were you inside the courthouse, though?

18  A.    Yes.

19  Q.    So what did you get recorded?

20  A.    Frankly, I have no idea what I got recorded.

21  Q.    But the recording we saw a day or two ago, Mr. Fitzpatrick

22  and Mr. Pettway inside the grand jury room, did you make that?

23  A.    No, sir. No.

24  Q.    All right.

25  A.    I can tell you for a fact the video that I took has never been

1    published.

2    Q.    Do you recall when Mr. Fitzpatrick went into the courtroom?

3    A.    I couldn't even say for sure if I was on that floor when he

4    went into the courtroom.

5    Q.    Was there some point in time that you saw Mr. Fitzpatrick

6    again?

7    A.    Yes.

8    Q.    All right. And what was going on when you saw him?

9    A.    I would almost have to pick up on the mid-floor landing,

10   where we wound up kind of all converging again while waiting on

11   some law enforcement officer to come down and talk to us. Once

12   that happened, I believe we were asked to leave the courthouse, in

13   which case we did, and we went out to the front– I'd call it the

14   front porch of the courthouse.

15   Q.    Was there further discussion between Mr. Fitzpatrick and law

16   enforcement there?

17   A.    Absolutely. Apparently– well, my speculation would be that

18   the call did go to 911, or whoever, because by the time we were

19   outside, there were converging multiple variously dressed law

20   enforcement, from plainclothes to uniform to khaki, with golf shirt

21   and a badge sewed on; you know, different agencies, different

22   types of law enforcement officers.

23   Q.    And during the time that you witnessed the interaction

24   between Mr. Fitzpatrick and those law enforcement officers, did

25   you ever see Mr. Fitzpatrick strike any of the officers?

1   A.   Absolutely not.

2   Q.   Did he lay a hand on any of them?

3   A.   No.

4   Q.   And he was ultimately taken into custody, correct?

5   A.   Yes.

6   Q.   Did you and the others follow him down to the jail?

7   A.   When he was originally asked to, I guess, leave the

8   courthouse property, we were still on the front porch. We had been

9   there for several minutes, as Lieutenant Commander Fitzpatrick

10   and a couple of other people were speaking to the local officers

11   there.

12   Eventually, kind of a slight gentleman, a short gentleman,

13   asked him to leave, and Fitzpatrick said, "May I just ask a

14   question," and at that point the officer told him he's under arrest,

15   "Please follow me" or something. Then they went down the steps.

16   You know, I think the entourage, if you want to call it, of us

17   filmers, we all stayed well out of the way of law enforcement, as

18   well as Walt, allowed them to proceed down the steps and down the

19   sidewalk, and at that point we then followed in behind them.

20   Probably 30 to 50 feet down the sidewalk is when their whole

21   group of law enforcement and Walt stopped.

22   At that point, Walt tried to hand off a voice recorder, which I

23   took possession of, as well as I believe a notebook, which was

24   passed off to someone else. Then, at that point, they cuffed him

25   and then walked a few feet, and Walt dropped for some reason and

1    law enforcement then picked him up and carried him down the

2    street.

3    Q.    And that's the last you saw of him that day; is that correct?

4    A.    Yes.

5    Q.    Did you go back to Madisonville? I'm directing your

6    attention now to April the 7th.

7    A.    I did.

8    Q.    Who did you meet with that day?

9    A.    When we got back from the events of April 1st, we learned, I

10   think a day or two later, maybe three days later, that Fitzpatrick

11   was on a hunger strike and was not eating or drinking or anything.

12   So I believe at that point I had Carl Swensson's information as well

13   as one of my friends from the Georgia Militia, a gentleman who

14   was mentioned, Bill Looman.

15         We had discussed going up there to try to protest, do

16   something, because here is a man who served 23 years his country,

17   honorably, and now he's on a hunger strike for attempting to do

18   what he felt was right. So we wanted to at least come up and

19   support him.

20         On, I believe, April the 6th we had learned that he had been

21   released from prison, from jail. But at that time we had already

22   kind of made concrete plans to go up, so some people, I believe

23   Carl being one of them, said, well, he's out now, the urgency's not

24   there. Bill Looman and myself said, look, we've already planned

25   on coming up here, let's just go make sure the man is okay.  So

1  that's why we came up.

2  Q.    So the meeting on the 7th was between who?

3  A.    Bill Looman, Walter Fitzpatrick and myself.

4  Q.    Nobody else there?

5  A.    No.

6  Q.    And the entirety of the plan to come up for the 7th was simply

7  to show support for Walt Fitzpatrick?

8          MR. THEODORE:   Objection to leading, your Honor.

9          MR. GREEN:   It was. I'm sorry.

10  Q.    What was the plan for April the 7th?

11  A.    To make sure that Walt was in good health and to support him

12  in any way we could.

13  Q.    Was there any plan to take over the courthouse that day?

14  A.    No.

15  Q.    Was there any plan to take over the city that day?

16  A.    No.

17  Q.    Was there any plan to have an armed army up there that day?

18  A.    No.

19  Q.    Now, let's talk for just a second about citizens' arrests, as you

20  understand it. Do you consider the events of April the 1st, when

21  Mr. Fitzpatrick told Mr. Pettway he was under arrest, do you

22  consider that to have been a citizen's arrest?

23  A.    It appeared to me as one.

24  Q.    Okay. And what do you consider a citizen's arrest to be?

25  A.    In my mind, I mean, of course– and I think it was mentioned

1    by someone who testified before– like a Barney Fife type incident,

2    because I don't know what a citizen's arrest is other than a citizen

3    arresting another citizen.

4         In my mind at the time, and possibly even now, if I'm walking

5    down the street and I see a gentleman attacking a female, do I need

6    to go down to the courthouse and get a judge to sign a warrant

7    before I can arrest this man or do I just do what I need to do right

8    there to protect the citizen?  I don't know what the legal thing to do

9    is, but to me, morally, somebody needs to take action, here's a

10   felony being committed in front of me.

11   Q.    Well, was the goal on the 1st to tell the person they were under

12   arrest and then have law enforcement come in and actually take him

13   in custody?

14         MR. THEODORE:   Objection, leading, your Honor.

15   Object to leading.

16         THE COURT:  Sustained.

17   Q.    What was the goal on the 1st with respect to your role and law

18   enforcement's role?

19   A.    My role on the 1st was to bring a video camera.

20   Q.    Was there anything else discussed on the 7th?

21   A.    Other than, you know, Walt had been released and was given a

22   court date of April 20th for his arraignment or some hearing. You

23   know, and we told him that, you know, we would definitely be

24   there to support him. You know, I believe that, in Walt's heart, he

25   had the right intentions of trying to do the right thing, and I felt

1   that he deserved, as a veteran, a lieutenant commander in the Navy,

2   that, you know, he deserved my attention at least.

3   Q.    Let's talk a little bit about some of the people that have

4   testified. How long have you known Shane Longmire?

5   A.    I'm guessing I probably met him six months before my wife,

6   which would probably put it somewhere around 11 to 11 and a half

7   years.

8   Q.    Did you ever tell Mr. Longmire you were going to take over

9   the courthouse– or, excuse me– take over the city?

10  A.    No.

11  Q.    But did you tell him that you would see something on the

12  12:00 o'clock news?

13  A.    I did.

14  Q.    Let's move forward to April the 19th. Do you recall being at

15  home that evening with your wife, Cindy, and there was a knock on

16  the door?

17  A.    Yes.

18  Q.    Who was present when you answered it?

19  A.    My wife, Cindy, was present, and outside of the door, the first

20  thing I saw were two Paulding County Sheriff's deputies and

21  another gentleman in plainclothes.

