# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE, TENNESSEE

United States of America,        :
                                        :

                    Plaintiff,      :

                                          :

vs.                                :          Case No. 3:10-cr-73

                                        :

Darren Wesley Huff,          :        **Trial Testimony/Motions**

                                        :

                    Defendant.     :

Transcript of proceedings before the Honorable Thomas A. Varlan,

U. S. District Judge, on **October 21ˢᵗ, 2011.**

Appearances:

                       On behalf of the Plaintiff:

                       A. William Mackie, Esq.
                       Jeffrey E. Theodore, Esq.
                       U.  S. Attorney's Office
                       Knoxville, Tennessee

                       On behalf of the Defendant:

                       G. Scott Green, Esq.
                       Knoxville, Tennessee

Court Reporter:

                       Donnetta Kocuba, RMR
                       800 Market Street, Suite 132
                       Knoxville, Tennessee 37902
                       (865) 524-4590

# I N D E X

Court's Ruling-Defendant's Motion in Limine #4:     3

| Defendant's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Darren W. Huff (cont'd from 10/20/11) | – | 5 | 54 | 57 |

Court's Ruling on Defendant's Objection-Rebuttal Witnesses:     65

Defendant's Renewed Rule 29 Motion:     72, 100

Court's Ruling re: Juror 131 as alternate juror:     102

| Government's Rebuttal Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| R. Steven Bebb | 73 | 80 | 91 | 92 |
| Greg Breeden | 93 | 96 | 99 | – |

| Government's Exhibits: | Identified | Received |
|---|---|---|
| 47 - "Potential Terrorist" business card | 5 | 5 |
| 51 - C.D. of Dupree/Breeden phone call | 95 | 96 |

Recesses:     65, 100

1    (Whereupon, Friday, October 21st, 2011, Court convened

2    without jury at 9:05 a.m.)

3                    THE COURT:   Good morning everyone. Before we

4    bring our jury in, returning to yesterday's discussions,

5    specifically, pursuant to motion in limine number four, the

6    Defendant had requested that the Court preclude the Government

7    from eliciting testimony that the Defendant's membership in the

8    groups, the Oath Keepers and the Georgia Militia, was terminated.

9        The Court denied the motion as moot with leave to renew,

10   because the Government indicated it would not elicit such

11   testimony during its case-in-chief.  At the close of Defendant's

12   direct examination yesterday, the Government indicated that it did

13   now intend on seeking to introduce such evidence, and the Court

14   heard arguments from both sides regarding the admissibility of the

15   evidence.

16       The Court has considered the manner and the arguments of the

17   parties and finds, to the extent the Government wants to ask the

18   Defendant if he is still a member of either the Oath Keepers or the

19   Georgia Militia, the Government may do so as the subject matter

20   was raised on direct examination.

21       However, the Court concludes the Government may not elicit

22   testimony regarding whether the Defendant's memberships in such

23   groups were terminated.  The Court finds whether the Defendant's

24   memberships were terminated is not relevant to the issues in this

25   case, as such action took place after the events at issue in this case;

1    and, further, the fact of termination and the reasons for such

2    termination is not proper character evidence. Even if relevant or

3    otherwise admissible, however, the Court further finds that the

4    probative value of such evidence is substantially outweighed by

5    the danger of unfair prejudice, under Rule 403 of the Federal Rules

6    of Evidence.

7            If the Defendant were to testify that his memberships were

8    terminated, even without explaining the reasons for the

9    termination, it could allow the jury to assume the memberships

10   were terminated because the Defendant had done something wrong

11   in connection with this case; thus, giving rise to the danger of

12   unfair prejudice under Rule 403.

13           Further, if he were asked why his memberships were

14   terminated, the danger of unfair prejudice is even greater, because

15   those reasons, again, do involve the events at issue in this case and

16   third parties' assessments of the Defendant's actions.

17           Further, the Court finds that testimony from the Defendant

18   regarding what people told him when terminating him would most

19   likely be inadmissible hearsay.

20           Are we ready for our jury?

21               MR. GREEN:   We are, your Honor.

22               MR. THEODORE:   Yes, your Honor.

23               THE COURT:   Bring our jury in. Mr. Huff, why don't

24   you come on up to the stand, please?

25           (Jury convened in courtroom at 9:08 a.m.)

1      THE COURT:  All right.  Thank you. Everyone may be

2  seated, and I believe we're ready to begin the cross-examination.

3  Mr. Theodore, you may proceed on behalf of the Government.

4      MR. THEODORE:    Thank you, your Honor.

5                  **CROSS-EXAMINATION**

6  by Mr. Theodore:

7  Q.    Good morning, Mr. Huff.

8  A.    Good morning.

9  Q.    Mr. Huff, do you refer to yourself as a potential domestic

10  terrorist?

11  A.    At times.

12  Q.    In fact, you even have a business card that you produced

13  where you refer to yourself as a potential domestic terrorist; is that

14  right?

15  A.    That is correct.

16  Q.    I want to show you what has been marked as Government's

17  Exhibit 47.

18      THE COURT:  Any objection to this document?

19      MR. GREEN:  No, your Honor, as long as Mr. Theodore

20  will place this in context about when, when this card was produced.

21      THE COURT:  All right.  Let's go ahead and display it

22  to the jury.  We'll admit Government's Exhibit 47 subject to that

23  statement.

24      (Government's Exhibit No. 47 received into evidence.)

25  Q.    Is that the front side of your business card?

1    A.    Yes.

2    Q.    And it has your name and then "Right-wing Extremist and

3    Potential Domestic Terrorist;" is that correct?

4    A.    Yes.

5    Q.    So you consider yourself a potential domestic terrorist?

6    A.    I believe that Homeland Security and the Department of

7    Justice considers me a potential domestic terrorist.

8    Q.    And you're quite proud of that, aren't you?

9    A.    I'm not proud of that. Facts are facts.

10   Q.    Well, you put it on your business card and you displayed that

11   to people and you hand that business card out to people; is that

12   right?

13   A.    I do.

14   Q.    That would suggest to me that you're quite proud of that title.

15   A.    I'm not saying that I'm proud of that title.  The fact is,

16   Homeland Security, their potential domestic terrorist watch list

17   includes Desert Storm veterans, Christians, lots of people who

18   would basically, in the everyday world, consider themselves

19   conservative, including now, if I'm not mistaken, Janet

20   Napolitano's most recent would be the potential for Tea Party

21   members to be potential domestic terrorists.

22   Q.    And you put "as featured in Time Magazine;" is that right?

23   A.    Yes.

24   Q.    There was an article in Time Magazine, and that article talks

25   about the secret world of extreme militia groups?

1    A.    Correct.

2    Q.    So that's the context you were putting this in?  You were

3    putting this in– you have your title there, "Potential Domestic

4    Terrorist as featured in Time Magazine," talking about extreme–

5    the secret world of extreme militias?

6    A.    I didn't talk about that. Time Magazine did.

7    Q.    Right. But you're, of course, pretty much adopting that by

8    having that on that card?

9    A.    I don't know how you could say I'm adopting it.  I'm just

10    stating a fact.

11    Q.    Well, you're proud that you're considered in that context; are

12    you not?

13    A.    It's– facts are facts.  I can't run from it.  If it were up to me, I

14    would rather not been in Time Magazine.  I would have rather not

15    been on MSNBC, I would rather not been in the Associated Press

16    with the Government saying that I'm a danger to the community.

17    Q.    So that's why you put on your card, to show everybody,

18    make– bring everyone's attention to those facts?

19    A.    I think it was done in humor at the ridiculousness of the

20    Government labeling conservative members of this country as

21    potential domestic terrorists.

22    Q.    And the backside of that card, might not be very visible,

23    basically shows– what type of assault rifle is on the back of that?

24    A.    That one is an AR-15.

25    Q.    Do you have an AR-15?

1  A.    No.

2  Q.    You, actually, you gave this card to Special Agent Scott

3  Johnson; is that right?

4  A.    I did.

5  Q.    And you didn't try to explain or anything; that was just your

6  calling card, your business card?

7  A.    At the time, Agent Johnson said that, you know, we needed to

8  keep our conversation to a minimum, so I just said, yeah, here's my

9  card when this is over. I think I even asked him if we could have a

10  drink together when this is over.

11  Q.    You didn't tell him that, well, this is kind of a joke here, I'm

12  giving you this card as kind of a joke?

13  A.    The way he stated, that we didn't, that we didn't need to have

14  a lengthy conversation at the FBI headquarters, no, I did not.

15  Q.    When was that? Was that recent, that you gave that to Special

16  Agent Johnson?

17  A.    It was.

18  Q.    When was that?

19  A.    I can't remember the date. I think it may have been three

20  weeks ago. I can't remember when it was. It was recent.

21  Q.    Within the last couple weeks; is that right?

22  A.    Approximately.

23  Q.    And you actually went over to the FBI office at that time?

24  A.    I did.

25  Q.    I want to direct your attention now to some things you've

1    already testified about. You went to Madisonville, Tennessee, you

2    indicated, on April 1st, 2010, and you went there to help Walter

3    Fitzpatrick when he was going to try to place Mr. Pettway under

4    arrest; is that right?

5    A.    I had no idea what I was going to be seeing on April the 1st.

6    Q.    Okay. At that point, before you went there, you didn't know

7    that there was going to be a citizen's arrest, an attempted citizen's

8    arrest, at that time?

9    A.    No.

10   Q.    Once you got there, you learned of the circumstances, though,

11   you learned Mr. Fitzpatrick was going to place Mr. Pettway under

12   arrest; is that right?

13   A.    Yes.

14   Q.    And, in fact, you realized that Mr. Fitzpatrick went into a

15   closed door, closed door, to a grand jury session occurring, not a

16   matter open to the public? Just like when juries deliberate, things

17   like that, it's not open to the public, went into a closed session and

18   tried to arrest the grand jury foreperson? You're aware that's what

19   Mr. Fitzpatrick tried to do?

20   A.    At the time, I had no idea what he was going to do, and I

21   think, as has been testified, I can't even remember where I was at

22   when he went into the that room. But, according to Walter

23   Fitzpatrick's own testimonies–

24   Q.    Well, we're not– Mr. Fitzpatrick is not testifying.

25   A.    Okay. I understand.

1  Q.    So that would be hearsay.  But we heard testimony in this

2  court here from Mr. Pettway.  Mr. Pettway indicated that you, in

3  fact, were there at the courtroom.  You may have not gone

4  substantially in it, but you were there and you were, in fact,

5  videotaping at that time, at least at about the doorway area?

6  A.    The videotape that I recorded has never been published.  I

7  would say, unequivocally, Gary Pettway lied on this witness stand.

8  I've never been in that courtroom. I had no idea Mr. Pettway was

9  even black until I saw the video a few days later that Carl

10 Swensson had posted on the internet.

11 Q.    Okay.  You were videotaping that day, correct?

12 A.    I believe, if I'm–

13 Q.    Mr. Huff, that's just an easy question.  Were you videotaping?

14 A.    It's not that– I could say yes, I was videotaping, but I did not

15 push "record" until I believe we were outside of the courtroom. I

16 can't say that for sure only because the FBI is in possession of my

17 video camera which, when I recorded it, was on a disc.  I'm not

18 technically inclined.  My disc is with the video camera. It was

19 never even downloaded on my own computer.  Thus, the video that

20 I have shot has never been seen by anyone.

21 Q.    Okay.  You indicated, I think, the first thing yesterday is, you

22 weren't even sure what was on your video camera; is that right?

23 A.    That is true.

24 Q.    But one thing you are sure of; it doesn't have anything about

25 Mr. Pettway?

1    A.    Nothing.

2    Q.    All right.  Now, this is Government's Exhibit Number Five,

3    and this is you, and that's downstairs from the courthouse; and you

4    are, of course, videotaping?

5    A.    I believe I did push "record" during this time.

6    Q.    Okay.  Nevertheless, you went to the courthouse and I think

7    you described that you had your entourage with you at that time.  I

8    think you used the term "entourage;" is that right?

9    A.    I don't know what else you would call a group of five or six

10   people.

11   Q.    Okay.  And you all had a similar goal when you went there; is

12   that right?

13   A.    I had no goal.

14   Q.    Okay.  Well, you knew what was going on, you knew Mr.

15   Fitzpatrick was going to try to arrest Mr. Pettway?

16   A.    At approximately 8:50 in the morning I found out that that's

17   what the purpose was.  I'd never heard of Walter Fitzpatrick.

18   Q.    Okay.

19   A.    I had never heard of Monroe County until approximately

20   March 25th.

21   Q.    But when you went to the courthouse, you knew what the

22   purpose of that was, correct?

23   A.    Yes.

24   Q.    And so your testimony is that Mr. Pettway just flat out lied

25   when he said that you were there when he saw you near the door of

1   the courtroom there? Is that your testimony?

2   A.    I think it was a complicated question, but I'll try to answer it.

3   I would say that if Gary Pettway, as he did testify, said that he saw

4   me inside of that courtroom, then, yes, he was lying.

5   Q.    What if he said he saw you at the doorway, perhaps not inside

6   the courtroom, but at the doorway of the courtroom?

7   A.    Then I would also say that Gary Pettway is lying.

8   Q.    And so here you were there with a group of people, you all

9   had the similar goal of going over there, but– and all these people

10  went up to that courtroom. You're aware that people went up there

11  with Mr. Fitzpatrick, right?

12  A.    Yes.

13  Q.    But you decided to, oh, I'm going to stay on a different floor

14  completely, I'm not going to go with my entourage as they proceed

15  forward with this attempted arrest?

16  A.    Not everybody went with Walter Fitzpatrick.

17  Q.    You know the people that did go, though, right?

18  A.    I do not.

19  Q.    Well, let me ask you this. You went over there, you were

20  there to, part of your role, was to be a videotape– record some of

21  the incidents going on that day; that's fair, isn't it?

22  A.    That was my only purpose, yes.

23  Q.    Okay. Did you feel that the arrest of Mr. Pettway was

24  justified?

25  A.    I couldn't answer that, not at the time.

1    Q.    Okay. Let me ask you now, do you feel that the attempted

2    arrest of Mr. Pettway by Mr. Fitzpatrick was justified?

3    A.    I don't know that I could answer that at this time. I think, you

4    know, I mean, my, my beliefs have changed and changed back over

5    the course of time. You know, at this point, I'm now under the

6    impression that the Government, through case law, changes the law

7    to whatever they feel like and that the written statutes mean

8    nothing except what a judge says that they mean.

9         At the time, when I looked at the TCA statutes that Walter

10   Fitzpatrick had on his sheet, it looked as though this might be

11   valid. But, at the time, I'm clueless about the law, and, frankly, I'm

12   still clueless about the law. But the way it was worded, it looked as

13   though he's probably got a point. Why has no one stepped in to

14   investigate this? So when we videotaped it during that day, I

15   literally had no opinion.

16   Q.    You had no opinion. You drove all the way from Dallas,

17   Georgia , to Madisonville, Tennessee, and you had no opinion or

18   inclination one way or the other what was going on in

19   Madisonville?

20   A.    No.

21   Q.    You had some opinions about what was going on, right?

22   A.    I had no idea what was going on in Madisonville prior to my

23   arrival. I was not given any details whatsoever.

24   Q.    You were maybe upset about something going on in

25   Madisonville when you drove there?

1    A.    No.

2    Q.    But you just decided to make a ride up there anyway?

3    A.    Yes.

4    Q.    When you drove in that day, did you have your AK-47 with

5    you that day?

6    A.    No.

7    Q.    And we're talking about April 1ˢᵗ?

8    A.    Correct.

9    Q.    Did you have your .45, Colt .45, with you that day?

10   A.    It was in my truck.

11   Q.    So right now you would admit that Mr. Fitzpatrick perhaps

12   was wrong in his belief that Mr. Pettway had been doing things

13   unlawfully?

