IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT
NORTHERN DIVISION

UNITED STATES OF AMERICA, )
                          )
Plaintiff,                )
                          )    No. 3:10-CR-73
vs.                       )    Knoxville, Tennessee
                          )    May 15, 2012
DARREN WESLEY HUFF        )
                          )
Defendant.                )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS A. VARLAN
UNITED STATES DISTRICT JUDGE

_____

KRISTIN E. SCHULTZ BURKE, LCR #247
MILLER & MILLER COURT REPORTERS
12804 Union Road, Knoxville, Tennessee 37934
Phone: 865-675-1471 / Fax: 865-675-6398
Email: JMccon3590@aol.com

Electronically signed by Kristin Schultz (001-364-541-6088)          7c992d17-8032-45a4-b231-8687c0f91f36

```
 1    APPEARANCES:

 2
      For the Plaintiff:      JEFFREY E, THEODORE, ESQ.
 3                            A. WILLIAM MACKIE, ESQ.
                              U.S. Department of Justice
 4                            Office of U.S. Attorney
                              800 Market Street, Suite 211
 5                            Knoxville, Tennessee 37902

 6
      For the Defendants:     G. SCOTT GREEN, ESQ.
 7                            800 South Gay Street, Suite 1600
                              Knoxville, TN 37929
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1
INDEX

2  WITNESS                                                    PAGE

3  SPECIAL AGENT MATTHEW JOHNSON
          Direct Examination by Mr. Theodore           8
4         Cross-Examination by Mr. Green               13
          Redirect Examination by Mr. Theodore         17
5         Recross-Examination by Mr. Green             19

6
   DETECTIVE DANIEL DOCKERY
7         Direct Examination by Mr. Theodore           20
          Cross-Examination by Mr. Green               25
8         Redirect Examination by Mr. Theodore         34
          Recross-Examination by Mr. Green             35
9

10  ARGUMENT BY MR. THEODORE                            36

11  ARGUMENT BY MR. GREEN                               41

12  ARGUMENT BY MR. THEODORE                            44

13  ARGUMENT BY MR. GREEN                               45

14  ARGUMENT BY MR. MACKIE                              55

15  ARGUMENT BY MR. THEODORE                            68

16  ARGUMENT BY MR. GREEN                               70

17
   STATEMENTS BY THE DEFENDANT, MR. HUFF               71
18

19  JUDGE'S RULING                                      77

20

21

22

23

24

25

1          This above-styled cause came to be heard on the

2   15th day of May, 2012, in the United States District Court

3   for the Eastern District of Tennessee, Northern Division,

4   the Honorable Thomas A. Varlan presiding.

5          THE DEPUTY CLERK:  All rise.

6          This Honorable Court is again in session, the

7   Honorable Thomas A. Varlan, United States District Judge,

8   presiding.

9          Please come to order and be seated.

10         THE COURT:  Good morning, everyone.

11         Call up the next case, please.

12         THE DEPUTY CLERK:  Criminal Action 3:10-CR-73,

13  United States of America vs. Darren Wesley Huff.

14         Jeffrey Theodore and Mr. William Mackie are here

15  on behalf of the Government.

16         Is the Government present and ready to proceed?

17         MR. THEODORE:  Present and ready, Your Honor.

18         THE DEPUTY CLERK:  Mr. Scott Green is here on

19  behalf of the Defendant.

20         Is the Defendant present and ready to proceed?

21         MR. GREEN:  Ready to proceed.

22         THE COURT:  Thank you.

23         As everyone knows, the parties appeared before

24  the Court initially for purposes of sentencing in this

25  case on April 20, 2012.  At that time, the Court heard the

1    parties' positions on their objections to the Presentence

2    Investigation Report.  The Court took those objections

3    under advisement and ruled on them via written order on

4    May 2, 2012.

5          Today we'll continue with the sentencing.  The

6    Court will hear from the parties regarding sentencing,

7    allow the Defendant to allocute if he wishes, I will rule

8    upon any motions for variance or departure, and then I

9    will impose a judgment and sentence.

10         I'm quite certain we swore in Mr. Huff on

11   April 20, but just since we've had a break in the

12   sentencing, why don't we begin by asking Mr. Huff to rise

13   and we'll have you sworn in by the Courtroom Deputy for

14   purposes of this continued sentencing hearing.

15         THE DEPUTY CLERK:  Sir, if you will raise your

16   right hand.

17         Do you solemnly swear to true answers make to

18   all questions asked at this time as you shall answer unto

19   God?

20         If so, please say, "I do."

21         MR. HUFF:  I do.

22         THE DEPUTY CLERK:  Please state your name for

23   the record.

24         MR. HUFF:  Darren Huff.

25         THE DEPUTY CLERK:  Thank you, sir.

1           THE COURT:  You may be seated.

2           Again, just as background, the Court notes that

3    Defendant's filing of the sentencing memorandum under

4    seal, Document 189 in the record, which the Court

5    construes as a motion for variance, the Government has

6    filed a response to the sentencing memorandum, Document

7    190.  The Government also filed a motion for an upward

8    departure, Document 192.  And the Defendant filed a pro se

9    motion to take judicial notice and motion in allocution,

10   Document 193.  Regarding the pro se motion, the Government

11   moved to strike the motion as being filed in contravention

12   of Local Rule 83.4(c).  The Court granted the Government's

13   motion to the extent the Defendant's filing was construed

14   as a motion for relief.  The rule that would consider the

15   filing as relevant to sentencing pursuant to Criminal Rule

16   of Procedure Rule 32(i)(4).

17          With this background in mind, let's do this.

18   Does the Government wish to present witnesses this

19   morning?

20          MR. THEODORE:  Yes, Your Honor.  We have two

21   witnesses this morning.

22          THE COURT:  Mr. Green, do you have any

23   additional witnesses?

24          MR. GREEN:  No, Your Honor.

25          THE COURT:  We'll hear from the witnesses and

1    then we'll hear from the parties concerning sentencing and

2    the motions pending.

3              MR. THEODORE:  Okay.  And, Your Honor, we have

4    filed the motion as the indicator for upward departure,

5    two bases, §5K2.17 of the guidelines and §5K2.7.  There

6    will be one witness for each one of those different

7    sections for each basis for departure.

8              I would like to call Special Agent Scott Johnson

9    to the Stand.

10             THE DEPUTY CLERK:  Do you solemnly swear your

11   testimony will be the truth, the whole truth and nothing

12   but the truth, so help you God?

13             THE WITNESS:  I do.

14             THE DEPUTY CLERK:  Please state and spell your

15   name for the record.

16             THE WITNESS:  Matthew Scott Johnson;

17   M-A-T-T-H-E-W, S-C-O-T-T, J-O-H-N-S-O-N.

18             THE DEPUTY CLERK:  Thank you, sir.

19             THE COURT:  And before we hear from the witness,

20   Mr. Theodore, just to put it in the proper context, I know

21   the Government is requesting an upward departure pursuant

22   to the cited guidelines provisions, but we do have -- in

23   light of the Court's rulings on the objections to the

24   presentence report, we have a restricted guideline range,

25   or we have an advisory guideline range higher than the

1    statutory maximum resulting in a restricted guideline

2    range equivalent to the statutory maximum.

3             MR. THEODORE:  Right.  That's right, Your Honor.

4    Depending upon -- I mean, this motion, our motion for a

5    departure could well end up being moot or we could end up

6    withdrawing the motion depending on the Court's -- what

7    the Court does rule, if it does rule in certain ways and

8    then the timing of that rule.  I guess this would also

9    relate to the §3553 factors as well.

10            THE COURT:  Thank you.  You may proceed.

11            MR. GREEN:  Thank you.

12                    MATTHEW SCOTT JOHNSON,

13   having first been duly sworn, was examined as follows:

14                    DIRECT EXAMINATION

15   BY MR. THEODORE:

16        Q     Could you state your name and occupation for

17   the record, please.

18        A     Special Agent Matthew Scott Johnson.  I'm a

19   Special Agent with the FBI.

20        Q     How long have you worked for the FBI?

21        A     Over 14 years.

22        Q     What particular section do you work in with

23   the FBI?

24        A     Counter Terrorism, Domestic Terrorism.

25        Q     Describe a little bit about your experience

1    in the different sections you've worked with the FBI.

2           A      I worked four years of drugs work, narcotics

3    work in Miami.  I worked counter terrorism with the Hostage

4    Rescue Team.  For the last four years, I've worked here in

5    Knoxville counter terrorism, international terrorism,

6    domestic terrorism.

7           Q      What did you do before you were FBI agent?

8           A      I was a Chief Warrant Officer in the United

9    States Army as a helicopter pilot.

10          Q      As part of your military experience and then

11   your experience as an FBI agent, have you had a lot of

12   experience with firearms?

13          A      Yes, I have.  In the military, I was Range

14   Safety Officer, Range Officer in Charge.  I went to Unit

15   Armor School.  Then, with the FBI, within 14 years, I have

16   been assigned to the FBI SWAT Team, a sniper on the FBI

17   Sniper Team.  For 5 of those 14 years, I have been through

18   training as a firearms instructor with the FBI.

19          Q      So you're a firearms instructor for the FBI?

20          A      Correct.

21          Q      Do you have a special certification for

22   that?

23          A      Yes.  Every five years, we have to go

24   through a recertification process.

25          Q      Are you experienced and familiar with

1   automatic weapons?

2       A    Yes, I am.

3       Q    Are you familiar and experienced with the

4   weapon semi-automatic AK-47?

5       A    Yes.

6       Q    You were here as the case agent during the

7   trial on this case?

8       A    Yes, I was.

9       Q    You were aware there was an exhibit

10  admitted -- an AK-47, that was admitted at trial?

11      A    Yes, sir.

12      Q    I want to show you the substituted exhibit

13  for that, which was Trial Exhibit 6A.  I want to show that

14  to you.

15          MR. GREEN:  Your Honor, we'll stipulate there

16  was an AK-47 introduced at trial.  There's a lot of things

17  in this case that are kind of hard to bring in with this.

18          THE COURT:  And the Court recalls that exhibit

19  if you want to do that.

20          MR. THEODORE:  Okay.  That's fine.

21  BY MR. THEODORE:

22      Q    You did examine that firearm at some point

23  in time?

24      A    Yes, I did.

25      Q    Were there also some ammunition clips that

1    were also introduced at trial?

2         A     Yes, there were.  There were four clips that

3    were seized with that weapon at his residence.

4         Q     Okay.  Those ammunition clips, were those

5    actually -- were they loaded at that time?

6         A     Yes, they were.

7         Q     How many rounds were in each of those

8    ammunition clips?

9         A     Approximately 29 to 30 rounds each.

10        Q     They were loaded at the time they were

11   seized?

12        A     Yes, they were.

13        Q     Were those clips designed for the AK-47 that

14   was introduced at trial?

15        A     Yes, they were.

16        Q     Were there any other clips, ammunition

17   clips, that were seized in the case?

18        A     Yes.  On April the 30th, 2010, upon the

19   Defendant's arrest here in Knoxville, in his vehicle, there

20   were eight clips, eight magazines, the same nature, for the

21   AK-47 that was fully loaded as well.

22        Q     So how many rounds would have been in each

23   one of those clips?

24        A     Twenty-nine to thirty.

25        Q     Okay.

1    A    Then there was a box of ammunition, an ammo
2    can as well full of 7.62 -- the same rounds that were in
3    the clips.
4    Q    How much ammunition for an AK-47 was seized
5    all together in this case?
6    A    Over 500 rounds at his residence.  I believe
7    it was 525 rounds at his residence.  Then, during his
8    arrest here in Knoxville, I believe he had over 800 rounds.
9    Now all of those weren't AK-47; some were 45 and some were
10   40 cal, but the majority were AK-47.
11   Q    You said the clips.  I'm kind of holding up
12   Trial Exhibit 27.  Do you remember that exhibit?
13   A    Yes, sir.  Those were seized on April 30th
14   here in Knoxville out of his vehicle.
15   Q    Again, you said those were fully loaded?
16   A    Correct.
17   Q    What type of ammunition again goes in those?
18   A    7.62.  It's a rifle round.
19   Q    Those were designed for the AK-47 rifle?
20   A    Yes.
21   Q    Are those clips that I have, again, Trial
22   Exhibit 27 and Trial Exhibit 7, the four clips seized from
23   the Defendant's home, are those large capacity magazines?
24   A    Yes, they are.
25   Q    Again, because of the quantity, certainly

1   every one of those clips had more than over 15 rounds each?

2           A     Yes.

3                 THE DEPUTY CLERK:  The unit is working now.

4                 MR. GREEN:  I'm sorry.

5                 THE DEPUTY CLERK:  It's working, the screen.

6                 MR. THEODORE:  Okay.

7                 Your Honor, I have no further questions.

8                 THE COURT:  Thank you.

9                 Mr. Green?

10                MR. GREEN:  Thank you, Your Honor.

11                       CROSS-EXAMINATION

12  BY MR. GREEN:

13          Q     Agent Johnson.

14          A     Good morning, Mr. Green.

15          Q     How are you?

16          A     I'm good.  How are you?

17          Q     Just fine.

18                If I understand your testimony correctly,

19  you've been doing this with the Federal Bureau of

20  Investigation in some capacity for some 14 years; is that

21  correct?

22          A     Correct.

23          Q     You have been in counter terrorism for how

24  long now?

25          A     Three-and-a-half to four years with the

1  Hostage Rescue Team, and then for the last three to four

2  years here in Knoxville.

3       Q     Have you ever been involved in another case,

4  another prosecution, wherein 18 United States Code §231 was

5  utilized?

6       A     No.

7       Q     Are you aware of another case wherein 18

8  United States Code §231 has been utilized?

9       A     Not personally aware, no.

10       Q     Thank you.

11             All right.  Now, when you found the AK-47

12  clips that we were just looking at on Mr. Huff's person

13  when he was arrested, there was no AK-47 in that vehicle,

14  was there?

15       A     No, there was not.

16       Q     In fact, the AK-47 was back in Georgia and

17  he was arrested in Knoxville, correct?

18       A     Correct.

19       Q     And there's no way, would you agree with me,

20  that we can say that that is in close proximity of that

21  weapon if the clips are in Knoxville and the weapon is in

22  Georgia, correct?

23       A     Correct.

24       Q     April the 20th, were you in Madisonville

25  that day?

Electronically signed by Kristin Schultz (001-364-541-6088)

1          A       Yes, I was.

2          Q       Did you see Darren Huff that day?

3          A       Yes, I did.

4          Q       Did you see Darren Huff with an AK-47 that

5     day?

6          A       No, I did not.

7          Q       In fact, you were aware and you have seen

8     the video of the roadside stop, correct?