22  Q.    All right. Did the gentleman in plainclothes introduce

23  himself?

24  A.    He did. He flashed a badge and said that his name was Chuck

25  Reed from the FBI.

1    Q.    And what did he start asking you about?

2    A.    He asked what was going on in Monroe County, Tennessee, so

3    I told him.  At the time, I had no information– I mean, I don't know

4    if I'm jumping ahead, but these arrest warrants that were shown

5    and everything, I wasn't that familiar with all of the Tennessee

6    statutes or anything.  I think, at the time of April 1st, Walt had

7    handouts, Lieutenant Commander Fitzpatrick had handouts that

8    had these in there, and they wound up just being in my truck.  I was

9    more interested in supporting him.

10            But he asked what was going on, and I told him that, you

11   know, that the citizens from Monroe County, including Walter

12   Fitzpatrick, felt that the laws were being violated by the

13   Government itself and had sought intervention from various

14   agencies with little to no avail.

15            In fact, no one would even look at the information he had

16   presented, so he took it upon himself to effect the citizen's arrest,

17   try to put it in a court of law so that it would have to be looked at at

18   that point.

19   Q.    Was there anything said to Agent Reed about the possibility

20   of citizens' arrests occurring the next day in Madisonville?

21   A.    Without knowing the exact words, I'm sure it was implied.

22   Q.    Did you tell him what you would have with you when you

23   went to Madisonville?

24   A.    I did.

25   Q.    And what did you tell him?

1    A.    I told him that I intended to go armed with a .45 on my side

2    and an AK-47.

3    Q.    Did you give him anything by way of identification?

4    A.    I believe I gave him a business card that I had at the time.

5    Q.    Was there anything said about stepping on anybody's toes?

6    A.    Yes. No one– in fact, you know, looking back, at least in my

7    mind, showing the consistency of the actions from April the 1st, law

8    enforcement was contacted. No one was looking to bump heads,

9    interact negatively with law enforcement. It certainly was not our

10   intention.

11         The fact that Walter Fitzpatrick had previously and

12   numerously contacted law enforcement to intervene in what he felt

13   was corruption in Monroe County, I'm now in support of him

14   trying to do the same thing.

15         So when Chuck Reed was at my home, I told him, look, you

16   know, I mean, we're not looking to bump heads or step on

17   anybody's toes, but the fact is, you guys haven't even looked at the

18   information presented by Walter Fitzpatrick, nor have you taken

19   action. I would love it if you would be there, but we're certainly

20   not looking for any sort of confrontation or anything like that.

21   Q.    Who did you say that you would love to be there? I mean,

22   were you saying that to Agent Reed?

23   A.    Yes.

24   Q.    And talking about who?

25   A.    Him and the FBI in general.

1   Q.     Do you recall a point in time that you heard Agent Reed say

2   something about he had to call his supervisor in response to

3   something you said?

4            MR. THEODORE:   Objection. Hearsay.

5            MR. GREEN:   Your Honor, it's not being offered for

6   the truth of the matter; it's merely–

7            MR. THEODORE:   That has no relevance, your Honor.

8            MR. GREEN:   Can I finish my statement, please?

9            THE COURT:   Let him finish.

10            MR. GREEN:   It's being offered to place what Mr. Huff

11   is getting ready to say in context.

12            THE COURT:   Well, let's just go into what he's saying.

13   I believe as to context, we've had the agent who testified.

14            MR. GREEN:   Yeah, the agent's already been on the

15   stand.

16   Q.     What did you say to Agent Reed immediately prior to him

17   making the statement about needing to call his supervisor?

18   A.     The fact is, and what was going on in my mind– because I

19   think, from what I've heard, this is what everybody's trying to

20   figure out, is, what was going on in my mind.  It's not everyday

21   that the FBI knocks on your door, it's not everyday that the FBI

22   asks about firearms, it's not everyday that you have a discussion

23   with the FBI that you have firearms in your possession that were

24   legal.  And I think I even let him know that I did have a license and

25   all that, so there was nothing illegal.

1    But it's still awkward and intimidating. And during the

2  conversation of telling him, look, we're not looking to step on toes

3  or butt heads or anything like that, would you do me a favor? If

4  there is a problem, call me. Please, don't kick in my door at four

5  o'clock in the morning; just call me, here is my card.

6    I think Officer Reed, Agent Reed, testified that he did have

7  my phone number and that is how he came into possession of my

8  phone number, because we wanted their interaction, we wanted

9  their involvement. It wasn't in any way a recruiting exercise; it

10 was, we need help in Madisonville. You know, I'm a nobody. It's

11 Walter Fitzpatrick. I'm trying to reach out on his behalf to get

12 somebody to intervene in Monroe County.

13 Q.    If the FBI had called you back that night and said there was a

14 problem, what would have happened?

15 A.    Calls would have went out immediately to Monroe County,

16 anyone who I did have a number for, which I think, at the time,

17 would have been Carl Swensson, Walter Fitzpatrick and Bill

18 Looman. Those are the only three ones that I really knew.

19 Q.    And what would those calls have said? What would you have

20 told him?

21 A.    That I think we've got what we needed, that we're not– you

22 know, hearing was just a hearing. It was not, you know, to free

23 Walt, because he'd already been released, so that's just silly. It

24 would have just let them know that maybe somebody is actually

25 going to look at this information, so there's no need, you know, in

1    a protest. Mission accomplished.

2    Q.    All right. Turning your attention to the next morning, what

3    time did Mr. DeSilva arrive at your house?

4    A.    It was probably just prior or around 5:00 a.m.

5    Q.    Did you all stay at the house very long once he was there?

6    A.    Not a real long time. I mean, I think I was still finishing

7    getting ready. Cindy, the wife, was up and, you know, making

8    coffee, playing with the dogs, whatever the case was. And

9    whenever Michael did come over, it was always a social visit, so it

10   was never he walks in and we run right out type of thing. It was,

11   you know, hey, Cindy, how are you; hey Michael, hugs, all this

12   thing.

13   Q.    Okay. And I guess I'll follow up with, at that time, how did

14   you view Michael DeSilva?

15   A.    I don't have kids of my own, and I think a lot of the people

16   who did come to our Bible study and socialize at our home were

17   Michael's age. Frankly, most of them were friends of my nephew's,

18   so they're almost the ages of a child that I would have had.

19        So, you know, I think Michael was probably one of the closer

20   ones because, you know, if you couldn't tell by his testimony, he's

21   a thinker, and I like thinkers, I like to pick his brain; he liked to

22   pick my brain. So Michael and myself and Cindy were all very

23   close.

24   Q.    And Michael had expressed an interest in riding along with

25   you; is that correct?

1   A.    Absolutely.

2   Q.    Now, there's been some testimony about–

3            MR. GREEN:   Could we flash up Number 23, please?

4   Q.    I'll ask you to look at Government's Exhibit No. 23, Mr. Huff.

5   There's been testimony about you mounting an anti-aircraft gun on

6   this. Has there ever been an attempt to mount an anti-aircraft gun?

7   A.    No attempt has ever been made.

8   Q.    All right.  Had you planned on taking an anti-aircraft gun with

9   you to Madisonville, Tennessee, on April the 20th?

10  A.    No.

11  Q.    Did you even, in fact, drive this truck on April the 20th to

12  Madisonville, Tennessee?

13  A.    No.

14  Q.    What truck did you drive?

15  A.    My black 2004 GMC Sierra.

16  Q.    And that truck had what on it, by way of identification, that

17  day?