14   A.    I can't answer that question at this time either.

15   Q.    Well, let me show you Government's Exhibit Number 46. This

16   has been admitted into evidence. Do you recognize that's an e-mail

17   that you received from Carl Swensson; is it not?

18   A.    I'm going to have to say yes. I don't remember it, but when

19   you showed it, it looks– the timing and everything, looks like it

20   probably is legitimate.

21   Q.    Okay. And that was received– that's your e-mail account,

22   correct?

23   A.    It is.

24   Q.    And, in fact, that was found in your car at the time of your

25   arrest?

1   A.    Yes.

2   Q.    So it was important enough that you not just had it like on

3   your computer or something; you actually printed it off and had it

4   in your vehicle?

5   A.    I did.

6   Q.    And that clearly states that there was authority, that there was

7   legal authority under Tennessee law, for Mr. Pettway to be the

8   grand jury foreperson?

9   A.    I don't know that I can answer that.

10  Q.    Okay.  Well, Mr. Swensson's indicating that to you at least in

11  that e-mail?

12  A.    Well, as he also pointed out, at the top, which was a little

13  more bold and in black print, here's what a judge in Tennessee did

14  to circumvent the Tennessee law without amending it.

15  Q.    Okay.  Well, this is a court's opinion.  You know that the law,

16  when a Court renders an opinion like that, that becomes the law.

17  You understand that, right?

18  A.    An opinion, so– this is why I'm confused and I can't answer

19  these questions, because what you're telling me is that a judge's

20  opinion is– holds more weight than the written law, and that's

21  what's confusing to me.  That's why I can't have an opinion on it at

22  this time.

23  Q.    So your opinion is that, you still think he may have been

24  acting unlawfully as grand jury foreperson?

25  A.    I have no opinion.

1 Q. No opinion at all?

2 A. I believe that Walt Fitzpatrick did what he felt was right.

3 Q. You talked about Mr. Fitzpatrick, you said, never placed a

4 hand on Mr. Pettway; is that right? Is that what you testified to?

5 A. I don't recall saying that.

6 Q. Didn't you testify to that yesterday, that he never laid a hand

7 on Mr. Pettway?

8 A. To my knowledge, he did not.

9 Q. Okay. You did see at least a video that was placed in court,

10 right?

11 A. That is correct.

12 Q. And although he may not have laid a hand on him, you realize

13 that Mr. Fitzpatrick was telling him repeatedly that, "You are

14 under arrest. You're understand arrest"? Do you recall that, right?

15 A. I do.

16 Q. And you recall Mr. Pettway asking Mr. Fitzpatrick to leave?

17 Of course, this is a closed proceeding of the grand jury; asking him

18 to leave, and Mr. Fitzpatrick refusing to leave? You saw that,

19 didn't you?

20 A. I saw that, yes.

21 Q. Okay. And, in fact, Mr. Fitzpatrick even tried to go in

22 further, even after being asked to leave, Mr. Fitzpatrick kept

23 approaching and kept going up to Mr. Pettway. You saw that,

24 right?

25 A. I saw that.

1    Q.    And the only reason and the only thing that stopped it is Mr.

2    Pettway then summoned the help of some deputies and law

3    enforcement officers, to escort, to get Mr. Fitzpatrick out of there?

4    A.    I saw that.

5    Q.    And you were outside on the doorsteps of the courtroom or the

6    porch area of the courthouse–

7    A.    I'm sure I was inside of the court building. I could have been

8    on– anywhere in that, in that building.

9    Q.    I'm sorry. I'm moving on to a different time now.

10   A.    Okay.

11   Q.    After that time, after Mr. Pettway– after Mr. Fitzpatrick tried

12   to put Mr. Pettway under arrest, then you went outside and were on

13   the front steps of the courthouse; is that right?

14   A.    Eventually, yes.

15   Q.    And at some point in time that's where Sheriff Bivens showed

16   up at that location?

17   A.    Correct.

18   Q.    And you had your entourage with you at that time, right?

19   A.    We keep calling it my entourage. I was there to videotape. We

20   would call it Walter's entourage and that would probably be a little

21   more accurate.

22   Q.    Okay. So you were part of Walter's entourage?

23   A.    Thank you.

24   Q.    And there were several people there and several people were

25   videotaping; is that right?

1  A.    There may have been three maybe, but, yeah, multiple people

2  were videotaping.

3  Q.    And there were a number of people, including the entourage,

4  that had kind of congregated on the steps?

5  A.    Correct.

6  Q.    In fact, almost the point that they were somewhat surrounding

7  one of the detectives there, along with Mr. Fitzpatrick, and

8  questioning the statutes and whatnot?

9  A.    I think the majority of people that were on the front porch of

10  the courthouse were law enforcement.

11  Q.    There was a number of people, several, half a dozen people, at

12  least, from your group?

13  A.    A half a dozen, five or six, out of 15 to 20.

14  Q.    And at some point in time you saw– in fact, you were

15  videotaping it– Mr. Fitzpatrick approached Sheriff Bivens almost

16  face-to-face and told him, "You're under arrest"?

17  A.    I believe I recall that.

18  Q.    And, of course, almost immediately after that, almost

19  immediately after that, I think maybe just a few seconds went by,

20  but Mr. Fitzpatrick was asked to leave; and he didn't, and he was

21  placed under arrest himself for trying to make an unlawful arrest?

22  A.    He was asked to leave, and his response was, "May I ask a

23  question," and the– whoever it was. I don't know the other

24  gentleman's name. Then he said, "You're under arrest."

25  Q.    Well, Mr. Fitzpatrick continued to try to ask a question and

1    that's why?

2    A.    One time.

3    Q.    So the reason why nothing further happened, Mr. Fitzpatrick

4    didn't have a chance to say anything more to Sheriff Bivens

5    because other law enforcement officers intervened?

6    A.    Okay.

7    Q.    Is that correct?

8    A.    Sure.

9    Q.    Okay.  Do you believe that that was a lawful attempted arrest,

10   citizen's arrest, of Sheriff Bivens?

11   A.    I can't answer that question.  I'm not an attorney.  And as I've

12   stated before, who knows what the law is anymore.  I don't know.

13   I've never seen a regular arrest warrant, I'd never seen a citizen's

14   arrest warrant until that day.  But I can't tell you if it was valid or

15   not.

16   Q.    Okay.  Well, you saw what Walt Fitzpatrick had drafted as

17   citizens' arrest warrants?

18   A.    I probably caught a glimpse of it before we went across the

19   street.

20   Q.    Okay.  At some point you did, though, correct?

21   A.    I did.

22   Q.    And you thought that those were valid citizens' arrest

23   warrants?

24   A.    I think there were valid statements contained in them.

25   Q.    Where they declared, other people there, declared a number of

1    public officials and law enforcement officials, as well as all the

2    way up the chain of command to federal officials, as domestic

3    enemies?

4    A.    According to Walt Fitzpatrick's complaint and arrest warrant,

5    yes.

6    Q.    And you agreed with that?

7    A.    I can't say either way.

8    Q.    Well, you were trying to, eventually, you went to try to

9    execute some of those yourself?

10   A.    I didn't try to execute anything.

11   Q.    You were planning on going to Madisonville to execute

12   citizens' arrest warrants; did you not?

13   A.    I went back to Madisonville in support of Walter Fitzpatrick,

14   and if the opportunity presented itself, assist him. However, I

15   don't even know how to define that. I did not go up to arrest

16   anyone.

17   Q.    Okay. After the whole Fitzpatrick– the attempted arrest he

18   tried to make on April 1st, he was taken into the custody?

19   A.    Correct.

20   Q.    And that angered you; did it not?

21   A.    I don't know that I would say that it angered me. It was, I

22   think, a bad situation. I don't think that it angered me at all. It was

23   disappointing.

24   Q.    You were upset about it?

25   A.    Again, I don't know that I would say that there was an

1    emotion quite like upset.  It was disappointing.

2    Q.    Well, you felt strongly enough about it that, on April 7th,

3    April 6th, April 7th time period, you went back to Tennessee and you

4    met with Mr. Fitzpatrick, as you testified?

5    A.    That was a long question. I think the first part I'm confused

6    on.  If you would, rephrase it.

7    Q.    After the April 1st incident, you went back to Tennessee, the

8    Madisonville area, sometime around April 6th or April 7th?

9    A.    I did return to Madisonville.

10   Q.    Okay.  And you met with Mr. Fitzpatrick at that time?

11   A.    I did.

12   Q.    So you were really concerned about his situation?

13   A.    I was concerned about his safety.

14   Q.    Okay.  This is about a four-hour drive for you; it's not just

15   around the corner for you?

16   A.    No, it's actually– it's not around the corner, but it's only

17   about two to two and a half hours.

18   Q.    From Dallas, Georgia ?

19   A.    Yes, sir.  It's 161 or two miles.

20   Q.    A little bit of a drive, though?

21   A.    A little bit, sure.

22   Q.    As we went on, though, at about April– on April 15th, 2010,

23   you went to the Chase Bank, your local bank?

24   A.    I was in there frequently, yes.

25   Q.    A regular customer there?

1   A.    Yes.

2   Q.    And as a regular customer you had gotten to know the bank

3   manager, Shane Longmire?

4   A.    Yes.

5   Q.    And you were talking about the whole Fitzpatrick situation to

6   him?

7   A.    Correct.

8   Q.    And you told him, in fact– did you not– that you were going to

9   go to Madisonville on April 20th to take over the city?

10  A.    No.

11  Q.    You did not make that statement to Mr. Longmire?

12  A.    No.

13  Q.    So that was not a truthful statement that Mr. Longmire made

14  on the stand there about you?

15  A.    No.

16  Q.    Did you not tell Mr. Longmire that you were going to

17  Madisonville on April 20th to take over the courthouse?

18  A.    No.

19  Q.    So if Mr. Longmire testified to that, he wasn't being truthful?

20          MR. GREEN:   Your Honor, I object. I don't think Mr.

21  Longmire said the courthouse.

22          MR. THEODORE:    Well, then, if he did, your Honor.

23          THE COURT:   I'll overrule the objection, remind the

24  jury that the questions are not evidence. What the witnesses say are

25  the evidence for the jury to consider. Go ahead.

1    Q.    If he said you went there to take over the courthouse, that

2    would not be truthful?

3    A.    No.

4    Q.    You told him that you were going to go there and meet with

5    some militia groups in Madisonville; did you not?

6    A.    I had been told by Carl Swensson.  Again, I knew that the

7    militia, myself. I didn't know anyone from any other militia at the

8    time. Carl Swensson had stated that he was going to contact other

9    militia, so I was literally just repeating what he had said.  But I did

10   say that, yes.

11   Q.    Okay.  So you did tell Mr. Longmire you would be meeting up

12   with some militia groups?

13   A.    Correct. Based on the information that Carl Swensson had

14   given.

15   Q.    And that was your intent when you went to Madisonville?

16   A.    Was?

17   Q.    To meet up with some other militia groups in Madisonville?

18   A.    Sure.  I believe, on Carl Swensson's website–

19   Q.    Okay.  Mr. Huff–

20   A.    –his video–

21   Q.    – I think you can answer that yes or no.

22   A.    I believe that Carl Swensson's video called for an en masse

23   approach.  That literally was what it was, was how many people can

24   we get into Madisonville.

25   Q.    Mr. Huff, I'm going to ask you some very, just very specific

1   and direct questions; okay? And if you don't understand one of my

2   questions, just tell me that and I will try to clarify the question;

3   okay?

4   A.   Thank you.

5   Q.   Okay. Now, can you grant me the same courtesy and try to

6   give very specific and direct answers to my very specific and direct

7   questions?

8   A.   I will try.

9   Q.   Did you tell Shane Longmire that, in fact, you were thinking

10  about mounting an AK– or an anti-aircraft gun on your camouflage

11  utility vehicle, mounting it there and maybe taking that?

12  A.   No.

13  Q.   Now, you have possessed an anti-aircraft gun; have you not?

14  A.   It is not mine and I am not in possession of it.

15  Q.   I'm not asking you who owns it. Okay. I'm asking you, did

16  you, in fact, at that time, possess an anti-aircraft gun?

17  A.   Yes.

18  Q.   And you did, in fact, have a mount for it to go on your truck;

19  did you not?

20  A.   It was a mount.

21  Q.   A mount for the anti-aircraft gun?

22  A.   Correct. A pedestal mount.

23  Q.   Did you tell Shane Longmire that you were going to use that,

24  take that anti-aircraft gun to Madisonville?

25  A.   Never.

1    Q.    You told Mr. Longmire that you would be taking an AK-47

2    with you; is that right?

3    A.    Without recalling the conversations, I would say that it is

4    certainly– I can't deny that.

5    Q.    Okay.  Well, in fact, I think yesterday, when you testified,

6    you said you did tell him that.

7    A.    Okay.  That's what I'm saying.  I can't– I don't remember the

8    conversations, sure.

9    Q.    So you may have told him you were taking an AK-47?

10   A.    Yes.

11   Q.    Because, in fact, you did take an AK-47?

12   A.    Yes.

13   Q.    All right.  You talked to Erica Dupree at the bank on that same

14   day?

15   A.    Yes.

16   Q.    And you've had a long– or you've known Erica Dupree for a

17   while, right?

18   A.    Yes.

19   Q.    Had a good relationship with her?

20   A.    Yes.

21   Q.    In fact, you liked, enjoyed talking to her; you felt comfortable

22   talking to her?

23   A.    Yes.

24   Q.    More so probably than some of the other tellers?

25   A.    Yes.

1    Q.    You told her also, on that same day you talked to Shane

2    Longmire– this was on April 15th, 2010– you told her that you were

3    going to Madisonville to take over the city?

4    A.    No.

5    Q.    You heard her testify to that; did you not?

6    A.    I did.

7    Q.    So you're saying she wasn't being truthful about that?

8    A.    That is what I'm saying.

9    Q.    You told her you were going to Madisonville with some

10   militia groups; did you not?

11   A.    It was probably the same sentence that Shane Longmire heard

12   as well, that there were other militia groups that were supposed to

13   be present, again, based on Carl Swensson's information.

14   Q.    And that's what you believed to be the case.  You believed

15   you would be hooking up with some other militia groups?

16   A.    Many other people, yes.

17   Q.    For the same purpose you were going there?

18   A.    To support Walter Fitzpatrick, yes.

19   Q.    And maybe take over the city or take over the courthouse?

20   A.    No.

21   Q.    You told Erica Dupree that you were taking your AK-47 as

22   well; is that right?

23   A.    Possibly in the same sentence that Shane Longmire had heard.

24   Q.    And, again, you said that you did have your AK-47?

25   A.    Yes.

1    Q.    When you went there that day?

2    A.    Yes.

3    Q.    So you took it from your home, you transported that across

4    the Tennessee-Georgia line, went to Madisonville with that AK-47

5    in your vehicle?

6    A.    I believe transporting is a commercial activity, but it was in

7    my possession when I left my home on April the 20th.

8    Q.    And you took it in your vehicle and you carried it over,

9    through your vehicle, over the state line; is that right?

10   A.    Yes.

11   Q.    And, in fact, you had about three to 400 rounds of ammunition

12   with you at that time, too, AK-47 ammunition; is that right?

13   A.    If I'm being truthful, no.  Three or 400 rounds was a little

14   embellishment.

15   Q.    Well, in fact, when search warrants were done, were you– at

16   the time of your arrest you had about 400 rounds, over 400 rounds

17   of AK-47 ammunition in your truck?

18   A.    In which truck?

19   Q.    Well, that's your utility truck.

20   A.    Okay.  Because that one didn't go to Madisonville.

21   Q.    Okay.  But you had that much in your utility truck?

22   A.    In the utility truck, yes.

23   Q.    And, of course, when the search warrant was conducted of

24   your home, and we know this is ten days after the–

25   A.    Sure.

1    Q.    –the Madisonville, the April 20th incident, that you had over

2    400 rounds of AK-47 ammunition at your home as well?