9          A       I've seen the video.

10         Q       This crime of violence that we're all

11    talking about that he has supposedly been guilty of

12    perpetrating, he was allowed to leave the roadside on

13    Highway 68 and go into Madisonville, was he not?

14         A       Yes, he was.

15         Q       At any point in time, did you see him

16    retrieve an AK-47 in Madisonville?

17         A       No, I did not.

18         Q       At any point in time, did you see him

19    attempt to retrieve an AK-47 while in Madisonville?

20         A       No, I did not.

21         Q       At any point in time, did you see him

22    attempt to load what has been described as a high capacity

23    magazine into an AK-47 while in Madisonville?

24         A       No, sir.

25         Q       There was no assemblage of three or more

1    persons who were going to create a civil disobedience or

2    disturbance on the side of Highway 68, was there?

3         A       Not on the side of Highway 68, no.

4         Q       Right.  That was my question.  On the side

5    of Highway 68, he was pulled over, had one other person

6    with him and that was it, correct?

7         A       In that vehicle, but there was another

8    vehicle with their vehicle that had pulled off to the side

9    to video; so there were three people there.

10        Q       But it's been the United States' position

11   throughout that the intent was to do something in

12   Madisonville, correct?

13        A       Correct.

14        Q       You never saw anything happen with an AK-47

15   within Madisonville, did you?

16        A       Correct.

17        Q       The magazines that we've seen pictures of,

18   where could one purchase such a magazine?

19        A       At a local gun shop.

20        Q       Perfectly legal to do so; isn't it?

21        A       Yes.

22        Q       Perfectly legal to possess them; isn't it?

23        A       Yes.

24           MR. GREEN:  I believe that's all.

25           THE COURT:  Thank you.

1        Mr. Theodore, anything further?

2               REDIRECT EXAMINATION

3  BY MR. THEODORE:

4      Q    Were there any other ammunition clips like

5  the exhibits we just looked at, Trial Exhibit 7 and 27, any

6  another clips seized from the Defendant, his vehicles or

7  his home?

8      A    For the AK-47 or other weapons?

9      Q    No, for the AK-47.

10     MR. GREEN:  I'm going to object unless he limits

11  it to the seizure date that he's talking about and from

12  where.

13  BY MR. THEODORE:

14     Q    I'm talking about in the course of the case.

15  The search warrant of the house, of course, occurred at a

16  different time than his arrest; is that right?

17     A    It occurred the same day.

18     Q    The same day.  Okay.

19     A    April the 30th.

20     Q    And the house was searched?

21     A    Yes, it was.

22     Q    Were there any other clips, ammunition

23  clips, for an AK-47 seized from the house?

24     A    There were four clips seized from the house.

25     Q    None other than those four?

1          A      No.

2          Q      What about from his truck when he was

3     arrested on April 30?  Were there any other ammunition

4     clips seized besides the eight that were in the exhibit

5     here?

6          A      There were for other weapons, yes.

7               MR. GREEN:  I'm going to object unless he is

8     talking about an AK-47.

9               MR. THEODORE:  That's what I'm referring to,

10    Your Honor.

11    BY MR. THEODORE:

12         Q      For the AK-47.

13         A      Not clips, but there was an ammo can that

14    was seized with -- I would have to check my notes, but

15    there were several hundred rounds in the ammo can in his

16    truck for an AK-47.  At the house, there was an ammo can

17    seized with several hundred AK-47 rounds as well.

18         Q      Any other clips, though, besides the eight

19    that were introduced at trial from his truck for the AK-47?

20               Is this all you're aware of that were --

21         A      Yes.

22         Q      Okay.  Every clip that was seized that was

23    for an AK-47, would you characterize that as a large

24    capacity ammunition clip?

25         A      Yes.  Those are designed to fit in that

1    assault weapon, large capacity for an assault weapon.

2              MR. THEODORE:  Thank you.

3              Nothing further.

4              THE COURT:  Anything else further, Mr. Green?

5                        RECROSS-EXAMINATION

6    BY MR. GREEN:

7         Q     Are you aware of anyone, Agent Johnson, who

8    actually saw a clip that Mr. Huff had on his person or in

9    his vehicle on April the 20th which would have fit an

10   AK-47?

11        A     Not for an AK-47.

12        Q     And, in fact, there are AK-47 clips which

13   make the rifle functional that aren't large capacity clips;

14   is that not correct?

15        A     Yes, there are.

16             MR. GREEN:  Thank you.

17             THE COURT:  Thank you, Agent Johnson.  You can

18   go back to the counsel table.

19             Mr. Theodore?

20             MR. THEODORE:  Yes, Your Honor.  The next

21   witness we call is Detective Daniel Dockery.

22             THE DEPUTY CLERK:  Please raise your right hand.

23             Do you solemnly swear your testimony will be the

24   truth, the whole truth and nothing but the truth, so help

25   you God?

1          THE WITNESS:  Yes.

2          THE DEPUTY CLERK:  Place state and spell your

3  name for the record.

4          THE WITNESS:  Daniel Ray Dockery; D-A-N-I-E-L,

5  R-A-Y, D-O-C-K-E-R-Y.

6                    DANIEL DOCKERY,

7  having first been duly sworn, was examined as follows:

8                    DIRECT EXAMINATION

9  BY MR. THEODORE:

10         Q     Mr. Dockery, what is your occupation?

11         A     I'm a detective with the Madisonville City

12  Police Department.

13         Q     How long have you worked there?

14         A     I've worked there since 2004.

15         Q     Were you working on April 20th, 2010?

16         A     I was.

17         Q     What were your duties on that day?

18         A     On that particular day, I'll take you back

19  to the early hours.  I worked night shift the night prior,

20  that is a 12-hour 6:00 to 6:00 shift.  On that particular

21  night, I was told by my superiors to be on the look out for

22  any kind of suspicious vehicle, maybe something parked in a

23  suspicious place, so on and so forth.

24              On the early morning hours, me, and I have

25  two other guys, we were more or less on specific patrol

1    inside the city municipality buildings.

2         Q    Was there anything unusual that you were

3    anticipating?

4         A    Yes.  As far as unusual, there was a threat

5    that Mr. Huff was to be in Madisonville on that particular

6    day.  As far as the timeline, we have no clue.  As far as

7    the only specifics I'm given is a man that is potentially

8    armed coming into the city.

9         Q    Was there a great concern about that?

10        A    Yes, sir.

11        Q    Why was that?

12        A    Well, anytime you have a man that is

13   potentially armed and supposedly being from some kind of

14   extremist group, there's also a potential for some kind of

15   violence.

16             On that particular morning, it started

17   probably 3 or 4:00.  You know, we had officers coming from

18   THP, Tennessee Highway Patrol.  We had bomb dogs on our

19   city ground and our city municipality offices, the county

20   offices.

21        Q    Were they doing sweeps of the buildings?

22        A    They were.

23        Q    Is that typical?

24        A    It is not.

25        Q    Was that done in response to the belief that

1    Mr. Huff was going to be arriving?

2            A      It is.

3            Q      What else was done?

4            A      As far as the bomb dogs, we're talking at 4

5    or 5:00 in the morning.  I'm to get off at 6:00.  Of

6    course, I have to stay over.  There was a collective, and

7    this is a rough number, maybe 80 to 100 officers from

8    Madisonville City, Monroe County, Sweetwater City, Tellico,

9    TBI, the FBI, the anti-terrorism group, and DTF was there

10   in plain clothes, I want to say.

11           Q      Were there certain precautions, other

12   precautions taken?  You mentioned bomb dogs doing sweeps.

13   Anything else?

14           A      Yes, sir.  I didn't know the particulars

15   other than what I was told, but snipers on rooftops looking

16   out for all municipal buildings and businesses within our

17   city grid.  We have a city grid where all our county

18   buildings are as far as the courthouse, city hall, court

19   clerk's office.  Everybody that day was assigned to some

20   kind of special detail, you know.  You might be there and

21   two or three people, "You're at the courthouse."  "You're

22   at this corner."  "You're at that corner."  "You're in

23   plain clothes."  "You're walking the streets."

24           Q      Were there special assignments as far as

25   protective detail to certain buildings, municipal

1  buildings?

2          A      Yes.

3          Q      Is the --

4          A      City --

5          Q      Go ahead.

6          A      City hall, that was the staging area.  I was

7   assigned to the city hall building.  You have the General

8   Sessions Court.  You have the big courthouse.  You have the

9   Court Clerk's Office.  Even the little businesses in town,

10  somebody was assigned to that business to either walk that

11  grid and then report back to central, you know, exactly

12  what you see or anything suspicious.

13         Q      Again, why was that done?

14         A      That was done in precaution to Mr. Huff

15  arriving and a potential of violence.

16         Q      Had you ever seen precautions like that

17  taken on any other instance?

18         A      Since I been working there, no.

19         Q      So that was unusual conduct, unusual

20  precautions you were taking?

21         A      It was very unusual.

22         Q      Were there any other things that were done,

23  any other surveillance techniques that were utilized in

24  preparation for this?

25         A      Yes.  ATF utilized their pole cam.  Fort

1  Loudon, which is the utility board, has to come and

2  actually put it on top of a light pole.  That was utilized

3  during this to keep a direct feed on the general court

4  building, you know, just in case one of our officers

5  couldn't be there or if they were somewhere else, that

6  somebody sitting at central had a feed at all times.

7       Q    Is that something that is typically done

8  there in Madisonville?

9       A    It is not.  That's the first time I've ever

10 seen that utilized.

11      Q    Describe city hall.  Was it able to function

12 as normal on that day?

13      A    City hall that day was open.  Police

14 officers were in and out.  I, for one, as far as a

15 civilian, other than city hall workers, I don't recall

16 seeing any civilians there.

17      Q    Why do you think that is?

18           MR. GREEN:  I object, Your Honor.  That calls

19 for pure speculation.

20           MR. THEODORE:  Your Honor, the rules of hearsay

21 don't apply at a sentencing hearing.

22           MR. GREEN:  It's not a hearsay objection, Your

23 Honor.  It calls for pure speculation for him to assume

24 why there weren't people there.

25           THE COURT:  I think that's a valid objection.

1    You might want to approach it through a different

2    question.

3              MR. THEODORE:  Very well.

4    BY MR. THEODORE:

5         Q     You said you didn't see citizens there?

6         A     I don't recall seeing any there.

7         Q     Okay.

8         A     I recall seeing a massive amount of law

9    enforcement.

10        Q     In your opinion, do you think that the

11   governmental function of Madisonville or the county was

12   disrupted on that day?

13             MR. GREEN:  I object to his opinion, Your Honor.

14             THE COURT:  I will overrule the objection.

15             THE WITNESS:  Of course.

16             MR. THEODORE:  Nothing further.

17             THE COURT:  Cross-examination?

18                       CROSS-EXAMINATION

19   BY MR. GREEN:

20        Q     Detective Dockery.

21        A     Yes, sir.

22        Q     Good morning.  How are you?

23        A     How are you?  I'm just fine.

24        Q     I want to make sure I understand.  There was

25   a whole lot of police officers that came to Madisonville on

1    April the 20th, correct?

2            A      Yes.

3            Q      There was your department, correct?

4            A      Correct.

5            Q      There was the Monroe County Sheriff's

6    Department, correct?

7            A      Correct.

8            Q      Sweetwater Police Department, correct?

9                   THP?

10           A      Correct.

11           Q      TBI.

12           A      Correct.

13           Q      FBI.

14           A      Correct.

15           Q      Is that correct?

16           A      Correct.

17           Q      When did you to go to the academy?

18           A      I went to the academy in '05.

19           Q      Okay.  Do you recall them teaching you at

20   the academy your job as a law enforcement officer is to

21   keep people safe?

22                  Is that correct?

23           A      Exactly.  Yes, sir.  That's correct.

24           Q      And keep the community safe, correct?

25           A      Correct.

Electronically signed by Kristin Schultz (001-364-541-6088)

1          Q       All of these law enforcement officers, would

2    you assume that all of them have been trained in a similar

3    fashion that you've been trained?

4          A       Correct.

5          Q       So everybody there, their function was to

6    keep people safe, correct?

7          A       Correct.

8          Q       That's what cops do, right?

9          A       Correct.

10         Q       And that's why they were there, right?

11         A       Right.

12         Q       Can you tell me, in the city of

13   Madisonville, let's start first with city hall, was there a

14   single office that was closed down that day because of all

15   the cops around?

16         A       No, sir.

17         Q       Let's move over to the courthouse, the

18   county offices.  Was there a single office that was shut

19   down that day?

20         A       No, not that I recall.

21         Q       There was courts going on that day, weren't

22   there?

23         A       Yes.

24         Q       Any courts shut down that day?

25         A       No.

Electronically signed by Kristin Schultz (001-364-541-6088)

1      Q      Were you aware of any cases that they had to
2  run the people off and say, "No.  We can't accommodate you
3  today because Mr. Fitzpatrick's case is on"?
4      A      I'm not personally aware, no.
5      Q      The people that were all there, you-all had
6  been briefed and you were aware that you were there because
7  of these statements that Mr. Huff had supposedly made to
8  these bank tellers down in Georgia, correct?
9      A      Correct.
10     Q      You are aware that he was there as a
11  consequence of Mr. Fitzpatrick's case being on the docket,
12  correct?
13     A      Correct.
14     Q      Mr. Fitzpatrick's case didn't actually get
15  heard that day, did it?
16     A      That I do not know.
17     Q      You-all were watching, weren't you?  You
18  were watching what was going on?
19     A      I was not in the courtroom, no.
20     Q      But you were monitoring -- there was
21  somebody monitoring where Mr. Fitzpatrick was coming and
22  going, correct?
23     A      I would assume, yes.
24     Q      In fact, his case got continued pretty
25  quickly that morning, did it not?

1        A        I do not know.

2        Q        Well, let me ask it a different way.  The

3    whole thing was shut down and dissipated and everybody was

4    gone by about 11:00 that morning, weren't they?

5        A        I personally didn't get home until 4:00 that

6    evening.

7        Q        I'm not talking about when you got home.

8    I'm talking about all the people that you-all were

9    concerned about had cleared out by about 11:00 that

10   morning, hadn't they?

11       A        I guess you would have to say -- what people

12   are you talking about?

13       Q        I'm talking about Mr. Huff, Mr. Fitzpatrick

14   and the other people you were keeping an eye on.

15                Is that correct?

16       A        Did somebody follow them out of town?  I

17   don't know the specifics in that.  I know that my detail

18   was over at 4:00 that evening.

19       Q        When did you or someone communicate to you

20   that Mr. Huff had left Madisonville?

21       A        I don't recall.

22       Q        But wasn't that the whole point of being

23   there was to watch him?

24       A        Yes.

25       Q        Wasn't that a rather important fact to know,

1   when he left?

2          A      It probably was, but, as far as me, I'm just

3   a ground troupe.  I'm not the higher ups in this.