18  A.    Oath Keepers decals.

19  Q.    As you rode up the road on your way to Tennessee, what was

20  Michael doing?

21  A.    Sleeping.

22  Q.    Did you talk to him at all about what had happened the night

23  before?

24  A.    I did tell him about the visit of the FBI and my request that

25  they call if there was any problem whatsoever, to let me know, and

1    then I would make the calls and, you know, we wouldn't go and we

2    would wait instead to talk to them, to let them review the

3    information.

4         You know, I told him that I did request the phone call instead

5    of a door kick-in at four a.m. And I told him, you know, neither one

6    of those had happened, so, you know, in my mind, apparently,

7    according to the inaction or the lack of, you know, any sort of call

8    or anything from the FBI, that it was a non-issue. Because, I mean,

9    we were just going up to protest anyway.

10   Q.    I want to fast-forward to when you got off the interstate, off

11   of I-75, at Sweetwater, the Sweetwater exit. Tell the jury what

12   happened,

13   A.    When we got at the exit, as was testified before, a car just

14   before the exit ramp had cut in front of me, and the gentleman

15   inside waved. I had no idea who it was. I'm thinking the people

16   here in middle Tennessee got some attitudes about cutting people

17   off, so I had no idea who it was.

18        And as soon as we got to the top of the exit ramp, we came to a

19   stop. We were going to be turning right, going to towards

20   Madisonville, so, you know, I knew that there was a trooper behind

21   me. Frankly, I don't have the best driving habits, and I normally

22   don't come to a complete stop, but given the fact that, you know, I

23   had less than 12 or 13 hours prior had a visit from the FBI, who was

24   asking about Monroe County, apparently, you know, there is a

25   awareness of what's going on.

1          So I remember telling Michael, you know, that we're

2     absolutely going to be watching our P's and Q's, here's this

3     trooper behind us, I'm going to stop, so I did. And then, as soon as

4     I started back on the road, then I got pulled over.

5     Q.    Was there any traffic coming when you did come to a stop? I

6     mean, we saw the video, but–

7     A.    Right. Yeah, there was nothing. In fact, at the exit you have

8     unobstructed view looking right or left. I mean, you can see for a

9     country mile.

10    Q.    Once the vehicle was stopped at the roadside with the blue

11    lights behind, what happened then?

12    A.    We immediately pulled over. I couldn't really understand why

13    we were being pulled over, and I think when– and I may be jumping

14    ahead here a little bit, but as soon as we were pulled out and began

15    to engage in conversation with the troopers, you know, I

16    questioned why we were being pulled over, because I did, in fact,

17    come to a complete stop when the vehicles who were in front of me

18    did not. So the logic didn't make any sense to me, that I was being

19    pulled over for running a stop sign.

20    Q.    How were you initially taken out of the vehicle?

21    A.    I believe they call it a felony procedure. I had personally

22    never been through one before; this was the first. But I've watched

23    "Cops." You know, it was a– you know, I had my hands out the

24    window, opened the door from the outside.

25         So I did, stepped out, you know, looked forward, and at that

1    time realizing that it wasn't just the trooper, but, rather, several

2    officers in varying attire with assault rifles and everything else.

3    Realizing the seriousness, at least from the officer's mind, of this

4    stop to be pulling us out this way, I made it a point to make them

5    aware that I did have a firearm on my side.

6         So I believe– and I believe the video demonstrated– that I did

7    turn to my side and kind of lifted my arm to make sure that the

8    firearm was revealed to them.

9    Q.    And did you follow their commands and walk backwards, as

10   we saw on the tape?

11   A.    Absolutely.

12   Q.    Now, there was a point in time where they were asking for

13   consent to search the vehicle, and what was your response?

14   A.    As respectfully as I could, I really did not see that we had

15   given any reason for them to even want to search the vehicle, other

16   than the decals that were on the truck, and I just didn't feel like

17   that was enough reason for them to search the vehicle. You know,

18   frankly, I kind of enjoy my privacy and my right to my privacy

19   regardless of if I had anything to hide or not, which I think, that

20   day, we proved that we did not. They sent two dogs around it.

21   Q.    All right. Did you tell Lieutenant Williams, though, the fact

22   there was an AK-47 in there?

23   A.    Yes, I did.

24   Q.    I want to jump forward a little bit. When you were arrested on

25   the 30th and Agent Johnson questioned you, you told him that there

1    wasn't; is that true?

2    A.     I believe that is true.

3    Q.     And when you told Agent Johnson that, was that the truth?

4    A.     When I told him that I did not?

5    Q.     There was not a gun there, there was no AK?

6    A.     That was not the truth.

7    Q.     All right. So there was an AK in that toolbox?

8    A.     There was.

9    Q.     And we have seen the video, but how long was there

10   interaction between you and the trooper and Lieutenant Williams

11   before Trooper Wilson said you're free to go?

12   A.     Before he said I was free to go, I'm going to guess, 50 to 60

13   minutes.

14   Q.     And during that period of time was there discussion between

15   you, Lt. Williams and/or Trooper Wilson, about what to do with

16   your .45?

17   A.     Yes.

18   Q.     All right. Tell me about the discussion. Who asked you first

19   about the .45 and what was going to happen with it?

20   A.     You know, it is funny, looking back on it, because, you know,

21   I mean, now, you know, it's been a year and a half since the arrest,

22   and I'm, you know, the most dangerous man in America. When I

23   looked back at this traffic stop and was pulled out in a felony

24   procedure, I wasn't laid out on the ground, spread-eagle, I wasn't

25   handcuffed. No one even talked harsh to me.

1    In fact, the video shows that it was actually– I mean, I felt like

2    it was an incredibly great opportunity to, as an Oath Keeper, to

3    reach out to law enforcement, to say, hey, we're– you know, yes,

4    I'm in the militia, yes, I'm in the Oath Keepers, hey, we're the

5    same, we took the same oath and everything. You know, and, of

6    course, Trooper Wilson did take the .45 from me and did, you

7    know, as many checks as he could. I believe he showed, as was

8    demonstrated in the video, that he was unsuccessful.

9    When it came time, you know, getting close to their end of the

10   traffic stop, it was Lt. Williams who, as he was handing me the .45,

11   said, look, we know you guys have a protest or rally going on in

12   Madisonville. Whatever it is you guys are doing, we just want to

13   make sure that everybody stays safe. And I said, we're on the same

14   page.

15   So he said, would you do me a favor, Mr. Huff? When you

16   get to Madisonville, would you mind putting this .45 away, and I

17   said, well, are you guys going? He said, yes, sir, as a matter of

18   fact, we're going to be following you into town. And I said,

19   perfect, all we want is to make sure that everybody is safe. If you

20   guys are going, I'll put it away right now.

21   And, at that point, as you saw, I mean, I got out of the truck,

22   took the keys out of the ignition, unlocked the toolbox. He gave

23   me the .45, I placed it in there, closed the toolbox on the driver's

24   side, locked it, and then started talking a lot more.

25   Q.    And, in fact, this talking a lot more lasted how long?

1    A.    Another 30 minutes or so, maybe a little longer.

2    Q.    As we bored these folks with this morning, correct?

3    A.    Sorry. Yes.

4    Q.    All right. When ultimately you left and went toward

5    Madisonville, where did you next stop?

6    A.    On Highway 68. I'm guessing it's probably 11 or so miles to

7    a traffic light, just prior to Highway 411. At that traffic light you

8    turn left to go into the downtown Madisonville, and as soon as you

9    turn left, there's a gas station on the right and a parking lot where I

10   believe they had some school buses parked.