3    A.    I did.

4    Q.    So you certainly had the capability. You had a lot of AK-47

5    ammunition, you possessed or owned that in some context, right?

6    A.    Yes.

7    Q.    And, of course, when you were in Madisonville and you were

8    kind of working the crowd at Donna's Restaurant, you told them, of

9    course, you bragged about having your AK-47, and you talked

10   about having three to 400 rounds of ammunition in your truck?

11   A.    Well, as you just stated, and the phrase that you used is

12   probably a good one, that I was working the crowd.

13   Q.    Okay. So you don't always– so are you saying you didn't

14   have three to 400 rounds?

15   A.    I am saying that.

16   Q.    How many rounds did you have?

17   A.    I think the FBI could probably attest to what was there. And

18   when Michael had testified, that when he got the flag or the drill

19   out of the toolbox, the only thing he testified seeing is a black case.

20   I would admit that it's the same black case that, when they did

21   come to my home, they took possession of.

22        We've already been through the magazines and how many

23   rounds they hold. That's what Michael saw, was this bag with the

24   little compartments for the magazines on the outside of the bag.

25   And I believe at that time those each had magazines inside of them,

1    which I believe would be four magazines. I can't remember

2    exactly. It's been a while since I've seen that bag, but there were,

3    you know, approximately four magazines in the bag.

4    Q.    Okay. So and how many rounds per magazine? Those were all

5    loaded, of course?

6    A.    Yes, sir. I believe there were– I think those were 30-round

7    magazines.

8    Q.    So you're saying you think you had more like four magazines,

9    30 rounds for each magazine?

10   A.    Yes, sir.

11   Q.    And you're also saying, I guess by that, that you don't always

12   tell the truth, because when you were talking to people at Donna's–

13   of course, we heard it on tape here– you said you had three to 400

14   rounds of AK-47 ammunition?

15   A.    I think we've heard the videotape from the traffic stop and

16   what was said and what was not said.

17   Q.    Okay. So the question was, though, you don't always tell the

18   truth about matters, do you?

19   A.    I may stretch the truth. I think that's called embellishment.

20   Q.    Okay. Well, in fact, when you talked to Special Agent Scott

21   Johnson here, when he interviewed you, you flat out denied having

22   an AK-47 with you on that day; did you not?

23   A.    I did.

24   Q.    Okay. You testified about that yesterday?

25   A.    I did.

1    Q.    In fact, he even told you, before asking you that question,

2    before you said that, that he advised you that making a statement

3    like that, if you're not truthful to him, that's a violation of the law?

4    A.    I don't recall that statement being made.

5    Q.    You don't recall Agent Johnson telling you that if you're not

6    honest with him that can be a violation of the law?

7    A.    I do not recall.

8    Q.    But he may have advised you that?

9    A.    I can't say either way.

10   Q.    Why did you deny to Agent Johnson that you had an AK-47 on

11   April 20th, 2010?

12   A.    I was being interrogated by the FBI for reasons I had no idea

13   about.

14   Q.    They didn't tell you why you were placed under arrest?

15   A.    I was only told that I had a warrant for my arrest.

16   Q.    They told you, in fact, that you were charged with certain

17   offenses; did they not?

18   A.    He may have.

19   Q.    In fact, he advised you of your rights at that time?

20   A.    He may have.

21   Q.    They didn't put– you know, did they take a rubber hose to you

22   or put a big bright light on you or anything like that, did they?

23   A.    No.

24   Q.    They asked you if you wanted to talk to them?

25   A.    Yes.

1    Q.    And you indicated you did?

2    A.    Yes.

3    Q.    And then you proceeded to lie to Special Agent Johnson at

4    that time?

5    A.    Talking to them is one thing. I think it was– I believe it was a

6    total of a six-hour interrogation. Initially, I believe that because

7    this must be some sort of misunderstanding, absolutely, I wanted to

8    talk to him. In fact, to this day, I like Scott Johnson. But there

9    comes a certain point when you realize, wait, hold on, what's going

10    on here? And, frankly, yeah, my, if I could be frank, my butt

11    puckered a little bit.

12    Q.    You were a little scared?

13    A.    Yes.

14    Q.    You were worried that you might get in some more trouble if

15    you indicated you did have an AK-47 at that time?

16    A.    Yes.

17    Q.    You're willing to lie, Mr. Huff, are you not, if you think it can

18    help you out?

19    A.    I panicked.

20    Q.    Are you a little nervous about being here today, been a little

21    bit nervous about these charges?

22    A.    Hopefully, the truth will come out. Yes, I can't lie, I've

23    never– I don't have a criminal record of any sort and, yes, I'm

24    nervous.

25    Q.    And as you indicated, sometimes you're willing to lie if it can

1    help you out. Did you indicate that?

2    A.     You indicated that.

3    Q.     Okay.  Well, let me ask you that. That would seem to indicate

4    to me that you are willing to lie if you think it might help you out?

5              MR. GREEN:   It's been asked and answered, your

6    Honor.  I object.

7              MR. THEODORE:    I don't think I got a direct answer,

8    your Honor.

9              THE COURT:   This is cross-examination. I'll overrule

10   the objection.

11   Q.     You're willing to lie if you think it might help you out; is that

12   true?

13   A.     No, not on the stand.  I'm under oath.

14   Q.     Do you recall telling Shane Longmire that you would not be

15   able to videotape the incident at Madisonville on April 20th as you

16   did on April 1st, you wouldn't be able to videotape on April 20th

17   because you would be on the front lines with your AK-47?

18   A.     I believe Shane Longmire's testimony said that I would be on

19   the front lines with two AK-47s.

20   Q.     Did you say that?

21   A.     Did he say that?

22   Q.     Well, I'm asking did you tell Shane Longmire that?

23   A.     No, I did not. It was obviously a false statement with him

24   saying that I was going to be on the front lines with two AK-47s

25   when I've never owned more than one.

1    Q.    Okay. Well, did you tell him that you would be on the front

2    lines with any AK-47?

3    A.    No.

4    Q.    With one AK-47?

5    A.    No.

6    Q.    You didn't tell him you would be on the front lines with any

7    weapon?

8    A.    On the front lines with any weapon? No.

9    Q.    You did not make that statement to him?

10   A.    No.

11   Q.    Do you recall telling Erica Dupree, as you left, "In case I

12   never see you again, bye"?

13   A.    I can't deny that that statement was made. I don't recall

14   making it.

15   Q.    So you may have made that statement?

16   A.    I can't say if I did or not.

17   Q.    And that's because you were telling her about going there to

18   take over the city and you knew that something could get volatile;

19   is that right?

20   A.    That was a complicated question. Could you rephrase it?

21   Q.    Okay. That's because you knew that you had just previously

22   told her you were going there to take over the city?

23   A.    No.

24   Q.    Okay. Did you tell Shane Longmire and Erica Dupree that

25   you were going to execute citizens' arrest warrants?

1    A.    I did not tell them that I was going to execute citizens' arrest

2    warrants.

3    Q.    Did you tell them that other people were going to?

4    A.    That's possible.

5    Q.    Did you tell them that you were going to join that group?

6    A.    What do you mean by join that group?

7    Q.    That you were going to join– well, you spoke about the

8    entourage on April 1st. Were you going to go to Madisonville to

9    join up with other people who wanted to execute citizens' arrest

10   warrants?

11   A.    Could you rephrase it again?

12   Q.    Let me ask you– I'll ask it this way.  You indicated you were

13   going to Madisonville, and why were you going to Madisonville on

14   April 20th?

15   A.    To support Walter Fitzpatrick.

16   Q.    And part of that support was going to be to execute citizens'

17   arrest warrants against public officials and law enforcement

18   officials?

19   A.    No one was psychic. If the opportunity presented itself, we

20   were there for Walter Fitzpatrick.

21   Q.    Okay.  Well, let me show you what's been admitted– I need

22   Exhibit Nine, please. Do you recognize this document, Mr. Huff?

23   A.    I do.

24   Q.    That's the citizen's arrest warrant that was issued by Walt

25   Fitzpatrick; is that right?

1    A.    I believe so.

2    Q.    In fact, when you were stopped going to Madisonville that

3    morning, when there was a traffic stop by Trooper Michael Wilson,

4    you gave the officers a copy of that citizen's arrest warrant; did

5    you not?

6    A.    It was the– it was my copy that I gave to him, yes. That was in

7    the back seat with other pieces of paper.

8    Q.    And you talked about wanting to execute citizens' arrests; is

9    that right?

10   A.    It wasn't me that was executing anything.

11   Q.    Well, you said that you were going to execute the citizen's

12   arrest; did you not?

13   A.    I did not say that I was going to execute citizens' arrests.

14   Q.    Okay.  Didn't you say– didn't we listen to a tape where you

15   said, "Just as a warning, we fully plan to go forward with those

16   citizens' arrests"?  Do you recall making that?

17   A.    We, as in a group? Me, specifically? No. Again, this is Walter

18   Fitzpatrick's citizen's arrest warrant.

19   Q.    Okay.  And you were including yourself in that group, weren't

20   you?

21   A.    We were there to support Walter Fitzpatrick.

22   Q.    And, in fact, Lieutenant Williams was questioning you about

23   some of the– the people, some of the declared domestic enemies in

24   here.  He went through and started listing some of the officials,

25   well, what have they done and what has this person done, and you

1    said, basically, they have put in a rival government in Monroe

2    County and Madisonville and it was an act of treason, an act of

3    war. Didn't you say that?

4    A.    Something along those lines.

5    Q.    Okay. And he was talking specifically about this citizen's

6    arrest warrant, asking why did you want to go there to arrest these

7    people, and that's what you– you gave him a reason, treason; is that

8    right? You heard the tape.

9    Q.    Sure.

10   Q.    And you said that; did you not?

11   A.    Yes.

12   Q.    And, in fact, you told Lt. Williams that you didn't want to, but

13   you would fight them if you had to?

14   A.    I don't remember the exact words.

15   Q.    Okay. Well, it's on the tape; is it not?

16   A.    It is on the tape.

17   Q.    Okay. Does that sound like something– so you were prepared

18   to fight law enforcement that day; were you not?

19   A.    I don't know that I can honestly answer that question. Again,

20   I'm not psychic.

21   Q.    Well, you told Lt. Williams that you were, that you were

22   prepared to do that?

23   A.    That I was prepared to fight law enforcement? I don't think I

24   said that.

25   Q.    You said prepared to fight you guys, you don't want to have to

1   do it, but you will fight you guys, meaning, presumably, law

2   enforcement?

3   A.    I'm not sure how to answer that question.

4   Q.    Did you tell Lt. Williams that he could be your friend or his

5   enemy?

6   A.    Probably. I am honestly trying to remember exactly what was

7   said on the tape. I know you're here to try to trip me up.

8   Q.    No. I'm just trying to get to the truth of the matter.

9   A.    Sure.

10  Q.    I'd appreciate some honest answers on them, Mr. Huff.

11  A.    I'm trying to give them to you as honestly as I can.

12  Q.    Did you tell Lt. Williams that you were prepared to use your

13  AK-47 to effect the citizens' arrest warrants that day, on April

14  20th?

15  A.    I believe what he testified was that I was prepared to use my

16  AK-47 to defend my life.

17  Q.    I thought he also said to effect the citizens' arrests?

18  A.    I can't recall if that was stated or not.

19  Q.    But you did indicate to him that you were prepared to use your

20  AK-47 in Madisonville on that day, on April 20th, when you got

21  there? You told Lt. Williams that?

22  A.    I'm not sure how to answer that question.

23  Q.    Well, didn't you just say that–

24  A.    To defend my life? Sure. I think that's a basic animal instinct.

25  Q.    Okay. So you told them you were prepared to use the AK-47

1    that day in Madisonville to defend your life; that much you agree

2    on?

3    A.    I would agree with that.

4    Q.    You were pretty adamant during that stop that these

5    individuals on this warrant, this citizen's arrest warrant which you

6    gave them, were domestic enemies?

7    A.    I don't know if I would say adamant.

8    Q.    You believed that?

9    A.    Okay.

10   Q.    Well, I'm asking you.

11   A.    The ones that I know– I don't know who the majority of these

12   people on this arrest warrant are.

13   Q.    Well, you believed, certainly, Mr. Pettway was a domestic

14   enemy; did you not?

15   A.    At the time, yes.

16   Q.    You believed he was guilty of treason?

17   A.    If they have changed the form of government as far as the

18   state constitution, the state statutes, according to the TCA, that

19   they have ignored those. And as Gary Pettway testified, there was

20   one case that said that it was okay; which, as you stated, was a

21   judge's opinion that now, apparently, supersedes the written law;

22   which now I know that written law means nothing, according to

23   what you have stated. At the time, yes, I believe that that is treason.

24   It's changing our form of government.

25   Q.    At that time, you believed Mr. Pettway, grand jury

1   foreperson, just because you thought he might have stayed over,

2   had been appointed too many times, was guilty of treason?

3   A.   A grand jury foreman over two grand juries simultaneously

4   for 28 years? I was under the understanding that a grand jury was

5   comprised of citizens, not government employees.

6   Q.   Mr. Huff, I'm just asking you, so you thought that that was

7   actually a treasonous offense?

8   A.   I did.

9   Q.   Treason's a pretty serious crime, isn't it?

10  A.   It sure is.

11  Q.   As a matter of fact, it's a capital offense, isn't it?

12  A.   It is.

13  Q.   In fact, it's one of the– almost every capital offense requires

14  murder to some degree, except treason. Treason is one where it's

15  not murder and it's a capital offense?

16  A.   I believe so.

17  Q.   So what were you hoping to do? You're declaring all these

18  public officials, trying to execute arrest warrants on them, for

19  treason. What were you hoping, to have them hanged, or what?

20  What were you hoping to do?

21  A.   As I had stated–

22           MR. GREEN:   Objection. I mean, he's going– I've

23  allowed a lot of latitude here, but he's going way far afield. That's

24  not relevant.

25           MR. THEODORE:   He's talking about treason, your

1    Honor.

2              THE COURT:   Why don't you ask him what he was

3    hoping to do?

4              MR. THEODORE:    I'll move on.

5              THE COURT:   All right.  Thank you.

6    Q.    I think it was pointed out, but on the bottom of that citizen's

7    arrest warrant which you were showing the officers, that Section 2,

8    the "Doctrine of non-resistance condemned-that the government

9    being instituted for the common benefit, the doctrine of non-

10   resistance against arbitrary power and oppression is absurd,

11   slavish, and destructive of the good and happiness of mankind."

12             Did you say that– or, I'm sorry. You didn't say that. Did you

13   agree with that statement on the warrant?

14   A.    I actually never read that until you put it up on the thing

15   yesterday.  As I said, when I gave Lt. Williams this document, it

16   was in the back seat with other papers, and I'd only received it a

17   couple weeks prior, and I'm pretty messy in my truck.

18   Q.    Right. And, of course, at the time of your arrest, you had

19   numerous copies of that same citizen's arrest warrant; did you not?

20   A     I don't know if I had numerous copies of that.  There were

21   several papers in a box, correct.

22   Q.    Okay. Citizens' arrest warrants just like that, identical to

23   that?

24   A.    I can't answer.  As I said, there were several papers in a box.

25   Q.    In fact, when you testified about trying to see Sheriff Guider,

1    you were trying to see if he might help you out somehow with this

2    citizen's arrest warrant?

3    A.    All I asked the sheriff and the Cumberland County, I think, as

4    been testified, was also present, all I asked of them was if they

5    would look at the information. In fact, at the time, I think as I did

6    testify, there was an election or something going on, that they

7    didn't have a lot of time.