4          Q      But did somebody not get on the radio and

5   say, "Hey.  Subject Huff" -- or whatever the code name was

6   for him that day, the Boogieman, or whatever he was being

7   called -- "the Boogieman has left Madisonville"?

8                 Nobody communicated that?

9          A      I don't believe anybody said anything about

10  a Boogieman.  No.

11         Q      Well, what was his code name?  What were

12  you-all calling him?

13         A      Mr. Huff.

14         Q      Did anybody say, "Mr. Huff has left

15  Madisonville"?

16         A      I do not recall them saying that.

17                I can tell you that my detail was over at

18  4:00.

19         Q      So, at 4:00, you didn't know whether or not

20  Darren Huff was still there or not?

21         A      I did not know.

22         Q      So he couldn't have been the sole focus of

23  all this law enforcement attention that was there, could

24  he?

25         A      Of course he was.

1      Q      Well, then why didn't you know that he was

2  gone?

3      A      Because that's not my job to know he's gone.

4  I'm putting on a detail saying, "Here's what you need to

5  watch out for."  Okay?  "Now it's time for you to go home."

6  I don't know no specifics in it.

7      Q      Well, that's fair.  You don't know any of

8  the specifics.

9      A      You don't bring in, you know, a 100 people

10  and try to drag them into one room and say, "Okay, guys.

11  This is what he's doing.  This is where he's going.  This

12  is what the FBI is doing.  This is what the TBI is doing."

13  That is way above my pay grade.

14      Q      Okay.  Well, there was --

15      A      My pay grade is I was on an assignment and I

16  got home at 4:00 that evening.

17      Q      Okay.  And your assignment was to do what?

18      A      I was staged at city hall in case anything

19  happened.

20      Q      Just keeping an eye on it?

21      A      Precaution.

22      Q      Like cops do sometimes when they have to go

23  monitor a situation, right?

24      A      Right.

25      Q      Like cops do, for instance, when they have

1   to go to a ball game to make sure since there's a crowd

2   there, there's not any kind of disturbance, right?

3           A       Right.

4           Q       Okay.  You mentioned the fact that there was

5   some bomb dogs that were sweeping the place; is that

6   correct?

7           A       Yes.

8           Q       There weren't any bombs found, were there?

9           A       No.

10          Q       Was there a specific bomb threat that had

11  been made?

12          A       I guess it would be the potential of any

13  kind of violence.  Precaution.

14          Q       So the precautions were made, that's my

15  point, at the discretion of those people that you say have

16  the higher pay grade that are paid to make these decisions,

17  right?

18          A       Right.

19          Q       Not necessarily anything that Mr. Huff may

20  have said or not said, these were discretionary calls that

21  they made, right?

22          A       Right.

23          Q       Is it a fair statement that while it may

24  have been tense there, you've never seen that many cops in

25  one place in your life?

1          A      Correct.

2          Q      If we pay cops to make us safer, then that

3    must have been an awful safe place that day, wasn't it?

4          A      I would like to imagine, yes.

5          Q      The pole cam that you were talking about, so

6    there was actually a camera that was monitoring what now?

7          A      The general sessions building.

8          Q      The general sessions building, right?

9          A      Right.

10         Q      So, if we had seen any evidence of somebody

11   pull a gun and attempting to effect a citizen's arrest,

12   there should be a picture of it, right?

13              MR. THEODORE:  Objection.  Calls for

14   speculation, Your Honor.

15              MR. GREEN:  Well, let me ask it a different way.

16              THE COURT:  Go ahead.

17   BY MR. GREEN:

18         Q      That camera was making a video record of

19   what was going on at the general sessions building,

20   correct?

21         A      I'm unsure if it's a video or just a live

22   feed.

23         Q      Well, a live feed can be recorded, can it

24   not?

25         A      I would say so, yes.

1          MR. GREEN:  That's all.

2          THE COURT:  Thank you.

3          Any Redirect?

4          MR. THEODORE:  Just briefly, Your Honor.

5                    REDIRECT EXAMINATION

6     BY MR. THEODORE:

7          Q     You're aware that a gentleman named Walter

8     Fitzpatrick was supposed to have an arraignment on that

9     day?

10         A     Yes.

11         Q     That was part of the incentive for Mr. Huff

12    to actually come there on that day; is that right?

13         A     Yes.

14         Q     Are you aware that his court case, in fact,

15    was continued because of the massive presence there and all

16    the preparations that were taken in anticipation of the

17    protest that his arraignment was continued to another point

18    in time?

19         A     Are you saying it was continued to the 20th

20    or from the 20th --

21         Q     No, from the 20th to another point in time.

22         A     Like I told him, I mean, I have no clue when

23    it was continued.

24         MR. THEODORE:  Nothing further.

25         THE COURT:  Anything further, Mr. Green?

1          MR. GREEN:  Just very briefly.

2                    RECROSS-EXAMINATION

3    BY MR. GREEN:

4          Q     Before today, had you ever laid eyes on

5    Darren Huff?

6          A     Yes, sir.

7          Q     So you saw him that day?

8          A     I did not see him that day.  I had seen him

9    on previous dates.  He was there on one other instance.

10         Q     Would that have been the April 1st incident

11   with --

12         A     It may have been.

13         Q     Was he wearing camos that day?

14         A     I don't recall.

15         Q     Well, he wasn't.  Okay?

16               Was he wearing camos on the 20th?

17         MR. THEODORE:  Your Honor, I object.  This is

18   going well beyond the scope of Direct.

19   BY MR. GREEN:

20         Q     Was he dressed to take down the city that

21   day?

22         MR. THEODORE:  Relevance, Your Honor.

23         THE COURT:  I will allow this line of

24   questioning.

25

1    BY MR. GREEN:

2           Q      Was he dressed to take down a city that day

3    or --

4           A      I wouldn't know how one would dress to take

5    down a city.

6           Q      Well, was he wearing a casual dress shirt

7    and chino pants?

8           A      On that particular day, I told you I didn't

9    lay eyes on him.  On the day that you're referring to, I

10   don't recall what he was wearing.

11              MR. GREEN:  That's all.

12              THE COURT:  Thank you, Detective Dockery.

13              Any other witnesses?

14              MR. THEODORE:  No, Your Honor.

15              THE COURT:  Why don't we do this then,

16   Mr. Theodore.  If you would like to present argument, do

17   it in the context of the Government's motion or, more

18   broadly, on the subject of sentencing.  We'll hear

19   argument from the Government --

20              MR. THEODORE:  Okay.

21              THE COURT:  -- and then we'll hear from

22   Mr. Green on sentencing as well as the motion; and I will

23   certainly give you the opportunity to respond.

24              MR. THEODORE:  Yes, sir.

25              Your Honor, I'm going to address the motions for

1    upward departure by the Government.  Mr. Mackie is going

2    to address the response to the Defendant's motion for a

3    variance and departure.

4          THE COURT:  That's fine.

5          MR. THEODORE:  Your Honor, with regard to the

6    motions for upward departure, the first basis that we

7    articulated is 5K2.17 in that the Defendant possessed a

8    semi-automatic firearm capable of accepting a large

9    capacity magazine in connection with a crime of violence.

10         Of course, this Court has already ruled that Mr.

11   Huff has been convicted of a crime of violence.  So the

12   question is:  Did he possess a semi-automatic firearm

13   capable of accepting large capacity magazines in

14   connection with his offense here.

15         There is evidence in various ways here and a lot

16   of it, in addition to the physical evidence at trial,

17   comes from Mr. Huff himself.  We heard a tape at trial

18   where Mr. Huff was in a restaurant called Donna's

19   Restaurant in Madisonville on the day of the crime, and he

20   is regaling the crowd and telling them about how he's got

21   an AK-47 in his truck and he's got 300 to 400 rounds of

22   ammunition with it.  We heard it in Mr. Huff's owns words.

23         In addition to that, we have Mr. Huff testifying

24   at trial.  And, of course, he knows there is a tape here

25   of him admitting to having the AK-47 in his truck.  He

1   would be pretty hard pressed to deny that he had it.  So,

2   when he testified, he admits that he had an AK-47 with him

3   on that day.  He talked about that he didn't bring it on

4   April 1st, but on April 20th, he did have his AK-47.

5           He says he didn't have 300 to 400 rounds, he

6   minimizes that, but he did say something very important.

7   He said he had, I believe it was four clips of ammunition

8   with him that were with the AK-47.  Those are 30-round

9   clips.  I don't have the exact testimony, but I think it

10  was very clear from his testimony that he had several

11  clips of ammunition for the AK-47 with that firearm; and

12  that came from his own mouth, his own words, when he

13  testified at trial, Your Honor.

14          Clearly, they were -- and we know what type of

15  clips they were.  Yeah.  We don't have a picture of those

16  exactly that day, but we know the type of clips that he

17  had associated with that gun.  Ammunition clips for an

18  AK-47 were seized from his house, they were seized from

19  his truck on the day of his arrest, and we know exactly

20  which type of clips they were.  They were the 29 to

21  30-round clips.

22          I believe, again, that Mr. Huff's testimony made

23  that even more clear, I think, as far as how many rounds

24  he had on that.  He was conceding that fact.  Of course,

25  he didn't realize what he was saying and what the

1   implications would be for motions for upward departure and

2   that that can be a valid basis for a departure, Your

3   Honor.

4           So I think the evidence is very clear when you

5   look at the physical evidence here, when you look at Mr.

6   Huff's own statements, and you look at just the massive

7   amount of AK-47 ammunition that he had in his home, in his

8   truck.  Clearly, I think it's clear that he possessed a

9   semi-automatic firearm, by his own words, that accepted

10  large capacity magazines and it was in connection with a

11  crime of violence.  Certainly, that possession was in

12  connection -- he had it with him during the offense

13  itself.  He had that AK-47, according to him, with him in

14  Madisonville that day.

15          Your Honor, then we look at the degree of the

16  Court, under that guideline provision, to look at the

17  degree which that type of weapon increased the likelihood

18  of death or injury under the circumstances of that case.

19  As far as contemplating the degree of departure, the Court

20  can factor that in.  I think when you combine the firearm

21  and ammunition that Mr. Huff had, the AK-47 with the

22  ammunition that he had, and with this express intent to

23  take over the courthouse, to take over the city,

24  obviously, there was a potential for great harm.  The

25  whole situation was fraught with the potential for

1    something bad to happen, and it well could have happened.

2    Had there been any type of misstep at all, there could

3    have been something that was very, very severe and tragic.

4        I think we know all too well with shootings that

5    have happened in Tucson just barely over a year ago when

6    Representative Gabby Giffords and five others were killed,

7    a number of others injured, we know from the Fort Hood

8    shootings, we know the type of harm that can be inflicted

9    by one person with an assault weapon like this with a

10   semi-automatic who has bad intent.  Your Honor, certainly,

11   there was a great potential for serious harm to have been

12   inflicted.

13       Fortunately, there was a massive amount of law

14   enforcement there that day.  In fact, even Mr. Green

15   characterized it in his own motion, his own sentencing

16   memorandum, there was a small army of law enforcement

17   there.  They were there for a reason because they realize

18   what could have potentially happened there if they weren't

19   ready for it.

20       Your Honor, with respect to the disruption of

21   governmental function, §5K2.7, I first ask the Court to

22   recall the testimony of District Attorney Steve Bebb and

23   he testified that it was the tensest day he's ever seen.

24   He was coordinating about 100 law enforcement officers and

25   agents that day.  Again, it's Mr. Green who characterized

1    it as a small army there.  That's not typical.  There was

2    evidence here, testimony here, that officers were

3    assigned, had special protective details for municipal

4    offices that day.  And, yes, obviously, you can say,

5    "Well, that's part of the law enforcement efforts", but

6    when you have this type of massive response, something so

7    out of the ordinary, obviously, you are taking away

8    resources that could be possibly needed for other

9    instances, for other types of law enforcement matters.

10           Your Honor, we would submit to the Court that

11   it's not typical.  There was very unusual circumstances

12   that day with the massive response and the special

13   assignments that had to be done and the special protective

14   measures that caused a disruption to governmental

15   functions.

16           Thank you.

17           THE COURT:  Thank you.

18           Mr. Green?

19           MR. GREEN:  Your Honor, I'll start first with

20   the last 2.7 that Mr. Theodore just spoke about.

21           THE COURT:  That's fine.

22           MR. GREEN:  The officer that just testified very

23   candidly said there wasn't a single office in the county

24   courthouse or in the city hall that shut down or was

25   affected in any fashion.  The court continued to run that

1    day.  There's just no evidence that the governmental

2    functions were disrupted.

3            What is very significant here, Your Honor, is

4    the Government wants to have enhanced punishment, an

5    upward departure from the sentencing guidelines, based on

6    decisions that the Government made that day.  In every

7    case that I have looked at that interprets this particular

8    guideline, it's always talking about the conduct of the

9    defendant which wound up causing disruption to a

10   governmental function.

11           In this instance, taking the evidence in the

12   light most favorably for the Government, Mr. Huff made

13   some statements which alarmed government officials, but

14   then those government officials, as the officer just said,

15   they made the discretionary call to bring out a bomb dog.

16   They made the discretionary call to place snipers on

17   roofs.  They made the discretionary call to bring in

18   whether it was 10, 20, 50 or 100 law enforcement officers.

19   To say that there may have been some disruption from

20   making a cop do what he's supposed to do, we don't

21   concede, number one, that there was.  They are trained to

22   make people safe and to be there to keep people safe.

23           Secondly, these were not actions that Mr. Huff

24   took.  For instance, he didn't storm the courthouse with

25   his AK-47s blasting away and they had to shut the place

1    down for a week to process a crime scene.  It's very, very

2    different, Your Honor, when based on words he said or did

3    not say, they made the discretionary call that, "This is

4    what we feel like needs to be done."  We think that that

5    takes it outside of that particular guideline.

6            As to 2.17, Your Honor, if we want to guess and

7    try to cobble together some of the evidence in this case,

8    I guess you could make an argument that a large capacity

9    magazine enhancement may or may not apply, but I'm going

10   to read the guideline.

11           "If the defendant possessed a semi-automatic

12   firearm capable of accepting a large capacity magazine in

13   connection with a crime of violence or controlled

14   substance offense, an upward departure may be warranted.

15   A semi-automatic firearm capable of accepting a large

16   capacity magazine means a semi-automatic firearm that has

17   the ability to fire many rounds without reloading because

18   at the time of the offense the firearm had attached to it

19   a magazine or similar device that could accept more than

20   15 rounds of ammunition or a magazine or similar device

21   that could accept more than 15 rounds of ammunition was in

22   close proximity to the firearm".