11        And on that day there were also a few trooper cars in that

12   parking lot. I thought, hey, what a great place to pull over and flag

13   up. I believe at the time I had some Oath Keepers flags, because I

14   was so into Oath Keepers and had one of their flags and wanted to

15   fly that as we drove into Madisonville.

16   Q.    And Michael put that up, correct?

17   A.    Correct.

18   Q.    Now, what actually did the flag say? Did it say Oath Keepers

19   or did it have a symbol on it?

20   A.    I can't remember exactly what flag, but I do believe that it

21   was the Oath Keepers flag. It would have looked– I believe at the

22   time it was like a drab green flag with the exact same logo that was

23   on the back windo of the Oath Keepers truck, is what we called it at

24   the time, the same– it was actually patterned after the rangers, the

25   Army Rangers' logo.

1    Q.    All right. When you parked your vehicle at Donna's, where

2    did you park?

3    A.    There was a couple of one-way streets, and I had already been

4    there twice, kind of got familiar with the layout, because it's only a

5    couple of blocks big. I believe just before Donna's I took a left,

6    circled around the block, and parked up against Donna's, facing the

7    courthouse.

8    Q.    So the front of your truck was facing toward the courthouse,

9    correct?

10   A.    Yes, it was.

11   Q.    And which side of the truck then would have been closest to

12   Donna's Restaurant?

13   A.    The passenger's side.

14   Q.    Well, as we saw on the video, which side of the toolbox had

15   you placed the gun in?

16   A.    The driver's side.

17   Q.    From the time you parked that truck until you came back later

18   and started up to leave and did, in fact, leave Madisonville, was

19   there ever a point in time that you put that firearm back on your

20   side?

21   A.    No.

22   Q.    At any point, when you were back at the roadside, were you

23   ever told that you were in violation of federal law at that point?

24   A.    None whatsoever.

25   Q.    How long were you in Donna's?

1    A.    I'm guessing, two to three hours in total.

2    Q.    And what was going on inside of Donna's?

3    A.    Meeting new people, you know, of course, telling– I'd never

4    been pulled over like that. I'd only seen it on, you know, drama

5    programs. So, I mean, that was the original highlight of Donna's,

6    was hearing about, you know, all these assault rifles and, you

7    know, a potentially dangerous situation that actually turned quite

8    positive. I mean, we– I believe Cloud Nine would have been a good

9    representation of how I felt leaving that traffic stop.

10   Q.    All right. And let's just be honest. Who was doing 99 per cent

11   of the talking inside of Donna's?

12   A.    Me.

13   Q.    While you were in Donna's, did you have occasion to meet a

14   number of people that you had not met before?

15   A.    Yes.

16   Q.    Who did you know when you first went into Donna's that was

17   there, present?

18   A.    When I first went into the Donna's, it would have been Carl

19   Swensson.

20   Q.    And Michael?

21   A.    And Michael.

22   Q.    Now, has Michael ever engaged– had he ever gone to

23   Madisonville with you before?

24   A.    No.

25   Q.    Had you ever engaged him in any sort of militia stuff before,

1   like going on field training exercises?

2   A.    He had come to– because he only lives maybe eight miles

3   from my home. You know, I had been in the militia and part of Oath

4   Keepers, and I think he felt that he wasn't qualified to be in either

5   one. And I said, dude, I mean, the militia thing is awesome; you

6   know, we go camping you know, we do all this stuff, we even do

7   training here at the house, come check it out. And I think he was

8   either– he may have come to one meeting at my home, possibly

9   two, over several months.

10   Q.    But Michael was never involved in any of the Walter

11   Fitzpatrick stuff?

12   A.    No, no, not at all.

13   Q.    Did you all eat when you were in Donna's?

14   A.    Yes.

15   Q.    And did you find out where Walt was that day?

16   A.    We had heard– and, of course, I wasn't that familiar with

17   Monroe County. I actually thought it was similar to my one-horse

18   town that I live in– excuse me– where we only had one courthouse.

19   You know, I don't think– I didn't even inquire where Walt was. I

20   assumed he was still at his hearing.

21        Eventually, I'm guessing maybe after the first hour or so we

22   were in the restaurant, and I think we were outside, smoking, and

23   saw Walt walking down the street. At that point, I think a few of us

24   asked, you know, where were you, and he said, I was down at the

25   sessions court. And I'm like, okay, I don't even know what

1    sessions court is.

2    Q.    And that's a different building from the main courthouse,

3    correct?

4    A.    I found that out at some point, yes.

5           MR. GREEN:    Now, could we put up the citizen's arrest

6    warrant, please, and I'm going to ask that you enlarge it just a little

7    bit, because my 50-year-old eyes don't read as good as they used

8    to. Better yet, can I borrow one?

9    Q.    I'm going to go through this, Mr. Huff, and ask you some

10   questions. On April the 20th of 2010, did you have any contact at

11   all with Carroll Ross or Amy Reedy when you were in

12   Madisonville?

13   A.    No.

14   Q.    Did you have any contact at all with Robert Steven Bebb or

15   James H. Stutts, Steven Morgan or Paul D. Rush when you were in

16   Madisonville?

17   A.    No.

18   Q.    Did you have any contact with Martha M. "Marty" Cook or

19   Gary Pettway while you were in Madisonville?

20   A.    No.

21   Q.    Did you have any contact with Sheriff Bill Bivens when you

22   were in Madisonville?

23   A.    I didn't know who he was until much later, that he was one

24   that– he was outside of the courtroom. I don't recall saying

25   anything to him or him to me, but he's the only one that I now

1    recognize from this list who I did contact that day or had contact

2    with as far as visually.

3    Q.    Now, are you talking about Bivens or Byrum?

4    A.    Well, eventually, I found out also Benny Byrum was, I guess,

5    the courthouse deputy or something, so somehow there was visual

6    communication or, you know, whatever. I saw him as well as the

7    sheriff.

8    Q.    All right. So did you speak with and have contact with Benny

9    Byrum that day?

10   A.    There was– I can't recall anything specifically that was said.

11   Q.    Did you say something to him?

12   A.    I would say I did.

13   Q.    What was that?

14   A.    I couldn't tell you word-for-word. It was while we were

15   being– I think he was the one that was escorting us out of the

16   courtroom.

17   Q.    We're getting our days confused. On April the 20th, the 20th,

18   not the 1st, the 20th.

19   A.    My apologies.

20   Q.    No, it's my bad.

21   A.    No.

22   Q.    Let's back up again, then. On April the 20th did you see

23   Sheriff Bill Bivens at all?

24   A.    I do not recall seeing Sheriff Bivens.

25   Q.    All right. And did you have contact with Benny Byrum, one

1    of his deputies, on the 20th?

2    A.      I did.

3    Q.      And tell the jury about that.

4    A.      During the course of the morning, as you have heard a couple

5    of other people testify, you know, we were there in good faith. We

6    just came off of this incredible high of a traffic stop, you know,

7    being able to turn a potentially bad situation into one that was so

8    positive.

9           In my mind, I wanted to keep the roll going. While we were

10   in Madisonville, we were in this restaurant, I think it was kind of

11   rainy, maybe even a little bit chilly, even on April the 20th.  So

12   talking with a gentleman who had been mentioned, Bill Looman,

13   we thought it would be a right thing to do, as an exercise of good

14   faith, to let's buy some sausage biscuits and coffee.  These guys

15   have got to sit out here in their SUVs, let's take care of them.