8          And I believe that it would also be known that there were a

9    couple of business cards in my possession at the time of my arrest,

10   and his was one, where I had asked him if we could possibly set up

11   a meeting the following week so that he could look at the

12   information.

13         Again, as I have testified, I don't know the law. We were in

14   search of someone who did know the law that could look at this

15   information and tell us if we're crazy.

16   Q.    Mr. Huff, it's fair to say that you've kind of gone through a

17   transformation or you did in the months leading up to April 20th,

18   2010, kind of a personal and political transformation; is that right?

19   A.    I wouldn't call it political, but I had come into some more

20   knowledge, I guess.

21   Q.    And you developed a very intense dislike for the federal

22   government, to say the least– is that right– or for the government

23   of any sort, not just federal government; government?

24   A.    No, not at all.

25   Q.    In fact, you even believed that 9/11 was an inside job, I think?

1   A.    I do believe that.

2   Q.    You believe President Obama is the devil; is that right?

3   A.    No.

4   Q.    Didn't you make statements to that effect during your traffic

5   stop?

6   A.    No.

7   Q.    Well, you do believe, of course, when you were working the

8   crowd at Donna's, of course, you were talking about you believed–

9   and you got choked up then, too, like yesterday, but about

10  Caucasians being the chosen people, and you explained all about

11  the Caucasus and whatnot; did you not?

12  A.    Yes.

13  Q.    And that's that you believe?

14  A.    Yes.

15  Q.    When you were with the officers at the traffic stop by Trooper

16  Michael Wilson, did you tell them that you were going to meet up

17  with Oath Keepers and militia members in Madisonville?

18  A.    We had hoped. No one knew who was going to be there.

19  Q.    But that was your plan?

20  A.    There was no plan.

21  Q.    How many did you say that showed up in Madisonville for

22  basically the same purpose you did on April 20th?

23  A.    I cannot answer that, other than the people that I saw in

24  Donna's, which has been testified by several people as around 15.

25  Q.    Maybe 15 to 20 people; would that be fair?

1   A.    Possibly.

2   Q.    And you talked to some people outside of Donna's too?

3   A.    I did.

4   Q.    And, in fact, you told one person outside of Donna's, while

5   standing right outside, that this would be a good day to take over

6   the courthouse because it's raining and they wouldn't expect us to

7   do it today?

8   A.    I don't believe that all of that was stated at all.

9   Q.    Okay. You heard Mike Hall testify, did you?

10  A.    I did.

11  Q.    And did he not say that you said today would be a good day,

12  and he believed you were referencing the courthouse, to take it

13  over, because they don't expect us to do it today?

14  A.    I believe that the video of the traffic stop has not

15  demonstrated one time that I ever made a statement even close to

16  that.

17  Q.    I'm not talking about the statements at the traffic stop. I'm

18  talking when you were standing outside of Donna's Restaurant and

19  you were talking to one of your other supporters, one of these other

20  individuals that came there, and you made that statement outside of

21  Donna's?

22  A.    I have never made a statement about taking over the

23  courthouse, the city, the state, nothing.

24  Q.    Not to Erica Dupree, not to Shane Longmire, not to Don

25  Williams, not to any of those people?

1  A.    No. Again, I'll have to say no.  The video, we watched it

2  yesterday, and Trooper Wilson said that I repeatedly stated it, yet

3  he was mike'd the entire time. It was not stated.

4  Q.    You heard Mike Hall's testimony; did you not?

5  A.    I did.

6  Q.    And you heard him say that you were talking to somebody else

7  and you said today would be a good day to take it over?

8  A.    I never said anything about taking anything over.

9  Q.    And then you noticed and you thought that maybe he might be

10  law enforcement and you asked to go someplace else?

11  A.    I'm sorry. Rephrase the question.

12  Q.    And then perhaps you recognized, you perceived that he might

13  be in law enforcement, and then you asked the person you were

14  talking to to go someplace else?

15  A.    I don't recall seeing Mike Hall at all until he came up here on

16  the stand two days ago.

17  Q.    Were you talking to some of your cohorts out there, outside of

18  Donna's, talking about the situation with the courthouse and with

19  Fitzpatrick?  Were you discussing it with them?

20  A.    We were talking about everything about Madisonville.  I've

21  never seen that many law enforcement officers in one place, except

22  at a parade.

23  Q.    Yeah, there were quite a few, weren't there?

24  A.    There were.

25  Q.    Maybe, I think, as somewhere 50 to 75, maybe?

1   A.   We thought there were a lot more than that.

2   Q.   It was an extremely tense situation; was it not?

3   A.   It wasn't for me.

4   Q.   You didn't sense a tension in the city that day?

5   A.   I believe if I had I wouldn't have gotten out of my truck to

6   walk into Donna's and as a– you know, we're all sitting and cutting

7   up and laughing inside Donna's Restaurant.

8   Q.   Mr. Huff, I realize you want to try to explain everything. I'm

9   just asking you, did you think that it was tense that day?

10  A.   I didn't, not after the traffic stop.

11  Q.   When you were at Donna's, in fact, you went back out to your

12  truck several times; did you not?

13  A.   I recall at least one time going back out to the truck.

14  Q.   And you went into the toolbox of your truck?

15  A.   On the passenger's side, yes.

16  Q.   Okay.  Did you go into the toolbox?

17  A.   I went into the toolbox.

18  Q.   And you retrieved your firearm; did you not?

19  A.   I'm sorry?

20  Q.   Did you retrieve your Colt .45?

21  A.   No, of course, not.  Would you like to hear one of Darren

22  Huff's explanations on that?

23  Q.   Mr. Huff, that's why you have your attorney, so I'm sure he'll

24  try to cover that on redirect.

25  A.   Okay.

1    Q.    Now, Mr. Huff, in the State of Tennessee, of course, you

2    testified people can lawfully do a citizen's arrest?

3    A.    To my knowledge, yes.

4    Q.    There is some authority for doing that?

5    A.    Yes.

6    Q.    You were testifying about that, and I think you even gave an

7    example of a citizen's arrest, somebody's being mugged or

8    something like that, and what did you say?  You gave the example

9    yesterday what you believed to be what you could do?

10    A.    I ramble.  I can't remember exactly what I said.

11    Q.    Didn't you say, well, if you saw somebody being mugged or

12    something of that, assaulted, that a citizen can go and stop that

13    from occurring at that time?

14    A.    Okay.

15    Q.    Did you say that, something like that?

16    A.    All– I can't deny that I said that.

17    Q.    Okay.  Was that your belief, that you can do a citizen's arrest,

18    you can try to stop somebody from, if you see a crime occurring in

19    your presence, you can try to stop that?

20    A.    I would certainly feel obligated to stop someone from being

21    attacked.

22    Q.    And you feel like you would be authorized to do that; is that

23    right?

24    A.    I believe so.

25    Q.    And you could actually restrain that person. If you saw

1    somebody being mugged and you felt you were in a position to stop

2    the assailant, you could actually restrain them and physically hold

3    them, place them under arrest, citizen's arrest?

4    A.    Until law enforcement arrived to take them into custody.

5    Q.    Okay. So, I mean, I think you gave an example of arrest.

6    When you have an arrest, I mean, it assumes, of course, that you're

7    taking physical control of somebody, right?

8             MR. GREEN:   I object to what's assumed. Maybe,

9    perhaps General Theodore could rephrase the question.

10             MR. THEODORE:    I can rephrase the question.

11             THE COURT:   Thank you.

12   Q.    By its terms, Mr. Huff, an arrest is taking custody and control

13   of another person physically?

14   A.    I believe that is two separate acts, being arrested and being

15   taken into custody are two totally separate things.

16   Q.    Well, you could be taken into custody right at the scene of the

17   crime, but it is– Okay. Let's say this. By its terms, it means taking

18   physical control of a person, right?

19   A.    Are you telling me that's what arrest means?

20   Q.    Well, that by its terms it includes that. When you arrest

21   somebody, you are going to take physical control of a person?

22   A.    I don't believe that.

23   Q.    Well, Mr. Huff, I mean, when you were young, did you ever

24   even just watch like cop shows, cop TV shows?

25             MR. GREEN:   Your Honor, I object.

1      MR. THEODORE:   It's cross-examination.

2      THE COURT:   You need to state what the objection is.

3      MR. GREEN:   Well, my objection is, what is the

4   relevance of what he watched on TV? He's answered General

5   Theodore's questions several times as well as he can about what his

6   perception of an arrest is. I guess I'm objecting to relevance at this

7   point. Where are we going?

8      MR. THEODORE:   I'm trying to get his

9   understanding of arrest, your Honor.

10      THE COURT:   I'll overrule the objection.

11   Q.   When you were little, did you ever watch cop shows?

12   A.   I did.

13   Q.   I'm a little bit older than you. I'm in my 50s and stuff, and I

14   watched shows like Dragnet. I think Adam 12 was my favorite one.

15   But I don't know. Did you have any favorites?

16   A.   I remember Adam 12 actually being one of mine, but I was

17   much younger, so I couldn't even tell you anyone's name.

18   Q.   And, of course, you know from even when you were little,

19   even when you were young, you understand what an arrest means.

20   It means taking that– somebody in authority, somebody who has a

21   lawful reason and can take control, physical control, of another

22   person and physically restrain that person?

23   A.   Even at a young age, regardless of what law enforcement

24   show or– back then, the public servants who wore badges, they

25   always said the words "You're under arrest," and it was different

1    from them actually taking physical custody of an individual.

2    Q.    Wasn't just part and parcel of that, you take under arrest and

3    then sometimes put handcuffs on them?

4    A.    For someone with a badge, it probably goes hand-in-hand.

5    Q.    Well, a citizen's arrest, obviously, an arrest can be the same

6    thing. You're going to take physical control of somebody?

7    A.    I didn't have any handcuffs. How would I take custody of

8    someone? We would be fighting all the way to wherever I would be

9    taking them.

10   Q.    Well, you just talked about your example, about, if you saw

11   some type of an assault taking place, you could physically restrain

12   that person?

13   A.    Physically restrain until the law enforcement got there and

14   then placed them under arrest and allow them to take them into

15   custody.

16   Q.    Did you tell the trooper, if you recall, during the traffic stop,

17   that you were at the higher– you were going to secure citizens'

18   arrest warrants, that you were at the higher end of the enforcement

19   end of this, the higher end of the enforcement part of this citizen's

20   arrest warrant?

21   A.    I did state that.

22   Q.    Do you recall having a conversation with Stewart Rhodes

23   (phonetic) about the whole situation in Madisonville and what you

24   were doing there?

25   A.    Yes.

1    Q.    And do you recall telling him that, that you had a meeting

2    with him and it was going dark, you described the meeting as going

3    dark?

4    A.    Yes.

5    Q.    And do you recall Stewart Rhodes asking you why do you

6    want to make Madisonville the flashpoint?

7    A.    Absolutely. That was Stewart Rhodes' question to me.

8    Q.    Right.  Because it was perceived that you– you know,

9    flashpoint is a common word used when referring to a perceived

10   imminent conflict; is it not?

11   A.    That is correct.

12   Q.    And he certainly thought that that was what was going on?

13            MR. GREEN:   I object to what he could have thought,

14   your Honor.  It calls for pure speculation.

15            THE COURT:   I'll sustain that objection.

16   Q.    Did you want to make Madisonville the flashpoint for your

17   cause?

18   A.    Absolutely not.

19   Q.    You heard Mr. Swensson, your witness, testify here today,

20   and he even questioned maybe whether this was a valid federal

21   court; did he not?

22   A.    I remember that.

23   Q.    So this might be a martial court, military court?

24   A.    That is Carl Swensson's impression.

25   Q.    Do you believe the same thing?

1    A.    I don't really know what to believe anymore.

2    Q.    Well, have you ever believed that, because there's gold

3    fringes on that flag, that this is somehow a military tribunal

4    because of that?

5    A.    I don't know that I can even answer that. I do know, from

6    looking in flag books and having people who owned flag

7    companies, who told me that the gold fringe represents admiralty.

8    Q.    Okay. Have you ever thought that to be the case then, that

9    this is a military tribunal because of the gold fringes on that flag?

10   A.    I don't believe this is a military tribunal, no.

11   Q.    Do you believe here today that you're sitting here because of

12   an unlawful grand jury process?

13   A.    I do.

14   Q.    We're not talking about the facts of the case?

15   A.    Sure.

16   Q.    We're talking about the law?

17   A.    I'm not talking about the law. I'm talking about I believe that

18   the indictment itself was flawed.

19   Q.    Well, you believe the whole grand jury process is unlawful;

20   do you not?

21   A.    No, not at all.

22   Q.    If you believe somebody is guilty of treason, do you believe

23   that acts of violence would be justified against those acts of

24   treason?

25   A.    I've never heard of a historical example of anyone who had

1    committed treason that was resulting in a violent result, I guess.

2    Q.    Okay.  The question is, if you think somebody is committing

3    treasonous acts, do you believe it's appropriate for you to resort to

4    violence to oppose that treason?

5    A.    I can't say either way.  I'm not really sure exactly what your

6    question is.

7    Q.    Well, you did believe, of course, you did state that you

8    believed in Madisonville they were instituting a rival, a rival form

9    of government there; did you not?

10   A.    I believe so.

11   Q.    Let me just ask you something.  You indicated that you're a

12   gun enthusiast or that you have a strong like–

13   A.    I like guns.

14   Q.    You're a gun enthusiast, right?  In fact, I think we've already

15   seen, but– so you're family with different type of slang

16   terminology that's used with regard to firearms?

17   A.    A few.

18   Q.    I mean, do you know that firearms are not always– people

19   don't always say firearm or gun; they use other slang terms, right?

20   A.    Those are the ones that I'm familiar with.  I mean, I'm sure

21   there are others.

22   Q.    People talk about carrying a piece?

23   A.    Sure, sure.

24   Q.    A heater?

25   A.    If you're Al Capone.

1    Q.    Okay. Steel?

2    A.    I've actually never heard that used.

3    Q.    If a gun can fire automatically, it's a rock 'n roll? Have you

4    heard of that?

5    A.    I haven't.

6    Q.    Do you know that pulling out, sometimes pulling out the

7    muscle, means firearms?

8    A.    Again, I guess it would depend on the context.

9    Q.    Okay.  But that is a common slang term; is it not?

10   A.    I can't– I have no idea.

11   Q.    Let me ask you, when you were talking to the officers at the

12   traffic stop on April 20th when Trooper Wilson stopped you and

13   you made statements to the various officers there, were you being

14   honest with them?

15   A.    I mean, I– I'm not sure what, what the question is.

16   Q.    The question is, whether you were being honest with them

17   when you were talking to them.

18   A.    I would answer that by saying I was being sincere. I mean,

19   again, as I've testified and everyone in this courtroom is aware, I

20   ramble and sometimes I don't take a breath.

21   Q.    And you had your .45 with you because ain't no Government

22   official going to go peacefully?

23   A.    I remember saying that.

24   Q.    Do you think that if Madisonville had instituted a rival

25   government, or Monroe County had, that acts of violence would be

1  justified to oppose that?

2  A.    No.

3  Q.    Didn't you more or less indicate that to the police officers?

4  A.    I think what we did indicate, and I'd said it in several other

5  places, is that whoever we were going to approach, whoever Walt

6  intended to arrest, was still an American and deserved a trial.  That

7  was the whole point of a citizen's arrest, instead of a shoot-out,

8  like you guys are trying to paint it as.

9  Q.    You know, Mr. Huff, you keep saying that Walt was trying to

10  do these arrests. You were going there to help him execute these

11  citizen's arrest warrants; are you denying that?

12  A.    I'm not denying anything. Again, I'm not psychic. We went

13  there to support Walt in any capacity that we could offer the

14  support.

15  Q.    Which meant executing, helping him execute, citizens' arrest

16  warrants.  That was what you were there to do.  Are you denying

17  that?