23           Well, for starters, one, we still don't concede

24   the fact that this was a crime of violence, and that will

25   be litigated before the 6th Circuit.  But assuming

1    argument, or for purposes of this argument because the

2    Court has found that this particular offense is a crime of

3    violence, what is significant here, Your Honor, is Mr.

4    Theodore talks about the fact that his truck was searched

5    and his house was searched.  They are very, very true

6    statements, Your Honor.  However, that is excluding one

7    very important fact.  The truck that was searched when he

8    was arrested was the camo truck, and that was not the

9    truck that he had on April the 20th.  The black Oath

10   Keepers truck that he drove on April the 20th to this day

11   has not been searched.

12          His statements about there being 1 round, 50

13   rounds or 1,000 rounds of ammunition in that truck don't

14   add anything to this particular occasion.  We have to

15   guess and speculate as to what he did or did not have

16   within the toolbox of that truck in order to be able to

17   apply this enhancement, and I don't think that's what the

18   law calls for.  We don't believe that they have proven it.

19          THE COURT:  Thank you.

20          Mr. Theodore, anything further?

21          MR. THEODORE:  Just briefly, Your Honor.

22          It doesn't require speculation.  All you have to

23   do is look at what the testimony of Mr. Huff was and the

24   evidence at trial, both the tape recording where he's

25   talking to people at Donna's Restaurant and his own

1    testimony with regard to having that firearm and having

2    the ammunition clips with that firearm at that time.

3           MR. GREEN:  Briefly, in response to that, Your

4    Honor.

5           They can't have their cake and eat it too.  They

6    have gotten an obstruction enhancement because they said

7    his testimony was not worthy of belief.  So to now come in

8    here and say, "Okay.  Well, we're going to believe him on

9    this but not when he says, 'I didn't make those

10   statements.'"  They don't get to have it both ways, Judge.

11          THE COURT:  All right.  Thank you.

12          Let's switch then to the Defendant's sentencing

13   memorandum and motions.

14          Mr. Green, we'll hear from you, and then we'll

15   let Mr. Mackie respond.

16          MR. GREEN:  Your Honor, we, obviously, would ask

17   the Court to rely upon all of the grounds even if I don't

18   specifically talk about them in my argument that are

19   included within the sentencing memorandum that we filed.

20          I'm going to touch upon --

21          THE COURT:  The Court will do so and has read

22   everything that's been filed by both parties in this case.

23          MR. GREEN:  I'm going to touch upon two or three

24   things that we talked about in the sentencing memorandum.

25   I will say from a personal perspective that this has been

1    one of the more interesting and challenging cases that I

2    have been involved in 25 years of practicing law.

3    Mr. Huff is an interesting individual.  Mr. Huff is in

4    some ways a contradiction, and in other ways he is very,

5    very consistent in the way he has lived his life.

6          I think it's very significant when the Court

7    looks at the §3553(a) factors which specifically include

8    the history and characteristics of the Defendant, Mr.

9    Huff's entire life has been one that has been one of his

10   conduct and his actions speaking much louder than his

11   words.  This is not a person who professes to be religious

12   and then there's no outward manifestations which would

13   support those claims or beliefs.

14         This is a person as in many, many of the letters

15   that Your Honor read that were attached to his sentencing

16   memorandum observed, this is a man who has been very, very

17   giving with both his time and whatever financial resources

18   he may have had at the time.  As Your Honor read in the

19   materials we attached to our sentencing memorandum,

20   Mr. Huff and his wife purchased a home.  I've been to that

21   home.  It's a nice home in a nice subdivision in Dallas,

22   Georgia.  It's the type of community where a lot of

23   people, if they had an extra 30, 40 or $50,000.00, the

24   first thing that they would want to do is figure out where

25   they could put a swimming pool in their backyard.  That

1    wasn't the situation with the Huffs.

2          Mr. and Mrs. Huff spent the money that they

3    could come up with to build an addition off the back of

4    their home.  That addition didn't house a media room,

5    rather it housed a meeting room.  That meeting room, Your

6    Honor, on a weekly basis, as those letters told the Court,

7    brought in anybody who wanted to come in.  Whether it was

8    5 people, 15 people or 20 people every week, the Huffs had

9    people in for Bible studies every Friday night; and that

10   was at their expense.  If it cost $100.00, $150.00 to feed

11   everyone there for as long as they wanted to stay there,

12   whether it was until 10:00 in the evening or 3:00 in the

13   morning talking about the Bible and discussing the Bible

14   and what they've read, they did it at their own expense

15   and out of their own pocket.  That house, unfortunately

16   because of Mr. Huff's current predicament will probably no

17   longer be the Huffs.  It's going to be owned by a bank

18   again in the very near future.

19         Mr. Huff is an individual while -- you know, we

20   referred to him during the course of this trial and I

21   think the facts fit, he is a very, very passionate

22   individual about what he believes in.  He can be very,

23   very vocal when he has a passionate belief about

24   something, but that, to me, Your Honor, is the ultimate

25   irony in this case.

1      The Government wants to imprison him not because

2   of what he did in Madisonville that day but because of

3   what he said.  Where we have an individual whose whole

4   life is characterized by his actions dictating who he is,

5   as the example I just gave about housing the Bible studies

6   proves on a repetitive and daily and weekly and monthly

7   basis.

8      Secondly, Your Honor, this case has been

9   challenging for me.  I'm not as smart as these lawyers

10  over here.  I kind of look at facts when I see them in a

11  case and I say, "What has my client done?  What are the

12  bad facts that I have to deal with here?  What has he done

13  that puts us before this court", whether it's across the

14  street or over here.  When I look at these facts, I still

15  have to scratch my head a little bit.

16      I understand a jury has said what they've said,

17  they said he's guilty of this offense; but when you step

18  back once again and look at all the facts in this case, he

19  can legally possess guns, he can legally assemble, he can

20  legally protest what he believed to be the conduct of

21  governmental officials in Madisonville in Monroe County in

22  arresting Mr. Fitzpatrick and what he and others perceived

23  to be corruption.  We may not agree with that, but that's

24  kind of what makes this country what it is.  He has the

25  right to say what he believes in.  He has the right to

1    protest against that which he doesn't believe in and feels

2    is not right.  He had the right.  He had a carry permit.

3    He had taken the lawful steps he had to take to legally be

4    able to carry a firearm.

5              Was it the smartest choice in the world to go to

6    Madisonville that day toting a .45 on his hip?  Probably

7    not.

8              Was it the smartest choice in the world to run

9    his mouth about having an AK-47 in the toolbox of his

10   truck?  Probably not.

11             But if we're going to incarcerate everybody that

12   says stupid stuff, I'm going to be at the front of the

13   list, and there is not going to be a person who would be

14   safe.

15             The other thing that I guess I just can't get my

16   head wrapped around, Your Honor, is if we give the

17   Government the benefit of every fact in this case, just

18   for purposes of this argument -- and we're certainly not

19   conceding that.  We'll let the 6th Circuit decide what is

20   and what isn't -- but if we give them the benefit of the

21   doubt, what if they say the next time, if there ever is

22   another one, an 18 U.S.C. §231 punishment, or prosecution,

23   and that person is convicted, what can they say for that

24   next defendant?

25             They're telling this court that this statute

1    calls for five years and this man deserves every day of

2    it.  They're telling this court that he is the worst of

3    the worst.  They're telling this court that even though he

4    made the decision to put his sidearm off his hip, which

5    those law enforcement officers couldn't force him to do,

6    he made that decision to put it in the toolbox and never

7    took it out.  Even though he made the statement the night

8    before to the FBI, "Hey.  If there's a problem, tell me.

9    I won't go up there", even though he came back a week

10   later after having done nothing in Madisonville and was

11   recruiting law enforcement -- not other militia members,

12   not other yayhoos off the streets, not gang members out

13   from East Knoxville -- law enforcement officers who are

14   trying to help him with his cause, they are saying he is

15   the worst of the worst, that he deserves every day this

16   court can give him under this statute.

17         What is left for the next one?  What is left for

18   the next 18 U.S.C. §231 prosecution where that defendant

19   doesn't keep the gun in his truck, where he gets out and

20   does try to arrest a citizen, where he gets out and does

21   try to arrest a government official?  What's left for him?

22   It's not going to be more than what this citizen gets.

23         THE COURT:  Although, we have to be mindful,

24   don't we, that in looking back at Count 2 for which the

25   Defendant was found not guilty was carrying a firearm

1    during or in relation to a crime of violence, which, if

2    the Defendant had been found guilty of that crime, I don't

3    have that information in front of me, but I believe he

4    would be facing, perhaps, 60 months on top of the

5    potential 60-month sentence in this case.

6                MR. GREEN:  I'm not trying to be a smart aleck,

7    Your Honor, but ifs and buts were candy and nuts, every

8    day would be Christmas.  I mean, what we're dealing with

9    is the statute that is before the Court --

10               THE COURT:  I know, but you're dealing with ifs

11   and buts as well.  Your argument is if he had taken the

12   gun out, if he had not taken it off the side --

13               MR. GREEN:  With all due respect, Your Honor, my

14   argument is for purposes of this statute and this statute

15   alone, if it's utilized again, what is left?

16               If, in fact, just having the intent and having

17   guns constitutes a crime of violence which gets your

18   guideline ranges just ratcheted up the way these have

19   been, I mean, what's left?  I mean, everybody is going to

20   get five years here.  How do we distinguish between this

21   person who took the steps that he took that day to make

22   sure there wasn't violence, to make sure there wasn't a

23   problem in Madisonville, to make sure that he didn't move

24   the wrong way towards that gun on his hip and all of a

25   sudden the snipers start blasting and people get killed?

1    What's left?

2         He's the worst of the worst, if you believe the

3    United States.  There can be no greater punishment under

4    this statute, if they have their way.

5         I want to talk as well, Your Honor, about

6    disparity, and that is a specific consideration under 18

7    United States Code §3553(a).  Disparity comes in many

8    shapes and forms.  I have a very, very difficult time,

9    Your Honor, understanding how, when we think back to kind

10   of how Mr. Huff got embroiled in this whole mess to the

11   extent that he did, Mr. Huff didn't start this, Your

12   Honor.  Mr. Huff may have said some things which alarmed

13   some bank employees, but all of that stemmed from what

14   Walter Fitzpatrick did.

15        Walter Fitzpatrick has never faced the first

16   federal prosecution.  Walter Fitzpatrick was prosecuted in

17   the state system, as was Mr. Huff.  Walter Fitzpatrick who

18   authored the citizens' arrest warrants.  Walter

19   Fitzpatrick who was the proverbial stick that stirred the

20   pot and continued to stir the pot did less than six months

21   in custody.  The United States of America wants this court

22   to impose 60 months, 10 times as much punishment on this

23   citizen as Mr. Fitzpatrick suffered.

24        And it's not just Mr. Fitzpatrick, Your Honor.

25   There's others.  Later today, an individual named Kenneth

1    Roy Wade will plead guilty before Judge Phillips.  An

2    Affidavit of Complaint, sworn affidavits, in his court

3    file on the ECF System says that Mr. Wade threatened a

4    sitting Social Security Judge, threatened him with murder,

5    admitted to the FBI that he waited on that judge and

6    planned the shooting, but that judge never came out,

7    Mr. Wade faces between 24 and 34 months in custody; but

8    the Government says that Darren Huff deserves 60.

9            Franklin Delano Jeffries, II went to trial.

10   Mr. Jeffries was convicted of posting a video on You Tube

11   which threatened the life of Chancellor Mike Moyers as

12   retaliation for decisions that Chancellor Moyers had made

13   in a custody dispute involving Mr. Jeffries' son.

14   Mr. Jeffries was sentenced after a trial to 18 months in a

15   federal penitentiary, but Darren Huff deserves 60.

16           United States of America vs. Glendon Llewellyn

17   Swift.  Mr. Swift called United States Representative Eric

18   Cantor's office in Washington, threatened to rape

19   Representative Cantor's daughter, threatened, among other

20   things, to kill Representative Cantor's wife and referred

21   to him in a diatribe, expletive-laced messages on two

22   occasions as a "Jew boy".  Mr. Swift received a punishment

23   of 13 months, but Mr. Huff deserves 60.

24           United States of America vs. Jimmy Ray Brown, he

25   was indicted for being a felon in possession.  Immediately

1    after he was released -- and, obviously, we know he is a

2    felon because he is a felon in possession, unlike Mr. Huff

3    who had no record.  Jimmy Ray Brown was indicted for being

4    a felon in possession.  After release, he went to the

5    agent's family, to his home, and confronted his family and

6    made certain statements which were construed as being

7    threats and threatened retaliation for past action, Mr.

8    Brown received a sentence of 37 months; but Mr. Huff's

9    country tells him he deserves 60.

10          Your Honor, we can all agree to disagree about

11   certain things, and Mr. Huff and I have had our

12   differences.  I don't think that's any great secret.  I'm

13   probably not at the top of his Christmas card list.

14   That's no great secret.  But what the United States of

15   America is doing in this case, with all due respect -- and

16   I have great respect for the people behind me -- is a

17   little bit scary.  We have an individual who had a

18   conversation with the FBI the night before where he told

19   them everything he was going to do the next day, what he

20   would have with him, what their plans were and who made

21   the statement that he wouldn't go if there was a problem.

22          But rather than say anything, "Hey.  Mr. Huff,

23   maybe you shouldn't be doing that", they laid in the wings

24   and they waited.  They watched him.  They watched him

25   leave Georgia.  They watched him cross the state line.

1    Now they want to put him in prison for five years.  They

2    watched him do nothing in Madisonville that day --

3    nothing.  He didn't hurt anybody and they want to put him

4    to prison for five years for speaking out.

5              Who's next?

6              Who's next?

7              If this Court wants to look at some really

8    ill-advised things that were said and some very poor

9    choices about the luggage, for lack of a better way of

10   putting it, that he brought with him to Tennessee on April

11   the 20th, I guess if you want to look at that in

12   isolation, you can hammer him and you can give him five

13   years.  But if you want to look at everything he has done

14   in his life and if you want to look at all the facts in

15   this case, yeah, this could have been a whole lot worse --

16   could have been, should have been, would have been.  It

17   could have been a whole lot worse, but a big reason that

18   it wasn't, Your Honor, is because of the decisions he

19   made.

20             I just, with all due respect, don't believe he's

21   the worst of the worst.

22             THE COURT:  Thank you.

23             Mr. Mackie?

24             MR. MACKIE:  Your Honor, I do think it is

25   appropriate to start where Mr. Green, in a sense, left off

1 and discuss why this is a case that fully warrants a

2 guideline sentence that is a just and appropriate

3 punishment.

4   On the basis of what Mr. Green was just saying,

5 let's step back and think about this case.  Let's use

6 reason, not emotion, and let's ask what his client has

7 done, what has the Defendant done, and why is a guideline

8 sentence appropriate.