16          So, at that point, we did. I think the coffee was attempted to

17   be delivered, but was refused, and so we were kind of standing

18   there with a bag full of biscuits and some coffee. So I said, you

19   know, what? Let me take them right over there, because at that

20   point the Deputy Byrum and another gentleman were standing out

21   in front of the courthouse, in front of the doors. So I volunteered to

22   take them over there to them, and they could pass them out to the

23   people inside the courthouse.

24   Q.      Did you take him the bag of biscuits?

25   A.      I did.

1  Q.   Did he take it?

2  A.   He did and smiled and said thank you and turned around and

3  walked back inside the courthouse.

4  Q.   Did you have any contact with T.R. McDaniel that day?

5  A.   I'm not sure who that is.

6  Q.   Did you have any contact with Steve Frisbee, Sheriff of

7  McMinn County?

8  A.   I don't know who that is.

9  Q.   Did you have any contact with Don Weiss?

10  A.   I don't know who that is.

11  Q.   Jerry Estes?

12  A.   Don't know.

13  Q.   Rhonda Cooley?

14  A.   Have no idea.

15  Q.   Joel Reilly?

16  A.   I don't know.

17  Q.   Michael Mullins?

18  A.   I don't know.

19  Q.   Gary Roughhead?

20  A.   I don't know.

21  Q.   Robert Gates?

22  A.   Don't know.

23  Q.   Dennis Blair?

24  A.   Don't know.

25  Q.   Nancy Pelosi?

1   A.   I didn't have any contact. I know who she is, but I haven't

2   had any contact.

3   Q.   Joe Biden?

4   A.   No, sir.

5   Q.   Know who he is?

6   A.   I do.

7   Q.   Any contact?

8   A.   None.

9   Q.   Barack Hussein Obama, know who he is?

10  A.   I do.

11  Q.   No contact with him either?

12  A.   No contact.

13  Q.   So the only person on this citizens' arrest warrant that you

14  did have contact with then on April the 20th was Deputy Byrum,

15  when you took the biscuits to him, correct?

16  A.   Yes.

17          MR. GREEN:   You can turn that off, please.

18  Q.   Now, after you and Michael loaded back up, and Michael

19  testified to something about what– was there a problem starting

20  the truck when you guys got ready to leave?

21  A.   I had a starter that was going bad at the time, so it was

22  anyone's guess if it would actually start when the key was turned,

23  and it was our misfortune that, on a rainy day, puddles under the

24  truck, it wouldn't start. So I took the leadership role and decided I

25  needed to be the one to turn the ignition, because I knew the right

1   sounds. You know, I'd gotten the hammer out of the passenger

2   side toolbox to give to Michael so that he could crawl up under the

3   truck and tap on the starter.

4   Q.   And did he do that?

5   A.   He did.

6   Q.   And it started?

7   A.   Yes.

8   Q.   On your way back to Georgia , did you make any phone calls?

9   A.   I did.

10  Q.   Who did you call?

11  A.   I'm sure I called Carl, probably Bill Looman, making sure

12  everybody got home okay. One of the more important ones to me,

13  just because of the magnitude of the events of that day, mainly the

14  traffic stop, during the traffic stop Lt. Williams and I's

15  discussions were, you know, I told him, you know, we may be

16  back, who knows.

17      He said, well, hey, would you give me a call, and I told him,

18  hey, if anything comes up, give me a call, so we exchanged cards. I

19  wanted to make sure that I extended my gratitude to– I mean, to be

20  honest with you, I was thankful to be alive at that point. You know,

21  it's not everyday that you have so many guns pointed at you and

22  you're able to walk away. So, you know, I think, you know, I was

23  thanking God all morning, and I wanted to make sure that I

24  thanked him as well. So I did take the opportunity to call Don

25  Williams.

1  Q.    And thanked him for?

2  A.    Thanked him for his professionalism.

3  Q.    Now, I want to fast-forward a few days to, was there a

4  meeting in Cartersville between yourself and some other people

5  once you got back to Georgia?

6  A.    Yes.

7  Q.    This is a few days forward?

8  A.    Right.

9  Q.    Who all was in that meeting?

10  A.    Bill Looman, myself, Carl Swensson and a gentleman by the

11  name of James Renton (phonetic).

12  Q.    All right. And was it agreed in this meeting that you guys

13  were going to try to solicit some law enforcement assistance?

14  A.    Given the events of April 20th, I would never wish that

15  potential situation on anyone in my life. So, yeah, we agreed that,

16  hey, we still need some sort of intervention, someone to take a

17  look at this information, let's not go that route again. Can we not

18  find a law enforcement officer of some sort first; maybe that would

19  be the smart thing to do.

20        So through our discussions that morning, it was agreed that

21  somebody should, within the State of Tennessee, find a law

22  enforcement officer to be able to, you know, assist in some

23  capacity, whether it was reviewing the information, you know,

24  passing it off to the right person. We're just trying to get

25  intervention and assistance.

1    Bill Looman owned or still owns a crane company or

2  something like that. He's always on the job. Carl Swensson owns

3  a computer shop; he's got customers. James Renton (phonetic),

4  you know, he's a little bit older. I was in a position of having a

5  business that was basically doing nothing, and I had nothing on my

6  agenda. I was at least fairly familiar enough with the events in

7  Madisonville to try to talk sensibly to somebody, so it was agreed

8  that, okay, you've got nothing else to do, you're going to

9  Tennessee.

10    So, at that point, we decided that I would go to Tennessee,

11  you know, stay in a hotel and, you know, spend as many days as

12  possible traveling around to different county sheriffs'

13  departments, seeing patrolmen on the street, anybody we could,

14  with a badge, to say, hey, would you help us?

15  Q.    And did you do that?

16  A.    I did.

17  Q.    When you went to Tennessee on the 28th, where was the first

18  sheriff's department that you recall going to?

19  A.    I believe the first place that I stopped was in Loudon County,

20  where I believe it was the sheriff that testified earlier. It was my

21  understanding during that visit that there were some elections

22  coming up, which I don't know how you all do it up here, but it

23  was in April, May, right at the end of April, and he was hurried, as

24  he had testified. But there was himself, and I can't remember the

25  gentleman's name, but at the time at least he was the sheriff for

1   Cumberland county over in middle Tennessee.

2          When I approached them, you know, I told them, hey, we're

3   not– I can't– when I went to Tennessee, I had the exhibits that

4   have been shown as the arrest warrant and the other. I forget how it

5   was labeled, but there was also other packets of information,

6   which included the TCA statutes, everything that was basically

7   Walter Fitzpatrick's evidence to show to someone.

8          So there certainly wasn't enough time to cover it in five or

9   ten minutes when I was talking to them, so I'd gotten their cards.

10  And the agreement was that I would call them or their secretaries

11  the following week to set up, you know, an appointment and

12  actually sit down with them, show them the information, and get

13  their thoughts on it.

14  Q.    All right.  And, of course, by the next week you had been

15  arrested, correct?

16  A.    Correct.

17  Q.    Did you go to any other police departments or sheriffs'

18  departments?

19  A.    To the best of my recollection, you know, I believe Sevier

20  County was in it. You know, basically, I think, and as it showed

21  and was testified, you know, I had– I was in the camo-truck at that

22  time for different reasons.

23         But, you know, I had to go get an old school map, not

24  knowing the county seats in Tennessee specifically, so I bought an

25  old school map and just kind of plotted out where I was going to

1    go. But I believe I had made it to Blount County, whichever one

2    was the last one we just said.

3    Q.    Sevier?

4    A.    Sevier, Greene. When I was in Knox County, I spoke to

5    several officers without, you know, getting their business cards

6    and confirmation. You know, I was just basically fishing. I've

7    never done this before. I'm not a professional, so I did the best

8    that I could.