18  A.    I'm not denying it.

19           MR. THEODORE:    Nothing further, your Honor.

20           THE COURT:  Thank you. Redirect?

21           MR. GREEN:  Briefly, your Honor.

22                    **REDIRECT EXAMINATION**

23  by Mr. Green:

24  Q.    Mr. Huff, there were some questions asked of you about

25  statements that you made at the roadside, at the roadside stop?

1   A.   Yes.

2   Q.   Do you recall also making the statement to Trooper Wilson

3   that, "The FBI came to my house last night and we don't intend any

4   violence"?

5   A.   Yes.

6   Q.   Do you recall also making the statement that you were only

7   aware of one other person that was coming up?

8   A.   Yes.

9   Q.   Do you recall also telling the trooper that you would call that

10  person, let him know what was going on after you talked to these

11  officers, correct?

12  A.   Yes.

13  Q.   Do you recall telling these officers, well, just as we heard on

14  the tape, that we're all on the same side?

15  A.   Yes.

16  Q.   And about the gun, did you tell them that you would honor

17  their request to keep it in that toolbox, like we heard on the tape?

18  A.   Yes.

19  Q.   Do you recall also telling the officers, as we heard on tape,

20  that we're not looking for trouble?

21  A.   Yes.

22  Q.   That we're not looking to give Oath Keepers a bad name?

23  A.   Yes.

24  Q.   All of which, of course, we heard on tape, correct?

25  A.   Yes.

1   Q.    Mr. Theodore showed you some– a business card of yours.

2   When was that made, before or after you were arrested in this case?

3   A.    Certainly after. I believe maybe four to six weeks ago.

4   Q.    All right. Have you also made some t-shirts about your– that

5   relate to your arrest in this case?

6   A.    Yes.

7   Q.    Tell the jury about some of the t-shirts that you made.

8   A.    Because of my restricted employment, it's kind of hard to find

9   a job when you're under federal indictment. So about for six or

10  seven months I had to beg just to put food on my table. I refuse to

11  be intimidated, and as Mr. Theodore liked to show or tried to show,

12  that I'm proud to be in this position, and I'm the furthest thing

13  from it.

14        But all I could do was still have a voice. And I had a friend

15  who had a t-shirt shop, and I said, can you make me a couple of

16  shirts? Because, apparently, this government wants to label me.

17  The first one that he had me made– that he made for me said, "I am

18  the God-fearing, gun-toting, flag-waving, right-wing extremist the

19  government warned you about."

20        And the other one said, "I finally made Homeland Security's

21  Potential Domestic Terrorist Watch List, and all I got was this

22  lousy t-shirt." Obviously, the point behind them was for humor,

23  and they have been received as such. Another one that was one of

24  my initial shirts said, "Patriotism is not a spectator sport."

25        (Witness crying.)

1    Q.    Your words have gotten you in a lot of trouble. Have you ever

2    done anything in response to those words?

3    A.    I'm not sure I understand the question.

4    Q.    We've heard a whole lot about your words. Have you ever

5    committed the first act against anybody in this case?

6    A.    Never.

7              MR. GREEN:   That's all.

8              THE COURT:   Thank you. Any recross?

9              MR. THEODORE:    Just briefly, your Honor.

10                   **RECROSS-EXAMINATION**

11   by Mr. Theodore:

12   Q.    You said those t-shirts, you had those t-shirts made, Mr. Huff;

13   is that right?

14   A.    Yes.

15   Q.    You weren't the least bit embarrassed about having being

16   characterized as a right-wing extremist?

17   A.    Should I have crawled under a shell?

18   A.    I'm just asking you. You weren't embarrassed about it?

19   A.    This is the most humiliating thing I have ever gone through,

20   Mr. Theodore.

21   Q.    In fact, you have called yourself a potential domestic

22   terrorist?

23   A.    My government has called me a potential domestic terrorist.

24   Q.    And on your business card you display yourself as a potential

25   domestic terrorist. That's how you define yourself?

1    A.    That is how the Government defines me, Mr. Theodore.

2    Q.    And then you put it on your business card?

3    A.    Can I run from that?

4    Q.    You could deny it.

5    A.    How could I deny it? I am a veteran, I am a Christian.

6    Q.    That's not what it is. You know, of course, what a terrorist is?

7    A.    I do.

8    Q.    And you have labeled yourself a potential domestic terrorist.

9    That's how you labeled yourself on your own business card?

10   A.    According to the media, and Henry Kissinger in specific, in

11   2007 says, what we in America call terrorists are really just people

12   who reject the international system.

13   Q.    You said, in response and further elaborating on that, on your

14   business card, as the jury has seen, "As featured in Time

15   Magazine," and that article talks about–

16          MR. GREEN:  This has been asked and answered.  It

17   was covered on cross, your Honor. I object.

18          MR. THEODORE:   I think I did. I'll move on.

19          THE COURT:  Thank you.

20   Q.    Why did you bring the AK-47 with you?

21          MR. GREEN:  Object, your Honor.  That's beyond the

22   scope of recross– or redirect.

23          THE COURT:   Well, what does it relate to on the

24   redirect? I mean, we've talk about this on cross.

25          MR. THEODORE:   Well, he indicated he's never done

1    anything, your Honor, never done anything wrong, never had any

2    bad intentions. Mr. Green went through a litany of things that he

3    indicated he had not done. I think it's a fair response to that

4    question, your Honor.

5                MR. GREEN:   Well, no, the questions on redirect, your

6    Honor, were, "Your words have gotten you in a lot of trouble, have

7    your actions– have you done any act?"

8                THE COURT:   And what do you want to ask?

9                MR. THEODORE:   I just want to ask why he brought

10   the AK-47 and 120 rounds of ammo with him–

11               MR. GREEN:   Object. It was covered on cross, your

12   Honor. I object.

13               THE COURT:   I think we did cover that on direct. I'll

14   sustain the objection.

15               MR. THEODORE:   Nothing further, your Honor.

16               THE COURT:   All right. Thank you. Why don't we

17   take our morning break at this time, and so we'll allow the jury to

18   be excused for a 15-minute recess.

19        (Jury recessed at 10:25 a.m.)

20               THE COURT:   Mr. Green, do you have anything

21   further?

22               MR. GREEN:   No, your Honor.

23               THE COURT:   All right. So the Government– we'll do

24   this in front of the jury, but the Defendant will rest at this time?

25               MR. GREEN:   Yes.

1      THE COURT:   Does the Government have any rebuttal

2    testimony?

3      MR. THEODORE:   Your Honor, we have one rebuttal

4    witness.

5      THE COURT:   Mr. Huff, you can step down. Everyone

6    else can be seated if you would like.

7         (Witness excused.)

8      THE COURT:   Let me just give counsel a chance to talk

9    for a moment.

10        (Discussion between defense counsel and government counsel

11   had off the record.)

12      THE COURT:   Do you all want to talk about this during

13   the break?

14      MR. GREEN:   We may need to address a couple of

15   matters about what the Government wants to bring up in rebuttal,

16   your Honor.

17      THE COURT:   Can we do that now?

18      MR. GREEN:   I'm fine doing that now.  I'd rather

19   address it now.

20      THE COURT:   Go ahead.

21      MR. GREEN:   I mean, do we need to talk some more?

22      MR. THEODORE:   No.

23      THE COURT:   All right.  Who does the Government

24   intend to call as a rebuttal witness?

25      MR. THEODORE:   Well, your Honor, actually, we

1    have two.  We have Steve Bebb, who will testify just briefly, and

2    then we would have Police Chief Breeden, Greg Breeden, from the

3    Madisonville Police Department.  What we want to do, your Honor,

4    is actually put in at least a portion of a call that Erica Dupree made

5    to Chief Breeden regarding this incident.

6         We think that Erica Dupree's credibility has been called into

7    question by the Defendant's testimony here, and we want to put in

8    the tape, and that would be a prior consistent statement. He said

9    that she's being untruthful, and I think a prior consistent statement

10   would be appropriate, your Honor, and we could provide some

11   cases perhaps on the break.

12        MR. GREEN:   Your Honor, there's two fundamental

13   problems with the Government's position on this.  First and

14   foremost, it is not proper subject for rebuttal because I, as Mr.

15   Huff's attorney, did not elicit from him that Ms. Dupree was being

16   untruthful.  That was elicited during the Government's cross-

17   examination.

18        THE COURT:   Does that make that– does that make it

19   not proper rebuttal?

20        MR. GREEN:   Sure, it does. You can't set up a straw

21   man, just to knock him down, your Honor.  I mean, that is

22   fundamental stuff.  Secondly, the fact is, what Mr. Theodore asked

23   Mr. Huff was, so she lied when she testified.  That was the question

24   that was put.

25        Now they're wanting to come back and play a phone call that

1    she made to the chief of police, which is clearly hearsay. It's an

2    out-of-court statement that they're wanting to use to prove the

3    truth of the matters asserted therein. That is classic hearsay.

4              THE COURT:   All right. Any further response?

5              MR. THEODORE:    Yes, your Honor. Well, first of all,

6    Erica Dupree testified very consistently with Shane Longmire. She

7    said the same thing, and that was brought out on direct. And the

8    fact that– he talked about what he was saying at the bank first.

9    They brought up that whole topic.

10        The fact that we got into it, now he says that she was not

11   making truthful statements, clearly, it's relevant, your Honor. It's

12   not setting up a straw person. But now I think there is a good

13   reason to show a prior consistent statement and it should come in.

14             MR. GREEN:   But what they did, your Honor, is they

15   set it up by talking about what her testimony was when this man

16   was on the stand.

17             THE COURT:   I understand that, I understand that's the

18   argument. If anyone wants to supply me any case law during the

19   break, I'll take a look at it and reach a decision. What about Mr.

20   Bebb, is there any issue about his testifying as a rebuttal witness?

21             MR. GREEN:   Well, I guess my question is, is he going

22   to rebut– I don't know for what purpose they can put Mr. Bebb up

23   there, General Bebb up there. Is he going to be offering some form

24   of expert opinion? I mean, I don't know what he could testify to.

25        And I'm going to interpose the same objection if, in fact, they

1    have set up a straw man by their repetitive showing of this

2    document, civil arrest, the civil arrest warrant, and they're going to

3    use General Bebb simply to say here's what the law is in

4    Tennessee. We're going to object to that.

5              THE COURT:   All right. Mr. Theodore?

6              MR. THEODORE:   Yeah, it's come up by the Defense,

7    even that. In fact, they wanted the jury instructions on citizen's

8    arrest and the authority to do citizens' arrests. They have made that

9    an issue in this case, your Honor.

10         It was talked about, I believe, on opening statement, it's been

11   talked about by several witnesses, people have been cross-

12   examined about that by the Defense, asking them about, well, it is

13   lawful to do citizens' arrests.

14         I think it's fair for us now to put it in context, and we plan

15   calling Mr. Bebb to testify about the lawful authority of the

16   citizens' arrest warrants, your Honor.

17             MR. GREEN:   And, of course, I guess it would not

18   matter since it's rebuttal, but I was never given any notice that Mr.

19   Bebb was going to be offered as an expert. I guess, if the Court's

20   going to allow that, I would ask that I be allowed a little latitude to

21   explore his opinions. Because, apparently, they're tendering him as

22   an expert.

23             MR. THEODORE:   And, your Honor, Mr. Green's

24   right, it doesn't matter, because it's a rebuttal. We're not required,

25   under Rule 16, to provide any type of a notice. He doesn't have any

1    reports or examinations or anything like that. He's just going to

2    give testimony on it. It will be very short to that. That's all, your

3    Honor.

4               MR. GREEN:   But I guess I'm asking, is he going to

5    offer an opinion as an expert?

6               THE COURT:   Well, if I hear the Government or Mr.

7    Theodore saying, that he's going to offer opinion testimony on the

8    validity of these particular arrest warrants; is that correct?

9               MR. THEODORE:   That's right, your Honor.

10              THE COURT:   You're saying if he does so testify you

11   want latitude on cross-examination to explore those opinions? Is

12   that what you're saying?

13              MR. GREEN:   I'd like to be able to cross-examine him

14   about the validity of the arrest–

15              THE COURT:   If he testifies and if he offers opinions,

16   then you'll be able to cross him on those opinions.

17              MR. GREEN:   That's all I'm asking.

18              THE COURT:   Let's take a break. I'll let you know

19   about a ruling on Mr. Breeden's testimony. As I understand, it, the

20   Government wants to put the Madisonville Police Chief on the

21   stand, Mr. Breeden, for rebuttal to play the tapes of the telephone

22   call between him and Ms. Dupree?

23              MR. THEODORE:   That's correct. And not even the

24   entire tape; just a portion of it, because it goes on to other things.

25   But it would be about a three-and-a-half-minute tape, your Honor.

1          MR. MACKIE:    And, your Honor, as to the fact that

2     Ms. Dupree had a prior consistent statement as to statements made

3     by Mr. Huff in the bank that caused them to take actions.

4          THE COURT:    I understand what you want him to

5     testify about. All right. Let's take a break. Thank you.

6          (Recess had 10:33 a.m.; reconvened without jury 10:53 a.m.)

7          THE COURT:    Mr. Mackie, do you have anything

8     further to add?

9          MR. MACKIE:    Excuse me, your Honor?

10         THE COURT:    You were at the podium. I didn't know

11    if you had anything further. We're going to proceed forward. Let

12    me go ahead and address the matters we took up before.

13         All right. The Government wishes to call two witnesses in

14    rebuttal, one, District Attorney, Steve Bebb, to testify about the

15    issue of the citizens' arrest warrants. Certainly, the warrants were

16    discussed during Defendant's case or presentation of evidence with

17    at least two witnesses, Mr. Swensson and Mr. Huff.

18         As noted, the Defendant also has a jury charge the Court has

19    under consideration dealing with citizens' arrest warrants. Counsel

20    for the Defendant argues that if General Bebb is to testify about

21    any opinions regarding arrest warrants, which the Government

22    states would be very short testimony, that full cross-examination

23    of those opinions should be allowed, which the Court would agree

24    and would find that such limited testimony to be proper rebuttal

25    evidence.

1    The Government next wants to call the Madisonville Police

2    Chief, Gary Breeden, for the limited purpose of playing a tape of a

3    portion of a telephone call from Ms. Dupree to Mr. Breeden

4    relating to what she was told by the Defendant, Mr. Huff. The

5    Defendant objects based on arguing that it is not proper rebuttal

6    testimony and also, in response to the Government's evidentiary

7    basis for admitting the statement, that it would be hearsay.

8    The Court, in answering the question as to proper rebuttal and

9    hearsay, at the same time, the Court looks to Rule 801(d)(1)(B) as

10   the stated basis for admission of the statement as a prior consistent

11   statement not constituting hearsay.

12   Normally, a witness may not be corroborated by proof of prior

13   statements consistent with the witness' testimony. However, Rule

14   801(d)(1)(B) permits a prior statement by a witness that is

15   consistent with the witness's testimony and that is "offered to

16   rebut an express or implied charge against him of recent

17   fabrication or improper influence or motive."

18   And in considering the arguments of the parties, the Court

19   does find that the statement that the Government wishes to issue on

20   rebuttal does fit within the definition of non-hearsay as a prior

21   consistent statement, specifically the declarant, that being Ms.

22   Dupree, did testify at trial on the subject of cross-examination

23   concerning the statement.

24   The statement, based upon the Government's proffer, is

25   consistent with the declarant's testimony, and as further argued by

1    the Government, whether it was during direct or cross-

2    examination, the fact remains during the presentation of the

3    Defendant's case the charge was made of, in effect, recent

4    fabrication by Ms. Dupree; i.e., that she was untruthful on the

5    witness stand.

6         So the statement sought to be offered by the Government does

7    appear to fall squarely within the definition of non-hearsay

8    statement, as set forth in Rule 801(d)(1)(B), and, again, by its

9    nature, is offered to rebut a charge of recent fabrication and,

10   therefore, would be proper rebuttal.