9   Mr. Green, just before I go into the issues

10 about the variances and why I think they do not apply why

11 I think it's a guideline sentence would, in his eloquent

12 fashion, try to make this a First Amendment case.  His

13 client, the Defendant, Mr. Huff, certainly talked the

14 talk, but he also walked the walk.  He took actions beyond

15 talking.  The You Tube case, you could throw all sorts of

16 things, if somebody makes remarks and, yes, you can make

17 an interstate call that threatens someone and that's a

18 crime, but the sentence is different because it's a

19 different crime.

20   Just for one moment, just to put this to rest

21 under the §3553(a)(7), when you're talking about

22 disparity, and let's put this to rest, it's a question

23 about defendants with similar records found guilty of

24 similar conduct.  This is different.  So we're not going

25 to say if you pick out any cherry-picked case and say,

1    "This sentence was different", that's different conduct.

2    It's not words, it's actions.

3            So let's step back and think what has the

4    Defendant done and why, in fact, that the guideline

5    sentence that the Court outlined in its recent memorandum

6    and order and in the presentence report makes perfect,

7    rational sense and why there should be a variance and why

8    this should be applicable.

9            We are going to go over the reasons for the

10   variance in a moment and why it should; but let's just

11   overview and let's say, "What is the base offense?

12   Transportation of firearms, 2K2.1."  That is exactly what

13   happened.  This is not a stretch.  This is not words.

14   This is what happened.  He transported weapons across

15   state lines.  There is no question about that, and that is

16   certainly what the jury found.

17           Going on to what the Court found, possession of

18   a weapon in connection with another felony.  He didn't

19   just carry a gun for no purpose.  He did it for the reason

20   the jury found, which was to transport that weapon in

21   furtherance with the intent to further a civil disorder.

22   That is logical.  That is exactly what happened.  And what

23   was it?  It was not words.  It was action, action that had

24   already been taken out.

25           I don't think we have to think far back to

1    remember that he was carrying multiple copies of

2    Government Exhibit 2 and 3.  Government Exhibit 2 is a

3    Citizen's Arrest Warrant, and Government Exhibit 3 is the

4    Affidavit of Criminal Complaint.  This was action.  This

5    was not talk.

6         We already know from April 1st there was an

7    effort to actually move into a courtroom -- this, of

8    course, was not through the conduct that was charged, but

9    it certainly shows what the intent was -- into a courtroom

10   to execute an arrest warrant.  This was intent.  He had

11   the intent that day if he thought it was necessary to do

12   this very same thing, which would be, in a sense, the

13   aggravated assault, which the Court found.

14        Why do we say that?  Well, as Mr. Green was

15   saying, I would agree, the Defendant closely held his

16   beliefs and those beliefs are reflected in here, that he

17   believed these persons, both local officials as well as

18   national officials, but the local officials were domestic

19   enemies.  What was he going to do about it?  He was going

20   to arrest them.  That was his intent.  He expressed his

21   intent and he took actions to fulfill that intent.

22        I quote the arrest warrant that he was carrying,

23   doctrine of non-resistance condemned, that the Government

24   ought to be instituted for the common benefit, the

25   doctrine of non-resistance against arbitrary power and

1    oppression is absurd, slavish and destructive to the good

2    and happiness of mankind.  This was not a peaceful

3    protest.  The doctrine of non-resistance is absurd.  That

4    was his view and he was taking actions to enforce that.

5            Criminal Complaint to commit treason, to commit

6    levy of war against the United States.  This is something

7    he had a deeply held belief was a crime that he was going

8    to act upon.  So, stepping back, that is the aggravated

9    assault aspect.  It makes perfect sense.  He was seeking,

10   in his mind, to go over there and if the facts and the

11   circumstances warranted, he was going to arrest somebody.

12   That's more than minimal planning, no question about it.

13           We already know, as the Court has heard at trial

14   and has found on April 7th he had a planning meeting for

15   Phase 2.  It makes perfect sense that this was not an

16   impromptu something.  It wasn't just spouting off on a

17   moment.  This was something he thought about, he planned,

18   and he carried it out.  And he had a dangerous weapon that

19   was threatened as the Court found.  The presence of a

20   weapon, whether or not he is carrying it around, holding

21   it to the sky, shooting it into the sky or easily

22   accessible, he had the presence of that weapon.  That all

23   makes sense.  It makes perfect sense because that's

24   exactly what happened in this case.

25           The guideline punishment that the Court is

1    looking at is not, as Mr. Green argues, disproportionate

2    and oppressive when it's considered in terms of the actual

3    conduct of the Defendant.  This is not a case about

4    unlawful thoughts as he says, "The only thing I did", and

5    I think he believes it, "is I just had these thoughts and

6    I drove across the state line with a lawfully possessed

7    weapon.  Thinking bad thoughts while driving around

8    legally with guns, I shouldn't be punished for that."

9         He also asked for a variance because he did not

10   have knowing and sustained intent.  He says, "Well, you

11   know, the statute is so obscure."  I think it's also been

12   referred to, if not by him, as archaic.  It's not.  I

13   mean, it was passed probably before the recent Kardashian

14   wedding, but it doesn't mean that it's obscure or obtuse

15   or any of that.  It has been in place for a reason to stop

16   the conduct that the Defendant was undertaking, which was

17   as it says, to transport weapons interstate with the

18   intent -- you have to find the intent and that was found

19   in trial -- to further a civil disorder.

20        He also argues that he would be -- the Defendant

21   would be subject to abuse in prison because of his

22   beliefs, the coon argument, that because he has notoriety

23   or expressed some sort of extremist or white supremacist

24   view, that would make him more vulnerable.  I don't think

25   there's any basis for that.

1             So let's talk about specifically these arguments

2     for variance.  Let's first just address these, what I

3     consider the non-core secondary arguments, you know, the

4     subject to abuse in prison, the disproportioned others not

5     charged, whether it be Fitzpatrick or someone else, the

6     loss of civil rights and the fact that he's a religious

7     person.

8             We have already addressed the disproportion

9     issue.  You're comparing apples and oranges there.  This

10    is not the issue.

11            As far as him being religious, certainly there

12    is nothing wrong at all to be held against him being

13    religious.  I would say that being religious can be a

14    basis both for good but also for extremism.  Closely held

15    beliefs in that regard can prompt someone to believe that

16    the law in place is not appropriate because there is a

17    greater moral or religious view.  Being religious in and

18    of itself, there's nothing wrong with that.  If you're

19    using your personal-held beliefs in order to enforce what

20    you think is right against the existing law, then that is

21    a problem.

22            The core arguments in this case that the

23    Defendant makes is that the punishment under the guideline

24    sentence would be disproportionate and oppressive, they

25    didn't have a knowing intent, and it ultimately does not

1    promote respect for the law.  I would say to the Court it

2    is these very same factors that warrant a guideline

3    sentence.  When we look at §3553(a), we take the guideline

4    sentence -- of course, as we know, post-Booker being

5    advisory, but that is the starting point.  So you start

6    there and you say within the §3553(a) factors, it's

7    exactly where we should be at in the guideline sentence --

8    the nature and circumstance of the offense and the history

9    and characteristics of the defendant.

10           We have already emphasized that this is a case

11   of actions, not words.  We know that it started out on

12   April 1st with an attempt to arrest Mr. Huff in

13   conjunction with Mr. Fitzpatrick, Gary Pettway, Grand Jury

14   Foreman.  The second meeting on the 7th, they're planning

15   the future arrests, Phase 2.  As the Court has noted Mr.

16   Huff in his own words, "I'm on the higher end of the

17   enforcement side of this whole thing.  I'm not Mr.

18   Rhetoric.  I'm not Mr. Theoretical.  I'm Mr. Enforcement."

19   That's exactly what he was.  That's what he was doing that

20   day.

21           Reflect the seriousness of the offense, promote

22   respect for the law and just punishment for the offense.

23   This law, if one stepped back and looked at it, is

24   designed to do exactly this, to prevent violence.  This is

25   to stop something before it happens when there is evidence

1    of intent.

2           When you look back to some of the reported cases

3    on §231(a), and this case was §231(a)(1), United States

4    vs. Featherston cited in our earlier briefs, 461 F.2d 1119

5    in the 5th Circuit, it's talking about how the intent is

6    necessary.  The requirement of intent in this statute

7    narrows the scope of enactment, that's the statute, by

8    exempting innocent or inadvertent conduct from its

9    proscription.

10          In this case, it was a black, African militant

11   movement, BAMM.  A person was charged with instructing

12   someone on how to prepare an explosive device.  Not even

13   carrying it, not putting it out -- "Here is how you do

14   it."  That is instruction.  You say, "Oh.  Well, those are

15   just words."  Well, this is what the statute is intended

16   to prevent, not the actual explosion or not the actual

17   shooting, whether it be the Tucson shooting or anything

18   else.  It's to stop that from happening with sufficient

19   evidence of intent.

20          In this case also, under §3553(a), we talk about

21   adequate deterrence to criminal conduct by others and to

22   protect the public from further crimes of this Defendant.

23   I think it goes without saying, shall we say, that there

24   are others out there.  There are militia groups, there are

25   sovereign citizens, the people who you would call lone

1    wolves who may have these closely-held beliefs that these

2    are domestic enemies, that these are enemies of the state,

3    that, you know what, that's the beast that needs to be

4    slain.  This is what people believe and this is to deter

5    that kind of conduct where somebody is taking the law into

6    their own hands.

7              That was the point of Featherston, which was the

8    instruction on the explosive devices.  It was also the

9    point of this law that was used in the Wounded Knee

10   situation.  We cited that in the brief.  Just to remind

11   the Court, this is where someone actually took over a

12   building, a post office, as Russell Means in the American

13   Indian Movement took over a building.  There was a law

14   enforcement presence around it to try to keep it from,

15   shall we say, exploding.  People were streaming in with

16   weapons to join the movement no more than as in

17   Featherston where the stated purpose of the demonstration

18   was to prepare the members of BAMM for the coming

19   revolution.  People were coming into Wounded Knee for the

20   purpose of joining in this civil disorder.  That's what

21   the law was intended to stop, that particular action.

22             So, in this instance, do we have a basis for a

23   variance.  Well, to begin with, of course, the guideline

24   sentence is above what the statutory maximum is.  So,

25   certainly, if we're looking at the fact that the guideline

1   sentence, for the reasons that make perfect sense as I

2   outlined earlier, is 70 to 87 months; and if you go down

3   to the statutory maximum, which is appropriate, it's 60

4   months.  Right away, that is, in a sense, a statutory

5   variance.  But is that a just and fair sentence?

6   Absolutely, Your Honor.  Absolutely.  Because Mr. Huff

7   decided in that time, in a sense, to take the law in his

8   own hands.

9           In this country, we are a land of law.  This is

10  a country of law, not of power.  If you decide, if any

11  person decides to take the law into their own hands -- I

12  know.  Let's disregard the speed limit.  Let's start

13  there.  Let's start doing this because I don't think it's

14  right.  I have a personally held belief that it's right.

15  Or let alone I have a declared domestic enemy that I think

16  should be arrested.  This is not a question here of

17  enforcing an overbearing, draconian -- I think was the

18  word -- law and order.  This is trying to promote peace

19  and order.

20          Is it an adequate deterrence?  Does the

21  variance -- in the terms of the variances we have, if

22  there are variances that were argued, does that provide

23  adequate deterrence to criminal conduct of other persons

24  or this Defendant?  This Defendant, I think, still to this

25  day believes he did absolutely nothing wrong and he would

1   do it again if he could.  I think if he is given, in a

2   sense, time served and probation, which I think is what

3   they're asking for, he goes out there, "You know, I didn't

4   do anything wrong and I would do it again because I'm

5   right."  Does that promote respect for the law?  Not in

6   the least.  Not in the least.

7            If a judge makes a ruling, if a statute is

8   passed or a judge issues a ruling and says, "Thou shall

9   not do this because it's against the law", we live in a

10  society where people voluntarily comply with the law.  If

11  they don't, then they should be prosecuted.  As the famous

12  saying from Andrew Jackson's era, "The judge issued the

13  order.  Let's see him enforce it."

14           We don't want to be a nation where everyone

15  wants to have the force of guns to keep law and order.  It

16  is because people know that this is the established rule.

17  We do not convene our own Grand Jury, we do not write up

18  our own criminal complaints and affidavits, and we do not

19  go out and arrest people that we don't like for whatever

20  reasons because that is not what this nation is about.  If

21  the conduct in this case is not met with the appropriate

22  punishment, it will undercut respect for the law.  We need

23  to promote respect for the law by showing a just and fair

24  punishment, which in this case is the guideline sentence.

25           It is perfectly logical, if one goes through it

1    and looks at the way it was, in a sense, put together,

2    transported a weapon with the intent to commit a civil

3    disorder, you have that possession, you have the planning.

4    All of those issues that the guidelines call for above the

5    statutory maximum is for a reason.  It's not just

6    arbitrary.  It's for a reason.

7              The guideline sentence of five years is a just

8    and fair sentence both for the Defendant and for the

9    public interest for the reason, if nothing else, that it

10   meets the criteria set forth by Congress to deter future

11   conduct of this nature of which there are unfortunately

12   many out there who see nothing wrong with going and

13   arresting who they believe are declared domestic enemies.

14   To promote respect for the law and to send a message both

15   to this Defendant for his future conduct in life and to

16   others and to the public that in order to have peace and

17   order one must abide by law and order.

18             The Defendant took the law into his own hands,

19   in his view, and it should be appropriately and justly

20   punished.  The guideline sentence is absolutely

21   appropriate.  All the bases of the variance that the

22   Defendant argues does not have merit.  The appropriate and

23   the just punishment in this case would be a sentence of

24   five years.

25             THE COURT:  All right.  Thank you, Mr. Mackie.

1          Mr. Green, anything further?

2          MR. GREEN:  No, Your Honor.

3          THE COURT:  All right.  Just to be clear, we

4    argued motions but also obviously addressed sentencing

5    factors.  Does counsel for either party wish to in any

6    further respect address the subject of sentencing in this

7    case?

8          MR. GREEN:  Not related to sentencing, Your

9    Honor.  We have stated our position and what we believe

10   the sentence should be in the sentencing memorandum.

11   Obviously, Mr. Huff wishes to allocute and has some things

12   to say before the Court passes sentence.

13         THE COURT:  Mr. Theodore or Mr. Mackie, anything

14   further?

15         MR. THEODORE:  Your Honor, the only thing I

16   would say is I just wanted to respond briefly to what

17   Mr. Green was talking about as far as the Government's

18   conduct being scary here.  I think Mr. Mackie dealt with a

19   lot of things.  He uses the term "obscure" and, of course,

20   there is nothing ambiguous or vague about the statute he

21   is charged under.  It's designed to protect against the

22   exact type of conduct that Mr. Huff was involved with.