9    Q.    On April the 30th do you recall starting out again that morning

10   to attempt to speak with some– somebody about getting some help

11   and you get a phone call?

12   A.    I did.

13   Q.    Who was that from?

14   A.    That morning, I was headed to literally the farthest county in

15   northeast Tennessee, and start working my way back. It had been a

16   couple of days. And I believe it was around 10:30 Chuck Reed had

17   called my phone.

18   Q.    And that's Agent Reed, that testified yesterday?

19   A.    That is correct.

20   Q.    Okay. And what did Agent Reed say to you?

21   A.    He said that he understood that I was going to be meeting

22   with the Cartersville Police Department at two o'clock that day

23   and wanted to be a part of it. I'd never heard that I was going to

24   have a meeting at two o'clock that day with the Cartersville Police

25   Department, but I engaged in the conversation because, you know,

1    hey, here was a guy that wants to talk to me and possibly look at

2    this information.

3          So, you know, he said he wanted to be there. You know, I told

4    him, you know, unfortunately, I'm not even in Georgia right now,

5    I'm up here. And then, you know, it kind of hit me, holy cow, I'm

6    trying to find a guy in Tennessee, well, this guy's in Georgia , but

7    he's with the Federal Bureau of Investigation, he can go wherever

8    he wants to.

9          And so it hit me, I said, look, Chuck, here's what I'm doing.

10   I'm up here right now traveling the state. You know, my wife's at

11   home, everything else, but I'm up here traveling the state, trying to

12   find somebody who will just take a look . If we're crazy, tell us; if

13   not, would you at least look at this information.

14         And he said, you know what? Okay. And I said, great, it's

15   10:30 now, maybe 11:00 o'clock, whenever it was, and I said,

16   look, I'm northeast of Knoxville right now. I am turning my truck

17   around and I am headed straight there and I will see you in

18   Cartersville at two o'clock.

19   Q.    Is that what you did?

20   A.    Yes.

21   Q.    And did you make it to Cartersville?

22   A.    No.

23   Q.    Where were you pulled over; do you remember?

24   A.    When I first turned around, I don't remember what exit it

25   was. I don't– whichever highway takes you to northeast

1    Tennessee. I don't know if it was 40, I don't think it was 75. I

2    think it would have been 40. You know, I was probably– I'm

3    going to guess– maybe 15 miles north of town.

4         I turned around, went a few exits. There was a trooper in the

5    median. After I passed him, he pulled out on the highway, also

6    going southbound. At this point, I'm going south because I'm

7    ready to go home. Anyway, the trooper pulled in behind me, he

8    stayed maybe a third of a mile behind me. After a couple more

9    exits, I noticed there was now two troopers following at the same

10   distance, and I started thinking at the time– again, I was in the

11   camouflage truck– and I'm thinking, East Tennessee, camouflage

12   trucks, man, what a great fit, but maybe they're a little nervous

13   because it's a camouflage utility truck.

14        But, anyway, so I kept driving, and once we got somewhere

15   past downtown, and even though I'm from here, I don't spend a

16   great deal of time here, so I can't tell you exactly where it was, but

17   I know I was past downtown.

18        When I passed one of the entrance ramps, there was a

19   sheriff's car sitting there, and as soon as I passed him, the lights

20   came on. You know, I'm thinking, oh, great, and I looked in the

21   rearview mirror, and it was – I would equate it to like O.J.

22   Simpson. I mean, it was just a ocean of blue, blue lights, going on.

23   Q.    And were you pulled over?

24   A.    Immediately.

25   Q.    That camo-truck you pulled over, is that the same one you

1    take on field exercises?

2    A.    It is.  That was the purpose of the utility truck. If I could,

3    because we've seen it a lot, and nobody knows really what it's all

4    about, my business that was failing and pretty much had failed, left

5    me with a utility truck, a van, a trailer, that was just sitting,

6    collecting dust at my home. Had no use for any of them.

7          When I joined the militia, when these guys would do their

8    field training exercises, we all had to pack up our gear, you know,

9    our sleeping bags and tents and everything that we were going to

10   take, and I would watch these guys, and myself included, load it all

11   up on the truck, you know, on a Friday, go do our thing, then have

12   to come home and unload everything else.

13         And I'm like, I could probably go you one better because I've

14   got this utility truck with all these compartments in it, you know.

15   And I thought, you know, this truck's just sitting here doing me no

16   good, I own it outright, I don't have any payments to make on it,

17   it's mine free and clear.  I can do whatever the heck I want to do

18   with it, so went to Wal-Mart, grabbed a whole bunch of spray paint

19   and actually painted the thing myself.

20         Once that was done and, you know, sometime before that,

21   they, you know, offered to make me the chaplain of the Georgia

22   Militia because, as you guys have all seen, I do like to talk, and a

23   lot of the times it is about things in the Bible or things like that.

24         But, you know, that was their decision. So as now an officer

25   of the Georgia Militia, I had a leadership role. You know, it was

1    my decision to basically donate this truck to the militia to use

2    whatever they wanted. And we used that with all the gear that was

3    in there. I could now store everything in there to show people how

4    to be prepared, you know, whether it's food provisions.

5            Again, going back to a situation like Katrina, if something

6    happened and the power went out or your house burnt down,

7    whatever it is, and you had to get out of here, what is it that you

8    need to stay, you know, to survive for, you know, a two-week

9    period or whatever the case may be.

10           So we had my truck staged, you know, actually for the

11   weekend outings. I did have one compartment that I kept a few

12   guns in. And, you know, Georgia is like Tennessee, we all like our

13   guns. But one of the compartments kept the guns– I did keep the

14   guns in, including the AK-47.

15   Q.    All right. I guess you've heard the expression, ask somebody

16   what time it is and they'll tell you how to build a watch. When you

17   were arrested, did you give the officers any trouble?

18   A.    None whatsoever.

19   Q.    Do you recall being taken down the federal building and

20   speaking with Agent Johnson and Agent Harold (phonetic)?

21   A.    I do.

22   Q.    Did they express some frustration that you wouldn't go

23   away?

24   A.     A little bit.

25   Q.    On April the 20th of 2010, did you ever have the intent to

1    come to Madisonville, Tennessee, and take over a courthouse?

2    A.    No.

3    Q.    Did you ever have the intent to take over a city?

4    A.    No.

5    Q.    Did you ever have the intent to engage anyone in any violent

6    act with your weapons?

7    A.    None whatsoever.

8            MR. GREEN:   You may cross-examine.

9            THE COURT:   All right.  Thank you. I guess would be

10   a good stopping point.  The jury's put in a full day.  So why don't

11   we break for today and plan to resume tomorrow at 9:00 a.m., and

12   that would be Friday, October 21st.

13       Again, remind the jury that, you know, we're in the midst of

14   Defendant's presentation of evidence, in fact, in the midst of the

15   Defendant's testimony himself.  So just wanted to take this

16   occasion to remind the jury, as I've done on several occasions, to

17   continue to keep an open mind as you hear all the evidence in this

18   case and until you begin your deliberations in this case.

19       And along that same line, don't talk among yourselves about

20   the evidence you've heard today or anyone else, and don't do any

21   type of investigation or review of matters that you've heard in this

22   case via outside references or materials, including certainly the

23   internet or other technological means.

24       And also continue not reading or listening to or reviewing

25   anything about this case, certainly, until the case is over.  So, that

1    being said, I thank you for putting in a good, full day today, and

2    we look forward to seeing everybody back here tomorrow, Friday,

3    at 9:00 a.m. So the jury is dismissed at this time.