11        I assume, Mr. Theodore, Mr. Mackie, that would be the extent

12   of Mr. Breeden's testimony, simply to–

13        MR. MACKIE:   Yes, your Honor. If I may, just to make

14   sure that we are on the same page, and I want to follow the Court's

15   ruling, General Bebb would also testify now, consistent with the

16   Court's ruling, and what I believe I would argue to the Court is

17   non-hearsay, that he took actions to cause a police presence on

18   April 20th, based upon information he received that a bank teller

19   had called in and said that there was– that Mr. Huff had made

20   threatening statements.

21        MR. GREEN:   Well, I'm not sure what they're going to

22   be asking General Bebb. If they're going to ask him that did he take

23   certain actions or did he know that Erica Dupree called in,

24   therefore, he did "XYZ"?

25        MR. MACKIE:   Your Honor, I would ask him what

1    prompted the law enforcement's presence that day, and he'll say

2    two things; he had monitored the websites of Mr. Fitzpatrick and

3    that Chief Breeden had informed him that a bank teller had called

4    in that said Mr. Huff had made threatening statements about

5    coming that day, on the 20th; not the contents of the statement, but

6    that–

7              MR. GREEN:   I'm sorry. My mind is trying to go about

8    five places at once. I'm sorry. If Mr. Mackie could repeat what

9    they're attempting to elicit.

10             THE COURT:   You may again, Mr. Mackie. You want

11   Mr. Bebb, in addition, to testify, you want him to testify about two

12   things now. One is about the arrest warrant, the citizen's–

13             MR. MACKIE:    The arrest warrant, yes.

14             THE COURT:   And then, the second thing, you want

15   him to testify that he took action to cause a police presence on

16   April 20th because of one– or state that again?  That's what you

17   were stating.

18             MR. MACKIE:    One, that they and he had monitored

19   Mr. Fitzpatrick's website, which called upon people to come that

20   day, on the 20th; and he was informed by Chief Breeden that a bank

21   teller had called in to say that Mr. Huff had been making

22   threatening statements about coming to Madisonville on the 20th.

23             MR. GREEN:   I'm sorry. I don't see how that comes in

24   through General Bebb.  Isn't that double hearsay?

25             MR. MACKIE:    It's not hearsay in the sense it is what

prompted them to do something. He received information that
caused him to do further actions.

MR. GREEN:   And I think he can testify "I did XYZ
because I received information from law enforcement." But to say
that I received a complaint that Erica Dupree told me the
following, that's double, if not triple, hearsay. And they're getting
ready to attempt to prove it through Chief Breeden anyway. We
object.

THE COURT:   What about the monitoring of the
website? What's the Defendant's position about that, stating that
he took action based upon his monitoring of Mr. Fitzpatrick's
website?

MR. GREEN:   Mr. Fitzpatrick is not on trial, your
Honor. We'd object.

THE COURT:   All right. Was there any testimony
about this defendant monitoring the website or– I don't recall if
there was any. Has there been any testimony about Mr.
Fitzpatrick's website during Defendant's case?

MR. MACKIE:   No. That was in the context of him–
that was in the context of the two reasons that he caused law
enforcement presence that day, on the 20th.

THE COURT:   Let's back up to its root. What
testimony does that rebut? We're in rebuttal stage. We're not
calling General Bebb as a witness in the Government's case-in-
chief. What are we attempting to rebut here?

1       MR. MACKIE:    To rebut that Ms. Dupree never said

2   anything like that and this is– he received information that Ms.

3   Dupree had made that statement, which prompted him to take

4   action.

5       THE COURT:   Anything further by either side on that

6   point? Mr. Green, do you want to respond any further?

7       MR. GREEN:   We object to it, your Honor.

8       THE COURT:   The stated purpose of Mr. Bebb's

9   testimony about the police presence is to, in effect, offer a second

10  witness rebutting the charges of fabrication as to Ms. Dupree.  The

11  Court has ruled that Mr. Breeden may be presented for that

12  purpose.

13      The Court would, therefore, one,  find Mr. Bebb's testimony

14  on that point to be cumulative. But, further, the Court does believe

15  that, using Mr. Bebb to talk about what Mr. Breeden told him about

16  Ms. Dupree does raise additional hearsay concerns or layers of

17  hearsray such that his testimony ultimately related about what Ms.

18  Dupree said does not fit squarely within the definition of non-

19  hearsay set out in Rule 801(d)(1)(B), and, therefore, would sustain

20  the Defendant's objection to that portion of Mr. Bebb's testimony.

21      MR. MACKIE:    Yes, your Honor. Lastly–

22      THE COURT:   And if you want to discuss that with Mr.

23  Bebb before he takes the witness stand–

24      MR. MACKIE:    I certainly will, your Honor.

25      THE COURT:   –very quickly, you can. So Mr. Bebb's

1    testimony is going to be limited to rebuttal testimony about the

2    citizens' arrest warrants; Mr. Breeden's testimony is going to be

3    limited to Rule 801(d)(1)(B) testimony about the call he received

4    from Ms. Dupree.

5         Now, where are we next?

6              MR. MACKIE:   Well, your Honor, if I may, as far as

7    General Bebb's testimony–

8              THE COURT:   Go ahead.

9              MR. MACKIE:   –in terms of rebuttal, we will not get

10   into the issue about what prompted that. But I believe the

11   Defendant testified pretty clearly that he didn't think it was tense

12   that day, he didn't think anything was threatening. And Mr. Bebb

13   can testify as to his personal observation of people in the town that

14   day with weapons and it was a tense situation.

15             THE COURT:   So he–

16             MR. MACKIE:   Personally observed that.

17             THE COURT:   Mr. Green?

18             MR. GREEN:   Just as long as I can cross-examine him

19   about it.

20             THE COURT:   All right. That's fine. If he was there and

21   he personally observed, he could be offered to rebut the

22   Defendant's testimony as to the– his testimony regarding the tense

23   or lack of tensefulness with respect to that situation. All right.

24   Who is your first witness?

25             MR. MACKIE:   Yes.

1          THE COURT:   Who do you all want to call first?

2          MR. MACKIE:    General Bebb. And I will step out to

3    advise him.

4          THE COURT:   Right. And we'll be bringing the jury in.

5    Are they right out here, lined up?

6          COURTROOM DEPUTY:   Yes, sir.

7          THE COURT:   All right. We'll wait then, we'll wait

8    until the attorneys come back. General Bebb, we'll go ahead and

9    put you on the witness stand before our jury comes in.  Mr. Green,

10   when the jury comes in, we'll allow you to rest in front of the jury

11   on Defendant's case. So let's go ahead and bring our jury in.

12         MR. GREEN:   Your Honor, we're going to need to do a

13   motion once we rest, we should have.

14         THE COURT:   All right. You're right about that.  Do

15   you want make or renew your Rule 29 motion?

16         MR. GREEN:   Yes, I do.

17         THE COURT:   Defendant, having rested. We'll let the

18   record reflect you're renewing that motion, and we'll wait until

19   after rebuttal evidence, allow you, if you want to argument further

20   on it.

21         MR. GREEN:   Okay.

22         THE COURT:   Is that all right with everybody?

23         MR. THEODORE:    Yes.

24      (Jury reconvened in courtroom at 11:07 a.m.)

25         THE COURT:   All right.  Thank you. You may be

1    seated.  Before we swear in the next witness, Mr. Green, the

2    Defendant, Mr. Huff's counsel, informed the Court that, at the

3    conclusion of Mr. Huff's testimony, that the Defendant rests with

4    respect to his case-in-chief?

5             MR. GREEN:   We do rest, your Honor.

6             THE COURT:   All right.  So the Defendant rests at this

7    time. The Government has now indicated it wishes to call two brief

8    rebuttal witnesses, so, Ms. Norwood, if you will, swear in our

9    witness, please.

10            COURTROOM DEPUTY:   Do you solemnly swear your

11   testimony will be the truth, the whole truth, and nothing but the

12   truth, so help you God?

13            MR. BEBB:  I do.

14            COURTROOM DEPUTY:   Would you please state and

15   spell your name for the record?

16            THE WITNESS:   My name is Robert Steven Bebb; last

17   name is B-e-b-b.  I go by "Steve," not "Robert."

18            MR. MACKIE:  May I proceed, your Honor?

19            THE COURT:  Yes, please do.

20                      **DIRECT EXAMINATION**

21   by Mr. Mackie:

22   Q.    Do I address you as General Bebb?  Is that correct?

23   A.    I really– I don't even allow my staff to do that.  I tell them to

24   call me "Coach."  It's the only title I ever had I liked.

25   Q.    What's your position?

1    A.    I am District Attorney General for the Tenth Judicial District,

2    comprised of McMinn, Monroe, Bradley and Polk Counties.

3    Q.    And, sir, if you could speak into the microphone, it will help

4    me out.  Thank you. So does that cover– I think you said, Monroe

5    County is in that, and the county seat of that is what town?

6    A.    Madisonville.

7    Q.    Were you the District Attorney General for that district in

8    April of 2010?

9    A.    I was.

10   Q.    Were you aware of events that occurred on April 1st relating to

11   an attempted, quote, arrest of the grand jury foreman, Mr. Pettway?

12   A.    Yes. I was in Madisonville that day.

13   Q.    And you personally were aware of the events that were

14   happening that day?

15   A.    I was

16   Q.    And what, from your personal knowledge, was the– you

17   understood the basis of this arrest?

18   A.    That Mr. Fitzpatrick wanted to arrest the grand jury foreman

19   because he wouldn't allow him to indict President Obama for

20   treason.

21   Q.    And where did you understand this occurred?

22   A.    In Monroe County Courthouse, at the grand jury.

23   Q.    Now, I'm going to show you– well, I'm going to show you

24   Government's Exhibit Two in just a moment.  Did you understand

25   from being there that day what was considered to be the basis for

1    the arrest of the grand jury foreman?

2    A.    You mean from Mr. Fitzpatrick?

3    Q.    Right.

4    A.    That he would not allow him to testify about that Obama was

5    not a citizen and he should be indicted for treason.

6    Q.    And I'm going to show you Government Exhibit Two, which

7    has been admitted into evidence as a– called a citizen's arrest

8    warrant that Mr. Fitzpatrick, looks like, it says, filed in the clerk's

9    office on April 1st.  I want to ask you, before you were the District

10   Attorney General– well, let me ask you, how long have you been

11   District Attorney General?

12   A.    I was elected in 2006, so five years.  Too long, anyway.

13   Q.    And prior to that time what was your experience?

14   A.    From 1975 to 1980– post '82, I was Assistant District

15   Attorney, which was then the 24th Judicial District.  Then I was

16   elected criminal court judge there in 1982 and served in that

17   capacity for 23 years, four months and two days.

18   Q.    Not that you're counting the time.  But in that length of

19   experience as a district attorney and as the judge, have you dealt

20   with issues relating to arrest warrants and the concept of the

21   citizen's arrest?

22   A.    Constantly, arrest warrants. Very rarely have I ever heard of a

23   citizen's arrest.

24   Q.    All right. So, in terms of arrest warrants, are you familiar,

25   both as a judge and as a district attorney, as to what are the

1  procedures involved in terms of issuing an arrest warrant?

2  A.  I am very familiar with those.

3  Q.  And, to your knowledge, can a citizen draw up on their own an

4  arrest warrant and enforce it?

5  A.  No, not under the Rules of Criminal Procedure in Tennessee.

6  A citizen may make an affidavit that would lead to an arrest

7  warrant, but the arrest warrant has to be issued by a magistrate to

8  an officer.

9  Q.  Is that pursuant to statute?

10  A.  That's pursuant to Tennessee Rules of Criminal Procedure.

11  Q.  In this state is there some form of a citizen's arrest statute?

12  A.  Stems from the old common law concept of citizen's arrest

13  and has been codified in Tennessee many years ago.  I have never

14  had the experience of anybody making a citizen's arrest, but it's

15  apparent to me today that a citizen's arrest would be without a

16  warrant.

17  Q.  Now, to do a citizen's arrest, is there any– does there have to

18  be some sort of basis for it or can you do it for any reason?

19  A.  It would have to be by the same basis that an arrest warrant

20  would be issued, and that is that the person must have a reasonable

21  basis to believe that a state law has been violated and that that the

22  defendant or accused has violated that law.

23  Q.  And is that, when you say a reasonable basis, a reasonable

24  basis of a specific–

25  A.  Specific state crime.

1    Q.    I'm going to ask you to look at Government's Exhibit Two.

2    This, let's talk about the substance to begin with.  This lists certain

3    persons as declared domestic enemies, basically for treason.  As a

4    basis, do you believe, just in substance, does this have any validity

5    under Tennessee law?

6    A.    None.

7    Q.    Why not?

8    A.    Treason is a federal crime.

9    Q.    So that's, as a fundamental basis at least, it has to state a state

10   crime?

11   A.    Yes, sir.

12   Q.    Allege a state crime.  How about the format just itself, being

13   issued by a person with a notary?

14   A.    A notary is not a magistrate.  A magistrate would be a judge

15   or person designated that was a detached magistrate that can make

16   a decision based upon probable cause and reasonable basis for that

17   probable cause.

18   Q.    From your personal knowledge, was it your– what was your

19   understanding as to whether Mr. Fitzpatrick had previously

20   attempted to get an indictment and an arrest warrant on the

21   president and various other persons named in this?

22   A.    I know that he had tried to get in the grand jury before.

23   Q.    And had he been successful?

24   A.    I think the grand jury met with him, the three members of the

25   grand jury, as required under law, to hear what his complaint was,

1    and they decided, I guess, based on advice from my office, that it

2    was not a state crime and they refused to hear it.

3    Q.    So, in your opinion, is this citizen's arrest warrant a valid

4    alternative to a grand jury indictment and arrest warrant by a

5    judge?

6    A.    It is not.

7    Q.    Let's move ahead to– because you testified these events

8    occurred on April 1st with the arrest of the grand jury foreman.

9    Were you aware of whether there was a successive event relating to

10   Mr. Fitzpatrick and also Mr. Huff that month?

11   A.    Well, with Mr. Fitzpatrick it was constant.

12   Q.    And were you aware, on April 20th, of events happening in

13   Madisonville?

14   A.    I was. I was present.

15   Q.    You were present that day?

16   A.    Yes.

17   Q.    And did you have personal observations as to what was going

18   on?

19   A.    Yes, I did.

20   Q.    Can you describe whether it was a calm day, a tense day, and

21   what made you think either way?

22   A.    I've lived there many years, and this was the tensest day that

23   we've ever had. There were armed people walking the streets that

24   were not law enforcement officers; and, of course, we had law

25   enforcement officers present everywhere.

1  Q.    And can you describe whether– the number and what you saw

2  people doing?

3  A.    I saw people loading– I saw one man loading a gun in a

4  parking lot near the jail. And I saw other people who had arms, and

5  they were walking along, looking at buildings, because we had law

6  enforcement people on these buildings for–

7           MR. GREEN:   Your Honor, I'd respectfully object.  I

8  mean, the general told the Court during the break what the basis of

9  questioning General Bebb was, about the events of the 20th and the

10  atmosphere.  He's testified it was tense, but I believe he's going

11  way beyond the scope of what the Court had ruled that he could get

12  into.

13           MR. MACKIE:   Your Honor, I believe it's a appropriate

14  description why he considered that a tense day.

15           THE COURT:   Well, I believe I ruled he can testify his

16  observations as to forming his opinion as to whether it was a tense

17  day, but let's just kind of keep it within, you know, that subject

18  matter.  Looks like he's already done that, so–

19           MR. MACKIE:  Yes.

20  Q.    I mean, so just on that basis can you describe the numbers of

21  people there both in terms of persons and law enforcement?