23         Then he talks about, "Oh.  This is a little

24   scary what the Government is doing."  There is nothing

25   scary about prosecuting this type of violation when he has

1   the type of intent and the capabilities that he had.  I'll

2   tell you what is scary -- and it's not a little scary.

3   It's a lot scary -- it's a person like Mr. Huff who

4   characterizes himself, it came out at trial, as a

5   potential domestic terrorist.  That is a term that came

6   out.  He actually had business cards put out where he

7   characterized himself as a potential domestic terrorist.

8   He embraced that term.  He embraced it.  He wanted to be

9   characterized that way.  He was proud of it.

10          What is scary is somebody who calls themself a

11  potential domestic terrorist, then goes to a city,

12  expresses the intent to go take over the city and goes

13  there with an AK-47 and 300 to 400 rounds of ammunition,

14  according to him.  That's not a little scary.  That's a

15  lot scary.  That's exactly why there was the law

16  enforcement that there was.  What is scary is when

17  somebody who characterizes themselves as a potential

18  domestic terrorist links up and joins other fellow

19  extremists and they go down with the intention of

20  arresting public officials.

21          Of course, we know his statement all too well.

22  "Yep.  I fully intend to proceed with those citizens'

23  arrests.  I've got my .45 because ain't no government

24  official gonna go peacefully."

25          That's what is scary, Your Honor.  His conduct

1   is scary in this case.  There is an appropriate statute

2   and an appropriate guideline range.

3         Thank you.

4         THE COURT:  Thank you.

5         Mr. Green?

6         MR. GREEN:  I'm going to respond to that, Your

7   Honor.

8         THE COURT:  Okay.

9         MR. GREEN:  Maybe Mr. Theodore's a bit braver

10  than I am, but what I find very scary, Your Honor, is the

11  right to have different viewpoints and different

12  viewpoints of whether or not there is something wrong and

13  amiss in a particular municipality and government, somehow

14  that gets translated into, "We need to put this man in

15  prison for as long as we can possibly put him in prison."

16        I don't agree with him.  I haven't agreed with

17  him from Day 1.  He and I have had many, many passionate

18  arguments about any number of different subjects, but I

19  will stand here and talk until I can talk no more

20  defending his right to have those beliefs.  What is scary

21  to me, Your Honor, is that what is scaring everybody,

22  according to the Government, is what he says.  They keep

23  referring back to what he says and pieces of paper that he

24  was carrying.  He didn't do anything when he got to

25  Madisonville, but they want this court to give him every

1    single day that this court can give him under the law.

2    That is scary.

3              THE COURT:  All right.  Thank you.

4              The Court appreciates the arguments offered by

5    both counsel or all counsel for the parties in this

6    action.

7              Next, Mr. Huff, if there is anything, sir, you

8    would like to say on your own behalf before sentence is

9    imposed, then I would invite you back up to the lecturn.

10   You can discuss that with your counsel if you would like.

11             If you would, sir, would you like to make a

12   statement?

13             MR. HUFF:  Yes, sir.

14             THE COURT:  If you would come back up to the

15   podium then along with your counsel, please.

16             Go ahead.

17             MR. HUFF:  I actually had a prepared statement

18   and I believe that a lot of the things were covered, but

19   there were a few things that were stated by the Government

20   that I would like to address if that's okay.  So I'm not

21   really prepared, but I'll try and wing it as best I can.

22             THE COURT:  Go ahead.

23             MR. HUFF:  The obscure statements, the archaic

24   statements that they say that the defense counsel is

25   bringing up is also being brought up by the mainstream

1    media who are calling this an archaic and obscure statute.

2    No one can find anyplace where it's been used before.  I

3    would have to believe that as well as records are

4    maintained, at least since 1968, there would be a record

5    somewhere if it had been so that we could have some case

6    law.

7              Nevertheless, I was privileged to be a part of

8    this regardless of the outcome because I wanted to bring

9    things in open court.  Unfortunately, in my opinion,

10   things that I would rather have come out didn't make it.

11   But that being said, everything about this case has gone

12   to what my intent was; and, in that regard, some things

13   had come out, but I don't know that the pieces were

14   necessarily put together.

15             I think the episode at Wounded Knee was brought

16   up and how they were training people to, you know, make

17   bombs for the coming revolution.  I would be curious how

18   many of those participants actually sought out the

19   assistance of law enforcement as I did.

20             As was testified, when the FBI came to my house

21   the night before, I told them everything.  I told them

22   what we intended to do.  I told them that I intended to go

23   armed as was my right.  The Second Amendment to the United

24   States Constitution guarantees me that right.

25             It's my understanding that the Supreme Court has

1    also ruled that it is an individual's right not a

2    privilege.  But that being said, I also subjected myself

3    as one of these sovereign citizens that I'm being accused

4    of being, I subjected myself to the ATF or whoever does

5    the background checks to be able to apply and obtain a

6    Concealed Weapons Permit.

7            I have a driver's license.  I have a real

8    license plate on my vehicle.  I'm not a sovereign citizen.

9    But what concerns me the most is to find not that prior to

10   trial, the Government, through the Department of Justice,

11   the FBI and TBI in conjunction with the Tennessee Fusion

12   Center, had already produced and widely distributed a

13   26-page Power Point presentation entitled, "Suspicious

14   Activity Report Line Officer Training", where I have been

15   falsely labeled as a sovereign citizen and a potential

16   domestic terrorist.

17           My response, when I got the business cards made

18   up that was displayed through the trial, Mr. Jeffries just

19   presented them as though I had those prior to going to

20   Madisonville on April 20th.  I only had those made up a

21   couple of months before trial after seeing the absurdity

22   that was being reported in the media.  It was absolutely

23   absurd and bizarre to me that someone who has been

24   portrayed as badly as I have been portrayed, that I'm the

25   scariest guy currently in America, that I would be charged

1   with such a minor statute and have no criminal record to

2   speak of whatsoever.  It was my understanding going

3   through trial even up to the conclusion when Mr. Jeffries

4   walked over to the defense table and it was agreed that

5   I'm a Level 1 or a Category 1, that this was like a Level

6   12 as far as the sentencing guidelines, which would only

7   look at 10 to 16 months that weren't even mandatory.

8           It defies my logic and I would have to say that,

9   you know, maybe my defense attorney is not as intelligent

10  as these attorneys.  Well, I'm nowhere close to as smart

11  as my attorney.  I haven't been to college.  I've only

12  been to high school.  But how did we go from a 10 to

13  16-month with no mandatory minimum of incarceration or

14  even probation to now, all of a sudden, if the Government

15  had their way, I would be in for 20 years.

16          It doesn't even make sense and it creates

17  questions in my mind that, you know, ultimately -- and I

18  will present the questions to the Court.  Am I now going

19  to be sentenced for the charge that I was convicted on, or

20  am I to be sentenced the maximum allowed by law for

21  exercising my constitutional right to a jury trial or for

22  the sake of satisfying a perceived public opinion based

23  upon misrepresentations of the media; or is it because of

24  the pressure from the Department of Justice because they

25  already have me out in their educational series for law

1    enforcement that came out prior to trial where I was

2    already convicted in their mind and being used as a

3    national example to train law enforcement officers, in

4    other words, putting a target on my back personally

5    anytime I encounter a law enforcement officer?

6              So I was already convicted prior to trial so

7    that if somehow you were to allow me off with time served

8    and probation, they would then look bad and have egg on

9    their face once again.

10             When I went to Madisonville that day, as was

11   stated, everybody knows, the FBI was at my house the

12   evening prior.  I didn't hide anything from them.  When I

13   was stopped on the way to Madisonville, the officer,

14   Lieutenant Williams, I was there for 90 minutes as we all

15   saw, and I think a lot of us fell asleep watching the

16   video because it was so dramatic.  At the end of that

17   video or at the end the traffic stop, Officer Williams, as

18   his statements say, he asked me, "When you get to

19   Madisonville, would you mind putting this .45 away?"  He

20   testified that he asked me to put it away at the traffic

21   stop, but there was no such thing.  He asked me to put it

22   away at the traffic stop -- when I got to Madisonville.

23             I asked him, "Are you going?"

24             And he said, "Absolutely.  In fact, we'll be

25   following you."

1    So I said, "Great, because we just want to make

2 sure that everybody stays safe too.  In fact, I'll put her

3 away right now."

4    As the dash cam showed, Your Honor, I opened the

5 toolbox of my truck, I put the .45 inside, and I drove to

6 Madisonville.  Had I have listened to that officer, and

7 this to me is the most scary part because I feel that it's

8 only by God's grace that I'm even standing here talking

9 today, that officer used specific language.  He's been an

10 officer for years.  We saw him.  He's a little older.

11 He's a lieutenant with the Judicial Task Force.  He knows

12 what he's saying.  What that man asked me to do was to

13 take that .45 out of its holster in the presence of

14 potentially Agent Scott Johnson who had served as a

15 sniper.  The town was full of snipers.  What would have

16 happened that day had I have listened to Officer Williams

17 and went to town with every lawful intention of honoring

18 what he had asked me to do and took that .45 out of that

19 holster intending to put it away as I was asked?  But had

20 I have pulled that .45 out in front of those snipers, they

21 would have shot me dead in the street right then and

22 there, sir.

23    So my question is:  What am I getting sentenced

24 for?  For what I was convicted on or for all of this

25 speculation?

1          And that's all I have, Your Honor.  I appreciate

2    your time.

3          THE COURT:  Thank you.  The Court appreciates

4    your making that statement.

5          Why don't we do this.  Let's take about a

6    15-minute recess, and then I'll come in and pronounce

7    sentencing.  I want to consider some of the matters

8    discussed in court today as well as doublecheck a few of

9    the things discussed as well.

10          Let's stand in recess until 12:00.

11          THE DEPUTY CLERK:  All rise.

12          This Honorable Court stands in recess until

13    12:00.

14    (A brief recess was taken from 11:41 a.m. until 12:05 p.m.)

15          THE DEPUTY CLERK:  All rise.

16          This Honorable Court is again in session.

17    Please come to order and be seated.

18          THE COURT:  I want to thank everyone.

19          Again, the Court appreciates the statement

20    offered by the Defendant as well as the statements and

21    arguments both through their filings as well as in court

22    today offered by counsel for the Defendant and counsel for

23    the Government.

24          The Court also takes into consideration the

25    testimony of Agent Johnson and Detective Dockery offered

1   by the Government today as well as the letters of support

2   and other supporting material submitted on Defendant's

3   behalf.

4          In addition, the Court has carefully reviewed

5   the presentence report and the entire record in this case,

6   and in a manner intended to comply with the Sixth

7   Circuit's jurisprudence since the Booker case rendered the

8   sentencing guidelines advisory and Gall v. United States'

9   requirement that the Court make an individual assessment

10  based on the facts presented and adequately explain the

11  chosen sentence, the Court will explain its reasons for

12  the sentence to be imposed in this case.  The Court will

13  discuss the advisory guideline calculation and the factors

14  discussed in 18 United States Code §3553 relevant to this

15  case.  Based on those factors and consideration of the

16  guideline range as well as the statutory maximum and the

17  pending motions, the Court will impose a sentence

18  sufficient but not greater than necessary to comply with

19  the purposes discussed in 18 United States Code §3553.

20         First, with respect to the guideline range, and

21  that issue associated with the guideline range was

22  addressed in the Court's earlier ruling on the objections

23  to the presentence report and as set forth in Paragraph 49

24  of the presentence report, based on a total offense level

25  of 27 and criminal history category of 1, the guideline

1   range for imprisonment in this case is 70 to 87 months.

2   However, as there is a statutory maximum of 5 years, or 60

3   months, the restricted guideline range is 60 months.

4           Turning next to the §3553 factors beginning with

5   the nature and circumstances of the offense, the Defendant

6   has been found guilty by a jury of Count 1 against him,

7   that being transporting a firearm in commerce in

8   furtherance of a civil disorder in violation of Title 18

9   United States Code §231(a)(2).  The specific offense

10  conduct and, certainly, again, the Court notes the jury

11  trial in this case and the Court having heard the

12  testimony offered by both sides at this trial, but the

13  offense conduct is summarized in Paragraphs 6 through 12

14  of the presentence report which the Court would

15  incorporate as part of its analysis of the nature and

16  circumstances of Defendant's offense conduct.

17          In brief summary, on April 2, 2010, Walter

18  Fitzpatrick was arrested in Monroe County, Tennessee while

19  trying to conduct a citizens' arrest warrant on Grand Jury

20  Foreman Gary Pettway.  The Defendant became aware of the

21  arrest and the subsequent scheduled court date, and the

22  Paragraph 8 addresses various conversations, certainly,

23  again, which have been addressed by the parties' filings

24  and were by the Court at trial.  But Paragraph 8 addresses

25  the Defendant's conversations on April 15, 2010 with

1    Robert Shank Longmire as well as with Erica Dupree, both

2    employees of Chase Bank in Hiram, Georgia regarding

3    Defendant's statements related to upcoming travel to

4    Madisonville.

5           Paragraph 9 addresses the interview of the

6    Defendant by the FBI at his home on April 19th.

7           Paragraph 10 addresses the traffic -- the

8    Defendant being stopped for traffic violations on Highway

9    68 in Sweetwater, Tennessee, again, which was a subject of

10   the trial testimony in this case, and various statements

11   made by the Defendant at that traffic stop.

12          Paragraph 11 addresses Defendant's conduct in

13   Madisonville and outside the Monroe County Courthouse on

14   April 20, 2010.

15          The Court referencing those various dates by

16   summary, again, being very familiar with not only the

17   trial testimony in this case but the specific offense

18   conduct constituting the nature and circumstances of

19   Defendant's offense conduct.

20          Turning next to the history and characteristics

21   of the Defendant.  Again, addressing some of the matters

22   brought up in court today as well as in Defendant's

23   sentencing memorandum and the letters offered in support,

24   the Defendant, among other things, submits the themes to

25   his letters being that he is a deeply religious man and

1    that the Defendant is generous and compassionate toward

2    others.  The Defendant's counsel amplified upon those

3    history and characteristics today, including talking

4    about, again, through the letters his giving of his time

5    and financial resources -- "his" being the Defendant --

6    the discussion of the Bible studies being conducted at the

7    expense of the Defendant and his wife on his property in

8    Georgia.

9            Further, with respect to the history and

10   characteristics of the Defendant, the Court does note that

11   the Defendant is, I believe at the current time, 42 years

12   old.  He has a high school diploma as he discussed in

13   court today and is discussed in the presentence report.

14   The Defendant has a criminal history category of 1 with no

15   juvenile adjudications.  His adult criminal convictions

16   consisting only of the April 1, 2010 date of arrest and

17   conviction in Monroe County, Tennessee Circuit Court

18   leading to the Defendant pleading nolo contendere and his

19   six-month jail sentence suspended to probation.