4              (Jury recessed for the day at 5:27 p.m.)

5              THE COURT:   All right.  Everybody may be seated just

6    a moment.  One thing I thought I'd bring up. I was reviewing the

7    Court's order on the motions in limine that were filed by the

8    Defendant, some of which were ruled upon, some of which were

9    denied on the basis of the Government's representation that certain

10   matters would not be brought up or discussed in the Government's

11   case-in-chief.

12         In light of an issue that came up earlier today, I thought it

13   might be beneficial, either now, or I'll give the Government

14   opportunity to review tonight, it might be good to discuss, before

15   we begin the cross-examination, if the Government intends to go

16   into any of the issues on which the Court denied as moot, with

17   leave to renew based upon the Court's filings.

18         Specifically, I'm looking at motion in limine number three,

19   motion in limine number four, parts A and B, motion number five,

20   part A, and motion in limine number six, parts A, B and C. I think

21   we all know what we're talking about, so, Mr. Theodore, do you

22   want to address some of those now?

23              MR. THEODORE:  That's fine, your Honor.  Your

24   Honor, you know, the Government, we did not put in any evidence

25   regarding Mr. Huff's, you know, termination from the Oath

1    Keepers or the Georgia Militia, didn't do any of that, as we

2    indicated, you know, we would in the motion in limine, in our

3    response.

4         But I think that Mr. Huff now has really put that all whole–

5    his membership in the Georgia Militia and Oath Keepers, really

6    kind of made that an issue in the case. And I think, to really put

7    that in context, I think the Government should be at least allowed

8    to ask him, cross-examine him, about the fact that he was

9    terminated from those groups and why.

10         THE COURT:   Hold on a second, Mr. Green. Let me go

11   through the– motion in limine number three was related to

12   evidence the Defendant is a "birther" or challenges the legitimacy

13   of President Obama. I believe that was already gone into, so I'm

14   not sure that's an issue for purposes of cross-examination.

15         I guess what I'm saying is, if it comes up in cross, it's already

16   been delved into really somewhat even on direct in terms of

17   looking at the documents, so I'm not going to address that unless

18   Defendant feels I need to.

19         Motion in limine number five related to the Defendant was

20   convicted of any crime in Monroe County Circuit Court regarding

21   the events of April 1. The Government intend, based on the proof

22   today or the direct examination, to go into that?

23         MR. THEODORE:   We weren't planning on cross-

24   examining him on that, your Honor.

25         THE COURT:   And then motion in limine number six,

1   that Defendant is purportedly, and the word in the motion,

2   "Christian Identity " member, member of "White Supremacist

3   Group" or "Racist or anti-Semitic beliefs."

4         Does the Government, based on the proof today or the direct

5   examination, intend or seek to go into any of those areas?

6               MR. THEODORE:   No, we will not go into that on

7   cross-examination.

8               THE COURT:   So the only one potential issue,

9   depending on Mr. Green's response, let's hear your response, Mr.

10  Green, on the Government's desire, based on the testimony on

11  direct, to go into the issue of or the matter of termination of

12  membership by Oath Keepers and Georgia Militia.

13              MR. GREEN:   I think, clearly, we've addressed the

14  issue that he is or was a member of the Georgia Militia and was a

15  member of the Oath Keepers.  And I think, given that fact, that

16  they could clearly inquire, are you still a member, and he would

17  have to truthfully respond, no, I'm not.

18        But as far as going into why he was terminated, that was a

19  decision made by someone that they don't have here, and it

20  presupposes that that other person's opinion was correct. It

21  presupposes that other person knew the entirety of the facts which

22  comprised the reason that they decided to terminate Mr. Huff.

23        So as far as them asking him, are you still a member of either

24  of these groups, I think that's fair game, given the fact we talked

25  about the fact he was in Oath Keepers and was in the Georgia

1   Militia at one point.

2        But I don't think it's fair game, just because we talked about

3   he was in those groups, to say why you were terminated, because

4   that's bringing in the thought process of somebody else that they

5   don't have any evidentiary basis to support.

6        THE COURT:   Mr. Theodore, your response?

7        MR. THEODORE:   Well, your Honor, he would have

8   the chance to explain that, Mr. Huff. You know, he went into great

9   detail about his membership and he really made it sound– gave the

10  impression that he had this hunky-dory relationship with both

11  groups.  And, of course, you know, the Georgia Militia is just a

12  bunch of Boy Scouts and whatnot, through other testimony.

13       I think it's very relevant.  It's almost a form of character

14  evidence that he put in regarding his own character, and I think we

15  should be able to go into specific acts like that and just cross-

16  examine him about it to put it in context. Because I think it's a

17  little misleading to the jury right now.  We've agreed not to go into

18  a lot of other stuff, but he's really made that an issue here.

19       THE COURT:   Part of Mr. Green's concerns or

20  argument, I guess, relate to the evidentiary basis.  In certain

21  respects it's a hearsay objection, if you ask him about why he was

22  terminated, then it's going to be based on either something he was

23  told by somebody else– I mean, I'm looking at some evidentiary.

24       What's the evidentiary foundation to ask for for that question

25  to be answered?

1          MR. THEODORE:  Well, certainly he could say that he

2    was terminated, and I don't think that would go into it. If we got

3    into why– yes, I'm not sure that– and I understand that that would

4    be derived most likely from a hearsay statement.  I'm just trying to

5    think if it would not be offered for the truth of the matter.

6          THE COURT:  Go ahead.

7          MR. GREEN:  They're doing this, I mean, I'm getting

8    double-teamed.

9          MR. THEODORE:  Your Honor, at the very least, your

10   Honor, I think we should be able to get in that he was terminated

11   from those groups.

12         THE COURT:  All right. I don't hear the Defendant,

13   through counsel, objecting to being asked if he was– I mean, if

14   he's still in them, I mean, the extent to that is, was your

15   membership terminated. Do you object to that being asked?

16         MR. GREEN:  Well, I do. I mean, I don't know why

17   they just can't ask him, if there's an issue about the hunky-dory

18   relationship, okay, is this relationship so hunky-dory you're still a

19   part of it? Well, no, I'm not. I don't belong–

20         THE COURT:  That leaves open did he voluntarily

21   withdraw for some reason versus whether he was terminated, and I

22   understand. So issue number one is, can he be asked.  There's not a

23   dispute with is he still a member of those groups?

24         MR. GREEN:  No.

25         THE COURT:  The next, you know, step is, can he be

1    asked if those groups terminated his membership, and I understand

2    that's left open.  And, of course, then the next step would be, do

3    you know why you were terminated? I mean, right now, I mean,

4    unless the Government can show me an evidentiary foundation for

5    asking the why, I'm inclined not to allow that. And the

6    Government may not even be seeking to do that now with respect

7    to: Are you still a member? No. And why not? Because my

8    membership was terminated.

9         I mean, what's the Government's position on that?

10        MR.  THEODORE:   Well, your Honor, again, we think

11   it's very relevant, because, again, I think it's misleading.  It gives

12   the impression that– it could even give the opposite impression,

13   that he decided to– you know, he didn't like their, you know,

14   their– some of their radical ways or anything like that, militant

15   ways or something, so he decided to be– become more passive and

16   withdrew.

17        I mean, could give completely the opposite impression if he's

18   just allowed to say that he's not in it.  I think it's very relevant that

19   he was actually terminated from those groups.

20        THE COURT:   Mr. Green, you want to respond to that?

21        MR. GREEN:   Well, I want to respond first by saying,

22   your Honor, that I'd have to respectfully disagree with Mr.