22  A.    Well, there were a lot of citizens present on the streets that

23  were a lot of people I didn't know, carrying guns, and there were

24  probably– we probably had a hundred law enforcement officers in

25  the area.

1    Q.    And you were there that day in what capacity?

2    A.    Well, their district attorney, but I was sort of coordinating

3    law enforcement effort as far as gathering the law enforcement

4    officers there.

5    Q.    And at that day, in terms of your sense, can you describe

6    whether you believed it was peaceful or there could have been a

7    confrontation?

8    A.    I was worried there would be a confrontation, and I was

9    worried there would be citizens or anybody injured.  Very tense.

10                MR. MACKIE:   Nothing further, your Honor.

11                THE COURT:   Thank you. Cross-examination?

12                        **CROSS-EXAMINATION**

13    by Mr. Green:

14    Q.    Good morning, General.

15    A.    Coach.  By the way, whoever made this large enough for me to

16    see, I appreciate that.  I was squinting.

17    Q.    I think you and Randy Nichols are the only two people I

18    know, since I've got you under oath, that have ever left the

19    criminal court bench to go become a D.A.

20    A.    I was crazy.  I don't know what his excuse was.

21    Q.    He might be able to use that same line. Now, you've been the

22    district attorney since '06?

23    A.    Yes, sir.

24    Q.    And your county or your district encompasses Monroe

25    County?

1    A.    Yes.

2    Q.    McMinn County, Bradley County and Meigs County?

3    A.    Polk County.

4    Q.    Polk County. I guess Russ Johnson's got Meigs County,

5    right?

6    A.    Yes, he does.

7    Q.    And let's talk first about April the 20th, since that was the last

8    thing you talked about. It was tense that day?

9    A.    Very much.

10   Q.    You were there?

11   A.    Yes, sir.

12   Q.    At least a hundred law enforcement officers there?

13   A.    I believe there were.

14   Q.    Helicopters in the air?

15   A.    Pardon?

16   Q.    Was there helicopters in the air?

17   A.    I don't believe we had any helicopters in the air. I never saw

18   any, if they were there.

19   Q.    But a bunch of guns of all size and shapes, right?

20   A.    Yes.

21   Q.    Had officers up in the windows, on top of the buildings?

22   A.    Absolutely.

23   Q.    Officers on the ground?

24   A.    Yes.

25   Q.    Did anybody have a camera?

1  A.   Any of who?

2  Q.   Any of all these hundred officers, did any have a camera?

3  A.   Oh, yeah, we had, we had a lot of cameras.

4  Q.   What were they doing with them?

5  A.   You know, I really didn't direct that. I just know that I saw

6  them.

7  Q.   So the law enforcement officers, so I understand, on April the

8  20th, had cameras that could have or perhaps did document what

9  was going on inside the town, correct?

10  A.   I really don't know what they were doing with the cameras.

11  There were other people with cameras there, too, people with guns

12  on, that weren't law enforcement.

13  Q.   Okay. But what I'm driving at is that law enforcement

14  certainly had the ability to memorialize what was going on there

15  with video cameras, right?

16  A.   I saw cameras. I don't know that they were video cameras.

17  But I would assume–

18  Q.   Well, still digital cameras?

19  A.   Yeah, they were cameras.

20  Q.   Okay. Were they able to– there wasn't ever a confrontation

21  there, was there?

22  A.   Not that I'm aware of.

23  Q.   All right. You've been district attorney now for, what was

24  that, five years?

25  A.   Five years.

1    Q.    Got to do my math.

2    A.    Only three more to go.

3    Q.    And you going to run again?

4    A.    No, sir.

5    Q.    And you had a role as an assistant district attorney for, what,

6    eight years?

7    A.    Really, it was more like six and a half, because I quit five

8    times. I was working for General Fisher.

9    Q.    Richard Fisher?

10   A.    Yes.

11   Q.    He's now one of your assistants, correct?

12   A.    Part time, yes.

13   Q.    And you also– did Jerry Estes work for him then?

14   A.    No.

15   Q.    Jerry Estes was his successor, correct?

16   A.    Yes. Jerry actually defeated Fisher in the election.

17   Q.    And then you took over from Jerry?

18   A.    Yes.

19   Q.    In '06?

20   A.    Yes.

21   Q.    You talked to us a little bit about this citizen's arrest form,

22   and it's obviously not a valid document, correct?

23   A.    Right.

24   Q.    Because it's not issued by a magistrate, correct?

25   A.    Absolutely.

1    Q.    And you and I both know that because we've been to law

2    school and been in the middle of the criminal justice system for 25-

3    plus years?

4    A.    I guess so, yes.

5    Q.    All right.  But that's not necessarily something that the

6    average citizen would know off the street, is it?

7    A.    I have no idea.

8    Q.    Now, let's look at some of the names on there.  Now, could

9    you describe to the members of this grand(sic) jury what the

10   elements of an official misconduct charge would be?

11   A.    Pardon?

12   Q.    Official misconduct, that's a crime in Tennessee, correct?

13   A.    Official misconduct is a crime.  If one abuses their authority

14   as a judge, as a D.A., as any officer, may abuse their authority, in

15   order to be official misconduct.  Officers can commit official

16   misconduct.

17   Q.    And that's a crime; is it not?

18   A.    It is.

19   Q.    A felony; is it not?

20   A.    Yes.

21   Q.    What is that, an A or a D?

22   A.    You know, I don't know. I need to find out.

23   Q.    Well, let's look at some of the names on this list.  Now, the

24   first two names on there are Carroll Ross and Amy Reedy; is that

25   correct?

1    A.    That's correct.

2    Q.    And Carroll Ross is a circuit court judge in your district; is

3    that correct?

4    A.    He is.

5    Q.    Amy Reedy is a circuit court judge in your district; is that

6    correct?

7    A.    She is.

8    Q.    Does the name Michael Younger mean anything to you,

9    General?

10   A.    Yes.

11   Q.    In fact, he was a defendant in a triple homicide capital murder

12   case; is that correct?

13   A.    He was.

14   Q.    And you were forced to dismiss that case, weren't you,

15   General?

16   A.    I certainly was.

17   Q.    And you were forced to dismiss that case because, in part, of

18   the conduct of Amy Reedy and a detective named Duff Brumley,

19   weren't you, sir?

20   A.    Yes, sir.

21             MR. MACKIE:  I object, your Honor.

22             MR. GREEN:   Your Honor, they are–

23             THE COURT:   Let me hear the objection first.

24             MR. MACKIE:   The objection is, not relevant to the

25   issue as to the arrest warrant.  It's just going into whatever–

1    Underlying past history about one of these persons has absolutely

2    nothing to do with the validity of whether this arrest warrant is

3    legal under the state law.

4              MR. GREEN:   Your Honor, I didn't put this up there.

5    I'm allowed to cross-examine him about what he's testified to.

6              THE COURT:   Okay.  The objection went towards

7    relevance.  Can you respond to that?

8              MR. GREEN:   It's directly relevant. Her name's on this

9    warrant, and the general has just defined to us that official

10   misconduct– that was going to be my next question–that, in his

11   judgment, if there had been– well, I haven't been able to finish my

12   question so I could lay a foundation.

13             THE COURT:   I understand where you're headed.  I'll

14   overrule the objection. Go ahead.

15   Q.    There was a detective from the Cleveland Police Department

16   who is no longer employed there anymore; is that correct?

17   A.    Absolutely.

18   Q.    His name was Duff Brumley, correct?

19   A.    Brumley.

20   Q.    And part of the reason that you, as district attorney general,

21   were forced to file a motion to dismiss a capital murder case was

22   because there was 171 messages–

23   A.    No, 220 messages.

24   Q.    –220 messages between Detective Brumley and Amy Reedy,

25   correct?

1   A.    That's correct. During the pendency of this trial.

2              MR. MACKIE:   Your Honor, I will renew my objection.

3   It's way beyond the scope of the direct on this.

4              MR. GREEN:   They opened this door, your Honor.

5              THE COURT:   I'm going to overrule the objection, but

6   I think the gist of what you're wanting to point out on your cross

7   has been made for the Defense, so let's– I'll allow you a few more

8   questions, then tie it up.

9              MR. GREEN:   Okay.

10  Q.    This Detective Brumley was, you said, an officer with the

11  Cleveland Police Department?

12  A.    That's correct.

13  Q.    And he ultimately was terminated from that police

14  department, wasn't he?

15  A.    Yes.

16  Q.    And that was because, in part, your office was not going to–

17  A.    I wrote a letter saying I would never use him as a witness

18  again.

19  Q.    And that was in part because of accusations he'd made about

20  others, wasn't it, that were not true?

21  A.    There were some conflicts about that.

22  Q.    Do you see the name on there– thought I had it right in front

23  of me– Bill Bivens, Sheriff of Monroe County, Tennessee?

24  A.    I do.

25  Q.    And, of course, Sheriff Bivens was the duly elected sheriff

1  back in April, 2010, wasn't he?

2  A.    That's true.

3  Q.    Was he the duly elected sheriff back in 2008 in Monroe

4  County?

5  A.    I think he was elected in 2006 and then again 2010.

6  Q.    Did he have a couple of detectives that worked for him by the

7  name of Doug Brannon and– well, let's start first–

8  A.    Pat Henry.

9  Q.    Who?

10  A.    Are you thinking of Pat Henry?

11  Q.    Probably, yeah.  Pat Henry and Doug Brannon?

12  A.    Yes.

13  Q.    And it would certainly be unlawful and illegal for detectives

14  to pose as a lawyer and go in and talk to a represented defendant,

15  wouldn't it?

16           MR. MACKIE:   Your Honor, may I renew my

17  objection? This is outside whether this, the substance of the arrest

18  warrant, as in its form, is legitimate. That's what he testified as to,

19  and not the background history of any of these people.  Has nothing

20  to do with his testimony.

21           THE COURT:   These names aren't even on the warrant,

22  are they, that you're asking about?

23           MR. GREEN:   This witness just testified they are under

24  this officer's direct supervision.

25           THE COURT:   I understand. But a lot of officers are

1  under–

2         MR. GREEN:   This is the last thing I'm going into on

3  this subject.

4         THE COURT:   Go ahead.  I mean, I'll allow a little

5  latitude under Rule 612, given that we're on cross-examination in

6  the rebuttal phase.

7  Q.    And my question was, General, that you're aware, of course,

8  in the John–

9  A.    Dawson case.

10  Q.    –Edward Dawson case, that those two officers went in, they

11  were under Sheriff Biven's employ, and posed as a lawyer; in fact,

12  worked up legal documents, letterhead, and gave them to this poor

13  sap, saying that we're lawyers?

14  A.    Painfully aware.

15  Q.    And ultimately I believe– in fact, it was Judge Reedy who

16  said, well, that was okay, right?

17  A.    Think so.

18  Q.    And ultimately that case went up to the Court of Criminal

19  Appeals, didn't it?

20  A.    It did.

21  Q.    I'm sure that, since it's your district, you read the opinion,

22  didn't you?

23  A.    I think I did.

24  Q.    All right.  Once again, painfully aware?

25  A.    Yes.

1   Q.    And do you recall, talking once again about two detectives

2   under the employment of Sheriff Bivens, do you recall the Court

3   saying this, at the conclusion of that opinion: that Detective Henry

4   would illegally pose as an attorney and arrange the circumstances

5   of the defendant's case to make it appear as though he had

6   successfully undertaken legal representation of the defendant is

7   abhorrent, that the detective would specifically instruct the

8   defendant not to communicate the relationship to his appointed

9   counsel–

10          MR. MACKIE:   Objection, your Honor.

11          THE COURT:    The objection is to going into the detail

12  of the opinion, and that may be a valid objection.  So I'm going to

13  sustain the objection.  I'm allowing you a little latitude under Rule

14  612.  The witness did primarily testify about the validity of the

15  warrant, but also testified in more general terms about what

16  constitutes a valid warrant, and the warrant itself was shown to the

17  witness.

18          So let's keep our questions about the warrant.  To the extent

19  I'll give you a little leeway, it's about the face of the warrant and

20  what's in the warrant.

21          MR. GREEN:  Okay.

22  Q.    Well, the long and the short of it is, is that the Court of

23  Criminal Appeals wound up dismissing those indictments because

24  of what those two detectives did, didn't they?

25  A.    Yes, properly.

1    Q.    And they were kind of making up paperwork and making up

2    law themselves, weren't they?

3    A.    I think they were.

4    Q.    Were either of them prosecuted?

5    A.    No. Would you like to know why?

6    Q.    Sure.

7    A.    The reason I didn't prosecute them was because the motive

8    that they did that with was to solve a murder. It was not for their

9    personal gain, and they lost their jobs.

10   Q.    That's a fair point. You know, when we have good motives,

11   even if we have– we're going about them the wrong way,

12   sometimes that ought to play into it, shouldn't it?

13   A.    For the District Attorney General, on prosecuting people, I

14   always try to consider the motive.

15   Q.    Because that's just fair, isn't it?

16   A.    That's our job.

17   Q.    That's right. That's all of our jobs, isn't it?

18   A.    Right.

19            MR. GREEN:   That's all.

20            THE COURT:   Thank you. Any redirect?

21            MR. MACKIE:  Yes, your Honor.

22                    **REDIRECT EXAMINATION**

23   by Mr. Mackie:

24   Q.    General Bebb, do you believe that there was a reasonable

25   basis to arrest Gary Pettway on the 1st by any of these people?

1    A.    None.

2    Q.    And whatever the history of any of these other people, even

3    including the Defense Secretary, do you believe that this arrest

4    warrant gave any person the right to go and, physically or

5    otherwise, arrest any of these people?

6    A.    It did not.

7              MR. MACKIE:    No further questions.

8              THE COURT:    Any recross?

9                          **RECROSS-EXAMINATION**

10   by Mr. Green:

11   Q.    Did you ever prosecute a case or presided over a case for what

12   somebody was thinking? That was a crime?

13             MR. MACKIE: Your Honor, I'd object.

14             MR. GREEN:    Withdrawn.

15             THE COURT:    All right.  Thank you. Thank you, sir.

16             THE WITNESS:    Thank you.

17             THE COURT:    That concludes your testimony, and you

18   may be excused.

19             THE WITNESS:    Thank you very much.

20        (Witness excused.)

21             THE COURT:    The Government may call its next

22   witness.

23             MR. MACKIE:    The United States will call as rebuttal

24   Greg Breeden.

25             MR. GREEN:    Your Honor, may we approach on one

1    issue as Chief Breeden is coming up to get sworn?

2            THE COURT:   You may.

3        (Discussion at bench off the record.)

4            THE COURT:   While they're conferring, we'll go ahead

5    and swear in our witness.

6            COURTROOM DEPUTY:   Do you solemnly swear your

7    testimony will be the truth, the whole truth, and nothing but the

8    truth, so help you God?

9            MR. BREEDEN:   Yes, I do.

10            COURTROOM DEPUTY:   If you will please state and

11    spell your name for the record.

12            THE WITNESS:   Greg Breeden, B-r-e-e-d-e-n.

13                    **DIRECT EXAMINATION**

14    by Mr. Mackie:

15    Q.    Good morning, Mr. Breeden.

16    A.    Good morning.

17    Q.    Can you tell the jury how you're employed?

18    A.    I'm a Madisonville Police Chief, City of Madisonville.

19    Q.    And how long have you been the Madisonville Police Chief?

20    A.    Since 2001.

21    Q.    And I take it that covers the 2010 time period?

22    A.    Yes.

23    Q.    And when you were as Chief of Police in Madisonville, were

24    you involved in matters relating to the events of April 20th, 2010?

25    A.    Yes.

1    Q.    Relating to people coming into town and law enforcement

2    response?

3    A.    Yes, sir.

4    Q.    Prior to that time, April 20th, did you receive a call from

5    someone relating to events that might have happened that were

6    reported to you could be happening on the 20th, prior to April 20th?