20           I believe he was initially charged with

21   participating in a riot, disrupting a meeting in

22   retaliation for a past action; and Counts 1 and 3 were

23   dismissed.  The Defendant actually pled nolo contendere

24   for disrupting a meeting.  Other than that arrest and

25   conviction history, the Defendant has minor traffic

1   violations as outlined in Paragraph 31 of the presentence

2   report.

3          The Defendant from a physical condition

4   standpoint relates, and this is discussed in his motion

5   for a variance, that he has sleep apnea and he is supposed

6   to use a CPAP machine at night.  Further, he states that

7   he suffers from borderline high blood pressure, but the

8   Court is not aware of any medication the Defendant takes

9   in that regard.

10         Defendant reports no history of mental or

11  emotional problems and no history of treatment for such

12  problems.  However, as the presentence report notes in

13  Paragraph 37, records received from the General Services

14  Administration, military personnel records indicate the

15  Defendant was honorably discharged from the Navy for

16  personality disorders and various evaluations and

17  treatment are discussed in more detail in Paragraph 38 of

18  the presentence report.

19         Other than some usage of marijuana 15 years or

20  more earlier, the Defendant states that he has no other

21  substance abuse issues currently, or at the time of his

22  arrest had no substance abuse issues.

23         The Defendant, again, as the Court noted,

24  reports he graduated from high school in Powder Springs,

25  Georgia in 1987 and also, again, is noted under military

1    service, Paragraph 42 of the presentence report, the

2    Defendant enlisted in the United States Navy in 1988 and

3    was honorably discharged in 1991 as previously discussed

4    by the Court.

5              The Defendant, according to Paragraph 43 of the

6    presentence report, appeared to have been unemployed at

7    the time of the jury verdict.  He reported he was employed

8    with Crazy Native in Douglasville, Georgia for a portion

9    of time in 2010 and performed various jobs around that

10   shop, including reclaiming screens, clean up and masking

11   vinyl.  From 2001 to 2008, the Defendant related that he

12   was self-employed installing outdoor lighting.  Prior to

13   that time, from 1991 to 2001, he reports he was employed

14   with John Deere Landscapes in Kennesaw, Georgia.

15             With that background in mind, the Court turns to

16   the need for the sentence imposed to reflect various

17   factors, one of which is the seriousness of the offense.

18   While certainly there is some argument in this case in

19   terms of what Defendant did versus what he said, the Court

20   does conclude that the crime for which the Defendant was

21   convicted, while not -- again, as previously discussed and

22   it was discussed this morning, I know it was the first

23   instance in which the particular statute has been brought

24   before this court, the Court has previously found that

25   Defendant's crime of conviction, that is transporting a

1    firearm across state lines in furtherance of a civil

2    disorder, is a crime of violence.

3           The Court notes and the offense conduct

4    provisions note, among other things, that the Defendant

5    took his AK-47 and multiple rounds of ammunition with him

6    when he traveled to Madisonville from Georgia.  The

7    Defendant admitted during his testimony at trial that he

8    took the AK-47 and the rounds of ammunition with him.

9    Also discussed was the tape recording of the Defendant

10   talking to a crowd at Donna's Restaurant in Madisonville

11   where he referenced, among other things, the AK-47 and the

12   rounds of ammunition in his truck.  Certainly those items,

13   the firearm and ammunition, were introduced at the course

14   of the trial and again discussed here today via the

15   testimony offered by the Government.

16          The Court considers the need to promote respect

17   for the law and provide just punishment, again,

18   considering the Defendant's offense conduct and also

19   taking into consideration his relative lack of criminal

20   history but also, again, considering the nature and

21   circumstances particularly of Defendant's offense conduct

22   in this case as is already discussed in some detail by the

23   Court.

24          The Court considers the need to afford adequate

25   deterrence both specific to this Defendant, and in that

1    regard, again, the Court takes into consideration the

2    Defendant's offense conduct, also certainly the jury

3    verdict in this case, the seriousness of the Defendant's

4    offense conduct as well as his relative lack of criminal

5    history, and the Court is also mindful of the need to take

6    into consideration, and certainly the Government argues

7    for the Court to take into consideration, the need to

8    afford adequate general deterrence, that is to fashion a

9    sentence to act as a general deterrent to others similarly

10   situated to this Defendant who may contemplate the

11   undertaking of similar crimes in the future.

12          Certainly, given the nature and circumstances of

13   the Defendant's conduct as well as the Government argues

14   of the significant likelihood that the potential use of a

15   firearm would have substantially increased the likelihood

16   of death or injury under the circumstances in this case,

17   the Court is mindful of the need to fashion a sentence

18   that will afford adequate general in this case.

19          The Court considers the need to protect the

20   public from further crimes of this Defendant, again,

21   referencing his offense conduct in this case, but also

22   balancing that against the Defendant's relative lack of

23   criminal history.

24          The Court considers the need to provide the

25   Defendant with needed training, education and medical

1    treatment.  In this case, the Court does not find a need

2    for substance abuse treatment given the Defendant's

3    relative lack of substance abuse history.

4           The Court does believe it appropriate as part of

5    any sentence fashioned in this case to recommend, in light

6    of the Defendant's history as discussed in the presentence

7    report, the Court will recommend the Defendant receive

8    mental health treatment while in the Bureau of Prisons as

9    well as participating in a program of mental health

10   treatment while on any period of supervised release.

11          The Court also believes, given the Court's

12   review of the Defendant's employment history, that the

13   Defendant would further benefit from

14   educational/vocational training opportunities offered by

15   the Bureau of Prisons.  In that regard, both with respect

16   to medical treatment as well as training or

17   educational/vocational treatment, the Court would note

18   that although §3553(a)(2)(D) requires the Court to

19   consider the Defendant's need for educational or

20   vocational treatment -- excuse me -- the Defendant's need

21   for educational or vocational training, medical care or

22   other correctional treatment, the Court recognizes

23   pursuant to 18 United States Code §3582(a) that

24   imprisonment is not an appropriate means of promoting

25   correction and rehabilitation and that the Court may not

1    consider rehabilitative needs in imposing or lengthening a

2    period of confinement.  Thus, in discussing and

3    recommending both mental health treatment as well as

4    educational and vocational training opportunities, the

5    Court is not intending to and is not imposing or

6    lengthening the Defendant's prison sentence to enable him

7    to complete a treatment program or otherwise promote

8    rehabilitation.

9         With respect to the need to avoid sentence

10   disparities and other factors discussed today, the Court

11   does note that the advisory guidelines are intended in

12   part to carry out the national policies articulated by

13   Congress, that sentences be uniform across the country to

14   the extent possible and be based on the offender's actual

15   conduct and history.  The Court is going to address the

16   disparity argument raised by Defendant in more detail

17   momentarily in connection with discussion of Defendant's

18   motion for a variance.

19        Let me digress for just a moment here.  Given

20   the Court's rulings relating to the offense conduct being

21   a crime of violence, let me just make sure from the

22   Government, other than the testimony offered today, you're

23   not aware of any victims that wish to present testimony in

24   this case today, are you?

25        MR. THEODORE:  No, Your Honor.

1                THE COURT:  All right.  Thank you.

2           I'm going to turn next to the Defendant's

3     sentencing memorandum, which, again, the Court notes that

4     it's construed as a motion for variance; and as so argued

5     today, the Defendant raises several points in support of

6     his request in this case for a sentence of time served and

7     the Court will address each of those.

8           First, among other things, the Defendant argues

9     that he should receive a more lenient sentence because he

10    argues that he is less culpable than others, including

11    Carl Swenson, Jr. and Walter Fitzpatrick, and that he was

12    singled out for prosecution.  However, the Court does not

13    find this argument to warrant a variance.  It is not

14    relevant from the Court's viewpoint and from the viewpoint

15    of sentencing of this Defendant that the Defendant was the

16    only person involved with the events of April 2010 to be

17    federally prosecuted, and the Government notes the reason

18    the Defendant was prosecuted and others were not was

19    because the Defendant was the only person for which there

20    existed evidence of statements regarding an intent to

21    arrest public officials and take over the city with

22    respect to the date in question.  Also the fact that Mr.

23    Fitzpatrick received a six-month sentence in State Court

24    does not support a variance in this case because Mr.

25    Fitzpatrick for State Court purposes was charged with a

1   different crime in a different jurisdiction, of course,

2   and was not involved in the events of April 20 for which

3   the Defendant was charged.

4           The Defendant also cited this morning through

5   counsel several other individuals that he suggests or

6   argues gives rise to a disparity argument in this case.

7   The Court has reviewed that argument as well as being

8   familiar with some of those cases specifically because

9   they were before this Court and, again, the Court does not

10  find that the disparity argument with respect to those

11  defendants to give rise to a variance in this case.

12          In general, looking at all the defendants, the

13  Court finds there has been argument and discussions about

14  words versus actions and certainly there were actions in

15  this case as defined by the offense conduct and the trial

16  testimony in this case.  Many of the defendants cited by

17  defense counsel this morning involved words only or

18  minimal planning or not planning or actions to the level

19  that occurred in this case.

20          In the case of using something by way of

21  example, the case of Glendon Swift, which did involve a

22  sentencing before this Judge, there were threats made on a

23  telephone, over the telephone, to Representative Cantor's

24  office.  The Defendant pled guilty and testified that

25  those threats, which in that instance were words alone and

1   certainly was serious offense conduct but were words and

2   not action, the Defendant allocuted at his sentencing that

3   it involved -- he was having alcohol problems, the Court

4   recalls the loss of his wife and it was a

5   spur-of-the-moment action, if you will, on his part.

6   Also, the Court recalls in the Swift case that the

7   13-month sentence that the Court gave in that case was an

8   agreed upon sentence or recommended sentence that was

9   agreed upon by the Government and the Defendant in that

10  case and presented to the Court.

11          The Kenneth Wade case cited, I believe, based on

12  the review of the file, is only at the change of plea

13  status today.

14          The Jimmy Brown case, which perhaps did involve

15  a little bit more action or more action than the Swift and

16  perhaps Wade case and other cases cited by the Defendant,

17  involved threatening statements.  The Court actually has

18  pulled up some information here.  In that case, the

19  Defendant pled guilty to being a felon in possession and

20  witness intimidation, respectively.  The Defendant did

21  go -- did take action and go into the home of an agent

22  involved in the case where he asked to speak with the

23  agent's father.  The Defendant informed the agent's father

24  he planned on suing the agent for wrongful arrest and the

25  agent told the Defendant's son to plant marijuana on his

1   property so the agent could come and find it to make

2   money.  Unlike the Defendant here, it does not appear that

3   the Defendant had a gun in any respect in connection with

4   those threats, and the Court also notes with respect to

5   the Jimmy Brown that the Defendant's guidelines range was

6   37 to 46 months in that case based on a criminal history

7   category of 3 and an offense level of 19.  The Court also

8   notes in that case the statutory maximum for the witness

9   intimidation charge was 3 years, which, of course, is 2

10  years below the statutory maximum for the offense of

11  conviction in this case.

12          The Court, while mindful and taking into

13  consideration the severity arguments raised by the

14  Defendant does not believe the cases where Defendant

15  cited, including that of the Brown defendant, to be a

16  sufficiently similar offense or sufficiently similar

17  conduct to give rise or such as to warrant a variance in

18  this case based on a disparity argument.

19          The Defendant also asserts he suffered and will

20  suffer extra judicial punishment in that he will lose his

21  right to possess a firearm and to vote, that he has been

22  expelled from certain organizations, that he has been

23  ostracized by many, that he will lose his home and that

24  there will be no place for him -- no place for him to

25  escape the notoriety resulting from this case, all those

1   arguments being made in the Defendant's sentencing

2   memorandum. However, those points are also unavailing

3   with respect to the request for a variance. These

4   considerations while being taken into consideration by the

5   Court, these considerations in various degrees are present

6   with respect to virtually every case that comes before the

7   Court, certainly in a majority of them, and would exist

8   regardless of whether the Defendant received a sentence of

9   probation, time served, 60 months in prison or somewhere

10   in between.

11       Defendant also argues he is susceptible to abuse

12   in prison, but, again, the Court finds this point does not

13   warrant a variance. The Defendant himself acknowledges

14   that his susceptibility is not a severe as in some other

15   cases, and the Court does not find that the Defendant may

16   be susceptible to abuse as a reason to vary in this case.

17   As the Government points out, the Defendant makes no

18   showing that he is in any different position than any

19   other defendant espousing a certain political view or

20   social belief and the Defendant merely states he has been

21   placed in solitary confinement because of his views and

22   because of his sleep apnea. The Defendant did not provide

23   any examples of abuse since he has been incarcerated, and

24   the Court will not speculate that he will be subject to

25   such abuse if it were to vary on this ground.

1          The Defendant also asserts that he has been

2    convicted under an obscure, or I believe the word this

3    morning used by the Defendant was an archaic statute and

4    that he did not have any knowing intent to violate the

5    law.  The Court, again, finds this argument not to warrant

6    a variance.  The Defendant in making this argument while

7    not necessarily denying responsibility for his actions

8    perhaps certainly is making an argument that runs counter

9    to the verdict of the jury in this.  Also, even though the

10   statute may be obscure, the fact remains -- or even if the

11   statute were viewed as obscured from the standpoint that

12   it has not been utilized in this Court or another court to

13   any great extent, the fact remains the Defendant was

14   convicted of a jury of violating 18 United States Code

15   §231(a)(2) on the basis of the evidence submitted at trial

16   regarding not only the Defendant's words but specifically

17   the Defendant's actions in this case as outlined by the

18   Court previously as presented at trial and as discussed in

19   the presentence report.

20          The Defendant further argues that a guideline

21   sentence is disproportionate to the Defendant's actual

22   conduct, but the Court has already ruled on several

23   objections relating to this point and those rulings have

24   resulted in a restricted guidelines range of 60 months

25   imprisonment which the Court finds to be an appropriate

1    guidelines range taking into account the relevant conduct

2    of this case.

3              The Defendant also asserts that a guidelines

4    sentence will promote disrespect for the law.  However, a

5    sentence of time served, the Court finds and as the

6    Government argues, could actually promote disrespect for

7    the law because many individuals may not be deterred from

8    engaging in conduct similar to that of the Defendant if

9    they were facing a short or non-custodial sentence.  The

10   Government appropriately points out the Defendant was not

11   deterred after seeing Walter Fitzpatrick get arrested for

12   engaging not in similar conduct but somewhat related

13   conduct on April 1, 2010.