23   Theodore, that we've somehow opened up kind of a character

24   issue, because we didn't.

25        I mean, what you have to do and what we tried to do by

1    bringing up the fact that he joined Oath Keepers and the Georgia

2    Militia is to place all this in context. Because, otherwise, this

3    jury's left to speculate and wonder, well, did Walter Fitzpatrick

4    just kind of fall out of the sky on Mr. Huff ? I mean, how was it

5    that he got from the point to living in Dallas, Georgia , to knowing

6    Mr. Fitzpatrick, either by phone or in person or otherwise, to

7    ultimately showing up in Madisonville on April the 1st.

8            And that's the reason that we got into Oath Keepers and

9    Georgia Militia. I think, by necessity, there has to be a little bit of

10   explanation about these two groups because of the misconception

11   could be created by just talking about, hey, he's a militia man and,

12   hey, he drives around in this truck with these funny stickers on it.

13          But I think what's important, your Honor, is the fact if they

14   want to make issue with, all right, you like these groups, you

15   joined them, they've got the choice, the United States does.  They

16   can say, are you a member of either one of these groups at this

17   point in time? They don't have to ask him that question. They can

18   leave it alone.

19          But if they choose to ask him that, I don't think it's

20   appropriate to allow them to ask, well, were you terminated,

21   because first and foremost that presupposes that there was some

22   justification for the termination. There's no evidentiary basis to

23   support why he's no longer in it.

24                  THE COURT:  Well, let me just ask, for my information.

25   When did the membership cease or when was he terminated?

1    MR. GREEN:  Within three or four days after this went

2    public, the events of April the 20th went public.

3    THE COURT:  I mean, well, roughly.

4    MR. GREEN:  Oh, we're talking 27th, 28th.

5    MR. THEODORE:  28th.

6    THE COURT:  All right. So let me ask the Government.

7    Let's go back to the basics. What is the relevance or the probative

8    value of his termination of membership by these organizations on

9    February 27 to what, obviously, is one of the central issues in this

10   case, the Defendant's intent leading up to and including April 20th?

11   MR. THEODORE:  Well, again, your Honor, I think it

12   kind of came in in a form of character evidence for him, and I think

13   it's just very misleading. You know, Mr. Green's talking about we

14   need to put it in context.

15   Well, this puts everything in better context. He was

16   terminated because of his role on the 20th, on April the 20th,

17   because of his conduct on that day.  That's why he was terminated.

18   It's definitely relevant toward this.

19   THE COURT:  Anything further from either side?

20   MR. GREEN:  I've got to respond to that, your Honor.

21   THE COURT:  Go ahead and respond, and I'll take it

22   under advisement and let you know my ruling in the morning. Go

23   ahead.

24   MR. GREEN:  Let's suppose that the Oath Keepers

25   group had heard that Mr. Huff had come into Madisonville, pulled

1  an AK-47 out of the truck and started opening fire on the

2  courthouse, and after hearing those facts, they chose to terminate

3  him. Okay. Because, once again, we're getting back to there was a

4  decision made, and there's no evidentiary basis being placed

5  before this court on the appropriateness of the decision.

6       But the inference that is created is very prejudicial to Mr.

7  Huff; i.e., these groups which you now espouse just unilaterally,

8  because they knew the truth, they knew you're a bad man, the scary

9  guy that they have been trying to paint him to be, as Mr. Mackie

10  asked earlier, radical extremist, they kicked you out because of

11  what happened on April the 20th. And that's just clearly and highly

12  prejudicial to him, and there's no evidentiary basis to do it.

13       THE COURT:  All right. I understand the parties'

14  positions.

15       MR. THEODORE:  Your Honor, the only thing I would

16  just add to that is, it's cross-examination, and the Defendant will

17  have a chance to answer that, that he thinks he can put it in

18  another– explain that or put in another light, he'll have the

19  opportunity to do that.

20       THE COURT:  All right. Thank you. Mr. Green, do you

21  anticipate further witnesses? I won't hold you to it, but, generally?

22       MR. GREEN:  There may possibly be one brief witness

23  after Mr. Huff.  I'm 50-50 on whether I will call.

24       THE COURT:  Does the Government at this time

25  anticipate putting on rebuttal testimony?

1          MR. THEODORE:    One very brief witness.

2          THE COURT:   Brief.  So we should– you've got the

3    cross, and the direct went about an hour and 15 minutes, so–

4          MR. THEODORE:   I wouldn't expect cross will be that

5    long.

6          THE COURT:   Okay.  Then why don't we wait and do

7    our charge conference tomorrow, then, after we finish the

8    evidence? I think we'll have time, and hopefully get into closing

9    arguments, get the case to the jury. What are your all's thoughts on

10   length of time for closings?

11         MR. THEODORE:  Your Honor, I would request 45

12   minutes for initial summation and then 15 minutes for rebuttal for

13   total time of an hour.  And part of the reason is, really, I might not

14   even need that much time, but I don't like to feel kind of rushed

15   and be looking at the clock when I'm doing an argument.

16        Try to kind of build in a little bit of buffer there. And, again,

17   the trial is in the fourth day, so just an hour all together.

18         THE COURT:  Mr. Green?

19         MR. GREEN:   Brevity is my middle name, your Honor.

20         THE COURT:   Well, one thing I'm obviously looking

21   at is, I don't think, from what I'm hearing, it would necessarily

22   take two hours for closing. But if we finish the proof, we have our

23   charge, you know, we've got, let's see, an hour and a half for

24   closings, and then the Court's charge, you know, takes some time

25   to read.  It's multi-pages.

1        So we're talking two-plus hours for closings and giving of

2   the charge. So even if we start that in the afternoon, you know, we

3   may be toward the end of the day. But we'll just see where we are

4   after the testimony comes in.

5        MR. GREEN:   Oh, are we talking about did the Court

6   make a decision on how long? Because I'd kind of like to know,

7   and I'll probably structure my arguments more tonight. I'd kind of

8   like to know, just from a time perspective.

9        THE COURT:   I'll give up to an hour per side.

10       MR. GREEN:   I don't see any way I'm going to take

11  that long, but I appreciate it.

12       MR. THEODORE:   And I doubt I would, too.

13       THE COURT:   All right. And that would be up to 15

14  minutes rebuttal.

15       MR. THEODORE:   Yes.

16       THE COURT:   You know, if you take 30 minutes on

17  your opening closing–

18       MR. THEODORE:    I don't get and a half hour.

19       THE COURT:   – you don't get 30 minutes left.

20       MR. THEODORE:   No rollover.

21       THE COURT:   Whereas, if you take 50 minutes, you'd

22  only have ten minutes left, but it's 15 minutes max for rebuttal.

23       MR. THEODORE:  That's fine.

24   (Discussion off the record.)

25       THE COURT:   Hold on a second. Now, I want counsel

1  to get here maybe just five minutes early, and I'll try to come down

2  and we can talk about the issue that was argued today, and then

3  we'll also plan to have our charge conference after the closing of

4  proof.

5         All right.  Thank you. See everyone here tomorrow morning

6  at 9:00 a.m. or a few minutes before.

7         (Whereupon, October 20th, 2011, Court adjourned at 5:44

8  p.m.)

# C E R T I F I C A T I O N

I certify that the foregoing is an accurate transcript of the record of

proceedings in the titled matter.

_____/s/ _Donnetta Kocuba_____                    __9/20/12__
Donnetta Kocuba, RPR-RMR
Official Court Reporter
U.S. District Court
Knoxville, Tennessee