7    A.    Yes, sir, I did.

8    Q.    And can you tell us around what time that was, I mean, in

9    terms of days, weeks, months?

10   A.    I really couldn't tell you how much prior to the event, but it

11   was just maybe a week, and that's a guess.

12   Q.    Within a week?

13   A.    Yes, sir.

14   Q.    All right.  And when you received this call, who did you

15   receive it from– or let me rephrase that.  What information

16   prompted you to make a call, if you made a call, relating to this?

17   A.    My secretary called me one night at home and said that he had

18   received a call from a lady in Georgia that was concerned about a

19   trial that we had coming up in Madisonville and she had left a

20   phone number and wanted someone to call her.

21   Q.    And what did you do?

22   A.    I then called the lady and recorded our conversation.  This

23   was relative of a– I'm lost for a name– relative of a bank teller in

24   Georgia .

25   Q.    Was that bank teller named Erica Dupree?

1   A.    Yes, sir.

2   Q.    All right.  So your first call was to a relative of Ms. Dupree?

3   A.    Yes, sir.

4   Q.    All right.  And then after that call, did you make a call to

5   Erica Dupree?

6   A.    I believe she called me.  We arranged it to where she would

7   call me back.

8   Q.    All right.  I appreciate that.  Were you involved in a call with

9   Ms. Dupree?

10  A.    Yes, sir.

11  Q.    All right.  And did you record that call?

12  A.    Yes, sir, I did.

13  Q.    And did you provide a recording of that call to us?

14  A.    Yes.

15  Q.    All right.  And prior to that time, did you review that call of

16  the tape that you– I mean, the tape, the C.D. that you provided us?

17  A.    I listened to it right after we recorded it, and then I turned it

18  over to you guys.

19  Q.    And the C.D. that you provided to the Government, do you

20  believe that that accurately reflects the call that you made with

21  Erica Dupree?

22  A.    Absolutely.

23          MR. MACKIE:    Your Honor, at this time, the

24  Government would offer into evidence Government's Exhibit 51,

25  which is the recording of that call.

1          MR. GREEN:   And, once again, your Honor, if the

2    Court would note my objection based on the evidentiary basis of it.

3          THE COURT:   The Court so notes, and will, pursuant to

4    the Court's ruling, previous rulings, will admit Government's 51.

5          (Government's Exhibit No. 51 received into evidence.)

6          MR. MACKIE:   Your Honor, at this time, may I publish

7    to the jury?

8          THE COURT:   Yes.

9          (Government's Exhibit No. 51, a C.D., played to the jury.)

10   Q.    Based upon this call, did you take any actions?

11   A.    Yes. I called, immediately called, District Attorney Steve

12   Bebb, who was in contact with somebody from the Joint Terrorism

13   Task Force, and he put wheels in motion, you might say, to secure

14   us some more help for the court, court date.

15         MR. MACKIE:   That's all the questions I have.

16         THE COURT:   Thank you. Cross- examination?

17                    **CROSS-EXAMINATION**

18   by Mr. Green:

19   Q.    Chief Breeden, how are you this morning?

20   A.    Just fine.

21   Q.    It is Breeden, correct?

22   A.    Yes.

23   Q.    You were the chief on April the 1st, 2010, for Madisonville,

24   weren't you?

25   A.    Yes.

1  Q.    Did your department get a phone call that morning from some

2  people saying they were going over to effect a citizen's arrest at

3  the county courthouse?

4          MR. MACKIE:    Your Honor, I'm going to object. It's

5  beyond the scope.

6          THE COURT:   Beyond the scope in the direct

7  examination?

8          MR. GREEN:  Well, the scope, probably is.

9          THE COURT:   All right.  Well, let's go on then.

10          MR. GREEN:  All right.

11          THE COURT:   Thank you.

12  Q.    You heard Ms. Dupree a moment ago say something about

13  taking over a city, not a courthouse, but a city; is that correct?

14  That's what she told you?

15  A.    Taking over? I don't know what she said.  I didn't pay that

16  close attention to the tape there.

17  Q.    Okay.  Well, what kind of an army would it take to take over

18  Madisonville? I mean, you're a small town, but it's still you've got

19  how many streets in Madisonville?

20  A.    We're a small town, 5,000 people, so the streets equivalent to

21  5,000 people.

22  Q.    Okay.  So you've got neighborhoods around the center square

23  and then you've got government offices, because you're the county

24  seat, correct?

25  A.    That's correct.

1  Q.    There was also some discussion, and what we've heard just

2  then as far as your discussion with Ms. Dupree, that was not the

3  entirety of the conversation you had with her that day, was it?

4  There was more to the tape?

5  A.    Yes.

6  Q.    Do you remember the last thing, one of the last things she told

7  you was, talking about this guy that told her all this stuff,

8  remember her saying, "I hope he's all talk"? Remember her saying

9  that to you?

10  A.    Not particularly, but–

11  Q.    Well, then, I would ask for a few minutes' leave, your Honor,

12  because it's on that tape, and I want this officer to have a chance to

13  review that so he can tell us if she said that.

14          THE COURT:   What do we need to do to accomplish

15  that?

16          MR. THEODORE:    Your Honor, could we have just a

17  quick break?

18          THE COURT:  All right.

19          MR. GREEN:  I mean, it's one sentence, but it's on

20  there and I want him to hear it.

21          THE COURT:  How long will it take?

22          MR. MACKIE:    Just a moment.

23          THE COURT:  I mean, can we do it–

24          MR. GREEN:  Okay. They said they'd stipulate it.

25          THE COURT:  All right.

1          MR. MACKIE:    Your Honor, we'd stipulate that, at the

2   end of the conversations, as counsel said, that she says, "I hope

3   that's all just talk."

4          MR. GREEN:   Okay.  Thank you.

5          THE COURT:   Thank you. Anything further on cross?

6   Any further cross?

7          MR. GREEN:  No, your Honor.

8          THE COURT:   All right.  Any redirect?

9          MR. MACKIE:    I'm sorry, your Honor.

10          THE COURT:  Go ahead.

11                        **REDIRECT EXAMINATION**

12   by Mr. Mackie:

13   Q.    In response to the question about what it would take to take

14   over Madisonville, in your experience as a law enforcement

15   officer, a person with an AK-47, firing at people, would that take

16   over the city, in your opinion?

17   A.    Absolutely, it would take over the city.

18          MR. MACKIE:    No further questions.

19          THE COURT:  Recross?

20                        **RECROSS-EXAMINATION**

21   by Mr. Green:

22   Q.    Did they try to take over your city on April 20th with an AK-

23   47?

24   A.    I didn't see anybody with an AK-47.

25          MR. GREEN:   Thank you.

1    THE COURT:   All right.  Thank you, Chief Breeden.

2  You may be excused.

3      (Witness excused.)

4    THE COURT:   Anything further from the Government?

5    MR. THEODORE:    No, your Honor.

6    THE COURT:   The Government rests on its entire case?

7    MR. THEODORE:   Yes, your Honor.

8    THE COURT:   The Defendant rest his entire case?

9    MR. GREEN:   We do, your Honor.

10    THE COURT:   All right. Then I'm going to let the jury

11  go to lunch.  We've got to discuss jury charges and some other

12  things within the break. Why don't we say– let me confer with my

13  courtroom deputy a moment. Excuse me.

14      All right.  We're going to let the jury go until 1:15 to give us

15  time for what we have to do and then also give counsel time to

16  prepare for their closing arguments. So we'll, you know, let's come

17  back 1:15, and we'll try to get started right at 1:15. Thank you.

18    MR. GREEN:   Your Honor, I may need to step out for

19  just a second.

20    THE COURT:   All right.  Let's take a five-minute

21  recess and then we'll come back in.  We'll allow you to renew your

22  Rule 29 motion and also then we'll go into our charge conference.

23      (Recess had and reconvened at 11:55 a.m.)

24    THE COURT:   All right.  Thank you. You all may be

25  seated.  First, Mr. Green, is there anything further you want to say

1    with reference to Defendant's renewed Rule 29 motion?

2            MR. GREEN:   We do, your Honor.  We feel like, under

3    the entirety of the proof in this case, that it should not go forward

4    and that there exists as a matter of law reasonable doubts and that

5    no reasonable juror could convict Mr. Huff based on the proof

6    that's been put before the Court.

7            And in addition to what we heard, the Government's proof, we

8    would submit that the proof that they've heard yesterday, that the

9    most damaging thing that the Government has introduced against

10   Mr. Huff are statements that he made alongside the roadway on

11   Highway 68. And we believe, when those statements were taken in

12   context with the entirety of the video that we showed yesterday to

13   the jury, where he's also saying, you know, he wishes no harm to

14   anyone, we're all on the same side, their intentions are peaceful,

15   the FBI was just there the night before; that under the entirety of

16   all of that proof, coupled with the other evidence that's before the

17   Court, that we believe at this point that the case should be

18   dismissed by reason of judgment of acquittal.

             THE COURT:   Thank you. The Government want to respond

     briefly?

             MR.  THEODORE:      Your Honor, I would just incorporate

     the same arguments I made with respect to the Rule 29 motion and just

     also add that we don't believe that anything has really changed with regard

     to the evidence here.

             Certainly the Government witnesses were credible here.  There were

numerous witnesses, numerous statements that were testified about, statements of the Defendant, where he indicated he was going to take over the town or take over the city, take AK-47s with him. The statements still stand; of course, the tapes were introduced.

We think there's clearly evidence that, taken in a light most favorable to the Government, that a rational fact-finder could find that all the elements of both crimes have been met.

THE COURT:    All right.  Thank you. The Court appreciates both arguments. And, again, mindful of the standard under Rule 29, that the Government must be given the benefit of all inferences which can reasonably be drawn from the evidence, even if the evidence is circumstantial, and having considered the further evidence offered during Defendant's case, including that cited by counsel for the Defendant in support of Defendant's renewed motion for– renewed motion for judgment of acquittal, the Court will respectfully overrule that motion, again, based upon the applicable Rule 29 standards as well as the entirety of the evidence presented in this case.

The next thing I want to bring up before we go into our charge conference was a side bar conference I had with counsel for the parties.  I believe it may have even been day before yesterday.

As I told counsel at the time, after, I believe it was Trooper Michael Wilson testified, that one of our jurors, Juror 131, informed my staff that he recognized Trooper Wilson as being a deacon in his church and further indicated he did not think that would affect his decision-making ability, but wanted to bring it to the Court's attention.

Obviously, he had no way of knowing that, you know, he could identify that person until the person actually took the witness stand. We had a side bar conference. At that time, neither counsel wanted to question the juror, but various suggestions were made, and the Court said I would bring that up later.

The proof having now, the case having been concluded, I believe one of the considerations was, in effect, to move that juror to alternate.

MR. GREEN:    That would be my suggestion, your Honor. I think that– because, obviously and, unfortunately, Trooper Wilson's credibility is somewhat at issue here because, quite frankly, what he said on the stand just really didn't jibe with what we saw on the video when we played the whole thing yesterday, and a lot of that was about the emotions that he told us from the stand versus what we saw on the video.

So he's not just some tangential witness who may have introduced a document; he's kind of at the center of the storm. So I would think the prudent and safest way to treat Juror 131 is as an alternate, and that way that issue is really non-issue at that point.

THE COURT:    The Government like to respond?

MR. THEODORE:    Yes, your Honor. We have provided a case, United States vs. Solorio (phonetic), to the Court and which deals with kind of a similar issue, and I think the Sixth Circuit has presented with a situation like that.

Unless there's a showing of deliberate concealment or actual bias on the part of the juror, I don't think there's any basis for having that juror change any position. I think that the rules are really clear on who should

be the alternates in a case.

I think they're very clear, and the Sixth Circuit has been fairly firm on what those rules mean. And, your Honor, without there being any showing of deliberate concealment or actual bias and it seems like, indications from the juror, that there is certainly no actual bias and certainly no deliberate concealment, that I think we should just leave things as they are. I don't think there's any reason to try to shuffle the jury around and change the alternates when the rules are explicit about that.

You know, during voir dire, your Honor, there was a potential juror who the Government made a challenge for cause. That prospective juror even said that he would trust the Defendant– defense attorney more because of his knowledge of him, and we were denied a challenge for cause on that. And I don't dispute the Court's ruling on that, but we were denied even when a juror said that.

In this case, the juror has even gone beyond that, has indicated that he doesn't believe it would affect his judgment. And, again, under the Sixth Circuit case law, looking at <u>United States vs. Solorio</u>, I think it's better just to leave it alone. There's no showing of, again, deliberate concealment or actual bias, and we would ask that he just remain the same.

THE COURT:   Mr. Green?

MR. GREEN:   Well, I guess my response would be, your Honor, it is within the Court's discretion on how it treats this issue. Just I fail to see the harm in making someone– and as I told the Court the other day at the side bar, I very candidly admitted it speaks to Juror No. 131's honesty that he brought this matter to the Court's attention.

Certainly, he could have just kept his mouth shut and none of us would have been any the wiser. But I don't understand that just because we could do it this way and leave him as part of the panel, why we wouldn't just remove any problem at all. We've got two very healthy alternates who heard the entirety of the proof in this case.

THE COURT:    All right. Thank you. Here's what the Court's going to do. First, I have reviewed the case submitted by the Government, United States v. Solorio, and while I find the case helpful, I don't find it directly applicable to this situation. Certainly, there's been no contention and no one, counsel or the Court, is suggesting there was deliberate concealment on the part of this juror.

Clearly, it's a situation where someone came to the witness stand, who had not been previously identified, and at that moment the juror recognized a relationship or knowledge of that witness and at the next available opportunity informed the Court, specifically, the courtroom deputy.

I mean, at this point, no one has, neither the Court, nor counsel, have inquired further as to the extent of that relationship and whether it would, in fact, affect his decision-making process. Although, granted, the witness has stated at least to the court staff that it would not, however, the Court does believe it has discretion.

In effect, in certain respects, the Court could excuse the juror or could call the juror in and undergo additional questioning and potentially entertain a "for cause" challenge. But the Court does deem it advisable at this point to move Juror 131 to the second alternate position, in effect, and

if it became– I would not anticipate at this time, but then if it became necessary to inquire as to Juror 131 further on this particular topic, we could do so if and when it became necessary.

That would move Juror 156 to the primary jury. And the Court would note again, for the record, that all the jurors have seemed attentive to both sides' presentation of evidence in this case, including, but not limited to Juror 156. So the Court will move Juror 156 to the primary jury and move Juror 131 to the second alternate position.

Any objection by the Defendant to the Court so doing?

MR. GREEN:   Well, was Juror 156 the first alternate?

THE COURT:   Yes, yes, she was in Seat 13, and by the process entertained in the voir dire she was the first alternate.

MR. GREEN:   Who was Juror 1– I'm getting my positions mixed up.

THE COURT:   Juror 131, who was on our primary jury, was in Seat Number or is in Seat Number 9, second from the right, on the first row.

MR. GREEN:   Right.

THE COURT:   And the two alternates were, as it turned out in this case, were in Seats 13 and 14, with our first alternate being the female juror in Seat 13.

MR. GREEN:   Okay.  We have no objection to that, your Honor.

THE COURT:   Any objection by the Government?

MR.  THEODORE:   Well, just for the reasons stated, we

don't think that it should be altered.

THE COURT:    All right. Thank you. Next will be the charge conference, unless anybody else have anything besides the jury charge in this case?

MR. GREEN:    No. Thank you.

(Trial testimony concluded.)

## C E R T I F I C A T I O N

I certify that the foregoing is an accurate transcript of the record of

proceedings in the titled matter.

_____/s/_Donnetta Kocuba_____          ___9/22/12___

Donnetta Kocuba, RPR-RMR
Official Court Reporter
U.S. District Court
Knoxville, Tennessee