14             Finally, among other things, the Defendant

15   asserts based upon the letters submitted in his support,

16   and the Court has already addressed this somewhat, that

17   the Defendant submits via the letters as well as

18   discussion today that he is deeply religious and very

19   generous and compassionate toward others, and the Court

20   certainly takes that into consideration.  However, the

21   Court also notes that many defendants who come before this

22   court share these same characteristics and such

23   characteristics, therefore, do not take the Defendant out

24   of the heartland of cases to which the guidelines apply.

25   Also, the Court would note that the guidelines while

1  advisory and not mandatory state that religion is not

2  necessarily relevant to the determination of a sentence.

3          In sum, none of the arguments presented by the

4  Defendant, either individually or collectively, warrants a

5  variance and the Court would therefore deny Defendant's

6  request for a variance.  The Court will note, however, as

7  it does in other cases that it will take into

8  consideration all the points raised by the Defendant in

9  fashioning a sentence sufficient but not greater than

10  necessary to meet the purpose of sentencing.  In other

11  words, while not giving rise to a variance, the Court will

12  consider the facts and arguments raised by the Defendant

13  in his variance request as part of the nature and

14  circumstances of the Defendant's offense conduct, the

15  Defendant's history and characteristics and overall

16  consideration of the §3553 factors in this case.

17          The Court next turns to the Defendant's pro se

18  filing.  To the extent Defendant's arguments make an

19  additional request to vary or depart below the guidelines

20  range, the Court has considered those arguments,

21  including, among other things that the Defendant is being

22  punished for exercising his right to a jury trial and the

23  Defendant's argument that the Government used perjured

24  testimony to obtain a conviction.  The Court finds such

25  arguments do not support a departure or variance below the

1    guidelines for the reasons discussed by the Court not only

2    today in connection with Defendant's -- in connection with

3    the Court's ruling on the Defendant's request for a

4    variance but also discussed in the Court's various

5    post-trial orders in this case.

6           Accordingly, to the extent the Defendant himself

7    makes a request for a variance or departure, the Court

8    will deny that request, but, again, will take Defendant's

9    arguments into consideration in fashioning a sentence

10   sufficient but not greater than necessary to meet the

11   purposes of sentencing.

12          Turning next to the Government's motion for an

13   upward departure, the Government requests the Court depart

14   upward from the sentencing guidelines pursuant to

15   sentencing guideline §5K2.17 and §5K2.7.  §5K2.17, again,

16   relates to a semi-automatic firearm capable of accepting

17   large capacity magazines, and §5K2.7 relates to disruption

18   of governmental function.

19          The court acknowledges and takes into

20   consideration the parties' various arguments on the

21   applicability of the facts to those two guideline

22   provisions.  However, in light of the Court's rulings on

23   the objections to the presentence investigation report,

24   which resulted in a restricted guidelines range higher

25   than the statutory maximum penalty of five years

1    imprisonment, the Court would find the Government's motion

2    for upward departure to be moot.  In other words, the

3    Court finds the Government argument today, as Mr. Mackie

4    argued for a restricted guideline range of 60 months; so

5    the Court will deny the Defendant's -- excuse me, the

6    Government's motion as moot; but, again, as it does with

7    the Defendant's motion, it will take into consideration

8    the arguments offered in support and in opposition to the

9    applicability of those two provisions as part of the facts

10   and circumstances in this case that resulted in a

11   consideration of a sentence sufficient but not greater

12   than necessary to comply with the purposes of 18 United

13   States Code §3553.

14          In sum, the Court does not disagree with perhaps

15   both parties that this case is unusual in many respects.

16   The advisory guideline range is typically seen as, quote,

17   "a starting point", closed quote, and, often times, the

18   advisory guideline range is below the applicable statutory

19   maximum.  Herein as discussed more fully in the Court's

20   May 2 order, no guideline expressly had been promulgated

21   for Defendant's offensive conviction.  Again, this is the

22   first such type of case certainly to come before this

23   court.  Thus, the presentence report and the probation

24   office utilized an analogous offense guideline resulting

25   in the advisory guideline range applicable to this case

1    and coupled with the statutory maximum resulted in a

2    restricted guideline range of 60 months.

3            Looking more closely at this case, we have a

4    Defendant with a limited criminal history, in fact, a

5    criminal history category of 1 which would perhaps tend to

6    argue against application of the statutory maximum.  In

7    fact, Defendant so argued, arguing that the statutory

8    maximum should be reserved for the, quote, "worst of the

9    worst", closed quote.  Also, from Defendant's perspective

10   in quoting from Defendant's sentencing memorandum, quote,

11   "We have before the court a citizen who awaits sentencing

12   not because he distributed illicit drugs to fatten his

13   wallet but rather because a jury believed he endorsed an

14   uprising by others which never occurred", closed quote.

15           On the other hand, the Defendant does stand

16   convicted by a jury of a crime not only which has been

17   categorized by this Court as a crime of violence but also

18   categorized by this Court based upon the discussion today

19   of his being 1, which certainly involves a serious offense

20   conduct.  Again, the Court emphasizing not only the words

21   of this Defendant but certainly the actions of this

22   Defendant and ultimately his intent.

23           Also, in contrast perhaps to the Defendant's

24   position is noted in the Government's sentencing

25   memorandum, the Government states regarding the

1    Defendant's argument that he stands before the Court to be

2    sentenced not because of harm he caused another but rather

3    because of the thoughts the Government attributes to him.

4    The Government notes or argues and asserts that the

5    Defendant overlooks the fact he was convicted by a jury

6    upon proof of specific actions he took in furtherance of a

7    crime that has been held to be a crime of violence.  The

8    Government also points out that the Defendant

9    intentionally and deliberately committed a crime of

10   violence which could have resulted in harm to others.

11          Taking all of that into consideration in light

12   of all the things I have discussed, including the

13   restricted guideline range and the relevant §3553 factors,

14   the statutory maximum, the motions brought forward by the

15   parties and discussed in some detail by the Court today,

16   and considering the arguments and positions of the

17   Government and the Defendant, the allocation of the

18   Defendant, the presentence report and all the evidence in

19   the Court, the Court will impose a sentence in this case

20   of 4 years or 48 months.  For all the reasons discussed,

21   the Court finds this sentence to be sufficient but not

22   greater than necessary to comply with the purposes

23   discussed in 18 United States Code §3553.

24          Accordingly and pursuant to the Sentencing

25   Reform Act of 1984, it is the judgment of the Court on

1   Count 1 of the superseding indictment that the Defendant,

2   Darren Wesley Huff, is hereby committed to the custody of

3   the Bureau of Prisons to be imprisoned for a term of 48

4   months.

5           As previously noted, it is recommended he

6   receive mental health treatment while in the Bureau of

7   Prisons.

8           Upon release from imprisonment, you shall be

9   placed on supervised release for a term of two years

10  within 72 hours of release from the custody of the Bureau

11  of Prisons.  You shall report in person to the probation

12  office in the district to which you are released.

13          While on supervised release, you shall not

14  commit another federal, state or local crime, you shall

15  comply with the standard conditions adopted by this court

16  in Local Rule 83.10, and you shall not illegally possess a

17  controlled substance.

18          You shall not possess a firearm, destructive

19  device or other dangerous weapon.

20          You shall cooperate in the collection of DNA as

21  directed by the probation officer.

22          In addition, you shall comply with the following

23  special conditions while on supervised release:

24          One, you shall participate in a program of

25  mental health treatment as directed by the probation

1    officer until such time as you are released from the

2    program by the probation officer.  You shall waive all

3    rights to confidentiality regarding mental health

4    treatment in order to allow release of information to the

5    supervising US Probation Officer and to authorize open

6    communication between the probation officer and mental

7    health treatment provider.

8            Two, you shall take all medication prescribed by

9    the treatment program as directed.  If deemed appropriate

10   by the treatment provider or probation officer, you shall

11   submit to quarterly blood tests to determine whether you

12   are taking the medication as prescribed.

13           Three, you shall participate as necessary in a

14   program of testing and/or treatment for drug and/or

15   alcohol abuse as directed by the probation officer until

16   such time as you are released from the program by the

17   probation officer.

18           Title 18 U.S.C. §3565(b) and §3583(g) require

19   mandatory revocation of probation or supervised release

20   for possession of a controlled substance or firearm or for

21   refusal to comply with drug testing.

22           Pursuant to Title 18 U.S.C. §3013, you shall pay

23   a special assessment fee in the amount of $100.00 which

24   shall be due immediately.  If the Court finds you do not

25   have the ability to pay a fine, it will waive the fine in

1    this case.

2            Pursuant to Rule 32 of the Federal Rules of

3    Criminal Procedure, the Court advises you may have the

4    right or you have the right to appeal the conviction and

5    sentence imposed in this case.  A Notice of Appeal must be

6    filed within 14 days of entry of judgment.  If you request

7    and so desire, the Clerk of the Court can prepare and file

8    the Notice of Appeal for you.

9            It is further ordered that you be remanded to

10   the custody of the Attorney General pending designation by

11   the Bureau of Prisons.

12           Mr. Theodore or Mr. Mackie, does the Government

13   have any objection to the sentence as pronounced that have

14   not previously been raised?

15           MR. THEODORE:  No, Your Honor.

16           THE COURT:  Thank you.

17           Mr. Green, does the Defendant have any objection

18   to the sentence just pronounced that has not been

19   previously raised?

20           MR. GREEN:  We most respectfully object to the

21   sentence rendered, Your Honor, and adopt all previous

22   objections that were made up to this point.

23           And I have one other motion when the Court is

24   through.

25           THE COURT:  And the Court certainly believes, in

1    response to the statement just made, that it has

2    sufficiently addressed all of the motions and arguments

3    that are raised by the Defendant.  We will just

4    incorporate its responses previously made this morning as

5    well as the previous written orders of this court.

6            The other motion before the Court is the motion

7    by Mr. Green to withdraw after sentencing filed in this

8    case as Document 201, and the Court has reviewed that

9    motion as well as the affidavit submitted by Mr. Green and

10   is prepared to grant that motion at this time.  Although,

11   as it has done in other cases, the Court would grant the

12   motion, Mr. Green, on the condition that you prepare or

13   assist in preparing with the Clerk's Office a pro se

14   Notice of Appeal for Mr. Huff.

15           It looks like you already have that.

16           MR. GREEN:  We have done so, Your Honor.

17   Mr. Huff has signed the Notice of Appeal.  We have not

18   dated it.  I understand, obviously, once the notice is

19   filed, the Court loses jurisdiction.  I didn't know if the

20   Court wanted to wait a day to -- for us to wait a day

21   before submitting it, but we will get that filed.

22           THE COURT:  You might want to submit it after

23   the Court enters its written judgment in this case.

24           Would that be more appropriate, Madam Courtroom

25   Deputy?

1            THE DEPUTY CLERK:  Yes, sir.

2            THE COURT:  Because your 14 days is from the

3     entry of judgment, which would be the --

4            MR. GREEN:  Correct.  That's what I'm saying,

5     but Mr. Huff has signed the pro se notice and we'll make

6     certain that it's filed timely, Your Honor.

7            THE COURT:  Does the Government have any

8     response or objection to the motion to withdraw?

9            MR. THEODORE:  No objection, Your Honor.

10           THE COURT:  Mr. Huff, you have signed the

11    notice.  You don't have anything further to say on Mr.

12    Green's request, do you?

13           MR. HUFF:  No.

14           THE COURT:  Then the Court will grant the motion

15    to withdraw after sentencing on the condition, again, that

16    Mr. Green assists Mr. Huff, as he has already done, in

17    preparing a pro se Notice of Appeal and to insure that

18    that notice is filed within 14 days after entry of

19    judgment in this case.

20           MR. GREEN:  We'll make certain it's done, Your

21    Honor.

22           THE COURT:  Anything further on the Defendant's

23    behalf at this time before sentence is imposed?

24           MR. GREEN:  No, Your Honor.

25           THE COURT:  Any recommendations for designation?

1    It may not have been something you discussed, but --

2            MR. GREEN:  We haven't at any great length, Your

3    Honor.  He has got family in Knoxville.  He has got

4    family -- I think the closer family he has got is in the

5    state of Georgia.  If the Court could designate a facility

6    that is going to be as close as possible to Dallas,

7    Georgia.

8            The Gaston, Alabama facility may be the best

9    one, Your Honor.

10           THE COURT:  We will recommend that one.

11           MR. GREEN:  I think that's a medium security

12   facility.

13           THE COURT:  We will make that recommendation,

14   and if you-all want to discuss it just a moment once court

15   adjourns and you have any other recommendations, just give

16   those to us.

17           Anything further from the defense?

18           MR. GREEN:  No, Your Honor.

19           THE COURT:  Anything further from the

20   Government?

21           MR. THEODORE:  Your Honor, I guess I was

22   wondering if there could be a record, if the Court could

23   indicate what the basis -- because there is a variance

24   from the guideline range, what the -- because I realize

25   the Defendant's motions for variance have been denied

1    and --

2            THE COURT:  Well, the Court is not -- did not

3    grant the Defendant's variance, but the Court went below

4    the restricted guideline range for the reasons articulated

5    by the Court not in granting a variance but in

6    determining -- the Court arrived at a sentence of 4 years

7    or 48 months based upon its consideration of the §3553

8    factors.

9            MR. THEODORE:  Okay.  Thank you.

10           THE COURT:  If there is nothing further from

11   either side, we will stand in recess.

12           Thank you, everyone.

13           THE DEPUTY CLERK:  All rise.

14           This Honorable Court stands in recess until 1:30

15   p.m.

16

17   (End of proceedings.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2    STATE OF TENNESSEE   )

3    COUNTY OF KNOX        )

4            I, KRISTIN E. SCHULTZ BURKE, LCR #247, Court

5    Reporter and Notary Public, in and for the State of

6    Tennessee, do hereby certify that the above proceedings

7    were reported by me, transcribed by me, and that the

8    foregoing 107 pages of the transcript is a true and

9    accurate record to the best of my knowledge, skills and

10   ability.

11           I further certify that I am neither of kin nor of

12   counsel to any of the parties nor in anywise financially

13   interested in the outcome of this case.

14           I further certify that I am duly licensed by the

15   Tennessee Board of Court Reporting as a Licensed Court

16   Reporter as evidenced by the LCR number and expiration date

17   following my name below.

18           IN WITNESS WHEREOF, I have hereunto set my hand

19   and affixed my Notarial Seal this 13th day of March, 2013.

20

21   _____

22   Kristin E. Schultz Burke, LCR #247
     Expiration Date:  6/30/2014
     Notary Public Commission Expires:  12/27/2015
23   Miller & Miller Court Reporters
     12804 Union Road
24   Knoxville, TN 37934
     Phone:  865-675-1471 / Fax:  675-6398

25

Electronically signed by Kristin Schultz (001-364-541-6088)                    7c992d17-8032-45a4-b231-8687c0f91f36